Code of Federal Regulations Currentness
Title 30. Mineral Resources
Chapter II. Minerals Management Service, Department of the Interior
Subchapter A. Minerals Revenue Management (Refs & Annos)
→ Part 206. Product Valuation (Refs & Annos)
Subpart A. General Provisions

**§ 206.10 Information collection.**

The information collection requirements contained in this part have been approved by the Office of Management and Budget (OMB) under 44 U.S.C. 3501 et seq. The forms, filing date, and approved OMB clearance numbers are identified in 30 CFR 210.10.

**Subpart B. Indian Oil (Refs & Annos)**

**§ 206.50 Purpose and scope.**

(a) This subpart is applicable to all oil production from Indian (Tribal and allotted) oil and gas leases (except leases on the Osage Indian Reservation, Osage County, Oklahoma). The purpose of this subpart is to establish the value of production, for royalty purposes, consistent with the mineral leasing laws, other applicable laws, and lease terms.

(b) If the specific provisions of any Federal statute, treaty, settlement agreement between the Indian lessor and a lessee resulting from administrative or judicial litigation, or oil and gas lease subject to the requirements of this subpart are inconsistent with any regulation in this subpart, then the statute, treaty, lease provision or settlement agreement shall govern to the extent of that inconsistency.

(c) All royalty payments made to MMS or Indian Tribes are subject to audit and adjustment.

(d) The regulations in this subpart are intended to ensure that the trust responsibilities of the United States with respect to the administration of Indian oil and gas leases are discharged in accordance with the requirements of the governing mineral leasing laws, treaties, and lease terms.

**§ 206.51 Definitions.**

For the purposes of this subpart:

Allowance means an approved or an MMS-initially accepted deduction in determining value for royalty purposes. Transportation allowance means an allowance for the reasonable, actual costs incurred by the lessee for moving oil to a point of sale or point of delivery off the lease, unit area, or communitized area, excluding gathering, or an approved or MMS-initially accepted deduction for costs of such transportation, determined by this subpart.

Area means a geographic region at least as large as the defined limits of an oil and/or gas field in which oil and/or gas lease products have similar quality, economic, and legal characteristics.

Arm's-length contract means a contract or agreement that has been arrived at in the market place between independent, nonaffiliated persons with opposing economic interests regarding that contract. For purposes of this subpart, two persons are affiliated if one person controls, is controlled by, or is under common control with another person. For purposes of this subpart, based on the instruments of ownership of the voting securities of an entity, or based on other forms of ownership: ownership in excess of 50 percent constitutes control; ownership of 10 through 50 percent creates a presumption of control; and ownership of less than 10 percent creates a presumption of noncontrol which MMS may rebut if it demonstrates actual or legal control, including the existence of interlocking directorates. Notwithstanding any other provisions of this subpart, contracts between relatives, either by blood or by marriage, are not arm's-length

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

contracts. MMS may require the lessee to certify ownership control. To be considered arm's-length for any production month, a contract must meet the requirements of this definition for that production month, as well as when the contract was executed.

Audit means a review, conducted in accordance with generally accepted accounting and auditing standards, of royalty payment compliance activities of lessees or other interest holders who pay royalties, rents, or bonuses on Indian leases.

BIA means the Bureau of Indian Affairs of the Department of the Interior.

BLM means the Bureau of Land Management of the Department of the Interior.

Condensate means liquid hydrocarbons (normally exceeding 40 degrees of API gravity) recovered at the surface without resorting to processing. Condensate is the mixture of liquid hydrocarbons that results from condensation of petroleum hydrocarbons existing initially in a gaseous phase in an underground reservoir.

Contract means any oral or written agreement, including amendments or revisions thereto, between two or more persons and enforceable by law that with due consideration creates an obligation.

Field means a geographic region situated over one or more subsurface oil and gas reservoirs encompassing at least the outermost boundaries of all oil and gas accumulations known to be within those reservoirs vertically projected to the land surface. Onshore fields are usually given names and their official boundaries are often designated by oil and gas regulatory agencies in the respective States in which the fields are located.

Gathering means the movement of lease production to a central accumulation or treatment point on the lease, unit, or communitized area, or to a central accumulation or treatment point off the lease, unit, or communitized area as approved by BLM operations personnel for onshore leases.

Gross proceeds (for royalty payment purposes) means the total monies and other consideration accruing to an oil and gas lessee for the disposition of the oil produced. Gross proceeds includes, but is not limited to, payments to the lessee for certain services such as dehydration, measurement, and/or gathering to the extent that the lessee is obligated to perform them at no cost to the Indian lessor. Gross proceeds, as applied to oil, also includes, but is not limited to, reimbursements for harboring or terminaling fees. Tax reimbursements are part of the gross proceeds accruing to a lessee even though the Indian royalty interest may be exempt from taxation. Monies and other consideration, including the forms of consideration identified in this paragraph, to which a lessee is contractually or legally entitled but which it does not seek to collect through reasonable efforts are also part of gross proceeds.

Indian allottee means any Indian for whom land or an interest in land is held in trust by the United States or who holds title subject to Federal restriction against alienation.

Indian Tribe means any Indian Tribe, band, nation, pueblo, community, rancheria, colony, or other group of Indians for which any land or interest in land is held in trust by the United States or which is subject to Federal restriction against alienation.

Lease means any contract, profit-share arrangement, joint venture, or other agreement issued or approved by the United States under a mineral leasing law that authorizes exploration for, development or extraction of, or removal of lease products--or the land area covered by that authorization, whichever is required by the context.

Lease products means any leased minerals attributable to, originating from, or allocated to Indian leases.

Lessee means any person to whom an Indian Tribe, or an Indian allottee issues a lease, and any person who has been assigned an obligation to make royalty or other payments required by the lease. This includes any person who has an interest in a lease as well as an operator or payor who has no interest in the lease but who has assumed the royalty payment responsibility.

Like-quality lease products means lease products which have similar chemical, physical, and legal characteristics.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Load oil means any oil which has been used with respect to the operation of oil or gas wells for wellbore stimulation, workover, chemical treatment, or production purposes. It does not include oil used at the surface to place lease production in marketable condition.

Marketable condition means lease products which are sufficiently free from impurities and otherwise in a condition that they will be accepted by a purchaser under a sales contract typical for the field or area.

Marketing affiliate means an affiliate of the lessee whose function is to acquire only the lessee's production and to market that production.

Minimum royalty means that minimum amount of annual royalty that the lessee must pay as specified in the lease or in applicable leasing regulations.

MMS means the Minerals Management Service of the Department of the Interior.

Net-back method (or workback method) means a method for calculating market value of oil at the lease. Under this method, costs of transportation, processing, or manufacturing are deducted from the proceeds received for the oil and any extracted, processed, or manufactured products, or from the value of the oil or any extracted, processed, or manufactured products at the first point at which reasonable values for any such products may be determined by a sale under an arm's-length contract or comparison to other sales of such products, to ascertain value at the lease.

Net profit share (for applicable Indian lessees) means the specified share of the net profit from production of oil and gas as provided in the agreement.

Oil means a mixture of hydrocarbons that existed in the liquid phase in natural underground reservoirs and remains liquid at atmospheric pressure after passing through surface separating facilities and is marketed or used as such. Condensate recovered in lease separators or field facilities is considered to be oil. For purposes of royalty valuation, the term tar sands is defined separately from oil.

Oil shale means a kerogen-bearing rock (i.e., fossilized, insoluble, organic material). Separation of kerogen from oil shale may take place in situ or in surface retorts by various processes. The kerogen, upon distillation, will yield liquid and gaseous hydrocarbons.

Person means any individual, firm, corporation, association, partnership, consortium, or joint venture (when established as a separate entity).

Posted price means the price specified in publicly available posted price bulletins, onshore terminal postings, or other price notices net of all adjustments for quality (e.g., API gravity, sulfur content, etc.) and location for oil in marketable condition.

Processing means any process designed to remove elements or compounds (hydrocarbon and nonhydrocarbon) from gas, including absorption, adsorption, or refrigeration. Field processes which normally take place on or near the lease, such as natural pressure reduction, mechanical separation, heating, cooling, dehydration, and compression are not considered processing. The changing of pressures and/or temperatures in a reservoir is not considered processing.

Selling arrangement means the individual contractual arrangements under which sales or dispositions of oil are made. Selling arrangements are described by illustration in MMS Royalty Management Program Oil and Gas Payor Handbook.

Spot sales agreement means a contract wherein a seller agrees to sell to a buyer a specified amount of oil at a specified price over a fixed period, usually of short duration, which does not normally require a cancellation notice to terminate, and which does not contain an obligation, nor imply an intent, to continue in subsequent periods.

Tar sands means any consolidated or unconsolidated rock (other than coal, oil shale, or gilsonite) that contains a hydrocarbonaceous material with a gas-free viscosity greater than 10,000 centipoise at original reservoir temperature.

**§ 206.52 Valuation standards.**

(a)(1) The value of production, for royalty

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

purposes, of oil from leases subject to this subpart shall be the value determined under this section less applicable allowances determined under this subpart.

(2)(i) For any Indian leases which provide that the Secretary may consider the highest price paid or offered for a major portion of production (major portion) in determining value for royalty purposes, if data are available to compute a major portion, MMS will, where practicable, compare the value determined in accordance with this section with the major portion. The value to be used in determining the value of production, for royalty purposes, shall be the higher of those two values.

(ii) For purposes of this paragraph, major portion means the highest price paid or offered at the time of production for the major portion of oil production from the same field. The major portion will be calculated using like-quality oil sold under arm's-length contracts from the same field (or, if necessary to obtain a reasonable sample, from the same area) for each month. All such oil production will be arrayed from highest price to lowest price (at the bottom).

The major portion is that price at which 50 percent (by volume) plus 1 barrel of the oil (starting from the bottom) is sold.

(b)(1)(i) The value of oil which is sold under an arm's-length contract shall be the gross proceeds accruing to the lessee, except as provided in paragraphs (b)(1)(ii) and (b)(1)(iii) of this section. The lessee shall have the burden of demonstrating that its contract is arm's-length. The value which the lessee reports, for royalty purposes, is subject to monitoring, review, and audit. For purposes of this section, oil which is sold or otherwise transferred to the lessee's marketing affiliate and then sold by the marketing affiliate under an arm's-length contract shall be valued in accordance with this paragraph based upon the sale by the marketing affiliate.

(ii) In conducting reviews and audits, MMS will examine whether the contract reflects the total consideration actually transferred either directly or indirectly from the buyer to the seller for the oil. If the contract does not reflect the total consideration, then MMS may require that the oil sold under that contract be valued in accordance with paragraph (c) of this section. Value may not be less than the gross proceeds accruing to the lessee, including the additional consideration.

(iii) If MMS determines that the gross proceeds accruing to the lessee under an arm's-length contract do not reflect the reasonable value of the production because of misconduct by or between two contracting parties, or because the lessee otherwise has breached its duty to the lessor to market the production for the mutual benefit of the lessee and the lessor, then MMS shall require that the oil production be valued under the first applicable of paragraph (c)(2), (c)(3), (c)(4), or (c)(5) of this section. When MMS determines that the value may be unreasonable, MMS will notify the lessee and give the lessee an opportunity to provide written information justifying the lessee's value. If the oil production is then valued under paragraph (c)(4) or (c)(5) of this section, the notification requirements of paragraph (e) of this section shall apply.

(2) MMS may require a lessee to certify that its arm's-length contract provisions include all of the consideration to be paid by the buyer, either directly or indirectly, for the oil.

(c) The value of oil production from leases subject to this section which is not sold under an arm's-length contract shall be the reasonable value determined in accordance with the first applicable of the following paragraphs:

(1) The lessee's contemporaneous posted prices or oil sales contract prices used in arm's-length transactions for purchases or sales of significant quantities of like-quality oil in the same field (or, if necessary to obtain a reasonable sample, from the same area); provided, however, that those posted prices or oil sales contract prices are comparable to other contemporaneous posted prices or oil sales contract prices used in arm's-length transactions for purchases or sales of significant quantities of like-quality oil in the same field (or, if necessary to obtain a reasonable sample, from the same area). In evaluating the comparability of posted prices or oil sales contract prices, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

following factors shall be considered: Price, duration, market or markets served, terms, quality of oil, volume, and other factors as may be appropriate to reflect the value of the oil. If the lessee makes arm's-length purchases or sales at different postings or prices, then the volume-weighted average price for the purchases or sales for the production month will be used;

(2) The arithmetic average of contemporaneous posted prices used in arm's-length transactions by persons other than the lessee for purchases or sales of significant quantities of like-quality oil in the same field (or, if necessary to obtain a reasonable sample, from the same area);

(3) The arithmetic average of other contemporaneous arm's-length contract prices for purchases or sales of significant quantities of like-quality oil in the same area or nearby areas;

(4) Prices received for arm's-length spot sales of significant quantities of like-quality oil from the same field (or, if necessary to obtain a reasonable sample, from the same area), and other relevant matters, including information submitted by the lessee concerning circumstances unique to a particular lease operation or the salability of certain types of oil;

(5) A net-back method or any other reasonable method to determine value;

(6) For purposes of this paragraph, the term lessee includes the lessee's designated purchasing agent, and the term contemporaneous means postings or contract prices in effect at the time the royalty obligation is incurred.

(d) Any Indian lessee will make available, upon request to the authorized MMS or Indian representatives, to the Office of the Inspector General of the Department of the Interior, or other persons authorized to receive such information, arm's-length sales and volume data for like-quality production sold, purchased, or otherwise obtained by the lessee from the field or area or from nearby fields or areas.

(e)(1) Where the value is determined under paragraph (c) of this section, the lessee shall retain all data relevant to the determination of royalty value. Such data shall be subject to review and audit, and MMS will direct a lessee to use a different value if it determines that the reported value is inconsistent with the requirements of these regulations.

(2) A lessee shall notify MMS if it has determined value under paragraph (c)(4) or (c)(5) of this section. The notification shall be by letter to MMS Associate Director for Minerals Revenue Management or his/her designee. The letter shall identify the valuation method to be used and contain a brief description of the procedure to be followed. The notification required by this paragraph is a one-time notification due no later than the end of the month following the month the lessee first reports royalties on a Form MMS-2014 using a valuation method authorized by paragraph (c)(4) or (c)(5) of this section and each time there is a change from one to the other of these two methods.

(f) If MMS determines that a lessee has not properly determined value, the lessee shall pay the difference, if any, between royalty payments made based upon the value it has used and the royalty payments that are due based upon the value established by MMS. The lessee shall also pay interest on the difference computed under 30 CFR 218.54. If the lessee is entitled to a credit, MMS will provide instructions for the taking of that credit.

(g) The lessee may request a value determination from MMS. In that event, the lessee shall propose to MMS a value determination method and may use that value for royalty payment purposes until MMS issues a value determination. The lessee shall submit all available data relevant to its proposal. MMS shall expeditiously determine the value based upon the lessee's proposal and any additional information MMS deems necessary. In making a value determination, MMS may use any of the valuation criteria authorized by this subpart. That determination shall remain effective for the period stated therein. After MMS issues its determination, the lessee shall make the adjustments in accordance with paragraph (f) of this section.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(h) Notwithstanding any other provision of this section, under no circumstances shall the value of production, for royalty purposes, be less than the gross proceeds accruing to the lessee for lease production, less applicable allowances determined under this subpart.

(i) The lessee is required to place oil in marketable condition at no cost to the Indian lessor unless otherwise provided in the lease agreement or this section. Where the value established under this section is determined by a lessee's gross proceeds, that value shall be increased to the extent that the gross proceeds have been reduced because the purchaser, or any other person, is providing certain services the cost of which ordinarily is the responsibility of the lessee to place the oil in marketable condition.

(j) Value shall be based on the highest price a prudent lessee can receive through legally enforceable claims under its contract. Absent contract revision or amendment, if the lessee fails to take proper or timely action to receive prices or benefits to which it is entitled, it must pay royalty at a value based upon that obtainable price or benefit. Contract revisions or amendments shall be in writing and signed by all parties to an arm's-length contract. If the lessee makes timely application for a price increase or benefit allowed under its contract but the purchaser refuses, and the lessee takes reasonable measures, which are documented, to force purchaser compliance, the lessee will owe no additional royalties unless or until monies or consideration resulting from the price increase or additional benefits are received. This paragraph shall not be construed to permit a lessee to avoid its royalty payment obligation in situations where a purchaser fails to pay, in whole or in part or timely, for a quantity of oil.

(k) Notwithstanding any provision in these regulations to the contrary, no review, reconciliation, monitoring, or other like process that results in a redetermination by MMS of value under this section shall be considered final or binding as against the Indian Tribes or allottees until the audit period is formally closed.

(l) Certain information submitted to MMS to support valuation proposals, including transportation allowances or extraordinary cost allowances, is exempted from disclosure by the Freedom of Information Act, 5 U.S.C. 552, or other Federal law. Any data specified by law to be privileged, confidential, or otherwise exempt, will be maintained in a confidential manner in accordance with applicable laws and regulations. All requests for information about determinations made under this part are to be submitted in accordance with the Freedom of Information Act regulation of the Department of the Interior, 43 CFR part 2. Nothing in this section is intended to limit or diminish in any manner whatsoever the right of an Indian lessor to obtain any and all information to which such lessor may be lawfully entitled from MMS or such lessor's lessee directly under the terms of the lease, 30 U.S.C. 1733, or other applicable law.

**§ 206.53 Point of royalty settlement.**

(a)(1) Royalties shall be computed on the quantity and quality of oil as measured at the point of settlement approved by BLM for onshore leases.

(2) If the value of oil determined under § 206.52 of this subpart is based upon a quantity and/or quality different from the quantity and/or quality at the point of royalty settlement approved by the BLM for onshore leases, the value shall be adjusted for those differences in quantity and/or quality.

(b) No deductions may be made from the royalty volume or royalty value for actual or theoretical losses. Any actual loss that may be sustained prior to the royalty settlement metering or measurement point will not be subject to royalty provided that such actual loss is determined to have been unavoidable by BLM.

(c) Except as provided in paragraph (b) of this section, royalties are due on 100 percent of the volume measured at the approved point of royalty settlement. There can be no reduction in that measured volume for actual losses beyond the approved point of royalty settlement or for theoretical losses that are claimed to have taken place either prior to or beyond the approved point of royalty settlement. Royalties are due on 100 percent of the value of the oil as provided in this subpart. There can be no deduction from the value

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of the oil for royalty purposes to compensate for actual losses beyond the approved point of royalty settlement or for theoretical losses that are claimed to have taken place either prior to or beyond the approved point of royalty settlement.

**§ 206.54 Transportation allowances--general.**

(a) Where the value of oil has been determined under Section 206.52 of this subpart at a point (e.g., sales point or point of value determination) off the lease, MMS shall allow a deduction for the reasonable, actual costs incurred by the lessee to transport oil to a point off the lease; provided, however, that no transportation allowance will be granted for transporting oil taken as Royalty-In-Kind (RIK); or

(b)(1) Except as provided in paragraph (b)(2) of this section, the transportation allowance deduction on the basis of a selling arrangement shall not exceed 50 percent of the value of the oil at the point of sale as determined under § 206.52 of this subpart. Transportation costs cannot be transferred between selling arrangements or to other products.

(2) Upon request of a lessee, MMS may approve a transportation allowance deduction in excess of the limitation prescribed by paragraph (b)(1) of this section. The lessee must demonstrate that the transportation costs incurred in excess of the limitation prescribed in paragraph (b)(1) of this section were reasonable, actual, and necessary. An application for exception (using Form MMS-4393, Request to Exceed Regulatory Allowance Limitation) shall contain all relevant and supporting documentation necessary for MMS to make a determination. Under no circumstances shall the value, for royalty purposes, under any selling arrangement, be reduced to zero.

(c) Transportation costs must be allocated among all products produced and transported as provided in § 206.55. Transportation allowances for oil shall be expressed as dollars per barrel.

(d) If, after a review and/or audit, MMS determines that a lessee has improperly determined a transportation allowance authorized by this subpart, then the lessee shall pay any additional royalties, plus interest determined in accordance with 30 CFR 218.54, or shall be entitled to a credit, without interest.

**§ 206.55 Determination of transportation allowances.**

(a) Arm's-length transportation contracts.

(1)(i) For transportation costs incurred by a lessee under an arm's-length contract, the transportation allowance shall be the reasonable, actual costs incurred by the lessee for transporting oil under that contract, except as provided in paragraphs (a)(1)(ii) and (a)(1)(iii) of this section, subject to monitoring, review, audit, and adjustment. The lessee shall have the burden of demonstrating that its contract is arm's-length. Such allowances shall be subject to the provisions of paragraph (f) of this section. Before any deduction may be taken, the lessee must submit a completed page one of Form MMS-4110 (and Schedule 1), Oil Transportation Allowance Report, in accordance with paragraph (c)(1) of this section. A transportation allowance may be claimed retroactively for a period of not more than 3 months prior to the first day of the month that Form MMS-4110 is filed with MMS, unless MMS approves a longer period upon a showing of good cause by the lessee.

(ii) In conducting reviews and audits, MMS will examine whether the contract reflects more than the consideration actually transferred either directly or indirectly from the lessee to the transporter for the transportation. If the contract reflects more than the total consideration, then MMS may require that the transportation allowance be determined in accordance with paragraph (b) of this section.

(iii) If MMS determines that the consideration paid under an arm's-length transportation contract does not reflect the reasonable value of the transportation because of misconduct by or between the contracting parties, or because the lessee otherwise has breached its duty to the lessor to market the production for the mutual benefit of the lessee and the lessor, then MMS

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

shall require that the transportation allowance be determined in accordance with paragraph (b) of this section. When MMS determines that the value of the transportation may be unreasonable, MMS will notify the lessee and give the lessee an opportunity to provide written information justifying the lessee's transportation costs.

(2)(i) If an arm's-length transportation contract includes more than one liquid product, and the transportation costs attributable to each product cannot be determined from the contract, then the total transportation costs shall be allocated in a consistent and equitable manner to each of the liquid products transported in the same proportion as the ratio of the volume of each product (excluding waste products which have no value) to the volume of all liquid products (excluding waste products which have no value). Except as provided in this paragraph, no allowance may be taken for the costs of transporting lease production which is not royalty-bearing without MMS approval.

(ii) Notwithstanding the requirements of paragraph (i), the lessee may propose to MMS a cost allocation method on the basis of the values of the products transported. MMS shall approve the method unless it determines that it is not consistent with the purposes of the regulations in this part.

(3) If an arm's-length transportation contract includes both gaseous and liquid products, and the transportation costs attributable to each product cannot be determined from the contract, the lessee shall propose an allocation procedure to MMS. The lessee may use the oil transportation allowance determined in accordance with its proposed allocation procedure until MMS issues its determination on the acceptability of the cost allocation. The lessee shall submit all available data to support its proposal. The initial proposal must be submitted by June 30, 1988 or within 3 months after the last day of the month for which the lessee requests a transportation allowance, whichever is later (unless MMS approves a longer period). MMS shall then determine the oil transportation allowance based upon the lessee's proposal and any additional information MMS deems necessary.

(4) Where the lessee's payments for transportation under an arm's-length contract are not on a dollar-per-unit basis, the lessee shall convert whatever consideration is paid to a dollar value equivalent for the purposes of this section.

(5) Where an arm's-length sales contract price, or a posted price, includes a provision whereby the listed price is reduced by a transportation factor, MMS will not consider the transportation factor to be a transportation allowance. The transportation factor may be used in determining the lessee's gross proceeds for the sale of the product. The transportation factor may not exceed 50 percent of the base price of the product without MMS approval.

(b) Non-arm's-length or no contract.

(1) If a lessee has a non-arm's-length transportation contract or has no contract, including those situations where the lessee performs transportation services for itself, the transportation allowance will be based upon the lessee's reasonable, actual costs as provided in this paragraph. All transportation allowances deducted under a non-arms-length or no-contract situation are subject to monitoring, review, audit, and adjustment. Before any estimated or actual deduction may be taken, the lessee must submit a completed Form MMS-4110 in its entirety in accordance with paragraph (c)(2) of this section. A transportation allowance may be claimed retroactively for a period of not more than 3 months prior to the first day of the month that Form MMS-4110 is filed with MMS, unless MMS approves a longer period upon a showing of good cause by the lessee. MMS will monitor the allowance deductions to determine whether lessees are taking deductions that are reasonable and allowable. When necessary or appropriate, MMS may direct a lessee to modify its actual transportation allowance deduction.

(2) The transportation allowance for non-arms-length or no-contract situations shall be based upon the lessee's actual costs for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

transportation during the reporting period, including operating and maintenance expenses, overhead, and either depreciation and a return on undepreciated capital investment in accordance with paragraph (b)(2)(iv)(A) of this section, or a cost equal to the initial capital investment in the transportation system multiplied by a rate of return in accordance with paragraph (b)(2)(iv)(B) of this section. Allowable capital costs are generally those for depreciable fixed assets (including costs of delivery and installation of capital equipment) which are an integral part of the transportation system.

(i) Allowable operating expenses include: Operations supervision and engineering; operations labor; fuel; utilities; materials; ad valorem property taxes; rent; supplies; and any other directly allocable and attributable operating expense which the lessee can document.

(ii) Allowable maintenance expenses include: Maintenance of the transportation system; maintenance of equipment; maintenance labor; and other directly allocable and attributable maintenance expenses which the lessee can document.

(iii) Overhead directly attributable and allocable to the operation and maintenance of the transportation system is an allowable expense. State and Federal income taxes and severance taxes and other fees, including royalties, are not allowable expenses.

(iv) A lessee may use either depreciation or a return on depreciable capital investment. After a lessee has elected to use either method for a transportation system, the lessee may not later elect to change to the other alternative without approval of MMS.

(A) To compute depreciation, the lessee may elect to use either a straight-line depreciation method based on the life of equipment or on the life of the reserves which the transportation system services or on a unit-of-production method. After an election is made, the lessee may not change methods without MMS approval. A change in ownership of a transportation system shall not alter the depreciation schedule established by the original transporter/lessee for purposes of the allowance calculation. With or without a change in ownership, a transportation system shall be depreciated only once. Equipment shall not be depreciated below a reasonable salvage value.

(B) MMS shall allow as a cost an amount equal to the initial capital investment in the transportation system multiplied by the rate of return determined under paragraph (b)(2)(v) of this section. No allowance shall be provided for depreciation. This alternative shall apply only to transportation facilities first placed in service after March 1, 1988.

(v) The rate of return shall be the industrial rate associated with Standard and Poor's BBB rating. The rate of return shall be the monthly average rate as published in Standard and Poor's Bond Guide for the first month of the reporting period for which the allowance is applicable and shall be effective during the reporting period. The rate shall be redetermined at the beginning of each subsequent transportation allowance reporting period (which is determined under paragraph (c) of this section).

(3)(i) The deduction for transportation costs shall be determined on the basis of the lessee's cost of transporting each product through each individual transportation system. Where more than one liquid product is transported, allocation of costs to each of the liquid products transported shall be in the same proportion as the ratio of the volume of each liquid product (excluding waste products which have no value) to the volume of all liquid products (excluding waste products which have no value) and such allocation shall be made in a consistent and equitable manner. Except as provided in this paragraph, the lessee may not take an allowance for transporting lease production which is not royalty-bearing without MMS approval.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(ii) Notwithstanding the requirements of paragraph (i), the lessee may propose to MMS a cost allocation method on the basis of the values of the products transported. MMS shall approve the method unless it determines that it is not consistent with the purposes of the regulations in this part.

(4) Where both gaseous and liquid products are transported through the same transportation system, the lessee shall propose a cost allocation procedure to MMS. The lessee may use the oil transportation allowance determined in accordance with its proposed allocation procedure until MMS issues its determination on the acceptability of the cost allocation. The lessee shall submit all available data to support its proposal. The initial proposal must be submitted by June 30, 1988 or within 3 months after the last day of the month for which the lessee requests a transportation allowance, whichever is later (unless MMS approves a longer period). MMS shall then determine the oil transportation allowance on the basis of the lessee's proposal and any additional information MMS deems necessary.

(5) A lessee may apply to MMS for an exception from the requirement that it compute actual costs in accordance with paragraphs (b)(1) through (b)(4) of this section. MMS will grant the exception only if the lessee has a tariff for the transportation system approved by the Federal Energy Regulatory Commission (FERC) for Indian leases. MMS shall deny the exception request if it determines that the tariff is excessive as compared to arm's-length transportation charges by pipelines, owned by the lessee or others, providing similar transportation services in that area. If there are no arm's-length transportation charges, MMS shall deny the exception request if:

(i) No FERC cost analysis exists and the FERC has declined to investigate under MMS timely objections upon filing; and

(ii) the tariff significantly exceeds the lessee's actual costs for transportation as determined under this section.

(c) Reporting requirements--

(1) Arm's-length contracts.

(i) With the exception of those transportation allowances specified in paragraphs (c)(1)(v) and (c)(1)(vi) of this section, the lessee shall submit page one of the initial Form MMS-4110 (and Schedule 1), Oil Transportation Allowance Report, prior to, or at the same time as, the transportation allowance determined, under an arm's-length contract, is reported on Form MMS-2014, Report of Sales and Royalty Remittance. A Form MMS-4110 received by the end of the month that the Form MMS-2014 is due shall be considered to be timely received.

(ii) The initial Form MMS-4110 shall be effective for a reporting period beginning the month that the lessee is first authorized to deduct a transportation allowance and shall continue until the end of the calendar year, or until the applicable contract or rate terminates or is modified or amended, whichever is earlier.

(iii) After the initial reporting period and for succeeding reporting periods, lessees must submit page one of Form MMS-4110 (and Schedule 1) within 3 months after the end of the calendar year, or after the applicable contract or rate terminates or is modified or amended, whichever is earlier, unless MMS approves a longer period (during which period the lessee shall continue to use the allowance from the previous reporting period).

(iv) MMS may require that a lessee submit arm's-length transportation contracts, production agreements, operating agreements, and related documents. Documents shall be submitted within a reasonable time, as determined by MMS.

(v) Transportation allowances which are based on arm's-length contracts and which are in effect at the time these regulations become effective will be allowed to continue until such allowances terminate. For the purposes of this section, only those allowances that have been approved by MMS in writing shall qualify as being in effect at the time these regulations become effective.

(vi) MMS may establish, in appropriate

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

circumstances, reporting requirements which are different from the requirements of this section.

(2) Non-arm's-length or no contract.

(i) With the exception of those transportation allowances specified in paragraphs (c)(2)(v), (c)(2)(vii) and (c)(2)(viii) of this section, the lessee shall submit an initial Form MMS-4110 prior to, or at the same time as, the transportation allowance determined under a non-arm's-length contract or no-contract situation is reported on Form MMS-2014. A Form MMS-4110 received by the end of the month that the Form MMS-2014 is due shall be considered to be timely received. The initial report may be based upon estimated costs.

(ii) The initial Form MMS-4110 shall be effective for a reporting period beginning the month that the lessee first is authorized to deduct a transportation allowance and shall continue until the end of the calendar year, or until transportation under the non-arm's-length contract or the no-contract situation terminates, whichever is earlier.

(iii) For calendar-year reporting periods succeeding the initial reporting period, the lessee shall submit a completed Form MMS-4110 containing the actual costs for the previous reporting period. If oil transportation is continuing, the lessee shall include on Form MMS-4110 its estimated costs for the next calendar year. The estimated oil transportation allowance shall be based on the actual costs for the previous reporting period plus or minus any adjustments which are based on the lessee's knowledge of decreases or increases that will affect the allowance. MMS must receive the Form MMS-4110 within 3 months after the end of the previous reporting period, unless MMS approves a longer period (during which period the lessee shall continue to use the allowance from the previous reporting period).

(iv) For new transportation facilities or arrangements, the lessee's initial Form MMS-4110 shall include estimates of the allowable oil transportation costs for the applicable period. Cost estimates shall be based upon the most recently available operations data for the transportation system or, if such data are not available, the lessee shall use estimates based upon industry data for similar transportation systems.

(v) Non-arm's-length contract or no-contract transportation allowances which are in effect at the time these regulations become effective will be allowed to continue until such allowances terminate. For the purposes of this section, only those allowances that have been approved by MMS in writing shall qualify as being in effect at the time these regulations become effective.

(vi) Upon request by MMS, the lessee shall submit all data used to prepare its Form MMS-4110. The data shall be provided within a reasonable period of time, as determined by MMS.

(vii) MMS may establish, in appropriate circumstances, reporting requirements which are different from the requirements of this section.

(viii) If the lessee is authorized to use its FERC-approved tariff as its transportation cost in accordance with paragraph (b)(5) of this section, it shall follow the reporting requirements of paragraph (c)(1) of this section.

(3) MMS may establish reporting dates for individual lessees different from those specified in this subpart in order to provide more effective administration. Lessees will be notified of any change in their reporting period.

(4) Transportation allowances must be reported as a separate line item on Form MMS-2014, unless MMS approves a different reporting procedure.

(d) Interest assessments for incorrect or late reports and for failure to report.

(1) If a lessee deducts a transportation allowance on its Form MMS-2014 without complying with the requirements of this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

section, the lessee shall pay interest only on the amount of such deduction until the requirements of this section are complied with. The lessee also shall repay the amount of any allowance which is disallowed by this section.

(2) If a lessee erroneously reports a transportation allowance which results in an underpayment of royalties, interest shall be paid on the amount of that underpayment.

(3) Interest required to be paid by this section shall be determined in accordance with 30 CFR 218.54.

(e) Adjustments.

(1) If the actual transportation allowance is less than the amount the lessee has taken on Form MMS-2014 for each month during the allowance form reporting period, the lessee shall be required to pay additional royalties due plus interest computed under 30 CFR 218.54, retroactive to the first day of the first month the lessee is authorized to deduct a transportation allowance. If the actual transportation allowance is greater than the amount the lessee has taken on Form MMS-2014 for each month during the allowance form reporting period, the lessee shall be entitled to a credit without interest.

(2) For lessees transporting production from Indian leases, the lessee must submit a corrected Form MMS-2014 to reflect actual costs, together with any payment, in accordance with instructions provided by MMS.

(f) Actual or theoretical losses. Notwithstanding any other provisions of this subpart, for other than arm's-length contracts, no cost shall be allowed for oil transportation which results from payments (either volumetric or for value) for actual or theoretical losses. This section does not apply when the transportation allowance is based upon a FERC or State regulatory agency approved tariff.

(g) Other transportation cost determinations. The provisions of this section shall apply to determine transportation costs when establishing value using a netback valuation procedure or any other procedure that requires deduction of transportation costs.

**Subpart C. Federal Oil (Refs & Annos)**

**§ 206.100 What is the purpose of this subpart?**

(a) This subpart applies to all oil produced from Federal oil and gas leases onshore and on the Outer Continental Shelf (OCS). It explains how you as a lessee must calculate the value of production for royalty purposes consistent with the mineral leasing laws, other applicable laws, and lease terms.

(b) If you are a designee and if you dispose of production on behalf of a lessee, the terms "you" and "your" in this subpart refer to you and not to the lessee. In this circumstance, you must determine and report royalty value for the lessee's oil by applying the rules in this subpart to your disposition of the lessee's oil.

(c) If you are a designee and only report for a lessee, and do not dispose of the lessee's production, references to "you" and "your" in this subpart refer to the lessee and not the designee. In this circumstance, you as a designee must determine and report royalty value for the lessee's oil by applying the rules in this subpart to the lessee's disposition of its oil.

(d) If the regulations in this subpart are inconsistent with:

(1) A Federal statute;

(2) A settlement agreement between the United States and a lessee resulting from administrative or judicial litigation;

(3) A written agreement between the lessee and the MMS Director establishing a method to determine the value of production from any lease that MMS expects at least would approximate the value established under this subpart; or

(4) An express provision of an oil and gas lease subject to this subpart, then the statute, settlement agreement, written agreement, or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

lease provision will govern to the extent of the inconsistency.

(e) MMS may audit and adjust all royalty payments.

**§ 206.101 What definitions apply to this subpart?**

The following definitions apply to this subpart:

Affiliate means a person who controls, is controlled by, or is under common control with another person. For purposes of this subpart:

(1) Ownership or common ownership of more than 50 percent of the voting securities, or instruments of ownership, or other forms of ownership, of another person constitutes control. Ownership of less than 10 percent constitutes a presumption of noncontrol that MMS may rebut.

(2) If there is ownership or common ownership of 10 through 50 percent of the voting securities or instruments of ownership, or other forms of ownership, of another person, MMS will consider the following factors in determining whether there is control under the circumstances of a particular case:

ANS means Alaska North Slope (ANS).

Area means a geographic region at least as large as the limits of an oil field, in which oil has similar quality, economic, and legal characteristics.

Arm's-length contract means a contract or agreement between independent persons who are not affiliates and who have opposing economic interests regarding that contract. To be considered arm's length for any production month, a contract must satisfy this definition for that month, as well as when the contract was executed.

Audit means a review, conducted under generally accepted accounting and auditing standards, of royalty payment compliance activities of lessees, designees or other persons who pay royalties, rents, or bonuses on Federal leases.

BLM means the Bureau of Land Management of the Department of the Interior.

Condensate means liquid hydrocarbons (normally exceeding 40 degrees of API gravity) recovered at the surface without processing. Condensate is the mixture of liquid hydrocarbons resulting from condensation of petroleum hydrocarbons existing initially in a gaseous phase in an underground reservoir.

Contract means any oral or written agreement, including amendments or revisions, between two or more persons, that is enforceable by law and that with due consideration creates an obligation.

Designee means the person the lessee designates to report and pay the lessee's royalties for a lease.

Exchange agreement means an agreement where one person agrees to deliver oil to another person at a specified location in exchange for oil deliveries at another location. Exchange agreements may or may not specify prices for the oil involved. They frequently specify dollar amounts reflecting location, quality, or other differentials. Exchange agreements include buy/sell agreements, which specify prices to be paid at each exchange point and may appear to be two separate sales within the same agreement. Examples of other types of exchange agreements include, but are not limited to, exchanges of produced oil for specific types of crude oil (e.g., West Texas Intermediate); exchanges of produced oil for other crude oil at other locations (Location Trades); exchanges of produced oil for other grades of oil (Grade Trades); and multi-party exchanges.

Field means a geographic region situated over one or more subsurface oil and gas reservoirs and encompassing at least the outermost boundaries of all oil and gas accumulations known within those reservoirs, vertically projected to the land surface. State oil and gas regulatory agencies usually name onshore fields and designate their official boundaries. MMS names and designates boundaries of OCS fields.

Gathering means the movement of lease production to a central accumulation or treatment point on the lease, unit, or communitized area, or to a central accumulation or treatment point off the lease, unit, or communitized area that BLM or MMS approves for onshore and offshore leases, respectively.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Gross proceeds means the total monies and other consideration accruing for the disposition of oil produced. Gross proceeds also include, but are not limited to, the following examples:

(1) Payments for services such as dehydration, marketing, measurement, or gathering which the lessee must perform at no cost to the Federal Government;

(2) The value of services, such as salt water disposal, that the producer normally performs but that the buyer performs on the producer's behalf;

(3) Reimbursements for harboring or terminaling fees;

(4) Tax reimbursements, even though the Federal royalty interest may be exempt from taxation;

(5) Payments made to reduce or buy down the purchase price of oil to be produced in later periods, by allocating such payments over the production whose price the payment reduces and including the allocated amounts as proceeds for the production as it occurs; and

(6) Monies and all other consideration to which a seller is contractually or legally entitled, but does not seek to collect through reasonable efforts.

Index pricing point means the physical location where an index price is established in an MMS-approved publication.

Lease means any contract, profit-share arrangement, joint venture, or other agreement issued or approved by the United States under a mineral leasing law that authorizes exploration for, development or extraction of, or removal of oil or gas--or the land area covered by that authorization, whichever the context requires.

Lessee means any person to whom the United States issues an oil and gas lease, an assignee of all or a part of the record title interest, or any person to whom operating rights in a lease have been assigned.

Location differential means an amount paid or received (whether in money or in barrels of oil) under an exchange agreement that results from differences in location between oil delivered in exchange and oil received in the exchange. A location differential may represent all or part of the difference between the price received for oil delivered and the price paid for oil received under a buy/sell exchange agreement.

Market center means a major point MMS recognizes for oil sales, refining, or transshipment. Market centers generally are locations where MMS-approved publications publish oil spot prices.

Marketable condition means oil sufficiently free from impurities and otherwise in a condition a purchaser will accept under a sales contract typical for the field or area.

MMS-approved publication means a publication MMS approves for determining ANS spot prices or WTI differentials.

Netting means reducing the reported sales value to account for transportation instead of reporting a transportation allowance as a separate entry on Form MMS-2014.

NYMEX price means the average of the New York Mercantile Exchange (NYMEX) settlement prices for light sweet crude oil delivered at Cushing, Oklahoma, calculated as follows:

(1) Sum the prices published for each day during the calendar month of production (excluding weekends and holidays) for oil to be delivered in the prompt month corresponding to each such day; and

(2) Divide the sum by the number of days on which those prices are published (excluding weekends and holidays).

Oil means a mixture of hydrocarbons that existed in the liquid phase in natural underground reservoirs, remains liquid at atmospheric pressure after passing through surface separating facilities, and is marketed or used as a liquid. Condensate recovered in lease separators or field facilities is oil.

Outer Continental Shelf (OCS) means all submerged lands lying seaward and outside of the area of lands beneath navigable waters as defined in Section 2 of the Submerged Lands Act (43 U.S.C. 1301) and of which the subsoil and seabed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

appertain to the United States and are subject to its jurisdiction and control.

Person means any individual, firm, corporation, association, partnership, consortium, or joint venture (when established as a separate entity).

Prompt month means the nearest month of delivery for which NYMEX futures prices are published during the trading month.

Quality differential means an amount paid or received under an exchange agreement (whether in money or in barrels of oil) that results from differences in API gravity, sulfur content, viscosity, metals content, and other quality factors between oil delivered and oil received in the exchange. A quality differential may represent all or part of the difference between the price received for oil delivered and the price paid for oil received under a buy/sell agreement.

Rocky Mountain Region means the States of Colorado, Montana, North Dakota, South Dakota, Utah, and Wyoming, except for those portions of the San Juan Basin and other oil-producing fields in the "Four Corners" area that lie within Colorado and Utah.

Roll means an adjustment to the NYMEX price that is calculated as follows:

Roll = .6667 x ($P_0$-$P_1$) + .3333 x ($P_0$-$P_2$), where: $P_0$ = the average of the daily NYMEX settlement prices for deliveries during the prompt month that is the same as the month of production, as published for each day during the trading month for which the month of production is the prompt month; $P_1$ = the average of the daily NYMEX settlement prices for deliveries during the month following the month of production, published for each day during the trading month for which the month of production is the prompt month; and $P_2$ = the average of the daily NYMEX settlement prices for deliveries during the second month following the month of production, as published for each day during the trading month for which the month of production is the prompt month. Calculate the average of the daily NYMEX settlement prices using only the days on which such prices are published (excluding weekends and holidays).

(1) Example 1. Prices in Out Months are Lower Going Forward: The month of production for which you must determine royalty value is March. March was the prompt month (for year 2003) from January 22 through February 20. April was the first month following the month of production, and May was the second month following the month of production. $P_0$ therefore is the average of the daily NYMEX settlement prices for deliveries during March published for each business day between January 22 and February 20. $P_1$ is the average of the daily NYMEX settlement prices for deliveries during April published for each business day between January 22 and February 20. $P_2$ is the average of the daily NYMEX settlement prices for deliveries during May published for each business day between January 22 and February 20. In this example, assume that $P_0$ = $28.00 per bbl, $P_1$ = $27.70 per bbl, and $P_2$ = $27.10 per bbl. In this example (a declining market), Roll = .6667 x ($28.00-$27.70) + .3333 x ($28.00-$27.10) = $.20 + $.30 = $.50. You add this number to the NYMEX price.

(2) Example 2. Prices in Out Months are Higher Going Forward: The month of production for which you must determine royalty value is July. July 2003 was the prompt month from May 21 through June 20. August was the first month following the month of production, and September was the second month following the month of production. $P_0$ therefore is the average of the daily NYMEX settlement prices for deliveries during July published for each business day between May 21 and June 20. $P_1$ is the average of the daily NYMEX settlement prices for deliveries during August published for each business day between May 21 and June 20. $P_2$ is the average of the daily NYMEX settlement prices for deliveries during September published for each business day between May 21 and June 20. In this example, assume that $P_0$ = $28.00 per bbl, $P_1$ = $28.90 per bbl, and $P_2$ = $29.50 per bbl. In this example (a rising market), Roll = . 6667 x ($28.00-$28.90) + .3333 x ($28.00-$29.50) = (-$.60) + (-$.50) = -$1.10. You add this negative number to the NYMEX price (effectively a subtraction from the NYMEX price).

Sale means a contract between two persons where:

(1) The seller unconditionally transfers title to the oil to the buyer and does not retain any related

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

rights such as the right to buy back similar quantities of oil from the buyer elsewhere;

(2) The buyer pays money or other consideration for the oil; and

(3) The parties' intent is for a sale of the oil to occur.

Spot price means the price under a spot sales contract where:

(1) A seller agrees to sell to a buyer a specified amount of oil at a specified price over a specified period of short duration;

(2) No cancellation notice is required to terminate the sales agreement; and

(3) There is no obligation or implied intent to continue to sell in subsequent periods.

Tendering program means a producer's offer of a portion of its crude oil produced from a field or area for competitive bidding, regardless of whether the production is offered or sold at or near the lease or unit or away from the lease or unit.

Trading month means the period extending from the second business day before the 25th day of the second calendar month preceding the delivery month (or, if the 25th day of that month is a non-business day, the second business day before the last business day preceding the 25th day of that month) through the third business day before the 25th day of the calendar month preceding the delivery month (or, if the 25th day of that month is a non-business day, the third business day before the last business day preceding the 25th day of that month), unless the NYMEX publishes a different definition or different dates on its official Web site, www.nymex.com, in which case the NYMEX definition will apply.

Transportation allowance means a deduction in determining royalty value for the reasonable, actual costs of moving oil to a point of sale or delivery off the lease, unit area, or communitized area. The transportation allowance does not include gathering costs.

WTI differential means the average of the daily mean differentials for location and quality between a grade of crude oil at a market center and West Texas Intermediate (WTI) crude oil at Cushing published for each day for which price publications perform surveys for deliveries during the production month, calculated over the number of days on which those differentials are published (excluding weekends and holidays). Calculate the daily mean differentials by averaging the daily high and low differentials for the month in the selected publication. Use only the days and corresponding differentials for which such differentials are published.

(1) Example. Assume the production month was March 2003. Industry trade publications performed their price surveys and determined differentials during January 26 through February 25 for oil delivered in March. The WTI differential (for example, the West Texas Sour crude at Midland, Texas, spread versus WTI) applicable to valuing oil produced in the March 2003 production month would be determined using all the business days for which differentials were published during the period January 26 through February 25 excluding weekends and holidays (22 days). To calculate the WTI differential, add together all of the daily mean differentials published for January 26 through February 25 and divide that sum by 22.

(2) [Reserved]

**§ 206.102 How do I calculate royalty value for oil that I or my affiliate sell(s) under an arm's-length contract?**

(a) The value of oil under this section is the gross proceeds accruing to the seller under the arm's-length contract, less applicable allowances determined under §§ 206.110 or 206.111. This value does not apply if you exercise an option to use a different value provided in paragraph (d)(1) or (d)(2)(i) of this section, or if one of the exceptions in paragraph (c) of this section applies. Use this paragraph (a) to value oil that:

(1) You sell under an arm's-length sales contract; or

(2) You sell or transfer to your affiliate or another person under a non-arm's-length contract and that affiliate or person, or another

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.