requires you to maintain, and that you do maintain, in the pipeline by the value of that volume for the current month calculated under § 206.102 or § 206.103, as applicable; and

(B) Multiply the value calculated under paragraph (b)(6)(ii)(A) of this section by the monthly rate of return, calculated by dividing the rate of return specified in § 206.111(i)(2) by 12.

(iii) Fees paid to a non-affiliated terminal operator for loading and unloading of crude oil into or from a vessel, vehicle, pipeline, or other conveyance.

(iv) Transfer fees paid to a hub operator associated with physical movement of crude oil through the hub when you do not sell the oil at the hub. These fees do not include title transfer fees.

(v) A volumetric deduction to cover shrinkage when high-gravity petroleum (generally in excess of 51 degrees API) is mixed with lower-gravity crude oil for transportation.

(vi) Fees paid to a non-affiliated quality bank administrator for administration of a quality bank.

(7) You may not deduct any costs that are not actual costs of transporting oil, including but not limited to the following:

(i) Fees paid for long-term storage (more than 30 days).

(ii) Administrative, handling, and accounting fees associated with terminalling.

(iii) Title and terminal transfer fees.

(iv) Fees paid to track and match receipts and deliveries at a market center or to avoid paying title transfer fees.

(v) Fees paid to brokers.

(vi) Fees paid to a scheduling service provider.

(vii) Internal costs, including salaries and related costs, rent/space costs, office equipment costs, legal fees, and other costs to schedule, nominate, and account for sale or movement of production.

(viii) Theoretical line losses.

(ix) Gauging fees.

(c) Allowable capital costs are generally those for depreciable fixed assets (including costs of delivery and installation of capital equipment) which are an integral part of the transportation system.

(d) Allowable operating expenses include:

(i) Operations supervision and engineering;

(ii) Operations labor;

(iii) Fuel;

(iv) Utilities;

(v) Materials;

(vi) Ad valorem property taxes;

(vii) Rent;

(viii) Supplies; and

(ix) Any other directly allocable and attributable operating expense which you can document.

(e) Allowable maintenance expenses include:

(i) Maintenance of the transportation system;

(ii) Maintenance of equipment;

(iii) Maintenance labor; and

(iv) Other directly allocable and attributable maintenance expenses which you can document.

(f) Overhead directly attributable and allocable to the operation and maintenance of the transportation system is an allowable expense. State and Federal income taxes and severance taxes and other fees,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

including royalties, are not allowable expenses.

(g) To compute depreciation, you may elect to use either a straight-line depreciation method based on the life of equipment or on the life of the reserves which the transportation system services, or a unit-of-production method. After you make an election, you may not change methods without MMS approval. You may not depreciate equipment below a reasonable salvage value.

(h) This paragraph describes the basis for your depreciation schedule.

(1) If you or your affiliate own a transportation system on June 1, 2000, you must base your depreciation schedule used in calculating actual transportation costs for production after June 1, 2000, on your total capital investment in the system (including your original purchase price or construction cost and subsequent reinvestment).

(2) If you or your affiliate purchased the transportation system at arm's length before June 1, 2000, you must incorporate depreciation on the schedule based on your purchase price (and subsequent reinvestment) into your transportation allowance calculations for production after June 1, 2000, beginning at the point on the depreciation schedule corresponding to that date. You must prorate your depreciation for calendar year 2000 by claiming part-year depreciation for the period from June 1, 2000 until December 31, 2000. You may not adjust your transportation costs for production before June 1, 2000, using the depreciation schedule based on your purchase price.

(3) If you are the original owner of the transportation system on June 1, 2000, or if you purchased your transportation system before March 1, 1988, you must continue to use your existing depreciation schedule in calculating actual transportation costs for production in periods after June 1, 2000.

(4) If you or your affiliate purchase a transportation system at arm's length from the original owner after June 1, 2000, you must base your depreciation schedule used in calculating actual transportation costs on your total capital investment in the system (including your original purchase price and subsequent reinvestment). You must prorate your depreciation for the year in which you or your affiliate purchased the system to reflect the portion of that year for which you or your affiliate own the system.

(5) If you or your affiliate purchase a transportation system at arm's length after June 1, 2000, from anyone other than the original owner, you must assume the depreciation schedule of the person from whom you bought the system. Include in the depreciation schedule any subsequent reinvestment.

(i)(1) To calculate a return on undepreciated capital investment, multiply the remaining undepreciated capital balance as of the beginning of the period for which you are calculating the transportation allowance by the rate of return provided in paragraph (i)(2) of this section.

(2) The rate of return is 1.3 times the industrial bond yield index for Standard & Poor's BBB bond rating. Use the monthly average rate published in "Standard & Poor's Bond Guide" for the first month of the reporting period for which the allowance applies. Calculate the rate at the beginning of each subsequent transportation allowance reporting period.

(j)(1) After a transportation system has been depreciated at or below a value equal to ten percent of your total capital investment, you may continue to include in the allowance calculation a cost equal to ten percent of your total capital investment in the transportation system multiplied by a rate of return under paragraph (i)(2) of this section.

(2) You may apply this paragraph to a transportation system that before June 1, 2000, was depreciated at or below a value equal to ten percent of your total capital investment.

(k) Calculate the deduction for transportation costs based on your or your affiliate's cost of transporting each product through each individual transportation system. Where more than one liquid product is transported, allocate costs consistently and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

equitably to each of the liquid products transported. Your allocation must use the same proportion as the ratio of the volume of each liquid product (excluding waste products with no value) to the volume of all liquid products (excluding waste products with no value).

(1) You may not take an allowance for transporting lease production that is not royalty-bearing.

(2) You may propose to MMS a cost allocation method on the basis of the values of the products transported. MMS will approve the method if it is consistent with the purposes of the regulations in this subpart.

(l)(1) Where you transport both gaseous and liquid products through the same transportation system, you must propose a cost allocation procedure to MMS.

(2) You may use your proposed procedure to calculate a transportation allowance until MMS accepts or rejects your cost allocation. If MMS rejects your cost allocation, you must amend your Form MMS-2014 for the months that you used the rejected method and pay any additional royalty and interest due.

(3) You must submit your initial proposal, including all available data, within 3 months after first claiming the allocated deductions on Form MMS-2014.

**§ 206.112 What adjustments and transportation allowances apply when I value oil production from my lease using NYMEX prices or ANS spot prices?**

This section applies when you use NYMEX prices or ANS spot prices to calculate the value of production under § 206.103. As specified in this section, adjust the NYMEX price to reflect the difference in value between your lease and Cushing, Oklahoma, or adjust the ANS spot price to reflect the difference in value between your lease and the appropriate MMS-recognized market center at which the ANS spot price is published (for example, Long Beach, California, or San Francisco, California). Paragraph (a) of this section explains how you adjust the value between the lease and the market center, and paragraph (b) of this section explains how you adjust the value between the market center and Cushing when you use NYMEX prices. Paragraph (c) of this section explains how adjustments may be made for quality differentials that are not accounted for through exchange agreements. Paragraph (d) of this section gives some examples. References in this section to "you" include your affiliates as applicable.

(a) To adjust the value between the lease and the market center:

(1)(i) For oil that you exchange at arm's length between your lease and the market center (or between any intermediate points between those locations), you must calculate a lease-to-market center differential by the applicable location and quality differentials derived from your arm's-length exchange agreement applicable to production during the production month.

(ii) For oil that you exchange between your lease and the market center (or between any intermediate points between those locations) under an exchange agreement that is not at arm's length, you must obtain approval from MMS for a location and quality differential. Until you obtain such approval, you may use the location and quality differential derived from that exchange agreement applicable to production during the production month. If MMS prescribes a different differential, you must apply MMS's differential to all periods for which you used your proposed differential. You must pay any additional royalties owed resulting from using MMS's differential plus late payment interest from the original royalty due date, or you may report a credit for any overpaid royalties plus interest under 30 U.S.C. 1721(h).

(2) For oil that you transport between your lease and the market center (or between any intermediate points between those locations), you may take an allowance for the cost of transporting that oil between the relevant points

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

as determined under § 206.110 or § 206.111, as applicable.

(3) If you transport or exchange at arm's length (or both transport and exchange) at least 20 percent, but not all, of your oil produced from the lease to a market center, determine the adjustment between the lease and the market center for the oil that is not transported or exchanged (or both transported and exchanged) to or through a market center as follows:

(i) Determine the volume-weighted average of the lease-to-market center adjustment calculated under paragraphs (a)(1) and (a)(2) of this section for the oil that you do transport or exchange (or both transport and exchange) from your lease to a market center.

(ii) Use that volume-weighted average lease-to-market center adjustment as the adjustment for the oil that you do not transport or exchange (or both transport and exchange) from your lease to a market center.

(4) If you transport or exchange (or both transport and exchange) less than 20 percent of the crude oil produced from your lease between the lease and a market center, you must propose to MMS an adjustment between the lease and the market center for the portion of the oil that you do not transport or exchange (or both transport and exchange) to a market center. Until you obtain such approval, you may use your proposed adjustment. If MMS prescribes a different adjustment, you must apply MMS's adjustment to all periods for which you used your proposed adjustment. You must pay any additional royalties owed resulting from using MMS's adjustment plus late payment interest from the original royalty due date, or you may report a credit for any overpaid royalties plus interest under 30 U.S.C. 1721(h).

(5) You may not both take a transportation allowance and use a location and quality adjustment or exchange differential for the same oil between the same points.

(b) For oil that you value using NYMEX prices, adjust the value between the market center and Cushing, Oklahoma, as follows:

(1) If you have arm's-length exchange agreements between the market center and Cushing under which you exchange to Cushing at least 20 percent of all the oil you own at the market center during the production month, you must use the volume-weighted average of the location and quality differentials from those agreements as the adjustment between the market center and Cushing for all the oil that you produce from the leases during that production month for which that market center is used.

(2) If paragraph (b)(1) of this section does not apply, you must use the WTI differential published in an MMS-approved publication for the market center nearest your lease, for crude oil most similar in quality to your production, as the adjustment between the market center and Cushing. (For example, for light sweet crude oil produced offshore of Louisiana, use the WTI differential for Light Louisiana Sweet crude oil at St. James, Louisiana.) After you select an MMS-approved publication, you may not select a different publication more often than once every 2 years, unless the publication you use is no longer published or MMS revokes its approval of the publication. If you are required to change publications, you must begin a new 2-year period.

(3) If neither paragraph (b)(1) nor (b)(2) of this section applies, you may propose an alternative differential to MMS. Until you obtain such approval, you may use your proposed differential. If MMS prescribes a different differential, you must apply MMS's differential to all periods for which you used your proposed differential. You must pay any additional royalties owed resulting from using MMS's differential plus late payment interest from the original royalty due date, or you may report a credit for any overpaid royalties plus interest under 30 U.S.C. 1721(h).

(c)(1) If you adjust for location and quality differentials or for transportation costs under paragraphs (a) and (b) of this section, also adjust the NYMEX price or ANS spot price for quality based on premiums or penalties determined by

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

pipeline quality bank specifications at intermediate commingling points or at the market center if those points are downstream of the royalty measurement point approved by MMS or BLM, as applicable. Make this adjustment only if and to the extent that such adjustments were not already included in the location and quality differentials determined from your arm's-length exchange agreements.

(2) If the quality of your oil as adjusted is still different from the quality of the representative crude oil at the market center after making the quality adjustments described in paragraphs (a), (b) and (c)(1) of this section, you may make further gravity adjustments using posted price gravity tables. If quality bank adjustments do not incorporate or provide for adjustments for sulfur content, you may make sulfur adjustments, based on the quality of the representative crude oil at the market center, of 5.0 cents per one-tenth percent difference in sulfur content, unless MMS approves a higher adjustment.

(d) The examples in this paragraph illustrate how to apply the requirement of this section.

(1) Example. Assume that a Federal lessee produces crude oil from a lease near Artesia, New Mexico. Further, assume that the lessee transports the oil to Roswell, New Mexico, and then exchanges the oil to Midland, Texas. Assume the lessee refines the oil received in exchange at Midland. Assume that the NYMEX price is $30.00/bbl, adjusted for the roll; that the WTI differential (Cushing to Midland) is -$.10/bbl; that the lessee's exchange agreement between Roswell and Midland results in a location and quality differential of -$.08/bbl; and that the lessee's actual cost of transporting the oil from Artesia to Roswell is $.40/bbl. In this example, the royalty value of the oil is $30.00-$.10-$.08--$.40 = $29.42/bbl.

(2) Example. Assume the same facts as in the example in paragraph (1), except that the lessee transports and exchanges to Midland 40 percent of the production from the lease near Artesia, and transports the remaining 60 percent directly to its own refinery in Ohio. In this example, the 40 percent of the production would be valued at $29.42/bbl, as explained in the previous example. In this example, the other 60 percent also would be valued at $29.42/bbl.

(3) Example. Assume that a Federal lessee produces crude oil from a lease near Bakersfield, California. Further, assume that the lessee transports the oil to Hynes Station, and then exchanges the oil to Cushing which it further exchanges with oil it refines. Assume that the ANS spot price is $20.00/bbl, and that the lessee's actual cost of transporting the oil from Bakersfield to Hynes Station is $.28/bbl. The lessee must request approval from MMS for a location and quality adjustment between Hynes Station and Long Beach. For example, the lessee likely would propose using the tariff on Line 63 from Hynes Station to Long Beach as the adjustment between those points. Assume that adjustment to be $.72, including the sulfur and gravity bank adjustments, and that MMS approves the lessee's request. In this example, the preliminary (because the location and quality adjustment is subject to MMS review) royalty value of the oil is $20.00-$.72-$.28 = $19.00/bbl. The fact that oil was exchanged to Cushing does not change use of ANS spot prices for royalty valuation.

**§ 206.113 How will MMS identify market centers?**

MMS periodically will publish in the Federal Register a list of market centers. MMS will monitor market activity and, if necessary, add to or modify the list of market centers and will publish such modifications in the Federal Register. MMS will consider the following factors and conditions in specifying market centers:

(a) Points where MMS-approved publications publish prices useful for index purposes;

(b) Markets served;

(c) Input from industry and others knowledgeable in crude oil marketing and transportation;

(d) Simplification; and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(e) Other relevant matters.

**§ 206.114 What are my reporting requirements under an arm's-length transportation contract?**

You or your affiliate must use a separate entry on Form MMS-2014 to notify MMS of an allowance based on transportation costs you or your affiliate incur. MMS may require you or your affiliate to submit arm's-length transportation contracts, production agreements, operating agreements, and related documents. Recordkeeping requirements are found at part 207 of this chapter.

**§ 206.115 What are my reporting requirements under a non-arm's-length transportation arrangement?**

(a) You or your affiliate must use a separate entry on Form MMS-2014 to notify MMS of an allowance based on transportation costs you or your affiliate incur.

(b) For new transportation facilities or arrangements, base your initial deduction on estimates of allowable oil transportation costs for the applicable period. Use the most recently available operations data for the transportation system or, if such data are not available, use estimates based on data for similar transportation systems. Section 206.117 will apply when you amend your report based on your actual costs.

(c) MMS may require you or your affiliate to submit all data used to calculate the allowance deduction. Recordkeeping requirements are found at part 207 of this chapter.

**§ 206.116 What interest and assessments apply if I improperly report a transportation allowance?**

(a) If you or your affiliate net a transportation allowance rather than report it as a separate entry against the royalty value on Form MMS-2014, you will be assessed an amount up to 10 percent of the netted allowance, not to exceed $250 per lease selling arrangement per sales period.

(b) If you or your affiliate deduct a transportation allowance on Form MMS-2014 that exceeds 50 percent of the value of the oil transported without obtaining MMS's prior approval under § 206.109, you must pay interest on the excess allowance amount taken from the date that amount is taken to the date you or your affiliate file an exception request that MMS approves. If you do not file an exception request, or if MMS does not approve your request, you must pay interest on the excess allowance amount taken from the date that amount is taken until the date you pay the additional royalties owed.

**§ 206.117 What reporting adjustments must I make for transportation allowances?**

(a) If your or your affiliate's actual transportation allowance is less than the amount you claimed on Form MMS-2014 for each month during the allowance reporting period, you must pay additional royalties plus interest computed under 30 CFR 218.54 from the date you took the deduction to the date you repay the difference.

(b) If the actual transportation allowance is greater than the amount you claimed on Form MMS-2014 for any month during the allowance form reporting period, you are entitled to a credit plus interest under applicable rules.

**§ 206.118 [Reserved]**

**§ 206.119 How are royalty quantity and quality determined?**

(a) Compute royalties based on the quantity and quality of oil as measured at the point of settlement approved by BLM for onshore leases or MMS for offshore leases.

(b) If the value of oil determined under this subpart is based upon a quantity or quality different from the quantity or quality at the point of royalty settlement approved by the BLM for onshore leases or MMS for offshore leases, adjust the value for those differences in quantity or quality.

(c) Any actual loss that you may incur before the royalty settlement metering or measurement point is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

not subject to royalty if BLM or MMS, as appropriate, determines that the loss is unavoidable.

(d) Except as provided in paragraph (b) of this section, royalties are due on 100 percent of the volume measured at the approved point of royalty settlement. You may not claim a reduction in that measured volume for actual losses beyond the approved point of royalty settlement or for theoretical losses that are claimed to have taken place either before or after the approved point of royalty settlement.

**§ 206.120 How are operating allowances determined?**

MMS may use an operating allowance for the purpose of computing payment obligations when specified in the notice of sale and the lease. MMS will specify the allowance amount or formula in the notice of sale and in the lease agreement.

**§ 206.121 [Reserved]**

**Subpart D. Federal Gas (Refs & Annos)**

**§ 206.150 Purpose and scope.**

(a) This subpart is applicable to all gas production from Federal oil and gas leases. The purpose of this subpart is to establish the value of production for royalty purposes consistent with the mineral leasing laws, other applicable laws and lease terms.

(b) If the regulations in this subpart are inconsistent with:

(1) A Federal statute;

(2) A settlement agreement between the United States and a lessee resulting from administrative or judicial litigation;

(3) A written agreement between the lessee and the MMS Director establishing a method to determine the value of production from any lease that MMS expects at least would approximate the value established under this subpart; or

(4) An express provision of an oil and gas lease subject to this subpart; then the statute, settlement agreement, written agreement, or lease provision will govern to the extent of the inconsistency.

(c) All royalty payments made to MMS are subject to audit and adjustment.

(d) The regulations in this subpart are intended to ensure that the administration of oil and gas leases is discharged in accordance with the requirements of the governing mineral leasing laws and lease terms.

**§ 206.151 Definitions.**

For purposes of this subpart:

Affiliate means a person who controls, is controlled by, or is under common control with another person. For purposes of this subpart:

(1) Ownership or common ownership of more than 50 percent of the voting securities, or instruments of ownership, or other forms of ownership, of another person constitutes control. Ownership of less than 10 percent constitutes a presumption of noncontrol that MMS may rebut.

(2) If there is ownership or common ownership of 10 through 50 percent of the voting securities or instruments of ownership, or other forms of ownership, of another person, MMS will consider the following factors in determining whether there is control under the circumstances of a particular case:

(i) The extent to which there are common officers or directors;

(ii) With respect to the voting securities, or instruments of ownership, or other forms of ownership: The percentage of ownership or common ownership, the relative percentage of ownership or common ownership compared to the percentage(s) of ownership by other persons,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

whether a person is the greatest single owner, or whether there is an opposing voting bloc of greater ownership;

(iii) Operation of a lease, plant, pipeline, or other facility;

(iv) The extent of participation by other owners in operations and day-to-day management of a lease, plant, pipeline, or other facility; and

(v) Other evidence of power to exercise control over or common control with another person.

(3) Regardless of any percentage of ownership or common ownership, relatives, either by blood or marriage, are affiliates.

Allowance means a deduction in determining value for royalty purposes. Processing allowance means an allowance for the reasonable, actual costs of processing gas determined under this subpart. Transportation allowance means an allowance for the reasonable, actual costs of moving unprocessed gas, residue gas, or gas plant products to a point of sale or delivery off the lease, unit area, or communitized area, or away from a processing plant. The transportation allowance does not include gathering costs.

Area means a geographic region at least as large as the defined limits of an oil and/or gas field, in which oil and/or gas lease products have similar quality, economic, and legal characteristics.

Arm's-length contract means a contract or agreement between independent persons who are not affiliates and who have opposing economic interests regarding that contract. To be considered arm's length for any production month, a contract must satisfy this definition for that month, as well as when the contract was executed.

Audit means a review, conducted in accordance with generally accepted accounting and auditing standards, of royalty payment compliance activities of lessees or other interest holders who pay royalties, rents, or bonuses on Federal leases.

BLM means the Bureau of Land Management of the Department of the Interior.

Compression means the process of raising the pressure of gas.

Condensate means liquid hydrocarbons (normally exceeding 40 degrees of API gravity) recovered at the surface without resorting to processing. Condensate is the mixture of liquid hydrocarbons that results from condensation of petroleum hydrocarbons existing initially in a gaseous phase in an underground reservoir.

Contract means any oral or written agreement, including amendments or revisions thereto, between two or more persons and enforceable by law that with due consideration creates an obligation.

Field means a geographic region situated over one or more subsurface oil and gas reservoirs encompassing at least the outermost boundaries of all oil and gas accumulations known to be within those reservoirs vertically projected to the land surface. Onshore fields are usually given names and their official boundaries are often designated by oil and gas regulatory agencies in the respective States in which the fields are located. Outer Continental Shelf (OCS) fields are named and their boundaries are designated by MMS.

Gas means any fluid, either combustible or noncombustible, hydrocarbon or nonhydrocarbon, which is extracted from a reservoir and which has neither independent shape nor volume, but tends to expand indefinitely. It is a substance that exists in a gaseous or rarefied state under standard temperature and pressure conditions.

Gas plant products means separate marketable elements, compounds, or mixtures, whether in liquid, gaseous, or solid form, resulting from processing gas, excluding residue gas.

Gathering means the movement of lease production to a central accumulation and/or treatment point on the lease, unit or communitized area, or to a central accumulation or treatment point off the lease, unit or communitized area as approved by BLM or MMS OCS operations personnel for onshore and OCS leases, respectively.

Gross proceeds (for royalty payment purposes) means the total monies and other consideration accruing to an oil and gas lessee for the disposition

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of the gas, residue gas, and gas plant products produced. Gross proceeds includes, but is not limited to, payments to the lessee for certain services such as dehydration, measurement, and/or gathering to the extent that the lessee is obligated to perform them at no cost to the Federal Government. Tax reimbursements are part of the gross proceeds accruing to a lessee even though the Federal royalty interest may be exempt from taxation. Monies and other consideration, including the forms of consideration identified in this paragraph, to which a lessee is contractually or legally entitled but which it does not seek to collect through reasonable efforts are also part of gross proceeds.

Lease means any contract, profit-share arrangement, joint venture, or other agreement issued or approved by the United States under a mineral leasing law that authorizes exploration for, development or extraction of, or removal of lease products--or the land area covered by that authorization, whichever is required by the context.

Lease products means any leased minerals attributable to, originating from, or allocated to Outer Continental Shelf or onshore Federal leases.

Lessee means any person to whom the United States issues a lease, and any person who has been assigned an obligation to make royalty or other payments required by the lease. This includes any person who has an interest in a lease as well as an operator or payor who has no interest in the lease but who has assumed the royalty payment responsibility.

Like-quality lease products means lease products which have similar chemical, physical, and legal characteristics.

Marketable condition means lease products which are sufficiently free from impurities and otherwise in a condition that they will be accepted by a purchaser under a sales contract typical for the field or area.

Marketing affiliate means an affiliate of the lessee whose function is to acquire only the lessee's production and to market that production.

Minimum royalty means that minimum amount of annual royalty that the lessee must pay as specified in the lease or in applicable leasing regulations.

Net-back method (or work-back method) means a method for calculating market value of gas at the lease. Under this method, costs of transportation, processing, or manufacturing are deducted from the proceeds received for the gas, residue gas or gas plant products, and any extracted, processed, or manufactured products, or from the value of the gas, residue gas or gas plant products, and any extracted, processed, or manufactured products, at the first point at which reasonable values for any such products may be determined by a sale pursuant to an arm's-length contract or comparison to other sales of such products, to ascertain value at the lease.

Net output means the quantity of residue gas and each gas plant product that a processing plant produces.

Net profit share (for applicable Federal leases) means the specified share of the net profit from production of oil and gas as provided in the agreement.

Netting is the deduction of an allowance from the sales value by reporting a one line net sales value, instead of correctly reporting the deduction as a separate line item on the Form MMS-2014.

Outer Continental Shelf (OCS) means all submerged lands lying seaward and outside of the area of land beneath navigable waters as defined in section 2 of the Submerged Lands Act (43 U.S.C. 1301) and of which the subsoil and seabed appertain to the United States and are subject to its jurisdiction and control.

Person means any individual, firm, corporation, association, partnership, consortium, or joint venture (when established as a separate entity).

Posted price means the price, net of all adjustments for quality and location, specified in publicly available price bulletins or other price notices available as part of normal business operations for quantities of unprocessed gas, residue gas, or gas plant products in marketable condition.

Processing means any process designed to remove elements or compounds (hydrocarbon and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

nonhydrocarbon) from gas, including absorption, adsorption, or refrigeration. Field processes which normally take place on or near the lease, such as natural pressure reduction, mechanical separation, heating, cooling, dehydration, and compression, are not considered processing. The changing of pressures and/or temperatures in a reservoir is not considered processing.

Residue gas means that hydrocarbon gas consisting principally of methane resulting from processing gas.

Section 6 lease means an OCS lease subject to section 6 of the Outer Continental Shelf Lands Act, as amended, 43 U.S.C. 1335.

Selling arrangement means the individual contractual arrangements under which sales or dispositions of gas, residue gas and gas plant products are made. Selling arrangements are described by illustration in the MMS Royalty Management Program Oil and Gas Payor Handbook.

Spot sales agreement means a contract wherein a seller agrees to sell to a buyer a specified amount of unprocessed gas, residue gas, or gas plant products at a specified price over a fixed period, usually of short duration, which does not normally require a cancellation notice to terminate, and which does not contain an obligation, nor imply an intent, to continue in subsequent periods.

Warranty contract means a long-term contract entered into prior to 1970, including any amendments thereto, for the sale of gas wherein the producer agrees to sell a specific amount of gas and the gas delivered in satisfaction of this obligation may come from fields or sources outside of the designated fields.

**§ 206.152 Valuation standards--unprocessed gas.**

(a)(1) This section applies to the valuation of all gas that is not processed and all gas that is processed but is sold or otherwise disposed of by the lessee pursuant to an arm's-length contract prior to processing (including all gas where the lessee's arm's-length contract for the sale of that gas prior to processing provides for the value to be determined on the basis of a percentage of the purchaser's proceeds resulting from processing the gas). This section also applies to processed gas that must be valued prior to processing in accordance with § 206.155 of this part. Where the lessee's contract includes a reservation of the right to process the gas and the lessee exercises that right, § 206.153 of this part shall apply instead of this section.

(2) The value of production, for royalty purposes, of gas subject to this subpart shall be the value of gas determined under this section less applicable allowances.

(b)(1)(i) The value of gas sold under an arm's-length contract is the gross proceeds accruing to the lessee except as provided in paragraphs (b)(1)(ii), (iii), and (iv) of this section. The lessee shall have the burden of demonstrating that its contract is arm's-length. The value which the lessee reports, for royalty purposes, is subject to monitoring, review, and audit. For purposes of this section, gas which is sold or otherwise transferred to the lessee's marketing affiliate and then sold by the marketing affiliate pursuant to an arm's-length contract shall be valued in accordance with this paragraph based upon the sale by the marketing affiliate. Also, where the lessee's arm's-length contract for the sale of gas prior to processing provides for the value to be determined based upon a percentage of the purchaser's proceeds resulting from processing the gas, the value of production, for royalty purposes, shall never be less than a value equivalent to 100 percent of the value of the residue gas attributable to the processing of the lessee's gas.

(ii) In conducting reviews and audits, MMS will examine whether the contract reflects the total consideration actually transferred either directly or indirectly from the buyer to the seller for the gas. If the contract does not reflect the total consideration, then the MMS may require that the gas sold pursuant to that contract be valued in accordance with paragraph (c) of this section. Value may not be less than the gross proceeds accruing to the lessee, including the additional consideration.

(iii) If the MMS determines that the gross proceeds accruing to the lessee pursuant to an arm's-length contract do not reflect the reasonable value of the production because of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

misconduct by or between the contracting parties, or because the lessee otherwise has breached its duty to the lessor to market the production for the mutual benefit of the lessee and the lessor, then MMS shall require that the gas production be valued pursuant to paragraph (c)(2) or (c)(3) of this section, and in accordance with the notification requirements of paragraph (e) of this section. When MMS determines that the value may be unreasonable, MMS will notify the lessee and give the lessee an opportunity to provide written information justifying the lessee's value.

(iv) How to value over-delivered volumes under a cash-out program. This paragraph applies to situations where a pipeline purchases gas from a lessee according to a cash-out program under a transportation contract. For all over-delivered volumes, the royalty value is the price the pipeline is required to pay for volumes within the tolerances for over-delivery specified in the transportation contract. Use the same value for volumes that exceed the over-delivery tolerances even if those volumes are subject to a lower price under the transportation contract. However, if MMS determines that the price specified in the transportation contract for over-delivered volumes is unreasonably low, the lessee must value all over-delivered volumes under paragraph (c)(2) or (c)(3) of this section.

(2) Notwithstanding the provisions of paragraph (b)(1) of this section, the value of gas sold pursuant to a warranty contract shall be determined by MMS, and due consideration will be given to all valuation criteria specified in this section. The lessee must request a value determination in accordance with paragraph (g) of this section for gas sold pursuant to a warranty contract; provided, however, that any value determination for a warranty contract in effect on the effective date of these regulations shall remain in effect until modified by MMS.

(3) MMS may require a lessee to certify that its arm's-length contract provisions include all of the consideration to be paid by the buyer, either directly or indirectly, for the gas.

(c) The value of gas subject to this section which is not sold pursuant to an arm's-length contract shall be the reasonable value determined in accordance with the first applicable of the following methods:

(1) The gross proceeds accruing to the lessee pursuant to a sale under its non-arm's-length contract (or other disposition other than by an arm's-length contract), provided that those gross proceeds are equivalent to the gross proceeds derived from, or paid under, comparable arm's-length contracts for purchases, sales, or other dispositions of like-quality gas in the same field (or, if necessary to obtain a reasonable sample, from the same area). In evaluating the comparability of arm's-length contracts for the purposes of these regulations, the following factors shall be considered: price, time of execution, duration, market or markets served, terms, quality of gas, volume, and such other factors as may be appropriate to reflect the value of the gas;

(2) A value determined by consideration of other information relevant in valuing like-quality gas, including gross proceeds under arm's-length contracts for like-quality gas in the same field or nearby fields or areas, posted prices for gas, prices received in arm's-length spot sales of gas, other reliable public sources of price or market information, and other information as to the particular lease operation or the saleability of the gas; or

(3) A net-back method or any other reasonable method to determine value.

(d)(1) Notwithstanding any other provisions of this section, except paragraph (h) of this section, if the maximum price permitted by Federal law at which gas may be sold is less than the value determined pursuant to this section, then MMS shall accept such maximum price as the value. For purposes of this section, price limitations set by any State or local government shall not be considered as a maximum price permitted by Federal law.

(2) The limitation prescribed in paragraph (d)(1) of this section shall not apply to gas sold pursuant to a warranty contract and valued pursuant to paragraph (b)(2) of this section.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(e)(1) Where the value is determined pursuant to paragraph (c) of this section, the lessee shall retain all data relevant to the determination of royalty value. Such data shall be subject to review and audit, and MMS will direct a lessee to use a different value if it determines that the reported value is inconsistent with the requirements of these regulations.

(2) Any Federal lessee will make available upon request to the authorized MMS or State representatives, to the Office of the Inspector General of the Department of the Interior, or other person authorized to receive such information, arm's-length sales and volume data for like-quality production sold, purchased or otherwise obtained by the lessee from the field or area or from nearby fields or areas.

(3) A lessee shall notify MMS if it has determined value pursuant to paragraph (c)(2) or (c)(3) of this section. The notification shall be by letter to the MMS Associate Director for Minerals Revenue Management or his/her designee. The letter shall identify the valuation method to be used and contain a brief description of the procedure to be followed. The notification required by this paragraph is a one-time notification due no later than the end of the month following the month the lessee first reports royalties on a Form MMS-2014 using a valuation method authorized by paragraph (c)(2) or (c)(3) of this section, and each time there is a change in a method under paragraph (c)(2) or (c)(3) of this section.

(f) If MMS determines that a lessee has not properly determined value, the lessee shall pay the difference, if any, between royalty payments made based upon the value it has used and the royalty payments that are due based upon the value established by MMS. The lessee shall also pay interest on that difference computed pursuant to 30 CFR 218.54. If the lessee is entitled to a credit, MMS will provide instructions for the taking of that credit.

(g) The lessee may request a value determination from MMS. In that event, the lessee shall propose to MMS a value determination method, and may use that method in determining value for royalty purposes until MMS issues its decision. The lessee shall submit all available data relevant to its proposal. The MMS shall expeditiously determine the value based upon the lessee's proposal and any additional information MMS deems necessary. In making a value determination MMS may use any of the valuation criteria authorized by this subpart. That determination shall remain effective for the period stated therein. After MMS issues its determination, the lessee shall make the adjustments in accordance with paragraph (f) of this section.

(h) Notwithstanding any other provision of this section, under no circumstances shall the value of production for royalty purposes be less than the gross proceeds accruing to the lessee for lease production, less applicable allowances.

(i) The lessee must place gas in marketable condition and market the gas for the mutual benefit of the lessee and the lessor at no cost to the Federal Government. Where the value established under this section is determined by a lessee's gross proceeds, that value will be increased to the extent that the gross proceeds have been reduced because the purchaser, or any other person, is providing certain services the cost of which ordinarily is the responsibility of the lessee to place the gas in marketable condition or to market the gas.

(j) Value shall be based on the highest price a prudent lessee can receive through legally enforceable claims under its contract. If there is no contract revision or amendment, and the lessee fails to take proper or timely action to receive prices or benefits to which it is entitled, it must pay royalty at a value based upon that obtainable price or benefit. Contract revisions or amendments shall be in writing and signed by all parties to an arm's-length contract. If the lessee makes timely application for a price increase or benefit allowed under its contract but the purchaser refuses, and the lessee takes reasonable measures, which are documented, to force purchaser compliance, the lessee will owe no additional royalties unless or until monies or consideration resulting from the price increase or additional benefits are received. This paragraph shall not be construed to permit a lessee to avoid its royalty payment obligation in situations where a purchaser fails to pay, in whole or in part or timely, for a quantity of gas.

(k) Notwithstanding any provision in these

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

regulations to the contrary, no review, reconciliation, monitoring, or other like process that results in a redetermination by MMS of value under this section shall be considered final or binding as against the Federal Government or its beneficiaries until the audit period is formally closed.

(l) Certain information submitted to MMS to support valuation proposals, including transportation or extraordinary cost allowances, is exempted from disclosure by the Freedom of Information Act, 5 U.S.C. § 552, or other Federal Law. Any data specified by law to be privileged, confidential, or otherwise exempt will be maintained in a confidential manner in accordance with applicable law and regulations. All requests for information about determinations made under this subpart are to be submitted in accordance with the Freedom of Information Act regulation of the Department of the Interior, 43 CFR Part 2.

**§ 206.153 Valuation standards--processed gas.**

(a)(1) This section applies to the valuation of all gas that is processed by the lessee and any other gas production to which this subpart applies and that is not subject to the valuation provisions of § 206.152 of this part. This section applies where the lessee's contract includes a reservation of the right to process the gas and the lessee exercises that right.

(2) The value of production, for royalty purposes, of gas subject to this section shall be the combined value of the residue gas and all gas plant products determined pursuant to this section, plus the value of any condensate recovered downstream of the point of royalty settlement without resorting to processing determined pursuant to § 206.102 of this part, less applicable transportation allowances and processing allowances determined pursuant to this subpart.

(b)(1)(i) The value of residue gas or any gas plant product sold under an arm's-length contract is the gross proceeds accruing to the lessee, except as provided in paragraphs (b)(1)(ii), (iii), and (iv) of this section. The lessee shall have the burden of demonstrating that its contract is arm's-length. The value that the lessee reports for royalty purposes is subject to monitoring, review, and audit. For purposes of this section, residue gas or any gas plant product which is sold or otherwise transferred to the lessee's marketing affiliate and then sold by the marketing affiliate pursuant to an arm's-length contract shall be valued in accordance with this paragraph based upon the sale by the marketing affiliate.

(ii) In conducting these reviews and audits, MMS will examine whether or not the contract reflects the total consideration actually transferred either directly or indirectly from the buyer to the seller for the residue gas or gas plant product. If the contract does not reflect the total consideration, then the MMS may require that the residue gas or gas plant product sold pursuant to that contract be valued in accordance with paragraph (c) of this section. Value may not be less than the gross proceeds accruing to the lessee, including the additional consideration.

(iii) If the MMS determines that the gross proceeds accruing to the lessee pursuant to an arm's-length contract do not reflect the reasonable value of the residue gas or gas plant product because of misconduct by or between the contracting parties, or because the lessee otherwise has breached its duty to the lessor to market the production for the mutual benefit of the lessee and the lessor, then MMS shall require that the residue gas or gas plant product be valued pursuant to paragraph (c)(2) or (c)(3) of this section, and in accordance with the notification requirements of paragraph (e) of this section. When MMS determines that the value may be unreasonable, MMS will notify the lessee and give the lessee an opportunity to provide written information justifying the lessee's value.

(iv) How to value over-delivered volumes under a cash-out program. This paragraph applies to situations where a pipeline purchases gas from a lessee according to a cash-out program under a transportation contract. For all over-delivered volumes, the royalty value is the price the pipeline is required to pay for volumes within the tolerances for over-delivery specified in the transportation contract. Use the same value for volumes that exceed the over-delivery tolerances even if those volumes

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

are subject to a lower price under the transportation contract. However, if MMS determines that the price specified in the transportation contract for over-delivered volumes is unreasonably low, the lessee must value all over-delivered volumes under paragraph (c)(2) or (c)(3) of this section.

(2) Notwithstanding the provisions of paragraph (b)(1) of this section, the value of residue gas sold pursuant to a warranty contract shall be determined by MMS, and due consideration will be given to all valuation criteria specified in this section. The lessee must request a value determination in accordance with paragraph (g) of this section for gas sold pursuant to a warranty contract; provided, however, that any value determination for a warranty contract in effect on the effective date of these regulations shall remain in effect until modified by MMS.

(3) MMS may require a lessee to certify that its arm's-length contract provisions include all of the consideration to be paid by the buyer, either directly or indirectly, for the residue gas or gas plant product.

(c) The value of residue gas or any gas plant product which is not sold pursuant to an arm's-length contract shall be the reasonable value determined in accordance with the first applicable of the following methods:

(1) The gross proceeds accruing to the lessee pursuant to a sale under its non-arm's-length contract (or other disposition other than by an arm's-length contract), provided that those gross proceeds are equivalent to the gross proceeds derived from, or paid under, comparable arm's-length contracts for purchases, sales, or other dispositions of like quality residue gas or gas plant products from the same processing plant (or, if necessary to obtain a reasonable sample, from nearby plants). In evaluating the comparability of arm's-length contracts for the purposes of these regulations, the following factors shall be considered: price, time of execution, duration, market or markets served, terms, quality of residue gas or gas plant products, volume, and such other factors as may be appropriate to reflect the value of the residue gas or gas plant products;

(2) A value determined by consideration of other information relevant in valuing like-quality residue gas or gas plant products, including gross proceeds under arm's-length contracts for like-quality residue gas or gas plant products from the same gas plant or other nearby processing plants, posted prices for residue gas or gas plant products, prices received in spot sales of residue gas or gas plant products, other reliable public sources of price or market information, and other information as to the particular lease operation or the saleability of such residue gas or gas plant products; or

(3) A net-back method or any other reasonable method to determine value.

(d)(1) Notwithstanding any other provisions of this section, except paragraph (h) of this section, if the maximum price permitted by Federal law at which any residue gas or gas plant products may be sold is less than the value determined pursuant to this section, then MMS shall accept such maximum price as the value. For the purposes of this section, price limitations set by any State or local government shall not be considered as a maximum price permitted by Federal law.

(2) The limitation prescribed by paragraph (d)(1) of this section shall not apply to residue gas sold pursuant to a warranty contract and valued pursuant to paragraph (b)(2) of this section.

(e)(1) Where the value is determined pursuant to paragraph (c) of this section, the lessee shall retain all data relevant to the determination of royalty value. Such data shall be subject to review and audit, and MMS will direct a lessee to use a different value if it determines upon review or audit that the reported value is inconsistent with the requirements of these regulations.

(2) Any Federal lessee will make available upon request to the authorized MMS or State

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

representatives, to the Office of the Inspector General of the Department of the Interior, or other persons authorized to receive such information, arm's-length sales and volume data for like-quality residue gas and gas plant products sold, purchased or otherwise obtained by the lessee from the same processing plant or from nearby processing plants.

(3) A lessee shall notify MMS if it has determined any value pursuant to paragraph (c)(2) or (c)(3) of this section. The notification shall be by letter to the MMS Associate Director for Minerals Revenue Management or his/her designee. The letter shall identify the valuation method to be used and contain a brief description of the procedure to be followed. The notification required by this paragraph is a one-time notification due no later than the end of the month following the month the lessee first reports royalties on a Form MMS-2014 using a valuation method authorized by paragraph (c)(2) or (c)(3) of this section, and each time there is a change in a method under paragraph (c)(2) or (c)(3) of this section.

(f) If MMS determines that a lessee has not properly determined value, the lessee shall pay the difference, if any, between royalty payments made based upon the value it has used and the royalty payments that are due based upon the value established by MMS. The lessee shall also pay interest computed on that difference pursuant to 30 CFR 218.54. If the lessee is entitled to a credit, MMS will provide instructions for the taking of that credit.

(g) The lessee may request a value determination from MMS. In that event, the lessee shall propose to MMS a value determination method, and may use that method in determining value for royalty purposes until MMS issues its decision. The lessee shall submit all available data relevant to its proposal. The MMS shall expeditiously determine the value based upon the lessee's proposal and any additional information MMS deems necessary. In making a value determination, MMS may use any of the valuation criteria authorized by this subpart. That determination shall remain effective for the period stated therein. After MMS issues its determination, the lessee shall make the adjustments in accordance with paragraph (f) of this section.

(h) Notwithstanding any other provision of this section, under no circumstances shall the value of production for royalty purposes be less than the gross proceeds accruing to the lessee for residue gas and/or any gas plant products, less applicable transportation allowances and processing allowances determined pursuant to this subpart.

(i) The lessee must place residue gas and gas plant products in marketable condition and market the residue gas and gas plant products for the mutual benefit of the lessee and the lessor at no cost to the Federal Government. Where the value established under this section is determined by a lessee's gross proceeds, that value will be increased to the extent that the gross proceeds have been reduced because the purchaser, or any other person, is providing certain services the cost of which ordinarily is the responsibility of the lessee to place the residue gas or gas plant products in marketable condition or to market the residue gas and gas plant products.

(j) Value shall be based on the highest price a prudent lessee can receive through legally enforceable claims under its contract. Absent contract revision or amendment, if the lessee fails to take proper or timely action to receive prices or benefits to which it is entitled it must pay royalty at a value based upon that obtainable price or benefit. Contract revisions or amendments shall be in writing and signed by all parties to an arm's-length contract. If the lessee makes timely application for a price increase or benefit allowed under its contract but the purchaser refuses, and the lessee takes reasonable measures, which are documented, to force purchaser compliance, the lessee will owe no additional royalties unless or until monies or consideration resulting from the price increase or additional benefits are received. This paragraph shall not be construed to permit a lessee to avoid its royalty payment obligation in situations where a purchaser fails to pay, in whole or in part, or timely, for a quantity of residue gas or gas plant product.

(k) Notwithstanding any provision in these regulations to the contrary, no review, reconciliation, monitoring, or other like process that results in a redetermination by MMS of value under this section shall be considered final or binding against the Federal Government or its beneficiaries until the audit period is formally closed.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(l) Certain information submitted to MMS to support valuation proposals, including transportation allowances, processing allowances or extraordinary cost allowances, is exempted from disclosure by the Freedom of Information Act, 5 U.S.C. 552, or other Federal law. Any data specified by law to be privileged, confidential, or otherwise exempt, will be maintained in a confidential manner in accordance with applicable law and regulations. All requests for information about determinations made under this Part are to be submitted in accordance with the Freedom of Information Act regulation of the Department of the Interior, 43 CFR Part 2.

**§ 206.154 Determination of quantities and qualities for computing royalties.**

(a)(1) Royalties shall be computed on the basis of the quantity and quality of unprocessed gas at the point of royalty settlement approved by BLM or MMS for onshore and OCS leases, respectively.

(2) If the value of gas determined pursuant to § 206.152 of this subpart is based upon a quantity and/or quality that is different from the quantity and/or quality at the point of royalty settlement, as approved by BLM or MMS, that value shall be adjusted for the differences in quantity and/or quality.

(b)(1) For residue gas and gas plant products, the quantity basis for computing royalties due is the monthly net output of the plant even though residue gas and/or gas plant products may be in temporary storage.

(2) If the value of residue gas and/or gas plant products determined pursuant to § 206.153 of this subpart is based upon a quantity and/or quality of residue gas and/or gas plant products that is different from that which is attributable to a lease, determined in accordance with paragraph (c) of this section, that value shall be adjusted for the differences in quantity and/or quality.

(c) The quantity of the residue gas and gas plant products attributable to a lease shall be determined according to the following procedure:

(1) When the net output of the processing plant is derived from gas obtained from only one lease, the quantity of the residue gas and gas plant products on which computations of royalty are based is the net output of the plant.

(2) When the net output of a processing plant is derived from gas obtained from more than one lease producing gas of uniform content, the quantity of the residue gas and gas plant products allocable to each lease shall be in the same proportions as the ratios obtained by dividing the amount of gas delivered to the plant from each lease by the total amount of gas delivered from all leases.

(3) When the net output of a processing plant is derived from gas obtained from more than one lease producing gas of nonuniform content, the quantity of the residue gas allocable to each lease will be determined by multiplying the amount of gas delivered to the plant from the lease by the residue gas content of the gas, and dividing the arithmetical product thus obtained by the sum of the similar arithmetical products separately obtained for all leases from which gas is delivered to the plant, and then multiplying the net output of the residue gas by the arithmetic quotient obtained. The net output of gas plant products allocable to each lease will be determined by multiplying the amount of gas delivered to the plant from the lease by the gas plant product content of the gas, and dividing the arithmetical product thus obtained by the sum of the similar arithmetical products separately obtained for all leases from which gas is delivered to the plant, and then multiplying the net output of each gas plant product by the arithmetic quotient obtained.

(4) A lessee may request MMS approval of other methods for determining the quantity of residue gas and gas plant products allocable to each lease. If approved, such method will be applicable to all gas production from Federal leases that is processed in the same plant.

(d)(1) No deductions may be made from the royalty volume or royalty value for actual or theoretical losses. Any actual loss of unprocessed gas that may be sustained prior to the royalty settlement metering or measurement point will not be subject to royalty

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.