to which you are entitled, you must pay royalty at a value based upon that obtainable price or benefit. Contract revisions or amendments must be in writing and signed by all parties to an arm's-length contract. If you make timely application for a price increase or benefit allowed under your contract but the purchaser refuses, and you take reasonable measures, which are documented, to force purchaser compliance, you will owe no additional royalties unless or until monies or consideration resulting from the price increase or additional benefits are received. This paragraph is not intended to permit you to avoid your royalty payment obligation in situations where your purchaser fails to pay, in whole or in part, or timely, for a quantity of gas, residue gas, or gas plant product.

(j) Non-binding MMS reviews. Notwithstanding any provision in these regulations to the contrary, no review, reconciliation, monitoring, or other like process that results in an MMS redetermination of value under this section will be considered final or binding against the Federal Government or its beneficiaries until the audit period is formally closed.

(k) Confidential information. Certain information submitted to MMS to support valuation proposals, including transportation allowances and processing allowances, may be exempted from disclosure under the Freedom of Information Act, 5 U.S.C. 552, or other Federal law. Any data specified by law to be privileged, confidential, or otherwise exempt, will be maintained in a confidential manner in accordance with applicable laws and regulations. All requests for information about determinations made under this subpart must be submitted in accordance with the Freedom of Information Act regulation of the Department of the Interior, 43 CFR part 2.

**§ 206.175 How do I determine quantities and qualities of production for computing royalties?**

(a) For unprocessed gas, you must pay royalties on the quantity and quality at the facility measurement point BLM either allowed or approved.

(b) For residue gas and gas plant products, you must pay royalties on your share of the monthly net output of the plant even though residue gas and/or gas plant products may be in temporary storage.

(c) If you have no ownership interest in the processing plant and you do not operate the plant, you may use the contract volume allocation to determine your share of plant products.

(d) If you have an ownership interest in the plant or if you operate it, use the following procedure to determine the quantity of the residue gas and gas plant products attributable to you for royalty payment purposes:

(1) When the net output of the processing plant is derived from gas obtained from only one lease, the quantity of the residue gas and gas plant products on which you must pay royalty is the net output of the plant.

(2) When the net output of a processing plant is derived from gas obtained from more than one lease producing gas of uniform content, the quantity of the residue gas and gas plant products allocable to each lease must be in the same proportions as the ratios obtained by dividing the amount of gas delivered to the plant from each lease by the total amount of gas delivered from all leases.

(3) When the net output of a processing plant is derived from gas obtained from more than one lease producing gas of non-uniform content, the volumes of residue gas and gas plant products allocable to each lease are based on theoretical volumes of residue gas and gas plant products measured in the lease gas stream. You must calculate the portion of net plant output of residue gas and gas plant products attributable to each lease as follows:

(i) First, compute the theoretical volumes of residue gas and of gas plant products attributable to the lease by multiplying the lease volume of the gas stream by the tested residue gas content (mole percentage) or gas plant product (GPM) content of the gas stream;

(ii) Second, calculate the theoretical volumes of residue gas and of gas plant products delivered from all leases by summing the theoretical volumes of residue gas and of gas plant

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

products delivered from each lease; and

(iii) Third, calculate the theoretical quantities of net plant output of residue gas and of gas plant products attributable to each lease by multiplying the net plant output of residue gas, or gas plant products, by the ratio in which the theoretical volumes of residue gas, or gas plant products, is the numerator and the theoretical volume of residue gas, or gas plant products, delivered from all leases is the denominator.

(4) You may request MMS approval of other methods for determining the quantity of residue gas and gas plant products allocable to each lease. If MMS approves a different method, it will be applicable to all gas production from your Indian leases that is processed in the same plant.

(e) You may not take any deductions from the royalty volume or royalty value for actual or theoretical losses. Any actual loss of unprocessed gas incurred prior to the facility measurement point will not be subject to royalty if BLM determines that the loss was unavoidable.

**§ 206.176 How do I perform accounting for comparison?**

(a) This section applies if the gas produced from your Indian lease is processed and that Indian lease requires accounting for comparison (also referred to as actual dual accounting). Except as provided in paragraphs (b) and (c) of this section, the actual dual accounting value, for royalty purposes, is the greater of the following two values:

(1) The combined value of the following products:

(i) The residue gas and gas plant products resulting from processing the gas determined under either § 206.172 or § 206.174, less any applicable allowances; and

(ii) Any drip condensate associated with the processed gas recovered downstream of the point of royalty settlement without resorting to processing determined under § 206.52, less applicable allowances.

(2) The value of the gas prior to processing determined under either § 206.172 or § 206.174 , including any applicable allowances.

(b) If you are required to account for comparison, you may elect to use the alternative dual accounting methodology provided for in § 206.173 instead of the provisions in paragraph (a) of this section.

(c) Accounting for comparison is not required for gas if no gas from the lease is processed until after the gas flows into a pipeline with an index located in an index zone or into a mainline pipeline not in an index zone. If you do not perform dual accounting, you must certify to MMS that gas flows into such a pipeline before it is processed.

(d) Except as provided in paragraph (e) of this section, if you value any gas production from a lease for a month using the dual accounting provisions of this section or the alternative dual accounting methodology of § 206.173, then the value of that gas is the minimum value for any other gas production from that lease for that month flowing through the same facility measurement point.

(e) If the weighted-average Btu quality for your lease is less than 1,000 Btu's per cubic foot, see § 206.173(b)(4)(ii) to determine if you must perform a dual accounting calculation.

**Transportation Allowances**

**§ 206.177 What general requirements regarding transportation allowances apply to me?**

(a) When you value gas under § 206.174 at a point off the lease, unit, or communitized area (for example, sales point or point of value determination), you may deduct from value a transportation allowance to reflect the value, for royalty purposes, at the lease, unit, or communitized area. The allowance is based on the reasonable actual costs you incurred to transport unprocessed gas, residue gas, or gas plant products from a lease to a point off the lease, unit, or communitized area. This would include, if appropriate, transportation from the lease to a gas processing plant off the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

lease, unit, or communitized area and from the plant to a point away from the plant. You may not deduct any allowance for gathering costs.

(b) You must allocate transportation costs among all products you produce and transport as provided in § 206.178.

(c)(1) Except as provided in paragraphs (c)(2) and (3) of this section, your transportation allowance deduction for each selling arrangement may not exceed 50 percent of the value of the unprocessed gas, residue gas, or gas plant product. For purposes of this section, natural gas liquids are considered one product.

(2) If you ask MMS, MMS may approve a transportation allowance deduction in excess of the limitations in paragraph (c)(1) of this section. To receive this approval, you must demonstrate that the transportation costs incurred in excess of the limitations in paragraph (c)(1) of this section were reasonable, actual, and necessary. Under no circumstances may an allowance reduce the value for royalty purposes under any selling arrangement to zero.

(3) Your application for exception (using Form MMS-4393, Request to Exceed Regulatory Allowance Limitation) must contain all relevant and supporting documentation necessary for MMS to make a determination.

(d) If MMS conducts a review or audit and determines that you have improperly determined a transportation allowance authorized by this subpart, then you will be required to pay any additional royalties, plus interest determined in accordance with 30 CFR 218.54. Alternatively, you may be entitled to a credit, but you will not receive any interest on your overpayment.

**§ 206.178 How do I determine a transportation allowance?**

(a) Determining a transportation allowance under an arm's-length contract.

(1) This paragraph explains how to determine your allowance if you have an arm's-length transportation contract.

(i) If you have an arm's-length contract for transportation of your production, the transportation allowance is the reasonable, actual costs you incur for transporting the unprocessed gas, residue gas and/or gas plant products under that contract. Paragraphs (a)(1)(ii) and (iii) of this section provide a limited exception. You have the burden of demonstrating that your contract is arm's-length. Your allowances also are subject to paragraph (e) of this section. You are required to submit to MMS a copy of your arm's-length transportation contract(s) and all subsequent amendments to the contract(s) within 2 months of the date MMS receives your report which claims the allowance on the Form MMS-2014.

(ii) When either MMS or a tribe conducts reviews and audits, they will examine whether or not the contract reflects more than the consideration actually transferred either directly or indirectly from you to the transporter of the transportation. If the contract reflects more than the total consideration, then MMS may require that the transportation allowance be determined under paragraph (b) of this section.

(iii) If MMS determines that the consideration paid under an arm's-length transportation contract does not reflect the value of the transportation because of misconduct by or between the contracting parties, or because you otherwise have breached your duty to the lessor to market the production for the mutual benefit of you and the lessor, then MMS will require that the transportation allowance be determined under paragraph (b) of this section. In these circumstances, MMS will notify you and give you an opportunity to provide written information justifying your transportation costs.

(2) This paragraph explains how to allocate the costs to each product if your arm's-length transportation contract includes more than one product in a gaseous phase and the transportation costs attributable to each product cannot be determined from the contract.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(i) If your arm's-length transportation contract includes more than one product in a gaseous phase and the transportation costs attributable to each product cannot be determined from the contract, the total transportation costs must be allocated in a consistent and equitable manner to each of the products transported. To make this allocation, use the same proportion as the ratio that the volume of each product (excluding waste products which have no value) bears to the volume of all products in the gaseous phase (excluding waste products which have no value). Except as provided in this paragraph, you cannot take an allowance for the costs of transporting lease production that is not royalty bearing without MMS approval, or without lessor approval on tribal leases.

(ii) As an alternative to paragraph (a)(2)(i) of this section, you may propose to MMS a cost allocation method based on the values of the products transported. MMS will approve the method if we determine that it meets one of the two following requirements:

(A) The methodology in paragraph (a)(2)(i) of this section cannot be applied; and

(B) Your proposal is more reasonable than the methodology in paragraph (a)(2)(i) of this section.

(3) This paragraph explains how to allocate costs to each product if your arm's-length transportation contract includes both gaseous and liquid products and the transportation costs attributable to each cannot be determined from the contract.

(i) If your arm's-length transportation contract includes both gaseous and liquid products and the transportation costs attributable to each cannot be determined from the contract, you must propose an allocation procedure to MMS. You may use the transportation allowance determined in accordance with your proposed allocation procedure until MMS decides whether to accept your cost allocation.

(ii) You are required to submit all relevant data to support your allocation proposal. MMS will then determine the gas transportation allowance based upon your proposal and any additional information MMS deems necessary.

(4) If your payments for transportation under an arm's-length contract are not based on a dollar per unit price, you must convert whatever consideration is paid to a dollar value equivalent for the purposes of this section.

(5) Where an arm's-length sales contract price includes a reduction for a transportation factor, MMS will not consider the transportation factor to be a transportation allowance. You may use the transportation factor to determine your gross proceeds for the sale of the product. However, the transportation factor may not exceed 50 percent of the base price of the product without MMS approval.

(b) Determining a transportation allowance under a non-arm's-length or no contract.

(1) This paragraph explains how to determine your allowance if you have a non-arm's-length transportation contract or no contract.

(i) When you have a non-arm's-length transportation contract or no contract, including those situations where you perform transportation services for yourself, the transportation allowance is based upon your reasonable, allowable, actual costs for transportation as provided in this paragraph.

(ii) All transportation allowances deducted under a non-arm's-length or no contract situation are subject to monitoring, review, audit, and adjustment. You must submit the actual cost information to support the allowance to MMS on Form MMS-4295, Gas Transportation Allowance Report, within 3 months after the end of the 12-month period to which the allowance applies. However, MMS may approve a longer time period. MMS will monitor the allowance deductions to ensure that deductions are reasonable and allowable. When necessary or appropriate, MMS may require you to modify your actual transportation allowance deduction.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(2) This paragraph explains what actual transportation costs are allowable under a non-arm's-length contract or no contract situation. The transportation allowance for non-arm's-length or no-contract situations is based upon your actual costs for transportation during the reporting period. Allowable costs include operating and maintenance expenses, overhead, and either depreciation and a return on undepreciated capital investment (in accordance with paragraph (b)(2)(iv)(A) of this section), or a cost equal to the initial depreciable investment in the transportation system multiplied by a rate of return in accordance with paragraph (b)(2)(iv)(B) of this section. Allowable capital costs are generally those costs for depreciable fixed assets (including costs of delivery and installation of capital equipment) that are an integral part of the transportation system.

(i) Allowable operating expenses include operations supervision and engineering, operations labor, fuel, utilities, materials, ad valorem property taxes, rent, supplies, and any other directly allocable and attributable operating expense that you can document.

(ii) Allowable maintenance expenses include maintenance of the transportation system, maintenance of equipment, maintenance labor, and other directly allocable and attributable maintenance expenses that you can document.

(iii) Overhead directly attributable and allocable to the operation and maintenance of the transportation system is an allowable expense. State and Federal income taxes and severance taxes and other fees, including royalties, are not allowable expenses.

(iv) You may use either depreciation with a return on undepreciated capital investment or a return on depreciable capital investment. After you have elected to use either method for a transportation system, you may not later elect to change to the other alternative without MMS approval.

(A) To compute depreciation, you may elect to use either a straight-line depreciation method based on the life of equipment or on the life of the reserves that the transportation system services, or a unit of production method. Once you make an election, you may not change methods without MMS approval. A change in ownership of a transportation system will not alter the depreciation schedule that the original transporter/lessee established for purposes of the allowance calculation. With or without a change in ownership, a transportation system may be depreciated only once. Equipment may not be depreciated below a reasonable salvage value. To compute a return on undepreciated capital investment, you will multiply the undepreciated capital investment in the transportation system by the rate of return determined under paragraph (b)(2)(v) of this section.

(B) To compute a return on depreciable capital investment, you will multiply the initial capital investment in the transportation system by the rate of return determined under paragraph (b)(2)(v) of this section. No allowance will be provided for depreciation. This alternative will apply only to transportation facilities first placed in service after March 1, 1988.

(v) The rate of return is the industrial rate associated with Standard and Poor's BBB rating. The rate of return is the monthly average rate as published in Standard and Poor's Bond Guide for the first month of the reporting period for which the allowance is applicable and is effective during the reporting period. The rate must be redetermined at the beginning of each subsequent transportation allowance reporting period that is determined under paragraph (b)(4) of this section.

(3) This paragraph explains how to allocate transportation costs to each product and transportation system.

(i) The deduction for transportation costs must be determined based on your cost of transporting each product through each individual transportation system. If you transport more than one product in a gaseous phase, the allocation of costs to each of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

products transported must be made in a consistent and equitable manner. The allocation should be in the same proportion that the volume of each product (excluding waste products that have no value) bears to the volume of all products in the gaseous phase (excluding waste products that have no value). Except as provided in this paragraph, you may not take an allowance for transporting a product that is not royalty bearing without MMS approval.

(ii) As an alternative to the requirements of paragraph (b)(3)(i) of this section, you may propose to MMS a cost allocation method based on the values of the products transported. MMS will approve the method upon determining that it meets one of the two following requirements:

(A) The methodology in paragraph (b)(3)(i) of this section cannot be applied; and

(B) Your proposal is more reasonable than the method in paragraph (b)(3)(i) of this section.

(4) Your transportation allowance under this paragraph (b) must be determined based upon a calendar year or other period if you and MMS agree to an alternative.

(5) If you transport both gaseous and liquid products through the same transportation system, you must propose a cost allocation procedure to MMS. You may use the transportation allowance determined in accordance with your proposed allocation procedure until MMS issues its determination on the acceptability of the cost allocation. You are required to submit all relevant data to support your proposal. MMS will then determine the transportation allowance based upon your proposal and any additional information MMS deems necessary.

(c) Using the alternative transportation calculation when you have a non-arm's-length or no contract.

(1) As an alternative to computing your transportation allowance under paragraph (b) of this section, you may use as the transportation allowance 10 percent of your gross proceeds but not to exceed 30 cents per MMBtu.

(2) Your election to use the alternative transportation allowance calculation in paragraph (c)(1) of this section must be made at the beginning of a month and must remain in effect for an entire calendar year. Your first election will remain in effect until the end of the succeeding calendar year, except for elections effective January 1 that will be effective only for that calendar year.

(d) Reporting your transportation allowance.

(1) If MMS requests, you must submit all data used to determine your transportation allowance. The data must be provided within a reasonable period of time that MMS will determine.

(2) You must report transportation allowances as a separate line item on Form MMS-2014. MMS may approve a different reporting procedure on allottee leases, and with lessor approval on tribal leases.

(e) Adjusting incorrect allowances. If for any month the transportation allowance you are entitled to is less than the amount you took on Form MMS-2014, you are required to report and pay additional royalties due, plus interest computed under 30 CFR 218.54 from the first day of the first month you deducted the improper transportation allowance until the date you pay the royalties due. If the transportation allowance you are entitled to is greater than the amount you took on Form MMS-2014 for any royalties during the reporting period, you are entitled to a credit. No interest will be paid on the overpayment.

(f) Determining allowable costs for transportation allowances. Lessees may include, but are not limited to, the following costs in determining the arm's-length transportation allowance under paragraph (a) of this section or the non-arm's-length transportation allowance under paragraph (b) of this section:

(1) Firm demand charges paid to pipelines. You must limit the allowable costs for the firm

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

demand charges to the applicable rate per MMBtu multiplied by the actual volumes transported. You may not include any losses incurred for previously purchased but unused firm capacity. You also may not include any gains associated with releasing firm capacity. If you receive a payment or credit from the pipeline for penalty refunds, rate case refunds, or other reasons, you must reduce the firm demand charge claimed on the Form MMS-2014. You must modify the Form MMS-2014 by the amount received or credited for the affected reporting period.

(2) Gas supply realignment (GSR) costs. The GSR costs result from a pipeline reforming or terminating supply contracts with producers to implement the restructuring requirements of FERC orders in 18 CFR part 284.

(3) Commodity charges. The commodity charge allows the pipeline to recover the costs of providing service.

(4) Wheeling costs. Hub operators charge a wheeling cost for transporting gas from one pipeline to either the same or another pipeline through a market center or hub. A hub is a connected manifold of pipelines through which a series of incoming pipelines are interconnected to a series of outgoing pipelines.

(5) Gas Research Institute (GRI) fees. The GRI conducts research, development, and commercialization programs on natural gas related topics for the benefit of the U.S. gas industry and gas customers. GRI fees are allowable provided such fees are mandatory in FERC-approved tariffs.

(6) Annual Charge Adjustment (ACA) fees. FERC charges these fees to pipelines to pay for its operating expenses.

(7) Payments (either volumetric or in value) for actual or theoretical losses. This paragraph does not apply to non- arm's-length transportation arrangements.

(8) Temporary storage services. This includes short duration storage services offered by market centers or hubs (commonly referred to as "parking" or "banking"), or other temporary storage services provided by pipeline transporters, whether actual or provided as a matter of accounting. Temporary storage is limited to 30 days or less.

(9) Supplemental costs for compression, dehydration, and treatment of gas. MMS allows these costs only if such services are required for transportation and exceed the services necessary to place production into marketable condition required under § 206.174(h).

(g) Determining nonallowable costs for transportation allowances. Lessees may not include the following costs in determining the arm's-length transportation allowance under paragraph (a) of this section or the non-arm's-length transportation allowance under paragraph (b) of this section:

(1) Fees or costs incurred for storage. This includes storing production in a storage facility, whether on or off the lease, for more than 30 days.

(2) Aggregater/marketer fees. This includes fees you pay to another person (including your affiliates) to market your gas, including purchasing and reselling the gas, or finding or maintaining a market for the gas production.

(3) Penalties you incur as shipper. These penalties include, but are not limited to the following:

(i) Over-delivery cash-out penalties. This includes the difference between the price the pipeline pays you for over-delivered volumes outside the tolerances and the price you receive for over-delivered volumes within tolerances.

(ii) Scheduling penalties. This includes penalties you incur for differences between daily volumes delivered into the pipeline and volumes scheduled or nominated at a receipt or delivery point.

(iii) Imbalance penalties. This includes

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

penalties you incur (generally on a monthly basis) for differences between volumes delivered into the pipeline and volumes scheduled or nominated at a receipt or delivery point.

(iv) Operational penalties. This includes fees you incur for violation of the pipeline's curtailment or operational orders issued to protect the operational integrity of the pipeline.

(4) Intra-hub transfer fees. These are fees you pay to hub operators for administrative services (e.g., title transfer tracking) necessary to account for the sale of gas within a hub.

(5) Other nonallowable costs. Any cost you incur for services you are required to provide at no cost to the lessor.

(h) Other transportation cost determinations. You must follow the provisions of this section to determine transportation costs when establishing value using either a net-back valuation procedure or any other procedure that allows deduction of actual transportation costs.

**Processing Allowances**

**§ 206.179 What general requirements regarding processing allowances apply to me?**

(a) When you value any gas plant product under § 206.174, you may deduct from value the reasonable actual costs of processing.

(b) You must allocate processing costs among the gas plant products. You must determine a separate processing allowance for each gas plant product and processing plant relationship. Natural gas liquids are considered as one product.

(c) The processing allowance deduction based on an individual product may not exceed 66 2/3 percent of the value of each gas plant product determined under § 206.174. Before you calculate the 66 2/3 percent limit, you must first reduce the value for any transportation allowances related to post-processing transportation authorized under § 206.177.

(d) Processing cost deductions will not be allowed for placing lease products in marketable condition. These costs include among others, dehydration, separation, compression upstream of the facility measurement point, or storage, even if those functions are performed off the lease or at a processing plant. Costs for the removal of acid gases, commonly referred to as sweetening, are not allowed unless the acid gases removed are further processed into a gas plant product. In such event, you will be eligible for a processing allowance determined under this subpart. However, MMS will not grant any processing allowance for processing lease production that is not royalty bearing.

(e) You will be allowed a reasonable amount of residue gas royalty free for operation of the processing plant, but no allowance will be made for expenses incidental to marketing, except as provided in 30 CFR part 206. In those situations where a processing plant processes gas from more than one lease, only that proportionate share of your residue gas necessary for the operation of the processing plant will be allowed royalty free.

(f) You do not owe royalty on residue gas, or any gas plant product resulting from processing gas, that is reinjected into a reservoir within the same lease, unit, or approved Federal agreement, until such time as those products are finally produced from the reservoir for sale or other disposition. This paragraph applies only when the reinjection is included in a BLM-approved plan of development or operations.

(g) If MMS determines that you have determined an improper processing allowance authorized by this subpart, then you will be required to pay any additional royalties plus late payment interest determined under 30 CFR 218.54. Alternatively, you may be entitled to a credit, but you will not receive any interest on your overpayment.

**§ 206.180 How do I determine an actual processing allowance?**

(a) Determining a processing allowance if you have an arms's-length processing contract.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(1) This paragraph explains how you determine an allowance under an arm's-length processing contract.

(i) The processing allowance is the reasonable actual costs you incur to process the gas under that contract. Paragraphs (a)(1)(ii) and (iii) of this section provide a limited exception. You have the burden of demonstrating that your contract is arm's-length. You are required to submit to MMS a copy of your arm's-length contract(s) and all subsequent amendments to the contract(s) within 2 months of the date MMS receives your first report that deducts the allowance on the Form MMS-2014.

(ii) When MMS conducts reviews and audits, we will examine whether the contract reflects more than the consideration actually transferred either directly or indirectly from you to the processor for the processing. If the contract reflects more than the total consideration, then MMS may require that the processing allowance be determined under paragraph (b) of this section.

(iii) If MMS determines that the consideration paid under an arm's-length processing contract does not reflect the value of the processing because of misconduct by or between the contracting parties, or because you otherwise have breached your duty to the lessor to market the production for the mutual benefit of you and the lessor, then MMS will require that the processing allowance be determined under paragraph (b) of this section. In these circumstances, MMS will notify you and give you an opportunity to provide written information justifying your processing costs.

(2) If your arm's-length processing contract includes more than one gas plant product and the processing costs attributable to each product can be determined from the contract, then the processing costs for each gas plant product must be determined in accordance with the contract. You may not take an allowance for the costs of processing lease production that is not royalty-bearing.

(3) If your arm's-length processing contract includes more than one gas plant product and the processing costs attributable to each product cannot be determined from the contract, you must propose an allocation procedure to MMS. You may use your proposed allocation procedure until MMS issues its determination. You are required to submit all relevant data to support your proposal. MMS will then determine the processing allowance based upon your proposal and any additional information MMS deems necessary. You may not take a processing allowance for the costs of processing lease production that is not royalty-bearing.

(4) If your payments for processing under an arm's-length contract are not based on a dollar per unit price, you must convert whatever consideration is paid to a dollar value equivalent for the purposes of this section.

(b) Determining a processing allowance if you have a non-arm's-length contract or no contract.

(1) This paragraph applies if you have a non-arm's-length processing contract or no contract, including those situations where you perform processing for yourself.

(i) If you have a non-arm's-length contract or no contract, the processing allowance is based upon your reasonable actual costs of processing as provided in paragraph (b)(2) of this section.

(ii) All processing allowances deducted under a non-arm's-length or no-contract situation are subject to monitoring, review, audit, and adjustment. You must submit the actual cost information to support the allowance to MMS on Form MMS-4109, Gas Processing Allowance Summary Report, within 3 months after the end of the 12-month period for which the allowance applies. MMS may approve a longer time period. MMS will monitor the allowance deduction to ensure that deductions are reasonable and allowable. When necessary or appropriate, MMS may require you to modify your processing allowance.

(2) The processing allowance for non-arm's-length or no-contract situations is based upon your actual costs for processing during the reporting period. Allowable costs

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

include operating and maintenance expenses, overhead, and either depreciation and a return on undepreciated capital investment (in accordance with paragraph (b)(2)(iv)(A) of this section), or a cost equal to the initial depreciable investment in the processing plant multiplied by a rate of return in accordance with paragraph (b)(2)(iv)(B) of this section. Allowable capital costs are generally those costs for depreciable fixed assets (including costs of delivery and installation of capital equipment) that are an integral part of the processing plant.

(i) Allowable operating expenses include operations supervision and engineering, operations labor, fuel, utilities, materials, ad valorem property taxes, rent, supplies, and any other directly allocable and attributable operating expense that the lessee can document.

(ii) Allowable maintenance expenses include maintenance of the processing plant, maintenance of equipment, maintenance labor, and other directly allocable and attributable maintenance expenses that you can document.

(iii) Overhead directly attributable and allocable to the operation and maintenance of the processing plant is an allowable expense. State and Federal income taxes and severance taxes, including royalties, are not allowable expenses.

(iv) You may use either depreciation with a return on undepreciable capital investment or a return on depreciable capital investment. After you elect to use either method for a processing plant, you may not later elect to change to the other alternative without MMS approval.

(A) To compute depreciation, you may elect to use either a straight-line depreciation method based on the life of equipment or on the life of the reserves that the processing plant services, or a unit-of-production method. Once you make an election, you may not change methods without MMS approval. A change in ownership of a processing plant will not alter the depreciation schedule that the original processor/lessee established for purposes of the allowance calculation. However, for processing plants you or your affiliate purchase that do not have a previously claimed MMS depreciation schedule, you may treat the processing plant as a newly installed facility for depreciation purposes. A processing plant may be depreciated only once, regardless of whether there is a change in ownership. Equipment may not be depreciated below a reasonable salvage value. To compute a return on undepreciated capital investment, you must multiply the undepreciable capital investment in the processing plant by the rate of return determined under paragraph (b)(2)(v) of this section.

(B) To compute a return on depreciable capital investment, you must multiply the initial capital investment in the processing plant by the rate of return determined under paragraph (b)(2)(v) of this section. No allowance will be provided for depreciation. This alternative will apply only to plants first placed in service after March 1, 1988.

(v) The rate of return is the industrial rate associated with Standard and Poor's BBB rating. The rate of return is the monthly average rate as published in Standard and Poor's Bond Guide for the first month for which the allowance is applicable. The rate must be redetermined at the beginning of each subsequent calendar year.

(3) Your processing allowance under this paragraph (b) must be determined based upon a calendar year or other period if you and MMS agree to an alternative.

(4) The processing allowance for each gas plant product must be determined based on your reasonable and actual cost of processing the gas. You must base your allocation of costs to each gas plant product upon generally accepted accounting principles. You may not take an allowance for the costs of processing lease production that is not royalty-bearing.

(c) Reporting your processing allowance.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(1) If MMS requests, you must submit all data used to determine your processing allowance. The data must be provided within a reasonable period of time, as MMS determines.

(2) You must report gas processing allowances as a separate line item on the Form MMS-2014. MMS may approve a different reporting procedure for allottee leases, and with lessor approval on tribal leases.

(d) Adjusting incorrect processing allowances. If for any month the gas processing allowance you are entitled to is less than the amount you took on Form MMS-2014, you are required to pay additional royalties, plus interest computed under 30 CFR 218.54 from the first day of the first month you deducted a processing allowance until the date you pay the royalties due. If the processing allowance you are entitled is greater than the amount you took on Form MMS-2014, you are entitled to a credit. However, no interest will be paid on the overpayment.

(e) Other processing cost determinations. You must follow the provisions of this section to determine processing costs when establishing value using either a net-back valuation procedure or any other procedure that requires deduction of actual processing costs.

**§ 206.181 How do I establish processing costs for dual accounting purposes when I do not process the gas?**

Where accounting for comparison (dual accounting) is required for gas production from a lease but neither you nor someone acting on your behalf processes the gas, and you have elected to perform actual dual accounting under § 206.176, you must use the first applicable of the following methods to establish processing costs for dual accounting purposes:

(a) The average of the costs established in your current arm's-length processing agreements for gas from the lease, provided that some gas has previously been processed under these agreements.

(b) The average of the costs established in your current arm's-length processing agreements for gas from the lease, provided that the agreements are in effect for plants to which the lease is physically connected and under which gas from other leases in the field or area is being or has been processed.

(c) A proposed comparable processing fee submitted to either the tribe and MMS (for tribal leases) or MMS (for allotted leases) with your supporting documentation submitted to MMS. If MMS does not take action on your proposal within 120 days, the proposal will be deemed to be denied and subject to appeal to the MMS Director under 30 CFR part 290.

(d) Processing costs based on the regulations in §§ 206.179 and 206.180.

**Subpart F. Federal Coal (Refs & Annos)**

**§ 206.250 Purpose and scope.**

(a) This subpart is applicable to all coal produced from Federal coal leases. The purpose of this subpart is to establish the value of coal produced for royalty purposes, of all coal from Federal leases consistent with the mineral leasing laws, other applicable laws and lease terms.

(b) If the specific provisions of any statute or settlement agreement between the United States and a lessee resulting from administrative or judicial litigation, or any coal lease subject to the requirements of this subpart, are inconsistent with any regulation in this subpart then the statute, lease provision, or settlement shall govern to the extent of that inconsistency.

(c) All royalty payments made to the Minerals Management Service (MMS) are subject to later audit and adjustment.

**§ 206.251 Definitions.**

Ad valorem lease means a lease where the royalty due to the lessor is based upon a percentage of the amount or value of the coal.

Allowance means a deduction used in determining

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

value for royalty purposes. Coal washing allowance means an allowance for the reasonable, actual costs incurred by the lessee for coal washing. Transportation allowance means an allowance for the reasonable, actual costs incurred by the lessee for moving coal to a point of sale or point of delivery remote from both the lease and mine or wash plant.

Area means a geographic region in which coal has similar quality and economic characteristics. Area boundaries are not officially designated and the areas are not necessarily named.

Arm's-length contract means a contract or agreement that has been arrived at in the marketplace between independent, nonaffiliated persons with opposing economic interests regarding that contract. For purposes of this subpart, two persons are affiliated if one person controls, is controlled by, or is under common control with another person. For purposes of this subpart, based on the instruments of ownership of the voting securities of an entity, or based on other forms of ownership:

(a) Ownership in excess of 50 percent constitutes control;

(b) Ownership of 10 through 50 percent creates a presumption of control; and

(c) Ownership of less than 10 percent creates a presumption of noncontrol which MMS may rebut if it demonstrates actual or legal control, including the existence of interlocking directorates.

Notwithstanding any other provisions of this subpart, contracts between relatives, either by blood or by marriage, are not arm's-length contracts. The MMS may require the lessee to certify ownership control. To be considered arm's-length for any production month, a contract must meet the requirements of this definition for that production month as well as when the contract was executed.

Audit means a review, conducted in accordance with generally accepted accounting and auditing standards, of royalty payment compliance activities of lessees or other interest holders who pay royalties, rents, or bonuses on Federal leases.

BLM means the Bureau of Land Management of the Department of the Interior.

Coal means coal of all ranks from lignite through anthracite.

Coal washing means any treatment to remove impurities from coal. Coal washing may include, but is not limited to, operations such as flotation, air, water, or heavy media separation; drying; and related handling (or combination thereof).

Contract means any oral or written agreement, including amendments or revisions thereto, between two or more persons and enforceable by law that with due consideration creates an obligation.

Gross proceeds (for royalty payment purposes) means the total monies and other consideration accruing to a coal lessee for the production and disposition of the coal produced. Gross proceeds includes, but is not limited to, payments to the lessee for certain services such as crushing, sizing, screening, storing, mixing, loading, treatment with substances including chemicals or oils, and other preparation of the coal to the extent that the lessee is obligated to perform them at no cost to the Federal Government. Gross proceeds, as applied to coal, also includes but is not limited to reimbursements for royalties, taxes or fees, and other reimbursements. Tax reimbursements are part of the gross proceeds accruing to a lessee even though the Federal royalty interest may be exempt from taxation. Monies and other consideration, including the forms of consideration identified in this paragraph, to which a lessee is contractually or legally entitled but which it does not seek to collect through reasonable efforts are also part of gross proceeds.

Lease means any contract, profit-share arrangement, joint venture, or other agreement issued or approved by the United States for a Federal coal resource under a mineral leasing law that authorizes exploration for, development or extraction of, or removal of coal--or the land covered by that authorization, whichever is required by the context.

Lessee means any person to whom the United States issues a lease, and any person who has been assigned an obligation to make royalty or other payments required by the lease. This includes any

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

person who has an interest in a lease as well as an operator or payor who has no interest in the lease but who has assumed the royalty payment responsibility.

Like-quality coal means coal that has similar chemical and physical characteristics.

Marketable condition means coal that is sufficiently free from impurities and otherwise in a condition that it will be accepted by a purchaser under a sales contract typical for that area.

Mine means an underground or surface excavation or series of excavations and the surface or underground support facilities that contribute directly or indirectly to mining, production, preparation, and handling of lease products.

Net-back method means a method for calculating market value of coal at the lease or mine. Under this method, costs of transportation, washing, handling, etc., are deducted from the ultimate proceeds received for the coal at the first point at which reasonable values for the coal may be determined by a sale pursuant to an arm's-length contract or by comparison to other sales of coal, to ascertain value at the mine.

Net output means the quantity of washed coal that a washing plant produces.

Netting is the deduction of an allowance from the sales value by reporting a one line net sales value, instead of correctly reporting the deduction as a separate line item on the Form MMS-4430.

Person means by individual, firm, corporation, association, partnership, consortium, or joint venture.

Selling arrangement means the individual contractual arrangements under which sales or dispositions of coal are made to a purchaser.

Spot market price means the price received under any sales transaction when planned or actual deliveries span a short period of time, usually not exceeding one year.

**§ 206.252 Information collection.**

The information collection requirements contained in this subpart have been approved by the Office of Management and Budget (OMB) under 44 U.S.C. 3501 et seq. The forms, filing date, and approved OMB clearance numbers are identified in 30 CFR 210.10 and 30 CFR 216.10.

**§ 206.253 Coal subject to royalties--general provisions.**

(a) All coal (except coal unavoidably lost as determined by BLM under 43 CFR part 3400) from a Federal lease subject to this part is subject to royalty. This includes coal used, sold, or otherwise disposed of by the lessee on or off the lease.

(b) If a lessee receives compensation for unavoidably lost coal through insurance coverage or other arrangements, royalties at the rate specified in the lease are to be paid on the amount of compensation received for the coal. No royalty is due on insurance compensation received by the lessee for other losses.

(c) If waste piles or slurry ponds are reworked to recover coal, the lessee shall pay royalty at the rate specified in the lease at the time the recovered coal is used, sold, or otherwise finally disposed of. The royalty rate shall be that rate applicable to the production method used to initially mine coal in the waste pile or slurry pond; i.e., underground mining method or surface mining method. Coal in waste pits or slurry ponds initially mined from Federal leases shall be allocated to such leases regardless of whether it is stored on Federal lands. The lessee shall maintain accurate records to determine to which individual Federal lease coal in the waste pit or slurry pond should be allocated. However, nothing in this section requires payment of a royalty on coal for which a royalty has already been paid.

**§ 206.254 Quality and quantity measurement standards for reporting and paying royalties.**

For all leases subject to this subpart, the quantity of coal on which royalty is due shall be measured in short tons (of 2,000 pounds each) by methods prescribed by the BLM. Coal quantity information shall be reported on appropriate forms required under 30 CFR Part 216 and on the Solid Minerals

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Production and Royalty Report, Form MMS-4430, as required under 30 CFR Part 210.

§ 206.255 Point of royalty determination.

(a) For all leases subject to this subpart, royalty shall be computed on the basis of the quantity and quality of Federal coal in marketable condition measured at the point of royalty measurement as determined jointly by BLM and MMS.

(b) Coal produced and added to stockpiles or inventory does not require payment of royalty until such coal is later used, sold, or otherwise finally disposed of. MMS may ask BLM to increase the lease bond to protect the lessor's interest when BLM determines that stockpiles or inventory become excessive so as to increase the risk of degradation of the resource.

(c) The lessee shall pay royalty at a rate specified in the lease at the time the coal is used, sold, or otherwise finally disposed of, unless otherwise provided for at § 206.256(d) of this subpart.

§ 206.256 Valuation standards for cents-per-ton leases.

(a) This section is applicable to coal leases on Federal lands which provide for the determination of royalty on a cents-per-ton (or other quantity) basis.

(b) The royalty for coal from leases subject to this section shall be based on the dollar rate per ton prescribed in the lease. That dollar rate shall be applicable to the actual quantity of coal used, sold, or otherwise finally disposed of, including coal which is avoidably lost as determine by BLM pursuant to 43 CFR Part 3400.

(c) For leases subject to this section, there shall be no allowances for transportation, removal of impurities, coal washing, or any other processing or preparation of the coal.

(d) When a coal lease is readjusted pursuant to 43 CFR Part 3400 and the royalty valuation method changes from a cents-per-ton basis to an ad valorem basis, coal which is produced prior to the effective date of readjustment and sold or used within 30 days of the effective date of readjustment shall be valued pursuant to this section. All coal that is not used, sold, or otherwise finally disposed of within 30 days after the effective date of readjustment shall be valued pursuant to the provisions of § 206.257 of this subpart, and royalties shall be paid at the royalty rate specified in the readjusted lease.

§ 206.257 Valuation standards for ad valorem leases.

(a) This section is applicable to coal leases on Federal lands which provide for the determination of royalty as a percentage of the amount of value of coal (ad valorem). The value for royalty purposes of coal from such leases shall be the value of coal determined under this section, less applicable coal washing allowances and transportation allowances determined under §§ 206.258 through 206.262 of this subpart, or any allowance authorized by § 206.265 of this subpart. The royalty due shall be equal to the value for royalty purposes multiplied by the royalty rate in the lease.

(b)(1) The value of coal that is sold pursuant to an arm's-length contract shall be the gross proceeds accruing to the lessee, except as provided in paragraphs (b)(2), (b)(3), and (b)(5) of this section. The lessee shall have the burden of demonstrating that its contract is arm's-length. The value which the lessee reports, for royalty purposes, is subject to monitoring, review, and audit.

(2) In conducting reviews and audits, MMS will examine whether the contract reflects the total consideration actually transferred either directly or indirectly from the buyer to the seller for the coal produced. If the contract does not reflect the total consideration, then the MMS may require that the coal sold pursuant to that contract be valued in accordance with paragraph (c) of this section. Value may not be based on less than the gross proceeds accruing to the lessee for the coal production, including the additional consideration.

(3) If the MMS determines that the gross proceeds accruing to the lessee pursuant to an arm's-length contract do not reflect the reasonable value of the production because of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

misconduct by or between the contracting parties, or because the lessee otherwise has breached its duty to the lessor to market the production for the mutual benefit of the lessee and the lessor, then MMS shall require that the coal production be valued pursuant to paragraph (c)(2)(ii), (iii), (iv), or (v) of this section, and in accordance with the notification requirements of paragraph (d)(3) of this section. When MMS determines that the value may be unreasonable, MMS will notify the lessee and give the lessee an opportunity to provide written information justifying the lessee's reported coal value.

(4) The MMS may require a lessee to certify that its arm's-length contract provisions include all of the consideration to be paid by the buyer, either directly or indirectly, for the coal production.

(5) The value of production for royalty purposes shall not include payments received by the lessee pursuant to a contract which the lessee demonstrates, to MMS's satisfaction, were not part of the total consideration paid for the purchase of coal production.

(c)(1) The value of coal from leases subject to this section and which is not sold pursuant to an arm's-length contract shall be determined in accordance with this section.

(2) If the value of the coal cannot be determined pursuant to paragraph (b) of this section, then the value shall be determined through application of other valuation criteria. The criteria shall be considered in the following order, and the value shall be based upon the first applicable criterion:

(i) The gross proceeds accruing to the lessee pursuant to a sale under its non-arm's-length contract (or other disposition of produced coal by other than an arm's-length contract), provided that those gross proceeds are within the range of the gross proceeds derived from, or paid under, comparable arm's-length contracts between buyers and sellers neither of whom is affiliated with the lessee for sales, purchases, or other dispositions of like-quality coal produced in the area. In evaluating the comparability of arm's-length contracts for the purposes of these regulations, the following factors shall be considered: Price, time of execution, duration, market or markets served, terms, quality of coal, quantity, and such other factors as may be appropriate to reflect the value of the coal;

(ii) Prices reported for that coal to a public utility commission;

(iii) Prices reported for that coal to the Energy Information Administration of the Department of Energy;

(iv) Other relevant matters including, but not limited to, published or publicly available spot market prices, or information submitted by the lessee concerning circumstances unique to a particular lease operation or the saleability of certain types of coal;

(v) If a reasonable value cannot be determined using paragraphs (c)(2)(i), (ii), (iii), or (iv) of this section, then a net-back method or any other reasonable method shall be used to determine value.

(3) When the value of coal is determined pursuant to paragraph (c)(2) of this section, that value determination shall be consistent with the provisions contained in paragraph (b)(5) of this section.

(d)(1) Where the value is determined pursuant to paragraph (c) of this section, that value does not require MMS's prior approval. However, the lessee shall retain all data relevant to the determination of royalty value. Such data shall be subject to review and audit, and MMS will direct a lessee to use a different value if it determines that the reported value is inconsistent with the requirements of these regulations.

(2) Any Federal lessee will make available upon request to the authorized MMS or State representatives, to the Inspector General of the Department of the Interior or other persons authorized to receive such information, arm's-length sales value and sales quantity data

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

for like-quality coal sold, purchased, or otherwise obtained by the lessee from the area.

(3) A lessee shall notify MMS if it has determined value pursuant to paragraphs (c)(2)(ii), (iii), (iv), or (v) of this section. The notification shall be by letter to the Associate Director for Minerals Revenue Management of his/her designee. The letter shall identify the valuation method to be used and contain a brief description of the procedure to be followed. The notification required by this section is a one-time notification due no later than the month the lessee first reports royalties on the Form MMS-4430 using a valuation method authorized by paragraphs (c)(2)(ii), (iii), (iv), or (v) of this section, and each time there is a change in a method under paragraphs (c)(2)(iv) or (v) of this section.

(e) If MMS determines that a lessee has not properly determined value, the lessee shall be liable for the difference, if any, between royalty payments made based upon the value it has used and the royalty payments that are due based upon the value established by MMS. The lessee shall also be liable for interest computed pursuant to 30 CFR 218.202. If the lessee is entitled to a credit, MMS will provide instructions for the taking of that credit.

(f) The lessee may request a value determination from MMS. In that event, the lessee shall propose to MMS a value determination method, and may use that method in determining value for royalty purposes until MMS issues its decision. The lessee shall submit all available data relevant to its proposal. The MMS shall expeditiously determine the value based upon the lessee's proposal and any additional information MMS deems necessary. That determination shall remain effective for the period stated therein. After MMS issues its determination, the lessee shall make the adjustments in accordance with paragraph (e) of this section.

(g) Notwithstanding any other provisions of this section, under no circumstances shall the value for royalty purposes be less than the gross proceeds accruing to the lessee for the disposition of produced coal less applicable provisions of paragraph (b)(5) of this section and less applicable allowances determined pursuant to §§ 206.258 through 206.262 and § 206.265 of this subpart.

(h) The lessee is required to place coal in marketable condition at no cost to the Federal Government. Where the value established under this section is determined by a lessee's gross proceeds, that value shall be increased to the extent that the gross proceeds has been reduced because the purchaser, or any other person, is providing certain services, the cost of which ordinarily is the responsibility of the lessee to place the coal in marketable condition.

(i) Value shall be based on the highest price a prudent lessee can receive through legally enforceable claims under its contract. Absent contract revision or amendment, if the lessee fails to take proper or timely action to receive prices or benefits to which it is entitled, it must pay royalty at a value based upon that obtainable price or benefit. Contract revisions or amendments shall be in writing and signed by all parties to an arm's-length contract, and may be retroactively applied to value for royalty purposes for a period not to exceed two years, unless MMS approves a longer period. If the lessee makes timely application for a price increase allowed under its contract but the purchaser refuses, and the lessee takes reasonable measures, which are documented, to force purchaser compliance, the lessee will owe no additional royalties unless or until monies or consideration resulting from the price increase are received. This paragraph shall not be construed to permit a lessee to avoid its royalty payment obligation in situations where a purchaser fails to pay, in whole or in part or timely, for a quantity of coal.

(j) Notwithstanding any provision in these regulations to the contrary, no review, reconciliation, monitoring, or other like process that results in a redetermination by MMS of value under this section shall be considered final or binding as against the Federal Government or its beneficiaries until the audit period is formally closed.

(k) Certain information submitted to MMS to support valuation proposals, including transportation, coal washing, or other allowances under § 206.265 of this subpart, is exempted from disclosure by the Freedom of Information Act, 5 U.S.C. 522. Any data specified by the Act to be privileged, confidential, or otherwise exempt shall

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.