be maintained in a confidential manner in accordance with applicable law and regulations. All requests for information about determinations made under this Part are to be submitted in accordance with the Freedom of Information Act regulation of the Department of the Interior, 43 CFR Part 2.

**§ 206.258 Washing allowances--general.**

(a) For ad valorem leases subject to § 206.257 of this subpart, MMS shall, as authorized by this section, allow a deduction in determining value for royalty purposes for the reasonable, actual costs incurred to wash coal, unless the value determined pursuant to § 206.257 of this subpart was based upon like-quality unwashed coal. Under no circumstances will the authorized washing allowance and the transportation allowance reduce the value for royalty purposes to zero.

(b) If MMS determines that a lessee has improperly determined a washing allowance authorized by this section, then the lessee shall be liable for any additional royalties, plus interest determined in accordance with 30 CFR 218.202, or shall be entitled to a credit without interest.

(c) Lessees shall not disproportionately allocate washing costs to Federal leases.

(d) No cost normally associated with mining operations and which are necessary for placing coal in marketable condition shall be allowed as a cost of washing.

(e) Coal washing costs shall only be recognized as allowances when the washed coal is sold and royalties are reported and paid.

**§ 206.259 Determination of washing allowances.**

(a) Arm's-length contracts.

(1) For washing costs incurred by a lessee under an arm's-length contract, the washing allowance shall be the reasonable actual costs incurred by the lessee for washing the coal under that contract, subject to monitoring, review, audit, and possible future adjustment. The lessee shall have the burden of demonstrating that its contract is arm's-length. MMS' prior approval is not required before a lessee may deduct costs incurred under an arm's-length contract. The lessee must claim a washing allowance by reporting it as a separate line entry on the Form MMS-4430.

(2) In conducting reviews and audits, MMS will examine whether the contract reflects more than the consideration actually transferred either directly or indirectly from the lessee to the washer for the washing. If the contract reflects more than the total consideration paid, then the MMS may require that the washing allowance be determined in accordance with paragraph (b) of this section.

(3) If the MMS determines that the consideration paid pursuant to an arm's-length washing contract does not reflect the reasonable value of the washing because of misconduct by or between the contracting parties, or because the lessee otherwise has breached its duty to the lessor to market the production for the mutual benefit of the lessee and the lessor, then MMS shall require that the washing allowance be determined in accordance with paragraph (b) of this section. When MMS determines that the value of the washing may be unreasonable, MMS will notify the lessee and give the lessee an opportunity to provide written information justifying the lessee's washing costs.

(4) Where the lessee's payments for washing under an arm's-length contract are not based on a dollar-per-unit basis, the lessee shall convert whatever consideration is paid to a dollar value equivalent. Washing allowances shall be expressed as a cost per ton of coal washed.

(b) Non-arm's-length or no contract.

(1) If a lessee has a non-arm's-length contract or has no contract, including those situations where the lessee performs washing for itself, the washing allowance will be based upon the lessee's reasonable actual costs. All washing allowances deducted under a non-arm's-length or no contract situation are subject to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

monitoring, review, audit, and possible future adjustment. The lessee must claim a washing allowance by reporting it as a separate line entry on the Form MMS-4430. When necessary or appropriate, MMS may direct a lessee to modify its estimated or actual washing allowance.

(2) The washing allowance for non-arm's-length or no contract situations shall be based upon the lessee's actual costs for washing during the reported period, including operating and maintenance expenses, overhead, and either depreciation and a return on undepreciated capital investment in accordance with paragraph (b)(2)(iv)(A) of this section, or a cost equal to the depreciable investment in the wash plant multiplied by the rate of return in accordance with paragraph (b)(2)(iv)(B) of this section. Allowable capital costs are generally those for depreciable fixed assets (including costs of delivery and installation of capital equipment) which are an integral part of the wash plant.

(i) Allowable operating expenses include: Operations supervision and engineering; operations labor; fuel; utilities; materials; ad valorem property taxes, rent; supplies; and any other directly allocable and attributable operating expense which the lessee can document.

(ii) Allowable maintenance expenses include: Maintenance of the wash plant; maintenance of equipment; maintenance labor; and other directly allocable and attributable maintenance expenses which the lessee can document.

(iii) Overhead attributable and allocable to the operation and maintenance of the wash plant is an allowable expense. State and Federal income taxes and severance taxes, including royalties, are not allowable expenses.

(iv) A lessee may use either paragraph (b)(2)(iv)(A) or (B) of this section. After a lessee has elected to use either method for a wash plant, the lessee may not later elect to change to the other alternative without approval of the MMS.

(A) To compute depreciation, the lessee may elect to use either a straight-line depreciation method based on the life of equipment or on the life of the reserves which the wash plant services, whichever is appropriate, or a unit of production method. After an election is made, the lessee may not change methods without MMS approval. A change in ownership of a wash plant shall not alter the depreciation schedule established by the original operator/lessee for purposes of the allowance calculation. With or without a change in ownership, a wash plant shall be depreciated only once. Equipment shall not be depreciated below a reasonable salvage value.

(B) The MMS shall allow as a cost an amount equal to the allowable capital investment in the wash plant multiplied by the rate of return determined pursuant to paragraph (b)(2)(v) of this section. No allowance shall be provided for depreciation. This alternative shall apply only to plants first placed in service or acquired after March 1, 1989.

(v) The rate of return must be the industrial rate associated with Standard and Poor's BBB rating. The rate of return must be the monthly average rate as published in Standard and Poor's Bond Guide for the first month for which the allowance is applicable. The rate must be redetermined at the beginning of each subsequent calendar year.

(3) The washing allowance for coal shall be determined based on the lessee's reasonable and actual cost of washing the coal. The lessee may not take an allowance for the costs of washing lease production that is not royalty bearing.

(c) Reporting requirements--

(1) Arm's-length contracts.

(i) The lessee must notify MMS of an allowance based on incurred costs by using a separate line entry on the Form MMS-4430.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(ii) The MMS may require that a lessee submit arm's-length washing contracts and related documents. Documents shall be submitted within a reasonable time, as determined by MMS.

(2) Non-arm's-length or no contract.

(i) The lessee must notify MMS of an allowance based on the incurred costs by using a separate line entry on the Form MMS-4430.

(ii) For new washing facilities or arrangements, the lessee's initial washing deduction shall include estimates of the allowable coal washing costs for the applicable period. Cost estimates shall be based upon the most recently available operations data for the washing system or, if such data are not available, the lessee shall use estimates based upon industry data for similar washing systems.

(iii) Upon request by MMS, the lessee shall submit all data used to prepare the allowance deduction. The data shall be provided within a reasonable period of time, as determined by MMS.

(d) Interest and assessments.

(1) If a lessee nets a washing allowance on the Form MMS-4430, then the lessee shall be assessed an amount up to 10 percent of the allowance netted not to exceed $250 per lease selling arrangement per sales period.

(2) If a lessee erroneously reports a washing allowance which results in an underpayment of royalties, interest shall be paid on the amount of that underpayment.

(3) Interest required to be paid by this section shall be determined in accordance with 30 CFR 218.202.

(e) Adjustments.

(1) If the actual coal washing allowance is less than the amount the lessee has taken on Form MMS-4430 for each month during the allowance reporting period, the lessee shall pay additional royalties due plus interest computed under 30 CFR 218.202 from the date when the lessee took the deduction to the date the lessee repays the difference to MMS. If the actual washing allowance is greater than the amount the lessee has taken on Form MMS-2014 for each month during the allowance reporting period, the lessee shall be entitled to a credit without interest.

(2) The lessee must submit a corrected Form MMS-4430 to reflect actual costs, together with any payment, in accordance with instructions provided by MMS.

(f) Other washing cost determinations. The provisions of this section shall apply to determine washing costs when establishing value using a net-back valuation procedure or any other procedure that requires deduction of washing costs.

**§ 206.260 Allocation of washed coal.**

(a) When coal is subjected to washing, the washed coal must be allocated to the leases from which it was extracted.

(b) When the net output of coal from a washing plant is derived from coal obtained from only one lease, the quantity of washed coal allocable to the lease will be based on the net output of the washing plant.

(c) When the net output of coal from a washing plant is derived from coal obtained from more than one lease, unless determined otherwise by BLM, the quantity of net output of washed coal allocable to each lease will be based on the ratio of measured quantities of coal delivered to the washing plant and washed from each lease compared to the total measured quantities of coal delivered to the washing plant and washed.

**§ 206.261 Transportation allowances--general.**

(a) For ad valorem leases subject to § 206.257 of this subpart, where the value for royalty purposes has been determined at a point remote from the lease or mine, MMS shall, as authorized by this section, allow a deduction in determining value for royalty purposes for the reasonable, actual costs

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

incurred to:

(1) Transport the coal from a Federal lease to a sales point which is remote from both the lease and mine; or

(2) Transport the coal from a Federal lease to a wash plant when that plant is remote from both the lease and mine and, if applicable, from the wash plant to a remote sales point. In-mine transportation costs shall not be included in the transportation allowance.

(b) Under no circumstances will the authorized washing allowance and the transportation allowance reduce the value for royalty purposes to zero.

(c)(1) When coal transported from a mine to a wash plant is eligible for a transportation allowance in accordance with this section, the lessee is not required to allocate transportation costs between the quantity of clean coal output and the rejected waste material. The transportation allowance shall be authorized for the total production which is transported. Transportation allowances shall be expressed as a cost per ton of cleaned coal transported.

(2) For coal that is not washed at a wash plant, the transportation allowance shall be authorized for the total production which is transported. Transportation allowances shall be expressed as a cost per ton of coal transported.

(3) Transportation costs shall only be recognized as allowances when the transported coal is sold and royalties are reported and paid.

(d) If, after a review and/or audit, MMS determines that a lessee has improperly determined a transportation allowance authorized by this section, then the lessee shall pay any additional royalties, plus interest, determined in accordance with 30 CFR 218.202, or shall be entitled to a credit, without interest.

(e) Lessees shall not disproportionately allocate transportation costs to Federal leases.

**§ 206.262 Determination of transportation allowances.**

(a) Arm's-length contracts.

(1) For transportation costs incurred by a lessee pursuant to an arm's-length contract, the transportation allowance shall be the reasonable, actual costs incurred by the lessee for transporting the coal under that contract, subject to monitoring, review, audit, and possible future adjustment. The lessee shall have the burden of demonstrating that its contract is arm's-length. The lessee must claim a transportation allowance by reporting it as a separate line entry on the Form MMS-4430.

(2) In conducting reviews and audits, MMS will examine whether the contract reflects more than the consideration actually transferred either directly or indirectly from the lessee to the transporter for the transportation. If the contract reflects more than the total consideration paid, then the MMS may require that the transportation allowance be determined in accordance with paragraph (b) of this section.

(3) If the MMS determines that the consideration paid pursuant to an arm's-length transportation contract does not reflect the reasonable value of the transportation because of misconduct by or between the contracting parties, or because the lessee otherwise has breached its duty to the lessor to market the production for the mutual benefit of the lessee and the lessor, then MMS shall require that the transportation allowance be determined in accordance with paragraph (b) of this section. When MMS determines that the value of the transportation may be unreasonable, MMS will notify the lessee and give the lessee an opportunity to provide written information justifying the lessee's transportation costs.

(4) Where the lessee's payments for transportation under an arm's-length contract are not based on a dollar-per-unit basis, the lessee shall convert whatever consideration is paid to a dollar value equivalent for the purposes of this section.

(b) Non-arm's-length or no contract--

(1) If a lessee has a non-arm's-length contract

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

or has no contract, including those situations where the lessee performs transportation services for itself, the transportation allowance will be based upon the lessee's reasonable actual costs. All transportation allowances deducted under a non-arm's-length or no contract situation are subject to monitoring, review, audit, and possible future adjustment. The lessee must claim a transportation allowance by reporting it as a separate line entry on the Form MMS-4430. When necessary or appropriate, MMS may direct a lessee to modify its estimated or actual transportation allowance deduction.

(2) The transportation allowance for non-arm's-length or no-contract situations shall be based upon the lessee's actual costs for transportation during the reporting period, including operating and maintenance expenses, overhead, and either depreciation and a return on undepreciated capital investment in accordance with paragraph (b)(2)(iv)(A) of this section, or a cost equal to the depreciable investment in the transportation system multiplied by the rate of return in accordance with paragraph (b)(2)(iv)(B) of this section. Allowable capital costs are generally those for depreciable fixed assets (including costs of delivery and installation of capital equipment) which are an integral part of the transportation system.

(i) Allowable operating expenses include: Operations supervision and engineering; operations labor; fuel; utilities; materials; ad valorem property taxes; rent; supplies; and any other directly allocable and attributable operating expense which the lessee can document.

(ii) Allowable maintenance expenses include: Maintenance of the transportation system; maintenance of equipment; maintenance labor; and other directly allocable and attributable maintenance expenses which the lessee can document.

(iii) Overhead attributable and allocable to the operation and maintenance of the transportation system is an allowable expense. State and Federal income taxes and severance taxes and other fees, including royalties, are not allowable expenses.

(iv) A lessee may use either paragraph (b)(2)(iv)(A) or paragraph (b)(2)(iv)(B) of this section. After a lessee has elected to use either method for a transportation system, the lessee may not later elect to change to the other alternative without approval of the MMS.

(A) To compute depreciation, the lessee may elect to use either a straight-line depreciation method based on the life of equipment or on the life of the reserves which the transportation system services, whichever is appropriate, or a unit of production method. After an election is made, the lessee may not change methods without MMS approval. A change in ownership of a transportation system shall not alter the depreciation schedule established by the original transporter/lessee for purposes of the allowance calculation. With or without a change in ownership, a transportation system shall be depreciated only once. Equipment shall not be depreciated below a reasonable salvage value.

(B) The MMS shall allow as a cost an amount equal to the allowable capital investment in the transportation system multiplied by the rate of return determined pursuant to paragraph (b)(2)(B)(v) of this section. No allowance shall be provided for depreciation. This alternative shall apply only to transportation facilities first placed in service or acquired after March 1, 1989.

(v) The rate of return must be the industrial rate associated with Standard and Poor's BBB rating. The rate of return must be the monthly average rate as published in Standard and Poor's Bond Guide for the first month for which the allowance is applicable. The rate must be redetermined at the beginning of each subsequent calendar year.

(3) A lessee may apply to MMS for exception from the requirement that it compute actual

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

costs in accordance with paragraphs (b)(1) and (b)(2) of this section. MMS will grant the exception only if the lessee has a rate for the transportation approved by a Federal agency or by a State regulatory agency (for Federal leases). MMS shall deny the exception request if it determines that the rate is excessive as compared to arm's-length transportation charges by systems, owned by the lessee or others, providing similar transportation services in that area. If there are no arm's-length transportation charges, MMS shall deny the exception request if:

(i) No Federal or State regulatory agency costs analysis exists and the Federal or State regulatory agency, as applicable, has declined to investigate under MMS timely objections upon filing; and

(ii) The rate significantly exceeds the lessee's actual costs for transportation as determined under this section.

(c) Reporting requirements--

(1) Arm's-length contracts.

(i) The lessee must notify MMS of an allowance based on incurred costs by using a separate line entry on the Form MMS-4430.

(ii) The MMS may require that a lessee submit arm's-length transportation contracts, production agreements, operating agreements, and related documents. Documents shall be submitted within a reasonable time, as determined by MMS.

(2) Non-arm's-length or no contract--

(i) The lessee must notify MMS of an allowance based on the incurred costs by using a separate line entry on Form MMS-4430.

(ii) For new transportation facilities or arrangements, the lessee's initial deduction shall include estimates of the allowable coal transportation costs for the applicable period. Cost estimates shall be based upon the most recently available operations data for the transportation system or, if such data are not available, the lessee shall use estimates based upon industry data for similar transportation systems.

(iii) Upon request by MMS, the lessee shall submit all data used to prepare the allowance deduction. The data shall be provided within a reasonable period of time, as determined by MMS.

(iv) If the lessee is authorized to use its Federal- or State-agency-approved rate as its transportation cost in accordance with paragraph (b)(3) of this section, it shall follow the reporting requirements of paragraph (c)(1) of this section.

(d) Interest and assessments.

(1) If a lessee nets a transportation allowance on Form MMS-4430, the lessee shall be assessed an amount of up to 10 percent of the allowance netted not to exceed $250 per lease selling arrangement per sales period.

(2) If a lessee erroneously reports a transportation allowance which results in an underpayment of royalties, interest shall be paid on the amount of that underpayment.

(3) Interest required to be paid by this section shall be determined in accordance with 30 CFR 218.202.

(e) Adjustments.

(1) If the actual coal transportation allowance is less than the amount the lessee has taken on Form MMS-4430 for each month during the allowance reporting period, the lessee shall pay additional royalties due plus interest computed under 30 CFR 218.202 from the date when the lessee took the deduction to the date the lessee repays the difference to MMS. If the actual transportation allowance is greater than amount the lessee has taken on Form MMS-4430 for each month during the allowance reporting period, the lessee shall be entitled to a credit without interest.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(2) The lessee must submit a corrected Form MMS-4430 to reflect actual costs, together with any payments, in accordance with instructions provided by MMS.

(f) Other transportation cost determinations. The provisions of this section shall apply to determine transportation costs when establishing value using a net-back valuation procedure or any other procedure that requires deduction of transportation costs.

**§ 206.263 [Reserved]**

**§ 206.264 In-situ and surface gasification and liquefaction operations.**

If an ad valorem Federal coal lease is developed by in-situ or surface gasification or liquefaction technology, the lessee shall propose the value of coal for royalty purposes to MMS. The MMS will review the lessee's proposal and issue a value determination. The lessee may use its proposed value until MMS issues a value determination.

**§ 206.265 Value enhancement of marketable coal.**

If, prior to use, sale, or other disposition, the lessee enhances the value of coal after the coal has been placed in marketable condition in accordance with § 206.257(h) of this subpart, the lessee shall notify MMS that such processing is occurring or will occur. The value of that production shall be determined as follows:

(a) A value established for the feedstock coal in marketable condition by application of the provisions of § 206.257(c)(2)(i-iv) of this subpart; or,

(b) In the event that a value cannot be established in accordance with subsection (a), then the value of production will be determined in accordance with § 206.257(c)(2)(v) of this subpart and the value shall be the lessee's gross proceeds accruing from the disposition of the enhanced product, reduced by MMS-approved processing costs and procedures including a rate of return on investment equal to two times the Standard and Poor's BBB bond rate applicable under § 206.259(b)(2)(v) of this subpart.

**Subpart G. Other Solid Minerals (Refs & Annos)**

**§ 206.301 Value basis for royalty computation.**

(a) The gross value for royalty purposes shall be the sale or contract unit price times the number of units sold, *Provided, however*, That where the authorized officer determines:

(1) That a contract of sale or other business arrangement between the lessee and a purchaser of some or all of the commodities produced from the lease is not a bona fide transaction between independent parties because it is based in whole or in part upon considerations other than the value of the commodities, or

(2) That no bona fide sales price is received for some or all of such commodities because the lessee is consuming them, the authorized officer shall determine their gross value, taking into account: (i) All prices received by the lessee in all bona fide transactions, (ii) Prices paid for commodities of like quality produced from the same general area, and (iii) Such other relevant factors as the authorized officer may deem appropriate; and *Provided further*, That in a situation where an estimated value is used, the authorized officer shall require the payment of such additional royalties, or allow such credits or refunds as may be necessary to adjust royalty payment to reflect the actual gross value.

(b) The lessee is required to certify that the values reported for royalty purposes are bona fide sales not involving considerations other than the sale of the mineral, and he may be required by the authorized officer to supply supporting information.

**Subpart H. Geothermal Resources**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

§ 206.350 Purpose and scope.

(a) This subpart is applicable to all geothermal resources produced from Federal geothermal leases issued pursuant to the Geothermal Steam Act of 1970, as amended (30 U.S.C. 1001 et seq.). The purpose of this subpart is to establish the value of geothermal production for royalty purposes.

(b) All royalty payments made to MMS are subject to audit and adjustment.

§ 206.351 Definitions.

For purposes of this subpart:

Arm's-length contract means a contract or agreement that has been arrived at in the marketplace between independent, nonaffiliated persons with opposing economic interests regarding that contract. For purposes of this subpart, two persons are affiliated if one person controls, is controlled by, or is under common control with, another person. For purposes of this subpart, based on the instruments of ownership of the voting securities of an entity, or based on other forms of ownership:

(1) Ownership in excess of 50 percent constitutes control;

(2) Ownership of 10 through 50 percent creates a rebuttable presumption of control; and

(3) Ownership of less than 10 percent creates a presumption of noncontrol which MMS may rebut if it demonstrates actual or legal control, including the existence of interlocking directorates.

Notwithstanding any other provisions of this subpart, contracts between relatives, either by blood or by marriage, are not arm's-length contracts. The MMS may require the lessee to certify the claimed nature of ownership control. To be considered arm's-length for any production month, a contract must meet the requirements of this definition for the production month as well as when the contract was executed.

Audit means a procedure having the same meaning and effect as that described at 30 CFR part 217 for verifying royalty payment compliance activities of lessees or other authorized persons who pay royalties, rents, or bonuses on Federal geothermal leases.

Byproduct means:

(1) Any mineral or minerals (exclusive of oil, hydrocarbon gas, and helium) which are found in solution or developed in association with geothermal fluids and which have a value of less than 75 per centum of the value of the geothermal energy or are not, because of quantity, quality, or technical difficulties in extraction and production, of sufficient value to warrant extraction and production by themselves, and

(2) Commercially demineralized water.

Byproduct recovery facility means the facility or facilities at which byproducts are placed in marketable condition.

Byproduct transportation allowance means an approved allowance for the lessee's reasonable, actual costs, excluding gathering, incurred for moving byproducts, including commercially demineralized water, to a point of sale or point of delivery off the lease, unit area, or communitized area.

Contract means any oral or written agreement, including amendments or revisions thereto, between two or more persons and enforceable by law that with due consideration creates an obligation.

Deduction means a subtraction used in the geothermal netback procedure for determining the value of geothermal resources utilized by the lessee to generate electricity. Transmission deduction means a deduction for the lessee's reasonable actual costs incurred to wheel or transmit the electricity from the lessee's powerplant to the purchaser's delivery point. Generating deduction means a deduction for the lessee's reasonable, actual costs of generating plant tailgate electricity.

Delivered electricity means the amount of electricity in kilowatthours delivered to the purchaser.

Direct utilization means any process other than

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

electrical generation in which the thermal energy of the geothermal resource is utilized, including, but not limited to, space heating, greenhouse operations, and industrial or agricultural process heat.

Field means the land surface vertically projected over a subsurface geothermal reservoir encompassing at least the outermost boundaries of all geothermal accumulations known to be within that reservoir. Geothermal fields are usually given names and their official boundaries are often designated by regulatory agencies in the respective States in which the fields are located.

Gathering means the efficient movement of lease production from the wellhead to the point of utilization.

Geothermal netback procedure means the method of determining the value of geothermal resources that are utilized in a lessee-owned powerplant for the generation and sale of electricity by deducting the lessee's reasonable, actual transmission and generating costs from the sales price or value of the electricity to derive the value of the geothermal resource at the powerplant inlet.

Geothermal resources means:

(1) All products of geothermal processes, including indigenous steam, hot water, and hot brines;

(2) Steam and other gases, hot water, and hot brines resulting from water, gas, or other fluids artificially introduced into geothermal formations;

(3) Heat or other associated energy found in geothermal formations; and

(4) Any byproducts.

Geothermal utilization facility means a powerplant or direct utilization facility that utilizes the heat or other energy of the geothermal resource.

Gross proceeds (for royalty purposes) means the total monies and other consideration accruing to a geothermal lessee for any disposition of geothermal resources, including total payments for the sale of electricity generated by the lessee from lease-produced geothermal resources. Gross proceeds includes, but is not limited to, payments to the lessee for certain services such as effluent injection, field operation and maintenance, drilling or workover of wells, and/or field gathering to the extent that the lessee is obligated to perform them at no cost to the Federal Government. Gross proceeds also includes, but is not limited to, reimbursements for production taxes and other taxes. Tax reimbursements are part of gross proceeds accruing to a lessee even though the Federal royalty interest may be exempt from taxation. Monies and other consideration, including the forms of consideration identified in this paragraph, to which a lessee is contractually or legally entitled but which it does not seek to collect through reasonable efforts are also part of gross proceeds.

Lease means a geothermal lease issued under authority of the Geothermal Steam Act of 1970, as amended (30 U.S.C. 1001 et seq.), unless the context indicates otherwise.

Lessee means any person to whom the United States issues a geothermal lease, and any person who has been assigned an obligation to make royalty or other payments required by the lease. This includes any person who has an interest in a geothermal lease as well as an operator or payor who has no interest in the lease but who has assumed the royalty payment responsibility. This also includes any affiliate of the lessee that utilizes the geothermal resource to generate electricity, in a direct utilization process, or to recover byproducts, or any affiliate that transports lease production.

Like-quality lease products means lease products that have similar chemical, physical, and legal characteristics.

Marketable condition means lease products that are sufficiently free from impurities and otherwise in a condition that they will be accepted by a purchaser under a sales contract typical for the field.

Minimum royalty means the minimum amount of annual royalty as specified in the lease or in applicable leasing regulations that the lessee must pay after commencement of geothermal production in commercial quantities.

No sales means the utilization or disposal of geothermal resources without the benefit of a sale.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Person means any individual, firm, corporation, association, partnership, consortium, or joint venture (when established as a separate entity).

Plant tailgate electricity means the amount of electricity in kilowatthours generated by the powerplant exclusive of plant parasitic electricity, but inclusive of any electricity generated by the powerplant and returned to the lease for lease operations. Plant tailgate electricity should be measured at, or calculated for, the high voltage side of the transformer in the plant switchyard.

Point of utilization means the powerplant or direct utilization facility in which the geothermal resource (steam or hot water) is utilized.

Reasonable alternative fuel means a conventional fuel (such as coal, oil, gas, or wood) that would normally be used as a source of heat in direct utilization operations.

Secretary means the Secretary of the Department of the Interior or any person duly authorized to exercise the powers vested in that office.

Selling arrangement means the individually contracted arrangements under which sales or dispositions of geothermal resources are made, including sales or dispositions of byproducts and electricity sales where the lessee generates electricity from lease geothermal production.

Spot market price means the price received under any sales transaction when planned or actual deliveries span a short period of time, usually not exceeding 1 year.

Wheeling means the transmission of electricity from a powerplant to the point of delivery.

**§ 206.352 Valuation standards for electrical generation.**

(a) The value of geothermal resources produced from leases subject to this subpart and used to generate electricity shall be determined pursuant to this section.

(b)(1)(i) The value of geothermal resources that are sold pursuant to an arm's-length contract shall be the gross proceeds accruing to the lessee, except as provided in paragraphs (b)(1)(ii) and (b)(1)(iii) of this section. The lessee shall have the burden of demonstrating that its contract is arm's-length. The value that the lessee reports for royalty purposes is subject to monitoring, review, and audit.

(ii) In conducting reviews and audits, MMS will examine whether the contract reflects the total consideration actually transferred, either directly or indirectly, from the buyer to the seller for the geothermal resource. If the contract does not reflect the total consideration, MMS may require that the geothermal resource sold pursuant to that contract be valued in accordance with paragraph (d) of this section. Value shall not be less than the gross proceeds accruing to the lessee, including any additional consideration received.

(iii) If MMS determines that the gross proceeds accruing to the lessee pursuant to an arm's-length contract do not reflect the reasonable value of the production because of misconduct by or between the contracting parties, or because the lessee otherwise has breached its duty to the lessor to market the production for the mutual benefit of the lessee and the lessor, MMS shall require the geothermal resource to be valued pursuant to paragraph (d) of this section, and notification provided to MMS in accordance with paragraph (e)(3) of this section. If MMS determines that the value may be unreasonable, MMS will notify the lessee and give the lessee an opportunity to provide written information justifying the lessee's value.

(2) The MMS may require a lessee to certify that the provisions in its arm's-length contract include all of the consideration to be paid by the buyer, either directly or indirectly, for the geothermal resource.

(c)(1) The value of geothermal resources subject to this section that are sold under a non-arm's-length contract shall be determined in accordance with the first applicable of the following paragraphs:

(i) The gross proceeds accruing to the lessee pursuant to a sale under its non-arm's-length

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

contract provided that those gross proceeds are not less than the gross proceeds derived from or paid under the lowest-priced available comparable arm's-length contract for sales of geothermal resources to the lessee-affiliate's same powerplant (the "minimum value"). If the gross proceeds under the lessee's non-arm's-length contract are less than the "minimum value" under available comparable arm's-length contracts, or if there are no available comparable arm's-length contracts, value will be determined by the weighted average of the gross proceeds established under arm's-length contracts for the sale of significant quantities of geothermal resources to the same powerplant. Available contracts will mean contracts in the possession of the lessee, the lessee's affiliate, or MMS. In evaluating the comparability of arm's-length contracts for the purposes of these regulations, the following factors shall be considered: Time of execution, duration, terms, quality of the geothermal resource, volume, dedication to the same powerplant, and other factors that may be appropriate to reflect the value of the resource;

(ii) The value determined by the geothermal netback procedure. Under the geothermal netback procedure, the lessee's reasonable actual costs for the generation and transmission of electricity shall be deducted from the lessee's gross proceeds received for the sale of electricity to determine the value of the geothermal resource. Transmission deductions shall be determined pursuant to § 206.353 of this part. Generating deductions shall be determined pursuant to § 206.354 of this part; or

(iii) A value determined by any other reasonable valuation method approved by MMS.

(2) Value determinations made pursuant to this paragraph are subject to the notification requirements of paragraph (e) of this section.

(d)(1) The value of geothermal resources subject to this section that are not subject to a sales transaction ("no sales" geothermal resources) but are instead utilized directly by the lessee in its own powerplant for the generation and sale of electricity shall be determined in accordance with the first applicable of the following paragraphs:

(i) The weighted average of the gross proceeds established in arm's-length contracts for the purchase of significant quantities of geothermal resources to operate the lessee's same powerplant. In evaluating the acceptability of arm's-length contracts, the following factors shall be considered: Time of execution, duration, terms, volume, quality of resource, and such other factors as may be appropriate to reflect the value of the resource;

(ii) The value determined by the geothermal netback procedure. Under the geothermal netback procedure, the lessee's reasonable actual costs for the generation and transmission of electricity shall be deducted from the lessee's gross proceeds received for the sale of electricity to determine the value of the geothermal resource. Transmission deductions shall be determined pursuant to § 206.353 of this part. Generating deductions shall be determined pursuant to § 206.354 of this part; or

(iii) A value determined by any other reasonable valuation method approved by MMS.

(2) Value determinations made pursuant to this paragraph are subject to the notification requirements of paragraph (e) of this section.

(e)(1) Pursuant to subpart H of 30 CFR part 212, the lessee shall retain all data relevant to the determination of royalty value, particularly where the value is determined pursuant to paragraph (c) or (d) of this section. Such data shall be subject to review and audit, and MMS will direct a lessee to use a different value if it determines that the reported value is inconsistent with the requirements of these regulations.

(2) Upon request, lessees shall make available to authorized MMS representatives or to other authorized persons any and all contracts for the sale or other disposition of the lease production; contracts for the sale, generation, and/or transmission of electricity attributable to lease production; and any arm's-length sales

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and other data for like-quality production sold, purchased, or otherwise obtained by the lessee from the field as may be necessary to support a value determination.

(3) A lessee shall notify MMS if it has determined value pursuant to paragraph (c) or (d) of this section. The notification shall be by letter to the MMS Associate Director for Minerals Revenue Management or his/her designee. The letter shall identify the valuation method to be used and contain a brief description of the procedure to be followed. The notification required by this paragraph is a one-time notification due no later than the end of the month following the month the lessee first reports royalties on a Form MMS-2014 using a valuation method authorized by paragraph (c) or (d) of this section.

(f) If MMS determines that a lessee has not properly determined value, the lessee shall pay the difference, if any, between royalty payments made based upon the value it has used and the royalty payments that are due based upon the value established by MMS. The lessee shall also pay interest on that difference computed pursuant to 30 CFR 218.302. If the lessee is entitled to a credit, MMS will provide instructions for the taking of that credit.

(g) The lessee may request a value determination from MMS. In that event, the lessee shall propose to MMS a value determination method and may use that method in determining value, for royalty purposes, until MMS issues its decision. The lessee shall submit all available data relevant to its proposal. The MMS shall expeditiously determine the value based upon the lessee's proposal and any additional information MMS deems necessary. In making a value determination, MMS may use any of the valuation criteria consistent with this subpart. That determination shall remain effective for the period stated therein. After MMS issues its determination, the lessee shall make the adjustments in accordance with paragraph (f) of this section.

(h) Notwithstanding any other provision of this section, under no circumstances shall the value of production for royalty purposes be less than the gross proceeds accruing to the lessee where geothermal resources are directly sold.

(i) The lessee is required to place geothermal resources in marketable condition and to deliver geothermal resources to the powerplant at no cost to the Federal lessor. Where the value established pursuant to this section is determined by a lessee's gross proceeds, that value shall be increased to the extent that the gross proceeds have been reduced because the purchaser, or any other person, is providing certain services the cost of which ordinarily is the responsibility of the lessee to place the geothermal resource in marketable condition or deliver it to the powerplant.

(j) Value shall be based on the highest price a prudent lessee can receive through legally enforceable claims under its contract. Absent contract revision or amendment, if the lessee fails to take proper or timely action to receive prices or benefits to which it is entitled, it must pay royalty at a value based upon that obtainable price or benefit. Contract revisions or amendments shall be in writing and signed by all parties to the contract. If the lessee makes timely application for a price increase or benefit allowed under its contract but the purchaser refuses and the lessee takes reasonable measures, which are documented, to force purchaser compliance, the lessee will owe no additional royalties unless or until monies or consideration resulting from the price increase or additional benefits are received. This paragraph shall not be construed to permit a lessee to avoid its royalty payment obligation in situations where a purchaser fails to pay, in whole or in part or timely, for a quantity of geothermal resources.

(k) Notwithstanding any provision in these regulations to the contrary, no review, reconciliation, monitoring, or other like process that results in a redetermination by MMS of value under this section shall be considered final or binding as against the Federal Government or its beneficiaries until the audit period is formally closed.

(l) Certain information submitted to MMS to support value determinations is exempted from disclosure by the Freedom of Information Act, 5 U.S.C. 552, or other Federal law. Any data specified by law to be privileged, confidential, or otherwise exempt will be maintained in a confidential manner in accordance with applicable law and regulations. All requests for information about determinations made under this subpart are to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

be submitted in accordance with the Freedom of Information Act regulations of the Department, 43 CFR part 2.

**§ 206.353 Determination of transmission deductions.**

(a) Where the value of geothermal energy is determined by the geothermal netback procedure pursuant to paragraphs (c)(1)(ii) and (d)(1)(ii) of § 206.352 of this subpart, a transmission deduction shall be subtracted from the lessee's gross proceeds received for the sale of electricity to determine the plant tailgate value of the electricity. The transmission deduction consists of either or both of two components:

(1) Transmission line costs as determined pursuant to paragraph (b) of this section, and

(2) Wheeling costs if the electricity is transmitted across a third-party's transmission line under an arm's-length wheeling agreement. Transmission deductions are subject to the limitation prescribed in paragraph (c) of this section.

(b)(1) Transmission-line costs shall be based on the lessee's actual costs associated with the construction and operation of a transmission line for the purpose of transmitting electricity attributable and allocable to the lessee's powerplant utilizing Federal geothermal resources. The monthly transmission line cost component of the transmission deduction is determined by multiplying the annual transmission line cost rate (in dollars per kilowatthour) by the amount of electricity delivered for the reporting month. The transmission line cost rate shall be redetermined annually at the beginning of the same month of the year in which the transmission line was placed into service, the same month of the year in which the powerplant was placed into service, or, at the lessee's option, at a time concurrent with the beginning of the lessee's annual corporate accounting period; Provided, however, the period selected must coincide with the same period chosen for the generating deduction pursuant to § 206.354(b)(1). After a deduction period is chosen, the lessee may not later elect to use a different deduction period without MMS approval.

(2) Allowable transmission-line costs include operating and maintenance expenses, overhead, and either depreciation and a return on undepreciated capital investment in accordance with paragraph (b)(2)(iv)(A) of this section, or a cost equal to the capital investment in the transmission line multiplied by a rate of return in accordance with paragraph (b)(2)(iv)(B) of this section. Allowable capital costs are generally those costs for depreciable assets, including costs of delivery and installation of capital equipment, that are an integral part of the transmission line. A return on capital invested in the purchase of real estate for transmission facilities may be allowed provided that the lessee demonstrates the necessity for such purchase, the purchased land is not on a Federal geothermal lease, and MMS approves the deduction; the rate of return shall be the same rate determined in paragraph (b)(2)(v) of this section.

(i) Allowable operating expenses include operations supervision and engineering, operations labor, materials, ad valorem property taxes, rent, supplies, and any other directly allocable and attributable operating expenses that the lessee can document.

(ii) Allowable maintenance expenses include maintenance of the transmission line, maintenance of equipment, maintenance labor, and other directly allocable and attributable maintenance expenses that the lessee can document.

(iii) Overhead directly attributable and allocable to the operation and maintenance of the transmission line is an allowable expense. State and Federal income taxes and severance taxes and other fees, including royalties, are not allowable expenses.

(iv) To compute costs associated with capital investment, a lessee may use either depreciation with a return on undepreciated capital investment, or a return on capital investment. After a lessee has elected to use either method, the lessee may not later elect to change to the other alternative without MMS approval.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(A) To compute depreciation, the lessee must use a straight-line depreciation method based on the expected life of the geothermal project, usually the term of the electricity sales contract or other depreciation period acceptable to MMS. A change in ownership of a transmission line shall not alter the depreciation schedule established by the original lessee-owner for purposes of computing transmission line costs. With or without a change in ownership, a transmission line shall be depreciated only once. The rate of return used to compute the return on undepreciated capital investment shall be determined pursuant to paragraph (b)(2)(v) of this section.

(B) To compute a return on capital investment, the allowed cost shall be the amount equal to the allowable capital investment in the transmission line multiplied by the rate of return determined pursuant to paragraph (b)(2)(v) of this section. No allowance shall be provided for depreciation. This alternative shall apply only to transmission lines first placed into service on or after March 1, 1988.

(v) The rate of return shall be 2 times Standard and Poor's industrial BBB bond rate. The rate of return shall be 2 times the monthly average rate as published in Standard and Poor's Bond Guide for the first month of the annual deduction period and shall be effective during the following deduction period. The rate shall be redetermined annually at the beginning of the same month beginning the annual deduction period chosen pursuant to paragraph (b)(1) of this section.

(3) Transmission-line cost rates, determined annually, are computed by dividing the sum of the operating, maintenance, overhead, and capital costs by the annual amount of delivered electricity.

(4) For new transmission lines, the lessee's costs for the first deduction period shall be based on estimated expenses (including overhead) for operating and maintaining the transmission line. For subsequent deduction periods, the transmission line costs shall be estimated based on the lessee's actual operating and maintenance expenses for the previous period adjusted for decreases or increases that the lessee knows will affect the deduction in the current period.

(c) Under no circumstances shall the transmission deduction plus the generating deduction determined pursuant to § 206.354 of this subpart reduce the royalty value of the geothermal resource to zero.

(d)(1) If the actual transmission deduction determined at the end of the annual reporting period is less than the amount the lessee estimated and used in the netback procedure during the reporting period, the lessee shall be required to pay additional royalties retroactive to the first month of the reporting period, plus interest computed pursuant to 30 CFR 218.302. If the actual transmission deduction is greater than the amount applied in the netback calculation, the lessee shall be entitled to a credit.

(2) Lessees must submit corrected Forms MMS-2014 to reflect adjustments to royalty payments in accordance with MMS instructions.

(e)(1) All transmission deductions are subject to review, audit, and adjustment. When necessary or appropriate, MMS may direct a lessee to modify its estimated or actual transmission deduction and adjust royalty values accordingly.

(2) Pursuant to subpart H of 30 CFR part 212, the lessee must maintain all data and records supporting its transmission deduction, including wheeling and other transmission-related agreements. These data and records must be made available to MMS and other authorized personnel upon request, and shall be maintained in a confidential manner in accordance with applicable laws and regulations pursuant to § 206.352 of this subpart.

(f) A one-time refund of royalties equal to the royalty amount of actual dismantlement costs attributable to the transmission line that are in excess of actual income attributable to the salvage of the transmission line will be allowed at the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

completion of the dismantlement and salvage operations.

**§ 206.354 Determination of generating deductions.**

(a) Where the value of geothermal energy is determined by the geothermal netback procedure pursuant to paragraphs (c)(1)(ii) and (d)(1)(ii) of § 206.352 of this subpart, that value shall be determined by deducting the lessee's reasonable actual costs incurred to generate electricity from the plant tailgate value of the electricity (usually the transmission-reduced value of the delivered electricity). Generating deductions are subject to the limitation prescribed in paragraph (c) of this section.

(b)(1) Generating costs shall be based on the lessee's actual annual costs associated with the construction and operation of a geothermal powerplant. The monthly generating deduction is determined by multiplying the annual generating cost rate (in dollars per kilowatthour) by the amount of plant tailgate electricity measured (or computed) for the reporting month. The generating cost rate is determined from the annual amount of plant tailgate electricity and must be redetermined annually at the beginning of the same month of the year in which the powerplant was placed into service or, at the lessee's option, at a time concurrent with the beginning of the lessee's annual corporate accounting period; Provided, however, the period selected must coincide with the same period chosen for the transmission deduction pursuant to § 206.353(b)(1). After a deduction period is chosen, the lessee may not later elect to use a different deduction period without MMS approval.

(2) Allowable generating costs include operating and maintenance expenses, overhead, and either depreciation and a return on undepreciated capital investment in accordance with paragraph (b)(2)(iv)(A) of this section, or a cost equal to the capital investment in the powerplant multiplied by a rate of return in accordance with paragraph (b)(2)(iv)(B) of this section. Allowable capital costs are generally those costs for depreciable assets, including costs of delivery and installation of capital equipment, that are an integral part of the powerplant or are required by the design specifications of the power conversion cycle. A return on capital invested in the purchase of real estate for a powerplant site may be allowed provided that the lessee demonstrates the necessity for such purchase, the purchased land is not on a Federal geothermal lease, and MMS approves the deduction; the rate of return shall be the same rate determined in paragraph (b)(2)(v) of this section. The costs of gathering systems and other production-related facilities are not allowed.

(i) Allowable operating expenses include operations supervision and engineering, operations labor, materials, ad valorem property taxes, rent, supplies, auxiliary fuel and/or utilities used to operate the powerplant during down time, and any other directly allocable and attributable operating expense that the lessee can document.

(ii) Allowable maintenance expenses include maintenance of the powerplant, maintenance of equipment, maintenance labor, and other directly allocable and attributable maintenance expenses that the lessee can document.

(iii) Overhead directly attributable and allocable to the operation and maintenance of the powerplant is an allowable expense. State and Federal income taxes and severance taxes, including royalties, are not allowable expenses.

(iv) To compute costs associated with capital investment, a lessee may use either depreciation with a return on undepreciated capital investment, or a return on capital investment. After a lessee has elected to use either method, the lessee may not later elect to change to the other alternative without MMS approval.

(A) To compute depreciation , the lessee must use a straight-line depreciation method based on the life of the geothermal project, usually the term of the electricity sales contract or other depreciation period acceptable to MMS. A change in ownership of a powerplant shall not alter

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the depreciation schedule established by the original lessee-owner for computing the generating costs. With or without a change in ownership, a powerplant shall be depreciated only once. The rate of return used to compute the return on undepreciated capital investment shall be determined pursuant to paragraph (b)(2)(v) of this section.

(B) To compute a return on capital investment, the allowed cost shall be the amount equal to the allowable capital investment in the powerplant multiplied by the rate of return determined pursuant to paragraph (b)(2)(v) of this section. No allowance shall be provided for depreciation. This alternative shall apply only to powerplants first placed into service on or after March 1, 1988.

(v) The rate of return shall be 2 times Standard and Poor's industrial BBB bond rate. The rate of return shall be 2 times the monthly average rate as published in Standard and Poor's Bond Guide for the first month of the annual deduction period and shall be effective during the following deduction period. The rate shall be redetermined annually at the beginning of the same month beginning the annual deduction period chosen pursuant to paragraph (b)(1) of this section.

(3) Generating cost rates, determined annually, shall be computed by dividing the sum of the operating, maintenance, overhead, and capital costs by the annual amount of plant tailgate electricity.

(4) For new powerplants, the lessee's generating costs for the first deduction period shall be based on estimated expenses (including overhead) for operating and maintaining the powerplant. For subsequent deduction periods, the generating costs shall be estimated based on the lessee's actual operating and maintenance expenses for the previous period adjusted for decreases or increases that the lessee knows will affect the deduction in the current period.

(c) Under no circumstances shall the generating deduction plus the transmission deduction determined pursuant to § 206.353 of this subpart reduce the royalty value of the geothermal resource to zero.

(d)(1) If the actual generating deduction determined at the end of the annual reporting period is less than the amount the lessee estimated and used in the netback procedure during the reporting period, the lessee shall be required to pay additional royalties retroactive to the first month of the reporting period, plus interest computed pursuant to 30 CFR 218.302. If the actual generating deduction is greater than the amount applied in the netback calculation, the lessee shall be entitled to a credit.

(2) Lessees must submit corrected Forms MMS-2014 to reflect adjustments to royalty payments in accordance with MMS instructions.

(e)(1) All generating deductions are subject to review, audit, and adjustment. When necessary or appropriate, MMS may direct a lessee to modify its estimated or actual generating deduction and adjust royalty values accordingly.

(2) Pursuant to subpart H of 30 CFR part 212, the lessee must maintain all data and records supporting its generating deduction. These data and records must be made available to MMS and other authorized personnel upon request, and shall be maintained in a confidential manner in accordance with applicable laws and regulations pursuant to § 206.352 of this subpart.

(f) A one-time refund of royalties equal to the royalty amount of actual dismantlement costs attributable to the powerplant that are in excess of actual income attributable to the salvage of the powerplant will be allowed at the completion of the dismantlement and salvage operations.

**§ 206.355 Valuation standards for direct utilization.**

(a) The value of geothermal resources produced for leases subject to this subpart and used in direct utilization processes shall be determined pursuant to this section.

(b)(1)(i) The value of geothermal resources that are

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.