sold pursuant to an arm's-length contract shall be the gross proceeds accruing to the lessee, except as provided in paragraphs (b)(1)(ii) and (b)(1)(iii) of this section. The lessee shall have the burden of demonstrating that its contract is arm's-length. The value that the lessee reports for royalty purposes is subject to monitoring, review, and audit.

(ii) In conducting these reviews and audits, MMS will examine whether or not the contract reflects the total consideration actually transferred either directly or indirectly from the buyer to the seller for the geothermal resource. If the contract does not reflect the total consideration, MMS may require that the geothermal resource sold pursuant to that contract be valued in accordance with paragraph (d) of this section. Value shall not be less than the gross proceeds accruing to the lessee, including any additional consideration received.

(iii) If MMS determines that the gross proceeds accruing to the lessee pursuant to an arm's-length contract do not reflect the reasonable value of the geothermal resource because of misconduct by or between the contracting parties, or because the lessee otherwise has breached its duty to the lessor to market the production for the mutual benefit of the lessee and the lessor, MMS shall require the geothermal resource to be valued pursuant to paragraph (d) of this section and in accordance with the notification requirements of paragraph (e) of this section. When MMS determines that the value may be unreasonable, MMS will notify the lessee and give the lessee an opportunity to provide written information justifying the lessee's value.

(2) The MMS may require a lessee to certify that its arm's-length contract provisions include all of the consideration to be paid by the buyer, either directly or indirectly, for the geothermal resource.

(c)(1) The value of geothermal resources subject to this section that are sold under a non-arm's-length contract shall be determined in accordance with the first applicable of the following paragraphs:

(i) The gross proceeds accruing to the lessee pursuant to a sale under its non-arm's-length contract provided that those gross proceeds are not less than the gross proceeds derived from or paid under the lowest-priced available comparable arm's-length contract for sales of geothermal resources to the lessee-affiliate's same direct utilization facility (the "minimum value"). If the gross proceeds under the lessee's non-arm's-length contract are less than the "minimum value" under available comparable arm's-length contracts, or if there are no available comparable arm's-length contracts, value will be determined by the weighted average of the gross proceeds established under arm's-length contracts for the sale of significant quantities of geothermal resources to the same direct utilization facility. Available contracts will mean contracts in the possession of the lessee, the lessee's affiliate, or MMS. In evaluating the comparability of arm's-length contracts for the purposes of these regulations, the following factors shall be considered: Time of execution, duration, terms, quality of the geothermal resource, volume, dedication to the same direct utilization facility, and other factors that may be appropriate to reflect the value of the resource;

(ii) The equivalent value of the least expensive, reasonable alternative energy source (fuel). The equivalent value of the least expensive, reasonable alternative energy source shall be based on the amount of thermal energy that would otherwise be used by the direct utilization process in place of the geothermal resource. That amount of thermal energy (in Btu's) displaced by the geothermal resource shall be determined by the equation

thermal energy displaced =

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

$$\frac{(h_{in}-h_{out}) \times \text{density} \times 0.133681 \times \text{volume}}{\text{efficiency factor}}$$

where $h_{in}$ is the enthalpy in Btu's/lb at the utilization facility inlet (based on measured inlet temperature), $h_{out}$ is the enthalpy in Btu's/lb at the facility outlet (based on measured outlet temperature), density is in lbs/cu ft based on inlet temperature, the factor 0.133681 (cu ft/gal) converts gallons to cubic feet, and volume is the quantity of geothermal fluid in gallons produced at the wellhead or measured at an approved point. The efficiency of the alternative energy source shall be 0.7 for coal and 0.8 for oil, natural gas, and other fuels derived from oil and natural gas, or an efficiency factor proposed by the lessee and approved by MMS. The methods of measuring resource parameters (temperature, volume, etc.) and the frequency of computing and accumulating the amount of thermal energy displaced shall be determined and approved by BLM; or

(iii) A value determined by any other reasonable valuation method approved by MMS.

(2) Valuations made pursuant to this paragraph are subject to the notification requirements of paragraph (e) of this section.

(d)(1) The value of geothermal resources subject to this section that are not subject to a sales transaction but are instead used by the lessee in its own direct utilization facility ("no sales" geothermal resources) shall be determined in accordance with the first applicable of the following paragraphs:

(i) The weighted average of the gross proceeds established in arm's-length contracts for the purchase of significant quantities of geothermal resources to operate the lessee's same direct utilization facility. In evaluating the acceptability of arm's-length contracts, the following factors shall be considered: Time of execution, duration, terms, volume, quality of resource, and such other factors as may be appropriate to reflect the value of the resource;

(ii) The equivalent value of the least expensive, reasonable alternative energy source (fuel). The equivalent value of the least expensive, reasonable alternative energy source shall be based on the amount of thermal energy that would otherwise be used by the direct utilization process in place of the geothermal resource. That amount of thermal energy (in Btu's) displaced by the geothermal resource shall be determined by the equation

thermal energy displaced =

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

$$\frac{(h_{in}-h_{out}) \times \text{density} \times 0.133681 \times \text{volume}}{\text{efficiency factor}}$$

where $h_{in}$ is the enthalpy in Btu's/lb at the utilization facility inlet (based on measured inlet temperature), $h_{out}$ is the enthalpy in Btu's/lb at the facility outlet (based on measured outlet temperature), density is in lbs/cu ft based on inlet temperature, the factor 0.133681 (cu ft/gal) converts gallons to cubic feet, and volume is the quantity of geothermal fluid in gallons produced at the wellhead or measured at an approved point. The efficiency of the alternative energy source shall be 0.7 for coal and 0.8 for oil, natural gas, and other fuels derived from oil and natural gas, or an efficiency factor proposed by the lessee and approved by MMS. The methods of measuring resource parameters (temperature, volume, etc.) and the frequency of computing and accumulating the amount of thermal energy displaced shall be determined and approved by BLM; or

(iii) A value determined by any other reasonable valuation method approved by MMS.

(2) Valuations made pursuant to this paragraph are subject to the notification requirements of paragraph (e) of this section.

(e)(1) Pursuant to subpart H of 30 CFR part 212, the lessee shall retain all data relevant to the determination of royalty value, particularly where the value is determined pursuant to paragraph (c) or (d) of this section. Such data shall be subject to review and audit, and MMS will direct a lessee to use a different value if it determines that the reported value is inconsistent with the requirements of these regulations.

(2) Upon request, lessees shall make available to authorized MMS representatives or to other authorized persons any and all contracts for the sale or other disposition of the lease production, and any arm's-length sales and other data for like-quality production sold, purchased, or otherwise obtained by the lessee from the field as may be necessary to support a value determination.

(3) A lessee shall notify MMS if it has determined value pursuant to paragraph (c) or (d) of this section. The notification shall be by letter to the MMS Associate Director for Minerals Revenue Management or his/her designee. The letter shall identify the valuation method to be used and contain a brief description of the procedure to be followed. The notification required by this paragraph is a one-time notification due no later than the end of the month following the month the lessee first reports royalties on a Form MMS-2014 using a valuation method authorized by paragraph (c) or (d) of this section.

(f) If MMS determines that a lessee has not properly determined value, the lessee shall pay the difference, if any, between royalty payments made based upon the value it has used and the royalty payments that are due based upon the value established by MMS. The lessee shall also pay interest on that difference computed pursuant to 30 CFR 218.302. If the lessee is entitled to a credit, MMS will provide instructions for the taking of that credit.

(g) The lessee may request a value determination from MMS. In that event, the lessee shall propose to MMS a value determination method and may use that method in determining value, for royalty purposes, until MMS issues its decision. The lessee shall submit all available data relevant to its proposal. The MMS shall expeditiously determine the value based upon the lessee's proposal and any additional information MMS deems necessary. In making a value determination, MMS may use any of the valuation criteria consistent with this subpart. That determination shall remain effective for the period stated therein. After MMS issues its determination, the lessee shall make adjustments in accordance with paragraph (f) of this section.

(h) Notwithstanding any other provision of this section, under no circumstances shall the value of production, for royalty purposes, be less than the gross proceeds accruing to the lessee where

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

geothermal energy is directly sold.

(i) The lessee is required to place geothermal resources in marketable condition and to deliver geothermal resources to the direct utilization facility at no cost to the Federal lessor. Where the value established pursuant to this section is determined by a lessee's gross proceeds, that value shall be increased to the extent that the gross proceeds have been reduced because the purchaser, or any other person, is providing certain services the cost of which ordinarily is the responsibility of the lessee to place the geothermal resource in marketable condition or to deliver it to the direct utilization facility.

(j) Value shall be based on the highest price a prudent lessee can receive through legally enforceable claims under its contract. Absent contract revision or amendment, if the lessee fails to take proper or timely action to receive prices or benefits to which it is entitled, it must pay royalty at a value based upon that obtainable price or benefit. Contract revisions or amendments shall be in writing and signed by all parties to the contract. If the lessee makes timely application for a price increase or benefit allowed under its contract but the purchaser refuses and the lessee takes reasonable measures, which are documented, to force purchaser compliance, the lessee shall owe no additional royalties unless or until monies or consideration resulting from the price increase or additional benefits are received. This paragraph shall not be construed to permit a lessee to avoid its royalty payment obligation in situations where a purchaser fails to pay, in whole or in part or timely, for a quantity of geothermal resources.

(k) Notwithstanding any provision in these regulations to the contrary, no review, reconciliation, monitoring, or other like process that results in a redetermination by MMS of value under this section shall be considered final or binding against the Federal Government or its beneficiaries until the audit period is formally closed.

(l) Certain information submitted to MMS to support value determinations is exempted from disclosure by the Freedom of Information Act, 5 U.S.C. 552, or other Federal law. Any data specified by law to be privileged, confidential, or otherwise exempt will be maintained in a confidential manner in accordance with applicable laws and regulations. All requests for information about determinations made under this subpart are to be submitted in accordance with the Freedom of Information Act regulation of the Department, 43 CFR part 2.

**§ 206.356 Valuation standards for byproducts.**

(a) The value of geothermal byproducts, including commercially demineralized water, shall be determined pursuant to this section, less applicable byproducts transportation allowances determined pursuant to §§ 206.357 and 206.358 of this subpart.

(b)(1)(i) The value of byproducts that are sold pursuant to an arm's-length contract shall be the gross proceeds accruing to the lessee, except as provided in paragraphs (b)(1)(ii) and (b)(1)(iii) of this section. The lessee shall have the burden of demonstrating that its contract is arm's-length. The value that the lessee reports for royalty purposes is subject to monitoring, review, and audit.

(ii) In conducting reviews and audits, MMS will examine whether the contract reflects the total consideration actually transferred, either directly or indirectly, from the buyer to the seller for the byproducts. If the contract does not reflect the total consideration, MMS may require that the byproducts sold pursuant to that contract be valued in accordance with paragraph (c) of this section. Value may not be less than the gross proceeds accruing to the lessee, including any additional consideration received .

(iii) If MMS determines that the gross proceeds accruing to the lessee pursuant to an arm's-length contract do not reflect the reasonable value of the production because of misconduct by or between the contracting parties, or because the lessee otherwise has breached its duty to the lessor to market the production for the mutual benefit of the lessee and the lessor, MMS shall require that the byproduct production be valued pursuant to paragraph (c) of this section and in accordance with the notification requirements of paragraph (d) of this section. If MMS determines that the value may be unreasonable, MMS will notify

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the lessee and give the lessee an opportunity to provide written information justifying the lessee's reported byproduct value.

(2) The MMS may require a lessee to certify that the provisions in its arm's-length contract include all of the consideration to be paid by the buyer, either directly or indirectly, for the byproduct.

(c) The value of byproducts that are sold pursuant to a non-arm's-length contract or that are utilized by the lessee (no sales), except demineralized water used for the benefit of the lease pursuant to paragraph (b)(2) of § 202.351 of this subpart, shall be determined in accordance with the first applicable of the following paragraphs:

(1) The gross proceeds accruing to the lessee pursuant to a sale under its non arm's-length contract (or other disposition by other than an arm's-length contract), provided that those gross proceeds are not less than the gross proceeds derived from or paid under the lowest-priced available comparable arm's-length contract for sales, purchases, or other dispositions of like-quality byproducts in the field or, if necessary to obtain a representative sample, from the same area (the "minimum value"). If the gross proceeds under the lessee's non-arm's-length contract are less than the "minimum value" under available comparable arms length contracts, or if there are no available comparable arm's-length contracts, value will be determined by the weighted average of the gross proceeds established under arm's-length contracts for the sale of like-quality products in the field or, if necessary to obtain a representative sample, from the same area. Available contracts will mean contracts in the possession of the lessee, the lessee's affiliate, or MMS. In evaluating the comparability of arm's-length contracts for the purposes of these regulations, the following factors shall be considered: Field or area, price, time of execution, duration, terms, quality of the byproduct, volume, market or markets served, and other factors that may be appropriate to reflect the value of the byproduct;

(2) Other relevant matters including, but not limited to, published or publicly available spot-market prices, or information submitted by the lessee concerning circumstances unique to a particular lease operation or the saleability of certain byproducts; or

(3) A netback method or any other reasonable method used to determine value.

(d)(1) Pursuant to subpart H of 30 CFR part 212, the lessee shall retain all data relevant to the determination of royalty value, particularly where the value is determined pursuant to paragraph (c) of this section. Such data shall be subject to review and audit, and MMS will direct a lessee to use a different value if it determines that the reported value is inconsistent with the requirements of these regulations.

(2) Upon request, lessees shall make available to authorized MMS representatives or to other authorized persons any and all contracts and/or invoices for the sale or other disposition of the byproducts, and any arm's-length sales and other data for like-quality production sold, purchased, or otherwise obtained by the lessee from the field or other area as may be necessary to support a value determination.

(3) A lessee shall notify MMS if it has determined value pursuant to paragraph (c) of this section. The notification shall be by letter to the MMS Associate Director for Minerals Revenue Management or his/her designee. The letter shall identify the valuation method to be used and contain a brief description of the procedure to be followed. The notification required by this paragraph is a one-time notification due no later than the end of the month following the month the lessee first reports royalties on a Form MMS-2014 using a valuation method authorized by paragraph (c) of this section, and each time there is a change in a method under paragraph (c) of this section.

(e) If MMS determines that a lessee has not properly determined value, the lessee shall pay the difference, if any, between royalty payments made based upon the value it has used and the royalty payments that are due based upon the value established by MMS. The lessee shall also pay interest on that difference computed pursuant to 30

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

CFR 218.302. If the lessee is entitled to a credit, MMS will provide instructions for the taking of that credit.

(f) The lessee may request a value determination from MMS. In that event, the lessee shall propose to MMS a value determination method and may use that method in determining value, for royalty purposes, until MMS issues its decision. The lessee shall submit all available data relevant to its proposal. The MMS shall expeditiously determine the value based upon the lessee's proposal and any additional information MMS deems necessary. In making a value determination, MMS may use any of the valuation criteria consistent with this subpart. That determination shall remain effective for the period stated therein. After MMS issues its determination, the lessee shall make the adjustments in accordance with paragraph (e) of this section.

(g) Notwithstanding any other provisions of the section, under no circumstances shall the value of byproducts for royalty purposes be less than the gross proceeds accruing to the lessee, less applicable byproduct transportation allowances determined pursuant to §§ 206.357 and 206.358 of this subpart.

(h) The lessee is required to place the byproducts in marketable condition at no cost to the Federal Government. Where the value established pursuant to this section is determined by a lessee's gross proceeds, that value shall be increased to the extent that the gross proceeds have been reduced because the purchaser, or any other person, is providing certain services the cost of which ordinarily is the responsibility of the lessee to place the byproducts in marketable condition.

(i) Value shall be based on the highest price a prudent lessee can receive through legally enforceable claims under its contract. Absent contract revision or amendment, if the lessee fails to take proper or timely action to receive prices or benefits to which it is entitled, it must pay royalty at a value based upon that obtainable price or benefit. Contract revisions or amendments shall be in writing and signed by all parties to the contract, and may be retroactively applied to value byproducts, for royalty purposes, for a period not to exceed 2 years, unless MMS approves a longer period. If the lessee makes timely application for a price increase allowed under its contract but the purchaser refuses and the lessee takes reasonable measures, which are documented, to force purchaser compliance, the lessee will owe no additional royalties unless or until monies or consideration resulting from the price increase are received. This paragraph shall not be construed to permit a lessee to avoid its royalty payment obligation in situations where a purchaser fails to pay, in whole or in part or timely, for a quantity of byproducts.

(j) Notwithstanding any provision in these regulations to the contrary, no review, reconciliation, monitoring, or other like process that results in a redetermination by MMS of value under this section shall be considered final or binding against the Federal Government or its beneficiaries until the audit period is formally closed.

(k) Certain information submitted to MMS to support valuation proposals, including byproduct transportation allowances pursuant to §§ 206.357 and 206.358 of this subpart, is exempted from disclosure by the Freedom of Information Act, 5 U.S.C. 552. Any data specified by the act to be privileged, confidential, or otherwise exempt shall be maintained in a confidential manner in accordance with applicable laws and regulations. All requests for information about determinations made under this subpart are to be submitted in accordance with the Freedom of Information Act regulation of the Department, 43 CFR part 2.

**§ 206.357 Byproduct transportation allowances--general.**

(a) Where the value of byproducts has been determined at a point off the geothermal lease, unit, or participating area, MMS shall allow a deduction in determining value, for royalty purposes, for the lessee's reasonable, actual costs incurred to:

(1) Transport the byproducts from a Federal lease, unit, or participating area to a sales point or point of delivery that is off the lease, unit, or participating area; or

(2) Transport the byproducts from a Federal lease, unit, or participating area, or from a geothermal utilization facility to a byproduct recovery facility when that byproduct recovery

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

facility is off the lease, unit, or participating area and, if applicable, from the recovery facility to a sales point or point of delivery off the lease, unit, or participating area. Costs for transporting geothermal fluids from the lease to the geothermal utilization facility, whether on or off the lease, shall not be included in the transportation allowance.

(b) Under no circumstances shall the byproduct transportation allowance authorized by paragraph (a) of this section reduce the value of the byproducts under any selling arrangement to zero.

(c)(1) When byproducts are transported from a lease, unit, participating area, or geothermal utilization facility to a byproduct recovery facility, the lessee is not required to allocate transportation costs between the quantity of marketable byproducts and the rejected waste material. The byproduct transportation allowance shall be authorized for the total production that is transported. Byproduct transportation allowances shall be expressed as a cost per unit of marketable byproducts transported.

(2) For byproducts that are extracted on the lease, unit, or participating area, or at the geothermal utilization facility, the byproduct transportation allowance shall be authorized for the total production that is transported to a point of sale off the lease, unit, or participating area. Byproduct transportation allowances shall be expressed as a cost per unit of byproduct transported.

(3) Transportation costs shall be authorized as allowances only when the transported byproduct is sold, delivered, or otherwise utilized by the lessee and royalties are reported and paid.

(d) Byproduct transportation allowances are subject to monitoring, review, and audit. If, after a review and/or audit, MMS determines that a lessee has improperly determined a byproduct transportation allowance authorized by this section, then the lessee shall pay any additional royalties plus interest determined in accordance with 30 CFR 218.302, or shall be entitled to a credit without interest.

(e) If byproducts produced from Federal and non-Federal leases are commingled for transportation, lessees shall not disproportionately allocate transportation costs to Federal lease production.

(f) Upon request, the lessee shall make available to authorized MMS representatives or to other authorized persons all transportation contracts and all other information as may be necessary to support a byproduct transportation allowance.

(g) Byproduct transportation allowances are to be reported as separate lines on Form MMS-2014.

**§ 206.358 Determination of byproduct transportation allowances.**

(a) Arm's-length contracts.

(1) For transportation costs incurred by a lessee pursuant to an arm's-length contract, the transportation allowance shall be the reasonable, actual costs incurred by the lessee for transporting the byproducts under that contract, subject to monitoring, review, audit, and possible future adjustments. The MMS's prior approval is not required before a lessee may deduct costs incurred under an arm's-length transportation contract.

(2) In conducting reviews and audits, MMS will examine whether the contract reflects more than the consideration actually transferred either directly or indirectly from the lessee to the transporter for the transportation. If the contract reflects more than the total consideration paid, MMS may require that the byproduct transportation allowance be determined in accordance with paragraph (b) of this section.

(3) If MMS determines that the consideration paid pursuant to an arm's-length byproduct transportation contract does not reflect the reasonable value of the transportation because of misconduct by or between the contracting parties, or because the lessee otherwise has breached its duty to the lessor to market the production for the mutual benefit of the lessee and the lessor, MMS shall require that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

byproduct transportation allowance be determined in accordance with paragraph (b) of this section. When MMS determines that the value of the transportation may be unreasonable, MMS will notify the lessee and give the lessee an opportunity to provide written information justifying the lessee's transportation costs.

(4) Where the lessee's payments for transportation under an arm's-length contract are not established on a dollars-per-unit basis, the lessee shall convert whatever consideration is paid to a dollar value equivalent for the purposes of this section.

(b) Non-arm's-length or no contract.

(1) If a lessee has a non-arm's-length transportation contract or has no contract, including those situations where the lessee performs transportation services for itself, the byproduct transportation allowance shall be based upon the lessee's reasonable actual costs. All byproduct transportation allowances deducted under a non-arm's-length or no-contract situation are subject to monitoring, review, audit, and possible future adjustment. Prior MMS approval of byproduct transportation allowances is not required for non-arm's-length or no-contract situations.

(2) The byproduct transportation allowance for non-arm's-length or no-contract situations shall be based upon the lessee's actual costs for transportation during the reporting period, including operating and maintenance expenses, overhead, and either depreciation and a return on undepreciated capital investment in accordance with paragraph (b)(2)(iv)(A) of this section, or a cost equal to the capital investment in the transportation system multiplied by the rate of return in accordance with paragraph (b)(2)(iv)(B) of this section. Allowable capital costs are generally those for depreciable assets, including costs of delivery and installation of capital equipment, that are an integral part of the transportation system. A return on capital invested in the purchase of real estate to locate the byproduct transportation facilities may be allowed provided that the lessee demonstrates the necessity for such purchase, the purchased land is not on a Federal geothermal lease, and MMS approves the deduction; the rate of return shall be the same rate determined in paragraph (b)(2)(v) of this section.

(i) Allowable operating expenses include operations supervision and engineering, operations labor, fuel, utilities, materials, ad valorem property taxes, rent, supplies, and any other allocable and attributable operating expenses that the lessee can document.

(ii) Allowable maintenance expenses include maintenance of the transportation system, maintenance of equipment, maintenance labor, and other directly allocable and attributable maintenance expenses that the lessee can document.

(iii) Overhead attributable and allocable to the operation and maintenance of the transportation system is an allowable expense. State and Federal income taxes and severance taxes and other fees, including royalties, are not allowable expenses.

(iv) To compute costs associated with capital investment, a lessee may use either paragraph (b)(2)(iv)(A) or (b)(2)(iv)(B) of this section. After a lessee has elected to use either method for a transportation system, the lessee may not later elect to change to the other alternative without MMS approval.

(A) To compute depreciation, the lessee must use a straight-line depreciation method based on, as appropriate, either the life of equipment or the life of the geothermal project that the transportation system services. After an election is made, the lessee may not change methods. A change in ownership of a transportation system shall not alter the depreciation schedule established by the original transporter/lessee for purposes of the allowance calculation. With or without a change in ownership, a transportation system shall be depreciated only once. Equipment shall not be depreciated below a reasonable salvage value. The rate of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

return used to compute the return on undepreciated capital investment shall be determined pursuant to paragraph (b)(2)(v) of this section.

(B) To compute a return on capital investment, the allowed cost shall be the amount equal to the allowable capital investment in the transportation system multiplied by the rate of return determined pursuant to paragraph (b)(2)(v) of this section. No allowance shall be provided for depreciation.

(v) The rate of return shall be Standard and Poor's industrial BBB bond rate. The rate of return shall be the monthly average rate as published in Standard and Poor's Bond Guide for the first month of the annual reporting period for which the allowance is applicable and shall be effective during the reporting period. The rate shall be redetermined at the beginning of each subsequent transportation allowance reporting period.

**Subpart I. Ocs Sulfur--[Reserved]**

**Subpart J. Indian Coal (Refs & Annos)**

**§ 206.450 Purpose and scope.**

(a) This subpart prescribes the procedures to establish the value, for royalty purposes, of all coal from Indian Tribal and allotted leases (except leases on the Osage Indian Reservation, Osage County, Oklahoma).

(b) If the specific provisions of any statute, treaty, or settlement agreement between the Indian lessor and a lessee resulting from administrative or judicial litigation, or any coal lease subject to the requirements of this subpart, are inconsistent with any regulation in this subpart, then the statute, treaty, lease provision, or settlement shall govern to the extent of that inconsistency.

(c) All royalty payments are subject to later audit and adjustment.

(d) The regulations in this subpart are intended to ensure that the trust responsibilities of the United States with respect to the administration of Indian coal leases are discharged in accordance with the requirements of the governing mineral leasing laws, treaties, and lease terms.

**§ 206.451 Definitions.**

Ad valorem lease means a lease where the royalty due to the lessor is based upon a percentage of the amount or value of the coal.

Allowance means an approved, or an MMS-initially accepted deduction in determining value for royalty purposes. Coal washing allowance means an allowance for the reasonable, actual costs incurred by the lessee for coal washing, or an approved or MMS-initially accepted deduction for the costs of washing coal, determined pursuant to this subpart. Transportation allowance means an allowance for the reasonable, actual costs incurred by the lessee for moving coal to a point of sale or point of delivery remote from both the lease and mine or wash plant, or an approved MMS-initially accepted deduction for costs of such transportation, determined pursuant to this subpart.

Area means a geographic region in which coal has similar quality and economic characteristics. Area boundaries are not officially designated and the areas are not necessarily named.

Arm's-length contract means a contract or agreement that has been arrived at in the marketplace between independent, nonaffiliated persons with opposing economic interests regarding that contract. For purposes of this subpart, two persons are affiliated if one person controls, is controlled by, or is under common control with another person. For purposes of this subpart, based on the instruments of ownership of the voting securities of an entity, or based on other forms of ownership: ownership in excess of 50 percent constitutes control; ownership of 10 through 50 percent creates a presumption of control; and ownership of less than 10 percent creates a presumption of noncontrol which MMS may rebut

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

if it demonstrates actual or legal control, including the existence of interlocking directorates. Notwithstanding any other provisions of this subpart, contracts between relatives, either by blood or by marriage, are not arm's-length contracts. MMS may require the lessee to certify ownership control. To be considered arm's-length for any production month, a contract must meet the requirements of this definition for that production month, as well as when the contract was executed.

Audit means a review, conducted in accordance with generally accepted accounting and auditing standards, of royalty payment compliance activities of lessees or other interest holders who pay royalties, rents, or bonuses on Indian leases.

BIA means the Bureau of Indian Affairs of the Department of the Interior.

BLM means the Bureau of Land Management of the Department of the Interior.

Coal means coal of all ranks from lignite through anthracite.

Coal washing means any treatment to remove impurities from coal. Coal washing may include, but is not limited to, operations such as flotation, air, water, or heavy media separation; drying; and related handling (or combination thereof).

Contract means any oral or written agreement, including amendments or revisions thereto, between two or more persons and enforceable by law that with due consideration creates an obligation.

Gross proceeds (for royalty payment purposes) means the total monies and other consideration accruing to a coal lessee for the production and disposition of the coal produced. Gross proceeds includes, but is not limited to, payments to the lessee for certain services such as crushing, sizing, screening, storing, mixing, loading, treatment with substances including chemicals or oils, and other preparation of the coal to the extent that the lessee is obligated to perform them at no cost to the Indian lessor. Gross proceeds, as applied to coal, also includes but is not limited to reimbursements for royalties, taxes or fees, and other reimbursements. Tax reimbursements are part of the gross proceeds accruing to a lessee even though the Indian royalty interest may be exempt from taxation. Monies and other consideration, including the forms of consideration identified in this paragraph, to which a lessee is contractually or legally entitled but which it does not seek to collect through reasonable efforts are also part of gross proceeds.

Indian allottee means any Indian for whom land or an interest in land is held in trust by the United States or who holds title subject to Federal restriction against alienation.

Indian Tribe means any Indian Tribe, band, nation, pueblo, community, rancheria, colony, or other group of Indians for which any land or interest in land is held in trust by the United States or which is subject to Federal restriction against alienation.

Lease means any contract, profit-share arrangement, joint venture, or other agreement issued or approved by the United States for an Indian coal resource under a mineral leasing law that authorizes exploration for, development or extraction of, or removal of coal--or the land covered by that authorization, whichever is required by the context.

Lessee means any person to whom the Indian Tribe or an Indian allottee issues a lease, and any person who has been assigned an obligation to make royalty or other payments required by the lease. This includes any person who has an interest in a lease as well as an operator or payor who has no interest in the lease but who has assumed the royalty payment responsibility.

Like-quality coal means coal that has similar chemical and physical characteristics.

Marketable condition means coal that is sufficiently free from impurities and otherwise in a condition that it will be accepted by a purchaser under a sales contract typical for that area.

Mine means an underground or surface excavation or series of excavations and the surface or underground support facilities that contribute directly or indirectly to mining, production, preparation, and handling of lease products.

MMS means the Minerals Management Service of the Department of the Interior.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Net-back method means a method for calculating market value of coal at the lease or mine. Under this method, costs of transportation, washing, handling, etc., are deducted from the ultimate proceeds received for the coal at the first point at which reasonable values for the coal may be determined by a sale pursuant to an arm's-length contract or by comparison to other sales of coal, to ascertain value at the mine.

Net output means the quantity of washed coal that a washing plant produces.

Person means by individual, firm, corporation, association, partnership, consortium, or joint venture.

Selling arrangement means the individual contractual arrangements under which sales or dispositions of coal are made to a purchaser.

Spot market price means the price received under any sales transaction when planned or actual deliveries span a short period of time, usually not exceeding one year.

**§ 206.452 Coal subject to royalties--general provisions.**

(a) All coal (except coal unavoidably lost as determined by BLM pursuant to 43 CFR Group 3400) from an Indian lease subject to this part is subject to royalty. This includes coal used, sold, or otherwise disposed of by the lessee on or off the lease.

(b) If a lessee receives compensation for unavoidably lost coal through insurance coverage or other arrangements, royalties at the rate specified in the lease are to be paid on the amount of compensation received for the coal. No royalty is due on insurance compensation received by the lessee for other losses.

(c) If waste piles or slurry ponds are reworked to recover coal, the lessee shall pay royalty at the rate specified in the lease at the time the recovered coal is used, sold, or otherwise finally disposed of. The royalty rate shall be that rate applicable to the production method used to initially mine coal in the waste pile or slurry pond; i.e., underground mining method or surface mining method. Coal in waste pits or slurry ponds initially mined from Indian leases shall be allocated to such leases regardless of whether it is stored on Indian lands. The lessee shall maintain accurate records to determine to which individual Indian lease coal in the waste pit or slurry pond should be allocated. However, nothing in this section requires payment of a royalty on coal for which a royalty has already been paid.

**§ 206.453 Quality and quantity measurement standards for reporting and paying royalties.**

For all leases subject to this subpart, the quantity of coal on which royalty is due shall be measured in short tons (of 2,000 pounds each) by methods prescribed by the BLM. Coal quantity information shall be reported on appropriate forms required under 30 CFR Part 216 and on the Solid Minerals Production and Royalty Report, Form MMS-4430, as required under 30 CFR Part 210.

**§ 206.454 Point of royalty determination.**

(a) For all leases subject to this subpart, royalty shall be computed on the basis of the quantity and quality of Indian coal in marketable condition measured at the point of royalty measurement as determined jointly by BLM and MMS.

(b) Coal produced and added to stockpiles or inventory does not require payment of royalty until such coal is later used, sold, or otherwise finally disposed of. MMS may ask BLM or BIA to increase the lease bond to protect the lessor's interest when BLM determines that stockpiles or inventory become excessive so as to increase the risk of degradation of the resource.

(c) The lessee shall pay royalty at a rate specified in the lease at the time the coal is used, sold, or otherwise finally disposed of, unless otherwise provided for at § 206.455(d) of this subpart.

**§ 206.455 Valuation standards for cents-per-ton leases.**

(a) This section is applicable to coal leases on Indian Tribal and allotted Indian lands (except

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

leases on the Osage Indian Reservation, Osage County, Oklahoma) which provide for the determination of royalty on a cents-per-ton (or other quantity) basis.

(b) The royalty for coal from leases subject to this section shall be based on the dollar rate per ton prescribed in the lease. That dollar rate shall be applicable to the actual quantity of coal used, sold, or otherwise finally disposed of, including coal which is avoidably lost as determined by BLM pursuant to 43 CFR Part 3400.

(c) For leases subject to this section, there shall be no allowances for transportation, removal of impurities, coal washing, or any other processing or preparation of the coal.

(d) When a coal lease is readjusted pursuant to 43 CFR Part 3400 and the royalty valuation method changes from a cents-per-ton basis to an ad valorem basis, coal which is produced prior to the effective date of readjustment and sold or used within 30 days of the effective date of readjustment shall be valued pursuant to this section. All coal that is not used, sold, or otherwise finally disposed of within 30 days after the effective date of readjustment shall be valued pursuant to the provisions of § 206.456 of this subpart, and royalties shall be paid at the royalty rate specified in the readjusted lease.

**§ 206.456 Valuation standards for ad valorem leases.**

(a) This section is applicable to coal leases on Indian Tribal and allotted Indian lands (except leases on the Osage Indian Reservation, Osage County, Oklahoma) which provide for the determination of royalty as a percentage of the amount of value of coal (ad valorem). The value for royalty purposes of coal from such leases shall be the value of coal determined pursuant to this section, less applicable coal washing allowances and transportation allowances determined pursuant to §§ 206.457 through 206.461 of this subpart, or any allowance authorized by § 206.464 of this subpart. The royalty due shall be equal to the value for royalty purposes multiplied by the royalty rate in the lease.

(b)(1) The value of coal that is sold pursuant to an arm's-length contract shall be the gross proceeds accruing to the lessee, except as provided in paragraphs (b)(2), (b)(3), and (b)(5) of this section. The lessee shall have the burden of demonstrating that its contract is arm's-length. The value which the lessee reports, for royalty purposes, is subject to monitoring, review, and audit.

(2) In conducting reviews and audits, MMS will examine whether the contract reflects the total consideration actually transferred either directly or indirectly from the buyer to the seller for the coal produced. If the contract does not reflect the total consideration, then MMS may require that the coal sold pursuant to that contract be valued in accordance with paragraph (c) of this section. Value may not be based on less than the gross proceeds accruing to the lessee for the coal production, including the additional consideration.

(3) If MMS determines that the gross proceeds accruing to the lessee pursuant to an arm's-length contract do not reflect the reasonable value of the production because of misconduct by or between the contracting parties, or because the lessee otherwise has breached its duty to the lessor to market the production for the mutual benefit of the lessee and the lessor, then MMS shall require that the coal production be valued pursuant to paragraphs (c)(2)(ii), (c)(2)(iii), (c)(2)(iv), or (c)(2)(v) of this section, and in accordance with the notification requirements of paragraph (d)(3) of this section. When MMS determines that the value may be unreasonable, MMS will notify the lessee and give the lessee an opportunity to provide written information justifying the lessee's reported coal value.

(4) MMS may require a lessee to certify that its arm's-length contract provisions include all of the consideration to be paid by the buyer, either directly or indirectly, for the coal production.

(5) The value of production for royalty purposes shall not include payments received by the lessee pursuant to a contract which the lessee demonstrates, to MMS' satisfaction, were not part of the total consideration paid for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.