**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **WALLACE OENGA, GEORGENE SHUGLUK, LEROY OENGA, SR., MICHAEL DELIA, TONY DELIA, JOSEPH DELIA, JENNIE MILLER, and TRINITY DELIA,** | |
| **Plaintiffs,** | |
| **v.** | **No. 06-491 L**<br>**Chief Judge Edward Damich** |
| **THE UNITED STATES,** | |
| **Defendant,** | |
| **and** | |
| **BP EXPLORATION (ALASKA), INC., CONOCOPHILLIPS ALASKA, INC., EXXON MOBIL ALASKA PRODUCTION, INC., CHEVRON, U.S.A., INC., AND FOREST OIL CORPORATION,** | |
| **Intervenors.** | |

**UNITED STATES' MOTION TO DISMISS, OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

MATTHEW J. MCKEOWN
Acting Assistant Attorney General

JAMES M. UPTON
U.S. Department of Justice
Environment & Natural Resources
Division
Natural Resources Section
P.O. Box 663
Washington, D.C. 20044-0663

**TABLE OF CONTENTS**

MOTION TO DISMISS, OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT . . . . 1

BRIEF IN SUPPORT OF MOTION TO DISMISS, OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT . . . . 1

INTRODUCTION . . . . 1

A. Key Provisions of BIA Lease F-89-01 . . . . 4

B. Circumstances Surrounding the First Lease Rental Adjustment in 1993 . . . . 6

C. Circumstances Surrounding the Second Lease Rental Adjustment in 1998 . . . . 11

D. Circumstances Relating to the Allegedly Unauthorized Use of the Oenga Allotment . . . . 14

SUMMARY OF ARGUMENT . . . . 15

ARGUMENT . . . . 15

I. STANDARD OF REVIEW . . . . 15

II. CLAIM NO. 1 IS NOT A CLAIM UPON WHICH RELIEF MAY BE GRANTED . . . . 17

III. THE COURT LACKS SUBJECT MATTER JURISDICTION OVER CLAIM NO. 1 . . . . 20

IV. CLAIM NO. 2 IS NOT A CLAIM UPON WHICH RELIEF MAY BE GRANTED . . . . 24

A. Neither the Indian Long-Term Leasing Act nor the Regulations Promulgated Under the Act Require that Oil Royalties be used to Calculate Lease Rental Adjustments . . . . 24

1. Indian Long-Term Leasing Act, 25 U.S.C. § 415 . . . . 24

2. The Regulations Promulgated Under the Act . . . . 24

B. BIA Lease F-89-01 Does not Require that Oil Royalties be Used to Calculate Lease Rental Adjustments . . . . . . . . . . . . . . 26

V. THE COURT LACKS SUBJECT MATTER JURISDICTION OVER CLAIM NO. 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

VI. CLAIM NO. 3 IS NOT A CLAIM UPON WHICH RELIEF MAY BE GRANTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

## TABLE OF AUTHORITIES

### FEDERAL CASES

Adair v. United States,
70 Fed. Cl. 65 (Fed. Cl. 2006) . . . . . . . . . 17

American Pacific Roofing Co. v. United States,
21 Cl. Ct. 265 (Cl. Ct. 1990) . . . . . . . . . 16

Andrade v. United States,
485 F.2d 660 (1973), cert. denied, 419 U.S. 831 (1974) . . . . . . . . . 22

Arakaki v. United States,
71 Fed. Cl. 509, (Fed. Cl. 2006) . . . . . . . . . 15

Coast Federal Bank, FSB v. United States,
323 F. 3d 1035 (Fed. Cir. 2003) . . . . . . . . . 28

Coastal Petroleum Corp. v. United States,
228 Ct. Cl. 864 (1981) . . . . . . . . . 21

ConocoPhillips v. United States,
73 Fed. Cl. 46 (2006) . . . . . . . . . 26

Coulibaly v. T.G.I. Friday's, Inc.,
623 F. Supp. 860 (S.D. Ind.1985) . . . . . . . . . 22

Davis v. Scherer,
468 U.S. 183 (1984) . . . . . . . . . 16

Fallini v. United States,
56 F.3d 1378 (Fed. Cir. 1995), cert. denied, 517 U.S. 1243 (1996) . . . . . . . . . 21

Fort Mojave Tribe v. United States,
210 Ct. Cl. 727 (1976) . . . . . . . . . 22

Hercules, Inc. v. United States,
292 F.3d 1378 (Fed. Cir. 2002) . . . . . . . . . 28, 29

Hohri v. United States,
782 F.2d 227 (D.C. Cir.1986), vacated on other grounds, 482 U.S. 64 (1987) . . . . . . . . . 22

Hopland Band of Pomo Indians v. United States,
855 F.2d 1573 (Fed. Cir.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22

Hydaburg Co-op. Ass'n v. United States,
229 Ct. Cl. 250 (1981), cert. denied, 459 U.S. 905 (1982) . . . . . . . . . . . . . . . . . . . . . . . 21

Jones v. United States,
801 F.2d 1334 (Fed. Cir. 1986), cert. denied, 481 U.S. 1013 (1987) . . . . . . . . . . . . . . . . 21

LaGloria Oil v. United States,
72 Fed. Cl. 544 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 29

Littlewolf v. Hodel,
681 F. Supp. 929 (D.D.C. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

Littlewolf v. Lujan,
877 F.2d 1058 (D.C. Cir. 1989), cert. denied, 493 U.S. 1043 (1990) . . . . . . . . . . . . . . . . 21

Logan v. Zimmerman Brush,
455 U.S. 422 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Lyons v. Goodson,
787 F.2d 411 (8th Cir.1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

M.A. DeAtley Construction, Inc. v. United States,
– Fed. Cl. –, 2007 WL 646156 (Fed. Cl. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

McNabb v. United States,
54 Fed. Cl. 759 (Fed. Cl. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Menominee Tribe v. United States,
726 F.2d 718 (Fed. Cir. 1984), cert. denied, 469 U.S. 826 (1984) . . . . . . . . . . . 21, 22, 23

Mitchell v. United States,
10 Cl. Ct. 787 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Nager Elec. Co. v. United States,
368 F.2d 847 (Ct. Cl. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Pawnee v. United States,
830 F.2d 187 (Fed. Cir. 1987), cert. denied, 486 U.S. 1032 (1988) . . . . . . . . . . . . . 19, 25

Ortiz v. Hackett,
581 F. Supp. 1258 (N.D. Ind.1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Reynolds v. Army & Air Force Exchange Serv.,
846 F.2d 746 (Fed. Cir. 1988) . . . . . . . . . . 16

Riveria Drilling and Exploration Co., Inc. v. United States,
61 Fed. Cl. 395 (Fed. Cl. 2004) . . . . . . . . . . 15

Scheuer v. Rhodes,
416 U.S. 232 (1974), overruled on other grounds by Davis v. Scherer,
468 U.S. 183 (1984). . . . . . . . . . 16

Shrader v. United States,
– Fed. Cl. –, 2007 WL 174128 (Fed. Cl. 2007) . . . . . . . . . . 16

Soriano v. United States,
352 U.S. 270 (1957) . . . . . . . . . . 20

Travelers Indemnity Co. v. United States,
72 Fed. Cl. 56 (Fed. Cl. 2006) . . . . . . . . . . 17

Ullman v. United States,
64 Fed. Cl. 557 (Fed. Cl. 2005) . . . . . . . . . . 16

United States v. Navajo Nation,
537 U.S. 488 (2003) . . . . . . . . . . 19, 25

Urie v. Thompson,
337 U.S. 163 (1949) . . . . . . . . . . 22

Warr v. United States,
46 Fed. Cl. 343 (Fed. Cl. 2000) . . . . . . . . . . 17

Wolfchild v. United States,
62 Fed. Cl. 521 (2004), reconsideration denied, 68 Fed. Cl. 779 (2005) . . . . . . . . . . 20

Wood v. Carpenter,
101 U.S. (11 Otto) 135 (1879) . . . . . . . . . . 22

**FEDERAL STATUTES**

Act of May 17, 1906, 34 Stat.197, formerly codified at 25 U.S.C. §§ 270-1, et seq. (1970) . . . . . . . . . . 1

Indian Mineral Leasing Act, Pub. L. No. 311, ch. 258, Act of March 3, 1909, 35 Stat. 783, 25 U.S.C. §§ 396, et seq. (2007) . . . . . . . . . . 2, 18

Indian Long-Term Leasing Act, Pub. L. No. 255, ch. 615, Act of August 9, 1955, 69 Stat. 539, 25 U.S.C. § 415 (2007) . . . . . . . . . . 18, 23-24

Indian Self-Determination and Education Assistance Act, Pub. L. No. 93-638, Act of January 4, 1975, 88 Stat. 2203, 25 U.S.C. §§ 450, et. seq. (2007) . . . . . . . . . . 7

Federal Oil & Gas Royalty Management Act, Pub. L. No. 97-451, Act of January 12, 1983, 96 Stat. 2447, 25 U.S.C. §§ 1701, et seq. (2007) . . . . . . . . . . 18

28 U.S.C. § 1491 (2007) . . . . . . . . . . 2

28 U.S.C. § 2501 (2007) . . . . . . . . . . 2, 20-21, 24

**FEDERAL REGULATIONS**

25 C.F.R § 162.8 . . . . . . . . . . 24
25 C.F.R. Part 162 . . . . . . . . . . 19, 23, 24
25 C.F.R. Part 212 (2007) . . . . . . . . . . 2, 18-20, 24
25 C.F.R. § 162. 607 . . . . . . . . . . 25
25 C.F.R. § 162.101 . . . . . . . . . . 25
25 C.F.R. § 162.103(a)(1) . . . . . . . . . . 19
25 C.F.R. § 212.3 (2007) . . . . . . . . . . 19
30 C.F.R. Part 206 (2007) . . . . . . . . . . 18
43 C.F.R. Part 3160 (2007) . . . . . . . . . . 18

**RCFC RULES**

RCFC 12(b)(1) . . . . . . . . . . 1, 16-17
RCFC 12(b)(6) . . . . . . . . . . 1, 17

## LIST OF ATTACHMENTS

1. August 13, 1970 Alaska Native Allotment Application of Andrew Oenga

2. September 27, 2005 Alaska Native Allotment (Patent) No. 50-2005-0580 issued to Heirs, Devisees and/or Assigns of Andrew Oenga (covering Parcel B)

3. 43 U.S.C. §§ 270-11 and 270-12 (1970)

4. May 19, 1988 letter from Standard Oil Company to Bureau of Indian Affairs (BIA)

5. BIA Lease No. F-82-08

6. July 14, 1988 letter from BIA Agency Superintendent to Standard Alaska Production Co.

7. July 20, 1988 BIA Realty Officer telephone notes

8. August 26, 1988 letter to Standard Alaska Production Co. from Andrew Oenga attorney Glenn M. Feldman

9. September 20, 1988 letter to attorney Feldman from Standard Alaska Production Co.

10. September 26, 1988 letter to oil company attorney from attorney Glenn Feldman

11. September 27, 1988 internal BIA memorandum from Realty Specialist Dickinson to Realty Officer Scott, reporting on September 26, 1988 meeting

12. BIA Report of Investigation of Proposed Parcel B Lease, submitted January 17, 1989, approved January 20, 1989

13. BIA Lease No. F-89-01, approved January 20, 1989

14. September 11, 1990 Department of the Interior Order Approving Will and Decree of Distribution in the Estate of Andrew Oenga

15. Andrew Oenga's private attorney-prepared December 18, 1989 Last Will and Testament

16. Wallace Oenga's February 2, 1993 letter requesting, *inter alia*, a copy of the lease

17. BIA's February 18, 1993 letter responding to Wallace Oenga's requests

18. June 15, 1993 BIA appraisal request

19. BIA appraisal of June 17, 1993 fair rental value of Parcel B of Oenga allotment, dated August 6, 1993

20. July 29,1993 BP Exploration letter to BIA captioned "Request to Amend Surface Lease F-89-01"

21. July 30, 1993 internal BIA Report of Investigation regarding lease amendment

22. July 30, 1993 internal BIA memorandum recommending acceptance of the amendment

23. July 30, 1993 Arctic Slope Native Association Limited (ASNA) letter to part allotment owner Leroy Oenga regarding lease amendment and rent adjustment

24. August 3, 1993 BIA letter to BP Exploration regarding lease amendment, rent adjustment, and new ASNA role

25. August 27, 1993 Fax cover sheet from private attorney Feldman

26. August 30, 1993 letter from attorney Feldman to Leroy Oenga regarding lease

27. August 30, 1993 letter from Leroy Oenga to ASNA requesting assistance with negotiations

28. October 28, 1993 ASNA letter to attorney Feldman, soliciting suggestions regarding draft ASNA negotiating letter to BP on behalf of land owners

29. October 29, 1993 ASNA letter to part owner of allotment, Jenny Oenga regarding possible lease amendment

30. November 10, 1993 ASNA letter to BP, enclosing proposed lease amendments

31. November 30, 1994 (sic - should be 1993) BP Exploration letter responding to ASNA proposals

32. July 1993-January 1994 ASNA log of calls, visits, or correspondence - Oenga lease

33. January 17 and 18, 1994 owner-executed records of counseling regarding lease amendment

34. January 18, 1994 ASNA Report of Investigation recommending approval of lease amendment

35. Agreement to Amend BIA Lease F-89-01, fully executed and approved by BIA on January 20, 1994

36. January 21, 1994 BP letter explaining calculation of rent payments tendered

37. June 6 and July 20, 1994 attorney communications with part owner Leroy Oenga

38. December 5, 1994 Roger N. Bonnett Appraisal of Parcel B produced for BP Exploration, Inc.

39. December 23, 1994 BIA review and approval of appraisal

40. February 24, 1995 letter to BP by ASNA's attorneys, advocating further lease amendments on behalf of the allotment owners

41. Third Amendment to BIA Lease No. F-89-01, approved by BIA on May 11, 1995

42. May 11, 1995 Stipulation of Lease History, signed by all parties including lessors

43. May 14, 1997 BIA Restricted Use Appraisal Report

44. Sample October 8, 1997 letter, sent by ASNA to each owner of Parcel B, explaining method of determination of amount of rental adjustment to cover the lease years 1998-2001

45. January 27, 1994 Letter Agreement between ARCO Alaska Inc., BP Exploration (Alaska) Inc., and Exxon Corporation, covering *inter alia* use of drill pads and production facilities on Oenga Allotment Parcel B

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **WALLACE OENGA, GEORGENE SHUGLUK, LEROY OENGA, SR., MICHAEL DELIA, TONY DELIA, JOSEPH DELIA, JENNIE MILLER, and TRINITY DELIA,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 06-491 L** |
| | ) | **Chief Judge Edward Damich** |
| **THE UNITED STATES,** | ) | |
| **Defendant,** | ) | |
| **and** | ) | |
| **BP EXPLORATION (ALASKA), INC., CONOCOPHILLIPS ALASKA, INC., EXXON MOBIL ALASKA PRODUCTION, INC., CHEVRON, U.S.A., INC., AND FOREST OIL CORPORATION,** | ) | |
| **Intervenors.** | ) | |

**UNITED STATES' MOTION TO DISMISS, OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

Pursuant to RCFC 12(b)(1) and 12(b)(6), Defendant United States hereby moves to dismiss this lawsuit, or, in the alternative, for summary judgment. In Claim No. 1, plaintiffs contend that the subject lease should have been issued pursuant to the Indian Mineral Leasing Act and the regulations implementing the Act. Defendant moves to dismiss plaintiffs' Claim No. 1 on two grounds - - namely: (1) this claim is not a claim upon which relief may be granted

because the plaintiff allotment owners/lessors do not fit the definition of “Indian mineral owner” found in the Indian Mineral Leasing Act, 25 U.S.C. § 396, et seq. (2007), and, the regulations promulgated thereunder, 25 C.F.R. Part 212 (2007), and, therefore, these laws are inapplicable to this lease; [1/] and (2) Claim No. 1 accrued in 1989 when BIA Lease F-89-01 became effective, or, in the alternative, no later than 1993, and, therefore, is barred by 28 U.S.C. §2501, the governing 6-year statute of limitations;

In Claim No. 2, Plaintiffs argue that the fair market rental value of the subject allotment should have been measured by a royalty on all oil produced by use of the subject allotment as an oil production facility. Defendant moves to dismiss Claim No. 2 for failure to state a claim upon which relief may be granted because the BIA had no obligation to measure the lease rental adjustments by using royalty rates paid to owners of allegedly "comparable" properties. Claim No. 2 concerns the first two appraisals performed for the purpose of calculating the lease rental adjustments required by Paragraph Nos. 5 and 9 of the Lease - - the first in 1993 and the second in 1997.[2/] Since both of these appraisals were prepared more than six years before this suit was filed, the second grounds for dismissal of Claim No. 2 is that Claim No. 2 is barred by the 6-year statute of limitations period which governs suits filed under 28 U.S.C. § 1491.

Defendant moves to dismiss Claim No. 3 in its entirety. The gist of Claim No. 3 is the

---

[1/] During the March 28, 2007 telephonic Preliminary Status Conference, the Court informed the parties that “failure to state a claim upon which relief may be granted” can be viewed as an argument relating to/supporting the lack of subject matter jurisdiction, as opposed to a merits argument.

[2/] The amended Complaint notes that the appraisal done for the 2001 rental adjustment is the subject of an administrative proceeding before the Interior Board of Indian Appeals (IBIA) and is not part of this lawsuit. In light of that, Defendant has decided to take the position that the statute of limitations bars Claim No. 2 in its entirety.

plaintiffs' contention that the unauthorized use of the subject allotment by some of the five intervenor oil companies for an oil production facility/oil production platform amounts to a trespass. The United States contends that the wording of Paragraph No. 10 of the 1989 Lease is sufficiently broad so as to authorize the use of the subject allotment by ConocoPhillips Alaska, Inc. and Exxon Mobil Alaska Production, Inc. pursuant to a 1994 Facilities Sharing Agreement. In sum, Claim No. 3 is not a claim upon which relief may be granted.

A brief in support of this Motion is appended thereto.

Dated this 14th day of May, 2007.

Respectfully submitted,

MATTHEW J. MCKEOWN

s/ James M. Upton
JAMES M. UPTON
U. S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C. 20044-0663
Ph. (202) 305-0482
Fax: (202) 305-0506
E-mail address: james.upton@usdoj.gov

Attorneys for Defendant

Attachment

**BRIEF IN SUPPORT OF UNITED STATES' MOTION TO DISMISS, OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

**INTRODUCTION**

In 1970, Andrew Oenga, an Inupiaq Eskimo Native of Alaska applied for two parcels of land, comprising in total 160 acres, pursuant to the Alaska Native Allotment Act of May 17, 1906, 34 Stat. 197, as amended, formerly codified at 43 U.S.C. §§ 270-1, et seq. (1970). See Mr. Oenga's Allotment Application appended hereto as Attachment **No. 1**. The allotment application was assigned BLM Serial No. F-14632, and the smaller 40-acre parcel, the subject of this litigation, was eventually designated as Parcel B. Although Andrew Oenga's entitlement to receive this land was recognized long ago, title to Parcel B was only recently formally transferred to Mr. Oenga's heirs by Native Allotment Certificate (Patent) No. 50-2005-0580. See copy of Certificate appended hereto as Attachment **No. 2**. As the Certificate recites on its face, the conveyance reserves to the United States "[a]ll of [the] oil and gas in the land so allotted . . . " Such a reservation was explicitly required by 43 U.S.C. §§ 270-11 and 270-12 (1970). (Copies of these sections appended hereto as Attachment **No. 3**). In sum, Parcel B consists of surface rights only.

Roughly a decade after his allotment application was filed, Mr. Oenga, through private counsel, successfully asserted trespass claims against various oil companies with respect to the two parcels which had been allotted to him, and recovered substantial sums thereby. Then, in 1988, he and the Bureau of Indian Affairs (hereinafter "BIA") were approached by Standard Alaska Production Company (later renamed BP Exploration (Alaska), Inc.) about his use of his land in connection with the oil company's exploration and development plans.

At the time of the negotiations between Mr. Oenga and the oil company, which

culminated in the execution of BIA Lease No. F-89-01, many individuals were looking out for Mr. Oenga's interests. The template for the Lease was one which had been negotiated by well-known Indian law professor and attorney David Getches, who had previously represented a similarly situated Alaska Native allotment owner. The BIA suggested use of that prior lease as a template, and, in modified form, it became the lease eventually agreed to between the oil company and allotment owner. See oil company's May 19, 1988 letter from Standard Alaska Production Co. to the BIA acknowledging receipt of the 1982 BIA approved lease (No. F-82-8 suggested as a model for the drafting of the Oenga lease (copy appended as Attachment **No**. **4**) and a copy of the 1982 Lease (copy of F-82-8 appended as Attachment **No. 5**)). The prospective lessee apparently drafted a lease based upon the BIA-furnished model, as indicated by a July 14, 1988 letter which commented on the lessee's draft lease. (Copy of letter appended hereto as Attachment **No**. **6**).

The potential lessee, Standard Alaska Production Co., was considering whether to seek a grant of a right-of-way or a lease. (Copy of BIA notes dated July 20, 2007 appended as Attachment **No. 7**). At this point, the BIA was in direct communication with the oil company. Simultaneously, Andrew Oenga was seeking independent advice; in August, 1988, Mr. Oenga retained Glenn Feldman to represent him (see copy of August 26, 1988 letter appended hereto as Attachment **No. 8**). An experienced Indian law attorney, Mr. Feldman had successfully litigated Mr. Oenga's previous trespass claims against oil companies which had used Parcel A of the Oenga allotment. Mr. Feldman sent courtesy copies of the August 26th letter to George Ahmaogak, mayor of the North Slope Borough, and Ronald Brower, president of the Ukpeagvik Inupiat Corporation (UIC) - - that is, the Alaska Native Claims Settlement Act (ANCSA) village

corporation for the Native residents for the City of Barrow. These two sophisticated individuals provided informal counsel to Mr. Oenga. The oil company began to communicate with Mr. Oenga through Mr. Feldman. (See copy of letter of September 20, 1988, appended as Attachment **No**. **9**).

Just before a September 26, 1988 meeting attended by Mr. Oenga, two of his children who are named plaintiffs in this suit, his translator, three oil company representatives, and BIA Realty Specialist Kathleen Dickinson, Mr. Oenga decided to forego Mr. Feldman's representation. See copy of September 26, 1988 letter from Mr. Feldman to Standard Alaska Production Co. appended as Attachment **No. 10**. Ms. Dickinson's detailed report of the September 26, 1988 meeting, Attachment **No. 11**, clearly indicates that Mr. Oenga was not required to accept the lease which the oil company presented to him or the annual rental amount offered; instead, the BIA encouraged the Oengas to negotiate a better deal.

On or about November 15, 1989, Andrew Oenga and his family had agreed to rent parcel B of the allotment as provided for in the oil company's draft lease, according to Mr. Oenga's translator. See January 17, 1989 Report of Investigation by Ms. Dickinson, appended as Attachment **No. 12.** Mr. Oenga insisted that adjustments be made in the terms of the draft lease--namely: (1) he specified the amount of rent for the first term of the lease; (2) he demanded a $25,000 signing bonus; and (3) he demanded that the entire amount of each annual rent payment be paid to him, even though the State of Alaska owns a portion of the allotment. Finally, the BIA insisted that future periodic rental adjustments be based upon the use of two alternative calculations; whichever of the two amounts produced by the calculations was higher was the amount to be used to set the adjusted rental payment. Incorporating these changes, BIA Lease F-

89-01, was executed and became effective upon BIA approval on January 20, 1989. See Attachment **No. 13.**

**A.** **Key Provisions of BIA Lease F-89-01**

The key provisions of Lease F-89-01 are as follows:

1. Paragraph Nos. 5 and 9 of BIA Lease F-89-01 concern lease rental adjustments and reappraisal methodology, respectively. **Paragraph No. 5** provides, in pertinent part, as follows:

> 5. Lease Rental Adjustments: Rental payments may be increased at successive five-year intervals beginning in the sixth year after rental payments have begun. Such adjustments shall be based either upon the fair market undeveloped rental value for the property established by a Bureau of Indian Affairs appraisal (see section 9, Reappraisal Procedures) or the adjustment will be based on the application of a "Cost Adjustment Factor; which ever is greater.

[Emphasis added]

2. **Paragraph No. 9** provides as follows:

> 9. Reappraisal Procedures: Neither the Secretary nor any appraiser may consider the rentals provided for in this Lease Agreement for any purpose in determining the fair market rental rate pursuant to Paragraph [5] of this Lease Agreement. The Bureau of Indian Affairs review for purposes of establishing the fair rental value of the premises shall be based on the highest and best use of the premises as raw, unimproved vacant land at the time of the appraisal and shall not be based on the cost or value of improvements or developments made by the Lessee or any income the Lessee derives from the leased premises.

Paragraph Nos. 5 and 9 provided for periodic rent adjustments every five years beginning in the sixth year of the lease term. When it came time to make the first adjustment, Andrew Oenga was not involved because he had died on April 16, 1990. The Department of the Interior determined that his restricted Native allotment had been inherited by the named plaintiffs in this

case, or, in one instance, their predecessor-in-interest. See Interior's September 11, 1990 Order Approving Will and Decree of Distribution appended as Attachment **No**. **14**.

Plaintiffs Leroy Oenga and Georgene Shugluk, who had been personally involved in negotiating and approving the terms of their father's lease of Parcel B of his allotment, were among those named as devisees in Andrew Oenga's December 18, 1989 will, which was approved by the Interior Department's probate proceeding. Notably, Andrew Oenga had sought and utilized the assistance of private legal counsel in the preparation of that will. See Attachment **No. 15**.

3. Paragraph **No. 10** of the Lease provides as follows:

> 10. Use of Leased/Unleased Premises: The Lessee may use the leased premises for any and all oil field exploration, development, construction, facilities, production and support purposes, and for any other uses and purposes reasonably and conveniently related thereto. The unleased premises may be used for geotechnical, survey and design work at any time prior to commencement of construction activities. Such use shall be without cost to lessee and will not require separate or additional permits from Lessor. The Lessee shall make no unlawful uses of the leased and/or unleased premises, or knowingly permit any unlawful activity to be conducted thereon by others.

4. Paragraph **No. 11** of the Lease concerns improvements on the area leased; it provides, in pertinent part, as follows:

> 11. Improvements: The Lessee may construct any facilities (pipelines, access roads, roads, causeway approaches, drilling pads, a [sic] construction staging pads or other required facilities) on the leased premises as long as construction is limited to the ten (10) acres as herein described in Exhibit A. This Lease Agreement may be amended to increase or decrease the size of the leased premises at any time at the Lessee's sole discretion. * * *

5. Paragraph **No. 13** of the Lease provides, as follows:

> 13. Sublease: Lessee may sublease all or portions of the leased premises to

> others, as it may see fit, for uses permitted under this Lease Agreement; provided, however, that the Lessee shall remain primarily responsible to the Lessor for the payment of annual rentals when due, and for the observance of all terms and conditions of this Lease Agreement.
>
> The Lessee shall provide written notice to the Lessor and to the Arctic Slope Native Association Limited, if the Leased Premises are subleased. For the purpose of this Agreement, a sublease shall not include (a) facility sharing agreements or other transactions which do not convey an interest in real property, (b) any interest in the mineral estate underlying this Surface lease, or (c) any use of the tidelands adjacent to the Leased Premises.

**B. <u>Circumstances Surrounding the First Lease Rental Adjustment in 1993</u>**

Once the individuals identified as Andrew Oenga's heirs were identified, they stepped into the original lessor's shoes under BIA Lease No. F-89-01. Individual Indian Money accounts were established for them, and they each began receiving a proportionate share of the annual rents being paid by the oil company lessee. In addition to Leroy Oenga and Georgene Shugluk, who were familiar with the lease based on their involvement in the original 1988-89 negotiation, another heir, Wallace Oenga, made inquiry about the lease in February, 1993. The exchange of letters with the BIA confirms that he requested and was furnished with a copy of the lease at that time, Attachments **Nos. 16 and 17** hereto.

The amount of rent to be charged for the period 1994-1997 was determined through a process in which all the heirs of the original lessee were very actively involved. As it happened, the occasion for a rental adjustment, to take effect in 1994, the sixth year of the lease commencing on 1989, coincided with an expansion of the area under lease, the active negotiation of amended lease terms, and the consideration of the alternative of outright sale of Parcel B to the lessee. The same year, 1993, saw the transfer of day-to-day lease administration duties from the Fairbanks Agency of the Bureau of Indian Affairs to the Arctic Slope Native Association

(ASNA), which contracted to perform such administrative responsibilities under the Indian Self-Determination and Education Assistance Act, 25 U.S.C. §§ 450 et seq. (ISDA).

The first action taken with regard to a rental adjustment was a June 15, 1993 BIA request for an appraisal, Attachment **No. 18** hereto. On August 6, 1993, an appraisal of the original ten-acre tract under lease was completed and approved. That appraisal, prepared by BIA staff Appraiser John R. Cress, and approved by BIA Area Chief Appraiser J. Richard Larson, concluded that the annual fair market rent for the 10-acre parcel then under lease, as of June 17, 1993, was $16,000. Attachment **No. 19.**

While the already-described appraisal was being prepared pursuant to ¶ 9 of the Lease, lessee BP gave formal notice on July 29, 1993, pursuant to ¶ 11 of the Lease, that it was exercising its option to double the size of the area under lease to 20 acres. Attachment **No. 20.** A report and recommendation were promptly prepared, Attachment **Nos**. **21 and 22** hereto, and pro forma "approval" of this amendment was given by BIA Agency Superintendent Demientieff's signature on August 3, 1993. In the meantime, the Oenga heirs apparently were informed about both this new development and rent adjustment issues by letters from ASNA dated July 30, 1993. A copy of the one addressed to Leroy Oenga, Sr. is appended hereto as Attachment **No. 23.** By this letter, ASNA informed owner Leroy Oenga of two salient points. First, the rent was to be doubled due to the doubling of the acreage under lease, and a pro rata increase for the remaining 5 months of 1993 would be paid. The increase was to be "$6,666.65 (based on $1600 per acre per year for five months)." Second, the rent for 1994 and beyond would be increased "based either on the appraisal, or on the change in the consumer price index, whichever is greater." The estimated CPI increase was stated to be "about 23 percent since the beginning of

the lease."

On August 3, 1993, as part of the transfer of day-to-day lease administrative responsibilities from BIA to ASNA, pursuant to the Indian Self-Determination and Education Assistance Act (ISDA), BIA Realty Specialist Kathleen Dickinson wrote to lessee BP's representative notifying him of the new arrangements regarding rent payments, and pointing out that if a CPI – rather than appraisal – based rent adjustment was to take effect in 1994, it would not be possible to calculate it exactly until the index was issued in mid-January 1994. Attachment **No. 24.**

After the appraisal was completed on August 6, 1993, it became apparent that the appraisal would not support a rent increase, because the appraisal found the 1993 annual fair rental value to be $1600 an acre, which was the amount already being paid. The exact manner by which the lessors were informed of this development is not clear from the files maintained by BIA and ASNA. The ASNA files are now in the possession of a successor ISDA contractor, Inupiat Community of the Arctic Slope (ICAS). The owners apparently became aware of the basis for the rental adjustment taking effect in 1994, in light of their active engagement in negotiations with BP over the following months, culminating in certain lease amendments, agreed to in January 1994. As part of those amendments, the area under lease was increased to the entire forty acres of Parcel B, and the annual rent was increased to $80,640. All the owners signed the lease amendment providing for that rental increase in January 1994.

As compared with the per acre rent charged during the first 5 years, that amount represented a 26% increase. Applying the 1993 appraisal to a forty-acre parcel would have resulted in a total annual rent payment of $64,000. The actual rent agreed to and paid for 1994

and subsequent years, $80,640 was clearly made under ¶ 5 of the lease, based on the CPI increases between 1989 and 1994.

Between the time that ASNA assumed responsibility for the lease in August 1993, and the time that the lease was amended again in January 1994, there was a good deal of consultation and communication between ASNA Realty Officer Diane Stevens, BIA Realty Specialist Kathleen Dickinson, and the owners, Mr. Leroy Oenga in particular. See Attachment **Nos. 27-30** and **32-34**, discussed below.

In addition, Leroy Oenga was in direct contact and consultation with Glenn M. Feldman, the private attorney who had represented his late father Andrew in the settlement of trespass claims against oil companies a decade earlier. A fax cover sheet, Attachment **No. 25** hereto, indicates that on August 27, 1993, attorney Feldman sent a substantial volume of documents to George Ahmaogak, Borough Mayor, presumably as a means of communicating with the allotment owners. Mr. Ahmaogak had been an adviser to Andrew Oenga when his Allotment Parcel B was leased, and may have served in a similar capacity with Andrew's heirs. Most critically, attorney Feldman delivered his assessment of the 1989 lease to Leroy Oenga in an August 30, 1993 letter, Attachment **No. 26** hereto. Attorney Feldman expressed to Leroy Oenga his opinion that the lease was very unfavorable to the lessors for various reasons, and offered to further counsel Mr. Oenga after he met with the representatives of the oil company.

During the 1993 period that the heirs and the oil company were involved in negotiations, ASNA put together various calculations intended to justify a demand that BP pay a substantial amount of additional rent to the allotment owners. It can be inferred that these were seen by the owners, since they contributed to the owner-approved position advocated by ASNA in

communications with BP. Compare Attachment **Nos. 28** and **29** with **No. 30**. Leroy Oenga asked ASNA for assistance in negotiating with BP in an August 30, 1993 letter, apparently after being advised by attorney Feldman by telephone and in a confirming letter, that the 1989 lease left them with little bargaining power. Attachment **No. 27**.

On October 21, 1993, ASNA and the owners met with BP to propose and negotiate changes in the lease. The owners proposals included a request for a large lump sum payment for past use of the entire 40 acres, and a request that BP lease the full 40-acre parcel going forward. These demands were not rejected out of hand. At owner Leroy Oenga's request, ASNA then sought and incorporated attorney Feldman's advice with regard to a follow-up letter to BP. The draft letter to BP dated October 26, was sent to attorney Feldman in late October. Attachment **No. 28**. Interestingly, in seeking to justify additional compensation, the letter in 1993 set forth many of the complaints about the situation which are raised anew in the present litigation. Along with the letter was to be enclosed proposed lease amendments. Owner comments on the proposed amendments were solicited by October 29, 1993 letters & faxes. See Attachment **No. 29.**

The letter from ASNA to BP on behalf of the owners was finalized and sent on November 10, 1993. The proposed lease amendment enclosed with the letter would have provided for increasing the lease to cover a 40 acre parcel, but did not propose to automatically alter the rent adjustment provisions of the lease. It did call for BP to pay additional rent for the five years of the lease already past in the amount of $283,839.50. Attachment **No. 30.**

Prior to responding to the proposed lease revisions and back payment demand, BP on November 24, 1993 tendered a rent payment for 1994 in the amount of $46,822. This amount

was made up of $6,662 additional rent on the 10-acre lease size increase from October 1 to December 31, 1993, plus $40,160 rent for 20 acres for 1994. The 1994 rent was calculated using an "actual and estimated" CPI adjustment upping the annual per acre rent from $1600 to $2008, a 25.5% increase.

By letter dated November 30, 1993, BP formally responded to ASNA's proposals, rejecting the bulk of the proposed lease amendments, but agreeing to lease the full 40 acres and to pay rent on same going back to August 1, 1993. Attachment **No. 31.** Additional minimally documented consultations then apparently ensued. ASNA logs indicate that the heirs agreed to scale back their demands, after consulting with North Slope Borough Mayor George Ahmaogak. The logs also reflect intensive discussions with the heirs, culminating in their acceptance of a stripped down set of amendment provisions, signed by the owners on January 17 and 18, 1994. Attachment **No. 32.** A record of counseling was also signed by each of the five owners, Attachment **No. 33**, and BIA approval was sought and given on January 20, 1994, based on ASNA's frank and thorough Report of Investigation. Attachment **No**. **34**.

Following approval of the lease amendment, Attachment **No. 35** hereto, BP on January 21, 1994 transmitted payment in the amount of $137,120 to BIA for deposit to the owners' accounts. In the context of past changes and payments, it is clear that the basis of these payments was establishment of a new annual rental rate of $2016 per acre per year, increased from $1600 per acre per year, based on a CPI adjustment calculated under ¶ 5 of the 1989 lease. <u>See</u> BP explanation of payment tendered January 21, 1994, Attachment **No. 36.**

**C.** **<u>Circumstances Surrounding the Second Lease Rental Adjustment in 1997</u>**.

Activity related to the rent adjustment for the four year period beginning with the year

1998 actually commenced in 1994, the year of the second lease amendment. In addition, after the January 1994 lease amendment was agreed to, at least one of the heirs continued to harbor dissatisfaction over the appraised value the BIA had come up with the previous summer. Summer 1994 correspondence from Pepper, Hamilton and Scheetz, a Washington, D.C. law firm, addressed to part owner Leroy Oenga, clearly demonstrates that he not only had the *opportunity* to question at the time whether BIA appraisals and the BIA-implemented rent adjustment for the 1994-1997 period were adequate, he took *affirmative steps* at that time to evaluate whether more favorable rents or a high sales price could be justified. See transmittals of June 6 and July 20, 1994, addressed to Mr. Oenga, appended hereto as Attachment **No. 37.** In light of this demonstrated consideration of valuation issues as far back as 1994, it is hard to imagine any non-frivolous basis for finding that the limitations period has not expired with respect to at least the 1994-1997 rent adjustment.

Because an outright sale was being discussed, BP commissioned an appraisal of the market value of the property, which was prepared by one Roger N. Bonnett, MAI, of Appraisal Company of Alaska. That report was delivered to BP on or about December 9, 1994, and became the basis of BP's December 20, 1994 offer to purchase the Heald Point Allotment Parcel B property for $600,000, plus the sellers' retention of the $80,160, 1995 rent, which had been prepaid in January 1994. Attachment **No. 38.** This offer to purchase was conveyed by BP to ASNA, and to part owner Leroy Oenga and the other owners. BIA Review Appraiser John R. Cress, SRE, and Area Chief Appraiser J. Richard Larson reviewed the Bonnett Appraisal and signaled their approval of it by signatures dated December 23, 1994. Attachment **No. 39.** The owners apparently opted to reject the offer to purchase and instead made a proposal during a

January 1995 meeting with BP to again amend the 1989 lease, in a manner calling for a further lump sum, up-front payment to the owners of $240,000. According to a February 24, 1995 letter to BP written by ASNA's attorneys, BP rejected the proposed amendment in a letter dated February 2, 1995. Attachment **No. 40**. Negotiations over a possible amendment continued through the spring of 1995. Efforts by ASNA and BP to accommodate the owners' desire for cash culminated in the May 1995 execution of another lease amendment which constituted the Third Amendment. Attachment **No. 41.** Other than returning the payment schedule to a yearly rather than biennial basis, the 1995 amendments do not effect the rent adjustment provisions of the 1989 lease, as amended in 1994. Owing to the lessors' pattern of repeatedly seeking additional adjustments to the terms of the binding contract with the oil company lessee, it was decided that the circumstances of the contractual relationship should be more fully documented. The result was a "Stipulation of Lease History," reviewed and signed off on by all parties, including the allotment owners. See Attachment **No. 42.**

In anticipation of the need to adjust the rent to be charged for 1998 and subsequent years, a new appraisal was requested by ASNA in March 1997, and completed and approved by the BIA in May 1997. The BIA appraisal, prepared by J. Richard Larson, was termed a "Restricted Appraisal Report - Limited Appraisal," and was identified as a supplement to the December 1994 Bonnett Appraisal. Attachment **No. 43**. Prior to the November due date of the new rent payment, ASNA and Director Kathleen Dickinson on October 8, 1997 wrote letters to each of the land owners, informing them that the new annual rent beginning in 1998 would be $88,997.34, based on a 10.36 percent CPI adjustment. The letters, a sample of which is enclosed as Attachment **No. 44**, explained that the BIA's new fair rental value appraisal would not be

used, because its valuation of $85,680 per year would have resulted in a smaller rent increase than the CPI-based adjustment. The letters did not indicate that copies of the appraisal or CPI-based adjustment calculation were provided to the owners, but did invite the owners to ask any questions they might have. There is no record of any inquiry or challenge to the amount of this rent adjustment by the owners.

**D. Circumstances Relating to the Allegedly Unauthorized Use of the Oenga Allotment.**

In 1994, BP entered into a "Facilities Sharing Agreement"[3/] with ARCO (later acquired by Conoco Phillips Alaska, Inc.) and Exxon Mobil Alaska Production, Inc. [hereinafter, "'Conoco Phillips" and "Exxon Mobil"- - two of the intervenors herein.] Pursuant to the Agreement, Conoco Phillips and ARCO (ConocoPhillips' predecessor-in-interest) and Exxon Mobil have been making use of the Oenga allotment as a point of access to produce and transport oil from the West Niakuk Participating Area since 1994. Both ConocoPhillips ( as successor-in-interest to ARCO) and Exxon Mobil hold State oil and gas leases within the West Niakuk Participating Area.

Plaintiffs contend that the intervenors have trespassed on the Oenga allotment. They contend that the references in the Lease to the Niakuk Project constitute a legal limitation on BP's use of the allotment. It appears to be the case that at the time the Lease first became effective that both Andrew Oenga and BP contemplated that BP's basic interest was in developing the oil to which it held exclusive lease rights all of which related to the Niakuk Participating Area. Indeed, the initial plan was to put a road and pipeline on Parcel B and

[3/] A copy of the Facilities Sharing Agreement is appended as Attachment **No. 45**, was only made available to the United States on the eve of the filing of this motion.

connect to an offshore island drill pad by means of a causeway; this initial plan is reflected by the reference in paragraph No. 1 of the Lease and in Exhibit A appended to the Lease to the "Niakuk Project." See Attachment **No. 13**. However, the contingent nature of that use is recognized in Paragraph No.1 of the Lease which provides for cancellation or expansion, and by the preamble to the Lease which contemplated that Parcel B could be utilized by "agents, assigns, contractors, subcontractors and/or sublessees." Most significantly, Paragraph No. 10 of the Lease contains no geographic limitation on the use of Parcel B to produce oil from a given tract - - that is, it does not limit the use of the Oenga allotment to oil derived only from tracts in the Niakuk Participating Area. The broad and inclusive language of Paragraph No. 10 clearly negates the Plaintiffs' trespass claim.

## SUMMARY OF ARGUMENT

The standards for ruling upon RCFC 12(b)(1) and RCFC 12(b)(6) motions are well established. Plaintiffs' Claim No. 1 should be dismissed with prejudice because it fails to state a claim upon which relief may be granted and because it is barred by the governing six-year statute of limitations. Similarly, Claim No. 2 should be dismissed with prejudice because it fails to state a claim upon which relief may be granted and is time-barred, as well. Claim No. 3 should be dismissed with prejudice because it not a claim upon which relief may be granted.

## ARGUMENT

### I. STANDARD OF REVIEW

Subject matter jurisdiction is a threshold issue that a court must consider before evaluating the merits of a case. See Arakaki v. United States, 71 Fed. Cl. 509, 521 (Fed. Cl. 2006) (internal citations omitted). "When asserting jurisdiction, plaintiff is entitled to rely on the

allegations in the complaint, which are favorably construed by the court." Riveria Drilling and Exploration Co., Inc. v. United States, 61 Fed. Cl. 395, 397-98 (Fed. Cl. 2004), citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Davis v. Scherer, 468 U.S. 183 (1984). "However, fact-finding is proper when considering a motion to dismiss where the jurisdictional facts in the complaint . . . are challenged. If a motion to dismiss for lack of subject matter jurisdiction . . . challenges the truth of the jurisdictional facts alleged in the complaint, the . . . court may consider relevant evidence in order to resolve the factual dispute." Id. at 398 (internal citations, quotation marks and brackets omitted).

In a RCFC 12(b)(1) motion, "[o]nce the court's subject matter jurisdiction is put into question, it is 'incumbent upon [the plaintiff] to come forward with evidence establishing the court's jurisdiction. [The plaintiff] bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence." Shrader v. United States, – Fed. Cl. –, 2007 WL 174128 at *2 (Fed. Cl. 2007), quoting Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988); see also M.A. DeAtley Construction, Inc. v. United States, – Fed. Cl. –, 2007 WL 646156 at * 2 (Fed. Cl. 2007) (the plaintiff "bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence") (internal citations omitted); Ullman v. United States, 64 Fed. Cl. 557, 564 (Fed. Cl. 2005) ("plaintiff, as the non-moving party, bears the burden of establishing jurisdiction by a preponderance of the evidence") (internal citations omitted); American Pacific Roofing Co. v. United States, 21 Cl. Ct. 265, 267 (Cl. Ct. 1990) ("where the court's jurisdiction is put in question, plaintiff 'bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence'") (internal citations omitted); see also McNabb v. United States, 54 Fed. Cl. 759, 763 (Fed. Cl. 2002) ("If a defendant or the court

challenges jurisdiction or plaintiff's claim for relief . . . the plaintiff cannot rely merely on allegations in the complaint, but must instead bring forth relevant, competent proof to establish jurisdiction.") (internal citations omitted). Where a motion to dismiss properly asserts that the Court lacks jurisdiction over the subject matter of the complaint, the correct remedy is dismissal of the action or to transfer it to another federal court that would have jurisdiction. See Travelers Indemnity Co. v. United States, 72 Fed. Cl. 56, 60 (Fed. Cl. 2006).

RCFC 12(b)(6) provides for dismissal based on the "failure to state a claim upon which relief can be granted." RCFC 12(b)(6). This rule "addresses the question of whether in a specific case a court is able to exercise its general power with regard to the facts peculiar to the specific claim." Warr v. United States, 46 Fed. Cl. 343, 346 (Fed. Cl. 2000) (internal citations omitted). In evaluating a RCFC 12(b)(6) motion, the court assumes all well-pleaded factual allegations as true and draws all reasonable inferences in favor of the plaintiff. See Scheuer, 416 U.S. at 236. However, "[d]ismissal is proper where plaintiff[s] 'can prove no set of facts in support of [their] claim which would entitle [them] to relief.'" Adair v. United States, 70 Fed. Cl. 65, 68 (Fed. Cl. 2006) (internal citations omitted). Dismissal under RCFC 12(b)(6) "constitutes an adjudication on the merits of the claim." Warr, 46 Fed. Cl. at 346 (internal citations omitted).

## II. CLAIM NO. 1 IS NOT A CLAIM UPON WHICH RELIEF MAY BE GRANTED.

Plaintiffs contend that BIA Lease F-89-01 is a "mineral" lease within the meaning of the Indian Mineral Leasing Act, 25 U.S.C. §§ 396, et seq. (2007) ("IMLA") Plaintiffs argue that the money-mandating sources of substantive law for Claim No. 1 are 25 U.S.C. §§ 396(c), (d), (e), 30 U.S.C. §§ 1701 to 1757, 25 C.F.R. Part 212 (particularly 212.41(b)), 30 C.F.R. Part 206

(2007), and 43 C.F.R. Part 3160 (2007). See First Amended Complaint filed September 18, 2006. Plaintiffs reason that since BIA Lease F-89-01 should have been issued under IMLA, they were entitled to receive a 4 and 1/16 royalty on the value of all the oil produced by the use of the Oenga allotment as an oil production facility between 1994 and 2006.

Andrew Oenga's allotment is limited to surface rights only. See copy of Native Certificate of Allotment appended as Attachment **No. 2**. BIA Lease F-89-01 states that is was issued pursuant to 25 C.F.R. Part 162; these are the BIA regulations which implement the Indian Long-Term Leasing Act, 25 U.S.C. § 415 (2007). Plaintiffs argue that although the Oenga allotment consists only of "surface rights", it really amounts to a part of the "mineral interest" in those situations where the surface estate and subsurface estate are owned by two different entities - - the situation here. Plaintiffs contend that the subject lease should have been issued pursuant to the Indian Mineral Leasing Act, 25 U.S.C. §§ 396, et seq. (2007) (specifically, §§ 396, 396(c), 396(d) and 396(e) -- and the implementing regulations in 25 C.F.R. Part 212 (2007).

The "Definitions" section of Part 212 defines an "Indian mineral owner" as follows:

> **any individual Indian or Alaska native** who owns mineral interests in oil and gas, geothermal, or solid mineral resources, title to which is held in trust by the United States, or is subject to the restriction against alienation imposed by the United States.

(emphasis added) 25 C.F.R. § 212.3 (2007). Since the subject allotment consists solely of surface rights, the plaintiffs are not "mineral owner[s]" within the meaning of Part 212. Moreover, the Plaintiffs cite no legal support for the implicit premise upon which Claim No. 1 is grounded - - that is, the owner of the surface estate has legal parity with the owner of the subsurface/mineral estate.

In short, Claim No. 1 is not a claim upon which relief may be granted because IMLA is not applicable to the subject Lease and thus cannot furnish the legal rationale for the application of a 4 and 1/16 percent royalty to all oil produced through the use of Parcel B from 1989 to the present. In addition, the Indian Long-Term Leasing Act does not apply to mineral leases and the regulations promulgated pursuant to the Indian Long-Term Leasing Act., 25 C.F.R. § 162.103(a)(1), do not apply to ". . . mineral leases, prospecting permits 'or mineral development agreements' as covered by parts 211, 212 and 225 of this Chapter . . ."[4/]

In other words, neither the IMLA nor the regulations promulgated thereunder create the money mandating duty which Plaintiffs allege exists. See United States v. Navajo Nation, 537 U.S. 488, 493-512 (2003) (held that neither IMLA nor the regulations promulgated thereunder imposed any fiduciary duty on the Secretary of the Interior when approving amendments to tribal coal leases to ensure that the royalty rate specified therein was higher than the rate which had resulted from the negotiations over the amendments between the lessee coal company and the tribe or was the specific higher rate which the tribe had attempted to obtain); Pawnee v. United States, 830 F.2d 187, 191-92 (1987), cert. denied, 486 U.S. 1032 (1988) (held that neither IMLA nor 25 C.F.R. Part 212 imposed any fiduciary duty on the Secretary to calculate oil royalties in the manner which the plaintiffs alleged must be used and, therefore, the duty alleged did not exist). Since the alleged money mandating duty upon which Claim No. 1 is premised does not exist, Claim No. 1 is not a claim upon which relief may be granted and it must be dismissed with prejudice.

---

[4/] Similarly, 30 C.F.R. Part 206 and 43 C.F.R. 3160 relate to the leasing of mineral resources on both federal (public) and Indian lands. These regulations have no applicability to the subject lease.

## III. THE COURT LACKS SUBJECT MATTER JURISDICTION OVER CLAIM NO. 1.

Any claim presented by plaintiffs based on the theory that Parcel B should have been the subject of a mineral lease, instead of a land lease, is clearly untimely under 28 U.S.C. § 2501, which requires claims to be brought within six years of the time of their accrual. Because the claim arose when the lease was entered into in 1989, the Court obviously lacks jurisdiction to entertain it. Morever, *even if* one were to argue, as plaintiffs might, that the claim did not arise in 1989 when the lease was executed and approved, but instead only in 1993 or 1994, when the lessee began to use the property as a drilling site, rather than for pipeline transshipment of oil, a claim that was not brought until 2006 is still unmistakably well beyond the statutory time limit. Claims against the United States in the Court of Federal Claims must be filed within six years of the accrual of the cause of action. 28 U.S.C. § 2501. "This statute of limitations is a jurisdictional limitation on the government's waiver of sovereign immunity and therefore must be construed strictly." Wolfchild v. United States, 62 Fed. Cl. 521, 547 (2004), reconsideration denied, 68 Fed. Cl. 779 (2005) (citing Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1576-77 (Fed. Cir. 1988)). "Exceptions to the limitations and conditions upon which the government consents to be sued are not to be implied." Hopland Band, 855 F.2d at 1577 (citing Soriano v. United States, 352 U.S. 270, 276 (1957)). "Furthermore, since the 6-year limitations period of Section 2501 serves as a jurisdictional limitation rather than simply as an affirmative defense, such statutes of limitations have been held as "not capable of waiver or subject to an estoppel, whether pled or not." Id. (citations omitted).

In deciding the issue of dismissal on the statute of limitations ground, the Court must focus on the "first accrual" of a claim – that is, first accrual is the 28 U.S.C. § 2501 condition on

the waiver of sovereign immunity. Accordingly, the relevant question is when did events first transpire entitling the claimant to bring suit alleging the breach. Nager Elec. Co. v. United States, 368 F.2d 847, 851 (Ct. Cl. 1966). The Plaintiffs are not required to know all of the facts, or the cause of action, before the statute begins to run. Fallini v. United States, 56 F.3d 1378, 1380 (Fed. Cir. 1995), cert. denied, 517 U.S. 1243 (1996) ("The question whether the pertinent events have occurred is determined under an objective standard; a plaintiff does not have to possess actual knowledge of all the relevant facts in order for the cause of action to accrue.") (citing Menominee Tribe v. United States, 726 F.2d 718, 721 (Fed. Cir.) cert. denied, 469 U.S. 826 (1984)).

Indeed, it is when the operative facts exist and are not inherently unknowable that dictates first accrual. Menominee Tribe v. United States, 726 F.2d at 720-22 (Fed. Cir. 1984), cert. denied, 469 U.S. 826 (1984). The date of ordinary accrual for a breach of a statutory or regulatory duty is when the wrong began. See Menominee, 726 F.2d at 721; see also Jones v. United States, 801 F.2d 1334, 1335 (Fed. Cir. 1986), cert. denied, 481 U.S. 1013 (1987). Where government activities are open and notorious the claimant is "on inquiry as to its possible injury." Coastal Petroleum Corp. v. United States, 228 Ct. Cl. 864 (1981) (citations omitted). The rationale of this rule is that an Indian beneficiary, no less than anyone else, is charged with notice of whatever facts an inquiry appropriate to the circumstances would have uncovered. See, e.g., Littlewolf v. Hodel, 681 F. Supp. 929, 942 (D.D.C. 1988), aff'd sub nom., Littlewolf v. Lujan, 877 F.2d 1058 (D.C. Cir. 1989), cert. denied, 493 U.S. 1043 (1990). This principle is equally applicable to claims for money damages brought in the Court of Claims. Menominee, supra.; Hydaburg Co-op. Ass'n v. United States, 229 Ct. Cl. 250 (1981), cert. denied, 459 U.S.

905 (1982); Andrade v. United States, 485 F.2d 660, 661 (1973), cert. denied, 419 U.S. 831 (1974); Fort Mojave Tribe v. United States, 210 Ct. Cls. 727, 728 (1976).[5]

A claim "first accrues" for statute of limitations purposes, when "all the events have occurred which fix the alleged liability of defendant and entitle the plaintiff to institute its action." Hopland Band of Pomo Indians v. United States, 855 F. 2d 1573, 1577 (Fed. Cir.1988). In the instant case, the Plaintiffs' alleged first cause of action accrued, if ever, in 1989 when Lease BIA F-89-01 was issued pursuant to the Indian Long-Term Leasing Act, 25 U.S.C. § 415 (2007) and the implementing regulations, 25 C.F.R. Part 162 (2007). Andrew Oenga, an Inupiaq Eskimo Native of Alaska, was knowledgeable enough to seek advice before he entered into the

---

[5] As the court noted in Littlewolf, the statute of limitations applies objectively to people in a wide range of circumstances: "To the extent that plaintiffs argue that their unfortunate socioeconomic circumstances make it inherently unreasonable for them to bring suit within the Act's statute of limitations, that argument too cannot withstand scrutiny. Poverty and lack of education have never been deemed sufficient to render a statute of limitations unreasonable under the due process clause." FN8

> FN8 Statutes of limitations, for instance, apply to suits brought in forma pauperis. See, e.g., Lyons v. Goodson, 787 F.2d 411 (8th Cir.1986); Coulibaly v. T.G.I. Friday's, Inc., 623 F.Supp. 860, 861 (S.D. Ind.1985); Ortiz v. Hackett, 581 F.Supp. 1258, 1260 (N.D. Ind.1984). Statutes of limitations are, however, tolled in cases of incompetency (see, e.g., 55 C.J.S. Limitations of Actions § 243 (1948 and Supp.1987), where the plaintiff's claim was "unknown and inherently unknowable even in retrospect," Urie v. Thompson, 337 U.S. 163, 169 (1949) (silicosis), or where defendants fraudulently concealed a claim that a plaintiff could not have discovered by the exercise of reasonable diligence, *e.g.*, Logan v. Zimmerman Brush, 455 U.S. 422, 434-35 (1982); Wood v. Carpenter, 101 U.S. (11 Otto) 135 (1879); Hohri v. United States, 782 F.2d 227, 246 (D.C.Cir.1986), vacated on other grounds, 482 U.S. 64 (1987). While tolling principles are largely irrelevant to plaintiffs' claims, the last-mentioned doctrine suggests that mere ignorance of their claims does not excuse plaintiffs' failure to bring suit on the allotments issued to their forebears."

Littlewolf v. Hodel, 681 F. Supp. 929, 941 and note 8 (D.D.C.1988).

subject Lease. See Menominee Tribe of Indians v. United States, 726 F. 2d 718, 719 (Fed. Cir. 1984), cert. denied, 469 U.S. 826 (1984). Indeed, Mr. Oenga was assisted during lease negotiations with Standard Alaska Production Company by an experienced Indian law attorney, by BIA officials and by two of his own children, who now come before the court as plaintiffs. He insisted that several changes be made in the draft lease. BIA officials insisted that the lease provide that future periodic rental adjustments be made by using two alternative calculations; whichever calculation produced the higher rental adjustment was to be used. See discussion at 2-3, supra.

Alternatively, and giving plaintiffs the benefit of every doubt, one might entertain the argument that the claim that the lease should have been a mineral lease did not arise in 1989, because the parties at that time thought that the most likely use of Parcel B would be for pipeline transhipment of oil produced off premises. Such an argument ignores the fact that use of the premisses was explicitly authorized in Paragraph 10 of the lease for "exploration, development, construction, facilities, production and support purposes, and for any other uses and purposes reasonably and conveniently related thereto." But even more to the point, such an argument fails to overcome the statute of limitations defense, because plaintiffs themselves became aware of the new planned use of the premises as a drill pad for exploration and production no later than 1993 or 1994, well over a decade before they commenced this suit.

In sum, the Court has no subject matter jurisdiction over Claim No. 1 because 28 U.S.C. § 2501 bars Claim No. 1.

## IV. CLAIM NO. 2 IS NOT A CLAIM UPON WHICH RELIEF MAY BE GRANTED.

Neither the Indian Long-Term Leasing Act (25 U.S.C. § 415 (2007)), nor the regulations implementing the Act (25 C.F.R. Part 162 (2007)) require that oil royalties be used to calculate lease rental adjustments.

Paragraph Nos. 5 and 9 of BIA Lease F-89-01 govern lease rental adjustments and reappraisal methodology. Plaintiffs contend that Interior was under a legal obligation to calculate/measure lease rental adjustments - - that is, the required adjustments to the "fair annual rental rate" - - by the use of royalties paid to owners of allegedly comparable properties which also consisted of surface rights only. They contend that the 1993 and 1997 reappraisals conducted by BIA appraisers for the purpose of making lease rental adjustments were improperly done because they did not utilize any royalty rates paid for the use of supposedly comparable properties.

### A. Neither the Indian Long-Term Leasing Act nor the Regulations Promulgated Under the Act Require that Oil Royalties be used to Calculate Lease Rental Adjustments.

#### 1. Indian Long-Term Leasing Act, 25 U.S.C. § 415.

Nothing in the Indian Long-Term Leasing Act even addresses the issue of lease rental adjustments. Accordingly, the Act does not impose any fiduciary duty upon the Secretary to calculate lease rental adjustments by the use of oil royalties allegedly paid to owners/lessors of land consisting of surface rights only.

#### 2. The Regulations Promulgated Under the Act.

The regulations issued pursuant to the Indian Long-Term Leasing Act (25 C.F.R. Part 162) provide for "periodic review, at not less than less than five-year intervals, of the equities

involved" and provide that lease rental adjustments may be made to non-agricultural leases as a result of that review. See 25 C.F.R. § 162. 607. This version of the regulation, promulgated on January 27, 2001, 66 Fed. Reg. 7109, is substantively identical to the former 25 C.F.R § 162.8, in effect at the time BIA Lease No. F-89-01 was executed and approved. However, this section makes no mention of the use of oil royalties to calculate lease rental adjustments. The general provisions of Part 162 define the term “fair annual rental” as the “amount of rental income that a leased tract of Indian land would most probably command in an open and competitive market.” 25 C.F.R. § 162.101. See United States v. Navajo Nation, 537 U.S. 488, 493-512 (2003) (held that the Indian Mineral Leasing Act (IMLA) did not impose a fiduciary duty upon the Secretary when approving tribal coal lease amendments to ensure that a higher royalty rate than the one produced by the negotiations between the lessee coal company and the tribe (or a specific higher rate which the tribe had sought) be specified in the approved lease amendments); Pawnee v. United States, 830 F. 2d 187, 191-192 (1987), cert. denied, 486 U.S. 1032 (1988) (held that neither the Indian Mineral Leasing Act nor the regulations implementing the Act imposed a duty upon the Secretary to calculate oil royalties in the manner the plaintiffs advocated).

In sum, neither the Indian Long-Term Leasing Act nor the regulations promulgated under it (25 C.F.R. Part 212) create the money mandating duty which the Plaintiffs allege exists, and, therefore, Claim No. 2 is not a claim upon which relief may be granted. Thus, the only other possible source of the alleged duty would be BIA Lease F-89-01; however, the controlling language of BIA Lease F-89-01 imposes no such duty on the government.

**B. BIA Lease F-89-01 Does not Require that Oil Royalties be Used to Calculate Lease Rental Adjustments.**

Paragraph **No. 5** of BIA Lease F-89-01 states, in pertinent part, that lease rental adjustments:

> . . . . will be based upon either the **fair market undeveloped rental value** for the property established by a Bureau of Indian Affairs appraisal (see section 9, Reappraisal Procedures) **or the adjustment will be based on the application of a 'Cost Adjustment Factor**' ; which ever is greater. * * * *

[Emphasis added].

Paragraph **No. 9** of the Lease refers to " . . . determining the **fair market rental rate** pursuant to Paragraph [5] [the lease mistakenly states Paragraph 3] of this Lease Agreement." Paragraph **No. 9** also refers to "[t]he Bureau of Indian Affairs review for purposes of establishing the **fair rental value of the premises . . . . "** [Emphasis added].

The United States submits that the plain language of Paragraph **Nos. 5 and 9** quoted above is controlling with respect to the alternative bases for making lease rental adjustments for Parcel B. See Hercules, Inc. v. United States, 292 F.3d 1378, 1380-81 (Fed. Cir. 2002) (held that the plain language of the relevant portion of the governing contract was controlling on the issue being adjudicated); LaGloria Oil & Gas Co. v. United States, 72 Fed. Cl. 544, 571-572 (2006) (held that mechanism described in contract for adjusting prices controlled and government had complied with this provision); and ConocoPhillips v. United States, 73 Fed. Cl. 46, 53 (2006). There is nothing in either Paragraph **No. 5 or No. 9** which requires the Secretary of the Interior or the Bureau of Indian Affairs (BIA) to use royalties (alleged by the plaintiffs to have been paid to other owners/lessors of other properties which supposedly consist solely of surface rights) as a basis for calculating the required rental adjustments. In short, the government had no obligation to use royalties to calculate lease rental adjustments for Parcel B.

In sum, the alleged money mandating duty upon which Claim No. 2 is premised does not exist and ,therefore, Claim No. 2 is not a claim upon which relief may be granted and this claim must be dismissed with prejudice.

## V. THE COURT LACKS SUBJECT MATTER JURISDICTION OVER CLAIM NO. 2.

In addition to the United States' argument that Claim No. 2 is not a claim upon which relief may be granted, the government submits that the court lacks subject matter jurisdiction over Claim No. 2. The first part of Claim No. 2 concerns the allegedly improper lease rental adjustment of 1993. Since this first part of Claim No. 2 accrued in 1993, it is barred because it was filed in 2006 - - that is, filed seven years beyond the six-year statute of limitations period. See discussion of the governing caselaw on the statute of limitations at 21-24, supra. The second part of Claim No. 2 relates to the supposedly improper rental adjustment of 1997 and accrued in 1997. Thus, this second part of Claim No. 2 is barred, because it was filed three years beyond the six-year limitations period.

As we indicate in the “Factual Background” to this brief, there is considerable documentation to prove that the Plaintiffs were actively involved in the 1993 lease rental adjustment and were kept informed, and were assisted, by both the BIA and the Arctic Slope Native Association (ASNA) with respect to both lease adjustments. See 7-12, supra.

We also stress that Claim No. 2 is not an ongoing claim. This is because each rental adjustment gave rise to a separate and independent cause of action. See Mitchell v. United States, 10 Cl. Ct. 787, 788-89 (1986) (the claim that various timber stumpage contracts for sale of the Indian plaintiffs' commercial timber each contained inadequate stumpage rates was not

one, ongoing claim, but instead was comprised of separate and independent causes of action as to each challenged timber stumpage contract).

In sum, Claim No. 2 is barred by the governing six-year statute of limitations; this bar is a second grounds for dismissal of Claim No. 2 with prejudice.

## VI. CLAIM NO. 3 IS NOT A CLAIM UPON WHICH RELIEF MAY BE GRANTED.

Plaintiffs assert that ConocoPhillips Alaska, Inc. and Exxon Mobil Alaska Production, Inc. used the Oenga allotment as a drilling pad and oil production facility to develop oil from oil tracts owned by the State of Alaska and situated within the West Niakuk Participating Area. The two cited oil companies (two of the defendant-intervenors in the instant case) conducted this use pursuant to the 1994 Facilities Sharing Agreement. It is believed by the United States that such use may have commenced, in fact, around 1997 or 1998. Plaintiffs assert that this third party use of Parcel B was unauthorized because it violated Paragraph No. 10 of BIA Lease F-89-01, and, accordingly, amounted to a trespass.

Paragraph **No. 10** of the Lease provides, in pertinent part, as follows:

> "The Lessee may use the leased premises for **any and all oil field exploration**, **development, construction, facilities, production and support purposes, and for any other purposes reasonably and conveniently related thereto.**

[Emphasis added]. The United States submits that this plain language of BIA Lease F-89-01 is controlling with respect to the permissible uses of Parcel B. E.g., Hercules, Inc. v. United States, 292 F.3d 1378, 1380-81 (Fed. Cir. 2002); Coast Federal Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed. Cir. 2003).

Nothing in Paragraph No. 10 imposes any geographical restrictions on the authorized uses of allotment Parcel B - - that is, there is no restriction of the authorized uses solely to oil

from leased oil tracts within the **Niakuk Participating Area**. Thus, the use of the Oenga allotment for the development of/production of oil from leased oil tracts within the **West Niakuk Participating Area**, contrary to the plaintiffs' protestation, is clearly an authorized use. Accordingly, the latter use by ConocoPhillips and Exxon Mobil (pursuant to the 1994 Facilities Access Agreement) of the subject Parcel B was clearly authorized. Hercules, Inc. v. United States, 292 F.3d at 1038; LaGloria Oil & Gas Co. v. United States, 72 Fed. Cl. at 571-572. As we discuss at 14-15, supra, the Lease makes references to the "Niakuk Project" in Paragraph No. 1; appended to the Lease is "Exhibit A" consisting of the "Niakuk Project Location Map" and a diagram of the "Niakuk Onshore Access Road and Pipelines . . ." Defendant submits that these references do not, nor were they intended to, modify Paragraph No. 10. In other words, the use of allotment Parcel B for exploration or production of oil from any accessible location, without geographic limitation, (including the West Niakuk P.A.), did not violate the Lease, in light of Paragraph No. 10.

Use of the allotment by oil companies other than BP, including ARCO (now Conoco Phillips Alaska, Inc.) and Exxon Mobil Alaska Production, Inc. did not violate the Lease, either. This is because the initial (that is, 1989) version of Paragraph No. 13 of the lease would have permitted BP to sublease its entire leasehold interest in Parcel B. The second part of Paragraph No. 13 ( added by the January, 1994 amendments to the Lease) makes clear that "facility sharing agreements" were foreseeable and not prohibited by the Lease.

In short, Claim No. 3 is not a claim upon which relief may be granted and must be dismissed.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated this 14th day of May, 2007.

Respectfully submitted,

MATTHEW J. MCKEOWN
Acting Assistant Attorney General
Environment & Natural Resources Division

s/James M. Upton
JAMES M. UPTON
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C. 20044-0663
Ph. (202) 305-0484
Fax: (202) 305-0506
E-mail address; james.upton@usdoj.gov

Attorneys for Defendant

Attachments