# ATTACHMENT No. 1

Form 2212–3
(June 1966)
(formerly 4–021 & 2212–4)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

FORM APPROVED
BUDGET BUREAU NO. 42–R1359.2

Land Office & Serial Number
F14632

# ALASKA NATIVE ALLOTMENT APPLICATION AND EVIDENCE OF OCCUPANCY

Act of May 17, 1906 (34 Stat. 197)

*File in proper Land Office*

1. Name of Applicant *(first, middle initial, and last)*
Andrew Oenga

Address *(include zip code)*
Box 201 Barrow, Alaska 99723

2a. Are you a [x] full [ ] mixed blood? [ ] Indian [ ] Aleut [x] Eskimo

b. Were you born and are you now residing in the State of Alaska? [x] Yes [ ] No

3. Sex of Applicant [x] Male [ ] Female

4a. Are you head of a family? [xx] Yes [ ] No
b. Are you at least 21 years of age? [x] Yes [ ] No

5. Give legal description of the lands applied for *(If lands are unsurveyed, describe them in a manner sufficient to permit their ready identification on the ground)*

Parcel 1: Within T 11 N, R 17 E, Umiat meridian, Alaska, protracted survey: all of the section numbered 22, approximately 120 acres.

Parcel 2: Within T 12 N, R 15 E, Umiat meridian, Alaska, protracted survey: all of the section numbered 36, approximately 40 acres.

6a. Is the land applied for essentially nonmineral? [x] Yes [ ] No *(if "no," specify mineral)*

b. Is the land claimed for mining purposes by any person including yourself? [ ] Yes [x] No

c. Is the land occupied or improved by any person other than yourself? [ ] Yes [X] No

7. Have you received any other allotment under the Act of May 17, 1906, *supra* [ ] Yes [X] No *(if "yes," explain)*

8a. From what date have you occupied the land applied for? June or July, 19 32

b. Are the corners marked and posted as required by the regulations? [X] Yes ~~No~~

## EVIDENCE OF OCCUPANCY

### 1. PERIODS OF ACTUAL RESIDENCE ON THE LAND

| CALENDAR YEAR | BEGAN MONTH | BEGAN DAY | ENDED MONTH | ENDED DAY | IF ABSENT FROM THE LAND, GIVE REASONS |
|---|---|---|---|---|---|
| 1932 | June or July | | 1940 | | Parcel 1: This was my residence and hunting area ~~during these years.~~ |
| 1935 | March | | 1940 | December | Parcel 2: Hunting area and fishing during these years. |

### 2. CULTIVATION OF THE LAND

| CALENDAR YEAR | ACRES CULTIVATED | TYPE OF CROPS PLANTED | QUANTITY OF CROPS HARVESTED |
|---|---|---|---|
| | | Not applicable | |

### 3. DOMESTIC ANIMALS K ON THE LAND

| CALENDAR YEAR | KIND OF ANIMALS | NUMBER OF ANIMALS |
|---|---|---|
| | Not applicable | |

4. IMPR[illegible]

| DESCRIPTION OF IMPROVEMENTS | | DATE MADE |
|---|---|---|
| Parcel 1 | Cabin and shed | 1932 or 33 |
| | Ice cellar | 1932 or 33 |
| Parcel 2: | Ice cellar | 1935 |
| | | |

5. FISHING, TRAPPING, AND OTHER USES OF THE LAND

| CALENDAR YEAR | USE BEGAN | | USE ENDED | | TYPE OF USE | REMARKS |
|---|---|---|---|---|---|---|
| | MONTH | DAY | MONTH | DAY | | |
| Parcel 1: 1932 | summer | | 1940 | | Hunting and fishing; Area used as full-time residence. | |
| Parcel 2: 1935 | spring | | 1940 | winter | Hunting and trapping area; storage of supplies | |
| Both parcels used intermittantly after those dates. | | | | | | |

Remarks *(Enter here any other information showing compliance with the requirements of the law for substantially continuous use and occupancy of the land for a period of 5 years)*

** Reference to whether area is staked or marked; I do not know whether any of the markers remain in place, but I have reason to believe that this area was surveyed by oil companies during their exploration.

I CERTIFY That the statements made herein are true, complete, and correct to the best of my knowledge and belief and are made in good faith.

August 13, 1970
(Date)

Andrew Penga
(Signature or mark of Applicant)

(Signature of Witness)

WITNESSES MUST SIGN ONLY IF APPLICANT ENDORSES APPLICATION WITH HIS MARK OR THUMB PRINT RATHER THAN BY SIGNATURE

(Signature of Witness)

FOR USE OF BUREAU OF INDIAN AFFAIRS

I CERTIFY HEREBY That the above-named applicant is a native entitled to an allotment under the appropriate regulations in 43 CFR 2212.

I further certify that the applicant has occupied, marked, and posted the lands as stated in this application and that this claim does not infringe on other Native claims or area of Native Community use.

Katherine L. Adams
(Signature)

11/23/71
(Date)

Acting Realty Officer
(Title)

Title 18 U.S.C. Section 1001, makes it a crime for any person knowingly and willfully to make to any department or agency of the United States any false, fictitious, or fraudulent statements or representations as to any matter within its jurisdiction.

GPO 858-117

NATIVE ALLOTMENT - Act of 5/17/06
(34 Stat. 197) as amended 14 F-14632

Andrew Oenga
Box 201
Barrow, Alaska 99723

PARCEL A: T. 11 N., R. 17 E., Umiat Meridian, Alaska, protracted survey:
Sec. 22: All - Approx. 120 acres.
PARCEL B: T. 12 N., R. 15 E., Umiat Meridian, Alaska, protracted survey:
Sec. 36: All - Approx. 40 acres.

11/24/71 Application and evidence of occupancy filed. jf

# ATTACHMENT No. 2

# The United States of America

## *Native Allotment*

F-14632
Parcel B, Lot 1

Heirs, Devisees and/or Assigns of Andrew Oenga

This Native Allotment is a deed issued by the UNITED STATES, Department of the Interior, Bureau of Land Management, 222 West Seventh Avenue, #13, Anchorage, Alaska 99513-7599, as GRANTOR, to the Heirs, Devisees and/or Assigns of Andrew Oenga, in care of the Inupiat Community of the Arctic Slope, P.O. Box 934, Barrow, Alaska 99723-0934, as GRANTEE, for lands in the Barrow Recording District.

IT IS HEREBY CERTIFIED That, the application F-14632, Parcel B, Lot 1, filed pursuant to the Act of May 17, 1906, as amended, 43 U.S.C. §§ 270-1 to 270-3 (1970), repealed with a savings provision by 43 U.S.C. § 1617(a) (2000), has been approved pursuant to that Act, as amended, for the following-described land:

Umiat Meridian, Alaska

T. 12 N., R. 15 E.,
Sec. 36, Tract B.

Containing 22.21 acres, as shown on the plat of survey officially filed November 18, 1996.

Therefore, let it be known that, pursuant to the Act of May 17, 1906, as amended, the land described above shall be deemed the homestead of the allottee and his heirs in perpetuity, and shall be inalienable and nontaxable until otherwise provided by Congress or until the Secretary of the Interior or his delegate, pursuant to the provisions of the Act of May 17, 1906, as amended, approves a deed of conveyance vesting in the purchaser a complete title to the land.

Certificate No. 50-2005-0580

EXCEPTING AND RESERVING TO THE UNITED STATES:

1. A right-of-way thereon for ditches or canals constructed by the authority of the United States. Act of August 30, 1890, 43 U.S.C. § 945 (2000); and

2. All of oil and gas in the land so allotted, and to it, or persons authorized by it, the right to prospect for, mine, and remove such deposits from the same upon compliance with the conditions and subject to the provisions and limitations of the Act of March 8, 1922, as amended, 43 U.S.C. §§ 270-11 (1982) (repealed with a savings provision) and 270-12 (2000).

THE GRANT OF THE ABOVE-DESCRIBED LAND IS SUBJECT TO, an easement fifty (50) feet in width adjacent to and north of the section line of Sec. 36, T. 12 N., R. 15 E., Umiat Meridian, for use as a public highway and for public utilities.

/s/ Krissell Crandall

Krissell Crandall
Chief, Branch of Adjudication I

Dated at ANCHORAGE, ALASKA
on SEPTEMBER 27 2005

Return Recorded Document to:

Certificate No. 50-2005-0580

# ATTACHMENT No. 3

TRANSFER OF FUNCTIONS

Functions of registers were transferred to that officer as the Secretary of the Interior may designate by 1946 Reorg. Plan No. 3, and regulations thereunder. See note under former section 1 of this title.

ADMISSION OF ALASKA AS STATE

Admission of Alaska into the Union was accomplished Jan. 3, 1959 upon issuance of Proc. No. 3269, Jan. 5, 1959, 24 F.R. 81, 73 Stat. c16, as required by sections 1 and 8(c) of Pub. L. 85-508, July 7, 1958, 72 Stat. 339, set out as notes preceding section 21 of Title 48, Territories and Insular Possessions.

RESTORATION OF LANDS FROM RESERVATION

Lands restored from reservation as subject to the public lands law of Alaska, see section 4 of act Aug. 3, 1955, set out as a note under section 687a-2 of this title.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 270-6, 270-8, 270-15, 270-16, 687a-1, 687b-3 of this title.

**§ 270-1. Allotments to native Indians, Aleuts, or Eskimos; conveyance of allotted land.**

The Secretary of the Interior is authorized and empowered, in his discretion and under such rules as he may prescribe, to allot not to exceed one hundred and sixty acres of vacant, unappropriated, and unreserved nonmineral land in Alaska, or, subject to the provisions of sections 270-11 and 270-12 of this title, vacant, unappropriated, and unreserved land in Alaska that may be valuable for coal, oil, or gas deposits, to any Indian, Aleut, or Eskimo of full or mixed blood who resides in and is a native of Alaska, and who is the head of a family, or is twenty-one years of age; and the land so allotted shall be deemed the homestead of the allottee and his heirs in perpetuity, and shall be inalienable and nontaxable until otherwise provided by Congress: *Provided,* That any Indian, Aleut, or Eskimo, who receives an allotment under this section, or his heirs, is authorized to convey by deed, with the approval of the Secretary of the Interior, the title to the land so allotted, and such conveyance shall vest in the purchaser a complete title to the land which shall be subject to restrictions against alienation and taxation only if the purchaser is an Indian, Aleut, or Eskimo native of Alaska who the Secretary determines is unable to manage the land without the protection of the United States and the conveyance provides for a continuance of such restrictions. Any person qualified for an allotment as aforesaid shall have the preference right to secure by allotment the nonmineral land occupied by him not exceeding one hundred and sixty acres. (May 17, 1906, ch. 2469, 34 Stat. 197; Aug. 2, 1956, ch. 891, § 1(a)—(d), 70 Stat. 954.)

AMENDMENTS

1956—Act Aug. 2, 1956, included Aleuts, restricted allotment of nonmineral land to vacant, unappropriated, and unreserved nonmineral land, permitted allotment of vacant, unappropriated, and unreserved land that may be valuable for coal, oil, or gas deposits, and authorized conveyance of allotted land.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 270-2, 270-3, 687a of this title.

**§ 270-2. Same; allotments in national forests.**

Allotments in national forests may be made under sections 270-1 to 270-3 of this title if founded on occupancy of the land prior to the establishment of the particular forest or if the Secretary of Agriculture certifies that the land in an application for an allotment is chiefly valuable for agricultural or grazing purposes. (May 17, 1906, ch. 2469, § 2, as added Aug. 2, 1956, ch. 891, § 1(e), 70 Stat. 954.)

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 270-2, 270-3 of this title.

**§ 270-3. Same; proof of continuous use and occupancy of land.**

No allotment shall be made to any person under sections 270-1 to 270-3 of this title until said person has made proof satisfactory to the Secretary of the Interior of substantially continuous use and occupancy of the land for a period of five years. (May 17, 1906, ch. 2469, § 3 as added Aug. 2, 1956, ch. 891, § 1(e), 70 Stat. 954.)

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in section 270-2 of this title.

**§ 270-4. Affidavits; filing, publishing, and posting proofs of claims.**

All affidavits, testimony, proofs, and other papers provided for by the provisions of this Act and the Act of March 3, 1891, concerning public lands, or by any departmental or Executive regulation thereunder, by depositions or otherwise, under commission from such officer as the Secretary of the Interior may designate, which may have been or may hereafter be taken and sworn to anywhere in the United States, before any court, judge, or other officer authorized by law to administer an oath, shall be admitted in evidence as if taken before such officer as the Secretary of the Interior may designate. And thereafter such proof, together with a certified copy of the field notes and plat of the survey of the claim, shall be filed in the public survey office at Juneau, and if such survey and plat shall be approved by the Secretary of the Interior or such officer as he may designate, certified copies thereof, together with the claimant's application to purchase, shall be filed in the United States land office in the land district in which the claim is situated, whereupon, at the expense of the claimant, such officer as the Secretary of the Interior may designate of such land office shall cause notice of such application to be published for at least sixty days in a newspaper of general circulation published nearest the claim within Alaska, and the applicant shall at the time of filing such field notes, plat, and application to purchase in the land office, as aforesaid, cause a copy of such plat, together with the application to purchase, to be posted upon the claim, and such plat and application shall be kept posted in a conspicuous place on such claim continuously for at least sixty days, and during such period of posting and publication or within thirty days thereafter any person, corporation, or association, having or asserting any adverse interest in, or claim to the tract of land or any part thereof sought to be purchased, may file in the land office where such application is pending, under oath, an adverse claim setting forth the nature and extent thereof, and such adverse claimaint

shall, within sixty days after the filing of such adverse claim, begin action to quite title in a court of competent jurisdiction within Alaska, and thereafter no patent shall issue for such claim until the final adjudication of the rights of the parties, and such patent shall then be issued in conformity with the final decree of the court. (May 14, 1898, ch. 299, § 10, 30 Stat. 413; Oct. 28, 1921, ch. 114 § 1, 42 Stat. 208; Mar. 3, 1925, ch. 462, 43 Stat. 1144; 1946 Reorg. Plan No. 3, § 403, eff. July 16, 1946, 11 F.R. 7876, 60 Stat. 1100.)

CODIFICATION

Section is comprised of the last paragraph of section 10 of act May 14, 1898. The remainder of section 10 of act May 14, 1898, is classified to sections 687a to 687a-5 of this title.

TRANSFER OF FUNCTIONS

All functions of all other officers of the Department of the Interior and all functions of all agencies and employees of that Department were, with two exceptions, transferred to the Secretary of the Interior, with power vested in him to authorize their performance or the performance of any of his functions by any of those officers, agencies, and employees, by 1950 Reorg. Plan No. 3, §§ 1, 2, eff. May 24, 1950, 15 F.R. 3174, 64 Stat. 1262, set out in the Appendix to Title 5, Government Organization and Employees.

Functions of Supervisor of Surveys and Registers were transferred to the Secretary of the Interior of that officer as he may designate by 1946 Reorg. Plan No. 3. See note under former section 1 of this title.

Act Mar. 3, 1925, abolished the office of surveyor general and transferred the administration of all activities of surveyors general to the Field Surveying Service under the jurisdiction of the United States Supervisor of Surveys subject to regulations of the Secretary of the Interior.

Act Oct. 28, 1921, authorized the President to consolidate the offices of register and receiver in any district land office and to abolish the office of receiver.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in section 270 of this title.

**§ 270-5. Filing of notice of location; time limit.**

Any person who on April 29, 1950 is maintaining a settlement claim on surveyed or unsurveyed public land in Alaska shall file notice of the location of his settlement claim in the United States land office for the district in which the land is situated, (a) within ninety days from April 29, 1950, if notice of the location has not heretofore been filed in the recording district in which the land is situated, or (b) within two years from April 29, 1950, if notice of the location has heretofore been filed in such recording district. (Apr. 29, 1950, ch. 137, § 2, 64 Stat. 95.)

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in section 270-6 of this title.

**§ 270-6. Same; effect of failure to file.**

Unless notice of a settlement claim is filed in the proper district land office within the time prescribed by sections 270 and 270-5 of this title, the claimant, in making homestead proof or submitting a showing of residence, cultivation and improvements as a basis for a free survey, shall not be given credit for such residence and cultivation as may have taken place prior to the filing of (a) a notice of the claim in the proper district land office, (b) a petition for survey, or (c) an application for homestead entry. whichever is the earlier. (Apr. 29, 1950, ch. 137, § 3, 64 Stat. 95.)

**§ 270-7. Final or commutation homestead proof on unsurveyed land as basis for free survey; time limit.**

A homestead settler on unsurveyed public lands shall make final or commutation homestead proof within five years from the date of the filing of notice of the settlement claim in the district land office, as a basis for a free survey under section 270-10 of this title in accordance with regulations of the Secretary of the Interior. (Apr. 29, 1950, ch. 137, § 4, 64 Stat. 95; July 11, 1956, ch. 571, § 2, 70 Stat. 529.)

AMENDMENTS

1956—Act July 11, 1956, substituted "final or commutation homestead proof" for "proof of residence, cultivation, and improvements", and eliminated "and thereafter shall submit final or commutation proof" preceding "in accordance with regulations of the Secretary of the Interior."

**§ 270-8. Amount of homestead entries.**

Every person who was qualified under laws existing July 8, 1916, to make homestead entry of the public lands of the United States who has settled upon or who shall hereafter settle upon any of the public lands of the United States situated in Alaska, whether surveyed or unsurveyed, with the intention of claiming the same under the homestead laws, shall, subject to the provisions and limitations of section 270 of this title, be entitled to enter one hundred and sixty acres or a less quantity of unappropriated public land in Alaska, and no more: *Provided*, That nothing herein contained shall be construed to limit or curtail the area of any homestead claim unlawfully initiated prior to July 8, 1916. (July 8, 1916, ch. 228, § 1, 39 Stat. 352; June 28, 1918, ch. 110, 40 Stat. 632.)

REFERENCES IN TEXT

Homestead laws, referred to in the text, are classified to this chapter.

CODIFICATION

Section is comprised of the first part and the proviso of section 1 of act July 8, 1916. The clause preceding the proviso of section 1 of act July 8, 1916, is classified to section 270-9 of this title.

AMENDMENTS

1918—Act June 28, 1918, re-enacted section without change.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in section 270-14 of this title.

**§ 270-9. Effect of entry in another State or Territory.**

A former homestead entry in any other State or Territory shall not be a bar to a homestead entry in Alaska. (July 8, 1916, ch. 228, § 1, 39 Stat. 352; June 28, 1918, ch. 110, 40 Stat. 632.)

CODIFICATION

Section is comprised of the clause preceding the proviso of section 1 of act July 8, 1916. The remainder of section 1 of act July 8, 1916, is classified to section 270-8 of this title.

AMENDMENTS

1918—Act June 28, 1918, re-enacted section without change.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in section 270-14 of this title.

**§ 270-10. Entry on unsurveyed lands; final proof.**

The entryman may, after due compliance with the terms of the homestead laws, file his final homestead

proof in accordance with applicable regulations of the Secretary of the Interior regardless of whether or not the system of public surveys has been extended over the land included in a homestead entry. The Secretary of the Interior shall, within one year after the filing of such proof, issue proper instructions for the survey of the land so entered, without expense to the entryman, and if the entryman has complied with the requirements of the homestead law and applicable regulations a patent based on such survey shall be issued. Nothing in this section however, shall prevent the homesteader from securing earlier action on his entry and proof by a special survey at his own expense, if he so elects. (July 8, 1916, ch. 228, § 2, as added June 28, 1918, ch. 110, 40 Stat. 633, and amended Oct. 28, 1921, ch. 114, § 1, 42 Stat. 208; Mar. 3, 1925, ch. 462, 43 Stat. 1144; 1946 Reorg. Plan No. 3, § 403, eff. July 16, 1946, 11 F.R. 7876, 60 Stat. 1100; July 11, 1956, ch. 571, § 1, 70 Stat. 528.)

REFERENCES IN TEXT

Homestead laws, referred to in the text are classified to this chapter.

AMENDMENTS

1956—Act July 11, 1956, eliminated provisions requiring a preliminary showing of proof that residence, cultivation, and improvement requirements have been met by the settler.

CHANGE OF NAME

Acts Oct. 28, 1921, and Mar. 3, 1925, consolidated the offices of register and receiver and provided for a single officer to be known as register.

TRANSFER OF FUNCTIONS

Officers of United States Supervisor of Surveys and Registers were abolished and their functions transferred to the Bureau of Land Management by 1946 Reorg. Plan No. 3, § 403, eff. July 16, 1946, 11 F.R. 7876, 60 Stat. 1100. See note under former section 1 of this title.

Functions of "register" and "Supervisor of Surveys" were transferred to "such officer as the Secretary of the Interior may designate" and "Secretary of the Interior or such officer as he may designate," respectively, on authority of 1946 Reorg. Plan No. 3, and regulations thereunder. See note under former section 1 of this title.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 270-7, 270-14, 687a of this title.

### § 270-11. Entry on land containing coal, oil, or gas.

Claims under section 687a of this title, and homestead claims may be initiated by actual settlers on public lands of the United States in Alaska known to contain workable coal, oil, or gas deposits, or that may be valuable for the coal, oil, or gas contained therein, and which are not otherwise reserved or withdrawn, whenever such claim shall be initiated with a view of obtaining or passing title with a reservation to the United States of the coal, oil, or gas in such lands, and of the right to prospect for, mine, and remove the same; and any claimant who has initiated such a claim in good faith on lands containing workable deposits of coal, oil or gas, or that may be valuable for the coal, oil, or gas contained therein, may perfect the same under the provisions of the laws under which the claim was initiated, but shall receive the limited patent provided for in section 270-12 of this title: *Provided, however*, That should it be discovered at any time prior to the issuance of a final certificate on any claim initiated for unreserved lands in Alaska that the lands are coal, oil, or gas in character, the patent issued on such entry shall contain the reservation required by said section. (Mar. 8, 1922, ch. 96, § 1, 42 Stat. 415; Aug. 23, 1958, Pub. L. 85-725, § 1, 72 Stat. 730.)

AMENDMENTS

1958—Pub. L. 85-725 provided for settlement and entry of public lands in Alaska containing coal, oil, or gas under section 687a of this title and substituted "claimant who has initiated such a claim" for "settler who has initiated a homestead claim".

CREDITS; DIVESTMENT OF VESTED RIGHTS

Section 4 of Pub. L. 85-725 provided that: "Any person who heretofore settled or entered on lands made subject to the provision of the Act of March 8, 1922 [this section and section 270-12 of this title], under the terms of this Act [amending this section and sections 270-12 and 687a of this title] shall be entitled to credit toward the requirements of the Act under which settlement or entry was made to the full extent that he complied with such requirements prior to the enactment of this Act [Aug. 23, 1958]: *Provided, however*, That this section shall not be construed to divest or impair any right which has heretofore vested in any person, firm, or corporation pursuant to lease, contract or any other provision of law."

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in section 270-12 of this title.

### § 270-12. Patent for land entered under section 270-11; reservations.

Upon satisfactory proof of full compliance with the provisions of the laws under which the entry is made and of section 270-11 of this title the entryman shall be entitled to a patent to the lands entered by him, which patent shall contain a reservation to the United States of all the coal, oil, or gas in the land so patented, together with the right to prospect for, mine, and remove the same. The coal, oil, or gas deposits so reserved shall be subject to disposal by the United States in accordance with the provisions of the laws applicable to coal, oil, or gas deposits or coal, oil, or gas lands in Alaska in force at the time of such disposal. Any person qualified to acquire coal, oil, or gas deposits, or the right to mine and remove the coal or to drill for and remove the oil or gas under the laws of the United States shall have the right at all times to enter upon the lands entered or patented, as provided by the provisions hereof, for the purpose of prospecting for coal, oil, or gas therein, upon the approval by the Secretary of the Interior of a bond or undertaking to be filed with him as security for the payment of all damages to the crops and improvements on such lands by reason of such prospecting. Any person who has acquired from the United States the coal, oil, or gas deposits in any such land, or the right to mine, drill for, or remove the same, may reenter and occupy so much of the surface thereof as may be required for all purposes reasonably incident to the mining and removal of the coal, oil, or gas therefrom, and mine and remove the coal or drill for and remove the oil or gas upon payment of the damages caused thereby to the owner thereof, or upon giving a good and sufficient bond or undertaking in an action instituted in any competent court to ascertain and fix said damages: *Provided*, That the owner under such limited patent shall have the right to mine the coal for use on the land for domestic purposes at any time

prior to the disposal by the United States of the coal deposits: *Provided further*, That nothing in this section or section 270–11 of this title shall be construed as authorizing the exploration upon or entry of any coal deposits withdrawn from such exploration and purchase. (Mar. 8, 1922, ch. 96, § 2, 42 Stat. 416; Aug. 23, 1958, Pub. L. 85–725, § 2, 72 Stat. 730.)

AMENDMENTS

1958—Pub. L. 85–725 deleted last proviso "*And provided further*, That nothing herein contained shall be held or construed to authorize the entry or disposition, under section 274 of this title, or under Acts amendatory thereof or supplemental thereto, of withdrawn or classified coal, oil, or gas lands or of lands valuable for coal, oil, or gas."

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 270–11, 270–13 of this title.

**§ 270–13. Sale or disposition of lands containing coal, oil, or gas deposits.**

The Secretary of the Interior may (a) sell under the provisions of section 1171 of this title, or (b) make disposition under the following townsite laws, as amended: Sections 711 and 712 of this title; section 732 of this title; sections 733 to 736 of this title; and sections 975 to 975g of this title, of any lands in Alaska known to contain workable coal, oil or gas deposits, or that may be valuable for the coal, oil or gas contained therein, and which are otherwise subject to sale or disposition under said section 1171 of this title, or the said townsite laws, as amended, upon the condition that the patent issued to the purchaser thereof shall contain the reservation required by section 270–12 of this title. (Mar. 8, 1922, ch. 96, § 3, as added Aug. 17, 1961, Pub. L. 87–147, 75 Stat. 384, and amended Oct. 3, 1962, Pub. L. 87–742, 76 Stat. 740.)

AMENDMENTS

1962—Pub. L. 87–742 empowered the Secretary to dispose of lands under sections 711 and 712; section 732; sections 733 to 737; and sections 975 to 975g of this title.

**§ 270–14. Lands excepted from entry.**

There shall be excepted from homestead settlement and entry under the provisions of sections 270–8 to 270–10 of this title, the lands in Annette and Pribilof Islands, the islands leased or occupied for the propagation of foxes, and such other lands as have been, or may be, reserved or withdrawn from settlement or entry. (July 8, 1916, ch. 228, § 3, formerly § 2, 39 Stat. 352, renumbered June 28, 1918, ch. 110, 40 Stat. 633.)

**§ 270–15. Claims; rectangular system of surveys; departure on account of local or topographic conditions.**

The provisions of section 270 of this title, in so far as they require that the lands so settled upon, or to be settled upon, if unsurveyed, must be located in rectangular form by north and south lines running according to the true meridian, and marked upon the ground by permanent monuments at each of the four corners shall not apply where, by reason of the local or topographic conditions, it is not feasible or economical to include in a rectangular form with cardinal boundaries the lands desired; but all such claims must be compact and approximately rectangular in form, and marked upon the ground by permanent monuments at each corner, and the entryman or claimant shall conform his boundaries thereto. In all other respects the claims will be in conformity with the provisions of section 270 of this title. (Apr. 13, 1926, ch. 121, § 1, 44 Stat. 243; Apr. 29, 1950, ch. 134, § 3, 64 Stat. 93.)

AMENDMENTS

1950—Act Apr. 29, 1950, deleted, after "each of the four corners", and preceding ", shall not apply", the words "; and the provisions of section 270–10 of this title, in so far as they require that surveys executed thereunder without expense to the claimant, must follow the general system of the public land surveys".

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 270–17, 687a of this title.

**§ 270–16. Soldier's additional entry; trade or manufacturing site; application for official survey; deposit.**

If the rectangular system of the public lands surveys has not been extended over the lands included in a soldier's additional homestead entry, authorized by section 270 of this title, or a trade and manufacturing site authorized by section 687a of this title, the entryman or claimant may, upon the approval of such officer as the Secretary of the Interior may designate make application to the public survey office for an official survey of his claim, accompanied by a deposit of the estimated cost of the field and office work incident to the execution of such survey. Upon receipt of the application and its accompanying deposit the public survey office will immediately issue appropriate instructions for the survey of the lands involved, to be executed by the surveying service of the Bureau of Land Management not later than the next surveying season under the direction of the Secretary of the Interior or such officer as he may designate, unless by reason of the inaccessibility of the locality or other conditions the Secretary of the Interior or such officer as he may designate decides that it will result to the advantage of the Government or claimants to have the survey executed by a United States deputy surveyor, in which event the laws and regulations on April 13, 1926, governing the execution of the surveys by United States deputy surveyors will be observed. (Oct. 28, 1921, ch. 114, § 1, 42 Stat. 208; Mar. 3, 1925, ch. 462, 43 Stat. 1144; Apr. 13, 1926, ch. 121, § 2, 44 Stat. 244; 1946 Reorg. Plan No. 3, § 403, eff. July 16, 1946, 11 F.R. 7876, 60 Stat. 1100.)

CHANGE OF NAME

Acts Oct. 28, 1921, and Mar. 3, 1925, consolidated the offices of register and receiver and provided for a single officer to be known as register.

TRANSFER OF FUNCTIONS

All functions of all other officers of the Department of the Interior and all functions of all agencies and employees of that Department were, with two exceptions, transferred to the Secretary of the Interior, with power vested in him to authorize their performance or the performance of any of his functions by any of those officers, agencies, and employees, by 1950 Reorg. Plan No. 3, §§ 1, 2, eff. May 24, 1950, 15 F.R. 3174, 64 Stat. 1262, set out in the Appendix to Title 5, Government Organization and Employees.

"Bureau of Land Management" was substituted for "General Land Office," "such officer as the Secretary of the Interior may designate" for "register" and "Secretary

# ATTACHMENT No. 4

Standard Alaska
Production Company
900 East Benson Boulevard
P.O. Box 196612
Anchorage, Alaska 99519-6612
(907) 561-5111

May 19, 1988

STANDARD
ALASKA PRODUCTION

Mr. David O. Scott, Realty Officer
Bureau of Indian Affairs
P. O. Box 16
Fairbanks, AK 99701

RE: 7-507-4 Oenga Road and Pipeline Right-of-Way
Niakuk Development Project

Dear Mr. Scott:

We are in receipt of the information you have furnished us relative to filing right-of-way applications on native allotments and appreciate your rapid response to our inquiry.

Regarding our plans to file a right-of-way application for an access road and pipeline on Mr. Andrew Oenga's native allotment on Heald Point, transmitted herewith for your review is a copy of our fee appraisal of the property.

As you discussed today with Stu Hirsh of my staff, we will be entering negotiations later this spring with Mr. Oenga concerning the terms and conditions of the right-of-way; we plan to adapt BIA Lease F-82-B (Walton I. Ahmaogak) for use in this particular situation; and we plan to file our right-of-way application in the next 30 to 45 days.

We will keep you advised of our progress in this matter and will notify you prior to commencement of negotiations with Mr. Oenga. Please feel free to contact Stu Hirsh at 564-4841 if you have any questions or concerns regarding this matter.

Sincerely,

Steven D. Taylor, Manager
Environmental & Regulatory Affairs

SDT/SHH/6182W

copies: J.W. Buckee
J.A. Reeder
T. Obeney
L. Barry
C. Bailey
P.T. Hanley

# ATTACHMENT No. 5

Bk 33 pg 796
Barrow Rec Dist

U.S. Department of the Interior

Bureau of Indian Affairs

# LEASE AGREEMENT

BIA Lease No. F- 82-8

THIS Lease Agreement is made and entered into effective July 1, 1982, by and between Walton I. Ahmaogak, an Alaska Native, of Barrow, Alaska (with the approval of the Secretary of the Interior, acting for, and on behalf of Mr. Ahmaogak) hereinafter referred to as the "Lessor"; and ARCO Alaska, Inc., a Delaware corporation, hereinafter called "Lessee", in accordance with the provisions of existing law and the regulations (25 C.F.R. 162 (1982)) which by reference are made a part hereof.

WITNESSETH, that for and in consideration of the mutual covenants and Agreements provided herein, the Lessor hereby leases to the Lessee a parcel of land which comprises a portion of the Lessor's Parcel B of Alaska Native Allotment Application F-11322, which is referred to herein as the "leased premises", and which is described in Exhibit A, attached hereto, comprising 24 acres more or less.

1. Lease Term: The term of this Lease shall be for twenty-five (25) years beginning on July 1, 1982, and expiring

at midnight on June 30, 2007, unless extended or unless sooner terminated pursuant to the terms of this Agreement.

2. Lease Rentals: As rental for the leased premises, the Lessee agrees to pay the Lessor directly, or through the office of the Secretary if requested by the Lessor to do so, the sum of $30,000 per year for each of the first five (5) years of the Lease, payable by the Lessee in advance effective on July 1, 1982, upon approval of this Lease by the Secretary, and on July 1 of each year thereafter. In the event of the death of the Lessor during the term of this Lease, and while the leased premises are in restricted status, all rentals remaining due or payable to the decedent or his representative under the provisions of the Lease shall be paid to the official of the Bureau of Indian Affairs having jurisdiction over the leased premises. While the leased premises are in restricted status, the Secretary may in his discretion suspend the direct rental payment provisions of this Lease in which event the rentals shall be paid to the official of the Bureau of Indian Affairs having jurisdiction over the leased premises. Advice of each payment is to be provided to the Secretary concurrently with its issuance to the Lessor. A nonrefundable lease administration fee of $250.00 shall be paid to the Office of the Secretary at the time of approval of this Lease.

3. Increases in Lease Rentals:

(a) Commencing on July 1, 1987 and for a period of five years thereafter, the annual lease rental due the Lessor under this Lease Agreement shall be increased to $45,000, or to a rental value established by the BIA (appraised fair annual rental) for raw, unimproved vacant land, whichever is higher, provided that the maximum rental shall be $48,000 on account of the bonus paid as stated in paragraph 29;

(b) Commencing on July 1, 1992 and for a period of five (5) years thereafter, the annual lease rental due the Lessor under this Lease Agreement shall be increased to 150% of the rents paid for the prior five-year period or a rental value established by the BIA (appraised fair annual rental) for raw, unimproved vacant land, whichever is higher, provided that the maximum rental shall be 160% of the rents for the prior five-year period on account of the bonus paid as stated in paragraph 29;

(c) Commencing on July 1, 1997 and at each five-year anniversary of the Lease thereafter, the annual lease rental due the Lessor under this Lease Agreement shall be increased to a rental value established by the BIA (appraised fair annual rental) for raw, unimproved vacant land if it is higher than the rental paid for the prior five-year period.

4. Reappraisal Procedures: Neither the Secretary nor any appraiser may consider the rentals provided for in this

Agreement for any purpose in determining the equitable rental rate pursuant to paragraph 3 of this Lease. The BIA review for purposes of establishing the fair rental value of the premises shall be based on the highest and best use of the premises as raw, unimproved vacant land at the time of the appraisal and shall not be based on the cost or value of improvements or developments made by the Lessee or any income the Lessee derives from the leased premises.

In all cases, Lessee shall be a proper party with standing to contest the reasonableness of the Secretary's rental determination.

If, during the term of this Agreement, Lessor receives unrestricted title to the premises, the functions assigned to the Secretary hereunder shall be performed by a designated appraiser mutually acceptable to the parties, with the costs of such appraisal to be borne equally by the parties.

5. Use of Leased Premises: The Lessee may use the leased premises for oil field exploration, development, production and support purposes, and for the benefit of the oil and gas lease underlying the leased premises, or other oil and gas leases elsewhere, and for any other uses and purposes reasonably or conveniently related thereto. The Lessee shall make no unlawful use of the leased premises, or knowingly permit any unlawful activity to be conducted thereon by others.

6. Maintenance of Leased Premises: The Lessee, at its sole expense, shall keep the leased premises, and any improvements placed thereon, in good order and repair, ordinary wear and tear excepted.

7. Improvements: The Lessee may construct on the leased premises any improvements which may be useful or convenient to it or its designees in its use of the leased premises for oil field exploration, development, production and support. All improvements placed on the leased premises by the Lessee shall remain the property of the Lessee during the term of this Lease and any extension thereof, and shall become the property of the Lessor at the final expiration of this Lease or any extension thereof, unless they have been earlier removed by the Lessee, provided that if any improvements are removed, the premises shall be restored as nearly as possible to their condition prior to their removal. The Lessee shall not remove permanent improvements such as gravel pads, utilities and permanent structures that cannot be removed without substantial damage to the structure.

8. Sublease: By this Lease Agreement, the Lessee is granted permission to sublease all or portions of the leased premises to others, as it may see fit, for uses permitted under this Lease; provided, however, that the Lessee shall remain primarily responsible to the Lessor and the Secretary for the

payment of annual rentals when due, and for the observance of all terms and conditions of this Lease.

9. Surrender at End of Term: The Lessee agrees that upon the last day of the term, or upon the last day of any extension thereof, it will peaceably and quietly vacate and surrender the leased premises to the Lessor, in at least as good a condition as it is now. The Lessee agrees that it will in a similar manner vacate and surrender in good condition any improvements remaining on the premises, ordinary wear and tear excepted. The Lessee makes no warranty of fitness for a particular purpose or warranty of merchantability for any improvements left on the leased premises. An oil well is in place on the leased premises, and the Lessee shall be consulted prior to any surface development in the vicinity of the well.

10. Option to Extend: The Lessee shall have the option, at its sole discretion, to extend the term of this Lease for an additional twenty-five (25) years at the end of the original lease term. Notification of the exercise of this option shall be made in writing, at least ninety (90) days prior to the original termination date of this Lease.

11. Option to Cancel. Lessee may cancel this Lease after fifteen (15) years, and each fifth year afterward, including any extensions. Such cancellation shall be done by giving Lessor and the Secretary notice, at least ninety (90)

days in advance of June 30, 1997, or June 30 of the last year of each five-year period thereafter.

12. Termination for Force Majeure: The Lessee shall have the right to cancel this Lease, and all of its obligations hereunder, one year after an event constituting force majeure including but not limited to destruction by an act of God or war, or by government prohibition, rendering impossible its continued use of the West Dock and causeway.

13. Interest on Rentals Past Due: If any annual installment of rental is not paid within thirty (30) days after becoming due, interest at the rate of eighteen (18) percent per annum, compounded annually, will become due and payable from the day such rental was due, and will run until the delinquent rental is paid.

14. Delinquent Rental Payment: Any payment post-marked after the fifteenth day subsequent to the anniversary date of each year during the lease term shall be considered delinquent and may be rejected by the Lessor, unless a lease fee of $250.00 accompanies the delinquent payment, pursuant to 25 C.F.R. §162.13 (1982), in which case such payment must be accepted and the Lease continued.

15. Default and Remedies: If the Lessee should fail to perform or comply with any term or condition of this Lease, the Lessor, after written notice and a ten-day period to

respond regarding such default, may pursue its rights to re-enter, re-let, evict, terminate the Lease or recover rents or any other remedy it has under law. Lessee shall be given a reasonable time to cure such default or breach. Such a violation of the Lease Agreement shall also be acted upon in accordance with the regulations at 25 C.F.R. 162.14 (1982), so long as title to the leased premises remains restricted by the Secretary.

At the conclusion of the proceedings referred to above, if the Lessor has prevailed and whether or not the Lessor elects to terminate the Lease, the Lessor, in addition to any other rights and remedies, may enter the leased premises pursuant to summary administrative or judicial proceedings, including ejectment or other lawful action. The Lessor, under appropriate legal authority, may re-enter the leased premises, remove all persons from the premises, and remove the Lessee's property therefrom for storage or disposal, at the sole cost of the Lessee, and may re-let the premises in his discretion. The Lessor shall be under no liability, except for wilful negligence or unlawful acts, for any such entry, repossession, or removal after a breach or default has been determined by administrative or judicial proceedings to exist. The Lessee shall pay to the Lessor as additional rent, all costs and expenses incurred by or on behalf of the Lessor (including reasonable

attorneys fees) which were occasioned by any such default or breach by the Lessee under this Lease.

16. Insurance: The Lessee hereby certifies that it is self-insured for any liability incurred under this Lease for an amount up to $5 million. The Lessor shall receive the benefit of such self-insurance in the same fashion as if he were a co-insured. If self-insurance shall cease, the Lessee shall furnish the Lessor with certificates of insurance in an equivalent amount.

17. Indemnification of the Lessor: The Lessee shall protect, indemnify, and save the Lessor harmless against any and all liabilities, claims, damages, penalties, litigation, or costs and expenses related thereto (including, without limitation, reasonable attorneys fees) which may be imposed upon, incurred by, or asserted against the Lessor by reason of (a) any accident or injury to, or death of any person, or loss or damage to any personal or real property occurring on the leased premises, or any part thereof; (b) any use, non-use or condition of the leased premises, or any part thereof; (c) any failure on the part of the Lessee to perform, forebear, or otherwise comply with any of the terms of this Lease; (d) performance of any labor, services, or the furnishing of any materials with respect to the leased premises, or any part thereof. If any lawsuit or administrative proceeding is

brought against the Lessor by reason of any such occurrence, the Lessee shall, upon the Lessor's request, defend the suit or proceeding, or cause the same to be defended by counsel designated by the Lessee. Notice of such a proceeding shall be given by Lessor to Lessee as soon as practicable, and in no event later than ten (10) days after the Lessor has received notice of such a proceeding.

18. No Claims Against Lessor: Nothing contained in this Lease Agreement shall comprise the consent or request by the Lessor, whether express or implied, for the performance of any labor or services, or the furnishing of materials or other property, with respect to the leased premises or any part thereof; nor shall it give the Lessee any right, power, or authority to contract for or permit the performance of any labor or services, or the furnishing of any materials or other property, in any manner which would permit the making of a valid claim for payment against the Lessor.

19. Condition of the Leased Premises: The Lessee agrees that it is entirely familiar with the physical condition of the leased premises. The Lessor makes no representation or warranty with respect to the condition of the leased premises, nor with respect to its fitness or availability for any particular use or purpose. The Lessor shall not be liable for any latent or patent defect in the leased premises.

20. Approval: It is understood and agreed between the Lessor and the Lessee that this Lease, and any subsequent amendment or extension thereto, shall be valid and binding only after approval by the Secretary or his authorized delegate pursuant to 25 C.F.R. §162 (1982), except as may be provided in paragraph 8 herein.

21. Relinquishment of Restricted Title by the Secretary: Nothing contained in this Lease shall delay or prevent a termination of federal trust responsibilities with respect to the leased premises, by issuance of a fee patent or otherwise during the term of this Lease or any extension thereof. Termination of such responsibilities shall not act to abrogate the Lease. The Secretary shall notify the Lessor and the Lessee of any such change in the legal status of title to the leased premises. If a certificate of competency removing restrictions against alienation or encumbrance is issued by the Secretary to the Lessor, it shall be promptly recorded by the Lessor, and thereafter all references in this Lease Agreement to the powers, duties, or discretion of the Secretary with regard to the approval or administration of this Lease, or any extension thereof, shall have no further applicability or effect.

22. Taxes and Assessments: The Lessee shall be responsible for, and shall timely pay, all lawful federal, state, borough or local taxes, fees, or assessments (including any

interest and penalties thereon) which during the term of this Lease are assessed, levied, imposed upon, or become a lien upon the leased premises or any interest therein, or upon any alteration, addition, or improvement thereto, or upon personal property of any kind owned by and placed upon the leased premises by the Lessee, or upon any occupancy, use or possession of the leased premises or any part thereof, before any fine, penalty, interest, or cost becomes applicable. The Lessee shall be promptly provided by the Lessor with all notices of levy, taxation, assessment or lien which may be received by the Lessor with respect to the leased premises, and the Lessee shall have full authority to contest or seek adjustment of any such tax or assessment, by appropriate administrative or judicial proceedings. The Lessee shall not be obligated to pay any such taxes, fees or assessments which it is contesting in good faith, until the final adjudication of such dispute. It shall take reasonable action, however, to assure that Lessor's interest in the premises is not prejudiced by such contest.

23. Eminent Domain: If the leased premises, or any part thereof, is condemned or taken by eminent domain for any lawful use or purpose, then, as to the portion so taken, the term of this Lease shall terminate as of the date of title vesting in such proceeding, all rentals then due shall be paid to that date, and the parties shall thereafter have no claim

against each other for the value of the unexpired term of the Lease as to that portion. In the event of any such condemnation or taking, whether whole or partial, the Lessee shall be entitled to a pro rata share of the award paid for such condemnation, based upon the proportion of the award attributable to the value of any improvements placed upon the leased premises by the Lessee.

24. Inspection: The Secretary, the Lessor, and their authorized representatives may enter the leased premises or any part thereof at all reasonable times and subject to reasonable conditions for the purposes of inspecting the premises, except that the Secretary and his authorized representatives may inspect as authorized by law or to exercise any other right of the Lessor provided in this Lease.

25. Right of Access: The Lessor retains a right of reasonable access across the leased premises to the remainder of his Parcel B, in order to enable full and complete use of such Parcel B. Such access shall not conflict with the purposes of this Lease or the uses and improvements authorized hereunder. For purposes of such access, the Lessor shall be entitled to construct, at his expense, a roadway suitable for vehicular access to the remainder of Parcel B, such roadway to be no greater than 66 feet in width.

26. Integration: This Lease, together with any exhibits attached hereto which comprise a part of the Lease by

reference, and together with that certain grant of right-of-way dated July 12, 1982, that certain Memorandum of Agreement dated June 30, 1982, and that certain release dated July 2, 1982, (as to which the Secretary expresses no opinion), set forth all prior covenants, promises, agreements, conditions, and understandings, whether oral or written, between the Lessor and the Lessee and concerning the leased premises. No subsequent agreement, condition or understanding, whether oral or written, which is not set forth in this Lease Agreement, or in any duly-approved written amendment thereto, shall be enforceable unless it is reduced to writing and signed by all the parties to this Lease.

27. Lease Amendment and Interpretation: If any provision of this Lease, or the application thereof, is invalid or unenforceable, the remainder of this Lease and other applications of such provision shall not be affected by it, unless otherwise specifically provided herein. This Lease may be changed, waived, discharged, or terminated only by a document in writing signed by the party against which enforcement of such change, waiver, discharge, or termination is sought. The paragraph headings in this Lease are for purposes of reference only, and shall not limit or define the meaning of such paragraphs. This Lease may be executed in several counterparts, each of which is an original, but all of which shall constitute one instrument.

28. Waivers: The waiver of any breach or default of any covenant, condition or stipulation contained herein shall not be deemed to cause a waiver of any subsequent breach or default of the same or any other covenant, condition or stipulation, nor shall any failure to enforce any right or seek any remedy with respect to any obligation under this Lease Agreement prejudice or affect the future rights or remedies of the parties.

29. Periodic Review and Prepayment of Increased Rentals: The Lessor and the Lessee, with the approval of the Secretary, agree that a portion of an $800,000 lump sum paid to the Lessor constitutes a bonus for the execution of this Lease. On account of payment of this bonus, the Lessee shall be excused from paying any rental increases in excess of the maximum rents specified in Paragraph 3 for the first fifteen (15) years of the term of this Lease.

30. The Secretary of the Interior: Reference in this Lease Agreement to "the Secretary" or "the Secretary of the Interior" shall mean the Secretary of the United States Department of the Interior or his authorized representative, who is acting under delegated authority.

31. The Lessee: Reference in this Lease Agreement to the "Lessee" shall refer to ARCO Alaska, Inc., a Delaware corporation authorized to conduct business in the State of

Alaska, and to its lessees, sublessees, assigns, contractors, subcontractors, and agents who may from time to time enter, use and improve the leased premises for lawful activities in furtherance of the development and production of the Prudhoe Bay oil field and other oil fields, whether now known or unknown.

32. The Lessor: As used in this Lease, the term "Lessor" shall refer to the Native allottee, Walton I. Ahmaogak, and to his heirs assigns, and designees.

33. Successors in Interest: Each term, covenant, and condition contained in this Lease shall be binding upon and shall inure to the benefit of the heirs, executors, administrators, successors, and assigns of the parties hereto. So long as title to the leased premises is in a restricted status, all of the Lessee's obligations under this Lease shall run to the United States as well as to the Lessor.

34. Notices: All notices and other communications required or convenient under this Lease Agreement shall be in writing, and shall be deemed to have been given when mailed by first class certified mail, postage prepaid thereon, and addressed as follows: (a) SECRETARY: Area Director, c/o Realty Section, U.S. Bureau of Indian Affairs, P.O. Box 3-8000, Juneau, Alaska, 99802, or at such other address as the Secretary shall have furnished to the parties in writing; (b) LESSOR: Mr. Walton I. Ahmaogak, P.O. Box 274, Barrow, Alaska,

99723, or at such other address as the Lessor shall have furnished to the parties in writing; (c) LESSEE: ARCO Alaska, Inc., Attn: Manager, Land Department, P.O. Box 360, Anchorage, Alaska, 99510, or at such other address as the Lessee shall have furnished to the parties in writing.

35. Interest of Members of Congress or Department: No member of Congress, or agent of the Department of the Interior, shall receive any share of this Lease contract, or any benefit that may arise herefrom. This provision shall not be construed to extend to the general benefits received by the Lessee as a corporation, on behalf of all of its shareholders.

36. Corporate Qualification: ARCO Alaska, Inc. certifies that it is in all respects qualified to enter into and perform this Lease, as attested by BLM files AA-41769 (Anchorage) and F-72867 (Fairbanks). The Lessor has posted oil and gas surety bonds with the Bureau of Indian Affairs ($75,000, numbered 8088-26-31) and the Bureau of Land Management ($150,000, numbered 8088-26-29).

FOR THE LESSOR:

DATED: ______________ By: ______________
Walton I. Ahmaogak

Approved as to form and substance, and with the further assurance that this Agreement and its consequences have been explained to Ahmaogak in a language in which he is fluent:

By: ______________________
David Getches, Attorney-at-Law,
Co-counsel for Ahmaogak

GRAHAM & JAMES

By ______________________
Co-counsel for Ahmaogak

FOR THE LESSEE:

ARCO ALASKA, INC.

DATED: ______________ By ______________________

Its: ______________________

Approved as to form and substance:

______________________
Bruce Frenzel, Esq., its Counsel

FOR THE SECRETARY: The within lease is hereby approved, pursuant to the authority delegated by Departmental Manual Release #1666, 230 DM 10 BIAM 3.1 (6/30/1975)

This Lease Agreement is approved pursuant to 25 C.F.R. §131.5(a), for the uses and purposes stated therein.

U.S. BUREAU OF INDIAN AFFAIRS

DATED: July 12 1982 By ______________________
Area Director

STATE OF ALASKA )
) ss.
THIRD JUDICIAL DISTRICT )

The foregoing instrument was acknowledged before me this 2nd day of July, 1982 by Walton I. Ahmaogak the Lessor.

NOTARY PUBLIC in and for Alaska
My Commission Expires: 11-1-85

STATE OF ALASKA )
) ss.
THIRD JUDICIAL DISTRICT )

The foregoing instrument was acknowledged before me this 2nd day of July, 1982 by Gary L. Downey, the Vice President of ARCO Alaska, Inc., a Delaware corporation, on behalf of the corporation.

NOTARY PUBLIC in and for Alaska
My Commission Expires: 11-1-85

STATE OF ALASKA )
) ss.
THIRD JUDICIAL DISTRICT )

The foregoing instrument was acknowledged before me this 15th day of July, 1982 by Jacob Lestenkof, the Area Director, United States Bureau of Indian Affairs.

NOTARY PUBLIC in and for Alaska
My Commission Expires: 3-12-85

# Exhibit A

## Legal Description

## Lease

Beginning at a Point of Beginning described as a point which is a grid distance of 1104.80 feet and a grid bearing of S12-19-27W from Meander Corner #8 ATS 844 and a grid distance of 933.47 feet and a grid bearing of S23-24-16E from Meander Corner #1 ATS 944, thence due north to a point of curvature of a curve to the right with a radius of 600 feet whose radius point is due east, thence along said curve to the right to the shoreline of the Beaufort Sea, thence along the shoreline as surveyed by BLM in connection with the official survey of Ahmaogak's allotment in a southeasterly direction to a point determined by the intersection of a due north line and the shoreline, thence due south along the due north line to a point due east of the point of beginning, such point to be adjusted by moving the said due north line east or west in order to encompass 24 acres, thence due west to the Point of Beginning.

# ATTACHMENT No. 6

July 14, 1988

Mr. Steven D. Taylor, Manager
Environmental and Regulatory Affairs
Standard Alaska Production Company
P.O. Box 196612
Anchorage, Alaska 99519-6612

Re: 7-507-4 Oenga Surface Lease

Dear Mr. Taylor:

A review of your proposed surface lease from Mr. Andrew Oenga has been completed by Mr. Scott and myself.

We have the following comments:

1. <u>Lease Term:</u>

No lease can be approved for less than fair annual rental, 25 CFR 167.5 (b) (1987) unless it can be shown to be in the best interest of the landowner.

No lease shall provide the lessee a preference right to future leases. 25 CFR 167.5 (e) (1987).

We suggest that this paragraph be reworded to reflect these conditions.

There are other minor changes noted in red ink.

We suggest that the notary acknowledgements be placed below each signatory block.

The authority for the Secretary should read:

FOR THE SECRETARY OF THE INTERIOR

The within lease Agreement is hereby approved this____day of____________, 198____, pursuant to the authority delegated in Departmental Manual Release Number 2764; 230 DM 1-3, March 16, 1988 and redelegated by addendum to 10 BIAM, July 1, 1988.

Superintendent
Fairbanks Agency

We were unable to review this sooner.

Sincerely,

Michael J. Stancampiano
Superintendent

Enclosure

# ATTACHMENT No. 7

7-20

Stu Hirsh - Standard
called:
got letter on lease proposal:
They have 3 options

1. No lease
2. surface use permit - to survey
3. total lease - at FMV

He will recommend course of action to management - and get back -

Dave Scott

# ATTACHMENT No. 8

LAW OFFICES
O'CONNOR, CAVANAGH, ANDERSON, WESTOVER, KILLINGSWORTH & BESHEARS
A PROFESSIONAL ASSOCIATION

JAMES H. O'CONNOR (1922-1976)
HARRY J. CAVANAGH †
JOHN H. WESTOVER †
ROBERT G. BESHEARS †
GERALD L. JACOBS †
THOMAS A. McGUIRE, JR. †
RICHARD J. WOODS †
ARTHUR P. ALLSWORTH †
DONALD L. CROSS †
JOLYON GRANT †
M.E. RAKE, JR. †
RICHARD C. SMITH †
ROBERT S. KANT †
J. VICTOR STOFFA †
DONALD E. DYEKMAN †
REDFIELD T. BAUM †
MICHAEL W. CARNAHAN †
LARRY L. SMITH †
JEFFREY H. VERBIN †
CHARLES J. MUCHMORE †
JOHN B. FURMAN †
HAROLD W. WALES †
CAROL N. CAMPBELL
SCOTT A. SALMON
STEVEN L. LISKER †
SCOTT E. BOEHM
DAVID M. BELL
WILLIAM J. DOWNEY
PAUL J. ROSHKA, JR.
LAURENCE A. McHUGH *
RICHARD H. LORENZEN
JEFFREY D. BUCHANAN
THOMAS C. VOLKMANN
MICHAEL R. PERRY
BURGESS J.W. RABY
GILBERT L. RUDOLPH
ROBERT A. ROYAL
MARK R. HERRIOT
PAMELA H. OVERTON
ALAN A. MEDA
MICHELLE S. MONSEREZ
NICHOLAS J. WALLWORK
RAYMOND S. HEYMAN
DAVID L. LANSKY
CHRISTINA L. SUNDLOF
ANNA OCHOA THORNE
PETER AKMAJIAN
TIMOTHY D. RONAN
THOMAS J. SHORALL, JR.
MICHELLE A. NARDOZZI
BRIAN R. DANDO
ROBERT C. GLESCHER
JAMES L. MARVIN
FELECIA A. ROTELLINI
LUCAS J. NARDUCCI
JANET E. KORNBLATT
JAMES A. DOERING
LEIGH A. KAYLOR
J. MATTHEW DERSTINE
LORI L. HERZOG
SHARON E. REUSS
WILBERT G. ANDERSON †
JOHN H. KILLINGSWORTH †
RALPH E. HUNSAKER †
RALPH E. MAHOWALD †
GEORGE H. MITCHELL †
RICHARD E. MITCHELL †
MAYOR SHANKEN †
JEFFREY B. SMITH †
LAWRENCE H. LIEBERMAN †
HARDING B. CURE †
STEVEN D. SMITH †
K. DAVID LINDNER †
HENRY L. TIMMERMAN †
PHILIP C. GERARD †
FRANZULA M. BACHER †
CALVIN L. RAUP †
CHARLES L. FINE †
MARSHALL W. ANSTANDIG †
DAVID W. EARL †
TED A. SCHMIDT †
CHARLES F. MYERS †
SCOTT A. ROSE
RICHARD B. STAGG
PETER C. GUILD
BRIAN E. KELLEY
JOHN E. DeWULF
GLENN M. FELDMAN
JEAN E. HARRIS
KNOX KIMBERLY
MAX K. BOYER
DANIEL W. PETERS
DAVID L. KURTZ
STEPHEN E. RICHMAN
DAVID A. VAN ENGELHOVEN
PAUL J. GIANCOLA
DEANNA RECKER
NEIL D. BISKIND
GEORGE H. FOSTER, JR.
PAUL C. HILTONBERGER
RICHARD M. WEINROTH
FRANK M. FOX
ROBERT J. LORD **
LISA M. BOMMER
MICHAEL R. ALTAFFER
JAMES D. HOWARD, JR.
JOHN WOODROW
VICKI J. ROSENTHAL
TERESA D. FORST
CATHERINE M. SHOOK **
BRADD S. EASTON
ROBERT J. ITRI
NINA A. ORTEGA
DIANE L. SILVER
LYNNE A. OLIVER
CRAIG D. SWANSON
CHRISTOPHER ROBBINS
MARK W. ARNETT
DIANE DOIDGE
KAREN L. LIEPMANN
TONY J. RUDMAN

† A PROFESSIONAL ASSOCIATION
* ADMITTED IN ILLINOIS ONLY
** ADMITTED IN NEW YORK ONLY

SUITE 1100
ONE EAST CAMELBACK ROAD
PHOENIX, ARIZONA
85012-1656

TELEPHONE (602) 263-2400
TELECOPIER (602) 263-2900
TELEX 165-171 OCC-LAW

SUN CITY OFFICE
WILLIAM W. DON CARLOS †
WILLIAM C. WAHL, JR. †
SUITE B
13250 NORTH DEL WEBB BOULEVARD
SUN CITY, ARIZONA 85351-3053

SCOTTSDALE OFFICE
MICHAEL E. WOOLF †
JACK T. CORNMAN
CAROLYN C. STOCKTON
SUITE 308
4110 NORTH SCOTTSDALE ROAD
SCOTTSDALE, ARIZONA 85251

OF COUNSEL
KENNETH I. TODD

OUR FILE NO.
WRITER'S DIRECT DIAL NUMBER
(602) 263-2452

August 26, 1988

Mr. Steven D. Taylor, Manager
Environmental and Regulatory Affairs
Standard Alaska Production Company
P.O. Box 196612
Anchorage, Alaska 99519

Re: 7-507-4 Oenga Road and Pipeline Right of Way; Niakuk Development Project

Dear Mr. Taylor:

I have been retained by Mr. Andrew Oenga, P.O. Box 201, Barrow, Alaska 99723, to represent him in negotiating a proposed road and pipeline right of way across his native allotment at Heald Point, Prudhoe Bay, Alaska. Please direct all future correspondence for Mr. Oenga regarding this project to me.

I am in the process of gathering information regarding the Niakuk Development Project. I will be in touch with you in the near future to discuss your company's proposed use of Mr. Oenga's allotment in connection with this project.

Sincerely yours,

O'CONNOR, CAVANAGH, ANDERSON,
WESTOVER, KILLINGSWORTH & BESHEARS

Glenn M. Feldman

GMF:rd
cc: Mayor George Ahmaogak
Ronald Brower, President UIC
David Scott, Realty Officer, BIA
Ventis Plume, Chief Appraiser,
Anchorage Area Office

Received
AUG 30 1988
B.I.A.

# ATTACHMENT No. 9

Standard Alaska
Production Company
900 East Benson Boulevard
P.O. Box 196612
Anchorage, Alaska 99519 6612
(907) 561-5111

September 20, 1988

**STANDARD**
ALASKA PRODUCTION

Mr. Glenn M. Feldman
O'Connor, Cavanaugh Et Al
Suite 1100
One East Camelback Road
Phoenix, AZ 85012-1656

7-507-4 Oenga Surface Lease
Niakuk Development Project

Dear Mr. Feldman:

I am following up your conversation this date with Stu Hirsh of my staff concerning commencement of negotiations for our proposed surfact lease on Mr. Andrew Oenga's native allotment.

In order that all parties may be present at the initial negotiating session, we have rescheduled our meeting in Barrow. The meeting will now be held at 1:30 P.M. on Tuesday October 4th in the Borough Assembly Chambers.

To assist you in preparation for the meeting, I am transmitting herewith a copy of our draft lease which has be reviewed by the Bureau of Indian Affairs and a copy of our Niakuk Project Description.

Please direct any questions and/or correspondence regarding this matter to Stu Hirsh at our letterhead address or at 907-564-4841.

Sincerely,

Steven D. Taylor, Manager
Environment & Regulatory Affairs

SDT/SHH 6278W

# ATTACHMENT No. 10

LAW OFFICES

O'CONNOR, CAVANAGH, ANDERSON, WESTOVER, KILLINGSWORTH & BESHEARS

A PROFESSIONAL ASSOCIATION

JAMES H. O'CONNOR (1922-1978)

HARRY J. CAVANAGH †
JOHN H. WESTOVER †
ROBERT G. BESHEARS †
GERALD L. JACOBS †
THOMAS A. McGUIRE, JR. †
RICHARD J. WOODS †
ARTHUR P. ALLSWORTH †
DONALD L. CROSS †
JOLYON GRANT †
M.E. RAKE, JR. †
RICHARD C. SMITH †
ROBERT S. KANT †
J. VICTOR STOFFA †
DONALD E. DYEKMAN †
REDFIELD T. BAUM †
MICHAEL W. CARNAHAN †
LARRY L. SMITH †
JEFFREY H. VERBIN †
CHARLES J. MUCHMORE †
JOHN B. FURMAN †
HAROLD W. WALES †
CAROL N. CAMPBELL
SCOTT A. SALMON
STEVEN L. LISKER †
BRIAN E. KELLEY
SCOTT E. BOEHM
JOHN E. DeWULF
GLENN M. FELDMAN
LAURENCE A. McHUGH
RICHARD M. LORENZEN
JEFFREY D. BUCHANAN
DAVID L. KURTZ
STEPHEN E. RICHMAN
DAVID A. VAN ENGELHOVEN
PAUL J. GIANCOLA
NEIL D. BISKIND
PAUL C. MILTONBERGER
RICHARD M. WEINROTH
FRANK M. FOX
DEANNA RECKER
GEORGE H. FOSTER, JR.
RAYMOND B. HEYMAN
DAVID L. LANSKY
CHRISTINA L. SUNDLOF
ANNA OCHOA THORNE
PETER AKMAJIAN
TIMOTHY D. RONAN
THOMAS J. SHORALL, JR.
MICHELLE A. NARDOZZI
CHRISTINE M. ARDEN *
ROBERT J. ITRI
NINA A. ORTEGA
DIANE L. SILVER
JANET E. KORNBLATT
JAMES A. DOERING
LEIGH A. KAYLOR
DIANE DOIDGE
KAREN L. LIEPMANN
TONY J. RUDMAN
STEVEN M. RUDNER

WILBERT G. ANDERSON †
JOHN H. KILLINGSWORTH †
RALPH E. HUNSAKER †
RALPH E. MAHOWALD †
GEORGE H. MITCHELL †
RICHARD E. MITCHELL †
MAYOR SHANKEN †
JEFFREY B. SMITH †
LAWRENCE H. LIEBERMAN †
HARDING B. CURE †
STEVEN D. SMITH †
K. DAVID LINDNER †
HENRY L. TIMMERMAN †
PHILIP C. GERARD †
FRANZULA M. BACHER †
CALVIN L. RAUP †
CHARLES L. FINE †
MARSHALL W. ANSTANDIG †
DAVID W. EARL †
TED A. SCHMIDT †
CHARLES F. MYERS †
SCOTT A. ROSE
RICHARD B. STAGG
PETER C. GUILD
PAUL J. ROSHKA, JR
DAVID M. BELL
WILLIAM J. DOWNEY
JEAN E. HARRIS
KNOX KIMBERLY
MAX K. BOYER
DANIEL W. PETERS
MICHAEL R. PERRY
BURGESS J.W. RABY
GILBERT L. RUDOLPH †
ROBERT A. ROYAL
PAMELA M. OVERTON
MICHELLE S. MONSEREZ
NICHOLAS J. WALLWORK
BRADLEY J. STEVENS
MARK R. HERRIOT
ALAN A. MEDA
ROBERT J. LORD
LISA M. SOMMER
MICHAEL R. ALTAFFER
JAMES D. HOWARD, JR.
JOHN WOODROW
VICKI J. ROSENTHAL
TERESA D. FORST
CATHERINE M. SHOOK
BRIAN R. DANDO
JAMES L. MARVIN
FELECIA A. ROTELLINI
LUCAS J. NARDUCCI
CRAIG D. SWANSON
CHRISTOPHER ROBBINS
J. MATTHEW DERSTINE
LORI L. HERZOG
SHARON E. REUSS
MICHAEL W. KEMP
GAIL R. LANDE-TRIPP

† A PROFESSIONAL ASSOCIATION
* ADMITTED IN ILLINOIS ONLY

SUITE 1100
ONE EAST CAMELBACK ROAD
PHOENIX, ARIZONA
85012-1656

TELEPHONE (602) 263-2400
TELECOPIER (602) 263-2900

TELEX 165-171 OCC-LAW

SUN CITY OFFICE
WILLIAM W. DON CARLOS †
WILLIAM C. WAHL, JR. †
SUITE B
13250 NORTH DEL WEBB BOULEVARD
SUN CITY, ARIZONA 85351-3053

SCOTTSDALE OFFICE
MICHAEL E. WOOLF †
JACK T. CORNMAN
CAROLYN C. STOCKTON
SUITE 308
4110 NORTH SCOTTSDALE ROAD
SCOTTSDALE, ARIZONA 85251

OF COUNSEL
KENNETH I. TODD

September 26, 1988

OUR FILE NO. 22206-1

WRITER'S DIRECT DIAL NUMBER

(602) 263-2452

John A. Reeder
Senior Counsel
Standard Alaska Production Company
P.O. Box 196612
Anchorage, Alaska 99519

Re: Andrew Oenga

Dear Mr. Reeder:

In a telephone conversation with Andrew Oenga and his grandson, Leroy, on August 26, 1988, I was advised that Mr. Oenga was retaining me to represent him in negotiations concerning the proposed use of his Native Allotment at Heald Point, Prudhoe Bay, Alaska in connection with the Niakuk Project.

However, on September 23, 1988, I received a telephone call from Rex Okakok, who identified himself as an interpreter for Mr. Oenga. Mr. Okakok advised me that Mr. Oenga did not want me acting as his attorney in this matter. I asked Mr. Okakok to confirm this to me in writing. Although I have not yet received any such letter, I see from your correspondence that Mr. Oenga has communicated this view directly to you.

LAW OFFICES
O'CONNOR, CAVANAGH, ANDERSON, WESTOVER, KILLINGSWORTH & BESHEARS
A PROFESSIONAL ASSOCIATION

John A. Reeder
September 26, 1988
Page Two

As a result, contrary to my letter of August 26, 1988, I will not be representing Andrew Oenga in this matter. I regret any inconvenience that may have been caused by this confusion.

Sincerely yours,

O'CONNOR, CAVANAGH, ANDERSON,
WESTOVER, KILLINGSWORTH & BESHEARS

Glenn M. Feldman

GMF:rd

cc: Andrew Oenga
Mayor George Ahmaogak
Ronald Brower, President UIC
David Scott, Realty Officer, BIA
Ventis Plume, Chief Appraiser,
Anchorage Area Office
Steven D. Taylor, Standard Alaska

Fairbanks
Received
SEP 29 1988
B.I.A.
Agency

# ATTACHMENT No. 11

ED STATES GOVERNMENT

# memorandum

DATE: September 27, 1988

REPLY TO ATTN OF: Kathleen Dickinson, Realty Specialist KD

SUBJECT: Lease of Andrew Oenga's Allotment at Heald Pt.

TO: Dave Scott, Realty Officer

I met with Andrew Oenga, Rex Okakok, LeRoy Oenga, Georgejean Shugluk, Terry Obeney, Stu Hirsch and Connie Baily on 9-26-88 to discuss Standard Alaska Production Company's proposed lease of Andrew Oenga's Native Allotment F-14632 parcel B at Heald Pt., Alaska.

Rex Okakok acting as Mr. Oenga's interpreter asked for a background of the project. Mr. Obeney briefly explained the proposed Niakuk project and stated that although it was unclear whether they would be able to obtain all the necessary permits due to environmental concerns, they wanted to secure this lease with Mr. Oenga on a year to year basis until either the permits are secured or they scrap the project. They are cautiously optimistic about securing the permits by late this year.

An aerial photo was exhibited along with an illustration of the proposed route of the road on the parcel. Mr. Oenga's grandson LeRoy asked why they weren't leasing the whole 40 acres since there wouldn't be much use for the leftover portion. Mr. Obeney responded that they did not want to lease any more than they needed which at this point is estimated at a minimum of 10 acres and a maximum of 20 acres. I also expressed my concern regarding the value of the remainder and stated that I had requested our appraiser to address this issue, but I pointed out that without a definite location and amount of acreage it would be difficult to do this.

We spent a considerable amount of time discussing the appraisal, the appraisal technique and how the comps were arrived at. I pointed out that although our appraiser had reviewed the appraisal performed by the Appraisal Company of Alaska and agreed with the process and the appraisal's conclusions, he felt the yearly fee for a lease of 10 acres should be \$15,000 - \$18,000 per year. I also said that \$15,000 is the least they should accept and that it was just a guide for them.

Mr. Oenga appeared to understand the basis for the figures arrived at in the appraisal. However, neither he nor Rex Okakok had seen the proposed lease nor the appraisal prior to this meeting which put them at a disadvantage. I suggested we go through the main provisions of the lease as I had a few questions and to make sure the important points were covered.

Sec. 1 Lease Term. Mr. Oenga agreed to the year to year basis until the permits are secured at which time the lease is locked in at 5 year intervals. The option to extend was acceptable to him.

OPTIONAL FORM NO. 10
(REV. 1-80)
GSA FPMR (41 CFR) 101-11.6
5010-114
★U.S.GPO:1987-0-181-247/40255

Sec. 3 Lease Rentals. We did not negotiate the yearly rental at this point. Mr. Oenga agreed that the payments would be placed in an IIM account and then disbursed to him.

Sec. 8 Reappraisal Procedures. This was briefly discussed but should be clarified that the reappraisal will not include the value of the improvements.

Sec. 10 Improvements. Mr. Obeney said that at this point they are only proposing to construct the road and pipeline on the parcel. They may need to put a staging area for the actual construction on the parcel. Stu Hirsh said that the 20 acres at the top of page 5 should be 10 acres. He said that 10 acres would be the minimum required, they may increase the leased area to 20 acres and adjust payments accordingly. We discussed the removal of improvements at the end of the lease term. Mr. Obeney said that Standard is bound by the federal and state regulatory agencies' requirements on what could be removed without damaging the environment/premises but felt that all buildings and pipelines would be removed though the gravel would in all probability have to remain. Mr. Okakok said that is generally what the NSB does.

I requested that a statement regarding Standard's responsibility for a cleanup of hazardous wastes be included. Mr. Oenga said that this was also one of his concerns. Stu Hirsh said that the regulatory agencies require that they take all cleanup responsibility but they would include a statement to this effect in the lease.

Sec. 16, 17 Insurance and Indemnification. I explained to Mr. Oenga that Standard was insured for liability, claims, damages, etc., so he was protected in that regard.

Sec. 23 Eminent Domain. I requested that under the eminent domain section, last sentence, pro rata share "of the remaining term of the lease" be inserted as a condemnation during the last 10 years of a 50 year lease would then substantially reduce Standard's award.

Rex Okakok requested that he and Mr. Oenga be given time to study the lease and the appraisal prior to discussing the payment.

I asked Mr. Oenga if there was an area of his allotment which they should avoid and where he would like the road to go. He said the fishing and caribou hunting was very good there which brought out the point that once this was leased there would be a restriction against hunting on the allotment. Mr. Oenga agreed to this. But Mr. Oenga said that he would prefer they stay on the east side of the allotment. He further gave his permission for Standard to go onto the allotment to determine the best route to take. Mr. Obeney said that until an archeological survey of the area had been performed they could not propose a definite route. Mr. Okakok said the NSB may have done a archeological survey of the area. I related what our archeologist had said - a survey was done in 1983 but there was no record.

The meeting was wrapped up with Mr. Okakok promising to review the lease and discuss it with Mr. Oenga on Thursday the 29th and then contact me with proposed changes.

I requested a brief meeting with Mr. Okakok, Mr. Oenga and his family after the Standard Alaska Production Company representatives left. I told them that although the allotment had been approved BLM had patented a portion of it to the state who had been requested to reconvey it. I suggested that until that happened approximately 40% of the money received should be placed in an escrow account. They were agreeable to that.

We discussed the lease payment and I said it was up to them to decide but I would suggest they ask for more than was offered and also to consider asking for an up front "good faith" payment but not to get too outrageous. They said they would discuss it and let me know on Friday the 30th.

# ATTACHMENT No. 12

# REPORT OF INVESTIGATION

FOR A

**LEASE**

OF

NATIVE ALLOTMENT FF014632 PARCEL B

BELONGING TO ANDREW OENGA

INVESTIGATED BY

Kathleen F. Dickinson 1/17/89
Realty Specialist Date

REVIEWED BY

David O. Scott, Jr. 1-17-89
Realty Officer Date

APPROVED BY

Michael U. Stancampiano 1/20/89
Superintendent Date

# CERTIFICATION OF INVESTIGATION

I, Kathleen F. Dickinson, hereby certify the following to be true and accurate to the best of my knowledge and belief.

1. That I conducted the investigation hereinafter described.
2. That I prepared the hereinafter report of said investigation from my observations, field notes and conversations during the investigation.
3. That the hereinafter contained information is an accurate report of said investigation and findings.
4. That I believe my conclusions and recommendations to be valid for the reasons I stated in said report.

Certified to this 17th day of Jan, 1989.

By Kathleen F. Dickinson
Kathleen F. Dickinson
Realty Specialist
BIA, Fairbanks Agency

Authority

Pursuant to 5 USC 301, R.S. 463 and 465, 25 USC 2 and 9, an allottee may lease his restricted land, with the approval of the Secretary or his delegated representative.

Purpose

The purpose of this lease is allow Standard Alaska Production Company (Standard) to build a road and pipeline on a portion of the subject allotment connecting a causeway to the drilling pad at Niakuk Island.

Background

Andrew Oenga applied for a Native Allotment on November 23, 1971 for two parcels. The subject of this report is parcel B. The Native Allotment application was approved on April 1, 1976, under the 1906 Act, for the following described lands:

T11N, R15E, Sec. 1, UM and
T12N, R15E, Sec. 36, UM
containing 40 acres.

When Mr. Oenga's parcel was surveyed in 1985 as U.S. Survey 6904, BLM discovered that they had conveyed a portion (16.85 acres) of Mr. Oenga's allotment to the State of Alaska on March 27, 1974. There is currently an oil and gas lease between the State and Standard Alaska Production Company for that portion.

On September 25, 1987 BLM requested the State to reconvey the land within US Survey 6904 as they had determined that Mr. Oenga had a superior interest in the land. The State responded on October 21, 1987 that until they received a copy of the approved ASLS survey they could not process the reconveyance of the allotment. The ASLS survey is currently being prepared by BLM.

Findings

Our office was contacted by Stu Hirsh of Standard Alaska Production Company requesting information on how to obtain a lease and/or a right-of-way across a Native Allotment. Standard had obtained an appraisal of the subject property in January of 1988 which they forwarded to our office for review. The appraisal was sent to the Area Appraiser for review.

Standard submitted a draft lease (based on the Walton Ahmaogak Lease at West Dock) to our office on June 27, 1988. After review, several changes were suggested which were complied with by Standard.

On September 26, 1988 I met with Andrew Oenga, Rex Okakok, LeRoy Oenga, Georjean Shugluk, Terry Obeney, Stu Hirsh and Cindy Bailey; (the last 3 are Standard employees), to discuss the terms of the lease. Please see the attached memo dated September 27, 1988 for discussion of terms.

On October 19, 1988 I was contacted by Stu Hirsch of Standard who advised me that their application for a permit to build a causeway to Niakuk Islands had been rejected by the Corps of Engineers and the lease with Mr. Oenga would be placed on hold. I advised Mr. Okakok and Mr. Oenga of this.

On November 15, 1988 Mr. Hirsh called me and said Standard wants to go ahead with the lease of Mr. Oenga's allotment. I thereafter contacted Mr. Okakok who said that Mr. Oenga was agreeable to the terms of the lease with the previously discussed changes. They had decided that they would agree to the $1,600/acre/year if Standard would give Mr. Oenga an upfront payment of $25,000.

Standard agreed to these terms and forwarded a revised lease to us for review. I sent the lease to Roger Hudson of the Solicitor's Office for comment. Mr. Hudson made several recommendations of which the most important was that in Section 5, Lease Rental Adjustments, we consider using the CPI rather than the appraisal provision. I took this a step farther and included both methods, using whichever method gave the highest adjustment. Standard agreed to these suggestions.

Stu Hirsh and I had considerable discussion of what to do about the portion of Mr. Oenga's allotment which had been conveyed to the State. We first considered putting a portion of the lease payment in escrow until the certificate of allotment is issued. However, since Standard already has an oil and gas lease with the State which covers their proposed activity, if Mr. Oenga leased them his present and future interest in the land he could get the full payment now. Standard agreed to this and the revised lease was sent back through their legal department.

On January 11, 1989 I received the final draft of the lease which I forwarded to Rex Okakok for review and discussion with Mr. Oenga. A meeting was scheduled for January 19, 1989 in Barrow with Standard and Mr. Oenga to sign the lease.

ATTACHMENTS

Lease

Land Status Report

4/1/76 Approval Letter from BLM

US Survey 6904

9/27/88 Memo on meeting between Mr. Oenga, his representatives and Standard Alaska Production Company

Appraisal

Appraisal Review

Archeological Clearance

FONSI

IN REPLY REFER TO:

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
101 12th Avenue, Box 16
Fairbanks, Alaska 99701

This is to certify that the attached Lease
between Andrew Oenga and Standard Alaska Prod. Co.
for a portion of parcel B, FF014632
is in conformity with existing laws and regulations,
and all realty records checked as to description,
ownership and proper identification of grantor/grantee
and conformity extends to and includes all supporting
documents and other material as may be specified and
required in the Code of Federal Regulations.

David O. Scott, Jr.
Realty Officer

Approved: 1/20/87
Date

[signature]
Superintendent

BUREAU OF INDIAN AFFAIRS
FAIRBANKS AGENCY

LAND STATUS REPORT

NATIVE ALLOTMENT # FF014632 PARCEL B

Pursuant to the Act of May 17, 1906, (34 Stat. 954) as amended August 2, 1956, (70 Stat. 954) Andrew Oenga has applied for Native Allotment which was field examined on August 1974 and a favorable field report was completed on 1/28/75. The Native allotment application was approved on April 1, 1976 for the following described lands:

Umiat Meridian, Alaska

Township 11N Range 15E and T 12N R15E

Section 1 Sect. 36

Containing 40 acres.

1. There are (no) transactions affecting acreage or probates of record affecting ownership since issuance of the above approval.

2. There is (no) record of indebtedness to the United States against the land or the owner. None

3. As of this date, ownership of the land described above remains restricted as follows: Andrew Oenga

4. Exceptions or reservations for easements: None

I hereby certify that the foregoing data is complete and accurate according to the official records of the Bureau of Indian Affairs, Fairbanks Agency Real Estate Services

1-17-89
Date

David Q. Scott
Realty Officer, Fairbanks Agency

# ATTACHMENT No. 13

BOOK 0053 PAGE 873

U.S. Department of the Interior
Bureau of Indian Affairs

LEASE AGREEMENT

BIA Lease No. F-89-01

THIS Lease Agreement is made and entered into effective January 1, 1989, by and between Andrew Oenga, an Alaska Native, of Barrow, Alaska [with the approval of the Secretary of the Department of the Interior (the "Secretary") or his duly authorized representative, acting for, and on behalf of Mr. Oenga] hereinafter referred to as the "Lessor"; and Standard Alaska Production Company, a Delaware corporation, its agents, assigns, contractors, subcontractors and/or sublessees, hereinafter called "Lessee", in accordance with the provisions of existing law and regulations at [25 CFR 162 (1987)] which by reference are made a part hereof.

WITNESSETH, that for and in consideration of the mutual covenants and agreements provided herein, the Lessor hereby leases to the Lessee ten (10) acres of land, the "leased premises", which comprises a portion of Lessor's present and future interests in Parcel B of Alaska Native Allotment application F-14632. Said allotment is described as U.S. Survey 6904 T11N, R15E UM Sec. 1 and T12N, R15E UM Sec. 36. The remainder of the Native Allotment constitutes the "unleased premises". The allotment and leased premises are shown on the attached Exhibit A.

1. Lease Term: The term of this Lease Agreement shall be for twenty-five (25) years beginning on January 1, 1989, and expiring at midnight on December 31, 2014, unless extended or unless sooner terminated pursuant to the terms of this Lease Agreement. The anniversary date of this Lease Agreement is January 1st of each year following the year in which this Lease Agreement was executed.

The first ten years of the lease term shall constitute a period within which the Lessee shall attempt to obtain required permits for the Niakuk Project.

During this period, unless written notice to procede has been served, Lessee has the option to cancel this Lease Agreement at any time. If Lessee cancels this Lease Agreement, Lessee shall provide written notice of such cancellation to the Lessor and the Superintendent, Bureau of Indian Affairs in Fairbanks, Alaska not less than ninety (90) days prior to any anniversary date of this Lease Agreement. Cancellation of this Lease Agreement shall not be effective unless the written notice required herein is timely received.

Also during the initial ten (10) year period, Lessee must notify the Lessor and the Superintendent, Bureau of Indian Affairs in Fairbanks, Alaska of the status of the permitting process and/or of the Niakuk Project. Such notice shall be given at the time the annual rental payments are made and at any other time that, in the opinion of the Lessee, such notice is either warranted and/or appropriate; provided however, that such notice is required within ninety (90) days of the date the Niakuk Project is either fully permitted or the project is cancelled or delayed.

If Lessee serves written notice that it intends to procede with the Niakuk Project, then this lease will be deemed to have been taken for consecutive five (5) year periods and provisions of Section 15 shall become operative and effective on the next ensuing anniversary date of this Lease Agreement. If the final period is less than five (5) years, Lessee shall only be obligated for rental payments up to the expiration date of this Lease Agreement or any extension thereof.

At the end of this initial ten (10) year period, provisions of Section 15 automatically become effective and operative.

2. <u>Option to Extend</u>: The Lessee shall have the option, at its sole discretion, to extend the term of this Lease Agreement for additional five (5) year periods up to a maximum of twenty-five (25) years at the end of the original lease term. Notification of the exercise of this option shall be made in writing, not less than ninety (90) days prior to the original expiration date of this Lease Agreement.

3. <u>Lease Bonus</u>: As a bonus for executing this Lease Agreement, Lessee hereby agrees to pay Lessor the sum of twenty-five thousand dollars.

The bonus shall be paid upon approval of this Lease Agreement by the Superintendant, Bureau of Indian Affairs Fairbanks Agency.

4. Lease Rentals: As rental for the leased premises, the Lessee agrees to pay the U.S.D.I. - Bureau of Indian Affairs for Andrew Oenga, c/o Bureau of Indian Affairs, 101 12th Avenue Box 16, Fairbanks, Alaska 99701 for credit to the Lessors Indian Individual Money Account (account #985-U183) the sum of $16,000 per year ($1,600.00/acre X 10 acres) for each of the first five (5) years of the Lease Agreement. Lessee shall not be obligated to change either the designated payee or depository unless notified in writing, pursuant to section 31 below, at least sixty (60) days prior to the anniversary date of this Lease Agreement. Lease rental payments are due on the anniversary date of the lease and are payable in advance for the next succeeding year.

In the event of the death of the Lessor during the term of this Lease Agreement, and while the leased premises are in restricted status, all rentals remaining due or payable to the decedent or his representative under the provisions of the Lease shall be paid to the Superintendent, Bureau of Indian Affairs, 101 12th Avenue Box 16, Fairbanks, Alaska 99701 for credit to the Lessors Indian Individual Money Account. (For the purposes of this Lease Agreement, it is understood that restricted status is defined as a land status where lands are restricted or held for the benefit of Indians and are not subject to taxation; nor to alienation or encumbrances, and/or encroachment without the consent of the Secretary of Interior or his delegated representative.) While the leased premises are in restricted status, the Secretary may, in his discretion, suspend the direct rental payment provisions of this Lease, in which event the rentals shall be paid to the Superintendent, Bureau of Indian Affairs, Fairbanks, Alaska for credit to the account of this Lease Agreement.

5. Lease Rental Adjustments: Rental payments may be increased at successive five-year intervals beginning in the sixth year after rental payments have begun. Such adjustments will be based upon either the fair market undeveloped rental value for the property established by a Bureau of Indian Affairs appraisal (see section 9, Reappraisal Procedures) or the

adjustment will be based on the application of a "Cost Adjustment Factor"; which ever is greater. For the purposes of this Lease Agreement, "Cost Adjustment Factor" shall mean the ratio of (i) the most recently published Consumer Price Index to (ii) the most recently published Consumer Price Index as of the execution date of this Lease Agreement. The Consumer Price Index shall mean the U.S. Consumer Price Index, all items and all urban consumers, U.S. city average, 1982-84 equals 100, as first published, without seasonal adjustment, by the Bureau of Labor Statistics, Department of Labor, without regard to subsequent revisions or corrections by such Bureau. For the second and subsequent rental adjustments, the "Cost Adjustment Factor" shall mean the ratio of (i) the most recently published Consumer Price Index to (ii) the difference between the most recently published Consumer Price Index and the Consumer Price Index upon which the previous rental adjustment was or would have been based. Should this index be changed, altered, or ceased to be published the following will apply: a) if subject index is changed so that the base year differs from that used as of the year in which the term commences, the subject index shall be converted in accordance with the conversion factor published by the publisher of that index; b) if the subject index is discontinued or revised during the term of this agreement such index shall be replaced by another government index which will obtain substantially the same results as would be obtained if the subject index had not been discontinued or revised. It is agreed and understood by all parties that the rental payments will not escalate by more than 50% in any single five (5) year period.

6. Delinquent Rental Payment: Any payment received after the fifteenth (15th) day subsequent to the anniversary date of each year during the lease term shall be considered delinquent and a late fee of $250.00 will be assessed.

7. Interest on Rentals Past Due: If any rental payment is not paid within thirty (30) days after becoming due, interest at the rate of eighteen (18) percent per annum, compounded annually, will become due and payable from the day such rental was due, and will run until the delinquent rental is paid.

8. Default and Remedies: If the Lessee should fail to perform or to comply with any term or condition of this Lease Agreement, the Lessor,

after written notice giving Lessor a ten (10) day period within which to respond, may pursue his rights to re-enter, re-let, evict, terminate the Lease Agreement or recover rents or any other remedy he has under law. Lessee shall be given a reasonable time to cure such default or breach. Such a violation of the Lease Agreement shall also be acted upon in accordance with the regulation at 25 CFR 162.14 (1987), so long as title to the leased premises remains restricted by the Secretary.

9. Reappraisal Procedures: Neither the Secretary nor any appraiser may consider the rentals provided for in this Lease Agreement for any purpose in determining the fair market rental rate pursuant to Paragraph 3 of this Lease Agreement. The Bureau of Indian Affairs review for purposes of establishing the fair rental value of the premises shall be based on the highest and best use of the premises as raw, unimproved vacant land at the time of the appraisal and shall not be based on the cost or value of improvements or developments made by the Lessee or any income the Lessee derives from the leased premises.

In all cases, Lessee shall be a proper party with standing to contest the reasonableness of the Secretary's rental determination.

If, during the term of this Lease Agreement, Lessor receives unrestricted title to the premises, the functions assigned to the Secretary hereunder shall be performed by a designated appraiser mutually acceptable to the parties, with the costs of such appraisal to be borne equally by the parties.

10. Use of Leased/Unleased Premises: The Lessee may use the leased premises for any and all oil field exploration, development, construction, facilities, production and support purposes, and for any other uses and purposes reasonably or conveniently related thereto. The unleased premises may be used for geotechnical, survey and design work at any time prior to commencement of construction activities. Said uses shall be without cost to lessee and will not require separate or additional permits from the Lessor. The Lessee shall make no unlawful uses of the leased and/or unleased premises, or knowingly permit any unlawful activity to be conducted thereon by others.

11. Improvements: The Lessee may construct any facilities (pipelines, access roads, causeway approaches, drilling pads, a construction staging pads or any other required facilities) on the leased premises as long as construction is limited to the ten (10) acres as herein described on Exhibit A. This Lease Agreement may be amended to increase or decrease the size of the leased premises at any time at Lessee's sole discretion. If the leased premises is so increased or decreased, Lessee shall proportionately increase or decrease its lease rental payments effective on the next ensuing lease anniversary date after such increase or decrease; provided however that rental amounts shall be pro rated beginning on the date that leased premises is increased or decreased. It is agreed and understood by all parties that the leased premises cannot be reduced to less than the ten (10.0) acres originally taken under this Lease Agreement. All improvements placed on the leased premises by the Lessee shall remain the property of the Lessee during the term of this Lease Agreement and any extension thereof, and shall become the property of the Lessor at the final expiration of this Lease Agreement or any extension thereof. Prior to the expiration or termination of this Lease Agreement, Lessee may remove any improvement, provided that Lessee restore the leased premises to a condition satisfactory to the Secretary and the regulatory agencies with jurisdiction over this project. The Lessee shall not remove permanent improvements such as gravel pads, utilities and permanent structures that regulatory agencies determine cannot be removed without substantial damage to either the structure(s) or the leased premises.

12. Maintenance of Leased Premises: The Lessee, at its sole expense, shall keep the leased premises, and any improvements placed thereon, in good order and repair, ordinary wear and tear excepted.

13. Sublease: Lessee may sublease all or portions of the leased premises to others, as it may see fit, for uses permitted under this Lease Agreement; provided, however, that the Lessee shall remain primarily responsible to the Lessor for the payment of annual rentals when due, and for the observance of all terms and conditions of this Lease Agreement.

14. Surrender at End of Term: The Lessee agrees that upon the last day of the Lease term, or upon the last day of any extension thereof, it will

peaceably and quietly vacate and surrender the leased premises to the Lessor, free and clear of any hazardous waste and/or material and in a condition satisfactory to the Secretary and the regulatory agencies with jurisdiction over this project. The Lessee agrees that it will in a similar manner vacate and surrender in good condition any improvements remaining on the premises, ordinary wear and tear excepted. The Lessee makes no warranty of fitness for a particular purpose or warranty of merchantability for any improvements left on the leased premises.

15. Option to Cancel: Lessee may, for any reason, cancel this Lease Agreement at the end of each five (5) year period during the Lease Agreement term or any extension thereof. Such cancellation will be effective upon written notice to the Lessor and the Superintendent, Bureau of Indian Affairs in Fairbanks, Alaska not less than ninety (90) days prior to the end of each five (5) year period.

16. Termination for Acts of God: The Lessee shall have the right to cancel this Lease Agreement, and all of its obligations hereunder, after serving written notice consistent with other cancellation provisions in the Lease Agreement, one year after an event constituting an act of god. As used in this Lease Agreement, an act of god means the prevention of Lessee from complying with any expressed or implied covenant of this Lease Agreement after efforts made in good faith, by reason of war, riots, acts of God, severe weather, acts of governmental authorities, failure or lack of adequate transportation facilities, or any other cause beyond Lessee's reasonable control whether similar to those enumerated or not.

17. Insurance: The Lessee hereby certifies that it is self-insured for any liability incurred under this Lease Agreement for an amount up to $5 million. The Lessor shall receive the benefit of such self-insurance in the same fashion as if he were co-insured. If self-insurance shall cease, the Lessee shall furnish the Lessor with certificates of insurance in an equivalent amount.

18. Indemnification of the Lessor: The Lessee shall protect, indemnify, and save the Lessor harmless against any and all liabilities,

claims, damages, penalties, litigation, or costs and expenses related thereto (including, without limitation, reasonable attorney's fees) which may be imposed upon, incurred by, or asserted against the Lessor by reason of (a) any accident or injury to, or death of any person, or loss or damage to any personal or real property occurring on the leased premises, or any part thereof; (b) any use, non-use or condition of the leased premises, or any part thereof; (c) any failure on the part of Lessee to perform, forebear, or otherwise comply with any of the terms of this Lease Agreement; (d) performance of any labor, services, or the furnishing of any materials with respect to the leased premises, or any part thereof. If any lawsuit or administrative proceeding is brought against the Lessor by reason of any such occurrence, the Lessee shall, upon the Lessor's request, defend the suit or proceeding, or cause the same to be defended by counsel designated by the Lessee. Notice of such a proceeding shall be given by the Lessor to the Lessee as soon as practicable, and in no event later than ten (10) days after the Lessor has received notice of such a proceeding.

19. <u>No Claims Against Lessor</u>: Nothing contained in this Lease Agreement shall comprise the consent or request by the Lessor, whether expressed or implied, for the performance of any labor or services, or the furnishing of materials or other property, with respect to the leased premises or any part thereof; nor shall it give the Lessee any right, power, or authority to contract for or permit the performance of any labor or services, or the furnishing of any materials or other property, in any manner which would permit the making of a valid claim for payment against the Lessor.

20. <u>Condition of the Leased Premises</u>: The Lessee agrees that it is entirely familiar with the physical condition of the leased premises. The Lessor makes no representation or warranty with respect to the condition of the leased premises, nor with respect to its fitness or availability for any particular use or purpose. The Lessor shall not be liable for any latent or patent defect in the leased premises.

21. <u>Approval</u>: It is understood and agreed between the Lessor and the Lessee that this Lease Agreement, and any subsequent amendment or extension thereto, shall be valid and binding only after approval by the

Secretary or his authorized delegate pursuant to 25 CFR 162 (1987), except as may be provided in paragraph 26 herein.

22. Relinquishment of Restricted Title by the Secretary: Nothing contained in this Lease Agreement shall delay or prevent a termination of federal trust responsibilities with respect to the leased premises, by issuance of a fee patent or otherwise during the term of this Lease Agreement or any extension thereof. Termination of such responsibilities shall not act to abrogate the Lease Agreement. The Secretary shall notify the Lessor and the Lessee of any such change in the legal status of title to the leased premises. If a certificate of competency removing restrictions against alienation or encumbrance is issued by the Secretary to the Lessor, it shall be promptly recorded by the Lessor, and thereafter all references in this Lease Agreement to the powers, duties, or discretion of the Secretary regarding this Lease Agreement, or any extension thereof, shall have no further applicability or effect.

23. Taxes and Assessments: The Lessee shall be responsible for, and shall timely pay, all lawful federal, state, borough or local taxes, fees, or assessments (including any interest and penalties thereon) which during the term of this Lease Agreement are assessed, levied, imposed upon, or become a lien upon the leased premises or any interest therein, or upon any alteration, addition, or improvement thereto, or upon personal property of any kind owned by and placed upon the leased premises by the Lessee, or upon any occupancy, use or possession of the leased premises or any part thereof, before any fine, penalty, interest, or cost becomes applicable. Lessor shall promptly provide to the Lessee all notices of levy, taxation, assessment or lien which Lessor receives with respect to the leased premises, and the Lessee shall have full authority to contest or seek adjustment of any such tax or assessment, by appropriate administrative or judicial proceedings. The Lessee shall not be obligated to pay any such taxes, fees or assessments which it is contesting in good faith, until the final adjudication of such dispute. It shall take reasonable action, however, to assure that Lessor's interest in the premises is not prejudiced by such contest.

24. Eminent Domain: If the leased premises, or any part thereof, is condemned or taken by eminent domain for any lawful use or purpose, then as

to the portion so taken, the term of this Lease Agreement shall terminate as of the date of title vesting in such proceeding, all rentals then due shall be paid to that date, and the parties shall thereafter have no claim against each other for the value of the unexpired term of the Lease Agreement as to that portion. In the event of any such condemnation or taking, whether whole or partial, the Lessee shall be entitled to a pro rata share of the award paid for such condemnation, based upon the proportion of the award attributable to the value of any improvements placed upon the leased premises by the Lessee.

25. Inspection: The Secretary, the Lessor, and their authorized representatives may enter the leased premises or any part thereof at all reasonable times and subject to reasonable conditions, including but not limited to, reasonable notice to Lessee, for the purposes of inspecting the premises, except that the Secretary and his authorized representatives may inspect as authorized by law or to exercise any other right of Lessor provided in this Lease.

26. Right of Access: The Lessor retains a right of reasonable access across the leased premises. Such access shall not conflict with the purposes of this Lease Agreement or the uses and improvements authorized hereunder. For purposes of such access, the Lessor shall be entitled to use the access road constructed by Lessee pursuant to this Lease Agreement, subject to compliance with Prudhoe Bay Unit security procedures.

27. Entire Agreement: This Lease Agreement, together with any exhibits attached hereto, comprises the entire agreement and sets forth all prior covenants, promises, agreements, conditions, and understandings, whether oral or written, between the Lessor and the Lessee and concerning the leased premises. No subsequent agreement, condition or understanding, whether oral or written, which is not set forth in this Lease Agreement, or in any duly-approved written amendment thereto, shall be enforceable unless it is reduced to writing and signed by all the parties to this Lease Agreement.

28. Lease Amendment and Interpretation: If any provision of this Lease Agreement, or the application thereof, is invalid or unenforceable, the remainder of this Lease Agreement and other applications of such provisions

shall not be affected by it, unless otherwise specifically provided herein. This Lease Agreement may be changed, waived, discharged, or terminated only by a document in writing signed by the party against whom enforcement of such change, waiver, discharge, or termination is sought. The paragraph headings in this Lease Agreement are for purposes of reference only, and shall not limit or define the meaning of such paragraphs. This Lease Agreement may be executed in several counterparts, each of which is an original, but all of which shall constitute one instrument.

29. Waivers: The waiver of any breach or default of any covenant, condition or stipulation contained herein shall not be deemed to cause a waiver of any subsequent breach or default of the same or any other covenant, condition or stipulation, nor shall any failure to enforce any right or seek any remedy with respect to any obligation under this Lease Agreement prejudice or affect the future rights or remedies of the parties.

30. Successors in Interest: Each term, covenant, and condition contained in this Lease shall be binding upon and shall inure to the benefit of the heirs, executors, administrators, successors, and assigns of the parties hereto. So long as title to the leased premises is in a restricted status, all of the Lessee's obligations under this Lease Agreement shall run to the United States as well as to the Lessor.

31. Notices: All notices and other communications required or convenient under this Lease Agreement shall be in writing, and shall be deemed to have been given when mailed by first class certified mail, postage prepaid thereon, and addressed as follows: (a) Superintendent, Bureau of Indian Affairs, 101 12th Ave. Box 16, Fairbanks, Alaska 99701, or at such other address as the Secretary shall have furnished to the parties in writing; (b) LESSOR: Mr. Andrew Oenga, P.O. Box 201, Barrow, Alaska 99723, or at such other address as the Lessor shall have furnished to the parties in writing; and (c) Standard Alaska Production Company, Attn: Land Manager, P.O. Box 196612, Anchorage, Alaska 99519-6612, or at such other address as the Lessee shall have furnished to the parties in writing. Notices to Lessee regarding any changes of rental recipient (payee) and/or depository shall not be binding upon Lessee unless said notice is received at least sixty (60) days prior to the Lease Agreement anniversary date.

32. <u>Interest of Members of Congress or Department</u>: No member of Congress, or agent of the Department of the Interior, shall receive any share of this Lease Agreement, or any benefit that may arise herefrom. This provision shall not be construed to extend to the general benefits received by the Lessee as a corporation, on behalf of all of its shareholders.

33. <u>Corporate Qualification</u>: Standard Alaska Production Company certifies that it is in all respects qualified to enter into and perform this Lease Agreement, as attested by Bureau of Land Management qualification file 063890 and State of Alaska qualification file ADL QF-1768. The Lessor has the following current bonds on file: Alaska Oil and Gas Conservation Commission Bond 2S100302630-277 ($200,000), Alaska Statewide Oil and Gas Bond 2S100302630-295 ($500,000) and Alaska Statewide Miscellaneous Land Use Bond 64S10052736BCA ($1,000,000).

FOR THE LESSOR:

DATED: Jan. 17, 1989    By: Andrew Oenga
Andrew Oenga

Approved as to form and substance, and with the further assurance that this Agreement and its consequences have been explained to Andrew Oenga in a language in which he is fluent:

By: Rex A. Okakok

STATE OF ALASKA )
) ss.
SECOND JUDICIAL DISTRICT )

The foregoing instrument was acknowledged before me this 17th day of January, 1989 by Andrew Oenga the Lessor.

KATHLEEN F. DICKINSON NOTARY PUBLIC STATE OF ALASKA

NOTARY PUBLIC in and for Alaska
My Commission Expires: 1/27/92

AFFIDAVIT OF INTERPRETER

I, Rex A. Okakok, of lawful age, being first duly sworn state the following: I interpreted this Lease Agreement for Andrew Oenga in the language in which he is fluent (Inupiaq) on JAN 19, 1989: and I performed a true translation of this Lease Agreement; and that Mr. Oenga stated that he executed this Lease Agreement of his own free will and was not acting under duress, menace, fraud or undue influence of any person; and that Mr. Oenga declared that he fully understood this Lease Agreement.

Rex A. Okakok

STATE OF ALASKA )
) ss.
SECOND JUDICIAL DISTRICT )

The foregoing instrument was sworn to and executed before me this 19th day of January 1989, by Rex A. Okakok.

[signature]
Notary Public

My Commission Expires 1/27/92

KATHLEEN F. DICKINSON
NOTARY PUBLIC
STATE OF ALASKA

FOR THE LESSEE:

Standard Alaska Production Company

DATED:__________________ By:__________________

Its:__________________

Approved as to form and substance:

__________________

John A. Reeder, Senior Attorney

STATE OF ALASKA )
) ss.
THIRD JUDICIAL DISTRICT )

The foregoing instrument was acknowledged before me this 16th day of January, 1989 by G.N. NELSON, the PRESIDENT of Standard Alaska Production Company, a Delaware corporation, on behalf of the corporation.

Loretta M. Togade
NOTARY PUBLIC in and for Alaska
My Commission Expires: 8/8/89

NOTARY PUBLIC

FOR THE SECRETARY OF THE INTERIOR: The within Lease Agreement is hereby approved, this 20 day of January, 1989, pursuant to the authority delegated in Departmental Manual Release Number 2784; 230 DM 1-3, March 16, 1988 and redelegated by addendum to 10 BIAM, July 1, 1988.

DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS

DATED: 1/20/89

By [signature]
Superintendent
Fairbanks Agency

STATE OF ALASKA )
) ss.
FOURTH JUDICIAL DISTRICT )

The foregoing instrument was acknowledged before me this 20th day of January, 1989 by M.J. Stancampiano, the Fairbanks Agency Superintendent, United States Department of the Interior.

[signature]
NOTARY PUBLIC in and for Alaska
My Commission Expires: 1/27/92

KATHLEEN F. DICKINSON NOTARY PUBLIC STATE OF ALASKA

6183W

EXHIBIT A

BOOK 0058 PAGE 889




U.S. Survey 6904

T12N, R15E UM Sec. 36

T11N, R15E UM Sec. 1

Right-of-way (Approximate)

| | |
|---|---|
| Length | 4,000' |
| Width | 100' |
| Area | 9.2 acres |

0 1 Mile

**STANDARD**
ALASKA PRODUCTION

NIAKUK PROJECT LOCATION MAP

DATE: 9/21/88 SCALE: As Noted SHEET: 1 of 2

BOOK 0053 PAGE 890




CROSS SECTION C-C'
(Looking North)

89-00072
61-
c/c2 -
RECORDED-FILED
BARROW RECORDING
DISTRICT
FEB 1 2 00 PM '89
REQUESTED BY STANDARD
ADDRESS ALASKA PRODUCTION Co.

**STANDARD**
ALASKA PRODUCTION

**NIAKUK ONSHORE ACCESS ROAD AND PIPELINES SECTION C-C'**

| DATE: 9/21/88 | SCALE: 1"=20' | SHEET: 2 of 2 |
|---|---|---|

Return To:
Stu Hirsh
Standard Alaska Production Co.
P.O. Box 196612
Anchorage, AK 99519-6612

# ATTACHMENT No. 14

BOOK 0058 PAGE 185

United States Department of the Interior
OFFICE OF HEARINGS AND APPEALS
2020 Hurley Way, Suite 150
SACRAMENTO, CA 95825

COPY

| | | |
|---|---|---|
| IN THE MATTER OF THE ESTATE OF | ) | PROBATE IP SA 437N 90 |
| ANDREW OENGA | ) | ORDER APPROVING WILL AND DECREE OF DISTRIBUTION |
| DECEASED ESKIMO | ) | |

On June 13, 1990, a hearing was held at Fairbanks, Alaska to determine the validity of the last will and testament of Andrew Oenga, dated December 18, 1989, and to settle his estate.

The following findings and conclusions are based upon the evidence adduced:

Andrew Oenga, who was a resident of the State of Alaska, died on April 16, 1990, at Anchorage, Alaska. Had there been no will, his heirs at law determined in accordance with the laws of Alaska, Alaska Statute section 13.11.015(1), and the respective shares taken by each would be:

| | | | |
|---|---|---|---|
| Georgene Shugluk, B: 2/20/49 | Eskimo | daughter | 5/25 |
| Wallace Oenga, B: 5/9/52 | Eskimo | son | 5/25 |
| Leroy Oenga, Sr., B: 5/6/56 | Eskimo | adopted son | 5/25 |
| Jennie Oenga, B: 12/27/57 | Eskimo | daughter | 5/25 |
| Michael Delia, B: 7/9/54 | Eskimo | grandson | 1/25 |
| Tony Delia, B: 5/8/57 | Eskimo | grandson | 1/25 |
| Joseph Delia, B: 2/13/60 | Eskimo | granson | 1/25 |
| Andrew Delia, B: 1/28/61 | Eskimo | grandson | 1/25 |
| Jennie Miller, B: 10/23/64 | Eskimo | granddaughter | 1/25 |

The above named grandchildren are the children of Frieda Trent, a predeceased daughter of the decedent.

The evidence establishes that Clara Sakeagak, John Jasper Trent, and Kimra White were all adopted out of the family, and that Andrew Oenga and Vera Oenga culturaly adopted Leroy Oenga, Sr. a natural son of Frieda Trent.

Return to: Bureau of Indian Affairs, 101 12th Ave, Box 16, Fairbanks, AK 99701

PROBATE
IP SA 437N 90

The evidence establishes that the will was properly made and executed and that Andrew Oenga possessed testamentary capacity and was free of undue influence. Accordingly, the will should be approved.

No claims were filed against the estate.

ORDER

**NOW, THEREFORE,** By virtue of the power and authority vested in the Secretary of the Interior by section 2 of the Act of June 25, 1910, 25 U.S.C. 373, and other applicable statutes, and pursuant to 43 CFR Part 4 and the findings and conclusions herein, it is hereby ordered that the last will and testament of Andrew Oenga, dated December 18, 1989 be, and same is approved. The Superintendent or other officer in charge shall cause a distribution to be made of the trust estate of the testatrix in accordance with the said last will and testament, as follows:

TO: **Jennie Oenga**, Eskimo, daughter, born 12/27/57
**Walace Oenga**, Eskimo, son, born 5/9/52
**Georgene Shugluk**, Eskimo, daughter, born 2/20/49
**Leroy Oenga**, Eskimo, son, born 5/6/56
**Michael Delia**, grandson, born 7/9/54

**EACH AN EQUAL** undivided **1/5 share** in the testator's native trust or restricted estate as more fully described on the attached and incorporated inventory including an equal undivided 1/5 share of any funds in the testator's Individual Indian Money account

This decision is final for the Department unless a petition for rehearing is timely filed in accordance with 43 CFR 4.241 within 60 days from the date hereof as set forth in the notice attached hereto.

Dated at Sacramento, California, SEP 11 1990

William E. Hammett

William E. Hammett
Administrative Law Judge

Jennie Oenga, PO Box 201, Barrow, AK 99723
Walace Oenga, PO Box 201, Barrow, AK 99723
Georgene Shugluk, PO Box 201, Barrow, AK 99723
Leroy Oenga, Sr., PO Box 201, Barrow, AK 99723
Michael Delia, PO Box 201, Barrow, AK 99723

INVENTORY AND APPRAISEMENT OF RESTRICTED
LANDS OF Andrew Oenga, DECEASED ESKIMO
OF THE STATE OF ALASKA

According to the records of the Bureau of Indian Affairs/Fairbanks Agency, Fairbanks, Alaska, Andrew Oenga, deceased Eskimo, at the time of his death April 16, 1990 was possessed of the following restricted lands in Alaska.

HIS OWN PUBLIC DOMAIN ALLOTMENT: F-14632

Approved Native Allotment F-14632 for lands described within:

Parcel A - Secs. 22 and 27, T. 11 N., R. 17 E., Umiat Meridian, containing 119.95 acres.

ESTIMATED AT: $900,000

Parcel B - Secs. 1 and 36, T. 12 N., R. 15 E., Umiat Meridian, containing 40 acres, pursuant to the Act of May 17, 1906 (34 Stat. 197) as amended.

Aggregating 159.95 acres.

ESTIMATED AT: $600,000

TOTAL ESTIMATED VALUE OF DECEDENT'S ESTATE: $1,500,000

I hereby certify that the foregoing is an accurate inventory according to the records of the Bureau of Indian Affairs, of the restricted real property or interest therein owned by Andrew Oenga at the time of his death April 16, 1990. The value shown in this inventory may not necessarily represent the present market value of the property. Further investigation of values should be made before entering into any negotiations involving this property.

Dated at Fairbanks, Alaska on May 03, 1990.

H. James Bryant
Realty Officer

IN REPLY REFER TO:

UNITED STATES
DEPARTMENT OF THE INTERIOR

BOOK 0058 PAGE 188

BUREAU OF INDIAN AFFAIRS
ALASKA TITLE SERVICES CENTER
1675 C STREET
ANCHORAGE, ALASKA 99501-5198
(907) 271-4594

THIS IS TO CERTIFY that the foregoing Probate Order Approving Will and Inventory, Probate No. SA 437N-90 is a full, true and correct copy of the original as the same appears in the records and files of the Bureau of Indian Affairs, Alaska Title Services Center.

IN WITNESS WHEREOF, I have hereunto set my hand this 17th day of September 1990, at Anchorage, Alaska.

for Scott D. Houk, Land Law Examiner

90-0785
BA... ...REC 21—
DISTRICT
REQUESTED BY BIA
101 - 12th AVE Box 16
FBKS AK 99701
'90 NOV 27 AM 10 08

813271