# APPENDIX A TO DECLARATION OF EDWARD MORSE

**QUALIFICATIONS**
**ED MORSE, CRE, MAI**

**EDUCATION:**
Yakima Valley College - 1968-1970
Bachelor of Science Degree - University of Idaho - 1972
Masters Degree in Business Admin - University of Idaho - 1973
Juris Doctorate of Law, Cum Laude - Gonzaga University, College of Law - June 1977

**REAL ESTATE APPRAISAL EDUCATION:**
***University of Idaho***
Essentials of Real Estate (#461) 1971
Real Property Appraisal (#462) - 1972
***Appraisal Institute of Real Estate Appraisers***
Principles of Income Property Appraising #201) - 1974
Basics Principles, Methods & Techniques of Real Estate Appraisal (#1A) - 1974
Urban Properties (#11) - 1976
Eminent Domain & Condemnation Valuation Principles (#IV) - 1978
Investment Analysis (#006) - 1981
Standards of Professional Practice (#2-3) - 1981
Report writing and Valuation Analysis (#2-2) - 1989
Capitalization Theory & Techniques Part A & B (#1BA, #1BB) - Challenged 1989
Case Studies in Real Estate Valuation (#2-1) - Challenged 1990
SSP – A&B Standards of Professional Practice & USPAP - 2002 (15 hr) 2005 (7 hr)
Business Practices and Ethics (#11420N) – 2003
USPAP Update course (7hr) 2007
*Miscellaneous Courses*
Separating Real & Personal Prop from Intangible Bus Assets (#SE800) - 2002
American Right of Way Assn (#401)

**SEMINARS:**
*FHLMC*
Residential Instruction Seminar
*SREA*
Introduction to Capitalization Seminar, Condemnation & Partial Takings, Underwriting & Regulations 41-B to 41-C,
***Appraisal Institute of Real Estate Appraisers***
Feasibility & Highest and Best Use Seminar, Income Capitalization Seminar, Appraising Properties with Environmental Hazards, AIREA 1991 Symposium - 1991, Litigation Valuation - 1992, Environmental Considerations in Real Property Valuation - 1992, Appraising the Tough Ones - 1993, Understanding Limited Appraisals & Reporting Options (General) - 1994, Real Estate Risk Analysis - 1995, Litigation Valuation - 1995, Business Valuation - Part I - 1996, Business Valuation - Part II - 1996, Zoning, Police Power & Regulatory Takings - 1996, Timberland Valuation - 1997, 30 Specialized Appraisal Issues - 1998, Appraisal of Detrimental Conditions - 2000, 2000 Real Estate Market Forum - 2000, Valuation of Detrimental Conditions in Real Estate - 2000, Appraisal Review - 2001, Real Estate Fraud: The Appraiser's Responsibilities & Liabilities - 2002, Appraisal Consulting - 2003, Scope of Work - 2003, Mathematically Modeling Real Estate Data Seminar - 2004, Feasibility, Market Value, Investment Timing: Option Value - 2005, The Road Less Traveled: Special Purpose Properties - 2005, Site To Do Business - 2006, Attacking and Defending an Appraisal in Litigation - 2007

*Law Seminars*

The Art & Science of Mediation-Institute of Conflict Mgmt & First District Bar Assn - 1996, Eminent Domain, Law Seminars International - 1998, Eminent Domain & Land Valuation Litigation, American Law Institute - 1999, Partial Interests: Theory and Case Law - 2000, Eminent Domain & Inverse Condemnation in Idaho, Law Seminars International - 2001, Eminent Domain & Inverse Condemnation, Law Seminars International - 2003

*Miscellaneous Seminars & Symposiums*

Loss Prevention - 1998, Skills of Expert Testimony, IRWA - 2000, Recent Development in Federal Tax Valuation - 2000, Appraisal Foundation - Valuation Fraud Symposium - 2006

## PROFESSIONAL AFFILIATIONS/MEMBERSHIPS

The Counselors of Real Estate (CRE)
Appraisal Qualifications Board of the Appraisal Foundation – past member, past Chairman
Idaho Real Estate Appraiser Board - former & present Board Member, past Board Chairman
Member, Inland Northwest Chapter of the Appraisal Institute, MAI Certificate #10898
Idaho State Certified General Appraiser, Certificate #23
Washington State Certified General Real Estate Appraiser - #270-11 MO-RS-EE-P507K2
Montana State Certified General Appraiser, Certificate #453
Licensed Idaho Real Estate Broker - inactive status
Member of the Idaho Bar Association - inactive status

## APPRAISAL EXPERIENCE:

Gridley & Hoagland, Real Estate Appraisers - January 1974 to June 1976; Morse & Morbeck, Real Estate Appraisers - July 1976 to August 1979; Acuff & Morse, Real Estate Appraisers and Counselors - September 1979 to June 1985; Appraiser - Morse & Company, Real Estate Appraisers and Counselors - July 1985 to Present

Authored - "The Appraisal of Community Property," The Appraisal Journal, 10/88, pg 477

## TEACHING EXPERIENCE:

Instructor - Formerly a Certified Instructor for the Idaho Real Estate Commission, Education Council, for their Real Estate Appraisal Course, at various locations and at North Idaho College. Developed and taught a seminar for appraisers on Regulatory Taking Damage Measures for the Inland Northwest Chapter of the Appraisal Institute; and regulatory taking and special benefits seminars for attorneys with Law Seminars International.

Speaking engagements on appraisal issues, qualifications, and eminent domain.
Adjunct University of Idaho College of Law – Appraisal, Valuation & Damages

## TYPICAL ASSIGNMENTS:

Appraisals to determine the Market Value of unimproved land, existing and proposed residential and multi-residential properties; existing and proposed recreational properties and recreational land; agricultural property, timber lands, ranches, special purpose properties; existing and proposed commercial, industrial and mining properties. I have also completed appraisals of existing and proposed subdivisions; PUD's; and condominiums. I have appraised special purpose properties including golf courses, athletic clubs, bowling alleys, psychiatric hospital, mini-lubes, car washes, C-stores, water rights, mining and mineral interests including gravel, corridors, railroad rights-of-way, linear easements, and businesses. I have also appraised conservation easements, numerous partial takings, and remnant parcels, leaseholds, and physical and legal interests. Recreational property includes waterfront lands, condominiums, ski condominiums, waterfront PUD's and condos; and recreational "in holdings" surrounded by public lands and river front recreation land.

I have qualified as an expert witness and testified in both district and magistrate court in Idaho, Washington, and U.S. Bankruptcy Court. I have testified about actual market value, and as an expert regarding damages on the fee simple estate and partial interests. I have completed appraisals for partial interest acquisitions, for easements and similar fractional interests, in a "before" and "after" situation, and other fractional interests like leased fee subject to a leasehold interest, and life estates. I have testified on damages in condemnation cases and numerous real estate damage cases. I have also completed appraisals on contaminated or impaired properties, and have testified as an expert regarding the value of contaminated property, and damages to real property, and damages to business interests. Litigation and appraisal experience includes, easements, fee interests, partial interests and assignments for community property valuation and apportionment of community improvements.

Typical assignments also include appraisals, consulting, counseling to solve real estate problems, feasibility analysis and/or highest and best use analysis; and appraisals on real property interests. I have served as a court appointed arbitrator involving the partition of a large farm with timberlands, and as arbitrator in several cases involving real property and contractual interests. Real estate counseling assignments include the determination of damages, regulatory takings, and the denial of all viable economic use.

**TYPICAL CLIENTS**:
Served as an independent fee appraiser for such clients as:

Ada County Highway Dist
Avista Utilities
Bank CDA
Bank of America
City of Bonners Ferry
City of Coeur d'Alene
City of Colville, WA
City of Hayden
City of Sandpoint
Coeur d'Alene Tribe
Crown Pacific
DAW Forest Products
Farmer's Insurance Group
Grange Mutual Life Insurance
Idaho Forest Industries
Idaho Independent Bank
Idaho Power
Idaho Public Utility Comm
Idaho Transportation Dept
Inland Northwest Bank
Key Bank
Kootenai County
Kootenai County Library Dist
Louisiana-Pacific Corp
Merrill Lynch
Mountain West Bank
Panhandle State Bank
Safeco Insurance
Spokane County Parks Dept
Sterling Savings/Action Mortgage
Transamerica Mortgage Co
WA Mutual Savings Bank
Washington Trust Bank
Washington Water Power
Wells Fargo Bank
Union Pacific Rail Road
US Bank
Various Law Firms & Attorneys

APPENDIX B TO DECLARATION OF EDWARD MORSE

COLVILLE RIVER UNIT

APPLICATION FOR THE THIRD EXPANSION OF THE UNIT AREA

FINDINGS AND DECISION OF THE DIRECTOR,
DIVISION OF OIL AND GAS UNDER DELEGATION OF AUTHORITY
FROM THE COMMISSIONER,
DEPARTMENT OF NATURAL RESOURCES
STATE OF ALASKA

April 22, 2004
TABLE OF CONTENTS

I. INTRODUCTION, BACKGROUND, AND CONCLUSION ..... 1

II. DISCUSSION OF DECISION CRITERIA ..... 3

A. Decision Criteria considered under 11 AAC 83.303(b) ..... 3

1. The Environmental Costs and Benefits of Unitized Exploration or Development ..... 3

2. Prior Exploration Activities in the Colville River Unit Area, and Proposed Expansion Area, and the Geological and Engineering Characteristics of the Reservoir. ..... 6

3. Plans for Exploration or Development of the Proposed Unit Expansion Area ..... 7

4. The Economic Costs and Benefits to the State and Other Relevant Factors. ..... 8

B. Decision Criteria considered under 11 AAC 83.303(a) ..... 9

1. The Conservation of All Natural Resources. ..... 9

2. The Prevention of Economic and Physical Waste.. ..... 10

3. The Protection of All Parties in Interest, Including the State. ..... 11

III. FINDINGS AND DECISION ..... 11

A. The Conservation of All Natural Resources. ..... 11

B. The Prevention of Economic and Physical Waste. ..... 12

C. The Protection of All Parties in Interest, Including the State. ..... 13

## I. INTRODUCTION, BACKGROUND, AND CONCLUSION

On December 9, 2003, ConocoPhillips Alaska, Inc. (ConocoPhillips), as Operator and on behalf of the other working interest owners (WIOs), applied for approval of the Third Expansion of the Colville River Unit (CRU) under the provisions of 11 AAC 83.356 and Section 12.1 of the CRU Agreement. The CRU is the first unit formed in Alaska with a private party -- Arctic Slope Regional Corporation (ASRC) -- as the lessor of a significant portion of the unit area. With this Application, ConocoPhillips proposes to add to the current unit area all or some portions of 15 leases and approximately 34,176 acres of which 15,681 acres are State-only lands, 16,578 acres are ASRC-only lands, and 1,920 acres are jointly-held lands.

The Department of Natural Resources (DNR) determined that the Application was complete on January 14, 2004. Notice of the Application was published in the Anchorage Daily News and The Arctic Sounder on January 22, 2004. Copies of the Application and the public notice were provided to interested parties under 11 AAC 83.311. DNR also provided public notice to the Alaska Departments of Environmental Conservation and Fish and Game, the North Slope Borough, the City of Nuiqsut, the City of Barrow, the Kuukpik Village Corporation, ASRC, the Nuiqsut Postmaster, the radio station KBRW in Barrow, the U.S. Department of the Interior, Bureau of Land Management (BLM), and the Alaska Oil and Gas Conservation Commission (AOGCC). The notice was also published on the State of Alaska Public Notice website and the Division of Oil and Gas' (Division) website.

The public notices invited interested parties and members of the public to submit comments by February 23, 2004. DNR received no comments regarding the Application.

The CRU Agreement and DNR regulations require the Unit Operator to file plans of exploration, development and operations describing the activities within the unit area and expansion area. The Unit Operator must consider how it can best develop the resource underlying the entire unit area, regardless of internal lease boundaries. The revised initial unit plan includes a plan of exploration (POE) and a plan of development (POD). The revised initial POE describes plans to explore for potential prospects other than the currently producing Alpine Reservoir. The POE submitted with the Application outlines exploration plans for the Iapetus Prospect within the expanded CRU boundary.

The CRU Agreement and DNR regulations provide for separate approval of the unit plan of operations by the DNR Commissioner before any operations begin within the unit area on lands managed by the State. The unit plan of operations must contain: (1) statements and maps or drawings giving the sequence and schedule of operations; (2) the projected use requirements of the proposed operations; including the location and design of well sites, material sites, water supplies, waste sites, buildings, roads and utilities; (3) plans for rehabilitating the affected area; and (4) a description of procedures designed to minimize adverse effects on other natural resources and other uses of the area, including fish and wildlife habitat, historic and archeological sites, and public use. These plans are to be circulated to other State and local agencies for their review and comment before approval by the DNR Commissioner. The proposed plans must also be consistent with the Alaska Coastal Management Program.

Inclusion of the leases in the CRU will conform and modify the leases to the provisions of the CRU Agreement. Attachment 1 describes the working and royalty interests in the 15 leases proposed for the Third CRU expansion. Attachment 2 is a map showing the leases or portions of leases and their assigned unit tract numbers (CRU Tracts 162 through 178). Following is a summary of the history of the 15 expansion leases.

Four (4) jointly-held leases containing approximately 1,920 acres are proposed for the Third CRU expansion. ADLs 390344 (CRU Tracts 162-163) and 390345 (CRU Tract 164) were created when ADL 380093 and ADL 388904, respectively, were severed and committed in part to the CRU with the second expansion of the unit on November 11, 2002. ADL 388904 was created when ADL 380095 was severed and committed in part to the CRU on March 20, 1998. Both ADL 380093 and ADL 380095 were originally sold in State Lease Sale No. 75. The lease form, DOG 9208AS, reserves a 16.667 percent royalty share for the State and ASRC, and became effective on February 1, 1993, for a primary term of ten years.

ADL 390348 (CRU Tract 165) was created when ADL 388906 was severed and committed, in part, to the CRU with the first expansion of the unit on November 9, 2000. ADL 388906 was created when ADL 387211 was severed and committed in part to the CRU on March 20, 1998. ADL 387211 was originally issued in State Lease Sale No. 86A, Colville River Exempt: Colville River State Onshore, State/ASRC Onshore and Offshore, held on October 1, 1996. ADL 387211 was issued on lease form DOG 9208 AS (Rev 5/96), which reserves a 16.66667 percent royalty share for the State and ASRC, and became effective October 1, 1996, for a primary term of seven years.

ADL 390350 (CRU Tracts 166-167) was created when ADL 389726 was severed and committed in part to the CRU on November 11, 2002. ADL 389726 was created when ADL 388525 was severed and committed in part to the CRU on November 9, 2000. ADL 388525 was originally sold in State Lease Sale 86, Central Beaufort Sea: Harrison Bay to Flaxman Island, held on November 18, 1997. The lease form, DOG 9208AS (Rev. 6/97), reserves a 16.66667 percent royalty share for the State and ASRC. The lease became effective January 1, 1998, with a primary term of seven years.

Nine (9) State-only leases or portions of leases containing approximately 15,681 acres are proposed for the Third CRU expansion. ADLs 388465 (CRU Tract 168), 388466 (CRU Tract 169), 388463 (CRU Tract 170), 388464 (CRU Tract 171), 388502 (CRU Tract 172), 388503 (CRU Tract 173), 388504 (CRU Tract 174), 388498 (CRU Tract 175), and 388497 (CRU Tract 176) were sold in State Lease Sale 86, Central Beaufort Sea: Harrison Bay to Flaxman Island, held on November 18, 1997. The lease form, DOG 9609 (Rev. 6/97), reserves a 16.66667 percent royalty share for the State. The leases became effective January 1, 1998, with a primary term of seven years.

ASRC is the sole lessor of two leases encompassing approximately 16,578 acres proposed for inclusion into the CRU. ARCO, now ConocoPhillips, and ASRC signed the Western Colville/NPR-A Agreement on September 1, 1995, granting ConocoPhillips these ASRC leases. The leases, ALK-4742 (CRU Tract 177) and ALK-4743 (CRU Tract 178), were effective September 1, 1995, and grant exclusive right to explore for oil, gas, and associated hydrocarbon

substances for a primary term of ten years. ALK-4742 (CRU Tract 177) reserves a 10.5 percent net royalty share for ASRC, with an overriding royalty share of 2.00 percent to the Kuukpik Village Corporation. ALK-4743 (CRU Tract 178) reserves a 15 percent net royalty share for ASRC, with an overriding royalty share of 1.6667 percent to the Kuukpik Village Corporation.

All of the leases proposed for the Third CRU expansion as a result of Lease Sales 75, 86 and 86A are owned jointly by the State and ASRC. The joint ownership was established by the 1991 State-ASRC Settlement Agreement, approved by the legislature in Chapter 41 SLA 1992. The ownership split between the State and ASRC varies from lease to lease, as described in the Settlement Agreement. The State and ASRC independently administer their individual interests. Currently, working interest ownership is aligned for the proposed expansion leases (ConocoPhillips Alaska Inc. 56%, Phillips Alpine Alaska, Inc. 22%, and Anadarko Petroleum Corporation 22%).

The Kuukpik Village Corporation owns the surface estate of the leases in Lease Sale 75 within NPR-A, in Lease Sale 86A, ADL 388525, and the two ASRC-only leases.

For reasons set out in this decision, the Division approves the expansion of the CRU, subject to the work program, bid deferment payments, changes in lease agreement terms, and automatic contraction provisions contained in this decision.

## II. DISCUSSION OF DECISION CRITERIA

The Commissioner of the Department of Natural Resources (the Commissioner) reviews applications to expand unit areas under AS 38.05.180(p) and 11 AAC 83.303 – 11 AAC 83.395. By memorandum dated September 30, 1999, the Commissioner approved a revision of Department Order 003 and delegated this authority to the Director of the Division of Oil and Gas. The Division's review of the Application is based on the criteria set out in 11 AAC 83.303 (a) and (b). A discussion of the subsection (b) criteria, as they apply to the Application, is set out directly below, followed by a discussion of the subsection (a) criteria.

### A. Decision Criteria considered under 11 AAC 83.303(b)

#### 1. The Environmental Costs and Benefits of Unitized Exploration or Development.

The lands in and surrounding the CRU are habitat for a variety of fish, waterfowl and marine mammals. Area residents occasionally use these lands and waters for subsistence hunting and fishing. Oil and gas activity in the proposed unit expansion area will impact some wildlife habitat, and may impact some subsistence activity. The extent of these impacts depends on a number of variables. DNR can control some of the variables to minimize the impacts. The environmental impact will depend on the effectiveness of mitigation measures, the availability of alternative habitat and subsistence areas, and the ability of the fish, waterfowl and marine mammals to adapt to some displacement and changes in their habitat.

DNR develops lease stipulations through the lease sale process to mitigate the potential environmental impacts from oil and gas activity. Alaska statutes require DNR to give public notice and issue a written finding before disposal of the State's oil and gas resources. AS 38.05.035(e), AS 38.05.945, 11 AAC 82.415. In preparing a written finding before an oil and gas lease sale, the commissioner may impose additional conditions or limitations beyond those imposed by law. AS 38.05.035(e).

DNR considered all comments filed before holding Lease Sales 75, 86 and 86A. DNR included mitigation measures in the leases issued. The proposed CRU expansion leases contain stipulations designed to protect the environment and address any outstanding concerns regarding impacts to the area's fish and wildlife species and to habitat and subsistence activities. They address such issues as the protection of primary waterfowl areas, site restoration, construction of pipelines, seasonal restrictions on operations, public access to, or use of, the leased lands, and avoidance of seismic hazards. Including the leases in the CRU will not result in additional restrictions or limitations on public access to the lands or to public and navigable waters. Lease operations before or after unitization are subject to a coastal zone consistency determination, and must comply with the terms of both the State and North Slope Borough coastal zone management plans. Lease and unit operations also require approval of a State plan of operations.

Ongoing mitigation measures such as seasonal restrictions on specific activities in certain areas will reduce the impact on bird, fish, and mammal populations. Designating primary waterfowl areas is one method of protecting the bird habitat. DNR requires consolidation of facilities to minimize surface disturbances. Regulating waste disposal is another way to limit environmental impacts. With these mitigating measures, the anticipated exploration and development related activity is not likely to significantly impact bird, fish, and mammal populations. The anticipated activity under the expanded CRU will impact habitat and subsistence activity less than if the lessees developed the leases individually. Unitized exploration, development and production will minimize surface impact.

The proposed State-only and jointly-held expansion leases contain stipulations designed to protect the environment and address any outstanding concerns regarding impacts to the area's fish and wildlife species and to habitat and subsistence activities. The expansion leases address the issue of public access to, or use of, the leased lands. Including the leases in the CRU will not change these stipulations. The stipulations are in effect whether the leases are unitized or not.

The surface estate of the uplands within the Colville River Delta portion of Sales 75, 86 and 86A falls into one of two ownership categories: the land owned by the Kuukpik Village Corporation, and the land owned by Native Allottees. For the Kuukpik-owned surface outside of the National Petroleum Reserve, Alaska (NPR-A), a 1974 Agreement between Kuukpik, ASRC, and the State of Alaska, and a 1992 Settlement Agreement between ASRC and Kuukpik provided for the right of access to Kuukpik's surface. ASRC and the State of Alaska, their successors, assignees, and lessees were allowed to conduct oil and gas activities on Kuukpik's lands east of NPR-A under the provisions of the 1992 Settlement Agreement, the leases, and, to the extent applicable, the requirements of AS 38.05.130.

For the Kuukpik-owned surface inside NPR-A, the lessee of any State of Alaska-ASRC jointly held lease may not exercise its access rights to the Kuukpik-owned surface until the lessee makes provisions to compensate the landowner for all damages sustained by reason of entering upon the land as required by the lease, and, to the extent applicable, the requirements of AS 38.05130, as required in the terms of the lease. The August 27, 1997, Surface Use Agreement ("Surface Use Agreement") between ConocoPhillips and the Kuukpik Village Corporation defined the terms and conditions of ConocoPhillips' use of the surface of Kuukpik's NPR-A lands in exchange for Kuukpik's consent to development of the oil and gas resources on these lands.

Under the Surface Use Agreement, ConocoPhillips must hold a meeting with the Kuukpik Village Corporation Board of Directors regarding an exploration and land activity update of the Kuukpik-owned lands. The Division is not aware that ConocoPhillips presented an activity update and plan of operations for the proposed Third CRU Expansion lands. The Kuukpik Village Corporation has not objected to the proposed Third CRU Expansion.

Also, under 11 AAC 83.311, the DNR is required to publish notice of a unit expansion in a Statewide-circulated newspaper and a newspaper serving the locality in which the unit is located. Further, since the CRU is located within the boundary of an organized borough, regional corporation, and village corporation organized under Section 8(a) of the Alaska Native Claims Settlement Act, the notice was mailed to the North Slope Borough, the President of ASRC, and the President of Kuukpik Village Corporation. In this case, notice was also provided to the Mayor and City Council of Nuiqsut and Barrow, and the radio station, KBRW, in Barrow for broadcast to the North Slope Native community.

With regard to the Native Allottees' surface, the mitigating measures and lessee advisories provide that rights to exploration and development of the oil and gas resources may not be exercised until the lessees make provisions to compensate the landowner for all damages sustained by reason of entering upon the land as required by the lease, and, to the extent applicable, the requirements of AS 38.05130.

In addition to the mitigating measures in the leases, State unitization regulations require the commissioner to approve a Plan of Operations before the unit operator performs any surface operations. 11 AAC 83.346. A proposed Plan of Operations must describe the operating procedures designed to prevent or minimize adverse effects on natural resources. Plans of Operation are subject to extensive technical review by a number of local, State, and federal agencies. They are also subject to consistency with the Alaska Coastal Management Program standards, if the affected lands are within the coastal zone. The unit operator must guarantee full payment for all damage sustained to the surface estate before beginning operations. The Plan of Operations must include plans for rehabilitation of the unit area. Furthermore, when the lessees propose to explore or develop the expansion area and submit a Unit Plan of Operations, the DNR may require that it comply with the lease stipulations and lessee advisories developed for the most recent lease in the CRU, the expanded CRU, or the region.

The approval of the CRU expansion itself has no environmental impact. The unit expansion does not entail any environmental costs in addition to those that may occur when permits to conduct lease-by-lease exploration or development are issued. The commissioner's approval of the unit

expansion is an administrative action, which, by itself, does not convey any authority to conduct any operations within the unit. Unitization does not waive or reduce the effectiveness of the mitigating measures that condition the lessee's right to conduct operations on these leases. DNR's approval of the Unit POE or POD is only one step in the process of obtaining permission to drill a well or wells or develop the potential and known reservoirs within the unit area. The Unit Operator must still obtain approval of a Plan of Operations from the State, and, if necessary, ASRC, on jointly held leases, and permits from various agencies on State leases before drilling a well or wells or initiating development activities to produce reservoirs within the unit area.

ConocoPhillips plans to drill a number of exploration wells within the proposed CRU expansion area. The proposed surface locations for the wells are on either State of Alaska or Kuukpik Village Corporation conveyed lands. When ConocoPhillips applies for permits and authorizations for the wells from the various federal, State, and local agencies, interested parties will have the opportunity to comment during the permit review process.

**2. Prior Exploration Activities in the Colville River Unit Area, and Proposed Expansion Area, and the Geological and Engineering Characteristics of the Reservoir.**

The South Harrison Bay No. 1 well was commenced on November 21, 1976, and completed on February 8, 1977, at a surface location just west of the proposed third expansion area. Due to the presence of the Fish Creek slump detachment surfaces, the Pebble Shale Formation is absent from the normal stratigraphy encountered in the area. The well was drilled as a straight hole to a total depth of 11,290' with the Sadlerochit and Lisburne formations as the primary exploration objectives. Both formations appeared wet on the logs. Log calculated porosities ranged from 5 – 15 %. Secondary targets were the Kuparuk River Formation, the Sag River Sandstones, and the basal sand in the Torok Formation.

The Torok Formation appears to lie directly on top of the Lower Cretaceous Unconformity (LCU) as a result of the Fish Creek slide. The South Harrison Bay No.1 well contained significant hydrocarbon shows on the mud log within the Torok section between 5680-7290'. DST #1 and #2 was tested between the depths of 7119-7290'. The third DST was taken in the interval between 5680-5790'. No hydrocarbons were recovered from any of the three drill stem tests.

Five exploration wells have been drilled east-southeast of the proposed expansion area. None of the five wells were tested and all were plugged and abandoned. All five wells have some sand development above the Gamma Ray Shale within the Torok Formation. All five wells have some Kuparuk C sandstone developed (about ten feet thick) above the LCU. The Nuiqsut well spud on April 1, 1998 and reached a total depth of 7,650' (md) (-7583 tvdss) in the top of the Nuiqsut sandstone on April 19, 1998. The Nuiqsut well contained approximately 22 feet of Alpine C sandstone and 37 feet of Alpine A sandstone. ARCO Temptation 1 commenced on March 24, 1996, and was plugged and abandoned on April 4, 1996. The Temptation 1A commenced on March 24, 1996, and was completed and abandoned on April 23, 1996. The Temptation wells contain sandstone above the Gamma Ray Shale, an 8-10' thick Kuparuk C sandstone resting unconformably on the LCU, no Alpine sandstone interval, and a silty Nuiqsut

section and coarsening and cleaning upward section of the Nechelik interval. Both wells bottomed in the Nechelik interval at depths of 7,750' (md and tvd) (-7,716' tvdss) and 8,950' md (-7,525 tvdss), respectively.

The Nigliq No. 1 and 1A wells bottomed in the Jurassic Kingak formation, just below the base of the Nechelik interval at 8,040 md (7,875 tvd) (-7,832 tvdss) and 9,820' md (7,195 tvd) (-7,152' tvdss), respectively. The Alpine sandstone interval is absent and the Nechelik interval coarsens and cleans upward in the Nigliq wells and looks similar in character to the Nechelik interval in the Temptation wells. The top of the Nuiqsut interval is coincident with the LCU in Nigliq 1. In the Nigliq 1A, the LCU is coincident with the top of the Nechelik interval. The section of Nuiqsut present in Nigliq 1 and the top of the Nechelik sandstone have been truncated by the LCU in the Nigliq 1A well.

ConocoPhillips has mapped the Iapetus exploration prospect on the expansion acreage with their 2003 South Harrison Bay 3-D and Fiord 3-D seismic surveys. The well data from the surrounding area including the South Harrison Bay 1 Well to the west, the Temptation 1 and 1A Wells and the Nigliq 1 and 1A Wells to the east, and the Nuiqsut Well to the southeast help define the prospect. Interpretation of the seismic data and the available well information provide evidence that the proposed Third CRU expansion area encompasses the minimum area required to include all or part of one or more potential hydrocarbon accumulations.

### 3. Plans for Exploration or Development of the Proposed Unit Expansion Area.

ConocoPhillips' proposed plan of exploration for the Third CRU expansion area is described in Attachment 4 to the Application. After submittal of the Application, the Division and ASRC had further discussions with ConocoPhillips regarding the proposed expansion area plan of exploration. As a result of these discussions and as a condition of including the proposed expansion area into the CRU, the WIOs have agreed to amend their exploration activities to include certain terms and conditions requested by the Division and ASRC. The amended exploration plan activities are set out in Attachment 3 to this Findings and Decision.

Because only portions of certain state-only leases, ADLs 388497, 388498, 388502, 388503, and 388504 are being committed to the CRU at this time, under 11 AAC 83.373, these commitments constitute severance of the leases as to the unitized and non-unitized portions of the lease. The non-unitized portion of the lease will be treated as a separate and distinct lease having the same effective date and term as the original lease and maintained only in accordance with the terms and conditions of the original lease, statutes and regulations.

Finally, in the event of the CRU contraction of any of the approved Third CRU Expansion Area Tracts, the WIOs agreed to waive the extension provisions of 11 AAC 83.140 and the notice and hearing provisions of 11 AAC 83.374 with respect to such contractions.

The plan of exploration for the Third CRU Expansion leases with the agreed-to terms and conditions ensures that the lease extensions resulting from unitization under 11 AAC 83.336 continue only so long as the WIOs proceed diligently with exploration and development.

### 4. The Economic Costs and Benefits to the State and Other Relevant Factors.

Approval of the CRU expansion will provide near-term economic benefits to the State by creating jobs associated with the assessment of the hydrocarbon potential of the leases within the expansion area. The WIOs have provided sufficient technical data to define the prospect under consideration, have committed their diverse lease interests to the proposed unit expansion area, and have agreed to a plan of exploration that ensures a timely sequence of drilling and development activities to evaluate and develop the CRU and the proposed unit expansion areas. The plan of exploration with the agreed-to terms and conditions advances exploration and evaluation of the prospects in the expansion area sooner than would occur under any individual lease exploration effort.

The leases in the CRU and expansion area are written on a variety of forms, containing a variety of provisions. During the CRU Agreement negotiations and the discussions for this Application, the parties bargained for amendments to the terms and conditions of the various lease contracts to harmonize them. The WIOs have agreed to lease amendments requested by the Division as a condition of including the State-only and the jointly-held expansion area leases into the CRU. The agreed-to lease amendments are:

1) Paragraph 36(b) of lease form DOG 200204 will replace the existing paragraph 35(b) of lease forms DOG 9208AS, DOG 9208AS (Rev. 5/96) and DOG 9208AS (Rev. 6/97), and paragraph 36(b) of lease form DOG 9609 (Rev. 6/97); and

2) No ANS Royalty Settlement Agreement will apply to the Third CRU Expansion leases.

Consistent lease provisions allow the WIOs and the State to reduce the administrative burdens of operating and regulating this unit. Conforming the terms of the older leases to the newer form lease and to the unit agreement allows the State to avoid costly and time-consuming re-litigation of the lease provisions in the older forms.

The CRU Agreement has provisions that resolve some of the challenging issues associated with operation of an oil and gas unit. The parties agreed to the methodology for establishing and revising participating areas. The parties have agreed to the basis for allocating production to the individual tracts included in the participating area. The CRU Agreement also describes the royalty accounting procedures and sets the deemed rate of recovery of certain outside substances injected into reservoirs within the unit. The CRU Agreement makes consistent the dismantlement, restoration, and rehabilitation responsibilities of the WIOs when a unit terminates. The CRU Agreement contains the dispute resolution procedures that the parties have agreed to use if any disputes arise during the operation of this unit.

Also, by extending the CRU expansion leases, the leases continue to be subject to the 1997 Surface Use Agreement between ConocoPhillips and the Kuukpik Village Corporation. In the past, the Division has requested a copy of the Surface Use Agreement as a condition of its approval of unit expansions. The Division does not have a copy of the Surface Use Agreement

and has expressed concerns that terms and conditions contained in the document would restrict or prevent exploration and development activities within the expanded CRU. Because the Surface Use Agreement is a private transaction between ConocoPhillips and the Kuukpik Village Corporation, Kuukpik has insisted that ConocoPhillips maintain the confidentiality of the Agreement. ConocoPhillips has always concurred with Kuukpik. Of the four parties involved with this issue of access to the Surface Use Agreement, the State of Alaska is the only party without the document. The State continues to not have access to the Surface Use Agreement.

As a compromise to resolve this issue during the Second CRU Expansion discussions, ConocoPhillips stated, in a letter dated October 17, 2002, that the Surface Use Agreement would not be a barrier to meeting the work commitments imposed in the Findings and Decision for the Second CRU Expansion, and that it will never be used to seek relief from work commitments imposed by those Findings and Decision. Because the Surface Use Agreement governs surface access to a majority of the CRU and expanded CRU, the DNR accepted ConocoPhillips' statement, but required as a condition of its approval of the Second CRU Expansion that the Surface Use Agreement never be a barrier to meeting any work commitments imposed by DNR, and that it would never be used to seek relief from any work commitments imposed by the DNR.

The Division sought similar assurances from ConocoPhillips for the work commitments imposed in this Findings and Decision regarding the Third CRU expansion. In April 6, 2003 e-mail, ConocoPhillips assured the Division that the Surface Use Agreement would not be a barrier to meeting, and would never be used to seek relief from, the work commitments imposed by this Findings and Decision. The Division relies on and accepts this assurance.

### B. Decision Criteria considered under 11 AAC 83.303(a)

#### 1. The Conservation of All Natural Resources.

DNR recognizes unitization of the leases overlying a reservoir as a prudent conservation mechanism. Without unitization, the unregulated development of reservoirs can become a race for possession by competing operators. This race can result in: 1) unnecessarily dense drilling, especially along property lines; 2) rapid dissipation of reservoir pressure; and 3) irregular advance of displaced fluids, all of which contribute to the loss of ultimate recovery or economic waste. The proliferation of surface activity, duplication of production, gathering, and processing facilities, and haste to get oil to the surface also increase the potential for environmental damage. Lessee compliance with conservation orders and field pool rules issued by the AOGCC would mitigate some of these impacts without an agreement to unitize operations. Still, unitization is the most efficient method for maximizing oil and gas recovery, while minimizing negative impacts on other resources. Including the expansion acreage within the CRU will provide the State with a comprehensive plan for exploring and developing the expansion area. Expansion of the CRU and implementation of the plan of exploration will ensure that WIOs prudently and diligently explore the acreage included in the unit.

The expansion of the CRU will promote the conservation of both surface and subsurface resources through unitized, rather than lease-by-lease, development. Unitization allows the unit operator to explore and develop the unit area as if it were one lease. Without this expansion, the

lessee would be compelled to seek permits to drill wells on each individual lease in order to extend the leases beyond their primary terms. Unitization reduces both the number of facilities required to develop reserves that may be discovered and the aerial extent of land required to accommodate those facilities. Review and approval of exploration and development permits under a unit agreement will also ensure that rational surface-use decisions are made without consideration of individual lease ownership or expense. After unitization, facilities can be designed and located to maximize recovery and to minimize environmental impact, without regard to lease ownership. Although the applicant has not determined the extent of any oil and gas contained in the prospective reservoirs, the expansion will ensure that the acreage is explored and recovery from the leases is maximized if a commercial hydrocarbon accumulation is discovered.

**2. The Prevention of Economic and Physical Waste.**

Inclusion of the expansion leases in the CRU will prevent economic and physical waste because the unit operator must have a cost sharing formula, a coordinated exploration and development plan, and if a commercial discovery is made, a comprehensive reservoir depletion model. A cost-sharing agreement promotes efficient development of common surface facilities and operating strategies. A cost-sharing agreement and an acceptable unit operator allow the WIOs in the unit to rationally decide well spacing requirements and injection strategies, and construct the appropriate common, joint-use surface facilities. Unitization prevents economic and physical waste by eliminating redundant expenditures for a given level of production, and avoiding loss of ultimate recovery by adopting a unified reservoir management strategy.

Unitized operations improve development of reservoirs beneath leases that may have variable or unknown productivity. Marginally economic reserves, which otherwise would not be produced on a lease-by-lease basis, can be produced through unitized operations in combination with more productive leases. Facility consolidation lowers capital costs and promotes optimal reservoir management for all WIOs. Pressure maintenance and secondary recovery procedures are easier to design and achieve through joint, unitized efforts than would otherwise be possible. In combination, these factors allow less profitable areas of a reservoir to be developed and produced in the interest of all parties, including the State.

The total cost of exploring and developing the expansion leases would be higher on a lease-by-lease basis than it would be under unitization terms. Drilling and facilities investment costs will be minimized as a consequence of eliminating a need for numerous sites within the unit area. Locations of individual wells and surface facilities will be selected to optimize ultimate oil and gas recovery, while minimizing or completely avoiding adverse impacts to the environment.

Reducing costs and environmental impacts through unitized operations will expedite development of any reserves discovered and will promote greater ultimate recovery of any oil and gas from the unit area. This will increase and extend the State's income stream from production taxes and royalties. The revenues to the lessees and unit operator may be reinvested in new exploration and development in the State. Unitization means reduced costs and increased benefits to all interested parties. It benefits the local and State economy, and provides revenues to the State's general, school, constitutional budget reserve, and permanent funds.

### 3. The Protection of All Parties in Interest, Including the State.

Inclusion of the expansion leases in the CRU Agreement under the proposed plan of exploration with the agreed-to terms and conditions outlined in Section II.A.3 promotes the State's economic interests because the further exploration and development of the prospects within the expansion area will likely occur earlier than without unitization. Diligent exploration and development under a single approved unit plan without the complications of competing operators is in the State's best interest. It promotes efficient evaluation of the State's resources, yet minimizes impacts to the region's cultural, biological, and environmental resources. The CRU Agreement also provides for accurate reporting and record keeping, State concurrence with operating procedures, royalty settlement, in kind taking, and emergency storage of oil, all of which will further the State's interest. The modifications to provisions of the leases that provide for reasonable costs of transportation away from the leased or unit area to the point of sale will economically benefit the State. These all protect the State's interest.

ASRC's interests are protected by its level of involvement in the unit management process and the dispute resolution procedures. The Kuukpik Village Corporation's interests were protected during the process of negotiating for consent to subsurface development on their lands. They negotiated for specific limitations on surface use of the leases in which they have surface rights. Kuukpik also received overriding royalty interests in the leases as compensation from the working interest owners and ASRC for consenting to oil and gas activities on their lands.

The interests of any Native Allottees within the expanded CRU are protected because the mitigating measures and lessee advisories in the lease provide that rights to exploration and development of the oil and gas resources may not be exercised until the lessees make provisions to compensate the landowner for all damages sustained by reason of entering upon the land. Also, when ConocoPhillips applies for permits and authorizations for the various activities in the agreed-to plan of exploration from the various federal, State, and local agencies, the allotment owners will have the opportunity to comment during the permit review process.

The State and ASRC will both be able to protect their respective economic interests in the unit management process by the use of the CRU Agreement's dispute resolution procedures, if necessary.

The proposed expansion of the CRU protects the economic interests of all WIOs and royalty owners of a common reservoir. Operating under a unit agreement and unit operating agreement assures each individual working interest owner an allocation of costs and revenues commensurate with the value of their leases. The provisions of the CRU Agreement and State law that provide for notice and an opportunity to be heard if they disagree with a unit management decision made by the State or ASRC also protect the WIOs.

## III. FINDINGS AND DECISION

### A. The Conservation of All Natural Resources.

1. Including all or portions of the fifteen leases in the CRU will conserve natural resources, including hydrocarbons, gravel, sand, water, wetlands, and other valuable habitat.

2. The unitized development and operation of the leases in this proposed expansion area would reduce the amount of land and fish and wildlife habitat that would otherwise be disrupted by individual lease development. This reduction in environmental impacts and interference with subsistence activity is in the interest of the public and Native Allottees.

3. Before undertaking any specific operations, the unit operator must submit a Plan of Operations to the DNR and other appropriate State and local agencies for review and approval. All agencies must grant the required permits before drilling or development operations may commence. DNR may condition its approval of a unit Plan of Operations and other permits on performance of mitigating measures in addition to those in the leases if necessary or appropriate. Requiring strict adherence to the mitigating measures will minimize adverse impacts on the environment and Native Allottees. However, if the exploration activities in the expansion exploration plan result in the discovery of a commercially producible reservoir, then there will be environmental impacts associated with the reservoir development. All unit development must proceed according to an approved plan of development.

**B. The Prevention of Economic and Physical Waste.**

1. ConocoPhillips submitted geological and engineering data to DNR in support of the unit expansion application. DNR technical staff determined that the expansion area encompasses the minimum area required to include all or part of one or more oil and gas reservoirs, or all or part of one or more potential hydrocarbon accumulations.

2. The plan of exploration for the expansion areas -- subject to the conditions of Section II.A.3 and Section II.A.4 of this Findings and Decision -- meets the requirements of 11 AAC 83.303 and 11 AAC 83.341. The plan is approved for a 5-year period, that is, until April 21, 2009.

3. ConocoPhillips must submit an annual update to the expansion area exploration plan to the Proper Authority for approval under Section 8.1.1 of the CRU Agreement. The annual update must describe the status of projects undertaken and the work completed, and any proposed changes to the plan. Any changes to the unit plan must comply with Article 8 of the CRU Agreement. ConocoPhillips must submit a new exploration or development plan before the expansion area exploration plan expires.

4. For reporting convenience, the annual update to the expansion area exploration plan may be submitted simultaneously with the annual update to the CRU unit plan.

5. Including the expansion leases in the CRU will help ensure a fair return to the State from hydrocarbon production from the expanded unit area.

6. The expansion of the CRU will expedite exploration and development of the unit area. The unit expansion provides greater economic benefits to the State than the economic costs to the State of extending the term of the State leases committed to the unit.

**C. The Protection of All Parties in Interest, Including the State.**

1. The CRU expansion, subject to the conditions of Section II.A.3 and Section II.A.4 of this Findings and Decision, adequately protects the public interest, and is in the State's best interest.

2. The CRU expansion, subject to the conditions of Section II.A.3 and Section II. A.4 of this Findings and Decision meets the requirements of AS 38.05.180(p) and 11 AAC 83.303.

3. DNR complied with the public notice requirements of 11 AAC 83.311.

4. The unit expansion will not diminish access to public and navigable waters beyond those limitations (if any) imposed by law or already contained in the oil and gas leases covered by this Agreement.

5. The CRU Agreement provides for expansions and contractions of the unit area in the future, as warranted by data obtained by exploration. The Agreement thereby protects the public interest, the rights of the parties, and the correlative rights of adjacent landowners.

6. ConocoPhillips, as Unit Operator, provided evidence of reasonable effort to obtain joinder of proper parties to the CRU Agreement.

7. The applicants for expansion have sufficient interest in the unit to exercise control of unit operations. 11 AAC 83.316(c).

8. Revised Exhibits A and B to the CRU Agreement shall be submitted to the Proper Authority in accordance with Sections 2.1 and 2.2 of the CRU Agreement.

For the reasons discussed in this Findings and Decision, I hereby approve the Third Expansion of the Colville River Unit. Pursuant to Section 12.1 of the CRU Agreement, this Third Expansion will be effective after approval by the Commissioner and the President of ASRC.

A person affected by this decision may appeal it, in accordance with 11 AAC 02. Any appeal must be received within 20 calendar days after the date of "issuance" of this decision, as defined in 11 AAC 02.040(c) and (d) and may be mailed or delivered to Tom Irwin, Commissioner, Department of Natural Resources, 550 W. 7th Avenue, Suite 1400, Anchorage, Alaska 99501; faxed to 1-907-269-8918, or sent by electronic mail to dnr_appeals@dnr.state.ak.us. This decision takes effect immediately. An eligible person must first appeal this decision in accordance with 11 AAC 02 before appealing this decision to Superior Court. A copy of 11 AAC 02 may be obtained from any regional information office of the Department of Natural Resources.

*Original signed by Sean Parnell, Deputy Director* *April 22, 2003*

Mark D. Myers, Director
Division of Oil and Gas

Date

Attachment 1: Third CRU Expansion Leases/Tracts
Attachment 2: Map of Third CRU Expansion Leases/Tracts
Attachment 3: Agreed-to Plan of Exploration for the Third CRU Expansion Area

CRU_3rdExpansion_F&D

ATTACHMENT 3

Planned Exploration Activities

For the Third Colville River Unit Expansion Area

**A. Expansion Area**

The Expansion Area shall consist of the lands described on Attachment 1 to this document. The Expansion Area consists of:

| | |
|---|---|
| State of Alaska lands | 17,027.39 acres |
| ASRC lands | 17,148.59 acres |
| Total all lands | 34,175.98 acres |

More or less within T. 12-13 N., R. 2-4 E., U.M., Alaska

The Expansion Area is further divided into an Area "A" and Area "B" for purposes of delineation/exploration activities. See Attachment 2 to this document.

Area A is defined as CRU Tracts 162-173; Tract 174: Section 32; Tract 177: T12N, R3E, U.M. Sections 4-11 and 13-24; Tract 178.

Area B is defined as CRU Tract 174: Section 30 and 31; Tracts 175 and 176; Tract 177: T13N, R2E, U.M., Sections 33-36; T12N, R2E, U.M., Sections 1-4, 9-12.

**B. Exploration Drilling**

1. By December 31, 2004, commit, in writing, to drill the Iapetus #1 Well to a bottomhole location within either Area A or Area B by June 1, 2005. If the CRU Working Interest Owners ("CRU WIOs") fail to make this commitment, all the Expansion Area leases will automatically contract out of the CRU on December 31, 2004, and expire according to their terms.
2. Drill the Iapetus #1 Well by June 1, 2005, to a bottomhole location of the CRU WIOs' choosing within Area A or Area B to the target interval as described in Attachment 3 to the Application. If the Iapetus #1 Well is not drilled by June 1, 2005, then all of the acreage within the Expansion Area shall automatically contract out of the CRU on June 1, 2005, and no payment shall be due to the DNR or ASRC. The timely drilling of the Iapetus #1 Well in accordance with this paragraph shall maintain all of the Expansion Area in the CRU until the obligation date described in paragraph B.3 below.
3. By June 1, 2005, commit in writing to drill a second test well (hereinafter referred to as the "Iapetus #2 Well") by June 1, 2006, to a bottomhole location of the CRU WIOs' choosing within Area A or Area B, but not the same Area selected for the Iapetus #1 Well, and with the bottomhole location of the Iapetus #2 Well separated at least one mile (5280 feet) horizontally from the bottomhole location of the Iapetus #1 Well. If the CRU WIOs decline to commit to drill the Iapetus #2 Well then all of the acreage within either Area A or Area B, the Area not containing the Iapetus #1 Well, shall automatically contract out of the CRU on June 1, 2005. If the CRU WIOs commit to drill the Iapetus #2 Well, but fail to drill the Iapetus #2 Well by June 1, 2006, then the acreage within the Area selected for the Iapetus #2 Well shall automatically contract out of the CRU on June 1, 2006 and the CRU WIOs shall make a payment of either (1) if Area A contracts out of the CRU, Two Hundred Eleven Thousand Two Hundred Dollars ($211,200.00) or (2) if Area B contracts out of the CRU, One Hundred Seven Thousand Eight Hundred Dollars ($107,800.00), proportionately to and as directed by, the DNR and ASRC.

4. The timely drilling of the Iapetus #1 Well and/or the Iapetus #2 Well in accordance with paragraph B.2 and B.3, respectively, shall maintain the appropriate Area or Areas in the CRU until the obligation date described in paragraph B.5 below.
5. The Expansion Area lands must be included in an approved participating area within 5-years of the effective date of the Third CRU Expansion Findings and Decision. Any Expansion Area lands not in an approved participating area with 5 years of the effective date shall automatically contract from the CRU on that date. If a participating area is not proposed and approved within 5-years from the effective date of this Findings and Decision, then all of the Expansion Area shall automatically contract from the CRU.

# APPENDIX C TO DECLARATION OF EDWARD MORSE

# North Slope Unit Ownership




Percentages are based upon Working Interest Ownership on an acreage basis.