**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **WALLACE OENGA, GEORGENE SHUGLUK, LEROY OENGA, SR., MICHAEL DELIA, TONY DELIA, JOSEPH DELIA, JENNIE MILLER, and TRINITY DELIA,** | ) | **No. 06-491 L** **Chief Judge Edward Damich** |
| **Plaintiffs.** | ) | |
| **v.** | ) | |
| **THE UNITED STATES,** | ) | |
| **Defendant, and** | ) | |
| **BP EXPLORATION (ALASKA) INC., CONOCOPHILLIPS ALASKA, INC., EXXON MOBIL ALASKA PRODUCTION, INC., CHEVRON U.S.A., INC. and FOREST OIL CORPORATION,** | ) | |
| **Defendant Intervenors,** | ) | |
| **and KUUKPIK CORPORATION,** | ) | |
| **Intervenor-Defendant.** | ) | |

**KUUKPIK CORPORATION'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES. .......................................................................................... ii

I. QUESTIONS PRESENTED. ........................................................................... 2

II. PERTINENT FACTS. ..................................................................................... 2

A. About Kuukpik. ........................................................................................ 2

B. About the Surface Use and Other Related Agreements. .................................. 3

C. Confidentiality and Potential Harm to Kuukpik From Disclosure. ................... 5

III. ARGUMENT. ................................................................................................ 7

A. The Documents Are Not Relevant to Deciding the Liability Issue Raised by the United State's Motion to Dismiss/Summary Judgment. ............................ 7

B. The Transactions the Documents Cover are in no Way "Comparable". ......... 10

C. BIA Had No Access to the Documents – Neither Should Plaintiffs. .............. 13

IV. CONCLUSION. ............................................................................................ 13

# TABLE OF AUTHORITIES

**Statutes**

43 U.S.C. § 1601 et. seq. .......... 2

43 U.S.C. § 1613(f). .......... 12

25 U.S.C. § 415 (2007). .......... 8

25 C.F.R. Part 162 (2007). .......... 8

Public Law 96-481 (12/2/1980). .......... 12

AS 45.50.940(3). .......... 5

**Cases**

*Northrop Grumman Information Technoloy, Inc. v. United States*,
74 Fed. Cl. 407, 417 (2007). .......... 5

## I. QUESTIONS PRESENTED

Kuukpik Corporation ("Kuukpik") disagrees with Plaintiffs' description of the issues their motion raises and believes they can more aptly be stated as follows:

> Should the Court order production of confidential documents that contain competitively sensitive proprietary and trade secret information of non-party Kuukpik Corporation that (1) has no relevance at all to deciding the liability issue raised by the United State's motion to dismiss and/or for summary judgment; (2) concerns transactions so different in kind, character and magnitude from the Native Allotment rent question involved in this case that they cannot conceivably be deemed "comparable" for computing damages should Plaintiffs' claim survive the United State's motion; and where (3) the information would not have been available to the BIA to compute the periodic rent adjustments as Plaintiffs contend it should have?

## II. PERTINENT FACTS

### A. About Kuukpik.

Kuukpik was formed in 1973 pursuant to the Alaska Native Claims Settlement Act ("ANCSA"), 43 U.S.C. § 1601 *et seq.*, and is the Alaska Native Village Corporation for Nuiqsut, an Inupiat village located on Alaska's North Slope in the Colville River Delta some 20 miles from the Beaufort Sea. Declaration of Lanston Chinn (hereafter "Chinn Decl.") at ¶ 2. Prior to the discovery of oil, Nuiqsut was primarily a subsistence based economy, and subsistence remains an integral way of life for the people of Nuiqsut, who still live off the land and the sea and hunt caribou, moose, birds, fish and whale. Chinn Decl. at ¶ 5. Even now seventy percent of all households in Nuiqsut get half or more of what they eat through subsistence activities, the consumption of subsistence

resources averaging 742 pounds per person per year. *Id.* For most Nuiqsut residents over the age of 45 or 50, English is a second language. *Id.*

More than ninety-five percent of the 500 or so residents of Nuiqsut are Kuukpik shareholders, married to Kuukpik shareholders or children of Kuukpik shareholders. Chinn Decl. at ¶ 6. Kuukpik's principal asset is its lands, some of which are in an area known as the National Petroleum Reserve – Alaska ("NPRA"), and some located outside and east of NPRA. *Id.* Kuukpik's land ownership includes the surface of approximately half the area overlying the Alpine oil field, which is just 8 miles from Nuiqsut, in the heart of Nuiqsut residents' traditional subsistence range. Chinn Decl. at ¶¶ 4, 6. Alpine was the largest on-shore oil field discovery in North America in 15 years, and the first North Slope oil field discovery located on Native-owned lands since ANCSA's enactment in 1971. The oil field itself lies in the Colville River Delta, one of the richest and most ecologically sensitive areas on the North Slope. Chinn Decl. at ¶ 4.

Now, almost all of Kuukpik's business activities are based on the economic opportunities associated with oil and gas development. Chinn Decl. at ¶ 4.

**B. <u>About the Surface Use and Other Related Agreements.</u>**

The documents that Plaintiffs want access to – and what Kuukpik seeks to protect from disclosure – are the 1997 Surface Use Agreement ("SUA") between Kuukpik and ARCO Alaska, Inc. (now re-named ConocoPhillips, Alaska, Inc. ("CPAI")); the 1997 1431(o) Consent Agreement between Kuukpik and Arctic Slope Regional Corporation

("ASRC"); the 1997 Lease Amendment Agreement between ASRC and ARCO Alaska, Inc. (now CPAI); and the 1992 Settlement Agreement between ASRC and Kuukpik.

Together, these agreements govern the terms and conditions on which Kuukpik consented to oil and gas exploration and development activities on its lands. However, they concern much more than just compensation for the use of land. They consist of over 200 pages of very complex agreements that were intended to govern almost every aspect of not just what was then ARCO's (now CPAI's) exploration, development, production and decommissioning of Alpine on Kuukpik's lands, but also set minimum standards and conditions for development and operation of any future oil discoveries on Kuukpik's lands. Chinn Decl. at ¶ 7. The SUA includes provisions for education and training for Kuukpik shareholders and their families and Nuiqsut residents, preferences in contracting and local employment, and contractual environmental protections which incorporate not just state and federal environmental standards, but also specific environmental standards and stipulations developed by Kuukpik, and create a subsistence oversight panel to monitor ARCO's (now CPAI's) activities. *Id.* As additional consideration for CPAI's use of what will eventually be over 145,000 acres, the SUA requires CPAI to make certain annual payments to Kuukpik and provide other financial support to Kuukpik for the oversight panel, employment training and education, and other purposes. *Id.*

With regard to royalties (payment of which being why Plaintiffs say they want these documents), the SUA directs that CPAI pay to Kuukpik the royalties specified in the 1431(o) Consent Agreement between Kuukpik and ASRC. Chinn Decl. at ¶ 8. In

that agreement, Kuukpik gave its consent to ASRC to develop ASRC's NPRA subsurface (some of which ASRC owns with the State of Alaska per the terms of a 1991 ASRC/State settlement agreement resolving disputes about subsurface ownership under Kuukpik's non-NPRA lands). *Id.* The 1431(o) Consent Agreement provides for Kuukpik to receive varying overriding royalty percentages as to various different tracts, with such royalties expressly coming out of ASRC's royalty interests. *Id.* This is further reflected in the 1997 Lease Amendment Agreement between ASRC and the oil company lessees, by providing for corresponding reductions in the royalties to be paid to ASRC. *Id.* The 1992 Settlement Agreement gave Kuukpik consent to oil and gas exploration and development with respect to ASRC/State of Alaska subsurface located outside of NPRA, for which Kuukpik received certain consideration, including a modest overriding royalty which is also deducted from ASRC's royalty share. *Id.*

### C. **Confidentiality and Potential Harm to Kuukpik from Disclosure.**[1]

[1]Kuukpik is mindful that the Court has entered a protective order (at docket 58) the terms of which would cover any documents Kuukpik may be ordered to produce. However, protective orders, no matter how well drafted, are by no means a guarantee against disclosure, inadvertent or otherwise. Further, there is little in the way of an effective remedy in the event of disclosure, "given the vagaries of legal enforcement of such devices as judicial protective orders." *Northrop Grumman Information Technoloy, Inc. v. United States*, 74 Fed. Cl. 407, 417 (2007). Kuukpik further notes that the protective order the Court has entered nowhere provides the option to produce documents in redacted form (to omit confidential information even Plaintiffs would likely concede has no relevance to their case), and that it expires 90 days after the action is concluded, and then calls for protected information to be unsealed (unless "classified"), absent a motion to extend the protective order, which may or may not be granted. Given the importance to Kuukpik of maintaining the confidentiality of this information, it cannot voluntarily accept the risks associated with production subject to a protective order.

Revealing anything more definite beyond that generally described above risks compromising the very confidentiality that Kuukpik seeks to protect. The specifics of the SUA and related agreements are highly confidential and are regarded and treated by Kuukpik as trade secrets.[2] Chinn Decl. at ¶ 9. Kuukpik and CPAI have uniformly denied requests by others to obtain access to the SUA or the related agreements. *Id.* Indeed, one example of this is described in part in the materials included with Plaintiffs' motion to compel. See Docket 46, Appendix B to Declaration of Edward Morse, at pp. 10-11. The Alaska Division of Oil & Gas ("ADO&G"), which represents the State in its capacity as an owner of oil-producing lands, sought to obtain a copy of the SUA, and indicated that it was going to withhold certain tracts of land subject to the SUA from its upcoming lease sales, if the SUA was not provided to it. In response, both CPAI (which wanted to lease the tracts ADO&G threatened to withhold from the lease sale) and Kuukpik (which stood to get royalties if oil was discovered and produced from some of those tracts) refused to provide the SUA to ADO&G. Chinn Decl. at ¶ 9.

The harm to Kuukpik from disclosure of this confidential information could be immense. The oil and gas industry essentially provides the only opportunities for private economic development and employment in the many hundreds of square miles around Nuiqsut. Chinn Decl. at ¶ 10. Through the terms of the SUA, Kuukpik has been able to

---

[2]Alaska's Uniform Trade Secrets Act (copy included in Appendix A at p.2) protects information that "derives independent economic value, actual or potential, from not being generally known" and that "is the subject of efforts that are reasonable under the circumstances to protect its secrecy." AS 45.50.940(3).

develop various joint ventures which offer oil and gas services in specialty areas such as construction of gravel pads and ice roads, seismic work and camps and catering. *Id.* If competing contractors in these areas or the public knew the nature and scope of the preferences and assistance that Kuukpik receives by virtue of the SUA in these areas of oil field service work and Native hire and training, much of Kuukpik's competitive advantage would disappear. *Id.*

Maintaining confidentiality of the various terms of the SUA and related agreements is all the more important as new oil companies enter the area and seek access to or across Kuukpik's lands. Whether these agreements' terms apply to new oil and gas operators coming into the area is a subject on which ASRC and Kuukpik have disagreements. However, the SUA was negotiated with a one large leaseholder in mind, and many of its terms may not fit the situations presented by other oil companies with much smaller lease holdings (as some of CPAI's leases have expired or been released, others have acquired that acreage, but none hold interests affecting Kuukpik surface lands as large as ARCO had in 1997 or CPAI has now). Chinn Decl. at ¶ 11. As Kuukpik negotiates with and tries to reach agreement with these new companies, the SUA's terms will need modification for lessees holding smaller tracts who seek to access and use Kuukpik's lands. *Id.*

Kuukpik has also learned the need for additional protections and terms that it would seek in negotiations with other oil companies based on Kuukpik's and Nuiqsut residents' first hand experience over the past 10 years of a massive oil and gas industrial

facility and extensive exploration activities on the community's traditional subsistence lands. Chinn Decl. at ¶ 11. In his Declaration, Kuukpik's CEO, Lanston Chinn, describes several specific examples of instances where negotiations with new oil companies are occurring or are likely to occur where terms for access across or use of Kuukpik lands will be an issue and which could be negatively impacted through the disclosure of the terms of the SUA or the related agreements. *Id.* at ¶ 11. Maintaining their confidentiality is critically important to Kuukpik in holding onto the advantages it has in competing through its joint ventures for oil and gas services work and in its negotiations with much larger and better funded oil companies over access to Kuukpik lands. *Id.*

## III. ARGUMENT

### A. The Documents Are Not Relevant to Deciding the Liability Issue Raised by the United State's Motion to Dismiss/Summary Judgment.

Plaintiffs characterize the documents they seek as "certain documents relating to the lease of a similar Native surface interest at a neighboring oil field on the North Slope of Alaska used as a site for oil production pads." Docket 46, Oenga's Memorandum in Support of Motion to Compel (hereafter "Oenga's Mem.") at 4. Despite the confidential and proprietary nature of these documents both to CPAI and to Kuukpik especially, Plaintiffs contend that "they cannot fully respond to the United States' Motion to Dismiss/Summary Judgment regarding Claim 2 without these documents." *Id.*

Plaintiffs' Claim 2 is based on the Indian Long-Term Leasing Act (25.U.S.C. § 415 (2007)), its implementing regulations (25 C.F.R. Part 162 (2007)), and the Oenga

Lease Agreement itself. See Docket 13, First Amended Complaint, at 13-14. In Claim 2, Plaintiffs allege that the United States breached its fiduciary and trust obligations owed Plaintiffs as a result of the statute, the regulations, and the lease agreement, because the "fair annual rental" for the use of Oenga's 40-acre Native Allotment should have been – but was not – based on a royalty on the value of the oil and gas produced through the drilling pad and production facility constructed thereon. *Id.* at 15.

The United States' motion to dismiss and/or for summary judgment with respect to Claim 2 is premised on two arguments: (1) "the BIA had no obligation to measure the lease rental adjustments by using royalty rates paid to owners of allegedly 'comparable' properties;" and (2) the two lease rental adjustments that are the subject of Claim 2 were made in 1993 and in 1997 such that "Claim 2 is barred by the 6-year statute of limitations period which governs suits filed under 28 U.S.C. § 1491." Docket 42, United States' Motion to Dismiss, etc., at 2.

Plaintiffs nowhere contend that the documents they seek are relevant to the statute of limitations issues, and it is clear that the documents in question would have no bearing on those issues. The question before this Court, then, is to decide if these documents are relevant to resolving the issues raised by the United States' first argument, *i.e.*, whether BIA had any obligation to consider royalty rates paid to owners of allegedly comparable properties.

For the reasons succinctly set forth in the United State's Opposition to Plaintiffs' Motion to Compel (docket 50), the SUA and related agreements clearly have no bearing

on deciding this issue. Determining whether BIA had such an obligation is a legal question, the proper resolution of which should turn on the provisions of the governing statute, the applicable regulations, and the Oenga Lease Agreement. Do they allow the Government to ignore royalties paid for the use of other allegedly comparable properties in setting the "fair annual rental" for the use of Oenga's Allotment (Plaintiffs' broader interpretation of the United State's motion)? Or do they require/not require that "fair annual rental" be set as a royalty (the question Plaintiffs say the United State's motion raises if "viewed narrowly")? In either case, answering the legal question raised in no way, shape or form turns on the specific terms and conditions agreed to in a different (even if allegedly similar) transaction involving others whose relationships are in no way governed by the statute, the regulations, or the lease form that are the claimed source of the obligation Plaintiffs allege the United States breached.

The reality is that Plaintiffs want these documents not to prove that a legal obligation existed, but to try to establish damages for the asserted breach of an obligation the existence of which is very much in doubt. The Declaration of Edward Morse, Plaintiffs' appraiser, says as much. He claims he needs the documents to "render a thorough and complete opinion on their applicability as comparables that could be used to properly appraise the rental values of the Oenga property ...." See Docket 46, Morse Declaration at ¶ 8. That goes to damages, not liability.

The SUA and the related agreements have no bearing at all on the issues raised by the United State's motion.

**B. The Transactions the Documents Cover Are Not "Comparable."**

Even if Plaintiffs were entitled to do discovery on damages issues at this stage of the case,[3] the underlying premise for Plaintiffs' pursuit of the SUA and related agreements – that they concern a comparable transaction – could not be further from the truth. As the Declaration of Kuukpik's CEO, Lanston Chinn, makes clear, the SUA and the other related agreements are about considerably more than just compensation for land use. They are very complex agreements intended to regulate CPAI's use of and mitigate the adverse impacts to Kuukpik's lands resulting from large-scale oil and gas exploration and development activities, and to protect the traditional subsistence lifestyle of Kuukpik's shareholders and the Inupiat residents of Nuiqsut. See Chinn Decl. at ¶ 7. The SUA includes provisions for education and training, contracting and local employment preferences, and contractual environmental protections that go well beyond what state and federal environmental standards require. In stark contrast to the lease covering the 40 acre Oenga Allotment, the SUA covers what will eventually be over 145,000 acres, after all of Kuukpik's land selections and conveyances are completed.

---

[3]Kuukpik's understanding of the Court's Order at docket 38 is that the Court intended to limit discovery at this time to matters relevant to deciding the pending dispositive motions which address liability, not damages. However, Plaintiffs' motion to compel argues the documents they seek are relevant to damages, and since this could conceivably be an issue down the road should the Court deny the United State's motion, Kuukpik addresses the question here to (hopefully) avoid the need to intervene again at a later date when/if discovery relevant to damages is allowed.

It is true that under these agreements Kuukpik receives royalties in varying percentages on different tracts, but those royalties are the result of compromises reached between Kuukpik and Arctic Slope Regional Corporation ("ASRC"), which owns (in some instances in conjunction with the State of Alaska) the subsurface beneath Kuukpik's lands. See Chinn Decl. at ¶ 8. Those compromises related to the meaning and scope of Kuukpik's unique rights to consent to any subsurface development by ASRC. Such rights were granted by, or had their genesis in, rights given to Alaska Native Village Corporations generally by Section 14(f) of the Alaska Native Claims Settlement Act ("ANCSA"),[4] and to Kuukpik specifically by Section 1431(o) of the Alaska National Interest Lands Conservation Act ("ANILCA").[5] The royalty payments Kuukpik receives

---

[4]43 U.S.C. § 1613(f). Under Section 14(f) of ANCSA (copy included in Appendix A at p.3), when surface estate conveyances to Native village corporations in fulfillment of their land entitlements are made, the Native regional corporation encompassing the village generally receives title to the subsurface. However, the regional corporation's right to develop the subsurface estate "in the lands within the boundaries of any Native village shall be subject to the consent of the Village Corporation." Kuukpik's NPRA lands were specifically excluded from Section 14(f), and the 14(f) dispute between Kuukpik and ASRC related to Kuukpik's non-NPRA lands and the terms on which it would consent to ASRC development of the subsurface beneath those lands. Much of the controversy centered on what lands were included "within the boundaries" of the Native Village of Nuiqsut, ASRC contending they were limited to the lands immediately surrounding Nuiqsut, whereas Kuukpik contended its Section 14(f) consent rights extended to all lands owned by Kuukpik which its shareholders or their predecessors used for subsistence purposes. The 1992 Settlement Agreement between Kuukpik and ASRC resolved this issue and gave Kuukpik consent to development of the ASRC/State subsurface beneath Kuukpik's non-NPRA lands, which was necessary before a lease sale previously scheduled by the State of a portion of the ASRC/State subsurface could go forward.

[5]Part of Public Law 96-481 (12/2/1980). Section 1431(o) of ANILCA (copy included in Appendix A at p. 3) is what allowed ASRC to acquire the subsurface beneath

are paid from, and expressly carved out of, ASRC's royalty interest share. They are not "rent" for CPAI's use of Kuukpik's land, but instead constitute part of the consideration Kuukpik was able to negotiate and get ASRC to pay in exchange for consenting to development of ASRC's subsurface.

There is simply no merit to Plaintiffs' contentions that the SUA and the other agreements relate to a "comparable" lease situation which they need to review in order properly to value the Oenga Native Allotment. The circumstances in which these agreements were negotiated and the transactions they cover bear no similarity whatever to the Oenga Native Allotment Lease or determining the "fair annual rental" for same.[6]

**C. <u>BIA Had No Access to the Documents – Neither Should Plaintiffs.</u>**

---

Kuukpik's NPRA lands. It gave ASRC the option to trade its so-called "in lieu" subsurface to acquire subsurface in NPRA. However, to exercise the option ASRC had to "obtain the concurrence of the affected Village Corporation," *i.e.*, Kuukpik. Negotiations over such concurrence were protracted and occurred over many years, and in 1987 when the deadline for ASRC to exercise the option was about to expire, ASRC and Kuukpik entered into an agreement that provided concurrence for ASRC to acquire NPRA subsurface, but conditioned such concurrence on Kuukpik's further right to consent to any oil and gas exploration or development activities. Following many years of further negotiations, and the filing of and dismissal of a lawsuit brought by ASRC against Kuukpik over the validity of the 1987 agreement, ASRC and Kuukpik finally reached agreement on the terms for Kuukpik consent to development of ASRC's NPRA subsurface, which are set forth in the 1997 1431(o) Consent Agreement.

[6]Kuukpik believes there are ample and obvious grounds for denying Plaintiffs' motion to compel based on the existing record before the Court. However, if the Court has doubts on the "comparability" of the transactions covered by the SUA and the related agreements to the Oenga Native Allotment lease issues which it believes can only be resolved by reviewing the agreements, Kuukpik is prepared to submit them under seal to the Court for *in camera* review.

Finally, it bears emphasis that Plaintiffs' Claim 2 is based on the theory that the BIA should have determined the fair market rent for the Oenga Native Allotment by considering royalties paid to others for allegedly similar uses of their land. Yet even if BIA had done what Plaintiffs claim it should have, neither BIA nor its appraisers would have had access to the SUA or the other related agreements. The BIA has no authority to compel production of information from private parties to a private transaction for purposes of valuing Native allotments. To give Plaintiffs access to confidential documents for their use in trying to prove that the BIA breached its obligations to Plaintiffs by failing to consider information unavailable to the BIA makes no sense and would be wrong.

## IV. CONCLUSION

The SUA and the related agreements have no bearing on resolving the issues raised by the United State's motion. Nor are they relevant to any other issues in the case. Plaintiffs' contention that they need the SUA and related agreements for use as evidence of a "comparable" to compute damages should Plaintiffs avoid dismissal/summary judgment on liability is likewise without merit. The transactions these documents cover, and the context in which those transactions occurred, are totally different from the Oenga Native Allotment lease. BIA did not have access to this confidential and proprietary information of Kuukpik, and neither should Plaintiffs.

Plaintiffs' motion to compel should be denied.

Dated this 22nd day of June, 2007.

s/Bruce E. Falconer
BRUCE E. FALCONER
Boyd, Chandler & Falconer, LLP
911 W. 8th Avenue, Suite 302
Anchorage, Alaska 99501
Telephone: (907) 272-8401
Fax: (907) 274-3698
bfalconer@bcf.us.com

**Certificate of Service**

I hereby certify that on the 22nd day of June, 2007, I electronically filed the foregoing KUUKPIK CORPORATION'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL AND APPENDIX A with the Clerk of the Court using the CM/ECF System which will send notification of such filing to all parties of record.

RAYMOND C. GIVENS
Givens Law Firm
P.O. Box 400
912 E. Sherman Ave.
Coeur d'Alene, Idaho 83816-0400
Tel. (208) 676-1310
Fax: (208) 676-1296
E-mail: raygivens@givenslaw.com
Attorney for Plaintiffs

JAMES M. UPTON
U.S. Department of Justice
Environment & Natural Resources Div.
Natural Resources Section
P.O. Box 663
Washington, D.C. 20044-0663
Tel. (202) 305-0482
Fax: (202) 305-0506
E-mail: james.upton@usdoj.gov
Attorney for Defendant

LOUIS R. VEERMAN
GARY ZIPKIN
JOSEPH J. PERKINS, JR.
Guess & Rudd P.C.
510 L Street, Suite 700
Anchorage, Alaska 99501
(907) 793-2200 (switchboard)
(907) 793-2299 (fax)
E-mail: d.veerman@guessrudd.com
gzipkin@guessrudd.com
jperkins@guessrudd.com
Attorneys for Intervenors