IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WALLACE OENGA, GEORGENE SHUGLUK, LEROY OENGA, SR., MICHAEL DELIA, TONY DELIA, JOSEPH DELIA, JENNIE MILLER, and TRINITY DELIA, | ) | |
| Plaintiffs, | ) | Case No. 06-491 L<br>(ECF No. 1-06-cv-00491-EJD)<br>Chief Judge Edward J. Damich |
| vs. | ) | |
| THE UNITED STATES, | ) | |
| Defendant, | ) | |
| and | ) | |
| BP EXPLORATION (ALASKA) INC., CONOCOPHILLIPS ALASKA, INC., EXXONMOBIL ALASKA PRODUCTION INC., CHEVRON U.S.A. INC., and FOREST OIL CORPORATION, | ) | |
| Intervenor-Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF INTERVENOR-DEFENDANTS' *CORRECTED* MOTION FOR PARTIAL SUMMARY JUDGMENT (CLAIM THREE OF PLAINTIFFS' FIRST AMENDED COMPLAINT)**

Intervenor-Defendants, by and through their attorneys, Guess & Rudd P.C., hereby file this memorandum in support of their motion for summary judgment in favor of the Defendant and Intervenor-Defendants and against Plaintiffs respecting Claim Three of Plaintiffs' First Amended Complaint filed herein on September 18, 2006.

## TABLES OF CONTENTS

### Table of Contents—Memorandum In Support of Motion

| | Page |
|---|---|
| Table of Contents—Memorandum In Support of Motion | 2 |
| Table of Contents—Appendix (Exhibits A through P) | 4 |
| Table of Authorities Cited | 6 |
| Introduction and Concise Statement of the Motion | 7 |
| Applicable Rule of the CFC | 8 |
| Facts | 9 |
| Argument | 16 |
| 1. Pursuant to the Oenga Lease, Lessor has granted to BPX the right to occupy and use the leased premises for any and all purposes related to the development and production of oil and gas, *without limiting such right to certain particular tracts, areas, reservoirs, or lands but not others*. BPX's use and occupancy of the leased premises thus has been at all times authorized by and within the scope of the grant made by the Oenga Lease. | 16 |
| a. The express terms and plain language of the Oenga Lease grant to BPX the right to occupy and use the leased premises for any and all purposes related to the development and production of oil and gas, *without limiting such occupancy or use for the benefit of any particular lands.* | 16 |
| b. Because the Oenga Lease is a *lease* and not a right-of-way or easement, it grants all rights in and to the leased premises not expressly retained by Lessor. | 22 |
| 2. Under the 1994 Lease Amendment, BPX was authorized to enter into the Facility Sharing Agreement with ARCO Alaska, Inc. and Exxon Corporation without notice to or consent of Lessor. Thus, because BPX could occupy and use the leased premises for any and all purposes related to the development and production of oil and | |

gas, *without limiting such uses to any particular tracts, areas, reservoirs, or lands*, the shared use and occupancy of the leased premises by ARCO Alaska, Inc. and Exxon Corporation with BPX under the Facility Sharing Agreement for purposes related to the development and production of oil and gas from any lands has been at all times authorized by and within the scope of the grant made by the Oenga Lease. 26

Conclusion 28

**Table of Contents—Appendix (Exhibits A through P)**


| | | Page |
|---|---|---|
| Exhibit A: | Lease Agreement (BIA Lease No. F-89-01) between Andrew Oenga (with the approval of the Secretary of the Interior) and BPX, effective January 1, 1989, and recorded on February 1, 1989, at Book 53, Pages 873-890, Barrow Recording District ("Original 1989 Lease Agreement") | 4 |
| Exhibit B: | BPX's unrecorded letter of July 29, 1993, to the Bureau of Indian Affairs | 23 |
| Exhibit C: | Agreement To Amend BIA Lease among the heirs of Andrew Oenga (with the approval of the Secretary of the Interior) and BPX, effective January 20, 1994, and recorded on May 2, 1994, at Book 74, Pages 292-298, Barrow Recording District ("1994 Lease Amendment") | 26 |
| Exhibit D: | Third [sic] Amendment To BIA Lease among the heirs of Andrew Oenga (with the approval of the Secretary of the Interior) and BPX, effective May 11, 1995, and recorded on June 14, 1995, at Book 79, Pages 223-227, Barrow Recording District ("1995 Lease Amendment") | 34 |
| Exhibit E: | Evidence of change of name by Standard Alaska Production Company to BP Exploration (Alaska) Inc., effective January 31, 1989 | 40 |
| Exhibit F: | Native Allotment Certificate No. 50-2005-0580, dated September 27, 2005 | 53 |
| Exhibit G: | Tentative Approval decision dated October 9, 1964, as amended by the decision of February 7, 1969 (as corrected on February 19, 1969), as partially rescinded by the decision of March 11, 1980, and as partially rejected by the decision of August 4, 1980 | 56 |
| Exhibit H: | State of Alaska Competitive Oil and Gas Lease ADL-34630 effective as of April 1, 1967 | 71 |
| Exhibit I: | U.S. Patent No. 50-74-0093, dated March 27, 1974 | 78 |

| | | |
|---|---|---|
| Exhibit J: | Letter Agreement dated January 27, 1994, among BPX, ARCO Alaska, Inc., and Exxon Corporation ("Facility Sharing Agreement") | 83 |
| Exhibit K: | DNR Decision dated June 27, 2000 (as amended, with errata changes), approving BPX as sole operator of the Prudhoe Bay Unit Area | 89 |
| Exhibit L: | DNR Decision dated March 2, 1994, approving formation of Niakuk Participating Area | 104 |
| Exhibit M: | DNR Decision dated November 17, 1997, approving (1) expansion of Niakuk Participating Area and (2) formation of West Niakuk Participating Area | 125 |
| Exhibit N: | DNR letters dated September 12, 2005, October 27, 2005, and March 21, 2006, respecting certain approved Tract Operations | 144 |
| Exhibit O: | DNR Decision dated December 4, 1986, approving formation of Lisburne Participating Area | 153 |
| Exhibit P: | BPX's Responses (dated March 26, 2007) To Plaintiffs' First Interrogatories | 158 |


[In preparing this Motion for Partial Summary Judgment, BPX discovered a few errata in its initial Responses To Plaintiffs' First Interrogatories. BPX will correct these errata as soon as possible and then (1) serve said corrected Responses upon all parties and (2) file a corrected Exhibit P with the court.]

# Table of Authorities Cited


| | Page |
|---|---|
| **Federal Cases:** | |
| Aguilar v. United States, 474 F.Supp. 840, 847 (D. Alaska 1979) | 11 |
| Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375 (Fed. Cir. 2004) | 19 |
| C. Sanchez & Son, Inc. v. United States, 6 F.3d 1539, 1543 (Fed. Cir. 1993) | 16 |
| Castle v. United States, 301 F.3d 1328, 1337 (Fed. Cir. 2002) | 16 |
| Foley Co. v. United States, 11 F.3d 1032, 1034 (Fed. Cir. 1993) | 16 |
| NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159-60 (Fed. Cir. 2004) | 19 |
| S. Cal. Fed. S&L Ass'n v. United States, 422 F.3d 1319, 1328-30 (Fed. Cir. 2005) | 16, 19 |
| **Federal Rules:** | |
| 25 C.F.R. Part 162 (1987) | 22 |
| 25 C.F.R. Part 162 (2006) | 22 |
| 25 C.F.R. Part 169 (2006) | 22 |
| **Other Authorities:** | |
| RESTATEMENT (SECOND) OF PROPERTY: LANDLORD AND TENANT § 1.2 (1977) | 23 |
| RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 1.2 comment d (2000) | 24-25 |
| Milton R. Friedman & Patrick A. Randolph, Friedman on Leases §§ 26:2 (text accompanying nn. 11-12) and 27:3.1 (text accompanying nn. 25 and 28) (5th ed. 2003) | 25 |

## INTRODUCTION AND CONCISE STATEMENT OF THE MOTION

This case involves a Lease Agreement dated as of January 1, 1989, between Andrew Oenga (an Alaska Native who entered into said lease agreement with the approval of the Secretary of the Interior) and BP Exploration (Alaska) Inc. ("BPX" or "Lessee"),[1] as amended and supplemented as hereinafter described. Claim Three of Plaintiffs' First Amended Complaint ("Claim Three") seeks damages from the United States for the alleged failure by the United States to prevent Intervenor-Defendants ("Intervenors") from using the leased premises for purposes allegedly beyond the scope of the grant made by the lease. However, since the undisputed facts establish that the actions of Intervenors on the leased premises have been at all times within scope of the grant made by the lease, Claim Three fails as a matter of law.

Pursuant to this motion, Intervenors request that this court find that the actions of Intervenors on the leased premises have been at all times within scope of the grant made by the lease and that both Defendant and Intervenors are therefore entitled to summary judgment against Plaintiffs with respect to Claim Three.

---

[1] Standard Alaska Production Company (a Delaware corporation) was the name of the lessee when the original "Lease Agreement (BIA Lease No. F-89-01)" effective January 1, 1989, was executed. See Exhibit A attached hereto. Effective January 31, 1989, Standard Alaska Production Company changed its name to BP Exploration (Alaska) Inc. See Exhibit E attached hereto.

## APPLICABLE RULE OF THE CFC

RCFC 56 ("Summary Judgment") provides, in relevant part, as follows:

> *(b) For Defending Party.* A party against whom a claim or counterclaim is asserted … may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof.
>
> *(c) Motion and Proceedings Thereon.* The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.…
>
> …
>
> *(h) Procedures.* The following procedures shall be followed with respect to motions for summary judgment:
>
> (1) The moving or cross-moving party shall file, together with its motion, a separate document titled Proposed Findings of Uncontroverted Fact. This document shall contain concise, separately numbered paragraphs setting forth all of the material facts upon which the party bases its motion and as to which the party believes there is no genuine dispute. Each paragraph shall contain citations to the opposing party's pleadings or to documentary evidence, such as affidavits or exhibits, filed with the motion or otherwise part of the record in the case.
>
> (3) … In determining any motion for summary judgment, the court will, absent persuasive reason to the contrary, deem the material facts claimed and adequately supported by the moving party to be established, except to the extent that such material facts are controverted by affidavit or other written or oral evidence.

# FACTS

The lease agreement involved in this case, as the same has been amended and supplemented, comprises the following documents:

(1) Lease Agreement (BIA Lease No. F-89-01) between Andrew Oenga (with the approval of the Secretary of the Interior) and BPX, effective January 1, 1989, and recorded on February 1, 1989, at Book 53, Pages 873-890, Barrow Recording District ("Original 1989 Lease Agreement"), a copy of which is attached hereto as Exhibit A;

(2) BPX's unrecorded letter of July 29, 1993, to the Bureau of Indian Affairs ("BIA"), a copy of which is attached hereto as Exhibit B;

(3) Agreement To Amend BIA Lease among the heirs of Andrew Oenga (with the approval of the Secretary of the Interior) and BPX, effective January 20, 1994, and recorded on May 2, 1994, at Book 74, Pages 292-298, Barrow Recording District ("1994 Lease Amendment"), a copy of which is attached hereto as Exhibit C;

(4) Third [sic] Amendment To BIA Lease among the heirs of Andrew Oenga (with the approval of the Secretary of the Interior) and BPX, effective May 11, 1995, and recorded on June 14, 1995, at Book 79,

Pages 223-227, Barrow Recording District ("1995 Lease Amendment"), a copy of which is attached hereto as Exhibit D.

The Original 1989 Lease Agreement, as first supplemented by BPX's unrecorded letter of July 29, 1993, and then as amended by both the 1994 Lease Amendment and the 1995 Lease Amendment, is referred to herein as the "Oenga Lease".

Plaintiffs are the heirs of Andrew Oenga (see Plaintiffs' First Amended Complaint at ¶ 7) and are referred to herein either as the "Oenga heirs" or, collectively, as "Lessor" (as that term is used on the Oenga Lease).

The Oenga Lease covers a 40-acre parcel of land at Heald Point on the North Slope of Alaska (said 40-acre parcel is referred to hereinafter as the "leased premises") for which Andrew Oenga filed an application in 1971 under the Alaska Native Allotment Act of 1906. See BLM File AKFF014632. Said parcel includes 22.21 acres within Sec. 36, T. 12 N., R. 15 E., U.M., and 17.79 acres in Sec. 1, T. 11 N., R. 15 E., U.M.

As to the 22.21 acres of the leased premises situated in Sec. 36, T. 12 N., R. 15 E., U.M., the allotment application was approved by the BLM and, eventually, Native Allotment Certificate No. 50-2005-0580 was issued on September 27, 2005. See Exhibit F attached hereto. Said allotment certificate expressly excepts and reserves to the United States, out of the estate conveyed by said certificate,

> [a]ll of [the] oil and gas in the land so allotted, and to [the U.S.], or persons authorized by it, the right to prospect for,

> mine, and remove such deposits from the same upon compliance with the conditions and subject to the provision and limitations of the Act of March 8, 1922, as amended, 43 U.S.C. §§ 270-11 (1982) (repealed with a savings provision) and 270-12 (2000).

Said excepted oil and gas estate previously had been conveyed by the United States to the State of Alaska—see Tentative Approval decision dated October 9, 1964 [at p. 2, line 1 of table respecting T. 12 N., R. 15 E., U.M.], as amended by the decision of February 7, 1969 (as corrected on February 19, 1969), as partially rescinded by the decision of March 11, 1980, and as partially rejected by the decision of August 4, 1980 (copies of said decisions are attached hereto collectively as Exhibit G)—and included, together with adjoining lands, in State of Alaska Competitive Oil and Gas Lease ADL-34630 effective as of April 1, 1967 (see Exhibit H attached hereto).

As to the remainder of the leased premises situated in Sec. 1, T. 11 N., R. 15 E., U.M., the allotment has not yet been conveyed. Instead, it appears from the basic public land records available for said township that the United States must seek to recover said remainder from the State of Alaska, to which *all* of the lands in said township were conveyed by U.S. Patent No. 50-74-0093 dated March 27, 1974. See Exhibit I attached hereto; see also Aguilar v. United States, 474 F.Supp. 840, 847 (D. Alaska 1979) (holding that "[i]f the [U.S.] has mistakenly or wrongfully conveyed land to the State of Alaska to which [Native allotment applicants] have a superior claim, it is the responsibility of the defendant to recover that land").

Notwithstanding inaction by the United States to recover the surface of the southern portion of said 40-acre parcel from the State of Alaska, BPX has leased pursuant to the Oenga Lease, and thus is paying rent on, the entire 40-acre parcel as if the entire 40-acre parcel had been certificated.[2]

Pursuant to the Oenga Lease, BPX has developed and currently operates facilities on the leased premises for the development and production of oil and gas from certain oil and gas reservoirs underlying lands adjoining the leased premises. See Plaintiffs' First Amended Complaint at ¶ 9.a; see also Exhibit P attached hereto.[3]

---

[2] For purposes of this motion, BPX has not attempted to ascertain the extent to which any ultimate reconveyance of the southern portion of the leased premises in Sec. 1, T. 11 N., R. 15 E., U.M., by the state to the United States (for purposes of conveyance to the heirs of Andrew Oenga) will except and reserve to the state and its oil and gas lessees rights greater than those excepted and reserved pursuant to Native Allotment Certificate No. 50-2005-0580. BPX simply notes that, in circumstances similar to those facing the United States in connection with the southern portion of said allotment parcel in Sec. 1, T. 11 N., R. 15 E., U.M., the State of Alaska typically excepts and reserves the full oil and gas estate using language identical or similar to that set forth in AS 38.05.125 (2006) (including but not limited to the right to use the conveyed lands for the purpose of extracting oil, gas, and associated substances from the conveyed lands *or other lands*), rather than language referring to the Act of March 8, 1922.

[3] Some of the facilities developed by BPX at Heald Point are situated on the leased premises and some of the facilities developed by BPX at Heald Point are situated on filled tidelands contiguous with the leased premises. This fact is not legally significant for purposes of this motion, however, for it is undisputed that all oil and gas produced through wells drilled from Heald Point (whether through wells drilled from the leased premises or through wells drilled from filled tidelands) is transported across the leased premises.

In addition to their use by BPX, the leased premises were used by ConocoPhillips Alaska, Inc. (a Delaware corporation that formerly was known as ARCO Alaska, Inc. and then as PHILLIPS Alaska, Inc. before changing its name to ConocoPhillips Alaska, Inc.) and Exxon Corporation (predecessor-in-interest to intervenor ExxonMobil Alaska Production Inc.) pursuant to that certain Letter Agreement dated January 27, 1994, among BPX, ARCO Alaska, Inc., and Exxon Corporation (hereinafter "Facility Sharing Agreement"). See Exhibit J attached hereto. Such joint use continued until BPX became the sole operator of the Prudhoe Bay Unit Area in 2000. See Exhibit K attached hereto.

To date, BPX has used the leased premises to facilitate the production of oil and gas from the following lands (all of which are included in the state oil and gas leases identified below):

(1) the lands included in the original Niakuk Participating Area approved by the State of Alaska Department of Natural Resources ("DNR") on March 2, 1994 (see Exhibits L and P attached hereto), as follows:

| PBUA Tract | DNR Lease | Lands | |
|---|---|---|---|
| 4 | 34625 | T12N R15E UM: | Sec. 23 (S2)<br>Sec. 24 (SW4) |
| 31 | 34630 | T12N R15E UM: | Sec. 25 (All)<br>Sec. 26 (All) |
| 32 | 34635 | T12N R16E UM: | Sec. 29 (All)<br>Sec. 30 (All)<br>Sec. 31 (N2)<br>Sec. 32 (N2) |
| 33 | 34634 | T12N R16E UM: | Sec. 28 (All); and |

(2) the lands included in the *expanded* Niakuk Participating Area approved by DNR on November 17, 1997 (see Exhibits M and P attached hereto), as follows:

| PBUA Tract | DNR Lease | Lands | |
|---|---|---|---|
| 4 | 34625 | T12N R15E UM: | Sec. 13 (All)<br>Sec. 14 (All)<br>Sec. 23 (All)<br>Sec. 24 (All) |
| 31 | 34630 | T12N R15E UM: | Sec. 25 (All)<br>Sec. 26 (All)<br>Sec. 36 (NE4) |
| 32 | 34635 | T12N R16E UM: | Sec. 29 (All)<br>Sec. 30 (All)<br>Sec. 31 (N2)<br>Sec. 32 (N2) |
| 33 | 34634 | T12N R16E UM: | Sec. 28 (W2, NE4,<br>NW4SE4, S2SE4).[4] |

---

[4] Almost all of the production to date from lands included in the expanded Niakuk Participating Area has come from the Niakuk accumulation in and under said lands. Production from two of the wells drilled into lands within the Niakuk Participating Area

From 1994 (after execution of the Facility Sharing Agreement) until BPX became the sole operator within the Prudhoe Bay Unit Area in 2000, ARCO Alaska, Inc. and Exxon Corporation used the leased premises to facilitate the production of oil and gas from the lands included in the West Niakuk Participating Area also approved by DNR on November 17, 1997 (see Exhibits M and P attached hereto), as follows:

| PBUA Tract | DNR Lease | Lands | |
|---|---|---|---|
| 5 | 34626 | T12N R15E UM: | Sec. 15 (All)<br>Sec. 16 (All)<br>Sec. 21 (N2, SE4)<br>Sec. 22 (All) |
| 30 | 34629 | T12N R15E UM: | Sec. 27 (All). |

In addition, from 1994 until BPX became sole operator within the Prudhoe Bay Unit Area in 2000, ARCO Alaska, Inc. used the leased premises to facilitate the production of oil and gas from certain lands included in the Lisburne Participating Area approved by DNR on December 4, 1986 (see Exhibits O and P attached hereto), as follows:

| PBUA Tract | DNR Lease | Lands | |
|---|---|---|---|
| 32 | 34635 | T12N R16E UM: | Sec. 31 (All)<br>Sec. 32 (All) |
| 33 | 34634 | T12N R16E UM: | Sec. 33 (All). |

From June 2000 (when it became the sole operator within the Prudhoe Bay Unit Area), BPX has used the leased premises to facilitate the production of oil and gas from the

---

has included some oil from the deeper Raven accumulation in and under said lands. See Exhibit N attached hereto.

lands included in the West Niakuk Participating Area as described above and from the lands included in the Lisburne Participating Area as described above.

## ARGUMENT

**1. Pursuant to the Oenga Lease, Lessor has granted to BPX the right to occupy and use the leased premises for any and all purposes related to the development and production of oil and gas, *without limiting such right to certain particular tracts, areas, reservoirs, or lands but not others*. BPX's use and occupancy of the leased premises thus has been at all times authorized by and within the scope of the grant made by the Oenga Lease.**

**a. The express terms and plain language of the Oenga Lease grant to BPX the right to occupy and use the leased premises for any and all purposes related to the development and production of oil and gas, *without limiting such occupancy or use for the benefit of any particular lands.***

Contract interpretation is a question of law for the court. S. Cal. Fed. S&L Ass'n v. United States, 422 F.3d 1319, 1328 (Fed. Cir. 2005) (citing Castle v. United States, 301 F.3d 1328, 1337 (Fed. Cir. 2002)). A contract must be read in accordance with its express terms and the plain meaning thereof. S. Cal. Fed. S&L Ass'n v. United States, 422 F.3d 1319, 1329 (Fed. Cir. 2005) (citing C. Sanchez & Son, Inc. v. United States, 6 F.3d 1539, 1543 (Fed. Cir. 1993)). Contract interpretation begins with the plain language of the agreement. S. Cal. Fed. S&L Ass'n v. United States, 422 F.3d 1319, 1330 (Fed. Cir. 2005) (citing Foley Co. v. United States, 11 F.3d 1032, 1034 (Fed. Cir. 1993)).

The unnumbered "grant clause" of the Oenga Lease found on page 1 of the Original 1989 Lease Agreement, together with Sections 10 and 11 of the Oenga Lease, provide in relevant part as follows (emphasis added):

> [Grant Clause] WITNESSETH, that … the Lessor hereby leases to the Lessee ten (10) acres of land, the "leased premises", which comprises a portion of Lessor's present and future interests in Parcel B of Alaska Native Allotment Application F-14632.
>
> 10. Use of Leased/Unleased Premises: The Lessee may use the leased premises for any and all oil field exploration, development, construction, facilities, production and support purposes, and for any other uses and purposes reasonably or conveniently related thereto.… The Lessee shall make no unlawful uses of the leased and/or unleased premises, or knowingly permit any unlawful activity to be conducted thereon by others.
>
> 11. Improvements: The Lessee may construct any facilities (pipelines, access roads, causeway approaches, *drilling pads*, a construction staging pads or any other required facilities) on the leased premises as long as construction is limited to the ten (10) acres as herein described on Exhibit A. This Lease Agreement may be amended to increase or decrease the size of the leased premises at any time *at Lessee's sole discretion*. If the leased premises is so increased or decreased, Lessee shall proportionately increase or decrease its lease rental payments effective on the next ensuing lease anniversary date after such increase or decrease; provided however that rental amounts shall be pro rated beginning on the date that leased premises is increased or decreased. It is agreed and understood by all parties that the leased premises cannot be reduced to less than the ten (10.0) acres originally taken under this Lease Agreement.…

Nowhere in these sections of the Oenga Lease did Lessor except from the grant of the leased premises any of the rights that the Oenga heirs now assert were not granted. In

addition, nowhere in these sections did Lessor impose any limitation upon the purpose or scope of the oil and gas activities that BPX could undertake on the leased premises. Instead, pursuant to and by virtue of the plain language of the Oenga Lease, Lessor granted to BPX any and all rights in and to the leased premises (as the same might be enlarged from time to time) that BPX did not already own in or to the leased premises (by virtue of its ownership of interests in the state oil and gas leases thereunder) to produce oil or gas from any and all accumulations thereof, without regard for where such accumulations might be situated.

Notwithstanding the breadth of the foregoing language, the Oenga heirs assert that the Oenga Lease grants to BPX the right to use the leased premises to produce oil or gas from only the "Niakuk Project" as that term is used in—but not defined in—the second, third, and fourth paragraphs of Section 1 of the Original 1989 Lease Agreement (regarding the term of the Oenga Lease) but not in any of the grant clauses of the Original 1989 Lease Agreement. Based on this sole reference to the undefined "Niakuk Project" in certain provisions respecting the term of the Oenga Lease but not in any of the provisions describing the scope of the grant made thereby, the Oenga heirs allege that BPX and the other Intervenors have trespassed and are continuing to trespass on certain rights supposedly retained by Lessor in and to the leased premises.

Under a plain reading of the Oenga Lease, such an interpretation as advanced by the Oenga heirs cannot stand if the purpose and intent of the language upon which the Oenga

heirs rely otherwise is clear and can be given full force and effect. NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159-60 (Fed. Cir. 2004) ("[w]hen interpreting the contract, the document must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts").[5]

In the case of the second, third, and fourth paragraphs of Section 1 of the Original 1989 Lease Agreement, this is an easy task: BPX certainly did not want to commit to a 25-year lease if it might not be able obtain the permits and authorizations that it envisioned seeking, yet, just as obviously, Andrew Oenga sought to enjoy as soon as possible the financial security associated with having a *long-term lease*, with its predictable promised cash flow and limited right to cancel. All of the paragraphs contained in Section 1 of the Original 1989 Lease Agreement other than the first paragraph thereof set forth the manner in which the parties resolved *these two sets of competing concerns and goals*. But said paragraphs say *nothing* about limiting the scope of the grant made by Sections 10 and 11 of the Original 1989 Lease Agreement and thus have no effect thereon.

---

[5] In addition, where a contract contains an integration clause the use of extrinsic evidence to add to or modify the terms of a written agreement is prohibited. S. Cal. Fed. S&L Ass'n v. United States, 422 F.3d 1319, 1330 (Fed. Cir. 2005) (citing Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375 (Fed. Cir. 2004)). Section 27 of the Oenga Lease (Exhibit A attached hereto, at p. 10) is such an integration clause, and additional integration clauses are included in both the 1994 Lease Amendment (Exhibit C attached hereto, at p. 3) and the 1995 Lease Amendment (Exhibit D attached hereto, at p. 2).

The Oenga heirs also assert that BPX's unrecorded letter of July 29, 1993, constitutes an amendment to the Oenga Lease that limits or diminishes the rights granted to BPX under the Original 1989 Lease Agreement. Said letter does nothing of the sort. Instead, BPX's unrecorded letter of July 29, 1993, merely served as BPX's written *notice* to the BIA, as contemplated under the Original 1989 Lease Agreement, of the following:

(i) BPX's satisfaction of its obligation under Section 1 of the Original 1989 Lease Agreement (which obligation accrued when BPX received all of the permits and authorizations that it believed that it needed in order to proceed with development) to convert the lease from a year-to-year tenancy to a long-term tenancy expiring (unless extended pursuant to Section 2 of the Lease) on December 31, 2014, subject to BPX's right (*exercisable only at five-year intervals*) to cancel the Lease pursuant to Section 15 of the Original 1989 Lease Agreement;

(ii) BPX's exercise of its option under Section 11 of the Original 1989 Lease Agreement to increase the size of the leased premises.

In its letter of July 29, 1993, BPX proposed an effective date of August 1, 1993, for its increase from 10 acres to 20 acres, and the BIA acknowledged and agreed to such effective date when it signed BPX's letter of July 29, 1993. But said letter of July 29,

1993, made no other changes to the Original 1989 Lease Agreement. In particular, and without limiting the generality of the foregoing, said letter of July 29, 1993, did not cause the rights granted to BPX under the Original 1989 Lease Agreement in, to, or respecting the leased premises to be limited, diminished, or constrained to the development of any particularly described accumulation, pool, or reservoir of oil or gas or to the development of any particularly described lands. Instead, BPX's rights in, to, and respecting the leased premises remained exactly as described in Sections 10 and 11 of the Original 1989 Lease Agreement.[6] By its letter of July 29, 1993, BPX relinquished nothing.

The references to the "Niakuk Project" in the Original 1989 Lease Agreement (pp. 1-2) and in the letter of July 29, 1993 (p. 1) upon which the arguments of the Oenga heirs appear to rest do not limit the scope of the grant made by the Original 1989 Lease Agreement but, instead, solely relate to and *limit the extent to which BPX could continue to hold the Original 1989 Lease Agreement as a year-to-year tenancy* instead of a long-term tenancy. Moreover, what BPX stated in the first paragraph of its letter of July 29,

---

[6] Six months later BPX again exercised its option under Section 11 of the Original 1989 Lease Agreement to increase the size of the leased premises—this time from 20 acres to all 40 acres of land within Andrew Oenga's allotment parcel at Heald Point. Said exercise was memorialized in the 1994 Lease Amendment executed by the Oenga heirs, which also amended the provisions of the Original 1989 Lease Agreement in several other respects. Like the letter of July 29, 1993, however, nothing in the 1994 Lease Amendment caused the rights granted to BPX under the Original 1989 Lease Agreement in, to, or respecting the leased premises to be limited, diminished, or constrained to the development of any particular accumulation, pool, or reservoir of oil or gas, or to the development of any particular lands.

1993—namely, that "[t]he Lease provided authorization for BP to construct production facilities to support development of, and production from, our Niakuk oil accumulation"—was and is a true statement of fact. What is totally without basis is the argument of the Oenga heirs that said statement by BPX in its letter of July 29, 1993, should be construed to mean that BPX voluntarily relinquished to the Oenga heirs certain rights previously granted or that BPX, by using such language, somehow conceded that the Oenga Lease authorized BPX "to construct production facilities to support development of, and production from" only the Niakuk oil accumulation. That is not what Oenga Lease says and that is not what BPX's letter of July 29, 1993, says.

**b. Because the Oenga Lease is a *lease* and not a right-of-way or easement, it grants all rights in and to the leased premises not expressly retained by Lessor.**

What BPX negotiated for and was granted pursuant to the Original 1989 Lease Agreement was a lease[7] of the "leased premises" (as enlarged from time to time pursuant to Section 11 of the Original 1989 Lease Agreement), to use said leased premises for all of the purposes set forth in Sections 10 and 11. The Oenga lease is not a right-of-way or easement.

---

[7] See generally 25 C.F.R. Part 162 (2006) (current regulations respecting leasing of, *inter alia*, Alaska Native allotments); 25 C.F.R. Part 162 (1987) (regulations referred to in preamble paragraph of Original 1989 Lease Agreement); *cf.* 25 C.F.R. Part 169 (2006) (regulations respecting granting of rights-of-way upon or across, *inter alia*, Alaska Native allotments).

The key distinction between a lease, on the one hand, and a right-of-way or easement on the other is that a lease transfers "possession" from the lessor to the lessee, so that the lessee becomes seized of the estate in land held by the lessor, for the term of the lease. See RESTATEMENT (SECOND) OF PROPERTY: LANDLORD AND TENANT § 1.2 (1977). This is *exactly* what the Oenga Lease did: The Oenga Lease was structured, and at all times has been structured, as a grant of exclusive possession for all oil and gas purposes (see Section 10 of the Original 1989 Lease Agreement, which contains no express or implied exceptions or limitations of the type described above), with rental due thereunder based upon the fair market value from time to time of the *entire fee simple estate* held by Andrew Oenga when the Original 1989 Lease Agreement was executed (see Section 9 of the Lease).

There is no language in the Oenga Lease by which the Lessor expressly excepted and retained unto itself the right to use the leased premises for the purpose of producing oil or gas from any particular accumulation or from any particular lands. Moreover, there would be no reason for Lessor to retain such a right, since Lessor owns no rights to explore for, develop, or produce any oil or gas situated in or under *any* lands. The only rights that Lessor retained in the leased premises pursuant to the Oenga Lease were and are (1) a limited right of inspection (Section 25 of Oenga Lease) and (2) a limited right of access across the leased premises (Section 26 of Oenga Lease). Subject to those two

limited rights, possession of the entire estate held by Andrew Oenga in the leased premises was granted and remains granted to BPX by the Oenga Lease.

Indeed, if it had been the intent of the parties to the Oenga Lease to constrain the use of the leased premises to development of *only certain accumulations* of oil or gas *in only certain lands*—while simultaneously withholding from the grant made by the Oenga Lease and reserving unto Lessor the right to use the leased premises to develop any and all *other* accumulations of oil or gas situated in the same lands or other lands—the parties certainly would have imposed such a limitation or made such an exception *expressly*, by describing with certainty the lands in which the accumulations to be developed existed, and by stating that the right to use the leased premises for the development of other accumulations was not being granted but was, instead, being excepted and retained by Lessor.

In fact, the general common law respecting leases *requires* that any exceptions from, or limitations upon, the grant be set forth *expressly* in the lease. See, e.g., RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 1.2 comment d (2000), which states in relevant part as follows:

> The extent of the use rights granted normally determines whether an interest is possessory or nonpossessory. The benefit of an easement or profit is considered a nonpossessory interest in land because it generally authorizes limited uses of the burdened property for a particular purpose. The holder of an easement or profit is entitled to make only the uses

> reasonably necessary for the specified purpose. The transferor of an easement or profit retains the right to make all uses of the land that do not unreasonably interfere with the exercise of the rights granted by the servitude. For example, the transferor of an easement for an underground pipeline retains the right to enter and make any use of the area covered by the easement that is not specifically prohibited by the easement and that does not unreasonably interfere with the use of the easement for pipeline purposes. The holder of the easement may only use the area for purposes reasonably related to the pipeline. *By contrast, a transfer of possession generally transfers the right to make any use of the property that is not specifically prohibited. The transferor has no right to enter or use the land except as expressly reserved in the transfer. For example, the lessor who transfers a leasehold estate has no right to enter or use the leased premises except as expressly reserved in the lease, and the lessee may make any use that is not prohibited by the lease.*

(Emphasis added.) *Accord*, Milton R. Friedman & Patrick A. Randolph, Friedman on Leases §§ 26:2 (text accompanying nn. 11-12) and 27:3.1 (text accompanying nn. 25 and 28) (5th ed. 2003).

Under the Oenga Lease, Lessor reserved no rights to enter or use the land except for the limited right of inspection and the limited right of access across the leased premises described above.[8] *All rights* to use the leased premises for oil and gas purposes thus were granted by the Oenga Lease to Lessee, including but not limited to (1) the right to use the leased premises to develop and produce oil and gas from the initial Niakuk Participating

---

[8] While the Oenga Lease contains no recital or other explanation for the very limited nature of the rights reserved by Lessor, it would be fair to infer that Lessor reserved no greater rights because this would have lessened the scope of the estate being granted and possibly led to a lower appraisal and, thus, lower rent.

Area, (2) the right to use the leased premises to develop and produce oil and gas from the expanded Niakuk Participating Area, and—as discussed more fully below—(3) the right to use the leased premises to develop and produce oil and gas from the West Niakuk Participating Area and (4) the right to use the leased premises to develop and produce oil and gas from the Lisburne Participating Area.

**2. Under the 1994 Lease Amendment, BPX was authorized to enter into the Facility Sharing Agreement with ARCO Alaska, Inc. and Exxon Corporation without notice to or consent of Lessor. Thus, because BPX could occupy and use the leased premises for any and all purposes related to the development and production of oil and gas, *without limiting such uses to any particular tracts, areas, reservoirs, or lands*, the shared use and occupancy of the leased premises by ARCO Alaska, Inc. and Exxon Corporation with BPX under the Facility Sharing Agreement for purposes related to the development and production of oil and gas from any lands has been at all times authorized by and within the scope of the grant made by the Oenga Lease.**

After BPX entered into the Original 1989 Lease Agreement, and while it was pursuing permitting and development of the Niakuk accumulation, BPX applied for the formation of the Niakuk Participating Area. See Exhibit L attached hereto, at pp. 1-3. In October 1993, ARCO Alaska, Inc.—suspecting that the Niakuk accumulation actually extended westward so as to be partly situated in and under certain leases owned by ARCO Alaska, Inc. and Exxon Corporation located beyond the western edge of proposed Niakuk Participating Area—objected to BPX's application because it did not include these leases. See Exhibit L attached hereto, at pp. 2-3.

Following ARCO Alaska, Inc.'s objection to its application, BPX and the Oenga heirs expressly amended Section 13 of the Original 1989 Lease Agreement to permit BPX to enter into facility sharing arrangements with third parties. See 1994 Lease Amendment, at p. 2 (referring incorrectly to "Paragraph 13" instead of "Section 13"). Pursuant to the 1994 Lease Amendment, BPX then entered into the Facility Sharing Agreement with ARCO Alaska, Inc. and Exxon Corporation to allow them to use a drill slot on the leased premises to drill into their leases located in what is now the West Niakuk Participating Area.

As described in the "Facts" set forth above, ARCO Alaska, Inc. and Exxon Corporation subsequently did just that. In addition, as described in the "Facts" set forth above, ARCO Alaska, Inc. also used the leased premises to produce oil and gas from leases within the Lisburne Participating Area until BPX became the sole operator within the Prudhoe Bay Unit Area in 2000. After BPX became the sole operator within the Prudhoe Bay Unit Area, it has continued to use the leased premises to produce oil and gas both from leases within the West Niakuk Participating Area and from leases within the Lisburne Participating Area.

The 1994 Lease Amendment expressly amended the Original 1989 Lease Agreement to permit BPX to enter into the Facility Sharing Agreement. Expressly authorizing BPX to enter into agreements such as the Facility Sharing Agreement, so long as BPX remained primarily liable under the Oenga Lease, is fully consistent with the broad scope of the

grant made by the Oenga Lease. Any effort by the Oenga heirs to argue at this time (more than 18 years after the Original 1989 Lease Agreement was executed and more than 13 years after the 1994 Lease Amendment was executed *by them*) that BPX was not granted under the Oenga Lease the right to develop the West Niakuk accumulation, the Lisburne accumulation, or any other accumulation, and that BPX thus could not enter into facility sharing agreements with others for such purposes, simply must fail in the absence of any express exception or limitation of the type described above having been negotiated and included in the Original 1989 Lease Agreement or any amendment thereto.

## CONCLUSION

Based on the foregoing, Intervenors submit that, at all relevant times, BPX and others authorized by it have had and continue to have all of the rights it and they have needed to occupy and to use the leased premises in connection with the development and production of not only the Niakuk accumulation (as knowledge of the location thereof has increased over the years) but also the West Niakuk accumulation, the Lisburne accumulation, and the Raven accumulation. There has been no trespass. Summary judgment on Claim Three of Plaintiff's First Amended Complaint thus should be rendered in favor of the United States and Intervenors and against Plaintiffs.

RESPECTFULLY SUBMITTED this 25th day of June, 2007.

s/Joseph J. Perkins, Jr.
JOSEPH J. PERKINS, JR.
Guess & Rudd P.C.
510 L Street, Suite 700
Anchorage, Alaska 99501
Telephone: 907-793-2200
Fax: 907-793-2299
jperkins@guessrudd.com
Attorneys for Intervenor-Defendants

CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of June, 2007, a true and correct copy of the foregoing Memorandum in Support of Intervenor-Defendants' *Corrected* Motion for Partial Summary Judgment was sent electronically to the following counsel of record:

James M. Upton
Attorney for Defendant United States
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C. 20044-0663
Tel: 202-305-0482
Fax: 202-305-0506
E-mail: james.upton@usdoj.gov

Raymond C. Givens
Givens Law Firm
P.O. Box 400
912 E. Sherman Avenue
Coeur d'Alene, ID 83816
Tel: 208-676-1310
Fax: 208-676-1296
E-mail: raygivens@givenslaw.com

s/Joseph J. Perkins, Jr.
JOSEPH J. PERKINS, JR.