**EXHIBIT J**

Letter Agreement dated January 27, 1994, among BPX, ARCO Alaska, Inc., and Exxon Corporation ("Facility Sharing Agreement")

# LETTER AGREEMENT

## ARCO/EXXON ACCESS TO NIAKUK FACILITIES AND INTEGRATION OF NIAKUK INTERESTS

1.0 Drilling Slot Provision and Access Fee

BPX will provide a drilling and manifold slot (repayment addressed in Section 3.0 below) at the Heald Point drillsite for ARCO/Exxon to test the prospectivity of their lease(s) at the western limit of the BPX Niakuk Field. If the test results in commercial production, the cost of access to the BPX Heald Point initial and permanent facilities, prior to and post integration of interests, will be REDACTED REDACTED REDACTED REDACTED With regard to timing, the well may be drilled by ARCO/Exxon back-to-back with the ARCO/BPX/Exxon Alapah well, to be drilled after the sixth BPX Niakuk well, in the first quarter of 1994. If the ARCO/Exxon Niakuk well is not drilled at this time it will be drilled after the first 14 wells in the BPX Niakuk drilling program or during any interruption or cessation of that program, once ARCO, BPX and Exxon mutually agree that there is sufficient time to allow the drilling of the ARCO/Exxon Niakuk well. REDACTED

The cost of source water injection into Segment 1 of the Niakuk reservoir will be allocated to tracts based on oil production from Segment 1 of the Niakuk reservoir.

2.0 Operating Cost Allocation

Operating and Maintenance Costs for Greater Pt. McIntyre Area field-wide O&M and the Lisburne Production Center (LPC) will be determined and allocated in accordance with the already agreed appropriate allocation procedures, established for all Participating Areas within the Greater Pt. McIntyre Area. In each of these categories, the total O&M allocated to Niakuk will be further allocated to tracts based on proportionate total fluid production (oil, water and gas, with 6000 scf gas = 1 barrel).

3.0 Drilling Slot Repayment

In the event BPX requires 17 or more drilling and manifold slots on the Heald Point drillsite, ARCO/Exxon will provide one

100047

additional drilling and manifold slot to the drillsite once the existing 16 BPX Niakuk slots have been used (with the approval of the Lisburne Owners, this may be an unused Lisburne Alapah drilling and manifold slot).

4.0 Integration of Interests.

If ARCO, BPX and Exxon mutually agree, that, either commercially producible oil, from the Niakuk Segment 1 Reservoir, extends onto part or all of the ARCO/Exxon leases ADL 34626 and ADL 34629, or that drainage of commercially producible oil is occurring between ARCO/Exxon and BPX leases, ARCO, BPX and Exxon agree to: a) integrate their interests (as in 4.1, 4.2, and 4.3 below); b) jointly petition the AOGCC for appropriate Pool Rules; c) jointly petition the ADNR for an expansion of the Prudhoe Bay Unit (if required) and revision of the Niakuk Participating Area, and d) revise the Niakuk Supplemental Special Provisions to the PBUOA to encompass the appropriate portions of the ARCO/Exxon lease(s) and facilitate Sections 4.1 and 4.2, below.

It is the preference of ARCO, BPX and Exxon that any integration of interests will apply only to Segment 1 of the Niakuk Participating Area, provided that ARCO, BPX, Exxon agree to mutually acceptable provisions and that royalty obligations will track Segment 1 equity production allocations. Otherwise, ARCO, BPX and Exxon agree to pursue the formation of separate Participating Areas for Segment 1 and Segment 2 of the Niakuk Reservoir.

Pursuant to Article 21 of the PBUOA, ARCO and Exxon agree to vote their approval for the expansion of the Niakuk Participating Area, or formation of a new Participating Area and the expansion of the PBU (if necessary) and concomitant Pool Rules extension, to encompass any one or part or all of BPX tracts: ADL 34625 and ADL 312827. Such approval, will, in the case of ADL 312827, apply to any area of the lease up to 1,000 feet from the ARCO lease, Y1580, to the north.

All field equity determinations will be value-based.

100048

4.1 Ownership of Facilities

Regardless of any integration of interests, BPX (Niakuk Facility Owner) retains ownership of all BPX sole funded Niakuk surface Facilities.

4.2 Equalization

If Segment 1 is integrated separately, Segment 1 production well costs and production will be equalized according to Segment 1 equity interests. If the integration of interests in Segment 1 fails to take place prior to January 1, 1996 production well costs will be adjusted by the inflation equivalent defined in Section 34.002 of the PBUOA, except the adjustment factor will be 100% versus 125%. The start date for calculation of inflation equivalent is January 1, 1996.

If more than Segment 1 interests are integrated, production well costs and production equalization will relate directly to the production wells and production in the area within which interests are integrated and will take place concurrent with the associated equity determination.

Production wells will be eligible for cost equalization if they have achieved average production rates of 500 bopd over a sixty day period (consistent with Exhibit K of the Pt. McIntyre Agreement Regarding Interim Funding, Final Equity Determination and Facility Sharing, between ARCO, BPX and Exxon).

Cost and production equalization will be accomplished through disproportionate allocations over a period not to exceed two years.

4.3 Process for Integration

The parties agree that the process by which they will seek voluntary integration of Niakuk Field interests will occur is as follows: first, the parties will attempt to reach voluntary integration for 6 months from the date when Section (4.0) is satisfied and if that fails the parties may agree to submit to binding fourth party resolution.

5.0 Data Sharing

Upon notification by ARCO/Exxon of their intent to spud a test well and of their election to participate in the data exchange described in this section, BPX will provide ARCO/Exxon with all non-interpretative data from the most westerly well drilled in Segment 1, at that time. In return, ARCO/Exxon will provide all non-interpretative data from their test well to BPX. Prior to receipt of the BPX non-interpretative well data, ARCO/Exxon and BPX will agree the terms of a cash payment to be paid to BPX for its well data, in the event that ARCO/Exxon do not drill their test well after receipt of the BPX well data.

6.0 Effective Date

This agreement becomes effective upon the approval, by all parties:

By their signatures, at the date, below, the parties agree to these terms:

MPW [signature] 1-27-94

J. D. Weeks
Senior Vice President, ARCO Alaska Inc. Date:

[signature] 1-27-94

J. E. Golden
Vice President, BP Exploration (Alaska) Inc. Date:

J.W. Kiker
Production Engineering Manager, Exxon Corporation. Date:

100050

5.0 Data Sharing

Upon notification by ARCO/Exxon of their intent to spud a test well and of their election to participate in the data exchange described in this section, BPX will provide ARCO/Exxon with all non-interpretative data from the most westerly well drilled in Segment 1, at that time. In return, ARCO/Exxon will provide all non-interpretative data from their test well to BPX. Prior to receipt of the BPX non-interpretative well data, ARCO/Exxon and BPX will agree the terms of a cash payment to be paid to BPX for its well data, in the event that ARCO/Exxon do not drill their test well after receipt of the BPX well data.

6.0 Effective Date

This agreement becomes effective upon the approval, by all parties.

By their signatures, at the date, below, the parties agree to these terms:

J. D. Weeks
Senior Vice President, ARCO Alaska Inc. Date:

J. E. Golden
Vice President, BP Exploration (Alaska) Inc. Date: 1/27/94

J.W. Kiker
Production ~~Engineering~~ Manager, Exxon Corporation. Date: 1/27/94

# EXHIBIT K

DNR Decision dated June 27, 2000 (as amended, with errata changes), approving BPX as sole operator of the Prudhoe Bay Unit Area

# PRUDHOE BAY UNIT

## APPLICATION FOR
## CHANGE OF UNIT OPERATOR

## FINDINGS AND DECISION OF THE COMMISSIONER
## ALASKA DEPARTMENT OF NATURAL RESOURCES

JUNE 27, 2000
(AS AMENDED, WITH ERRATA CHANGES)

## I. INTRODUCTION

On June 1, 2000 BP Exploration (Alaska) Inc. (BP), with the requisite consent of the other Prudhoe Bay Unit producers, filed an application with the State of Alaska Department of Natural Resources (DNR) requesting approval of a change in unit operator for the Eastern Operating Area of the Prudhoe Bay Unit from Phillips Alaska, Inc. to BP.

BP's application follows the April 12, 2000 execution of several agreements between BP, Phillips Alaska, Inc. (Phillips), and Exxon Mobil Corporation (Exxon), the three largest producers in the Prudhoe Bay Unit who together account for more than ninety percent of the lease interests in that Unit. These April 12 agreements include the Alaska North Slope Alignment Agreement, the Prudhoe Bay Unit Alignment Agreement, and the Point Thomson Area Alignment and Exchange Agreement, among others. Of most interest here is the Prudhoe Bay Unit Alignment Agreement ("the Alignment Agreement").

The Alignment Agreement contractually obligates BP, Phillips, and Exxon to reduce the number of Prudhoe Bay Unit (PBU) operators from two to one, with the remaining operator being BP. It also requires the alignment of lease interests throughout the PBU so that each company owns the same interest in every lease included in the PBU. Further, the Alignment Agreement provides for amendment to the Prudhoe Bay Unit Agreement (PBUA) and the PBU Operating Agreement ("Operating Agreement"). All these actions are subject to the approval of DNR, except the amendment of the Operating Agreement.

Though BP filed the application for approval of change of unit operator on June 1, 2000, the producers have yet to file an application to amend the PBUA to provide for a single unit operator, rather than the two the PBUA now specifies. And the producers have advised DNR that applications for cross-assignment of leases—which are necessary to effectuate an alignment of lease interests—will not be filed until the deadline for filing under 11 AAC 82.615(a)(1), which is July 11, 2000. However, under 11 AAC 83.331(c) DNR has only 30 days to act on BP's application for approval of change of unit operator. Accordingly, DNR will consider and act on the June 1 application in the context of the entire Alignment Agreement, including applications not yet filed but required by the Alignment Agreement and governing statutes and regulations.

## II. IDENTIFICATION OF REGULATORY CRITERIA FOR CHANGE OF UNIT OPERATOR, MODIFICATION OF UNIT AGREEMENT, AND ASSIGNMENT OF INTERESTS IN LEASES.

Applications for change in unit operator, modification of a unit agreement, and assignment of an interest in an oil and gas lease cannot be approved unless approval is in the public interest or would not adversely affect the interests of the State. More specifically, an application for change of unit operator is governed by 11 AAC 83.331, entitled "Unit Operator." Applications filed under 11 AAC 83.331 are, in turn, subject to the requirements of 11 AAC 83.303, entitled "Criteria." 11 AAC 83.303(a) and (b) read:

**CRITERIA.** (a) The commissioner will approve [an application filed under 11 AAC 83.301-.395] if he makes a written finding that [approval of the application] is *necessary or advisable to protect the public interest* considering the provisions of AS 38.05.180(p)[1] and this section. The commissioner will approve [an application] upon a written finding that it will

(1) promote conservation of all natural resources, including all or part of an oil or gas pool, field, or like area;

(2) promote the prevention of economic and physical waste; and

(3) provide for the protection of all parties of interest, including the state.

(b) In evaluating the above criteria, the commissioner will consider

(1) the environmental costs and benefits of unitized exploration or development;

(2) the geological and engineering characteristics of the potential hydrocarbon accumulation or reservoir proposed for unitization;

(3) prior exploration activities in the proposed unit area;

(4) the applicant's plans for exploration or development of the unit area;

(5) the economic costs and benefits to the state; and

(6) any other relevant factors, including measures to mitigate impacts identified above, the commissioner determines necessary or advisable to protect the public interest.

(Emphasis added).

An application for modification of a unit agreement must be filed under 11 AAC 83.385. Just as an application for change in unit operator must be evaluated using the criteria set forth above and in 11 AAC 83.303(a) and (b), so too must an application for modification of a unit agreement. 11 AAC 83.303(c). Applications for assignments of interests in oil and gas leases

---

1 The provisions of AS 38.05.180(p) and the criteria of 11 AAC 83.303(a) are, for purposes of acting on BP's application, largely duplicative. AS 38.05.180(p) reads:

> *To conserve the natural resources of all or a part of an oil or gas pool, field, or like area,* the lessees and their representatives may unite with each other, or jointly or separately with others, in collectively adopting or operating under a cooperative or a unit plan of development or operation of the pool, field, or like area, or a part of it, when determined and certified by the commissioner to be *necessary or advisable in the public interest.* The commissioner may, with the consent of the holders of leases involved, establish, change, or revoke drilling, producing, and royalty requirements of the leases and adopt regulations with reference to the leases, with like consent on the part of the lessees, in connection with the institution and operation of a cooperative or unit plan as the commissioner determines necessary or proper to secure the proper protection of the public interest. The commissioner may not decrease royalty on leases in connection with a cooperative or unit plan except as provided in (j) of this section. The commissioner may require oil and gas leases issued under this section to contain a provision requiring the lessee to operate under a reasonable cooperative or unit plan, and may prescribe a plan under which the lessee must operate. The plan must adequately *protect all parties in interest, including the state.*

(Emphasis added).

are not evaluated using the criteria of 11 AAC 83.303(a) and (b), but under 11 AAC 82.605, which provides, in part:

> The commissioner will approve a transfer of an undivided interest in a lease . . . unless the commissioner makes a written finding that the transfer would *adversely affect the interests of the state* or the application does not comply with the applicable regulations.

(Emphasis added). While assignments are not judged under 11 AAC 83.303, that regulation nonetheless provides a useful framework for determining whether an assignment would "adversely affect the interests of the state."

## III. DISCUSSION OF REGULATORY CRITERIA

11 AAC 83.303 provides that DNR, in evaluating the broader criteria set forth in subsection (a), shall consider the more precise factors set forth in subsection (b). Consequently, a discussion of the guidelines for decision requires an examination of the six factors identified in subsection (b), then, to the extent not covered by the subsection (b) analysis, scrutiny of the three subsection (a) criteria. Accordingly, this Part III begins with a discussion of each of the six factors found in 11 AAC 83.303(b).[2]

### A. *Prior Exploration Activities In the Unit Area*

11 AAC 83.303(b)(3) requires a discussion of prior exploration activities in the unit area. Because exploration of the Prudhoe Bay Unit began decades ago and has been followed by development as well as production since 1977, exploration, development, and production are all discussed here.

The Prudhoe Bay field was discovered in 1968 with the drilling of the Prudhoe Bay State #1 well. This discovery was followed with additional exploration and development, culminating in the unitization of 111 state oil and gas leases in April 1977 and first production in June 1977.

Between 1968 and June 1977 a number of facilities were constructed to enable oil and gas production. The facilities built for the Eastern Operating Area at Prudhoe Bay included drill sites, two flow stations, the Central Compression Plant, the Natural Gas Injection Pad, and ARCO's base camp. In the Western Operating Area, the producers constructed more drill sites, one gathering center, the Central Power Station, and a second base camp. Additionally, the Trans Alaska Pipeline System was built to transport oil from Pump Station #1 at Prudhoe to the marine terminal at Valdez.

First production came from the Permo-Triassic Reservoir, which had been divided into two separate participating areas—the oil rim and the gas cap participating areas. The oil rim and gas cap participating areas were and are referred to as the initial participating areas (IPAs).

---

2 The sixth factor—other relevant facts and mitigation measures—allows expansion on the first five factors, which this decision does as part of its discussion of the first five factors when deemed appropriate.

Following the commencement of production in June 1977, additional facilities were built, including more drill sites, a third flow station, two more gathering centers, the Lisburne Production Center, West Dock, the Seawater Treatment Plant, the Apex Gas Injection Pad, the West Gas Injection Pad, and the Central Gas Facility, which was reported to be the largest gas plant in the world. Additional reservoirs were developed, resulting in the formation of the Pt. McIntyre, Lisburne, Niakuk, Western Niakuk, West Beach, Midnight Sun, and North Prudhoe Bay participating areas. Approximately 11 billion barrels of oil have been produced from the PBU reservoirs. During the most recent month for which figures are available—April 2000—22 million barrel were produced from the PBU, which represented two-thirds of the State's oil production in that month. More than 1400 wells have been drilled in the PBU. Between three and four billion barrels of oil remain in Prudhoe's reserves, as does twenty-four trillion cubic feet of gas, representing seventy percent of the State's known gas reserves.

Extensive exploration and development, together with the sheer magnitude of production, easily supported two unit operators in the past and could justify two operators into the future. However, two operators are not necessarily required. While reducing the number of operators would be imprudent if the remaining operator lacked sufficient field experience, that is not the case here. BP has a long history of successfully running the Western Operating Area of the PBU. Also, BP is and will be employing many of the former ARCO employees historically responsible for working the Eastern Operating Area of the PBU.

### *B. Future Plans for Exploration and Development of the Unit Area*

11 AAC 83.303(b)(4) requires discussion of the applicant's plans for exploration or development of the unit area. The producers' plans for exploration and development of the Prudhoe Bay Unit are not a single set of plans; rather there is a plan for each participating area within the PBU. The plans for the Pt. McIntyre, Lisburne, Niakuk, Western Niakuk, West Beach, Midnight Sun, and North Prudhoe Bay participating areas within the PBU are as set forth in the current plan of development approved by DNR for each participating area. These plans cannot be changed without the approval of DNR and all but the Lisburne plan are approved annually for a one year term; the current Lisburne plan was approved for a two year term. An approval of a change in unit operator or reduction in the number of unit operators does not carry with it an approval of change in a participating area's plan of development. Since DNR previously indicated its satisfaction with or conditional approval of current plans of development for the above-listed participating areas, and is not here approving changes to those plans, DNR does not view the producers' future plans for exploration and development of these participating areas as persuasive evidence in favor of or against approval of the pending application.

Unlike all the other participating areas in the PBU, the plan of development for the IPAs was approved in 1977 with the approval of the PBUA and has never been modified. Nor has it been approved on an annual basis. In twenty-three years the producers never sought approval of a new or modified plan of development for the IPAs, which account for approximately ninety percent of the remaining reserves at Prudhoe Bay. The 1977 plan of development for the IPAs, attached as Exhibit E to the PBUA, is no longer current. The 1977 plan does not address significant events in the life of the field, such as construction of the Central Gas Facility in 1984-1986, initiation of the first and second gas handling expansions (GHX I & II) in the early 1990s, the large-scale manufacture and blending of natural gas liquids since 1987, the large-scale

manufacture of miscible injectant and its use in enhanced oil recovery since 1987, transfer of miscible injectant to the Kuparuk River Unit since 1995, and production from the light oil column at less than 100 feet thickness. Nor does it account for events planned for early in the life of the field—events that have not occurred—such as a major gas sale. And it does not provide for known future projects, like the waterflood of the gas cap and pilot production from a gas-to-liquids conversion plant. Certainly the producers have plans for other future exploration, development, and production—plans that have not been disclosed to or approved by DNR. Moreover, the request to change from two operators to one operator is in and of itself a significant event.

The IPA producers' failure to submit for approval updates to the plan of development is compounded by their failure to regularly brief DNR on long-range proposed development activities. The producers of many other participating areas, both within and outside the PBU, invite DNR to semiannual or annual briefings on past performance and near and far term development plans. To the extent the IPA producers have briefed DNR, it has been, for the most part, after the fact. Sporadically, the IPA producers have briefed DNR on some current and some long range development plans.

The lack of a current approved plan of development for the IPAs, together with the producers spotty briefing on future proposed development activities, weigh heavily against approval of BP as the single unit operator, which can only be mitigated by the submission of current, periodic plans of development that are subject to DNR approval, as discussed in more detail below.

### *C. The Geological and Engineering Characteristics of the Reservoirs and Hydrocarbon Accumulations*

11 AAC 83.303(b)(2) requires consideration of the geological and engineering characteristics of the potential hydrocarbon accumulations or reservoirs.

For purposes of this decision, the most relevant geological characteristic of the reservoirs and potential hydrocarbon accumulations within the PBU is the sheer size of the Permo-Triassic reservoir, and hence its importance to the State as a source of revenue, in-state investments, and jobs. The Permo-Triassic reservoir (or IPAs) is the largest reservoir in North America. It accounts for eighty-five percent of the oil production from the PBU, with the remaining fifteen percent coming from the Pt. McIntyre, Lisburne, Niakuk, Western Niakuk, West Beach, Midnight Sun, and North Prudhoe Bay reservoirs combined.

The importance of the Permo-Triassic reservoir to revenue, investments, and jobs—though a consequence of the reservoir's size—is discussed elsewhere in this decision. But size is also important from an operational standpoint, as are other geological characteristics of the PBU. BP is one of the largest oil companies in the world and has as much or more experience than any other company in exploring, developing, and operating Prudhoe Bay. BP's experience and the magnitude of its resources weigh in favor of approving BP over other possible candidates for a single operator.

11 AAC 83.303(b)(2) requires consideration of not only the geological characteristics of the reservoirs, but also engineering. Again, BP's standing as a major oil company and an existing operator at Prudhoe Bay weigh in favor of BP over other possible candidates for a single operator.

### *D. The Economic Costs and Benefits to the State*

11 AAC 83.303(b)(5) requires an analysis of the economic costs and benefits to the State of approving BP as a single unit operator for the Prudhoe Bay Unit.

Efficiency and economies of scale may be a benefit of approving BP as a single unit operator. The PBU producers expect an increase in the rate of return on their PBU investments with a single unit operator. The producers assert that an increase in the rate of return may attract additional investments, to the economic benefit of the State. However, efficiency and economies of scale also may carry an economic cost: lost jobs. While there is no way to be certain, the economic benefit of incremental investments should outweigh any short-term loss of jobs caused by the combining of BP's and Phillips' PBU workforces. However, DNR is concerned that certain provisions of the Alignment Agreement may frustrate incremental investment, absent some mitigation measure.

The Alignment Agreement provides not only for a single unit operator, but also for a change in the voting requirements for certain PBU expenditures. To date, expenditures for ongoing operations and many facility expansions could be approved with the consent of BP and either Exxon or ARCO (now Phillips). More specifically, when BP and ARCO—the two operators and only companies with large in-field presences—voted to spend money (and thereby advance development and production), the other producers were compelled to contribute to the operation or expansion at issue. However, with the changes in voting requirements set forth in the Alignment Agreement, the consent of BP, Exxon, and Phillips will be necessary, meaning any one of the three companies—including two companies who do not operate the field and do not have large in-field presences—could veto important expenditures. Consequently, development and operations deemed necessary or advisable by the producer responsible for operating the unit may not occur. Similarly, development and operations viewed as necessary by the State and profitable by two of the three major PBU producers could be delayed or prohibited by the actions of a single PBU producer. Furthermore, the delay or prohibition could be unrelated to the necessity, merits, and anticipated profitability of the activity; a single company's internal disquiet—such as that caused by a pending acquisition, merger or consolidation—could adversely affect its investment decisions for Alaska, and hence interfere with PBU productivity.

The potential for economic frustration has been minimized for all participating areas other than the IPAs. The Pt. McIntyre, Lisburne, Niakuk, Western Niakuk, West Beach, Midnight Sun, and North Prudhoe Bay participating areas each have current plans of development subject to DNR's annual approval. If a proposed plan of development does not include operations or development that should be undertaken, DNR can require those operations or development as a condition of approval of the plan. However, the PBU operators have not submitted for approval a plan of development for the IPAs since 1977, and have taken the position that they are not legally obligated to. (See March 25, 1986 letter from ARCO Alaska, Inc. and Standard Alaska Production Company to Kay Brown, Director, Division of Oil and Gas,

Department of Natural Resources). A current plan of development for the IPAs—subject to DNR approval—is necessary to assure that the change in voting requirements accompanying the change in unit operator does not thwart the State's best interests and the economic benefits of a single unit operator.

As discussed in more detail later in this decision, DNR is entitled to approve an application on condition that certain mitigation measures are adhered to. One measure that could mitigate the impact of the change in voting requirements imposed by the Alignment Agreement is a plan of development for the IPAs, subject to periodic DNR approval.

### *E. The Environmental Costs and Benefits*

11 AAC 83.303(b)(1) requires consideration of the environmental costs and benefits of unitized exploration and development.

Historically, BP and ARCO Alaska Inc. (now Phillips) have had comparable environmental records at Prudhoe Bay. Currently, BP and Phillips have comparable plans and equipment for protecting the environment and mitigating the effects of any environmental damage. Approval of the producers' application for change in unit operator is not an approval of changes to those plans, nor does it change conditions attached to the issuance of existing surface use and environmental permits. While examination of these environmental costs and benefits does not weigh in favor of or against approval of the application for change in unit operator, it is important to note that environmental benefits flow from the merger that was the impetus for a single unit operator.

After BP proposed a merger with ARCO in the spring of 1999, the State, BP, and ARCO negotiated a "Charter for Development of the Alaskan North Slope." The Charter was designed to alleviate the State's concerns about the merger. While the merger initially proposed differed significantly from the merger ultimately consummated, the Charter remains in effect. The Charter includes a number of environmental undertakings, including the cleanup of abandoned sites, abandoned empty barrels, and existing BP and ARCO (Phillips) sites, as well as the closure of inactive reserve pits and commitments to corrosion monitoring and North Slope spill response. The Charter also includes commitments to the marine environment, such as the replacement of certain tankers.

### *F. Other Relevant Facts and Mitigation Measures*

11 AAC 83.303(b)(6) requires consideration of other relevant factors DNR determines necessary or advisable to protect the public interest, including measures to mitigate the impacts identified in analyzing the factors previously discussed.

This decision touched upon some of the "other relevant factors" in preceding sections. For example, the discussion of prior exploration activities was expanded to cover development and production activities as well. And several terms of the Alignment Agreement beyond its provision for BP as the sole unit operator have been considered. Another relevant factor—the producers' preexisting legal obligations—is discussed in Part IV below.

This decision also has mentioned a plan of development for the IPAs as a potential mitigation measure. A current plan of development, subject to DNR approval, is crucial to protecting the best interest of the State and public for the reasons discussed both above and below.

The Prudhoe Bay Unit is the State's largest single source of revenue, and the IPAs account for the vast majority of PBU's revenues. The State needs to know future plans for the IPAs so that it may project future revenues. Also, the State's royalty and severance take from the PBU, when combined, make it the largest stakeholder in PBU; no producer's net income from the PBU is equal to or greater than the State's take, except at the highest oil prices. The party with the largest interest—the State—should be able to insure that development is occurring rationally.

Moreover, certain provisions of the Alignment Agreement, if unchecked, would weaken the State's ability to regulate PBU development and operations. The diversity of interests in the PBU's many leases previously assured an advocate for the development of the reservoir(s) under each lease; with the equalization of interests in every PBU lease, the State loses a watchdog function previously performed, at least in part, by the various lessees advancing their individual self-interests. Additionally, the Alignment Agreement strengthens the producers' self-imposed "gag rule," which limits the right of a producer to communicate freely with DNR in the absence of permission from the other major producers. The State needs another tool, such as approval of plans of development for the IPAs, to counteract provisions of the Alignment Agreement that otherwise would hamper the State's ability to regulate its most valuable hydrocarbon resource. In this sense, the State is similar to Phillips and Exxon, who, through the Alignment Agreement, are strengthening their ability to oversee BP by the seconding of Phillips and Exxon employees into BP's PBU operations. Requiring a plan of development, approved annually or for such other period approved by DNR, is thus a necessary and appropriate mitigation measure.

DNR's review of plans of development will be most meaningful if DNR has access to the Reservoir Development Objectives and Field Development Plans approved by the PBU producers. Reservoir Development Objectives and Field Development Plans are PBU planning tools established by the Prudhoe Bay Unit Operating Agreement. They are put to a vote of the producers annually, on or about August 15, and pertain to activities both inside and outside the IPAs from and after the first day of January of the following year. They cover a period of three years or more, and thus should be part of the package which constitutes an application for approval of a plan of development, since 11 AAC 83.343(a) specifies that plans of development are to include "long-range proposed development activities for the unit, including plans to delineate all underlying oil or gas reservoirs, bring the reservoirs into production and maintain and enhance production once established," as well as "plans for the exploration or delineation of any land in the unit not included in a participating area." While the Reservoir Development Objectives and Field Development Plans do not commit the producers to the objectives and plans described in them, access to them would provide DNR with information on future activities that might, could, or should occur. Also, access to them will aid DNR in implementing AS 38.05.180(a), wherein the legislature of the State finds that the people of Alaska have an interest in the development of the State's oil and gas resources to maximize the economic and physical recovery of those resources. The Reservoir Development Objectives and Field Development Plans will help DNR evaluate whether a proposed plan of development is rational, and formulate

conditions for approval, if any. Annual submission of Reservoir Development Objectives and Field Development Plans is a measure that can mitigate some of the concerns expressed in this decision, and thus is an appropriate condition for approval of BP's application for change of unit operator. In addition, DNR will require access to the 1995-1999 Objectives and Plans to allow DNR to better evaluate the first PBU IPA plan of development to be submitted in twenty-three years.

DNR recognizes that, historically, the PBU producers have treated their Field Development Plans as highly confidential. DNR will keep these Plans confidential to the extent provided by the law, which currently protects cost data and financial information as well as geological, geophysical, and engineering data submitted in support of applications, bonds, leases, and similar items, including applications for approval of plans of development.

### *G. The Regulatory Criteria of 11 AAC 83.303(a) and AS 38.05.180(p)*

This discussion of regulatory criteria began with a decision to examine the more precise factors set forth in 11 AAC 83.303(b), then come back to the broader criteria of 11 AAC 83.303(a) and AS 38.05.180(p) to explore, as necessary, any matters not covered in the 11 AAC 83.303(b) analysis. Again, the criteria of 11 AAC 83.303(a) and AS 38.05.180(p) are largely duplicative and require consideration of: 1) the protection of all parties of interest, including the state and public; 2) the prevention of economic and physical waste; and 3) the conservation of all natural resources, including all or part of an oil or gas pool, field, or like area. These three criterion are addressed in turn below.

First, approval of BP as the single PBU operator must protect all parties in interest, including the State and public. Unconditional approval would not protect the State and public for the reasons discussed above. Approval upon the condition that an annual plan of development for the IPAs be submitted to DNR protects the State and public interests, when combined with the other conditions imposed by this decision. As for other parties in interest—the PBU producers—DNR finds that the major producers have adequately protected their own self-interests through the Alignment Agreement and other agreements simultaneously or previously executed. The minor producers are protected by: 1) the terms of the Operating Agreement, which requires consent of all producers for any amendment; 2) the economic efficiencies of a single operator; 3) the requirement that plans of development be approved by DNR; and 4) representations by the major producers that the minor producers are being invited to equalize their interest in all PBU leases, just as the major producers are doing.

Second, economic and physical waste may be minimized by the efficiencies of a single operator. The producers' argue that efficiencies improve economic performance and induce new production that might otherwise be wasted. The possibility of economic and physical waste also is reduced by DNR approval of a plan of development, since DNR will be able to compel actions necessary to avoid waste as part of its approval process.

Third, natural resources are conserved by approving an experienced operator with an environmental record comparable to that of the operator being replaced.

## IV. LEGAL JUSTIFICATION FOR A PLAN OF DEVELOPMENT IN THE ABSENCE OF AN APPLICATION FOR CHANGE IN UNIT OPERATOR

Even if the PBU producers had not filed an application for approval of BP as the single unit operator, DNR still would be entitled to compel submission of a current plan of development for the IPAs. As discussed below, the Prudhoe Bay Unit Agreement (PBUA), 11 AAC 83.343, and AS 38.05.180 each provide an independent basis for a plan of development.

### *A. The Prudhoe Bay Unit Agreement Requires Submission of a Plan of Development for DNR Approval*

As mentioned earlier, the PBU producers filed a plan of development for the IPAs as Exhibit E to the PBUA in 1977; that plan has not been modified or replace since. However, Article 4.2 of the PBUA provides that "[m]odifications of Exhibit E shall be submitted to the Director for approval." Modifications have, in fact, been made, as discussed in Part IIIB, above. Further evidence of modifications could be obtained were one to compare the 1977 Field Development Plan to Field Development Plans of more recent origin. Arguably, an application for modification to the plan of development for the IPAs is long overdue.

### *B. 11 AAC 83.343 Requires Submission of a Plan of Development for DNR Approval*

11 AAC 83.343, entitled "Unit Plan of Development," was first promulgated in 1981.[3] It provides, in part, that "[t]he unit plan of development must be updated and submitted to the commissioner for approval at least 90 day before the expiration date of the previously approved plan, as set out in that plan."[4] The initial PBU IPA plan of development did not have a date-

---

3 Though the 1977 Prudhoe Bay Unit Agreement predated promulgation of this 1981 state regulation, 11 AAC 83.343 is nonetheless germane to participating areas within the PBU, including the IPAs, since Article 12.1 of the Prudhoe Bay Unit Agreement provides: "This agreement shall be subject to all valid applicable . . . state . . . regulations . . . ." 11 AAC 83.343 is a valid applicable state regulation.

4 11 AAC 83.343, in its entirety, reads:

> (a) A unit plan of development must be filed for approval as an exhibit to the unit agreement if a participating area is proposed for the unit area under 11 AAC 83.351, or when a reservoir has become sufficiently delineated so that a prudent operator would initiate development activities in that reservoir. All development operations must be conducted under an approved plan of development. A unit plan of development must contain sufficient information for the commissioner to determine whether the plan is consistent with the provisions of 11 AAC 83.303. The plan must include a description of the proposed development activities based on data reasonably available at the time the plan is submitted for approval as well as plans for the exploration or delineation of any land in the unit not included in a participating area. The plan must include, to the extent available information exists
>
> (1) long-range proposed development activities for the unit, including plans to delineate all underlying oil or gas reservoirs, bring the reservoirs into production, and maintain and enhance production once established;
>
> (2) plans for the exploration or delineation of any land in the unit not included in a participating area;
>
> (3) details of the proposed operations for at least one year following submission of the plan; and

specific expiration; instead it expired when field development varied from the initial plan of development. Field development has varied substantially from the initial plan of development.

Furthermore, 11 AAC 83.343 may be viewed as a successor regulation to 11 AAC 83.315, which was first promulgated in 1974, then repealed in 1981 at the same time 11 AAC 83.343 was promulgated. 11 AAC 83.315, entitled "Rates of Prospecting and Production," provided:

> The commissioner [of DNR] will, in his discretion, require that any unit agreement contain a provision vesting authority in the commissioner or other person, committee, or agency as may be designated in the agreement and satisfactory to the commissioner, to alter or modify from time to time the rate of prospecting and development and the quantity and rate of production under the agreement.

Article 4.3 of the Prudhoe Bay Unit Agreement is a provision vesting authority in DNR to alter or modify from time to time the rate of prospecting and development and the quantity and rate of production under the agreement.[5] Consequently, each year DNR is legally entitled to alter or modify the rate of prospecting and development and the quantity and rate of production under the agreement by approving, conditionally approving, or denying a plan of development for the

---

(4) the surface location of proposed facilities, drill pads, roads, docks, causeways, material sites, base camps, waste disposal sites, water supplies, airstrips, and any other operation or facility necessary for unit operations.

(b) The commissioner will approve the unit plan of development if it complies with the provisions of 11 AAC 83.303. If the proposed unit plan of development is disapproved, the commissioner will, in his discretion, propose modifications which, if accepted by the unit operator, would qualify the plan for approval.

(c) The unit plan of development must be updated and submitted to the commissioner for approval at least 90 days before the expiration date of the previously approved plan, as set out in that plan. The update must describe the extent to which the requirements of the previously approved plan were achieved; if actual operations deviated from or did not comply with the previously approved plan, an explanation of the deviation or noncompliance must be included in the update. The commissioner will approve the updated unit plan of development if it complies with the provisions of 11 AAC 83.303. If the proposed update of a unit plan of development is disapproved, the commissioner will, in his discretion, propose modifications which, if accepted by the unit operator, would qualify the plan for approval. Within 10 days after receipt of an updated unit plan of development, the commissioner will inform the unit operator as to whether the proposed unit plan of development is complete. After the commissioner has determined that an updated unit plan of development is complete as submitted, or as modified by the unit operator following the commissioner's suggestions, the commissioner will have an additional 60 days in which to approve or disapprove the plan; if no action is taken by the commissioner, the update of the unit plan of development is approved.

(d) The unit operator shall submit an annual report to the commissioner describing the operations conducted under the unit plan of development during the preceding year.

(e) The unit operator may, with the approval of the commissioner, amend an approved plan of development.

5 The repeal of 11 AAC 83.315 did not nullify Article 4.3 of the PBUA, as AS 38.05.180(q) continues to read: "A [unit plan] . . . may contain a provision vesting the commissioner . . . with authority to modify from time to time the rate of prospecting and development and the quantity and rate of production under the plan."

IPAs. Thus, DNR has the authority to require submission of an annual plan of development, either directly through 11 AAC 83.343 or indirectly through PBUA Article 4.3.

### *C. AS 38.05.180(a) Provides an Independent Basis for Requiring an Annual Plan of Development Subject to DNR Approval*

AS 38.05.180, entitled "Oil and Gas Leasing," provides:

(a) The legislature finds that
(1) the people of Alaska have an interest in the development of the state's oil and gas resources to
(A) maximize the economic and physical recovery of the resources;
(B) . . . .
(C) . . . .

AS 38.05.180(a)(1)(A) vests DNR with authority to pursue this goal, which can be realized, in part, through requiring periodic plans of development that are subject o DNR approval.

### *D. Summary*

In summary, even if the PBU producers had not filed an application for approval of BP as the single unit operator, DNR still is entitled to compel submission of a current plan of development for the IPAs. As discussed above, the Prudhoe Bay Unit Agreement, 11 AAC 83.343, and AS 38.05.180 each provide an independent basis for a plan of development.

## V. CONDITIONAL APPROVAL OF APPLICATION FOR CHANGE OF UNIT OPERATOR

For the reasons discussed above, DNR approves BP's application for a change in unit operator for the Eastern Operating Area from Phillips Alaska, Inc. to BP Exploration (Alaska) Inc., subject to the following conditions:

1. **Plan of Development.** The Prudhoe Bay Unit operator shall submit to the Commissioner of the Department of Natural Resources of the State of Alaska a plan of development for the Prudhoe Bay Unit Oil Rim Participating Area and Gas Cap Participating Area (collectively referred to as the Permo-Triassic Reservoir) on or before September 15, 2000 for the Commissioner's review and approval. That plan of development and all future plans shall meet the requirements of 11 AAC 83.343 or other law in effect at the time a plan is submitted. The Commissioner shall approve, modify, or disapprove a plan of development in accordance with 11 AAC 83.343 or other law in effect at the time a plan is submitted. Plans shall be annual, unless the Commissioner approves submission more or less frequently. From and after January 1, 2001, the Prudhoe Bay Unit operator shall not develop or produce from the Permo-Triassic Reservoir except in accordance with a current plan of development approved by the Commissioner

2. **Permo-Triassic Reservoir Field Development Plans and Reservoir Development Objectives.** In the event the Reservoir Development Objectives for the Permo-Triassic Reservoir set forth in Section 35.002 of the Prudhoe Bay Unit Operating Agreement are revised, the Prudhoe Bay unit operator shall submit said revision to the Commissioner within 60 days of approval by the owners. The Prudhoe Bay unit operator shall meet with representatives of the Division of Oil and Gas annually, on a date acceptable to the Division, to review operations during the prior year and future development plans. At the time of the annual meeting, Division of Oil and Gas representatives may review, on a confidential basis for information purposes, the most recent Field Development Plan (FDP) approved by the owners pursuant to Sections 35.101 and 35.102 of the Prudhoe Bay Unit Operating Agreement. The Prudhoe Bay unit operator will provide Division of Oil and Gas representatives reasonable access for their review of the FDP at the operator's Anchorage office at a mutually agreeable time.

3. **Past PBUOA Reservoir Development Objectives and Field Development Plans.** The Prudhoe Bay Unit operator shall submit to the Commissioner, on or before July 15, 2000, the Reservoir Development Objectives and Field Development Plans for the Permo-Triassic approved by the PBU producers in August of 1995 through 1999. The Reservoir Development Objectives and Field Development Plans shall be submitted for informational purposes to assist DNR in carrying out its duties and shall be kept confidential as provided in AS 38.05.035(a)(9).

4. **Amendment to the PBUA.** At the soonest opportunity, but in no case later than 60 days after unanimous alignment of PBU interests, BP as unit operator shall file modifications of the Prudhoe Bay Unit Agreement to reflect changes resulting from the owners' alignment agreements. The modification of the Prudhoe Bay Unit Agreement should include the proposed text for the modified agreement.

## VI. APPLICATIONS TO BE CONSIDERED AT A FUTURE DATE

While the application for change of unit operator has been considered in the context of the Alignment Agreement, DNR is not now ruling on applications yet to be filed, including an application for modification of the Prudhoe Bay Unit Agreement and applications for the assignment of interests in oil and gas leases.

## VII. CONCLUSION

For the reasons set for above and subject to the conditions and limitations noted, I hereby approve the application for change of unit operator.

Kenneth A. Boyd [signature] 25 July '00

Kenneth A. Boyd, Director
Division of Oil and Gas
Department of Natural Resources
State of Alaska

Date