**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **WALLACE OENGA, GEORGENE SHUGLUK, LEROY OENGA, SR., MICHAEL DELIA, TONY DELIA, JOSEPH DELIA, JENNIE MILLER, and TRINITY DELIA** | ) | **No. 06-491 L**<br>**Chief Judge Edward Damich** |
| **Plaintiffs,** | ) | |
| **v.** | ) | |
| **THE UNITED STATES,** | ) | **OENGA RESPONSE AND PARTIAL SUMMARY JUDGMENT BRIEF** |
| **Defendant, and** | ) | |
| **BP EXPLORATION (ALASKA) INC., CONOCOPHILLIPS ALASKA, INC., EXXON MOBIL ALASKA PRODUCTION, INC., CHEVRON U.S.A., INC. and FOREST OIL CORPORATION,** | ) | |
| **Defendant Intervenors** | ) | |

# TABLE OF CONTENTS


TABLE OF AUTHORITY ........................................................................................ ii

I. STATEMENT OF QUESTIONS INVOLVED ........................................................ 1

II. STATEMENT OF CASE..................................................................................... 2

A. Introduction..................................................................................................... 2

B. Statutes and Regulations Involved ................................................................. 3

C. Facts ………………………………………………………………………..5

1. Facts - Andrew Oenga ...……………………………………………...….5
2. Facts - Allotment…………………………………………………………6
3. Facts - Lease and Amendments.........................................................................7
4. Facts - United States Appraisals…………………...………………………10
5. Facts - Production from West Niakuk, Lisburne.……………………………11
6. Facts - Royalties, Thruputs and Other Rents at Comparable Sites…………...12
` 7. Facts - Oil Production, U.S. Rent Collection and Potential Damages ……….13
8. Facts - Statute of Limitations…………………………………………………14

III ARGUMENT……………………………………………………………………15

A. Statute of Limitations - Claims One, Two & Three Are Timely Filed……………..15

B. Money-Mandating Duty – Analytical Approach & Legal Standards ..................... 20

C. Claim One – Money-Mandating Duty .......................................................... 23
1. Existence of Claim One Money Mandating Duty……………………………23
2. Case Within Scope of Claim One Money-Mandating Duty…………………25

D. Claim Two – Money-Mandating Duty.......................................................... 31
1. Existence of Claim Two Money Mandating Duty…………………….…..….31
2. Case Within Scope of Claim Two Money-Mandating Duty………..…….35

E. Claim Three Money-Mandating Duty .......................................................... 37
1. Existence of Claim Three Money Mandating Duty…………………………37
2. Case Within Scope of Claim Three Money-Mandating Duty…….………….39

IV. CONCLUSION................................................................................................. 50

# TABLE OF AUTHORITY

**Cases**

*Aguilar v. United States*, 474 F. Supp. 840 (D. Alaska 1979) .......... 9

*Agwiak v. United States*, 1375, 1380 (Fed.Cir. 2003) .......... 26

*Ahrens v. U.S.*, 62 Fed.Cl. 664, 669 (Fed.Cl.,2004) .......... 45

*Apache*, 537 U.S. 465, 123 S.Ct. 1126, 155 L.Ed.2d 40 .......... 24, 32

*Arizona v. United States*, 216 Ct.Cl. 221, 575 F.2d 855, 863 (Ct.Cl.1978)), *aff'd* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) .......... 45

*Brown v United States*, 86 F.3d 1554, (C.A.Fed 1996) (Brown I) .......... 25, 36, 37, 42

*Brown v. United States*, 195 F.3d 1334, (C.A.Fed. 2000) (*Brown II*) .......... 25

*Chippewa Cree Tribe of the Rocky Boys Reservation*, 69 Fed.Cl. 639 (2006) .......... 19

*Cities of Burbank, etc. v. Bodman*, 464 F.3d 1280, 1284 (C.A.Fed.,2006) .......... 45

*Dureiko v. U.S.* 209 F.3d 1345, 1357(C.A.Fed.2000) .......... 48

*Fisher v United States*, 402 F.3d 1167, 1173 (C.A.Fed 2005) .......... 23

*Flying Diamond Oil Corp v. Newton Sharp Co.*, 776 P2d 618 (Utah 1989) .......... 15

*Greco v. Dep't of the Army*, 852 F.2d 558, 560 (Fed.Cir.1988) .......... 45

*In re Lueders* 111 F.3d 1569, 1577 fn.12 (C.A.Fed., 1997) .......... 46

*In re Newstar Energy of Texas*, 280 BR 623 (2002) .......... 15

*Mitchell I*, 445 U.S. 535, 100 S.Ct. 1349 .......... 24

*Navajo III*, 537 U.S. 488, 123 S.Ct. 1079, 155 L.Ed.2d 60 .......... 24

*Navajo Nation v. United States*, 501 F. 3d 1327 (C.A.Fed 2007) .......... passim

*NVT Technologies, Inc. v. U.S.* 370 F.3d 1153, 1159 (C.A.Fed.,2004) .......... 45

*Osage Tribe of Indians of Oklahoma*, 68 Fed.Cl. 322 (2005) .......... 19, 29

*Pawnee v. United States*, 830 F.2d 187, 190 (C.A.Fed. 1987) .......... 25, 28, 29

*Rosebud Sioux Tribe v. United States* 75 Fed.Cl. 15, 28-29 (2007) ................................ 36

*Safeco Credit v. United States*, 44 Fed.Cl. 406, 419 (1999)........................................... 45

*Schism v. U.S.* 316 F.3d 1259, 1285 (C.A.Fed. 2002) ................................................... 34

*Shoshone Indian Tribe of the Wind River Reservation v. United States*, 365 F.3d 1339 (C.A. Fed 2004) ........................................................................................... passim

*Simmons v. United States*, 71 Fed.Cl. 188 (2006) ......................................................... 19

*Teg-Paradigm Enviromental, Inc. v. U.S.*, 465 F.3d 1329, 1338 (C.A.Fed.,2006) .......... 48

*Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engineering,),* 467 U.S. 138, 149 (1984)........................................................................................... 32

*U.S. v. Larionoff*, 431 U.S. 864, 873 (1977)................................................................. 33

*United States v. Mitchell* (“ *Mitchell II* ”), 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983)........................................................................................................ 24, 36

*Victory Carriers, Inc. v. United States*, 199 Ct.Cl. 410, 467 F.2d 1334, 1342 (1972) ..... 46

*Winstar Corp. v. United States*, 64 F.3d 1531, 1540 (Fed.Cir.1995) .............................. 45

**Statutes**

25 U.S.C. § 396.......................................................................................... 5, 25, 28

25 U.S.C. § 415.......................................................................................... 5, 33, 34

28 U.S.C. § 2501........................................................................................... passim

28 U.S.C.§ 1491............................................................................................... 4, 21

30 U.S.C. § 1701........................................................................................ 5, 25, 28

30 U.S.C. § 1702............................................................................................ 28, 29

30 U.S.C. § 226.............................................................................................. 28, 32

30 U.S.C. §1701.................................................................................................. 31

30 U.S.C. §1702.................................................................................................. 31

PL 109-54 (2005), 119 Stat. 499, 519 (2005)................................................. 5, 16, 17, 20

**Regulations**

25 CFR 162.617-162.623 (2001) ........ 42, 51, 52

25 CFR 212.14 (1987), *212.40 (1996)* ........ 31

25 CFR 212.16 (1987), *212.41(b) (1996)* ........ 31

25 CFR 212.3 ........ 33, 34, 35

25 CFR 212.41 (1996) ........ 33

25 CFR Part 162 (1987), *(2001)* ........ passim

25 CFR Part 212 (1987), *(1996)* ........ 5, 6, 28, 33

30 CFR Part 206 (1993) ........ 5

30 CFR Part 296 (1993) ........ 28

43 CFR Part 3160 (1993) ........ 5, 28

**Other Authorities**

*Black's Law Dictionary* (8th ed. 2004) ........ 48

## I. STATEMENT OF QUESTIONS INVOLVED

**Statute of Limitations** - Was this action, regarding failure to collect proper rents and other amounts due, timely filed within six years of accrual under PL 109-54 (2005), 119 Stat. 499, 519 (2005) as a result of 1) the accounting requested by Plaintiffs and the United States' submittal of its response less than a year before filing, (Claims One, Two, Three), and 2) the United States' failure, less than a year before filing, to take requested action regarding breach of the Lease Agreement, as amended, and trespass (Claim Three)?

**Claim One –** For purposes of a claim under the Tucker Act, and pursuant to the statutes and regulations alleged in Claim One 1) does a money-mandating duty exist which can render the United States liable in damages for a breach of that duty, and 2) is Plaintiffs' situation within the scope of that duty?

**Claim Two –** For purposes of a claim under the Tucker Act, and pursuant to the statutes and regulations alleged in Claim Two, and the obligations assumed by the United States in the Lease Agreement, as amended, 1) does a money-mandating duty exist which can render the United States liable in damages for a breach of that duty, and 2) is Plaintiffs' situation within the scope of that duty?

**Claim Three –** For purposes of a claim under the Tucker Act, and pursuant to the statutes and regulations alleged in Claim Three, the obligations assumed by the United States in the Lease Agreement, as amended, and Intervenors' actions, 1) does a money-mandating duty exist which can render the United States liable in damages for a breach of that duty, and 2) is Plaintiffs' situation within the scope of that duty?

## II. STATEMENT OF CASE

### A. Introduction

This is a Tucker Act case seeking damages from the United States for failure to collect proper rents and other sums due resulting from the lease, for oil production purposes, of Plaintiffs' uniquely located Native Allotment.[1] The United States is liable to Oengas for these damages because 1) it did not collect proper royalties on the oil and gas produced thru the facilities on Oengas' Allotment as required by federal law, 2) it did not collect "present fair annual rental" as required by federal law, which should be determined in light of royalties, thruputs and other considerations paid for similarly situated lands used as the location for oil production facilities, and 3) it did not collect sums due for trespass and other uses in breach of the Lease.[2]

---

[1] Plaintiffs are the heirs of Andrew Oenga. ("Oengas") Defendant United States will be referred to as "United States" or "Interior" for the Department of the Interior, or "BIA" for Interior's Bureau of Indian Affairs. Intervenors are referred to as "Oil Companies," or by a shortened version of their individual names such as "BPX" for British Petroleum, or as "ConocoPhillips" or as "Exxon.' Standard Alaska Production Company changed its name to BP Exploration (Alaska) Inc., and will be referred to as "SAP Co." or "BPX." Oil Companies Brief, fn. 1, Docket 41-2, p.7. All of ARCO's interests relevant to this case were acquired by ConocoPhillips, but reference will be made to "ARCO" regarding action it took. At various time during this case, the United States, thru the BIA, contracted for realty services with the Artic Slope Native Association Limited ("ASNA") or Inupiat Community of the Artic Slope ("ICAS"). See Intervenors' Uncontroverted Facts §§2, 3, 12, 13 Docket 41-11pp. 1-15.

[2] In the oil context, a "royalty" is an amount paid based on a percentage of the value or volume of oil produced, often ranging from 1% to 25%. A "thruput" is an amount paid based a charge per barrel of oil produced, often ranging from a few cents to several dollars.

These Motions address 1) statute of limitation questions regarding the timeliness of this actions' filing and 2) money-mandating duty questions, for jurisdictional and merits purposes, as to whether a duty exists under each Claim and whether Oengas' situation is within the scope of that duty. Oengas seek partial summary judgment that the case was timely filed, and that the money-mandating duty requirements as to each Claim are satisfied for both jurisdictional and merits purposes. The United States seek dismissal of all Claims on various grounds, including statute of limitations, lack of money-mandating duty, and Lease provisions. The Oil Companies seek dismissal of Claim Three based on Lease provisions.

This brief will address the various Motions by issue. In other words, each party's position on each issue is addressed when considering that issue. Issues regarding breach of the duties and damages are not raised by these Motions.

## B. Statutes and Regulations Involved

This action is brought under the Tucker Act for failure to collect proper rents and other sums due. 28 U.S.C. § 1491 (waiving sovereign immunity and creating a cause of action against the United States in certain circumstances). Regulations revised during the periods applicable to this case are shown in *italics.*

**Statute of Limitations – Statutes & Regulations** - The statutes involved in the statute of limitations motions are 1) 28 U.S.C. § 2501 (Tucker Act claims must be brought within 6 years of accrual), and 2) PL 109-54 (2005), 119 Stat. 499, 519 (2005), the Indian Trust Accounting Statute, (ITAS) which states:

> [N]otwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim, including any claim in litigation pending on the date of the enactment of this Act, concerning losses to or mismanagement of trust

> funds, until the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss.

Id. (emphasis added)

**Claim One - Statutes & Regulations** - The statutes and regulations involved in the Claim One motions are

- 25 U.S.C. § 396, §§ 396a-g, specifically §396c, d, e, and g (authorizing long term leasing of allotted lands for oil and gas development subject to Interior approval and authorizing promulgation of regulations);

- 30 U.S.C. § 1701 et seq. (establishing basis for collecting royalties on the production of oil and gas from allotted and other federal lands);

- 30 U.S.C. §226(m) (allowing "apportionment of production or royalties" where federal oil pool cannot be produced from that tract and needs to use production facility on a separately owned tract), and 42 U.S.C. § 9506a(j)(5) (same regarding the National Petroleum Reserve in Alaska).

- 25 CFR Part 212 (1987), *(1996)* (regulating allotted lands leased for oil and gas production;

- 30 CFR Part 206 (1993)(regulating the collection of royalties from allotted lands); and 43 CFR Part 3160 (1993) (regulating oil and gas production from allotted and other federal lands).

25 CFR Part 212 was amended during the period applicable to these motions. The years 1988-August 7, 1996 are governed by 25 CFR Part 212 (1987), which are attached. The years August 7, 1996-2001 are governed by *25 CFR Part 212 (1996)*, which are the current version of the regulations. Specifically applicable provisions are set out in Argument, below.

**Claim Two - Statutes & Regulations** - The statutes and regulations involved in the Claim Two motions are

- 25 U.S.C. § 415(a) (authorizing the lease of allotted lands for natural resource development with Interior approval);

- 25 CFR Part 162 (1987), *(2001)* (establishing procedures for leasing of and rent collection for allotted lands);

25 CFR Part 162 was amended during the period applicable to these motions. The years 1988-January 22, 2001 are governed by 25 CFR Part 162 (1987), which are attached. The remainder of 2001 is governed by *25 CFR Part 162 (2001)*, which is the current version of the regulations. Specifically applicable provisions are set out in Argument, below.

**Claim Three - Statutes & Regulations -** The statutes and regulations involved in the Claim Three motions are the same as those in Claims One and Two. Specifically applicable provisions are set out in Argument, below.

## C. Facts

### 1. Facts - Andrew Oenga[3]

Oenga, the simple name by which Andrew Oenga was know in his native Inupiat language, was born in 1909 near Point Hope, Alaska. This was a time when American was beginning its affair with the automobile, and its endless appetite for gasoline and other oil product. But it was a different time in the north of Alaska, along the Beaufort Sea and the Artic Ocean, the area now known as the North Slope.

Oenga birthplace was a traditional Inupiat sod house (whale bone studs covered with bearded seal or caribou hides and topped with sod). Winter light and heat was provided by *ogrwgook* (oil) from whale, bearded seal or seal. This was before oil came from underground pools, reached by long-reach directional drilling from well heads on strategically placed drilling pads and carried in long pipelines crisscrossing the tundra. It

[3] See Declaration of Leroy Oenga Attachment 1.

was a time when food came not from the local Safeway, but from hunting *tuttu* (caribou), *agvik* (whale), *oogruk* (bearded seal), *ivik* (walrus), *natchiq* (seal), *niglio* (geese), *amauligruaq* (ducks) and *aqargio* (ptarmigan); from fishing for *sulukpaugak* (grayling), *iqalukpik* (artic char) and *aanaakliq* (whitefish); and from gather *quagaq* (spinach roots) and *akpik* (berries).

Oenga learned in the traditional Inupiat way – at the feet of his parents and elders. He learned the life of prior generations. To gather food, he and his family followed the herds and the seasons, back and forth across ancient Inupiat trails for hundreds of miles from Point Hope to Canada. During the winter temperatures regularly reach -50° F. They traveled not by snow machine power by today's *ogrugook*, but by sleds powered by teams of twelve of more dogs.

Along the way they built many sod houses, homes to live in while in that area. Each had an ice cellar for storing food, built well below the permafrost. Oenga had such sod houses and ice cellars on both sides of the Sagavanirktok River at Heald Point and Point Brower.

As Oenga grew older, times changed in many ways. He began spending more time in Barrow and found "work" there. But he never abandoned the way of life in which he had been raised. He regularly traveled to Heald Point and Point Brower.

As newcomers flooded the land looking for the new oil, Oenga sought to protect his traditional hunting and fishing areas at Heald Point and Point Brower. He took action to keep the oil prospectors off the land and applied to Interior for a Native Allotment. He sought 40 acres at Heald Point and 120 acres at Point Brower. The allotments were eventually granted.

Near the end of his life, Oenga grew weary of the battle. He finally gave in to pressure from an oil company, which wanted to lease his Heald Point allotment for a road and pipeline to move to market the new *ogrwgook*, the new oil. In 1988, when Oenga was 79, meetings were held with the oil company and Interior staff. Papers were presented, drafted by oil company and Interior lawyers. The language of the meetings and papers was English, a language Oenga could barely speak or read, only a few greetings or words. An Inupiat interpreter was used, who surely did best to understand and explain to Oenga the implications of the various clauses and fine print of the lease provisions. The Lease Agreement was signed in January 1989.

Oenga died one year later in 1990. His heirs bring this action.

**2. Facts – Allotment**

In 1970 Andrew Oenga, applied for a Native allotment which included 40 acres at Heald Point. Docket 42-2 p. 2-4. The patent or "Native Allotment" was eventually granted regarding the land on which is located BPX's production facility. Docket 42-4, pp. 6-7. The issued Native Allotment contained two provisions important to this case. First, it contained a "restriction against alienation." US Doc 2, Docket 42-2 pp. 6-7 Second, it reserved to the United States oil and gas rights underlying the allotment, and the right to access those reserves underlying the allotment, but not elsewhere. Id.

**3. Facts – Lease and Amendments**

**Original Lease Agreement** - In May, 1988, the SAP Co approached the BIA about seeking "a right-of-way application for an access road and pipeline" across Mr. Oenga's Heald Point allotment. Docket 42-2, p.14. During this active participation of Interior and its Solicitor's Office, SAP Co.'s request for a right-of-way became a lease

proposal, incorporating some portions of another BIA-approved Lease. US Doc 5, Docket 42-2, pp. 16-36. The dominate Lease preparation and negotiation role assumed by the United States on behalf of Mr. Oenga is described in various federal notes, letters, memos and reports. Docket 42-2 pp. 37-41, 49-60. This is particularly shown by the July 14, 1988 letter from the BIA to SAP Co. acknowledging DOI receipt of a proposed lease for the Oenga allotment, and a September 27, 1988 BIA memo stating that Mr. Oenga had not been provided a copy of the SAP Co. proposed lease prior to the lease negotiation meeting between SAP Co., BIA, and Interpreter, and Mr. Oenga. Docket 42-2 pp.38, 50-52. The Lease Agreement was signed in January 1989. One of the signers was the Fairbanks Superintendent of the Bureau of Indian Affairs (BIA) "acting for and on behalf of Mr. Oenga." The Lease Agreement has been known as BIA Lease F-89-01. Lease Agreement, US Doc 13, Docket 42-2 pp.62-79

Relevant portions of the Lease Agreement, Docket 42-2 pp. 62-79, include:

- **Initial ¶** - The Secretary's representative approved the Lease, "acting for, and on behalf of Mr. Oenga." "25 CFR Part 162 (1987)" "made a part" of the Lease.
- **Granting ¶** - Appendix A, referenced showing the intended use of the Heald Point allotment was for a road/pipeline right-of-way.
- **§1**. "Niakuk Project" specifically referenced three times. ¶¶ 2, 3, 4.
- **§ 4** – The restricted status of the property was recognized. The United States assumed the obligation to collect rent payments,.
- **§5** – The United States assumed the responsibility for conducting appraisals.
- **§9** - Reappraisal guidelines were established.
- **§ 10** – Company allowed to "use the leased premise for any and all oil field exploration, development, construction, facilities, production and support purposes, and for any other uses and purposes reasonably or conveniently related thereto."

- **§ 11** - Construction of improvements, including "drilling pads" was expressly permitted.

- **§ 13** - Subleasing was expressly allowed, without addressing notice to or prior approval by the Secretary or Oenga.

- **§ 26** - Mr. Oenga retained "a right of reasonable access across the leased premise," and use of the road on his Heald Point allotment.

- **Signatures** – In January, 1989 the Lease was signed and approved by representatives of the United States, and SAP Co.. SAP Co.'s attorney, Mr. Oenga, and the Interpreter.

**First Lease Amendment – Change of Intended Use –** BPX was unable to obtain the permits necessary for the causeway approach of moving oil from the off shore island production pad to Heald Point. Docket 42-3 pp.3. In July 1993, a BPX letter to the BIA proposed as an amendment of the Oenga lease. Docket 43-3, pp.57-59. The document by its own term was intended by BPX to constitute an actual lease amendment. Provisions of the document relevant to these Motions include:

- The document was written to the BIA Superintendent only – not written to or copied to any Oenga heir.

- It had a dual title lines of "Notification of Niakuk Project Commencement," and "Request to Amend Surface Lease F89-01." Id. (emphasis in original)

- It made specific reference to the original Lease authorizing "BP to construct production facilities to support development of, and production from, our Niakuk oil accumulation." Id. (emphasis added)

- It informed United States that intended use hadchanged to oil production facility by stating, "an armored production pad will be constructed at the tip of Heald Point, referred to an "enclosed general location map." Id. This map showing the Allotment being used for a "drill pad" was omitted from the copy provided to the Court by the United States and BPX. Docket 42-3 pp.58-59 (United States); Docket 41-3 pp. 24-25. A complete version of this first Lease amendment, with the attached map, is included in Declaration of Leroy Oenga Attachment 1.

- It requested that the Superintendent "indicate you approval of this amendment by signing in the space provided below…," and stated "[t]he within Lease

Amendment is hereby approved…" immediately above the Superintendent's signature Id. (emphasis added)

- It did not provide for the collection of a royalty on oil produced thru the production facility to be constructed on the allotment.

- No one from the United States or any other entity consulted with any Oenga heir or provided them a copy of the document before the Superintendent signed the document in early August, 1993. No Oenga heir ever signed the document. Declaration of Leroy Oenga. Oenga Attachment 1.

In summary, this First Lease Amendment was signed by the United States for the Plaintiffs without the Plaintiffs knowledge, consent or signature. It allowed a change of use of the allotment from right-of-way to oil production, but with no royalty or other rent adjustment.

**Second Lease Amendment – Sublease -** The January 2004 Second Amendment 1) increased the area leased "to include the entirety" of Oengas' Heald Pt. Allotment, 2) made changes regarding the timing of lease payments, including the change from five years to four years for rent adjustment, and 3) specifically required prior notice of a sublease, but defined a "facility sharing agreement" as not a sublease. Docket 42-4 pp. 55-61.

**Third Lease Amendment – United States Assumes Sole Responsibility -** In the May 1995 Third Amendment, the United States, thru its contractor, assumed sole responsibility for communicating with BPX on Oengas' behalf regarding the lease. In other words, this lease amendment prohibited the Oengas from contacting BPX in any way regarding this lease. Docket 42-5 pp. 55-60.

**4. Facts – United States Appraisals**

As discussed above regarding the Lease and its amendments, the United States assumed the responsibility to conduct appraisals of the Oengas Allotment every 5, then 4

years, to be used in determining the rent due. This was done in 1993 and 1997. Docket 42-3, pp. 25-56; Docket 42-6 pp. 12-26. In neither case did the BIA conduct an appropriate appraisal, consider the Oengas Allotments' enhanced value due to the Allotment's unique location for oil production, or consider its value based on comparable properties involved in oil production in a similar way and receiving royalty payments. See Sealed Declaration of Morse. Oenga Attachment 3. As a result, the appraisals grossly undervalued the Oengas' Allotment.

Improper appraisals is a basis for Claim Two allegation that the United States collected less than "present fair annual rental" as required by 25 CFR Part 162. This is a disputed factual issue which specifically goes to the United States' breach of its duty owed the Oengas, and is thus beyond the scope of these Motions.

**5. Facts – Production from West Niakuk, Lisburne**

Documents obtained pursuant to the accounting requests show that in early July, 1993 ARCO contacted BIA seeking to lease a portion of Oengas' Allotment for oil production purposes. Declaration of Leroy Oenga, Oenga Attachment 1. At the time SAP Co was leasing only 10 ac. of the 40 ac. Allotment, but had an option on the rest. Rather than attempting to negotiate with SAP Co for the release of a portion that might be leased to ARCO, the BIA simply rejected ARCO's request. Id. Oengas never learned of this until being supplied to the responses to the accountings addressed below. Early the next year in 1994 ARCO and Exxon, its co-lessee of the West Niakuk state oil lease, entered into an agreement with BPX for use of the BPX oil production facility on the Oenga Allotment to access its West Niakuk oil.

The Oil Companies concede, as they must, that oil from the West Niakuk P.A. has been produced thru the facilities on the Oengas' Allotment by ConocoPhillips (ARCO) and Exxon. Docket 41-2 pp. 13-16. Similarly, they concede that oil from the Lisburne P.A. has been produced thru the facilities on the Oengas' Allotment by ARCO. Id. They claim a LETTER AGREEMENT as authority for some or all of this production. Docket 41-2 pp. 13-16. see redacted LETTER AGREEMENT at Docket 42-8, pp. 2-6; and unredacted version attached to the Sealed Declaration of Morse. Oengas were not given notice of this LETTER AGREEMENT, nor did they consent to it. Declaration of Leroy Oenga. Oenga Attachment 1.

Letters on behalf of the Oengas were written to the United States and its contractor on December 1, 2005, December 23, 2005, and June 4, 2007, demanding that formal notice be sent to BPX and others regarding breach of the Lease and trespass, and that certain remedies be pursued. See Declaration of Leroy Oenga, Oenga Attachment 1. To Oengas' knowledge, no such action was taken by the United States. Declaration of Leroy Oenga. Oenga Attachment 1.

**6. Facts – Royalties, Thruputs and Other Rents at Comparable Sites**

An appropriate appraisal for determining the rents due for the lease of land, should consider the consideration paid for similar use of similar lands, regardless of whether they are paid as rents, royalties, thruputs or as some other form of consideration. See Sealed Declaration of Morse.

Royalties on oil production at comparable sites range from 1% to 4% at other sites (in Alaska - 1% to 2% royalty plus other consideration - Kuukpik); (in Utah - 2.5% royalty - *Flying Diamond Oil Corp v. Newton Sheep Co.*, 776 P.2d 618 (Utah 1989)); and

(in Michigan - 4% royalty - *In re Newstar Energy of Texas*, 280 BR 623 (2002)). See Sealed Declaration of Morse. Apportionment of royalties by the United States between the tract containing the oil and the point of production under separate ownership is statutorily authorized, although the amounts that have been apportioned to each are not currently known. Id., 30 U.S.C. § 226(m) and 42 U.S.C. § 9506a(j)(5).

Possibly the best indication of the proper rent to have been collected for the lease of Oengas' land is derived from the compensation set by the Oil Companies themselves in the above LETTER AGREEMENT providing for use of the Oenga Allotment as the oil production facility for oil from the West Niakuk PA. Sealed Declaration of Morse and unredacted version of LETTER AGREEMENT showing actual compensation paid by ARCO and Exxon for access to the production facility on Oengas' Allotment. To determine the amount of this compensation properly attributable to the Oengas' Allotment, there would have to be an apportionment between the land, and the oil production facilities built on it, much as a county tax assessor apportions the taxable value of a home between the land and the house built on it. This apportionment would be appropriate during the damage phase of this case.

**7. Facts - Oil Production, U. S. Rent Collections and Potential Damages**

Vast quantities of oil have been produced thru the production facility on Oengas' Allotment. Discovery responses regarding this oil production and an estimate of its value have been summarized in the Declaration of Langer. Oenga Attachment 2.

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| Year | Volume Niakuk PA (bbls) | Volume W. Niakuk PA (bbls) | Volume Lisburne PA (bbls) | Total Volumes | Price per Barrel | Total $ thru Heald Pt. Pad | 2% Royalty | Paid to Oenga |
| 1994 | 3,369,858 | | 526,257 | 3,896,115 | $13.19 | $51,389,757 | $1,027,795 | $80,640 |
| 1995 | 6,408,349 | 634,520 | 543,523 | 7,586,392 | $14.62 | $110,913,051 | $2,218,261 | $80,640 |
| 1996 | 9,161,057 | 1,773,439 | 446,642 | 11,381,138 | $18.46 | $185,304,430 | $3,706,089 | $80,640 |
| 1997 | 8,334,782 | 1,930,123 | 412,746 | 10,677,651 | $17.23 | $183,975,927 | $3,679,519 | $80,640 |
| Sub-Total | 27,274,046 | 4,338,082 | 1,929,168 | 33,541,296 | | $531,583,165 | $10,631,664 | $322,560 |
| 1998 | 6,603,468 | 3,422,581 | 439,466 | 10,465,515 | $10.87 | $113,760,148 | $2,275,203 | $80,640 |
| 1999 | 5,937,651 | 3,419,294 | 371,183 | 9,728,128 | $15.56 | $151,369,672 | $3,027,393 | $88,997 |
| 2000 | 4,449,190 | 2,547,897 | 269,329 | 7,266,416 | $26.72 | $194,158,636 | $3,883,173 | $88,997 |
| 2001 | 3,632,731 | 2,994,533 | 171,833 | 6,799,097 | $21.84 | $148,492,278 | $2,969,846 | $88,997 |
| **Sub-Total** | **20,623,040** | **12,384,305** | **1,251,811** | **34,259,156** | | **$607,780,734** | **$12,155,615** | **$347,632** |
| **Total** | **47,897,086** | **16,722,387** | **3,180,979** | **67,800,452** | | **$1,139,363,899** | **$22,787,279** | **$670,192** |
| **Production %** | 71% | 24% | 5% | | | | | |

The most recent Kuukpik royalty rate of 2%, applied to this production would have been over $22 Million, 34 times more than the $670,192 rent actually collected by the United States for Oengas from 1994-2001. Id. See also Sealed Declaration of Edward Morse regarding LETTER AGREEMENT rents regarding West Niakuk.

**8. Facts – Statute of Limitations, Accounting Requests and Responses**

The Oengas were never provided copies of the appraisals or cost of living adjustment calculation upon which the United State based its determinations of what rent it would collect from BPX until the responses to the accounting requests described below. Declaration of Leroy Oenga, Oenga Attachment 1.

In 2003 Oengas orally requested documents from the United States' realty contractor, ICAS. Many documents were provided. Id. On November 22, 2005 the Plaintiffs formally requested an accounting of DOI regarding rent collections for the lease of the Oengas' Allotment. Declaration of Leroy Oenga, Oenga Attachment 1. DOI responded to that request for accounting in February 2006 and May 2006. Id.

# III. ARGUMENT

This action was timely filed within six years of accrual of the causes of action. Accrued occurred in 2006 upon receipt of an accounting from which Oengas could determine their loss. See Indian Trust Accounting Statute (ITAS), PL 109-54 (2005), 119 Stat. 499, 519 (2005). The network of statutes and regulations set out in Claims One, Two and Three, coupled with the obligations assumed by the United States in the Lease Agreement, as amended, constitute money-mandating sources of substantive law, for jurisdictional and merits purposes, creating fiduciary duties, owed Oengas by the United States. Those same statutes, regulations and obligations assumed, coupled with the United States' common law trust duties and the facts of this case, place Oengas' situation within the scope of those money-mandating duties.

For the reasons set out below, Plaintiffs ask that partial summary judgment be granted in their favor on each issue addressed. Similarly, Plaintiffs ask that the pending Motions of the United States and the Oil Companies be denied.

## A. Statute Of Limitations - Claims One, Two & Three Are Timely Filed

### 1. Statute Of Limitations Generally

The statute of limitation legal analysis must start with 28 U.S.C. § 2501. The statute requires that all claims in the Court of Federal Claims be filed "within six years after such claim first accrues." Id. (emphasis added). Accrual of an Indian breach of trust claim regarding failure to collect sums due is governed by the Indian Trust Accounting Statute, PL 109-54 (2005), 119 Stat. 499, 519 (2005), (ITAS). It states:

> [N]otwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim, including any claim in litigation pending on the date of the enactment of this Act, concerning losses to or mismanagement of trust

> funds, until the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss.

PL 109-54 (2005), 119 Stat. 499, 519 (2005) (emphasis added)

The leading case addressing the interplay between these two statutes is *Shoshone Indian Tribe of the Wind River Reservation v. United States,* 365 F.3d 13391345-51 (C.A. Fed 2004) (applying ITAS) ("*Wind River*"). The guidance of *Wind River* includes:

- ITAS is an accrual statute, so that a claim within its ambit "'shall not commence to run,' until the claimant is provided with a meaningful accounting." Id. at 1347 (emphasis added)
- This interpretation of ITAS is consistent with the general rule that "beneficiaries are under a lesser duty to discover malfeasance relating to their trust assets." Id
- The standard of care is that "the United States must be held to the 'most exacting fiduciary standards' in its relationship with the Indian beneficiaries." Id. at1348
- ITAS "covers claims concerning 'losses to ... trust *funds*' rather than losses to mineral trust *assets*," but covers the United States' failure "to timely collect amounts due and owing …" Id. at 1350-51. (emphasis in original)

The Court of Federal Claims has had several opportunities to apply the Federal Circuit's guidance from *Wind River*. *Osage Tribe of Indians of Oklahoma*, 68 Fed.Cl. 322 (2005) (holding ITAS applicable to claim seeking damages for failure to collect proper oil royalties and late charges due); *Chippewa Cree Tribe of the Rocky Boys Reservation*, 69 Fed.Cl. 639 (2006) (holding ITAS applicable to claim seeking damages for mismanagement of Judgment funds*); Shoshone Indian Tribe of the Wind River Reservation v. United States,* 71 Fed.Cl.172 (2006) (holding ITAS applicable to claim seeking damages for failure to collect proper oil royalties due); *Simmons v. United States*, 71 Fed.Cl. 188 (2006) (holding ITAS not applicable to damage claim for mismanagement trust assets)

The wording of these two statutes, and the standards adopted in *Wind River* and followed in the other cases, guide the determination on this statute of limitation issue.

**2. All Claims Within Statute of Limitations**

**United States Position –** The United States seeks dismissal of Claims One and Two (but not Claim Three) for lack of jurisdiction under 28 U.S.C. § 2501 because the action was not filed within 6 years of the date it claims the causes of action accrued. The United States Brief does not address the request for accounting, the submittals in response or the application of ITAS, even though these matters were pled by Oengas and addressed by the United States in its Answer.[4] The United States seeks no relief as to Claim Three on statute of limitation grounds.

**Oil Companies' Position –** The Oil Companies seek no relief on statute of limitation grounds.

**Oengas' Position –** Oengas seek partial summary judgment that all claims were filed within six years of accrual. ITAS, 28 U.S.C. § 2501.

[4] In ¶3 of the Second Amended Complaint, Oengas alleged "On November 22, 2005 Plaintiffs formally requested an accounting regarding the lease that is the subject of this action. On February 8, 2006, May 12, 2006 and May 26, 2006 the Defendants responded to that accounting." In ¶4 of Plaintiffs' Second Amended Complaint stated, "Claims One, Two and Three subject to the six year statute of limitations of 28 U.S.C. § 2501 applicable to this action did not accrue until 2007 [sic, should be 2006] because of operation of PL 109-54 (2005), 119 Stat. § 499, 519, the request for accounting and the receipt of the United States' response to that request." Docket 67, pp. 2-3.

The United States answered by stating, "Defendant admits the allegations contained in the first sentence of Paragraph No. 3. Defendant admits the allegation of the second sentence that the Defendant did furnish a response to Plaintiffs' request, but denies that the information comprising this response constituted 'an accounting' and denies that said information was not previously known by, or readily available to, Plaintiffs." Answer to Second Amended Complaint, Docket 74 p. 1-2, (emphasis added)

Oengas' claims are for failure to collect proper rents and other sums due. This brings the case within the ambit of ITAS. Oengas orally requested an informal accounting of the United States' realty contractor, ICAS in 2003, and formally requested an accounting of the United States in November 2005. Declaration of Leroy Oenga, Oengas Attachment 1. The accounting responses were received in 2003 and 2006. Id. Under ITAS, the causes of action in this case accrued on one of those two dates. Oengas' original Complaint was filed in June, 2006. Docket 1. The action was filed within the six years of accrual, regardless of which date is used, and thus was timely filed under 28 U.S.C. § 2501.

An additional reason Claim Three is timely filed within six years of accrual is that Claim Three accrued when the United States failed to take requested action after the 2005 demand letters regarding ARCO/Exxon and West Niakuk and the 2007 demand letter regarding Lisburne. See letters attached to Declaration of Leroy Oenga. Oenga Attachment 1.[5]

The United States' argues in its Brief that the cause of action accrued when the lease was signed (1989) or when the appraisals were conducted (1993, 1997), and that the Complaint is untimely because it was not filed within six years of those dates. Docket 42 pp. 33-36. This argument fails for two reasons. First, this case is a breach of trust case for failure to collect proper rents. Therefore the date the Lease was signed has nothing to do with the accrual of these causes of action.

---

[5] Still another factor in the timeliness of the filing of Claim Three is United States' failure to disclose, until 2006 in the response to the accounting requests, ARCO's 1993 interest in the needing the strategically located Oenga Allotment to access their offshore Lisburne and West Niakuk oil leases. Id. (lack of disclosure of ARCO's interest in Oengas' property, and United States' response to ARCO).

Second, ITAS and *Wind River* make clear that accrual of the cause of action in a case such as this is controlled by the date the accounting response is received, not by the date of some other event such as signing a lease or conducting an appraisal.

> The clear intent of the Act is that the statute of limitations will not begin to run on a tribe's claims until an accounting is completed. We therefore hold that the Act provides that claims falling within its ambit shall not accrue, i.e., "shall not commence to run," until the claimant is provided with a meaningful accounting. This is simple logic-how can a beneficiary be aware of any claims unless and until an accounting has been rendered?

*Wind River*, 364 F.3d at 1347(footnote omitted) (emphasis added)

The United States' asserts in its pleading that the accounting is inapplicable for accrual purposes because the information provided in the accounting was "previously known by, or readily available to, Plaintiffs." Docket 74 p. 1-2. This pleading argument fails for two separate and independent reasons. First, it is simply not true. Declaration of Leroy Oenga, Oenga Attachment 1 (appraisal and other information not known or readily available, nor did Oengas know if they had a claim). Second, the position asserted by the United States is not the legal standard applicable to ITAS. As quoted just above, *Wind River* made very clear that it is the accounting response that triggers accrual of the cause of action under ITAS.

*Wind River* also made clear that there is no duty for a trust beneficiary to independently manage the trust, or rent collections regarding it.

> Beneficiaries of a trust are permitted to rely on the good faith and expertise of their trustees; because of this reliance, beneficiaries are under a lesser duty to discover malfeasance relating to their trust assets. As the Supreme Court explained in *Mitchell II*, "[a] trusteeship would mean little if the beneficiaries were required to supervise the day-to-day management of their estate by their trustee or else be precluded from recovery for mismanagement." 463 U.S. at 227

*Wind River* 364 F.3d at 1347-48 (internal citations omitted)

Furthermore, Oengas were specifically prohibited in the Lease from dealing with BPX. That responsibility was specifically assumed in the Lease by the United States and its contractor. Third Lease Amendment ¶ 34, Docket 42-5, p.56. How can a beneficiary be considered responsible for rent collection activities, or determining if rents have been properly collected, if they cannot even speak with the party paying the rent? Id. The Oenga situation is precisely the type of situation where an accounting is absolutely essential to determine if a loss has occurred.

Under ITAS, as construed by *Wind River*, all of the United States' arguments fail. The action accrued when the accounting responses were received, either in 2003 or 2006. The action was timely filed in 2006. For all of the above reasons, this action was timely filed within six years of accrual. The United States' Motion to Dismiss Claims One and Two on statute of limitation grounds is without merit. It should be denied. The Oengas' statute of limitation Motion for Partial Summary Judgment as to Claim One, Two and Three should be granted.

## B. Money-Mandating Duty – Analytical Approach & Legal Standards

The remaining issues of these Motions involve money mandating-duty questions - whether money-mandating duties exist and whether Oengas' situation is within the scope of those duties. Such money-mandating duty analysis formerly required two separate determinations, one for jurisdiction, the other for the merits. Recently, however, the Federal Circuit held that only one money-mandating duty determination is required to fulfill both jurisdictional and merits purposes. *Fisher v United States*, 402 F.3d 1167, 1173 (C.A.Fed 2005) ("the determination that the source is money-mandating shall be determinative both as to the question of the court's jurisdiction and thereafter as to the

question of whether, on the merits, plaintiff has a money-mandating source on which to base his cause of action.”).

The determination of whether there is such a money-mandating duty in a specific case requires analysis under various Supreme Court and Federal Circuit precedents. Rather than paraphrasing those standards, it is better to simply set out the Federal Circuit’s recent analysis of them in *Navajo Nation v. United States*, 501 F. 3d 1327 (C.A.Fed 2007) (*Navajo V*).

> The Supreme Court's decisions in *Mitchell I*, 445 U.S. 535, 100 S.Ct. 1349, *United States v. Mitchell* (“ *Mitchell II* ”), 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983), *Apache*, 537 U.S. 465, 123 S.Ct. 1126, 155 L.Ed.2d 40, and *Navajo III*, 537 U.S. 488, 123 S.Ct. 1079, 155 L.Ed.2d 60, control this case. As explained in *Apache*:
>
>> Jurisdiction over any suit against the Government requires a clear statement from the United States waiving sovereign immunity, together with a claim falling within the terms of the waiver. The terms of consent to be sued may not be inferred, but must be “unequivocally expressed” in order to “define [a] court's jurisdiction.” The Tucker Act contains such a waiver, giving the Court of Federal Claims jurisdiction to award damages upon proof of “any claim against the United States founded either upon the Constitution, or any Act of Congress,” and its companion statute, the ***1334** Indian Tucker Act, confers a like waiver for Indian tribal claims that “otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe.”
>>
>> Neither Act, however, creates a substantive right enforceable against the Government by a claim for money damages. As we said in *Mitchell II*, a statute creates a right capable of grounding a claim within the waiver of sovereign immunity if, but only if, it “can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.”
>>
>> This *“fair interpretation” rule* demands a showing demonstrably lower than the standard for the initial waiver of sovereign immunity. “Because the Tucker Act supplies a waiver of immunity for claims of this nature, the separate statutes and regulations need not provide a second waiver of sovereign immunity, nor need they be construed in the manner appropriate to waivers of sovereign immunity.” It is enough, then, that a statute creating a Tucker Act right be *reasonably amenable* to the reading that it mandates a right of recovery in damages. While the premise to a Tucker Act claim will not be “lightly inferred,” a *fair inference will do.*

> 537 U.S. at 472-73, 123 S.Ct. 1126 (modification in original, citations omitted, emphasis added); *see also Navajo III*, 537 U.S. at 506, 123 S.Ct. 1079 (stating that courts must "determine whether the relevant source of substantive law can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties [the governing law] impose[s]" (modifications in original, citation and quotation marks omitted)).

*Navajo V*, 501 F. 3d at 1333-34. (emphasis in original)

In *Navajo V*, the Federal Circuit addressed this money-mandating determination in a 2-Step process. The first step is to determine whether the money-mandating duty exists, that is whether a statutory/regulatory network created a general money-mandating fiduciary duty by being "*reasonably amenable* to the reading that it mandates a right of recovery in damages." Id. (finding money-mandating duty), (emphasis in original); *Pawnee v. United States*, 830 F.2d 187, 190 (C.A.Fed. 1987), (finding money-mandating duty in Indian oil and gas regulations); *Brown v United States*, 86 F.3d 1554, 1563 (C.A.Fed 1996); (*Brown I*) (finding money-mandating duty in Indian leasing regulations).

The second step is to determine whether the plaintiff's situation is within the scope of the money-mandating duty. *Navajo V*, 501 F.3d at 1345-49, (finding specific breach of money-mandating duty). *Pawnee*, 830 F.3d at 191-92, (finding no specific breach of money-mandating duty); *Brown v. United States*, 195 F.3d 1334, (C.A.Fed. 2000) (*Brown II*). (finding no specific breach of money-mandating duty),

*Navajo V* also set out several factors to guide consideration of both aspects of this 2-step analysis. The sections below will address these factors and each Parties' positions on each Claim, first looking at whether a money-mandating duty exists, and then looking at whether Oengas' situation is within the scope of that duty.

## C. Claim One – Money-Mandating Duty

### 1. Existence of Claim One Money-Mandating Duty

**United States' Position –** Existence of Claim One Money-Mandating Duty - The United States does not specifically address whether the statutes and regulations alleged by Oengas in Claim One constitute a money-mandating source of substantive law creating a fiduciary duty that can render the United States financially liable if breached. Rather, the United States argues that the statutes and regulations alleged are not applicable to the Oengas' factual situation, which goes to the scope of the duty addressed in the next section. US Brief pp. 18-20.

**Oil Companies' Position –** Existence of Claim One Money-Mandating Duty - The Oil Companies do not address Claim One. Oil Company Brief pp.1-30.

**Oengas' Position -** Existence of Claim One Money-Mandating Duty – The Oengas seek partial summary judgment that the network of statutes and regulations set out in Claim One creates a money-mandating duty for the United States to collect a royalty on the value or volume of oil and gas produced from leased Native allotments. That network of statutes and regulations consists of:

- 25 U.S.C. § 396 – Granting the Secretary of the Interior (Secretary) authority and responsibility over the leasing of allotted land for mining purposes, which includes oil and gas production.

- 25 U.S.C. § 396a-g, specifically §396c, d, e, and g - Granting the Secretary specific authority and responsibility over the leasing of allotted lands for oil and gas development.

- 30 U.S.C. § 1701 et seq. – Establishing a uniform system of royalty collection by the United States regarding oil and gas production from allotted lands.[6]

---

[6] 30 U.S.C. 1701 et seq. (1996) became effective 3 years after the Oengas allotment began being used as the surface point of production. The provisions of the Act

- 25 CFR Part 212 (1987), *(1996)* – Rrequiring the United States to collect royalties on oil and gas production from allotted lands. They were revised effective August 7, 1996.

- 30 CFR Part 296 (1993) – Establish procedures for the Mineral Management Service (MMS) of the Department of the Interior (Interior) regarding the collection of oil and gas royalties.

- 43 CFR Part 3160 (1993) –Address procedures for oil exploration, development and production.

These statutes and regulations constitute a money-mandating source of substantive law, creating a fiduciary duty owed the landowner by the United States, which if breached, renders the United States liable for damages. The Federal Circuit has so found.

In *Pawnee v. United States,* 830 F.2d 187 (C.A.Fed. 1987) the Federal Circuit held that the network of most of these same statutes and regulations created a money-mandating fiduciary duty that could render the United States liable for damages regarding improper collection of oil and gas royalties.

> Because the statutes and regulations at issue in this case clearly establish fiduciary obligations of the Government in the management and operation of Indian lands and resources, they can fairly be interpreted as mandating compensation by the Federal Government for damages sustained. Given the existence of a trust relationship, it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties. It is well established that a trustee is accountable in damages for breach of trust.

*Pawnee v. United States,* 830 F.2d at 190. (emphasis added)

---

specifically apply to the last 5+ years applicable to this action, and can properly guide the Court as to a just result in the earlier years.

A similar result regarding the existence of a money-mandating duty as to coal leases was recently reached by the Federal Circuit in *Navajo V*, 501 F. 3d at 1349.[7] So too was a money-mandating duty found to exist under a similar regulatory scheme specific to the Osage Tribe. *Osage Tribe v. United States*, 68 Fed.Cl. 322 (2005).

For the above reasons, there exists a money-mandating duty that can render the United States liable for money damages if breached, as alleged in Claim One. The Oengas' Motion For Partial Summary Judgment as to this Claim One issue should be granted.

**2. Case Within Scope of Claim One Money-Mandating Duty**

**United States' Position –** Scope of Claim One Money-Mandating Duty - The United States seeks dismissal of Claim One for failure to state a claim, arguing that Oengas' factual situation is not within the scope of the Claim One statutes and regulations because the Oengas are not an "Indian mineral owner." US Brief pp. 18-20.

**Oil Companies' Position –** Scope of Claim One Money-Mandating Duty - The Oil Companies do not address Claim One. Oil Company Brief pp.1-30.

**Oengas' Position –** Scope of Claim One Money-Mandating Duty – The Oengas seek partial summary judgment that their factual situation is within the scope of the Claim One money-mandating fiduciary duty. The oil and gas royalty statutes and regulations that form the network creating the money-mandating fiduciary duty do apply

[7]This long-running Navajo Nation litigation involved coal, not oil leases. The *Pawnee* finding of a money-mandating duty was first distinguished from the Navajo coal leasing situation in *United States v. Navajo Nation*, 537 U.S. 488, 508 fn. 11 (2003) and *Navajo Nation v. United States*, 68 Fed.Cl. 805, 814 (2005). Recently the Federal Circuit held a network of statutes and regulations similar to those cited above constitutes a money-mandating duty in the coal leasing situation. *Navajo V.* Now the same network of statutes and regulations has been found by the Federal Circuit to constitute a money-mandating duty in both the oil and coal leasing situations. *Pawnee, Navajo V.*

to the Oengas' situation, imposing on the United States the specific fiduciary duty to collect a royalty on the oil produced thru the production facility on the leased Oenga Allotment.

The specific statutes and regulations of the network which bring the Oengas situation within the scope of the Claim One money-mandating duty include:

- 25 U.S.C. § 396 – granting the Secretary of the Interior (Secretary) authority to lease allotted land for mining purposes (defined elsewhere to include oil and gas), and to adopt regulations.

- 25 U.S.C. § 396d – making oil and gas leases subject to regulations.

- 30 U.S.C. § 1701(a) – finding
  - The Secretary should enforce effectively existing mineral leasing laws
  - Oil and gas royalty accounting system to be "archaic and inadequate"
  - The Secretary needs to "improve methods of accounting for such royalties."
  - The Secretary "should aggressively carry out his trust responsibility in the administration of Indian oil and gas.

- 30 U.S.C. § 1701(b) – listing statutory purposes to include
  - clarifying and defining the Secretary's oil and gas lease responsibilities on Indian lands.
  - "to fulfill the trust responsibility of the United States for the administration of Indian oil and gas resources."

- 30 U.S.C. § 1702 – defining terms to include:
  - (3) "Indian lands" – includes lands such as Oengas' that are "subject to federal restriction against alienation"
  - (5) "lease" – a "contract…under a mineral leasing law that authorizes exploration for, extraction of, or removal of oil or gas."
  - (6) "lease site" – "lands or submerged lands, **including the surface of a severed mineral estate, on which exploration for, or extraction or removal of, oil or gas is authorized pursuant to lease**." [precisely the Oengas' situation]

- 25 CFR 212.14 (1987), *212.40 (1996)* – specifying the United States is to collect oil and gas royalties.

- 25 CFR 212.16 (1987), *212.41(b) (1996)* – requiring the royalty payment and setting the amount – 12 ½%, *16 2/3%.*

This network 1) specifically recognizes the United States' trust responsibility, 2) applies to restricted fee allotted lands like Oengas, 3) requires the United States to collect royalties on covered oil and gas leases, 4) defines such leases as authorizing the extraction or removal of oil and gas, and 5) defines a covered "lease site" as one "including the surface of a severed mineral estate on which exploration for, or extraction, or removal of oil and gas is authorized pursuant to a lease." 30 U.S.C. § 1702 (6). (emphasis added)

The crucial aspect of this network, which brings the Oenga situation specifically within the scope of the money-mandating duty, is the statutory definition of "lease site" as "including the surface of a severed mineral estate on which exploration for, or extraction, or removal of oil and gas is authorized pursuant to a lease." Id. (emphasis added). The Oenga situation precisely meets this definition. Oengas own the "surface" that is "authorized pursuant to a lease" to be used for the "exploration for, or extraction, or removal of oil and gas" from a "severed mineral estate," the Niakuk PA, West Niakuk PA and Lisburne PA. Id.[8] The Oengas situation is within the scope of the money-mandating duty created by this network of statutes and regulations.

---

[8] It is appropriate to note that except for the Lease, there is no right for the United States, BPX or anyone else to produce oil or gas underlying other lands thru Oengas' Allotment. The patent or "Native Allotment" did reserved to the United States the right to the oil and gas "in the lands so allotted" and the right to "prospect for, mine and remove such deposits from the same," but **did not reserve** the right to produce oil and gas from **other lands** thru the Allotment. In other words, since the oil produced thru the Oenga Allotment did not come from the subsurface of the Oenga Allotment, it was not subject to the "Excepting And Reserving Clause" of the Oenga Native Allotment. See Native Allotment, Docket 42-2 p. 7. But for the lease, BPX had no right to use the surface of Oengas' Allotment to explore for and produce the oil and gas underlying other lands.

This conclusion is only reinforced when viewed in light of the "fair inference" and common law trust guidance set out in *Navajo V*, 501 F.3d at 1346 (explain that once money-mandating duty found to exist, the "common law trust duties of care, candor, and loyalty help define the fiduciary responsibilities," and can to be used "in drawing the inference that Congress intended damages to remedy a breach of obligation")(internal quotations omitted). This standard comes particularly into play in this case because 30 U.S.C. § 226(m) and 42 U.S.C. § 9506a(j)(5) (each providing that when oil or gas underlying United States lands "cannot be independently developed and operated," the Secretary of the Interior may pool that land with other separately owned land or tract under a "drilling agreement providing for an apportionment of production or royalties" with the owner of the other tract).

To put it another way, Congress has provided that when the United States finds itself in the same situation that BPX did - having an oil pool but no way to develop it - the Secretary of the Interior can enter into an agreement apportioning royalties with another landowner whose surface location can be used to develop the United States' oil. Given this specific congressional authorization, certainly "the common law trust duties of care, candor and loyalty" impose upon the United Sates the fiduciary obligation to collect a similar royalty for the Oengas. *Navajo V*, 501 F.3d at 1346.

If there be any ambiguity in these statutes and regulations, it is resolved by the rule of construction that statutes and regulations adopted for the benefit of Indian Tribes or Native people are to be construed in their favor. *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engineering,)*, 467 U.S. 138, 149 (1984) ("it is a settled principle of statutory construction that statutes passed for the benefit of dependent Indian

tribes are to be liberally construed, with doubtful expressions being resolved in favor of the Indians”). See, e.g., *Bryan v. Itasca County*, 426 U.S. 373, 392 (1976); *Alaska Pacific Fisheries v. United States*, 248 U.S. 78, 89 (1918); *Shoshone Indian Tribe of Wind River Reservation v. U.S.* 364 F.3d 1339 (C.A.Fed. 2004).

The above statutes and regulations bring the Oengas situation within the scope of the United States’ money-mandating duty, thus requiring a royalty be collected once the Allotment was used as the site of an oil production facility.

The United States’ argument is that there is no duty to collect a royalty in the Oenga situation because under *25 CFR 212.3 and 212.41 (1996)*, royalties are only to be collected for an "Indian mineral owner." The United States’ argument is without merit for three reasons.

First, the United States argument is totally unsupported by the regulations as to the period before August 7, 1996, the time period subject to the earlier regulations, 25 CFR Part 212 (1987). Those regulations make no reference to “Indian mineral owner.” The United States does not even address these earlier regulations applicable to the 3 years of oil production from the Oenga Allotment before August 7, 1996. 25 CFR Part 212 (1987). Their argument fails.

Second, the United States’ argument fails because it does not recognize the controlling impact of 30 U.S.C. §1702(5),(6) (1996) regarding the type of a “lease” and “lease site” at which oil and gas royalty collection is applicable. In fact, the United States does not even address the impact of 30 U.S.C. §1701 et seq. (1996) or the network discussed above. When 30 U.S.C. §1702(6) (1996) (defining “lease site”is taken into account, the United States reliance on the “Indian mineral owner” definition in *25 CFR*

*212.3 (1996)* becomes one that a narrow regulation definition should control over a broader statutory definition. This is simply not the law. The statute controls, and regulation must be construed to be consistent with the statute or be invalidated. *U.S. v. Larionoff*, 431 U.S. 864, 873 (1977). ("regulations, in order to be valid must be consistent with the statute under which they are promulgated"). See, e.g., *Schism v. U.S.* 316 F.3d 1259, 1285 (C.A.Fed. 2002).

Third, the United States' entire argument rests on the newer regulations defining "Indian mineral owner" as one who "owns mineral interests in oil and gas." *25 CFR 212.3, 212.41(b) (1996)*. But the regulations relied upon by the United States do not define "mineral interests." An underground pool of oil is of great potential, but of little value without a surface location that can be used as a point of production. One of the bundle of sticks in a complete "mineral interest" surely includes the stick or interest in the right of use of a surface location needed to realize the potential of the oil. If the surface overlying the oil pool cannot be used to develop the oil, as is the case with Niakuk, West Niakuk and Lisburne, then the "mineral interest" in those pools is not complete. If the owner of such a subsurface oil pool has to lease a surface point of production at another location, then that leased surface property has properly becomes part of the fully realized "mineral interest" and is entitled to a share of the royalty.

This is the logical underpinning of 30 U.S.C. § 226(m) and 42 U.S.C. § 9506a(j)(5) discussed above, which authorize the Secretary of the Interior to give up some of the royalty in exchange for access to a drilling location to develop and realize the potential of its oil mineral interest. When there is such an "apportionment of production or royalties between the point of production and the tract containing the oil," 30 U.S.C. §

226(m), 42 U.S.C. § 6506a(j)(5), both the owner of the rights in the subsurface oil pool and the owner of the point of production can properly be said to "own[] mineral interests in oil and gas" as used in 25 CFR 212.3. Oengas must be considered an "Indian mineral owner" and entitled to a royalty, even under regulation relied upon by the United States such as *25 CFR 212.3*.

For all of the above reasons, the Oengas situation is within the scope of the money-mandating duty created by the Claim One network of statutes and regulations requiring the United States to collect a royalty on oil and gas produced. The United States' Motion to Dismiss Claim One for failure to state a claim is without merit. It should be denied. The Oengas' Motion for Partial Summary Judgment as to Claim One should be granted.

## D. Claim Two – Money-Mandating Duty

### 1. Existence of Claim Two Money-Mandating Duty

**United States Position -** Existence of Claim Two Money-Mandating Duty - The United States argues that the statutes and regulations alleged in Claim Two do not constitute a money-mandating duty. Specifically, the United States argues in its Motion that "the BIA had no obligation to measure the lease rental adjustments by using royalty rates paid to owners of allegedly 'comparable' properties." It also argues in its Brief that the statutes and regulations alleged by Oengas in Claim Two do not require that "oil royalties be used to calculate lease rental adjustments." US Motion p. 2, US Brief p. 25. Docket 42 pp. 12, 37

**Oil Companies' Position -** Existence of Claim Two Money-Mandating Duty - The Oil Companies did not address Claim Two. Oil Company Brief pp.1-30.

**Oengas' Position -** Existence of Claim Two Money-Mandating Duty **–** The Oengas seek partial summary judgment that the Claim Two statute, regulations and the obligations assumed by the United States in the Lease Agreement each constitute a money-mandating duty. Those duties are for the United States to collect "fair" rent on leased allotted lands thru the use proper appraisals. 25 U.S.C. § 415(a) (allowing the leasing of restricted allotted lands, subject to Secretarial approval, and certain conditions); 25 CFR Part 162 (1987), *(2001)* (requiring collection of "fair annual rental" based on "periodic review" and setting other specific conditions on the leasing of allotted lands); Lease Agreement ¶¶5, 9 (requiring the United States to conduct periodic appraisals and to collect rents based in part thereon).

The Federal Circuit has found these statutes and regulations do impose a money-mandating duty on the United States. In *Brown v United States*, 86 F.3d 1554, (C.A.Fed 1996) (Brown I) the Federal Circuit stated,

> In sum, by virtue of the control they place in the hands of the Secretary, section 415(a) and the implementing regulations of part 162 impose upon the government a fiduciary duty in the commercial leasing context. "Given the existence of a trust relationship, it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties." *Mitchell II*, 463 U.S. at 226, 103 S.Ct. at 2972-73.

*Brown I*, 86 F.3d at 1563, (emphasis added). See also, *Rosebud Sioux Tribe v. United States* 75 Fed.Cl. 15, 28-29 (2007) (itemizing requirements of 25 CFR Part 162 and finding money-mandating duty to exist under regulations, relying upon *Brown I*.)

Because of the Federal Circuit's holding in *Brown I*, it should not be necessary to go further regarding existence of the Claim Two money-mandating duty in this case. But in light of the United States' challenge to the Claim Two money-mandating duty, it is

appropriate to consider the underpinnings of that duty. The specific regulations within 25 CFR Part 162 which create the Claim Two money-mandating duty, include:

- §162.1(b), *§ 162.101* – making the regulation applicable to restricted status land such as Oengas.
- §162.5(a), *§162.604(a)* – requiring that all leases "shall be on a form approved by the Secretary and subject to his written approval."(emphasis added)
- §162.5(b), *§ 162.107 §162.604(b)* – requiring that leases provide for the collection of "present fair annual rental" (emphasis added)
- *§162.101*- defining "fair annual rental" to be the amount of rent the land "would most probably command in an open and competitive market."
- §162.2, *162.601*- allowing the Secretary to grant leases in certain circumstances, including where a landowner's whereabouts is unknown.
- §162.5(b),(3), *§162.604(b)(3)* – allowing leases at less than fair market value only if "in the best interest of the landowner."
- §162.6(c), *§162.605(c)* – requiring leases negotiated by the Secretary be subject to the "fair annual rental" standard.

A money-mandating duty can also exist where the United States assumes actual control within its authority. *Navajo V* 501 F.3d at 1343 ("Where the government exercises actual control within its authority, neither Congress nor the agency needs to codify such actual control for a fiduciary trust relationship that is enforceable by money damages to arise."). The specific Lease Agreement provisions in which the United States assumed actual control and thus created a Claim Two money-mandating duty, include:

- Initial Lease Preamble – incorporating 25 CFR Part 162 (1987) into lease.
- Initial Lease ¶ 4 – United States to collect lease payments for Oengas.
- Initial Lease, Second Amendment, ¶¶ 5, 9 – United States to adjust rents due every 5, then 4 years, based on the greater of an appraisal conducted by United States or CPI based COLA.

- Initial Lease ¶ Appendix A, First Amendment Appendix A – Showing initial intended use of the Allotment to be a road / pipeline right of way connecting a causeway with a other oil facilities south of Allotment, and subsequent intended use as oil production facility.

- First Amendment – Informing the United States that BPX wanted to use Oengas' Allotment for oil production purposes. Signed only by Secretary's designee on behalf of Oengas.

- Third Amendment ¶ 34 – Prohibiting Oengas from communication with BPX regarding the lease, with this responsibility being assumed by the United States and its agent.

These regulatory and Lease provisions create the Claim Two money-mandating duty to determine and collect "present fair annual rental" based on proper appraisals. 25 CFR 162.5(b), *25 CFR 162.107, 162.604(b);* Lease Agreement ¶¶5, 9.

The United States' argument that there exists no duty "to measure the lease rental adjustments by using royalty rates paid to owners of allegedly 'comparable' properties," misses the mark. US Motion p. 2, Docket 42 p. 12. Oengas are not asserting that the Claim Two money-mandating duty requires the United States to collect a royalty. That is the Claim One argument. Royalties, thruputs or other consideration paid for the use of land are just different types of rent. Consideration of those different types of rent at other locations is only a comparison of alternative methods of calculating the amount due on the lease of land. See Sealed Declaration of Morse. As this Court noted in its discovery Order, use of comparative studies are appropriate to determine what rent is fair. Order dated September 13, 2007. Docket 70, p. 8. ("Both the Supreme Court and the Federal Circuit have also acknowledged the usefulness of comparability studies in determining whether a given rental adjustment is fair…").

The Claim Two duty is to conduct proper appraisals and collect "fair" rent. 25 CFR 162.5(b), *25 CFR 162.107, 162.604(b)*; Lease Agreement ¶¶ 5, 9. *Brown I, Navajo*

*V*. Royalties or thruputs are only types of rent and are properly considered to "determine whether a given rental adjustment is fair…" Docket 70, p. 8. The United States' argument is without merit and its Motion should be denied. The Oengas' Motion For Partial Summary Judgment as to this Claim Two issue should be granted.

**2. Case Within Scope of Claim Two Money-Mandating Duty**

**United States Position** - Scope of Claim Two Money-Mandating Duty – The United States does not address whether this case is within the scope of a Claim Two money-mandating duty, apparently because of its argument above that no such duty exists. US Br. pp. 25-26, Docket 42, pp.37-38.

**Oil Companies' Position** - Scope of Claim Two Money-Mandating Duty - The Oil Companies do not address Claim Two. Oil Companies' Brief, Docket 41-2, pp. 1-30.

**Oengas' Position –** Scope of Claim Two Money-Mandating Duty – The Oengas seek partial summary judgment that their situation is within the scope of the Claim Two money-mandating duty because they have alleged that 1) the United States breached its duty to collect "present fair annual rent," 25 CFR 162.5(b), *25 CFR 162.107, 162.604(b),* and 2) the United States breached its duty assumed in the Lease Agreement to base rents collected on an appropriate appraisal. A breach of either would be sufficient to place Oengas' situation within the scope of the Claim Two money-mandating duty. *Navajo V*, 501 F.3d at 1346 (rejecting United States argument that a specific breach of a statutory or regulatory standard is required to be within the scope of the duty in favor of a standard that once a duty is found to exist, "common law trust duties of care, candor and loyalty help define the fiduciary responsibilities …")

Specifically, the Oengas allege the United States breached its Claim Two money-mandating duty to conduct proper appraisals and collect "fair" rents because the United States 1) did not consider the Oengas' Allotments unique location for oil production purposes and 2) did not consider royalties, thruputs or other consideration from comparable properties used as sites for in oil production. For example, publicly available documents show that the royalties paid to a similar surface owner (Kuukpik Corporation) range from 1% to 2%. See Sealed Declaration of Morse for additional discussion of similarity and more detailed royalty and other compensation data). A 2% royalty on the volume of oil produced thru the Oengas Allotment would have been 34 times greater than what was collected by the United States for the Oengas. See Declaration of Langer, Oenga Attachment 2 and Chart in Facts above. Such disparity is not "fair," and that must be taken into consideration is setting "fair annual rental." 25 CFR 162.5(b), *§162.604(b).*

Similarly, consideration should be given to royalties apportioned under 30 U.S.C. § 226(m) and 42 U.S.C. § 9506a(j)(5), and to the rents collected by BPX from ARCO/Exxon under the LETTER AGREEMENT for their use of Oengas' Allotment regarding production of oil from West Niakuk. See Sealed Declaration of Morse. These allegation that the appraisals were improper and that "fair" rent was not collected by the United States are much more specific than required by the "fair inference" standard found to be sufficient in *Navajo V,* and surely meet that standard. 501 F.3d at 1346, quoting *Apache*, 537 U.S. at 472-3.

For the above reasons, the United States' Motion To Dismiss Claim Two should be denied. The Oengas' Motion For Partial Summary Judgment as to Claim Two should be granted.

## E. Claim Three Money-Mandating Duty

### 1. Existence of Claim Three Money Mandating Duty

**United States Position –** The United States does not address whether a fiduciary duty exists as to Claim Three. US Motion, Docket 42, pp. 12-13. see also US Brief, Docket 42, pp. 41-42.

**Oil Companies' Position –** The Oil Companies do not address whether a fiduciary duty exists as to Claim Three. Oil Co Brief, Docket 41-2, pp. 1-30

**Oengas' Position –** The Oengas seek partial summary judgment that money-mandating duties exist as to Claim Three. There are two independent money-mandating duties involved in Claim Three. Both are created by the statutes, regulations, and obligations assumed in the Lease by the United States, thus bringing into play the United States' common law trust duties of care, candor and loyalty.

The first United States duty is to send notices of breach of the Lease and trespass and take other related action, particularly when requested. This duty is created by 25 U.S.C. § 415(a), 25 CFR Part 162 (1987) and (2001). See *Brown I*, 86 F.3d at 1563 (holding that this statutory and regulatory scheme creates a money-mandating duty for Tucker Act purposes). It is brought into sharper focus by ¶ 34 of the Third Lease Amendment, which prohibits Oengas from dealing with BPX regarding the lease. The United States and its agent have assumed that responsibility. Id.

25 CFR 162.617-162.623 (2001) imposes specific duties in a breach and trespass situation. These include §162.618 (sending a Notice of Breach), §162.619 (cancellation of a Lease) and §162.623 (treatment of a holdover after cancellation as a trespasser and

obligation to "pursue any additional remedies available under applicable law."). See also *25 CFR 162.14 (1987).*

The second duty is for the United States to disclose to beneficiaries such as Oengas information it possesses learned from an adverse party which would be beneficial in Lease negotiations. The United States' "common law trust duties care, candor and loyalty," require the United States to disclose to a beneficiary such as Oengas all information in its possession which would benefit the beneficiary in lease negotiations. *Navajo V*, 501 F.3d at 1346-47 (United States obligated to disclose to Tribal beneficiary dealings with adverse party – an energy company wanting to lease Tribal lands for development of natural resources – which would have been helpful to Tribe in lease negotiations)

For the above reasons, there exists a money-mandating duty that can render the United States liable for money damages if breached, as alleged in Claim Three. The Oengas' Motion For Partial Summary Judgment as to this Claim Three issue should be granted.

**2. Case Within <u>Scope</u> of <u>Claim Three</u> Money-Mandating Duty**

**United States Position –** In Tucker Act terminology, the United States' position is essentially that Oengas' situation is not within the scope of any fiduciary duty regarding breach or trespass because the use complained of by Oengas is allowed by the Lease. The United States has moved to dismiss Claim Three "in its entirety" for failure to state a claim because §10 of the Lease Agreement "is sufficiently broad" to authorize the use complained of by Oengas, and that subletting was initially allowed and the Second Amendment "makes clear that 'facility sharing agreements' were foreseeable and

not prohibited by the lease." US Motion, Docket 42, pp. 12-13, US Brief, Docket 42, pp. 41-42, quoted language at p.42.

**Oil Companies' Position** – The Oil Companies seek partial summary judgment on Claim Three for essentially the same reason as the United States, but stated as two separate grounds. First, they argue that BPX has an unlimited right to use the Oengas' Allotment for oil and gas production from any location because of the terms of the Lease and the fact that it is a lease, not a grant of a right-of-way. Second, they argue that the Lease, as amended, authorizes BPX and other parties to enter into a "Facility Sharing Agreement" without notice or consent. The Oil Companies conclude that the use of the Oengas' Allotment by ARCO and Exxon is not unauthorized use, is not a breach and that there has been no trespass. Oil Co Brief, Docket 41-2, pp. 1-30.

**Oengas' Position** – The Oengas seek partial summary judgment that their situation is <u>within the scope</u> of both of the above Claim Three money-mandating duties. The Oengas' situation is brought within the scope of the United States' Claim Three duties because of Oengas' allegation of the United States breach of the statutory, regulatory, assumed and common law duties. There are two issues here. First, the United States breached its duty by failing to take required action regarding BPX's breach of the lease and ARCO/Exxon's trespass when requested by Oengas. Second, the United States breached its duty by failing to timely disclose to Oengas its knowledge of ARCO's interest in leasing the Oenga Allotment to access its state oil leases (West Niakuk and Lisburne). *Navajo V*. 501 F.3d at 1346-47. (allegation of breach of money-mandating duty, including "common law duties of care, candor and loyalty" brings a plaintiff's situation within scope of duty when United States has uniquely valuable knowledge

regarding adverse party, but fails to disclose it to beneficiary during negotiations).[9] The 1994 Second Lease Amendment negotiations regarding facility sharing agreement would likely have been much different if Oengas had known of ARCO's interest or need of access to Oengas' Allotment to develop their offshore state oil leases. Such knowledge, coupled with the regulatory right to sign off on any sublease or assignment, could well have resulted in Oengas receiving a sizable portion of the compensation paid to BPX by ARCO/Exxon for a place from which to develop West Niakuk. See Sealed Declaration of Morse. Oengas are entitled to a partial summary judgment that their situation is within the scope of the two Claim Three money-mandating duties.

The argument of the United States and the Oil Companies that ARCO and Exxon's use of Oengas' Allotment and the oil production facilities on it is authorized by the Lease and related documents fail for two separate and distinct reasons. First, the Lease limited BPX's use of the property to development of oil and gas production from Niakuk, not from West Niakuk or Lisburne. Producing oil and gas thru the facilities on Oengas' Allotment from other areas such as West Niakuk or Lisburne was a breach of the lease and presence of that oil on the Allotment was a trespass.

Second, the "LETTER AGREEMENT" between BPX, ARCO and Exxon was not authorized by, and in fact was prohibited by both the Lease Agreement, as amended, and the regulations. Each is addressed in turn.

[9] See Sealed Declaration of Morse for potential amounts received by BPX from ARCO's and Exxon's use of the production facility on Oengas' Allotment to access their state oil leases which should have been subject to the 1994 Second Lease Amendment negotiations if there had been full disclosure to Oengas by the United States of this ARCO interest.

**a. Lease Agreement Limited To Oil And Gas Production From Niakuk Only**

The Lease limited BPX's use of the Oengas' Allotment to developing oil and gas from Niakuk because that was the intent of the parties at the time of signing. *Cities of Burbank, etc. v. Bodman*, 464 F.3d 1280, 1284 (C.A.Fed.,2006) ("A principal objective in deciding what contractual language means is to discern the parties' intent at the time the contract was signed.") (emphasis added) (quoting *Winstar Corp. v. United States*, 64 F.3d 1531, 1540 (Fed.Cir.1995) (en banc) (quoting *Arizona v. United States*, 216 Ct.Cl. 221, 575 F.2d 855, 863 (Ct.Cl.1978)), *aff'd* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996)**.**

To determine this intent, the plain wording of the contract must be read as a whole to harmonize all provisions. *NVT Technologies, Inc. v. U.S.* 370 F.3d 1153, 1159 (C.A.Fed.,2004) ("When interpreting the contract, the document must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts."). See also *Ahrens v. U.S.***,** 62 Fed.Cl. 664, 669 (Fed.Cl.,2004) citing *Safeco Credit v. United States*, 44 Fed.Cl. 406, 419 (1999); *Greco v. Dep't of the Army*, 852 F.2d 558, 560 (Fed.Cir.1988); *Victory Carriers, Inc. v. United States*, 199 Ct.Cl. 410, 467 F.2d 1334, 1342 (1972).

This intent at the time of signing is shown by the plain wording of the Lease and the numerous references made in it to "Niakuk Project" or "our Niakuk oil accumulation," and by the total lack of reference to other areas. The Original Lease Agreement made reference to "Niakuk" six separate times.

- Original Lease Agreement, §1, ¶2 – stating that during the first ten years of the Lease, "the Lessee shall attempt to obtain required permits for the Niakuk Project." (emphasis added). Docket 42-2 p. 62

- Original Lease Agreement, §1, ¶3 – generally requiring notice be given to the United States' representative of "the status of the permitting process and/or of the Niakuk Project. (emphasis added). Id. p. 63

- Original Lease Agreement, §1, ¶3 – requiring specific notice if "the Niakuk Project is either fully permitted or the project is cancelled or delayed." (emphasis added). Id.

- Original Lease Agreement, §1, ¶4 – setting lease periods if BPX serves notice it "intends to proceed with the Niakuk Project…" (emphasis added). Id.

- Exhibit A, p.1, incorporated thru Original Lease Agreement, Granting Paragraph, is a map titled "NIAKUK PROJECT LOCATION MAP" showing the Allotment physically tied by the causeway to the "Proposed Niakuk Production Island Addition" (emphasis added) Id. p. 78

- Exhibit A, p.2, incorporated thru Original Lease Agreement, Granting Paragraph, construction drawing titled "NIAKUK ONSHORE ACCESS ROAD AND PIPELINES." (emphasis added) Id. p. 79

The repeated references in the Lease to only "Niakuk" indicates the intention of the parties at the time of signing that the Lease was intended to allow use of the Oengas' Allotment for production of oil and gas from Niakuk, but not elsewhere. This is akin to the statutory construction rule of *inclusio unis est exclusio alterius. In re Lueders,* 111 F.3d 1569, 1577 fn.12 (C.A.Fed., 1997). ("The doctrine *inclusio unis est exclusio alterius* instructs that where law expressly describes a particular situation to which it shall apply, an irrefutable inference must be drawn that what was omitted or excluded was intended to be omitted or excluded.")

The Original Lease Agreement §10 does provide that BPX "may use the leased premises for any and all oil field exploration, development, construction, facilities, production and support purposes, and any other uses and purposes reasonably or conveniently related thereto." Docket 42-2 p. 66 (emphasis added). This §10 use of singular terms for "oil field" and for the "exploration, development, construction" and

"production" from that "oil field" has meaning. Properly construed, this language shows the intent at time of signing was for development of the single "oil field" referenced repeatedly above in the Lease – Niakuk.

The provisions of the Lease as a whole that need to be harmonized are 1) the original Lease's repeated references to "Niakuk," 2) the Leases' total lack of reference to other oil fields, 3) the first drawing on Lease Exhibit A showing Oenga's Allotment physically tied to the offshore Niakuk area by the "Proposed Causeway / Pipelines" and 4) the use of the singular terms in §10's description of allowed uses. Harmonizing these provisions result in a construction of the Lease authorizing BPX to use Oenga's Allotment to develop oil and gas from Niakuk, but not from other oil fields.

If lease provisions cannot be harmonized, there is ambiguity and extrinsic evidence may be used to resolve that ambiguity regarding the intent of the parties at the time of signing. *Teg-Paradigm Enviromental, Inc*. *v. U.S*.**,** 465 F.3d 1329, 1338 (C.A.Fed.,2006) ("When a provision in a contract is susceptible to more than one reasonable interpretation, it is ambiguous, and we may then resort to extrinsic evidence to resolve the ambiguity") (internal citation omitted)

The first piece of extrinsic evidence showing the parties' intent at the time of signing the original Lease is the First Lease Amendment, a document actually written by BPX. In the first paragraph it states, "The Lease provided authorization for BP to construct production facilities to support development of, and production from <u>our Niakuk oil accumulation.</u>" Docket 42-3 p. 58. (Emphasis added). The second piece of such extrinsic evidence is the Memorandum of BIA realty specialist Dickerson, which was written during the lease negotiation period in 1988. It indicates that the only

discussion between the United States, BPX and the Oengas during the negotiation period leading up to signing was about using the Oenga Allotment to develop the "Niakuk project." Docket 42-2 pp. 50-52, (quoted words at p. 50 ¶ 2). These are not after-the-fact, self-serving pieces of extrinsic evidence prepared by Oengas as to what was intended, but rather evidence prepared by the Intervenors and the Defendant themselves that reflect their intent at the time of negotiation.

Another applicable rule of construction is that any ambiguity in a lease is to be construed against the drafter of the lease. *Dureiko v. U.S.* 209 F.3d 1345, 1357 (C.A.Fed.2000). ("In the absence of sufficient factual allegations supporting the parties' mutual intent, we construe the ambiguous contract provision against the drafter, unless the ambiguity is patent"). In this case, the lease was originally drafted by BPX, with review and revisions by BIA and Interior's Solicitor's office. See BIA Report of Investigation dated January 1989, Docket 42-2, pp 56-57 (explaining BPX drafted initial lease proposal and that it was reviewed and revised by the United States). Andrew Oenga played no role in drafting the lease. See Memorandum of BIA realty specialist Dickerson, Docket 42-2 p. 50, (explaining that at the negotiation session, "neither [Andrew Oenga] or Rex Okakok [the interpreter] had seen the proposed lease nor the appraisal prior to this [negotiation] meeting which put them at a disadvantage.")

This last rule – construing the contract against the maker – seems especially appropriate 1) where the contract is drafted in a language foreign to the non-drafting party, and 2) where there is such disparity of economic resources and familiarity with business and real property transactions as there is here between the drafters (BPX, a subsidiary of one of the largest and richest corporations in the world, and the United

States government) and the non-drafting party (Andrew Oenga, an Inupiat in his late 70s, who spoke and read little or no English and had spent his entire life in the Artic living a largely subsistence lifestyle). Any fair reading of the Original Lease Agreement shows how vastly one-sided it is. The document is properly construed against the maker.

For the above reasons, the intent of the parties at the time of signing was that BPX leased the Oengas' Allotment to develop oil and gas from Niakuk, but not elsewhere. Use of the Oengas' Allotment to develop oil from West Niakuk or Lisburne was not authorized by the lease. Such later use was thus a breach of the lease, and the oil and gas produced thru the facilities constituted a trespass. This proper construction of the Lease brings the Oengas' situation within the scope of the United States' money-mandating duty to give BPX notice of breach and trespass and take other appropriate action when so requested by Oengas. See Oengas' demand letters attached to the Declaration of Leroy Oenga. Oenga Attachment 1.

The United States argument that §10 of the Lease Agreement "is sufficiently broad" to authorize BPX's use of the Allotment to develop oil and gas from areas other than Niakuk is without merit for the reasons stated above. US Brief, Docket 42 pp. 29-30.

The Oil Companies' similarly argue that their use of Oengas Allotment to develop oil and gas from locations other than Niakuk is authorized by the lease. Oil Co. Br. Docket 41-2, pp. 16-22. Their argument fails when the lease is properly construed under the applicable rule of construction discussed above. The intent of the parties at the time of signing was that Oenga was leasing his Allotment to BPX only for development of oil and gas from Niakuk, not from other locations.

The Oil Companies' also argues that their unlimited use of Oengas' Allotment is authorized because the document is a lease, not the grant of a right-of-way. Oil Co. Br. Docket 41-2, pp. 22-30. This argument is a complete red herring because it is the Lease itself which restricts the use to developing oil from Niakuk, as discussed above. The controlling factor is the intent of the parties at time of signing, not whether the document is a lease or the grant of a right-of-way.

The Lease does not authorize the West Niakuk of Lisburne use to which BPX allowed others to put Oengas' Allotment. Oengas' allegation of breach is within the scope of the United States' money-mandating duty to give notice and take other appropriate action as alleged in Claim Three.

**b. Letter Agreement Violates Regulations and Lease Agreement, As Amended**

The Oil Companies argue that the use of Oengas' Allotment by ARCO and Exxon to develop oil and gas from West Niakuk and Lisburne is authorized by a "LETTER AGREEMENT" between BPX, ARCO and Exxon. See redacted LETTER AGREEMENT, Docket 42-6, pp. 2-6, unredacted version attached to Sealed Declaration of Morse. The provisions of the LETTER AGREEMENT have been discussed above in several contexts. The validity of the LETTER AGREEMENT as a basis for allowing ARCO/Exxon to produce oil and gas thru the facilities on Oengas' allotment from West Niakuk or elsewhere is governed by the applicable subleasing and assignment regulations, and the Second Lease Amendment. 25 CFR 162.12(a), (b) (1987); *25 CFR 162.610 (2001)*. The regulations generally allow subleasing and assignment of a lease, but "only with the approval of the Secretary and the written consent of all parties…" Id.

(emphasis added). However, a Secretary-approved lease may authorize "the lessee to sublease the premises, in whole or in part, without further approval." Id.

The Original Lease Agreement allowed subleasing, but did not specifically provide that Secretarial approval and written consent of all parties was waived. Original Lease §13, Docket 42-2 p.67. The Second Lease Amendment modified this language to require prior notice of any sublease. Second Lease Amendment Paragraph 13, Docket 42-4 p. 57. It did not waive written consent of all parties. Both documents were silent as to an "assignment," which under the regulations also requires Secretarial approval and consent of the parties [including Lessor] unless waived. 25 CFR 162.12(a) (1987); *25 CFR 162.610(a) (2001).*

The Second Amendment addressed subleases in one additional way. It provided that "a sublease shall not include (a) facility sharing agreements or other transactions which do not convey an interest in real property…" Second Lease Amendment, Paragraph 13, Docket 42-4 p. 57. In other words, this amendment did not waive notice, but rather required notice and defined a "facility sharing agreement" - something that might be a "sublease" and was definitely an "assignment" - to not be a "sublease." Id.

Regardless of whether the LETTER AGREEMENT is a sublease, it is without question an assignment.[10] The regulation requires prior notice and consent of all parties unless waived. 25 CFR 162.12 (1987) (an "assignment" may be made "only with the

[10] *Black's Law Dictionary* (8th ed. 2004), defines "assignment" as "the transfer of rights or property." It defines "partial assignment" as "the immediate transfer of part but not all of the assignor's right." At least one of the well-heads at BPX's facility on the Oengas' Allotment was assigned to ARCO and Exxon. Redacted LETTER AGREEMENT ¶ 1.0 ("BPX will provide a drilling and manifold slot (repayment addressed in Section 3.0 below) at the Heald Point drillsite for ARCO/Exxon …").

approval of the Secretary and the written consent of all parties…" unless prior approval of the Secretary is obtained…"); *25 CFR 162.610(a) (2001)* (same). There was no such notice, consent or waiver as to the LETTER AGREEMENT. See Declaration of Leroy Oenga ______. Defining a "facility sharing agreement" to be not a "sublease" is not a waiver of the regulation's requirements of prior notice and consent to an "assignment" like the LETTER AGREEMENT. Id.[11]

The LETTER AGREEMENT is an "assignment" that has not fulfilled the requirements to be a valid "assignment" under the regulations. Id. It authorizes nothing as to the Oengas' Allotment. It specifically does not authorize BPX to allow ARCO or Exxon to develop oil or gas thru the facilities on the Oengas' Allotment. By allowing such production by ARCO and Exxon, BPX breached the lease and the oil so produced constituted a trespass.

In summary, the Lease Agreement, as amended, limits BPX's use of the Oenga Allotment to production of oil and gas from only Niakuk, not other areas such as West Niakuk or Lisburne. The LETTER AGREEMENT does not authorize use of the Oengas' Allotment by ARCO or Exxon. BPX has breached the Lease by allowing production of oil and gas from West Niakuk and Lisburne thru the facilities of the Oengas' Allotment by ARCO, or Exxon, or by itself after unitization of these participation areas.

The United States' Motion To Dismiss Claim Three for failure to state a claim is without merit. It should be denied. The Oil Companies' Claim Three Motion For

---

[11] This lack of required notice and approval are not hollow procedural arguments. With the required notice and prior approval, a negotiation could have taken place and resulted in Oengas receiving their appropriate share of the proceeds of the sublease or assignment, which have been huge. See Sealed Declaration of Morse regarding consideration paid to BPX under the LETTER AGREEMENT.

Summary Judgment is without merit. It should also be denied. The Claim Three money-mandating duty exists and the Oengas situation is within the scope of that duty. The Oengas' Motion For Partial Summary Judgment as to Claim Three should be granted.

## IV. CONCLUSION

For the reasons above stated, the United States' Motions to Dismiss or for Summary Judgment as to Claims One, Two, and Three should be denied. The Oil Companies' Motion for Partial Summary Judgment as to Claim Three should be denied. The Oengas' Motions for Partial Summary Judgment should be granted.

DATED this 2nd day of January, 2008.

Respectfully submitted,

s/Raymond C. Givens
Raymond C. Givens
Givens Law Firm
Attorney for Plaintiffs
4935 116th Place SE
Bellevue, WA 98006
Tele: 425-641-5949
Fax: 425-614-0158
raygivens@givenslaw.com

**Certificate of Service**

I hereby certify that on the 2nd day of January, 2008, I electronically filed the foregoing OENGA RESPONSE AND SUMMARY JUDGMENT BRIEF with the Clerk of the Court using the CM/ECF System which will send notification of such filing to all parties of record.

DATED this 2nd day of January, 2008.

Respectfully submitted,

s/Raymond C. Givens
Raymond C. Givens
Givens Law Firm
Attorney for Plaintiffs
See above block