# ATTACHMENT 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| WALLACE OENGA, GEORGENE SHUGLUK, LEROY OENGA, SR., MICHAEL DELIA, TONY DELIA, JOSEPH DELIA, JENNIE MILLER, and TRINITY DELIA, | No. 06-491 L<br>Chief Judge Edward Damich |
| Plaintiffs,<br>v.<br>THE UNITED STATES,<br>Defendant, and<br>BP EXPLORATION (ALASKA) INC., CONOCOPHILLIPS ALASKA, INC., EXXON MOBIL ALASKA PRODUCTION, INC., CHEVRON U.S.A., INC. and FOREST OIL CORPORATION,<br>Defendant Intervenors | DECLARATION OF LEROY OENGA |

**DECLARATION OF LEROY OENGA**

Leroy Oenga hereby declares as follows:

1. I am a Plaintiff in this action, over the age of 18, of sound mind and competent to make this Declaration.

2. **Leroy Oenga** - I am Inupiat and live in Barrow, Alaska. I am the biological grandson of Andrew Oenga, but was raised by Andrew and adopted in the Inupiat way as his son. I, and

other members of my family are his heirs and have inherited from him undivided interests in his Native Allotments, including the one at Heald Point on the northeast edge of Prudhoe Bay, along the North Slope of Alaska. I regularly consult with family members about this matter.

3. **Andrew Oenga** - Andrew Oenga was born in 1909 near Point Hope, Alaska in a tradition Inupiat sod hut. He was raised in the traditional Inupiat way. This included constantly traveling by dogsled across the Artic from Point Hope all the way to Canada. He and his family lived off the land, hunting, fishing and gathering to provide food, clothing, animal oil for cooking and heating, and the other necessities of life. He and his family built sod huts along the way, which they used year after year when they were in that area. The sod huts usually had an icehouse built down into the permafrost for storing food. As an adult, my grandfather eventually settled in Barrow and found different jobs there, but he still regularly traveled to Heald Point, and sometimes took me with him. My grandfather applied to the Bureau of Indian Affairs for a Native Allotment regarding land at Heald Point (40 acres) and at Point Brower (120 acres). The Allotment was contested by oil companies and others, but was eventually granted, although a small portion has not been finalized. In the 1970s and 1980s, oil companies began trespassing on these lands, looking for oil. My grandfather, with the help of a lawyer supplied be the Borough of Barrow, brought a successful trespass action against one of the companies. My grandfather fought against oil company use of his lands for a long time, but as an old man he grew tired and when he was 79 he agreed to lease the Heald Point land to a company called Standard, which eventually became BP. I was with my grandfather at all the meetings throughout the Heald Point lease negotiations with the BIA and Standard. For some reason, the Borough of Barrow lawyer was not available to him that

time. The lease papers were prepared by Standard, but the BIA people apparently modified them some. The papers were written in English and the lease negotiations were conducted in English. My grandfather could not read, write or speak English, except for a few simple words. Rex Okakok acted as an interpreter, explaining things in a general way to my grandfather. Our understanding, my grandfather's and mine, at the time of negotiating and signing of the lease, was that my grandfather was leasing his Allotment for BP to use for only a road and pipeline as part of an oil transportation system moving Standard's oil from its offshore Niakuk state oil lease, which was to be drilled from an offshore island, with the oil moved along a causeway over the sea, across my grandfather's Allotment thru the pipeline on it, to the bigger pipelines leading to and beyond Deadhorse. There was even a paper attached to the Lease which showed this intended use. Even with the oil company using part of the land for a road and pipeline, my grandfather and our family could still continue to use much of the land in the traditional ways. All of the fine print of the papers was never really explained to my grandfather by Rex or anyone else. My grandfather died in 1990, a year after signing the Lease.

4. **Accounting Request** – In 2003 our attorney made an informal accounting request to ICAS, the BIA's realty contractor. Some documents were received in response. In 2005 our attorney made a formal accounting request to the Department of the Interior. See attached letter. Documents were received in response in 2003 and in February and May, 2006. There is simply no way we understood the United States had failed to collect proper rents or that we had suffered a loss until we received all of the materials received in response to these accounting requests.

5. **ARCO Leasing Interest -** We learned for the first time from documents produced in

response to the requests for accountings in 2003 and 2005 that in early July, 1993, ARCO asked the BIA if they could lease a portion of our Heald Point Allotment. A copy of the telephone log of KD, probably Kathleen Dickerson of the BIA, is attached. It shows that ARCO was told no because even though BP was only leasing a part of the Allotment at the time, BP had an option on the rest.

6. **First Lease Amendment** - Neither I, nor any members of the family who inherited from my grandfather, were given a copy of or consulted with, or asked to sign the attached first Lease amendment dated July 29, 1993 before it was signed by the BIA Superintendent on August 3, 1993.

7. **1993, 1997 Appraisals** - Until we received the responses to the accounting requests in 2003 and 2005, neither I, nor any member of the family were ever given copies of the 1993 and 1997 BIA-conducted appraisals of the Heald Point Allotment used to determined the lease rent paid by BP.

8. **LETTER AGREEMENT** - Neither I nor any member of my family who inherited from my grandfather were ever given prior notice of the LETTER AGREEMENT between BP, ARCO and Exxon regarding production of oil and gas from West Niakuk, a redacted copy of which is attached. Neither were we asked to sign it or consulted with about it before it was signed by those who did sign it. The first I or any member of the family learned of this LETTER AGREEMENT was in 2005 after our attorney met with BP. I first time we received a copy of the LETTER AGREEMENT was the redacted version filed in Court by the United States and BP in 2006. see attached.

9. **Access to Documents** - I did not know the vast majority of the information obtained in response to the 2003 and 2005 accounting requests and did not understand it to have been

generally available to myself or the family if we had asked. The BIA or their realty contractor might make an occasional document available if we specifically requested it, but the documents were not generally available to my knowledge. Attached is a letter from the Department of the Interior giving our attorney the runaround when he simply requested a copy of one of the appraisals.

10. **Breach and Trespass Demands** – In 2005 and 2007 the family, thru our attorney sent various demand letters to the Department of the Interior, asking that it take specific actions. Copies of the demand letters are attached. To my knowledge, no such action has been taken.

11. **Breach of Trust** - After learning what happened from the document obtained as a result of the accounting requests in 2003 and 2005, I do not believe the BIA or the United States has lived up to its trust responsibility owed to me and to my family regarding our Heald Point Allotment. This is shown by all the things in the Complaint, but particularly was true during the seven month period from July 1993 thru December 1994, when we were kept in the dark about critical matters until it was too late, and the BIA did not properly use the knowledge it had to properly negotiate on our behalf. There are 3 examples of this. First, we were never told of ARCO's phone call in early July 1993, expressing its interest in leasing a portion of the Allotment for oil production purposes, and did not learn of it until after the requests for accountings in 2003 and 2005. Second, we were never told of the first lease Amendment sent to the BIA on July 29, 1993 until after it was signed by the BIA on August 3, 1993. Third, in January 1994, the United States signed off on the facility sharing agreement amendment, and allowed my family and I to do the same, even though it knew of ARCO's interest using our Allotment for a production facility, and without telling myself or the family about ARCO's interest. The result of this was that by the end of that month the LETTER

AREEMENT had been singed without notice to the BIA or to the family, and ARCO was allowed to use our Allotment without any rent being paid to the family.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED this 2nd day of January, 2008.

Leroy Oenga

Certificate of Service

I hereby certify that on the 2nd day of January, 2008, I electronically filed the foregoing Declaration of Leroy Oenga with the Clerk of the Court using the CM/ECF System which will send notification of such filing to all parties of record.

James M. Upton
U.S. Department of Justice
Environment & Natural Resource Div
P.O. Box 663
Washington, D.C. 20044-0063
Tele: 202-305-0482
Fax: 202-305-0506
james.upton@usdoj.gov
Attorney for Defendant

James J. Perkins, Jr.
Guess & Rudd, P.C.
510 L Street, Suite 700
Anchorage, AK 99501
Tele: 907-793-2200
Fax: 907-793-2299
jperkins@guessrudd.com
jhunter@guessrudd.com
kmason@guessrudd.com
kwaggoner@guessrudd.com
Attorney for Intervenors

DATED this ____ day of January, 2008.

Respectfully submitted,

s/Raymond C. Givens
Raymond C. Givens
Givens Law Firm
Attorney for Plaintiffs
4935 116th Place SE
Bellevue, WA 98006
Tele: 425-641-5949
Fax: 425-614-0158
raygivens@givenslaw.com

GIVENS LAW FIRM
P.O. Box 400, 118 N. 7th Street
Coeur d'Alene, ID 83816
phone (208) 676-1310
fax (208) 676-1296
raygivens@givenslaw.com

November 22, 2005

Honorable Gale Norton
Secretary of the Interior
Department of the Interior
1849 C Street, NW
Washington DC 20240

Re: Demand For Accounting re: BIA Lease No. F-89-01, Heirs of Andrew Oenga

Dear Madame Secretary:

This office represents the Heirs of Andrew Oenga regarding BIA Lease No. F-89-01 as amended. Documents signed by the Heirs of Andrew Oenga acknowledging their representation by this office have previously been provided to the Department of Interior (DOI). The property subject to the above BIA Lease is described as follows:

> Parcel B of Alaska Native Allotment F-14632 legally described as USS 6904 T11N, R15E UM Sec. 1 and T12N, R15E UM Sec. 36

Specifically, the Andrew Oenga heirs represented and their IIM account numbers are:

| | |
|---|---|
| Leroy Oenga | IIM account number: 985U000206 |
| Wallace Oenga | IIM account number: 985U000204 |
| ~~Joseph Delia~~ | ~~IIM account number: 985U000755~~ |
| Michael Delia | IIM account number: 985U000207 |
| Tony Delia | IIM account number: 985U000754 |
| Jennie Miller | IIM account number: 985U000759 |
| Georgene Shugluk | IIM account number: 985U000205 |
| Trinity Delia | IIM account number: ________ |

Pursuant to P.L. 108-54(2005) and *Shoshone Indian Tribe of the Wind River Reservation v. United States*, 364 F.3d 1339 (2004), the heirs of Andrew Oenga respectfully demand you furnish an accounting regarding the above Lease Agreement As Amended. The "Lease Agreement As Amended" includes 1) the original "Lease Agreement" signed in January 1989, 2) the letter amendment dated July 29, 1993, 3) the Agreement to Amend BIA Lease F-89-01 signed in January 1994, and 4) the Third Amendment to BIA Lease F-89-01 signed in May, 1995.

It is requested that the accounting of the Lease Agreement As Amended include:

1) all funds collected by DOI under the Lease Agreement As Amended,

2) all funds due under the Lease Agreement As Amended,

3) all funds paid to the Lessors or their assignees under the Lease Agreement As Amended, with an itemization of the amount and date of each payment and to whom they were paid,

4) copies of all appraisals conducted pursuant to Article 5 and 9 of the original Lease Agreement or pursuant to other provisions of the Lease Agreement As Amended,

5) all "cost adjustment factor" documents prepared pursuant to Article 5 of the original Lease Agreement or pursuant to other provisions of the Lease Agreement As Amended,

6) all rental payment adjustment determinations of DOI as to "which ever is greater" between "appraisals" provided for in Article 5 and 9 of the original Lease Agreement and the "Cost Adjustment Factor" provided for in Article 5 of the original Lease Agreement, and

7) all funds due and owing under the Lease Agreement As Amended that remain unpaid.

It is requested that this accounting be provided within thirty (30) days of the above date of this letter to the Oenga's attorney at the address on the letterhead. If there are any questions, please have your staff or legal representative contact this office. Thank you for your prompt consideration.

Sincerely,

Raymond C. Givens
Attorney for Oenga Heirs

RCG:jr

cc: Oenga Heirs
Office of Special Trustee
Assistant Secretary for Indian Affairs
Bureau of Indian Affairs Alaska Area Director
Roger Hudson, Deputy Solicitor, Bureau of Indian Affairs

**MEMORANDUM OF PHONE CALL**

July 2, 1993 11:57 am

TO: KD AT: PHONE:

FROM: Peter Goebel AT: ARCO PHONE: 265-6281

SUBJECT: Lease of Andrew Oenga's allotment

**CONVERSATION:** He said that they were interested in leasing a portion of this allotment. He said that he was aware that BP already has a lease but was wondering if they could also lease a part of it. I told him I would check and see once I was done with serving on the jury and back in the office.

July 7, 1993 8:37 am

TO: Peter Goebel AT: ARCO PHONE:

FROM: KD AT: PHONE:

SUBJECT: Lease of Andrew Oenga's allotment

I told him that I had looked at the lease and that there could be a problem since section 11 specifies that the Lessee may increase or decrease the size of the leased area at their discretion. He said that it didn't seem fair to the allottee. I explained that any additional acreage would be paid for and that when the lease was negotiated, they were planning to build the cause way. I also told him that I had heard that BP wanted to put a production pad on the tip of the point but would try to verify that for him. I said that if there was any way to lease the balance to ARCO we certainly would. I also told him that ASNA has the contract for Realty services and gave him Diane's name and phone number for future reference.

July 7, 1993 8:49 am

TO: Stu Hirsh AT: BP PHONE: 564-4841

FROM: KD AT: PHONE:

SUBJECT: Lease of Andrew Oenga's allotment

He said that he is expecting approval from their London office to take additional lands at Heald point for a production pad on the tip of the point. He will send me a letter and map when he gets the approval (which he expects next week).

July 7, 1993 8:57 am

TO: Peter Goebel AT: ARCO PHONE:

FROM: KD AT: PHONE:

SUBJECT: Lease of Andrew Oenga's allotment

I advised him of the above and told him we would keep him apprised.

985 1373

BP EXPLORATION

BP Exploration (Alaska) Inc.
900 East Benson Boulevard
P.O. Box 196612
Anchorage, Alaska 99519-6612
(907) 561-5111

July 29, 1993

Mr. Samuel Demientieff, Superintendent
Bureau of Indian Affairs
101 12th Avenue, Box 16
Fairbanks, Alaska 99701

Notification of Niakuk Project Commencement

Request to Amend Surface Lease F89-01

Dear Mr. Demientieff:

On January 1, 1989, BP Exploration (Alaska) Inc. (formerly Standard Alaska Production Company) entered into a surface lease agreement with Mr. Andrew Oenga for 10 acres of his 40 acre native allotment (F-14632) on Heald Point. The Lease provided authorization for BP to construct production facilities to support development of, and production from, our Niakuk oil accumulation.

Pursuant to requirements of Section 1 of the Lease, BP hereby provides notice to the Bureau of Indian Affairs that the first phase of the Niakuk Development Project has been approved and that development will procede on an accelerated schedule during the latter half of 1993. Further pursuant to Section 1, the Lease is converted from a year-to-year basis to a fixed twenty-five year term.

In order to make effective use of both the Leased and Unleased Premises and to protect our facilities from erosion, an armored production pad will be constructed at the tip of Heald Point. We have also redesigned and relocated our pipelines to the east side of the access road.

Consequently, pursuant to Section 11 of the Lease, BP hereby requests that the Lease be amended so as to increase the size of the Leased Premises from 10 acres to 20 acres effective August 1, 1993. The new Leased Premises are shown on the enclosed general location map. We will provide you with a more detailed exhibit to be attached to the Lease as soon as it becomes available.

Rent for the enlarged Leased Premises will be due January 1, 1994 and will be prorated back to the effective date of the Lease amendment.

Please indicate your approval of this amendment by signing in the space provided below and returning one original of this letter to the undersigned at our letterhead address. The remaining original is for your records.

 Barrow Recording District

Mr. Samuel Dimeintieff
July 29, 1993
Page 2

We would appreciate your early attention to this matter as we hope to be in a position to begin gravel placement in early August.. Please contact me at 564-4841 if you have any questions or if you need any additional information.

Sincerely,

Stu Hirsh, CPL
Senior Landman

The within Lease Amendment is hereby approved, pursuant to the authority delegated by 209 DM 8 dated November 17, 1981, Secretary's Order No. 3150 dated May 11, 1992, as amended March 5, 1993, and 10 BIAM Bulletin 13, dated November 19, 1992, as amended April 8, 1993, and the Addendum to 10 BIAM 3, dated January 17, 1989.

8-3-93

Samuel Demientieff, Superintendent Date
Bureau of Indian Affairs
Fairbanks, Agency

RECORDED
AK TITLE SERVICES CENTER
94 FEB -4 PM 2:12
BUREAU OF INDIAN AFFAIRS
JUNEAU AREA OFFICE

985 1373

Return to:

Arctic Slope Native Association
Realty, Office
600 University Avenue
Fairbanks, Alaska 99709


985
1373
PRUDHOE BAY
SAGAVANIRKTOK RIVER
ACCESS ROAD
DRILL PAD
TOTAL AREA OF PROPERTY
TOTAL HATCHED AREA
PERCENTAGE OF PROPERTY

# LETTER AGREEMENT

## ARCO/EXXON ACCESS TO NIAKUK FACILITIES AND INTEGRATION OF NIAKUK INTERESTS

1.0 Drilling Slot Provision and Access Fee

BPX will provide a drilling and manifold slot (repayment addressed in Section 3.0 below) at the Heald Point drillsite for ARCO/Exxon to test the prospectivity of their lease(s) at the western limit of the BPX Niakuk Field. If the test results in commercial production, the cost of access to the BPX Heald Point initial and permanent facilities, prior to and post integration of interests, will be REDACTED REDACTED REDACTED With regard to timing, the well may be drilled by ARCO/Exxon back-to-back with the ARCO/BPX/Exxon Alapah well, to be drilled after the sixth BPX Niakuk well in the first quarter of 1994. If the ARCO/Exxon Niakuk well is not drilled at this time it will be drilled after the first 14 wells in the BPX Niakuk drilling program or during any interruption or cessation of that program, once ARCO, BPX and Exxon mutually agree that there is sufficient time to allow the drilling of the ARCO/Exxon Niakuk well.

REDACTED

REDACTED

The cost of source water injection into Segment 1 of the Niakuk reservoir will be allocated to tracts based on oil production from Segment 1 of the Niakuk reservoir.

2.0 Operating Cost Allocation

Operating and Maintenance Costs for Greater Pt. McIntyre Area field-wide O&M and the Lisburne Production Center (LPC) will be determined and allocated in accordance with the already agreed appropriate allocation procedures, established for all Participating Areas within the Greater Pt. McIntyre Area. In each of these categories, the total O&M allocated to Niakuk will be further allocated to tracts based on proportionate total fluid production (oil, water and gas, with 6000 scf gas = 1 barrel).

3.0 Drilling Slot Repayment

In the event BPX requires 17 or more drilling and manifold slots on the Heald Point drillsite, ARCO/Exxon will provide one

100047

additional drilling and manifold slot to the drillsite once the existing 16 BPX Niakuk slots have been used (with the approval of the Lisburne Owners, this may be an unused Lisburne Alapah drilling and manifold slot).

4.0 Integration of Interests

If ARCO, BPX and Exxon mutually agree, that, either commercially producible oil, from the Niakuk Segment 1 Reservoir, extends onto part or all of the ARCO/Exxon leases ADL 34626 and ADL 34629, or that drainage of commercially producible oil is occurring between ARCO/Exxon and BPX leases, ARCO, BPX and Exxon agree to: a) integrate their interests (as in 4.1, 4.2, and 4.3 below); b) jointly petition the AOGCC for appropriate Pool Rules; c) jointly petition the ADNR for an expansion of the Prudhoe Bay Unit (if required) and revision of the Niakuk Participating Area, and d) revise the Niakuk Supplemental Special Provisions to the PBUOA to encompass the appropriate portions of the ARCO/Exxon lease(s) and facilitate Sections 4.1 and 4.2, below.

It is the preference of ARCO, BPX and Exxon that any integration of interests will apply only to Segment 1 of the Niakuk Participating Area, provided that ARCO, BPX, Exxon agree to mutually acceptable provisions and that royalty obligations will track Segment 1 equity production allocations. Otherwise, ARCO, BPX and Exxon agree to pursue the formation of separate Participating Areas for Segment 1 and Segment 2 of the Niakuk Reservoir.

Pursuant to Article 21 of the PBUOA, ARCO and Exxon agree to vote their approval for the expansion of the Niakuk Participating Area, or formation of a new Participating Area and the expansion of the PBU (if necessary) and concomitant Pool Rules extension, to encompass any one or part or all of BPX tracts: ADL 34625 and ADL 312827. Such approval, will, in the case of ADL 312827, apply to any area of the lease up to 1,000 feet from the ARCO lease, Y1580, to the north.

All field equity determinations will be value-based.

100048

4.1 Ownership of Facilities

Regardless of any integration of interests, BPX (Niakuk Facility Owner) retains ownership of all BPX sole funded Niakuk surface Facilities.

4.2 Equalization

If Segment 1 is integrated separately, Segment 1 production well costs and production will be equalized according to Segment 1 equity interests. If the integration of interests in Segment 1 fails to take place prior to January 1, 1996 production well costs will be adjusted by the inflation equivalent defined in Section 34.002 of the PBUOA, except the adjustment factor will be 100% versus 125%. The start date for calculation of inflation equivalent is January 1, 1996.

If more than Segment 1 interests are integrated, production well costs and production equalization will relate directly to the production wells and production in the area within which interests are integrated and will take place concurrent with the associated equity determination.

Production wells will be eligible for cost equalization if they have achieved average production rates of 500 bopd over a sixty day period (consistent with Exhibit K of the Pt. McIntyre Agreement Regarding Interim Funding, Final Equity Determination and Facility Sharing, between ARCO, BPX and Exxon).

Cost and production equalization will be accomplished through disproportionate allocations over a period not to exceed two years.

4.3 Process for Integration

The parties agree that the process by which they will seek voluntary integration of Niakuk Field interests will occur is as follows: first, the parties will attempt to reach voluntary integration for 6 months from the date when Section (4.0) is satisfied and if that fails the parties may agree to submit to binding fourth party resolution.

100049

5.0 Data Sharing

Upon notification by ARCO/Exxon of their intent to spud a test well and of their election to participate in the data exchange described in this section, BPX will provide ARCO/Exxon with all non-interpretative data from the most westerly well drilled in Segment 1, at that time. In return, ARCO/Exxon will provide all non-interpretative data from their test well to BPX. Prior to receipt of the BPX non-interpretative well data, ARCO/Exxon and BPX will agree the terms of a cash payment to be paid to BPX for its well data, in the event that ARCO/Exxon do not drill their test well after receipt of the BPX well data.

6.0 Effective Date

This agreement becomes effective upon the approval, by all parties.

By their signatures, at the date, below, the parties agree to these terms:

MPW

J. D. Weeks — Date: 1-27-94
Senior Vice President, ARCO Alaska Inc.

J. E. Golden — Date: 1-27-94
Vice President, BP Exploration (Alaska) Inc.

J.W. Kilker — Date:
Production Engineering Manager, Exxon Corporation.

100050

5.0 Data Sharing

Upon notification by ARCO/Exxon of their intent to spud a test well and of their election to participate in the data exchange described in this section, BPX will provide ARCO/Exxon with all non-interpretative data from the most westerly well drilled in Segment 1, at that time. In return, ARCO/Exxon will provide all non-interpretative data from their test well to BPX. Prior to receipt of the BPX non-interpretative well data, ARCO/Exxon and BPX will agree the terms of a cash payment to be paid to BPX for its well data, in the event that ARCO/Exxon do not drill their test well after receipt of the BPX well data.

6.0 Effective Date

This agreement becomes effective upon the approval, by all parties.

By their signatures, at the date, below, the parties agree to these terms:

J. D. Weeks
Senior Vice President, ARCO Alaska Inc. Date:

J. E. Golden
Vice President, BP Exploration (Alaska) Inc. Date: 1/27/94

J.W. Kiker
Production ~~Engineering~~ Manager, Exxon Corporation. Date: 1/27/94

(9) 100051

# United States Department of the Interior

Office of the Special Trustee for American Indians
Office of Appraisal Services, Alaska Region
3601 "C" Street, Suite 256
Anchorage, Alaska 99503

Phone (907) 271-4050
Fax (907) 271-1343

August 2, 2004

Raymond C. Givens
Givens Law firm
PO Box 400
118 N. 7th Street
Coeur d'Alene, ID 83816

FAXED 8/2/04 JB

Dear Mr. Givens:

I have received your request for an original copy of the appraisal for lease purposes for Allotment #FF-14632, Parcel A, owned by the heirs of Andrew Oenga.

I had not received a copy of your previous letters and apologize for the delay in communicating with you regarding the lease appraisal. I realize that lease negotiations typically require a copy of the appraisal and assumed that a copy of the report would be sent to you by the Realty Officer for the Iñupiat Community of the Arctic Slope (ICAS).

At this time, I am not able to furnish you with a copy of the appraisal report. An appraisal is considered to be a confidential document and may be released only to the Client, per the confidentiality provisions of the Uniform Standards of Professional Appraisal Practice, as authorized by Congress. I am also bound by confidentiality constraints imposed upon the Bureau of Indian Affairs (BIA) and the Office of the Special Trustee for American Indians (OST) arising out of the pending Cobell vs. Norton litigation.

Since you represent the property owners, you should be able to get a copy of the appraisal report from the Realty Officer for ICAS, which is the office that requested the report. They have an original copy of the report and should be able to furnish your office with a copy.

In order for my office to furnish you with a copy of the appraisal report, we would have to have an authorization letter from either Niles Cesar, Area Director, BIA-Alaska or from the ICAS Realty Officer. I have contacted ICAS to see if I can get authorization to send you a copy, but have not yet heard back from them.

Please feel free to contact me if any additional questions arise regarding the appraisal. My direct telephone line is (907) 271-4094. I will be out of the office during the week of August 9-13.

Sincerely,

Jenness R. Burns, Regional Appraiser, Alaska Region

Cc: Delbert Rexford, ICAS Realty Officer
Niles Cesar, Regional Director, BIA-Alaska
Gabe Sneezy, Acting Director, OST Field Operations

GIVENS LAW FIRM
P.O. Box 400, 118 N. 7th Street
Coeur d'Alene, ID 83816
phone (208) 676-1310
fax (208) 676-1296
raygivens@givenslaw.com

December 1, 2005

Honorable Gale Norton
Secretary of the Interior
Department of the Interior
1849 C Street, NW
Washington DC 20240

Inupuit Community of the Artic Slope
Realty Office
P.O. Box 0934
6986 Ahmaogak Street
Barrow, Alaska 99723-0934

Re: BIA Lease No. F-89-01, Heirs of Andrew Oenga

TO: The Department of the Interior, Bureau of Indian Affairs (BIA) and its agent, Inupuit Community of the Article Slope. (ICAS), as successor in interest to Artic Slope Native Association, Limited (ASNA)

On behalf of the heirs of Andrew Oenga, demand is hereby made that you immediately give Notice of Default, Breach, and Failure to Perform or Comply regarding the above referenced Lease, as amended and 25 CFR 162, to Lessee BP Exploration (Alaska) Inc., the successor in interest to Standard Alaska Production Company (BP) pursuant to Paragraph 8 of the original Lease Agreement signed in January 1989 (default provisions) and ¶34 of the Third Amendment to BIA Lease F-89-01 signed in May 1995 (barring Oengas' from communicating directly with BP and requiring communication be from BIA or its agent as Trustee for Oengas).

The specific items of default, breach, and failure to perform or comply with terms and conditions of the Lease as amended include:

1) Failure of BP to make proper and timely lease payments in the appropriate amounts as required by the Lease.
2) Unauthorized and unreasonable use of the property by utilizing the property to produce oil from the West Niakuk Lease.
3) Unauthorized and unreasonable use of the property by altering the footprint and thereby destroying the essential character and benefits of the property without the consent of the Lessor.

4) Material misrepresentation regarding the intended use of the property as an oil production pad as opposed to an oil pipeline corridor as shown by the Lease attachments.

Oengas demand that this Notice be sent immediately because of statute of limitation concerns. The Notice must demand that BP cure all Lease violations within 10 days or Oengas will exercise their Option under ¶ 8 of the Lease.

Please provide this office with a copy of the Notice at the address on the letterhead.

Thank you very much.

Sincerely,

Raymond C. Givens
Attorney for Oenga Heirs

RCG:jr

cc: Oenga Heirs
Office of Special Trustee
Assistant Secretary for Indian Affairs
Bureau of Indian Affairs Alaska Area Director
Roger Hudson, Deputy Solicitor, Bureau of Indian Affairs

GIVENS LAW FIRM
P.O. Box 400, 118 N. 7th Street
Coeur d'Alene, ID 83816
phone (208) 676-1310
fax (208) 676-1296
raygivens@givenslaw.com

December 23, 2005

Honorable Gale Norton
Secretary of the Interior
Department of the Interior
1849 C Street, NW
Washington DC 20240

Inupuit Community of the Artic Slope
Realty Office
P.O. Box 0934
6986 Ahmaogak Street
Barrow, Alaska 99723-0934

Re: BIA Allotment F-14632 Parcel B (Oenga)
BIA Lease No. F-89-01, Heirs of Andrew Oenga

TO: The Department of the Interior, Bureau of Indian Affairs (BIA) and its agent, Inupuit Community of the Article Slope. (ICAS), as successor in interest to Artic Slope Native Association, Limited (ASNA)

On behalf of the heirs of Andrew Oenga demand is made that you as their Trustee, or on behalf of their Trustee, give Notice to Halt Trespass to the Lessees of the West Niakuk Oil Lease. The Oengas are demanding that the Lessees immediately halt the trespass on the above Oenga Allotment that occurs when oil from the West Niakuk Lease is produced through production facilities on that Allotment pursuant to BIA Lease No. F-89-01.

The Lessees of the West Niakuk Oil Lease to whom Notice should be given appear to be:

BP Exploration (Alaska) Inc.
ConocoPhillips Alaska
Chevron U.S.A.
Exxon Mobil Alaska
Forest Oil Corporation
Forcenergy Inc.
Phillips Alaska Inc.

The reason we are requesting you give such Notice is the restricted status of the Oenga Allotment of which you are the Trustee and because of ¶ 34 of the Third Amendment of

Lease F-89-01 signed by the Secretary of Interior's designee Samuel Demientieff, Superintendent of the Bureau of Indian Affairs Fairbanks Agency, which prohibits the Oengas from communicating directly with the Lessees of Lease F-89-01 and appoints the Bureau of Indian Affairs, acting through its agent, to be the "sole contact with Lessees for any and all matters arising out of this Lease Agreement [Lease F-89-01 Parcel B]." This matter arises out of that Lease Agreement.

Demand is further made that you take all action necessary to recover damages for such trespass in an amount equal to the greater of $1.00/barrel thru-put or a 2.5% royalty for all petroleum product from the West Niakuk oil lease that has passed through Allotment F-89-01 Parcel B. Demand is further made that you seek an equal amount of damages from BP Exploration (Alaska) Inc. for their role in facilitating this trespass.

Please be advised that the heirs of Andrew Oenga would consider entering into an appropriate Lease regarding future production of West Niakuk oil and gas through Allotment F-89-01 Parcel B at the above "pass-thru" or royalty rates.

The Oenga Heirs appreciate the efforts of your Solicitor's office in facilitating discussion with BP Exploration (Alaska) Inc. (BP) regarding the various breaches of Lease F-89-01 and in helping secure a six month Tolling Agreement so that settlement of the claims against BP can be discussed and hopefully resolved. Please be advised, however, that the Oenga Heirs do not consider the attached letter from the Alaska Region Office of the Solicitor, or subsequent discussions of BP, as fulfillment of the action requested in the letter on behalf of the Oenga Heirs dated December 1, 2005, which is also attached.

It is important to note that the above mentioned Tolling Agreement does not toll matters regarding the trespass of the West Niakuk oil on Allotment F-89-01, Parcel B. Consequently, your prompt attention to this trespass is imperative, and immediate action is required because of statute of limitations concerns.

The heirs of Andrew Oenga are hopeful that through your efforts and those of your Department, this matter can be resolved short of litigation so that the Oenga Heirs finally receive "fair annual rent" for the lease of their allotment as required under 25 U.S.C. § 162.5(1987), the regulations in effect at the time of the Lease and incorporated in the Lease of Allotment F-89-01 Parcel B.

Thank you for your attention to this important matter.

Sincerely,

Raymond C. Givens
Attorney for Oenga Heirs

RCG:jr

cc: ~~Oenga Heirs~~
Office of Special Trustee
Assistant Secretary for Indian Affairs
Bureau of Indian Affairs Alaska Area Director
Roger Hudson, Deputy Solicitor, Bureau of Indian Affairs

GIVENS LAW FIRM
P.O. Box 400, 118 N. 7th Street
Coeur d'Alene, ID 83816
phone (208) 676-1310
fax (208) 676-1296
raygivens@givenslaw.com

June 4, 2007

Honorable Carl Artman
Assistant Secretary of the Interior
for Indian Affairs
Department of the Interior
1849 C Street, NW
Washington DC 20240

Re: Demand of Heirs of Andrew Oenga re:
Allotment # F-14632, Parcel B, BIA Lease # F-89-01

Dear Mr. Assistant Secretary:

I write on behalf of the Heirs of Andrew Oenga (Oenga Heirs) regarding their above-leased Native Allotment (Heald Point at Prudhoe Bay, Alaska) to inform you of newly discovered facts which the Oenga Heirs believe constitute a breach of the lease and/or trespass regarding allotted land subject to restriction against alienation. The Oenga Heirs ask that the Department of the Interior (DOI) Bureau of Indian Affairs (BIA) take appropriate action.

The above allotment was leased with BIA involvement to a predecessor of BP Exploration (Alaska) Inc. (BP) for use in BP's development of their offshore Niakuk Project. BP later constructed an oil production facility on the leased allotment.

The newly discovered facts which the Oenga Heirs believe constitute a breach of the lease and/or trespass is the recently-learned fact that BP has been producing oil from the Lisburne PA through the facilities on the allotment since 1993, even though the lease only authorizes oil production from the Niakuk Project through the allotment.

This information was recently learned as the result of discovery in related litigation. The barrels of Lisburne PA oil produced through facilities on the leased allotment and its value is as follows:

| Year | BBLS | Annual Average Price/BBL | Value of Oil Produced |
|---|---|---|---|
| 1993 | 128,224 | $14.25 | $1,827,192 |
| 1994 | 526,257 | 13.19 | 6,941,330 |

| | | | |
|---|---|---|---|
| 1995 | 543,523 | 14.62 | 7,946,306 |
| 1996 | 446,642 | 18.46 | 8,245,011 |
| 1997 | 412,746 | 17.23 | 7,111,614 |
| 1998 | 439,466 | 10.87 | 4,776,995 |
| 1999 | 371,183 | 15.56 | 5,775,607 |
| 2000 | 269,329 | 26.72 | 7,196,471 |
| 2001 | 171,833 | 21.84 | 3,752,833 |
| 2002 | 202,912 | 22.51 | 4,567,549 |
| 2003 | 202,714 | 27.56 | 5,586,798 |
| 2004 | 129,002 | 36.77 | 4,743,404 |
| 2005 | 140,153 | 50.26 | 7,044,090 |
| 2006 | 161,225 | 59.69 | 9,623,520 |
| **TOTAL** | **4,145,209 BBLS** | | **$85,138,720** |

By this letter and pursuant to federal regulation, including 25 CFR 162.617 et seq., the Heirs of Andrew Oenga request that within two weeks of the above date of this letter you 1) conduct an immediate investigation of this matter, 2) find that BP's actions violate the lease as amended, 3) serve BP a formal notice that this activity constitutes a violation of the lease, 4) cancel the lease if proper restitution on damages are not immediately paid, and 5) collect from BP damages, penalty and interest for the past violation of the lease and for future violations until the practice is halted.

Furthermore, by this letter and pursuant to federal regulation, the heirs of Andrew Oenga request that you 1) declare BP's production of oil from the Lisburne PA through the facilities on the above Allotment to be an unauthorized trespass, 2) demand that BP immediately halt the trespass, and 3) collect from BP damages, penalty, and interest for all past trespass, and for all future trespass until this practice is halted.

Please understand that the Heirs of Andrew Oenga view the above actions by the BIA as required by fiduciary duty and trust responsibility owed to the Heirs of Andrew Oenga by DOI through the BIA. If the above actions are not taken by the BIA within 14 days of the date of this letter, please be advised that the Heirs of Andrew Oenga will add this breach of trust claim to those currently pending in *Oenga v. United States*, United States Court of Federal Claims No. 06-491 L.

Sincerely,

Raymond C. Givens
Attorney for Oenga Heirs

RCG:jh

cc: Oenga Heirs
Niles Cesar, BIA Alaska Regional Director
Roger Hudson, DOI Solicitor's Office – Alaska Region