**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **WALLACE OENGA, GEORGENE SHUGLUK, LEROY OENGA, SR., MICHAEL DELIA, TONY DELIA, JOSEPH DELIA, JENNIE MILLER, and TRINITY DELIA** | ) | **No. 06-491 L**<br>**Chief Judge Edward Damich** |
| **Plaintiffs,** | ) | |
| **v.** | ) | **OENGAS' PROPOSED FINDINGS OF UNCONTROVERTED FACTS** |
| **THE UNITED STATES,** | ) | |
| **Defendant, and** | ) | **OENGAS' RESPONSE TO INTERVENORS' PROPOSED FINDINGS OF UNCONTROVERTED FACTS** |
| **EXPLORATION (ALASKA) INC., CONOCOPHILLIPS ALASKA, INC., EXXON MOBIL ALASKA PRODUCTION, INC., CHEVRON U.S.A., INC. and FOREST OIL CORPORATION,** | ) | |
| **Defendant Intervenors** | ) | |

**OENGAS' PROPOSED FINDINGS OF UNCONTROVERTED FACTS**

Pursuant to RCFC 56(h), Oengas submit their Proposed Findings of Uncontroverted Facts. Some of the Proposed Findings might be more properly characterized as mixed questions of fact and law, but are included below simply as a matter of caution. The Proposed Findings are in the following outline

A . Oengas' Proposed General Findings

1. Parties
2. Andrew Oenga
3. Oengas' Native Allotment
4. Initial Lease Agreement
5. First Lease Amendment
6. Second Lease Amendment
7. Third Lease Amendment
8. Use of Oengas' Allotment Under Lease, Oil Production from Niakuk, West Niakuk, Lisburne
9. United Sates' Appraisals
10. Royalties, Thruputs and Other Consideration at Other Sites
11. Rents Collected by United States

B. Oengas' Proposed Statute of Limitation Findings

1. Oengas' 2003 and 2005 Accounting Requests and Responses – ALL CLAIMS
2. Oengas' Understanding re: Documents and Claim – ALL CLAIMS
3. Oengas Prohibited from Communicating with BPX by Lease- ALL CLAIMS
4. Oengas' Demands Regarding Breach of Lease and Trespass – CLAIM THREE
5. United States failure to Disclose – CLAIM THREE

## A . Oengas' Proposed General Findings

### 1. Parties

**a.** Plaintiffs (Oengas) are the heirs of Andrew Oenga. *United States Answer to Second Amended Complaint* ¶ 7, Docket 74 p.2

b. Defendant is the government of the United States, which includes the Department of the Interior. *United States Answer to Second Amended Complaint* ¶ 9, Docket 74 p. 2.

c. At various time during this case, the United States, thru the BIA, contracted for realty services with the Artic Slope Native Association Limited ("ASNA") or Inupiat Community of the Artic Slope ("ICAS"). ~~*United States Answer to Second Amended Complaint* ¶ 9, Docket 74 p.2~~

d. Intervenors ["Oil Companies"] are all participants in the "Prudhoe Bay Unit," which includes areas producing oil thru the facilities on Oengas' Allotment. *Intervenors' Answer to Second Amended Complaint* ¶ 9, Docket 74 pp.6-13

e. Standard Alaska Production Company (SAP Co.) changed its name to BP Exploration (Alaska) Inc. (BPX) in 1898. Id.

f. ARCO Alaska Inc. (ARCO) became Phillips Alaska, Inc., and then ConocoPhillips Alaska, Inc. (ConocoPhillips). Id.

g. Exxon Corporation became ExxonMobile Alaska Production, Inc. (Exxon). Id.

**2. Andrew Oenga**

a. Andrew Oenga (Oenga) was an Inupiat from the Artic Slope of Alaska. He was born in 1909 and died in 1090.He was raised in the subsistence lifestyle of the Inupiat, and lived in that manner throughout his life, although in later years he found work in Barrow, Alaska. As he traveled across the Artic Slope, he built and lived in sod homes or shelters. He had

one at Heald Point on the northeast edge of Prudhoe Bay. He spoke and read little or no English other than basic greetings and a few simple words. *January 2, 2008 Declaration of Leroy Oenga*, ¶ 3, Docket 78-2 p.3

**3. Oengas' Native Allotment**

**a.** In 1970 or 1971 Andrew Oenga applied for a Native Allotment regarding the Heald Point property at issue here on the northeast tip of Prudhoe Bay, Alaska. The Native Allotment was eventually issued. *United States Answer to Second Amended Complaint ¶11; United States Documents #1* (Application), *#2* (Native Allotment) Docket 42-2 pp.1-7

**b.** The Native Allotment conveyance was of a restrictive fee as "inalienable and nontaxable until otherwise provided by Congress or until the Secretary of the Interior or his delegate, pursuant to the provisions of the Act of May 17, 1906, as amended, approves a deed of conveyance vesting in the purchaser a complete title to the land." *United States Documents #2* (Native Allotment) Id.

**c.** The Native Allotment excepted and reserved to the United States "All oil and gas in the land so allotted, and to it, or persons authorized by it, the right to prospect for, mine, and remove such deposits from the same upon compliance with the conditions and subject to the provisions and limitations of the Act of March 8, 1922, as amended, 43 U.S.C. §§ 270-11 (1982) (repealed with a savings provision) and 270-12 (2000) (emphasis added). *United States Documents #2* (Native Allotment).

4. **Initial Lease Agreement**

**a.** The Initial Lease Agreement was executed in January 1989, and contains the provisions set out therein. *United States Answer to Second Amended Complaint* ¶*14, United States Document # 13*, Docket 42-2 pp.62-79.

**b.** SAP Co. initially approached the BIA about a "right-of-way application for an access road and pipeline" across Oengas' Allotment. *United States Document # 4*, Docket 42-2 pp.14.

**c.** The United States played an extensive role in negotiation and preparation of the Initial Lease Agreement as shown by the September 27, 1988 Memorandum of BIA Kathleen Dickerson, *United States Document # 11*, Docket 42-2 pp. 50-52; BIA Report of Investigation, signed January 1989, *United States Document # 13*, Docket 42-2 pp.54-60.

**d.** Actual drafting of the Initial Lease Agreement was done by BPX, (then SAP Co.). Id.

**e.** In the Initial Lease Agreement the United States assumed actual control, within its authority (i) to collect rents from BPX, and (ii) to conduct appraisals periodic appraisals of the property to be used in determining the rent due. *Initial Lease Agreement §4, §5, §9, United States Document # 13*, Docket 42-2 pp.62-79.

**f.** The Initial Lease Agreement and its attachments makes specific reference to "Niakuk" or Niakuk Project" seven times, 4 times in §1, twice in sheet 1 of Exhibit A, and once in Sheet 2 of Exhibit A. No reference is made to

any other oilfield, tract, or production area in the document. *Initial Lease Agreement, United States Document # 13*, Docket 42-2 pp.62-79.

**g.** The intent of the Parties signatories to the Initial Lease Agreement, as shown by the plain wording of the document itself, was that Oengas property was leased as the location for development of oil and gas from Niakuk by SAP Co. (BPX) only, and not for the development of oil and gas from other locations and/or by other entities. *Initial Lease Agreement, United States Document # 13*, Docket 42-2 pp.62-79.

**h.** The intent of the Parties signatories to the Initial Lease Agreement, as shown by the wording of the document and extrinsic evidence, including contemporaneously prepared BIA Memorandum and BIA Report of Investigation, and by the BPX prepared First Lease Amendment, was that Oengas property was leased as the location for development of oil and gas only from Niakuk by SAP Co. (BPX) only, and not for the development of oil and gas from other locations and/or by other entities. *Initial Lease Agreement, United States Document # 13*, Docket 42-2 pp.62-79; *Memorandum of BIA Kathleen Dickerson, United States Document # 11*, Docket 42-2 pp. 50-52; *BIA Report of Investigation, signed January 1989, United States Document # 13*, Docket 42-2 pp.54-60; attachment to *Declaration of Leroy Oenga,* Docket 78-2 pp12-14(complete First Lease Agreement).

5. **First Lease Amendment**

**a.** The First Lease Amendment was signed by BPX on July 29, 1993, by the BIA on August 3, 1993, contains the provisions set out therein, and included the "general location map" attached to the copy of the First Lease Amendment accompanying the Declaration of Leroy Oenga, but omitted from the copies provided by the United States and BPX. Attachment to *Complaint.*, Docket 1 pp. 40-42; attachment to *Declaration of Leroy Oenga,* Docket 78-2 pp12-14; *United States Answer to Second Amended Complaint* ¶*14, First Lease Amendment, United States Document # 20*, Docket 42-3 pp.58-59; BPX Exhibit B, Docket 41-3 pp. 24-25. *Intervenors' Document B*, pp.24-25.

**b.** From July 7, 1993, a month before the First Lease Amendment was signed by the United States, the United States knew that BPX intended to use the Oenga Allotment as an oil production facility and that the later received First Lease Amendment was intended as an amendment to the Lease. *United States Documents # 21, 22,* Docket 42-3 pp. 61-67.

**c.** Prior to the United States signing the First Amended Complaint, no notice of it was given to the Oengas of the proposed Lease Amendment and the Oengas did not sign the document. *United States Answer to Second Amended Complaint* ¶16, Docket 74 p.3; *Declaration of Leroy Oenga,* Docket 78-2 p. 5

**d.** The First Lease Amendment made the Oengas' Allotment the surface of a severed mineral estate, on which exploration for, or extraction or removal

of, oil or gas is authorized pursuant to lease. *Native Allotment, United States Document #2.* Docket 42-2 pp.6-7; *First Lease Amendment, United States Document # 20*, Docket 42-3 pp.58-59.

6. **Second Lease Amendment**

   **a.** The Second Lease Amendment was executed in January 1994, and contains the provisions set out therein. *United States Answer to Second Amended Complaint* ¶17; *Second Lease Amendment United States Document # 35*, Docket 42-4 pp.56-61.

   **b.** The Second Lease Amendment contained no language waiving notice or signature by all parties to the Lease of assignments or subleases. Id

7. **Third Lease Amendment**

   **a.** The Third Lease Amendment was executed in May 1995, and contains the provisions set out therein. *United States Answer to Second Amended Complaint* ¶18, Docket 74, p. 3; *Third Lease Amendment, United States Document # 41*, Docket 42-5 pp.55-60.

   **b.** The Third Lease Amendment required that the United States conduct appraisals every 4 years to be used in the determination of rents due. Id.

8. **Use of Oengas' Allotment Under Lease, LETTER AGREEMENT, Oil Production from Niakuk, West Niakuk, Lisburne**

   **a.** From at least 1994, the Oenga Allotment was used as a site for BPX's oil production facility to produce oil from Niakuk, West Niakuk and Lisburne. Intervenors' Answer to Second Complaint §§ 28, 61 Docket 69 pp. 18-19, 25.

**b.** The oil production data from Niakuk, West Niakuk and Lisburne produced thru BPX's production facilities on Oengas Allotment contained in the Chart summarizing Intervenors response to Oengas' discovery attached to the Declaration of Langer accurately reflects that data produced for the years covered by the Chart. *Declaration of Langer*, Docket 78-3 p.3.

**c.** In 1994 BPX entered into a LETTER AGREEMENT with ARCO/Exxon regarding the use of production facilities on Oengas' Allotment to produce oil from ARCO and Exxon's state oil leases. *Intervenors' Answer to Second Complaint* § 61 Docket 69 p. 25.

**d.** Consideration paid by ARCO and Exxon under the LETTER AGREEMENT for the use on Oengas' Allotment and the oil production facilities thereon is as described the *Sealed Declaration of Edward Morse*. Motion to File Sealed Declaration pending.

**e.** No prior notice of the LETTER AGREEMENT was given to the United States or to the Oengas, nor did the Oengas or the Secretary of the Interior or his designee sign the LETTER AGREEMENT. BPX Document J, Docket 41-5 pp.2-6 (redacted copy); *Sealed Declaration of Edward Morse* (unredacted copy) Motion to File Sealed Declaration pending; Declaration of Leroy Oenga, Docket 78-2 p. 5.

9. **United Sates' Appraisals**

**a.** In the Initial Lease Agreement the United States assumed the obligation to conduct appraisals to be used in the determination of rents due. The Initial

Lease Agreement required such appraisals be conducted every 5 years. *United States Document # 41*, Docket 42-5 pp.55-60.

**b.** Third Lease Amendment required that such appraisals be conducted every 4 years. *United States Document # 41*, Docket 42-5 pp.55-60.

**c.** An appropriate appraisal for determining the rents due for the lease of land, should consider the consideration paid for similar use of similar lands, regardless of whether they are paid as rents, royalties, thruputs or as some other form of consideration. *Sealed Declaration of Edward Morse*, Motion to File Sealed Declaration pending.

**d.** The United States' 1993 and 1997 appraisals of the value of Oengas' Allotment for determination of rents due were deficient for the reasons set out in the *Sealed Declaration of Edward Morse*. Motion to File Sealed Declaration pending.

10. **Royalties, Thruputs and Other Consideration at Other Sites**

**a.** Rents collected as consideration for the lease of land can include a set periodic amount, royalties, thruputs or as some other form of consideration. *Sealed Declaration of Edward Morse*, Motion to File Sealed Declaration pending.

**b.** Oil royalties paid to the Kuukpik Corporation at the Colville River Unit range from 1% to 1.25% to 1.6667% to 2%. *Intervenors' Appendix*, Docket 52 pp. 1-3, Docket 52-2 pp. 1-50.

c. Other oil production consideration is paid to the Kuukpik Corporation at the Colville River Unit. *Sealed Declaration of Edward Morse*, Motion to File Sealed Declaration pending.

d. Royalties of 2.5% to 4% paid for the surface use in development of subsurface oil accumulations are noted in reported cases. (in Utah - 2.5% royalty - *Flying Diamond Oil Corp v. Newton Sheep Co.*, 776 P.2d 618 (Utah 1989)); and (in Michigan - 4% royalty - *In re Newstar Energy of Texas*, 280 BR 623 (2002)).

11. **Rents Collected by United States**

a. The rents collected by the United States for lease of the Oengas' Allotment during the period 1994-2001, inclusive, are as summarized in the Declaration of Langer. Docket 78-3, pp. 2-5.

b. The United States has never made a finding that it was in the best interest of Oengas to collect less than "fair annual rental," or a lesser rent or a lesser royalty than provided for by federal regulation. *United States Answer to Second Amended Complaint* ¶47, ¶ 37. Docket 74 pp. 7, 6.

## B. Oengas' Proposed Statute of Limitation Findings

### 1. Oengas' 2003 and 2005 Accounting Requests and Responses – ALL CLAIMS

a. Oengas wrote to the United States on November 22, 2005 requesting an accounting of their IIM accounts and the various items detailed in the November 22, 2005 letter attached to the *January 2, 2008 Declaration of Leroy Oenga*, ¶ 4. Docket 78-2 pp. 4, 9-10. Oengas received responses

from the United States in February and May, 2006. *United States Answer to Second Amended Complaint* ¶ 3, Docket 74 pp. 1-2.

b. Oengas orally requested an informal accounting of similar information relating to issues in this case from ICAS in 2003. Oengas received responses from ICAS that same year. *January 2, 2008 Declaration of Leroy Oenga*, ¶ 4, Docket 78-2 p.4.

**2. Oengas' Understanding re: Documents and Claim – ALL CLAIMS**

a. Oengas did not know the vast majority of the information obtained in response to the 2003 and 2005 accounting requests until the responses were received. *January 2, 2008 Declaration of Leroy Oenga*, ¶ 9, Docket 78-2 pp. 5-6.

b. Oengas did not understand the documents obtained in the accounting to be generally available to them. Id

**3. Oengas Prohibited from Communicating with BPX by Lease- ALL CLAIMS**

a. ¶ 34 of the Third Amendment to BIA Lease F-89-01 contains language "designat[ing] and appoint[ing] the BIA, acting by and through ASNA, to be their sole contact with Lesees [BPX] for any and all maters arising out of [the] Lease Agreement…" It further provided that BPX "shall be under no obligation to respond to Lessors contacts and shall refer all such contacts to ASNA or the BIA." The United States signed and "approved" this lease on May 11, 1995. *United States Answer to Second Amended Complaint* ¶ 18 (admitting the incorporated lease amendment

but not allegations which may have been legal conclusions); *United States Document 41*, Docket 42-5 p. 56.

4. **Oengas' Demands Regarding Breach of Lease and Trespass – CLAIM THREE**

   a. In 2005 Oengas demanded the United States give notices and take action regarding the breach of the Lease and trespass that was occurring because of the production of oil from West Niakuk thru facilities on the Oengas Allotment, but the United States did not take the requested action. *United States Answer to Second Amended Complaint* ¶ 30, 31, Docket 74 p.5; *January 2, 2008 Declaration of Leroy Oenga*, ¶ 10, and attached letters, Docket 78-2 pp.6, 21-25.

   b. In 2007 Oengas demanded the United States give notices and take action regarding the breach of the Lease and trespass that was occurring because of the production of oil from Lisburne thru facilities on the Oengas Allotment, but the United States did not take the requested action. *January 2, 2008 Declaration of Leroy Oenga*, ¶ 10, and attached letter, Docket 78-2 pp.26-27.

5. **United States' Failure to Disclose – CLAIM THREE**

   a. Not until the 2003 accounting response did the United States disclose to Oengas that it had been contacted by ARCO in 1993 inquiring about leasing a portion of the Oengas' Allotment, that the United States had informed BPX of that fact, and that the United States rejected ARCO's request even though it made no effort to have BPX release its option so a

portion of the Allotment could be leased to ARCO. *January 2, 2008 Declaration of Leroy Oenga*, ¶ 5 and document attached. Docket 78-2 pp.4-5.

## OENGAS' RESPONSE TO INTERVENORS' PROPOSED FINDINGS OF UNCONTROVERTED FACTS

Pursuant to RCFC 56 (h), Oengas respond to Intervenors Proposed Findings of Uncontroverted Facts as follows:

**Intervenor Proposal #1**

1. The lease agreement involved in this case, as the same has been amended and supplemented, comprises the following documents:
(a) Lease Agreement (BIA Lease No. F-89-01) between Andrew Oenga (with the approval of the Secretary of the Interior) and BPX, effective January 1, 1989, and recorded on February 1, 1989, at Book 53, Pages 873-890, Barrow Recording District ("Original 1989 Lease Agreement"), a copy of which is attached to Intervenors' Memorandum In Support as Exhibit A;
(b) BPX's unrecorded letter of July 29, 1993, to the Bureau of Indian Affairs ("BIA"), a copy of which is attached to Intervenors' Memorandum In Support as Exhibit B;
(c) Agreement To Amend BIA Lease among the heirs of Andrew Oenga (with the approval of the Secretary of the Interior) and BPX, effective January 20, 1994, and recorded on May 2, 1994, at Book 74, Pages 292-298, Barrow Recording District ("1994 Lease Amendment"), a copy of which is attached to Intervenors' Memorandum In Support as Exhibit C; (d) Third [sic] Amendment To BIA Lease among the heirs of Andrew Oenga (with the approval of the Secretary of the Interior) and BPX, effective May 11, 1995, and recorded on June 14, 1995, at Book 79, Pages 223-227, Barrow Recording District ("1995 Lease Amendment"), a copy of which is attached to Intervenors' Memorandum In Support as Exhibit D. The Original 1989 Lease Agreement, as first supplemented by BPX's unrecorded letter of July 29, 1993, and then as amended by both the 1994 Lease Amendment and the 1995 Lease Amendment, is referred to herein as the "Oenga Lease".

**Oengas' Response to #1 -** Agree

**Intervenor Proposal #2**

2. Standard Alaska Production Company (a Delaware corporation) was the name of the lessee when the original "Lease Agreement (BIA Lease No. F-89-01)" effective January 1, 1989, was executed. See Exhibit A attached to Intervenors' Memorandum In Support. Effective January 31, 1989, Standard Alaska Production Company changed its name to BP Exploration (Alaska) Inc. See Exhibit E attached to Intervenors' Memorandum In Support.

**Oengas' Response to #2** -Agree

**Intervenor Proposal #3**

3. Plaintiffs are the heirs of Andrew Oenga (see Plaintiffs' First Amended Complaint at ¶ 7) and are referred to herein either as the "Oenga heirs" or, collectively, as "Lessor" (as that term is used on the Oenga Lease).

**Oengas' Response to #3** - Agree

**Intervenor Proposal #4**

4. The Oenga Lease covers a 40-acre parcel of land at Heald Point on the North Slope of Alaska (said 40-acre parcel is referred to hereinafter as the "leased premises") for which Andrew Oenga filed an application in 1971 under the Alaska Native Allotment Act of 1906. See BLM File AKFF014632; see also Exhibits A, B, C, D, and F attached to Intervenors' Memorandum In Support. Said parcel includes 22.21 acres within Sec. 36, T. 12 N., R. 15 E., U.M., and 17.79 acres in Sec. 1, T. 11 N., R. 15 E., U.M.

**Oengas' Response to #4** - Agree

**Intervenor Proposal #5**

5. As to the 22.21 acres of the leased premises situated in Sec. 36, T. 12 N., R. 15 E., U.M., the allotment application was approved by the BLM and, eventually, Native Allotment Certificate No. 50-2005-0580 was issued on September 27, 2005. See Exhibit F attached to Intervenors' Memorandum In Support.

**Oengas' Response to #5** - Agree

**Intervenor Proposal #6**

6. As to the 22.21 acres of the leased premises situated in Sec. 36, T. 12 N., R. 15 E., U.M., Native Allotment Certificate No. 50-2005-0580 expressly excepted and reserved to the United States, out of the estate conveyed by said certificate, [a]ll of [the] oil and gas in the land so allotted, and to [the U.S.], or persons authorized by it, the right to prospect for, mine, and remove such deposits from the same upon compliance with the conditions and subject to the provision and limitations of the Act of March 8, 1922, as amended, 43 U.S.C. §§ 270-11 (1982) (repealed with a savings provision) and 270-12 (2000).

**Oengas' Response to #6** - Agree

**Intervenor Proposal #7**

7. The oil and gas estate expressly excepted and reserved to the United States out of the estate conveyed by Native Allotment Certificate No. 50-2005-0580 previously had been conveyed by the United States to the State of Alaska. See Tentative Approval decision dated October 9, 1964 [at p. 2, line 1 of table respecting T. 12 N., R. 15 E., U.M.], as amended by the decision of February 7, 1969 (as corrected on February 19, 1969), as partially rescinded by the decision of March 11, 1980, and as partially rejected by the decision of August 4, 1980 (copies of said decisions are attached to Intervenors' Memorandum In Support collectively as Exhibit G).

**Oengas' Response to #7** - Agree

**Intervenor Proposal #8**

8. The oil and gas estate in and under the leased premises that was conveyed to the State of Alaska by the Tentative Approval decision dated October 9, 1964, as amended by the decision of February 7, 1969 (as corrected on February 19, 1969), was included, together with adjoining lands, in State of Alaska Competitive Oil and Gas Lease ADL-34630 effective as of April 1, 1967 (a copy of which is attached to Intervenors' Memorandum In Support as Exhibit H).

**Plaintiffs" Response to #8** - Agree

**Intervenor Proposal #9**

9. As to the remainder of the leased premises situated in Sec. 1, T. 11 N., R. 15 E., U.M., the allotment has not yet been conveyed because *all* of the lands in said

township were conveyed by U.S. Patent No. 50-74-0093 dated March 27, 1974. See Exhibit I attached to Intervenors' Memorandum In Support.

**Oengas' Response to #9** - Agree

**Intervenor Proposal #10**

10. Notwithstanding inaction by the United States to recover the surface of the southern portion of said 40-acre parcel from the State of Alaska, BPX has leased pursuant to the Oenga Lease, and thus is paying rent on, the entire 40-acre parcel as if the entire 40-acre parcel had been certificated.

**Oengas' Response to #10** - Agree

**Intervenor Proposal #11**

11. Pursuant to the Oenga Lease, BPX has developed and currently operates facilities on the leased premises for the development and production of oil and gas from certain oil and gas reservoirs underlying lands adjoining the leased premises. See Plaintiffs' First Amended Complaint at ¶ 9.a; see also Exhibit P attached to Intervenors' Memorandum In Support.

**Oengas' Response to #11** - Agree

**Intervenor Proposal #12**

12. In addition to their use by BPX, the leased premises were used by ConocoPhillips Alaska, Inc. (a Delaware corporation that formerly was known as ARCO Alaska, Inc. and then as PHILLIPS Alaska, Inc. before changing its name to ConocoPhillips Alaska, Inc.) and Exxon Corporation (predecessor-in-interest to intervenor ExxonMobil Alaska Production Inc.) pursuant to that certain Letter Agreement dated January 27, 1994, among BPX, ARCO Alaska, Inc., and Exxon Corporation (hereinafter "Facility Sharing Agreement"). See Exhibit J attached to Intervenors' Memorandum In Support.

**Oengas' Response to #12** - Agree

**Intervenor Proposal #13**

13. Such shared use of the leased premises by BPX, ARCO Alaska, Inc., and Exxon Corporation continued until BPX became the sole operator of the Prudhoe

Bay Unit Area in 2000. See Exhibit K attached to Intervenors' Memorandum In Support.

**Oengas' Response to #13 -** Agree

**Intervenor Proposal #14**

14. To date, BPX has used the leased premises to facilitate the production of oil and gas from the following lands (all of which are included in the state oil and gas leases identified below):
(a) the lands included in the original Niakuk Participating Area approved by the State of Alaska Department of Natural Resources ("DNR") on March 2, 1994 (see Exhibits L and P attached to Intervenors' Memorandum In Support), as follows:

| PBUA Tract | DNR Lease | Lands |
|---|---|---|
| 4 | 34625 | T12N R15E UM: Sec. 23 (S2) Sec. 24 (SW4) |
| 31 | 34630 | T12N R15E UM: Sec. 25 (All) Sec. 26 (All) |
| 32 | 34635 | T12N R16E UM: Sec. 29 (All) Sec. 30 (All) Sec. 31 (N2) Sec. 32 (N2) |
| 33 | 34634 | T12N R16E UM: Sec. 28 (All); and |

(b) the lands included in the *expanded* Niakuk Participating Area approved by DNR on November 17, 1997 (see Exhibits M and P attached to Intervenors' Memorandum In Support), as follows:

| PBUA Tract | DNR Lease | Lands |
|---|---|---|
| 4 | 34625 | T12N R15E UM: Sec. 13 (All) Sec. 14 (All) Sec. 23 (All) Sec. 24 (All) |
| 31 | 34630 | T12N R15E UM: Sec. 25 (All) Sec. 26 (All) Sec. 36 (NE4) |

| | | |
|---|---|---|
| 32 | 34635 | T12N R16E UM: Sec. 29 (All) Sec. 30 (All) Sec. 31 (N2) Sec. 32 (N2) |
| 33 | 34634 | T12N R16E UM: Sec. 28 (W2, NE4, NW4SE4, S2SE4). |

**Oengas' Response to #14 -** Agree

**Intervenor Proposal #15**

15. Almost all of the production to date from lands included in the expanded Niakuk Participating Area has come from the Niakuk accumulation in and under said lands. Production from two of the wells drilled into lands within the expanded Niakuk Participating Area has included some oil from the deeper Raven accumulation in and under said lands. See Exhibit N attached to Intervenors' Memorandum In Support.

**Oengas' Response to #15 -** Agree

**Intervenor Proposal #16**

16. From 1994 (after execution of the Facility Sharing Agreement) until BPX became the sole operator within the Prudhoe Bay Unit Area in 2000, ARCO Alaska, Inc. and Exxon Corporation used the leased premises to facilitate the production of oil and gas from the lands included in the West Niakuk Participating Area also approved by DNR on November 17, 1997 (see Exhibits M and P attached to Intervenors' Memorandum In Support), as follows:

| PBUA Tract | DNR Lease | Lands |
|---|---|---|
| 5 | 34626 | T12N R15E UM: Sec. 15 (All) Sec. 16 (All) Sec. 21 (N2, SE4) Sec. 22 (All) |
| 30 | 34629 | T12N R15E UM: Sec. 27 (All). |

**Oengas' Response to #16 -** Agree

**Intervenor Proposal #17**

17. From 1994 until BPX became sole operator within the Prudhoe Bay Unit Area in 2000, ARCO Alaska, Inc. also used the leased premises to facilitate the production of oil and gas from certain lands included in the Lisburne Participating Area approved by DNR on December 4, 1986 (see Exhibits O and P attached to Intervenors' Memorandum In Support), as follows:

| PBUA Tract | DNR Lease | Lands |
|---|---|---|
| 32 | 34635 | T12N R16E UM: Sec. 31 (All) Sec. 32 (All) |
| 33 | 34634 | T12N R16E UM: Sec. 33 (All). |

**Oengas' Response to #17 -** Agree

**Intervenor Proposal #18**

18. From June 2000 (when it became the sole operator within the Prudhoe Bay Unit Area), BPX has used the leased premises to facilitate the production of oil and gas from the lands included in the West Niakuk Participating Area as described above and from the lands included in the Lisburne Participating Area as described above.

**Oengas' Response to #18 -** Agree

**Intervenor Proposal #19**

19. The Oenga Lease was issued under 25 C.F.R. Part 162 (BIA regulations respecting leasing of, *inter alia*, Alaska Native allotments) and not under 25 C.F.R. Part 169 (regulations respecting granting of rights-of-way upon or across, *inter alia*, Alaska Native allotments).

**Oengas' Response to #19 –** Disagree – The Intervenors' Proposal implies inappropriate legal conclusions.

**Oengas' Proposed Revision - 19.**

*19. The Oenga Lease was issued "in accordance with the provisions of existing law and regulations at [25 CFR 162(1987)] which by reference are made a part hereof." 25 C.F.R. Part 162 are BIA regulations respecting leasing of, inter alia, Alaska Native allotments. The Lease Agreement did not reference 25 C.F.R. Part*

*169 (regulations respecting granting of rights-of-way upon or across, inter alia, Alaska Native allotments). Lease Agreement, Docket 42-2, p. 62.*

**Intervenor Proposal #20**

20. The unnumbered "grant clause" of the Oenga Lease found on page 1 of the Original 1989 Lease Agreement, together with Sections 10 and 11 of the Oenga Lease, provide in relevant part as follows (emphasis added):
[Grant Clause] WITNESSETH, that ... the Lessor hereby leases to the Lessee ten (10) acres of land, the "leased premises", which comprises a portion of Lessor's present and future interests in Parcel B of Alaska Native Allotment Application F-14632.
10. Use of Leased/Unleased Premises: The Lessee may use the leased premises for any and all oil field exploration, development, construction, facilities, production and support purposes, and for any other uses and purposes reasonably or conveniently related thereto.... The Lessee shall make no unlawful uses of the leased and/or unleased premises, or knowingly permit any unlawful activity to be conducted thereon by others.
11. Improvements: The Lessee may construct any facilities (pipelines, access roads, causeway approaches, *drilling pads*, a construction staging pads or any other required facilities) on the leased premises as long as construction is limited to the ten (10) acres as herein described on Exhibit A. This Lease Agreement may be amended to increase or decrease the size of the leased premises at any time *at Lessee's sole discretion*. If the leased premises is so increased or decreased, Lessee shall proportionately increase or decrease its lease rental payments effective on the next ensuing lease anniversary date after such increase or decrease; provided however that rental amounts shall be pro rated beginning on the date that leased premises is increased or decreased. It is agreed and understood by all parties that the leased premises cannot be reduced to less than the ten (10.0) acres originally taken under this Lease Agreement....

**Oengas' Response to #20 –** <u>Agree</u>, except that emphasis was not in original.

**Intervenor Proposal #21**

21. Nowhere in these sections of the Oenga Lease did Lessor except from the grant of the leased premises any rights or impose any limitation upon the purpose or scope of the oil and gas activities that BPX could undertake on the leased premises.

**Oengas' Response to #21 –** <u>Disagree</u>. The text of the Lease speaks for itself.

Lease Agreement, Docket 42-2, p. 62-79. The Lease and its amendments must be read as a whole to harmonize all provisions. *NVT Technologies, Inc. v. U.S.* 370

F.3d 1153, 1159 (C.A.Fed.,2004) When interpreting the contract, the document must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts."). What rights lease language caused to be granted, limited, diminished or constrained is a question of law. *Vassar v U.S.* 63 Fed. Cl. 166, 169 (Fed. Cl. 2004) (Lease interpretation is a question of law). Whether or not the Lease excepted "any right or imposed any limitation upon the purpose or scope of the oil and gas activities that BPX could undertake in the leased premises" is a question of law. Id.

**Oengas' Proposed Revision - #21** [if a Finding is appropriate]

*21. The purpose or scope of the oil and gas activities that BPX could undertake on the leased premises under the Lease Agreement is determined by construing the lease as a whole. The intent of the parties in the Initial Lease Agreement was that Oenga leased the Native Allotment for use only in oil and gas development from Niakuk only by SAP Co. (BPX) only, and not otherwise. No amendment changed this intent.* [see Oengas' Proposed Facts above at A.5.a.-d.]

**Intervenor Proposal #22**

22. In the case of the second, third, and fourth paragraphs of Section 1 of the Original 1989 Lease Agreement, the parties to the Oenga Lease resolved *two sets of competing concerns and goals*: (1) BPX did not want to commit to a 25-year lease if it might not be able obtain the permits and authorizations that it envisioned seeking; (2) Andrew Oenga sought to enjoy as soon as possible the financial security associated with having a *long-term lease*, with its predictable promised cash flow and limited right to cancel.

**Oengas' Response to #22** - <u>Disagree</u>. The text of the Lease speaks for itself. Lease Agreement, Docket 42-2, p. 62-79. Questions of lease interpretation are questions of law. *Vassar v U.S.* 63 Fed. Cl. 166, 169 (Fed. Cl. 2004) (Lease interpretation is a question of law). Oengas do not dispute Intervenors' characterization of BPX's concerns and goals. Andrew Oengas' concerns and

goals (intent) in the Lease Agreement was to lease the portion of his allotment for a road and pipeline right-of-way which would have minimum impact on the land and the fishing. This way he and his family could have road access to and enjoyment of the remainder of the allotment. See Declaration of Leroy Oenga.

**Oengas Proposed Revision #22** [if a Finding is appropriate]

*22. The intent of the parties is determined by construing the lease as a whole. The intent of the parties in the Initial Lease Agreement was that Oenga leased the ~~Native Allotment for use only in oil and gas development from Niakuk only by~~ SAP Co. (BPX) only, and not otherwise. No amendment changed this intent.* [see Oengas' Proposed Facts above at A5a-d]

**Intervenor Proposal #23**

23. BPX's unrecorded letter of July 29, 1993, served as BPX's written *notice* to the BIA, as contemplated under the Original 1989 Lease Agreement, of the following: (a) BPX's satisfaction of its obligation under Section 1 of the Original 1989 Lease Agreement (which obligation accrued when BPX received all of the permits and authorizations that it believed that it needed in order to proceed with development) to convert the lease from a year-to-year tenancy to a long-term tenancy expiring (unless extended pursuant to Section 2 of the Lease) on December 31, 2014, subject to BPX's right (*exercisable only at five-year intervals*) to cancel the Lease pursuant to Section 15 of the Original 1989 Lease Agreement;
(b) BPX's exercise of its option under Section 11 of the Original 1989 Lease Agreement to increase the size of the leased premises

**Oengas' Response to #23** – <u>Disagree</u>. The text of the First Lease Amendment speaks for itself. Matters of lease interpretation, or the purposes served by it, are questions of law. *Vassar v U.S.* 63 Fed. Cl. 166, 169 (Fed. Cl. 2004) (Lease interpretation is a question of law). The First Lease Amendment was both a Notice and an Amendment of the Lease.

**Oengas Proposed Revision #23** [if a Finding is appropriate]

*23. BPX's letter dated July 29, 1993 was 1) a Notice that BPX wished to increase the acreage leased from 10 acres to 20 acres and had satisfied requirements to convert the Lease into a long term lease, and 2) an Amendment of the Lease.* [see Oengas' Proposed Facts above at A6a-b]

**Intervenor Proposal #24**

---

24. In its letter of July 29, 1993, BPX proposed an effective date of August 1, 1993, for its increase from 10 acres to 20 acres, and the BIA acknowledged and agreed to such effective date when it signed BPX's letter of July 29, 1993.

---

**Oengas' Response to #24** - Agree

**Intervenor Proposal #25**

25. Six months later BPX again exercised its option under Section 11 of the Original 1989 Lease Agreement to increase the size of the leased premises—this time from 20 acres to all 40 acres of land within Andrew Oenga's allotment parcel at Heald Point. Said exercise was memorialized in the 1994 Lease Amendment executed by the Oenga heirs, which also amended the provisions of the Original 1989 Lease Agreement in several other respects.

**Oengas' Response to #25** – Agree

**Intervenor Proposal #26**

26. No language in the 1994 Lease Amendment caused the rights granted to BPX under the Original 1989 Lease Agreement in, to, or respecting the leased premises to be limited, diminished, or constrained to the development of any particular accumulation, pool, or reservoir of oil or gas, or to the development of any particular lands

**Oengas' Response to #26 -** - Disagree. The text of the Lease speaks for itself. Lease Agreement, Docket 42-4, p. 56-61. The Lease and its amendments must be read as a whole to harmonize all provisions. *NVT Technologies, Inc. v. U.S.* 370 F.3d 1153, 1159 (C.A.Fed.,2004) When interpreting the contract, the document must be considered as a whole and interpreted so as to harmonize and give

reasonable meaning to all of its parts."). What rights lease language caused to be granted, limited, diminished or constrained is a question of law. *Vassar v U.S.* 63 Fed. Cl. 166, 169 (Fed. Cl. 2004) (Lease interpretation is a question of law).

**Oengas Proposed Revision #26** [if a Finding is appropriate]

*26. The intent of the parties in the Initial Lease Agreement was that Oenga leased the Native Allotment for use only in oil and gas development from Niakuk only by SAP Co. (BPX) only, and not otherwise. No amendment changed this intent.* [see Oengas' Proposed Facts above at A5, 6, 7, 8]

**Intervenor Proposal #27**

27. No language in the 1995 Lease Amendment caused the rights granted to BPX under the Original 1989 Lease Agreement in, to, or respecting the leased premises to be limited, diminished, or constrained to the development of any particular accumulation, pool, or reservoir of oil or gas, or to the development of any particular lands.

**Oengas' Response to #27 -** <u>Disagree</u>. The text of the Lease speaks for itself. Lease Agreement, Docket 42-5, p. 55-60. The Lease and its amendments must be read as a whole to harmonize all provisions. *NVT Technologies, Inc. v. U.S.* 370 F.3d 1153, 1159 (C.A.Fed.,2004) ("When interpreting the contract, the document must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts."). What rights lease language caused to be granted, limited, diminished or constrained is a question of law. *Vassar v U.S.* 63 Fed. Cl. 166, 169 (Fed. Cl. 2004) (Lease interpretation is a question of law).

**Oengas Proposed Revision #27** [if a Finding is appropriate]

*27. The intent of the parties in the Initial Lease Agreement was that Oenga leased the Native Allotment for use only in oil and gas development from Niakuk only by SAP Co. (BPX) only, and not otherwise. No amendment changed this intent.* [see Oengas' Proposed Facts above at A5, 6, 7, 8]

**Intervenor Proposal #28**

28. There is no language in the Oenga Lease by which the Lessor expressly excepted and retained unto itself the right to use the leased premises for the purpose of producing oil or gas from any particular accumulation or from any particular lands.

**Oengas' Response to #28** – Disagree

**Oengas Proposed Revision #28** [if a Finding is appropriate]

*28. The intent of the parties in the Initial Lease Agreement was that Oenga leased the Native Allotment for use only in oil and gas development from Niakuk only by SAP Co. (BPX) only, and not otherwise. No amendment changed this intent. However, there is no specific language in the Oenga Lease by which the Lessor expressly excepted and retained unto itself the right to use the leased premises for the purpose of producing oil or gas from any particular accumulation or from any particular lands.* [see Oengas' Proposed Facts above at A5, 6, 7, 8]

**Intervenor Proposal #29**

29. Lessor owns no rights to explore for, develop, or produce any oil or gas situated in or under *any* lands.

**Oengas' Response to #29** – Disagree. The proposal exceeds the matters relevant to this action.

**Oengas Proposed Revision #29** [if a Finding is appropriate]

*29. Lessors' rights to explore for, develop, or produce any oil or gas in the lands allotted by the Native Allotment F14632, Parcel B, Lot 1, is limit by the reservation contained in that Native Allotment, but such reservation does not affect or limit Lessors' rights to explore for, develop, or produce any oil or gas in any other the lands from that Native Allotment.* [see Oengas' Proposed Facts above at A3b, c]

**Intervenor Proposal #30**

30. Under the 1994 Lease Amendment, BPX was authorized to enter into the Facility Sharing Agreement with ARCO Alaska, Inc. and Exxon Corporation without notice to or consent of Lessor.

**Oengas' Response to #30** - Disagree. The text of the Lease speaks for itself. Lease Agreement, Docket 42-4, p. 56-61. What BPX was authorized to do under the Lease is a question of law. *Vassar v U.S.* 63 Fed. Cl. 166, 169 (Fed. Cl. 2004) (Lease interpretation is a question of law).

**Oengas Proposed Revision #30** [if a Finding is appropriate]

*30. Under the 1994 Lease Amendment and applicable federal regulations,, BPX was NOT authorized to enter into the LETTER AGREEMENT with ARCO Alaska, Inc. and Exxon Corporation unless prior notice had been given and consent of the Oengas and the Secretary of the Interior, or his designee had been obtained.* [see Oengas' Proposed Facts above at A8c, d, e]

DATED this 7th day of January, 2008.

Respectfully submitted,

s/ Raymond C. Givens
Raymond C. Givens
Givens Law Firm
Attorney for Plaintiffs
4935 116th Place SE
Bellevue, WA 98006
Tele: 425-641-5949
Fax: 425-614-0158
raygivens@givenslaw.com