IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WALLACE OENGA, GEORGENE SHUGLUK, LEROY OENGA, SR., MICHAEL DELIA, TONY DELIA, JOSEPH DELIA, JENNIE MILLER, and TRINITY DELIA, | ) | |
| Plaintiffs, | ) | Case No. 06-491 L<br>(ECF No. 1-06-cv-00491-EJD)<br>Chief Judge Edward J. Damich |
| vs. | ) | |
| THE UNITED STATES, | ) | |
| Defendant, and | ) | |
| BP EXPLORATION (ALASKA) INC., CONOCOPHILLIPS ALASKA, INC., EXXONMOBIL ALASKA PRODUCTION INC., CHEVRON U.S.A. INC., and FOREST OIL CORPORATION, | ) | |
| Intervenor-Defendants, and | ) | |
| KUUKPIK CORPORATION, | ) | |
| Intervenor-Defendant. | ) | |

**MEMORANDUM OF INTERVENOR-DEFENDANTS ("INTERVENORS") (1) IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (CLAIMS 1, 2, and 3 OF PLAINTIFFS' SECOND AMENDED COMPLAINT) AND (2) IN REPLY TO PLAINTIFFS' OPPOSITION TO INTERVENORS' MOTION FOR PARTIAL SUMMARY JUDGMENT (CLAIM 3 OF PLAINTIFFS' SECOND AMENDED COMPLAINT)**

# TABLES OF CONTENTS

## Table of Contents—Memorandum


| | Page |
|---|---|
| Table of Contents—Memorandum | i |
| Table of Contents—Appendix (Exhibits A through S) | iii |
| Table of Authorities Cited | v |
| Introduction To Opposition and Reply of Intervenors | 2 |
| Applicable Rules of the CFC | 3 |
| Additional Facts | 5 |
| Argument—Opposition To Plaintiffs' Motion For Partial Summary Judgment | 13 |
| 1. Intervenors join in the Opposition of the United States to Plaintiffs' Motion for Partial Summary Judgment respecting Claims 1, 2, and 3 of their Second Amended Complaint. | 13 |
| 2. None of 30 U.S.C. § 226(m), 42 U.S.C. § 6506a(j)(5), or any similar provisions of state law pursuant to which apportionment of production or royalty can be made applies to any of the rights of the Oenga heirs under the Oenga Lease. | 14 |
| 3. The legal bases for (a) the amounts paid under the Facility Sharing Agreement for access to the facilities constructed by BP on the Oenga Lease and (b) the overriding royalties paid and to be paid to Kuukpik Corporation on production from or allocated to Arctic Slope Regional Corporation under the Colville River Unit Agreement are so dissimilar from the circumstances respecting the Oenga Lease as to disqualify both from use as "comparables" for any purpose related to the Oenga Lease. | 15 |
| 4. The possessory rights granted to BP under the Oenga Lease were exclusive. The option granted to BP to expand from time to time the amount of land included in the Oenga Lease was exclusive, was irrevocable, and was exercisable when it was exercised by BP. The United States thus was not obligated (a) to breach the Oenga Lease | |

to prevent the exercise of such option, (b) to seek to renegotiate a partial relinquishment by BP of the Oenga Lease when contacted by another potential lessee, (c) to advise the Oenga heirs of such contact, or (d) to counsel the Oenga heirs to do (a) or (b) above. 19

Argument—Reply To Plaintiffs' Opposition To Intervenors' Motion For Partial Summary Judgment 21

1. Intervenors hereby include in their Reply the arguments set forth above in their Opposition To Plaintiffs' Motion for Partial Summary Judgment. 21

2. Notwithstanding the best efforts of the Oenga heirs to suggest ambiguity, the Oenga Lease that cannot be read, under the existing facts and applicable rules of law, in the manner they wish. 21

3. Neither the Facility Sharing Agreement nor the manner in which it was executed violates the Oenga Lease or 25 C.F.R. Part 162. 27

4. Heald Point is not a monopoly location. 29

Conclusion 30

**Table of Contents—Appendix (Exhibits A through S)**


| | | Page |
|---|---|---|
| Exhibit A: | Map of Prudhoe Bay Unit showing all participating areas and identifying area covered by maps attached as Exhibits B-1, B-2, B-3, B-4, and C [submitted as a separate PDF attachment] | 4 |
| Exhibit B-1: | Map of Heald Point area [submitted as a separate PDF attachment] | 5 |
| Exhibit B-2: | Map of Heald Point area showing Initial Niakuk Participating Area [submitted as a separate PDF attachment] | 6 |
| Exhibit B-3: | Map of Heald Point area showing Expanded Niakuk Participating Area and Initial West Niakuk Participating Area [submitted as a separate PDF attachment] | 7 |
| Exhibit B-4: | Map of Heald Point area showing Combined Niakuk Participating Area and Raven Participating Area [submitted as a separate PDF attachment] | 8 |
| Exhibit C: | Map showing wells drilled from Heald Point [submitted as a separate PDF attachment] | 9 |
| Exhibit D: | BLM Rectangular Survey of T11N R15E UM dated October 14, 1968 [submitted as a separate PDF attachment] | 10 |
| Exhibit E: | BLM Rectangular Survey of T12N R15E UM [situated immediately north of T11N R15E UM] dated October 14, 1968 [submitted as a separate PDF attachment] | 11 |
| Exhibit F: | BLM Rectangular Survey of T12N R15E UM dated November 18, 1996 [submitted as a separate PDF attachment] | 12 |
| Exhibit G | Entry for "Niakuk Islands" found in Geographic Names Information System maintained by U.S. Geological Survey <http://geonames.usgs.gov/pls/gnispublic/f?p=115:3:1690510353132399285::NO::P3_FID:1416433> | 13 |
| Exhibit H | DNR Decision dated September 2, 1988, certifying Niakuk No. 5 well as the well in which "commercial quantites" of oil in the Niakuk accumulation had first been discovered | 15 |
| Exhibit I | DNR Decision dated December 21, 2007, approving formation of Combined Niakuk Participating Area | 23 |

| | | |
|---|---|---|
| Exhibit J | DNR Decision dated December 21, 2007, approving formation of Raven Participating Area | 52 |
| Exhibit K | Letter dated August 26, 1988, from Glenn M. Feldman to Steven D. Taylor (BP) | 76 |
| Exhibit L | Internal BP Office Correspondence dated September 20, 1988, from Stu Hirsch (BP) to persons on distribution list (with handwritten note thereon from John A. Reeder (BP) dated September 22, 1988) | 78 |
| Exhibit M | Letter dated September 22, 1988, from Andrew Oenga to Cindy Bailey (BP) | 80 |
| Exhibit N | Letter dated September 23, 1988, from John A. Reeder (BP) to Glenn M. Feldman | 82 |
| Exhibit O | Letter dated September 26, 1988, from Glenn M. Feldman to John A. Reeder (BP) | 84 |
| Exhibit P | Internal BP Office Correspondence dated September 27, 1988, from T. J. Obeney (BP) to J. W. Buckee | 87 |
| Exhibit Q | Internal BP Office Correspondence dated September 27, 1988, from Cindy Bailey (BP) to John Reeder | 91 |
| Exhibit R | Internal BP Office Correspondence dated November 15, 1988, from T. J. Obeney (BP) to J. W. Buckee (with handwritten notes thereon made by J. W. Buckee) | 93 |
| Exhibit S | Internal BP Office Correspondence dated November 28, 1988, from Stu Hirsch (BP) to persons on distribution list | 95 |

## Table of Authorities Cited


| | Page |
|---|---|
| **Federal Cases:** | |
| Leisnoi, Inc. v. Stratman, 154 F.3d 1062 (9th Cir. 1998) | 17 |
| NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159-60 (Fed. Cir. 2004) | 25 |
| **Federal Statutes:** | |
| 30 U.S.C. § 226(m) | 14 |
| 42 U.S.C. § 6502 | 16 |
| 42 U.S.C. § 6506a(j)(5) | 14 |
| Alaska Native Claims Settlement Act ("ANCSA") § 7, 43 U.S.C. § 1606 | 17 |
| ANCSA § 8, 43 U.S.C. § 1607 | 16 |
| ANCSA § 11(a), 43 U.S.C. § 1610(a) | 17 |
| ANCSA § 11(b)(1), 43 U.S.C. § 1610(b)(1) | 16 |
| ANCSA § 12, 43 U.S.C. § 1611 | 16 |
| ANCSA § 14, 43 U.S.C. § 1613 | 16 |
| ANCSA § 14(f), 43 U.S.C. § 1613(f) | 17, 18 |
| Alaska National Interest Lands Conservation Act (Act of December 2, 1980, Pub. L. No. 96-487, 94 Stat. 2371) ("ANILCA") | 18 |
| ANILCA § 1431, 94 Stat. 2533-2543 | 18 |
| ANILCA § 1431(o), 94 Stat. 2542-2543 | 18 |
| **Federal Rules:** | |
| 25 C.F.R. § 162.12 (1987) | 27 |
| 25 C.F.R. § 162.12 (1993) | 27, 28 |
| 25 C.F.R. § 162.610 (2007) | 27 |

**<u>Other Authorities</u>:**

RESTATEMENT (SECOND) OF PROPERTY: LANDLORD AND TENANT § 1.2 (1977) 19

RESTATEMENT (SECOND) OF PROPERTY: LANDLORD AND TENANT § 15.1 comment i (1977) 28

RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 1.2 comment d (2000) 22

Milton R. Friedman & Patrick A. Randolph, <u>Friedman on Leases</u> §§ 26:2 (text accompanying nn. 11-12) and 27:3.1 (text accompanying nn. 25 and 28) (5th ed. 2003) 22

Bruce M. Kramer & Patrick H. Martin, <u>Law of Pooling and Unitization</u> (3d ed. updated 2007) 14

Howard R. Williams & Charles J. Meyers, <u>Oil and Gas Law</u> (updated 2007) (revisions by Patrick H. Martin & Bruce M. Kramer) 14

Donald J. Orth, <u>Dictionary of Alaska Place Names</u> (U.S. Geological Survey Professional Paper 567) at 686 (G.P.O. 1967) (reprinted 1971) 11

<u>Law of Federal Oil and Gas Leases</u> ch. 16 (Rocky Mt. Min. L. Fndn.) (updated 2007) 14

## INTRODUCTION TO OPPOSITION AND REPLY OF INTERVENORS

Intervenor-Defendants (excluding Kuukpik Corporation), by and through their attorneys, Guess & Rudd P.C., hereby file this memorandum

(1) opposing Plaintiffs' Motion for Partial Summary Judgment [Docket entries (hereinafter "Docket" or "Dockets") 77, 78, 82, and 83] respecting Claims 1, 2, and 3 of Plaintiffs' Second Amended Complaint filed herein on July 17, 2007 [Docket 67] and

(2) replying to Plaintiffs' opposition [Dockets 77, 78, 82, and 83] to Intervenor-Defendants' motion for partial summary judgment [Docket 62] respecting Claim 3 of Plaintiffs' Second Amended Complaint filed herein on July 17, 2007 [Docket 67].

This combined Opposition and Reply is filed pursuant to RCFC 5.2(b)(2), RCFC 7.2, and RCFC 56(h)(2).

This case involves a Lease Agreement dated as of January 1, 1989, between Andrew Oenga (an Alaska Native who entered into said lease agreement with the approval of the Secretary of the Interior) and BP Exploration (Alaska) Inc. ("BP" or "Lessee"), as amended and supplemented as hereinafter described.

Plaintiffs' Motion for Partial Summary Judgment seeks to establish that their Claims 1, 2, and 3 are not barred by any applicable statute of limitations and that various provisions of

the law and the Oenga Lease provide one or more bases for an award of damages against the United States, subject to proof as to the amount sustained. Intervenor-Defendants ("Intervenors") both (1) join in the filing of the United States in Opposition to Plaintiffs' Motion and (2) offer additional argument herein on their own behalf and for the benefit of the court on several key points relating thereto.

As for Claim 3 of Plaintiffs' Second Amended Complaint in particular, Plaintiffs seek damages from the United States for the alleged failure by the United States to prevent Intervenors from using the leased premises for purposes allegedly beyond the scope of the grant made by the Oenga Lease. Intervenors moved for partial summary judgment on this claim, and Plaintiffs have opposed that motion. Because the undisputed material facts establish that the actions of Intervenors on the leased premises have been at all times within scope of the grant made by the Oenga Lease, Claim 3 fails as a matter of law.

## APPLICABLE RULES OF THE CFC

RCFC 56 ("Summary Judgment") provides, in relevant part, as follows:

> *(c) Motion and Proceedings Thereon.* The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.…
>
> …

> *(h) Procedures.* The following procedures shall be followed with respect to motions for summary judgment:
>
> (1) The moving or cross-moving party shall file, together with its motion, a separate document titled Proposed Findings of Uncontroverted Fact. This document shall contain concise, separately numbered paragraphs setting forth all of the material facts upon which the party bases its motion and as to which the party believes there is no genuine dispute. Each paragraph shall contain citations to the opposing party's pleadings or to documentary evidence, such as affidavits or exhibits, filed with the motion or otherwise part of the record in the case.
>
> (2) The opposing party shall file, together with its opposition, a response to the requested findings by indicating, immediately below each finding, whether it agrees or disagrees with the finding as stated. If the opposing party does not agree with the proposed finding, it shall note the basis for its objection and may draft a proposed revision of the finding directly below the challenged finding. The opposing party may also file proposed findings of uncontroverted fact as to any relevant matters not covered by the moving party's statement.…
>
> (3) … In determining any motion for summary judgment, the court will, absent persuasive reason to the contrary, deem the material facts claimed and adequately supported by the moving party to be established, except to the extent that such material facts are controverted by affidavit or other written or oral evidence.

RCFC 7.2 ("Cross Motions") provides, in relevant part, as follows:

> *(e) Cross-motions.* Where the responding party files a cross-motion, it shall be contained in the same document as the response to the original motion; the response to the cross-motion shall be contained in the same document as the reply, subject to the page limitations in RCFC 5.2(b)(2).

RCFC 5.2(b)(2) allows a combined opposition and reply brief to include up to 30 pages, exclusive tables and any appendix.

## ADDITIONAL FACTS

In addition to facts set forth in the original motion filed by the United States [Docket 42], facts set forth in the motion for partial summary judgment filed by Intervenors [Docket 62], and facts set forth in the opposition and reply of the United States that is being filed concurrently with the this opposition and reply of Intervenors, Intervenors submit the following additional documents and evidence to aid the court in ruling upon the pending motions and to clarify certain matters made cloudy by Plaintiffs.

First, Intervenors submit—as part of the Appendix attached hereto—the following maps (each of which is being filed with the court as a separate PDF attachment in order to preserve the quality and legibility of the information set forth thereon) to aid the court in interpreting the legal descriptions set forth in Intervenors' motion and generally to provide the court with graphic representations of the lands and area involved in this dispute and the improvements made by Intervenors on and in the vicinity of those lands:

| | |
|---|---|
| Exhibit A: | Map of Prudhoe Bay Unit showing all participating areas and identifying area covered by maps attached as Exhibits B-1, B-2, B-3, B-4, and C; |
| Exhibit B-1: | Map of Heald Point area; |
| Exhibit B-2: | Map of Heald Point area showing Initial Niakuk Participating Area ("PA"); |
| Exhibit B-3: | Map of Heald Point area showing Expanded Niakuk PA and Initial West Niakuk PA; |
| Exhibit B-4: | Map of Heald Point area showing Combined Niakuk PA and Raven PA; |

Exhibit C: Map showing wells drilled from Heald Point;

Exhibit D: BLM Rectangular Survey of T11N R15E UM dated October 14, 1968;

Exhibit E: BLM Rectangular Survey of T12N R15E UM [situated immediately north of T11N R15E UM] dated October 14, 1968;

Exhibit F: BLM Rectangular Survey of T12N R15E UM dated November 18, 1996.

What can be learned from or observed on each of these maps that is relevant to this case is the following:

**<u>Exhibit A</u>:** Map of Prudhoe Bay Unit showing all participating areas and identifying area covered by maps attached as Exhibits B-1, B-2, B-3, B-4, and C.

This map shows, *inter alia*, the full extent of the current Prudhoe Bay Unit Area and the numerous participating areas established for the various oil or gas accumulations discovered to date within the boundaries thereof, including both

(1) the Prudhoe Bay Permo-Triassic Reservoir (the largest oil field discovered to date in North America, which reservoir is included within both the Oil Rim PA and the Gas Cap PA) and

(2) the several satellite accumulations that, due to their proximity to the main Prudhoe Bay oil field, are being developed in conjunction therewith.

The area in which the Niakuk accumulation is known to exist is the area to the northeast that is the subject of maps attached as Exhibits B-1, B-2, B-3, B-4, and C.

**Exhibit B-1**: Map of Heald Point area.

This general location map shows, *inter alia*,

(1) Heald Point and the offshore island group known as the Niakuk Islands;

(2) the entire 40-acre portion of Heald Point that is included in the Native allotment parcel and now is subject to the Oenga Lease [see Docket 62-3 (Appendix, pp. 4-39 (Exhibits A, B, C, and D))]; and

(3) the area where the improved drill site (DSNK) ultimately would be constructed at the end of Heald Point after BP notified the BIA that it was exercising its exclusive option to lease a total of 20 acres of the subject parcel and was converting the Oenga Lease from a year-to-year tenancy to a long-term lease [see Docket 62-3 (Appendix, pp. 23-25 (Exhibit B))]; as shown on this map, drill site DSNK was constructed on fill placed partly on the lands subject to the Oenga Lease and party on state-owned tidelands and submerged lands (see also Exhibit F attached hereto).

**Exhibit B-2**: Map of Heald Point area showing Initial Niakuk PA.

This map shows the Initial Niakuk PA as established on March 2, 1994 [see Docket 62-6 (Appendix, pp. 104-124 (Exhibit L))]. The Niakuk accumulation was known as early as 1988 to contain commercial quantities, see Exhibit H attached hereto, but the Initial Niakuk PA was not established until March 2, 1994 [see Docket 62-6 (Appendix, pp. 104-124 (Exhibit L))]. The initial Niakuk PA thus was established

(1) more than five years after the effective date (January 1, 1989) of the Oenga Lease [see Docket 62-3 (Appendix, pp. 4-22 (Exhibit A))],

(2) more than seven months after BP notified the BIA that it was converting the Oenga Lease from a year-to-year tenancy to a long-term lease [see Docket 62-3 (Appendix, pp. 23-25 (Exhibit B))], as it was required to do under the terms of the Original 1989 Lease Agreement [see Docket 62-3 (Appendix, pp. 4-22 (Exhibit A), at pp. 5-6)], and was exercising its exclusive option to lease more of the subject parcel,

(3) two months after execution *by Plaintiffs* of the 1994 Lease Amendment pursuant to which, *inter alia*, BP exercised its option to lease all 40 acres of the subject parcel [see Docket 62-3 (Appendix, pp. 26-33 (Exhibit C))].

This map also shows, *inter alia*, that oil and gas leases ADL-028320 and ADL-034630—leases granted by the State of Alaska *to BP* to explore for and produce state-owned oil and gas not only from the lands subject to the Oenga Lease but also from adjoining lands—already had been included in their entirety in the Lisburne PA prior to the negotiation and granting of the Oenga Lease [see Docket 62-8 (Appendix, pp. 153-157 (Exhibit O))].

**Exhibit B-3:** Map of Heald Point area showing Expanded Niakuk PA and Initial West Niakuk PA.

This map shows, *inter alia*, (1) the boundaries of the Niakuk PA after it was expanded on November 17, 1997 [see Docket 62-7 (Appendix, pp. 125-143 (Exhibit M))] and (2) the boundaries of the West Niakuk PA as established on November 17, 1997 [see

Docket 62-7 (Appendix, pp. 125-143 (Exhibit M))]. At the time these actions were taken, it was not clear to any interested party whether a combined participating area or separating participating areas should be established for the "Greater Niakuk Area" or what the ultimate boundaries of any participating area(s) might be, so the actions taken by DNR were described as "interim" [see Docket 62-7 (Appendix, pp. 125-143 (Exhibit M))]. This map also shows the Lisburne PA.

**Exhibit B-4:** Map of Heald Point area showing Combined Niakuk PA and Raven PA. This map shows, *inter alia*, (1) the boundaries of the Combined Niakuk PA effective as of January 1, 2008 [see Exhibit I attached hereto] and (2) the boundaries of the Raven PA effective as of January 1, 2008 [see Exhibit J attached hereto]. As described in the DNR Decision establishing the Raven PA [Exhibit J attached hereto], the small Raven oil accumulation was discovered in some of the *same drill holes* in which the Niakuk accumulation was found but in older and deeper geologic formations (faulted portions of the same formations in which the nearby Prudhoe Bay Permo-Triassic Reservoir was found). Though the Raven accumulation has been known to exist in these drill holes since 1976, BP did not commence production of oil from this accumulation until 2005, and then it did so only through existing wells [see Docket 62-8 (Appendix, pp. 144-152 (Exhibit N))]. No additional wells have been drilled for the purpose of developing the Raven accumulation.

**<u>Exhibit C</u>:** Map showing wells drilled from Heald Point.

This map shows the wellbores of the wells drilled to date from drill site DSNK plus the one Niakuk well drilled from Lisburne pad DSL-5. (Lisburne development wells drilled from DSL-5 are not shown.)

**<u>Exhibit D</u>:** BLM Rectangular Survey of T11N R15E UM dated October 14, 1968.

This survey shows the southeastern portion of Prudhoe Bay and—in Sec. 1 of T11N R15E UM—the southern portion of Heald Point.

**<u>Exhibit E</u>:** BLM Rectangular Survey of T12N R15E UM [situated immediately north of T11N R15E UM] dated October 14, 1968.

This survey shows (1) the eastern portion of Prudhoe Bay and, to the north thereof, the Beaufort Sea, and (2) the designation of all uplands in said township (including but not limited to the northern portion of Heald Point in Sec. 36) as Tract A.

**<u>Exhibit F</u>:** BLM Rectangular Survey of T12N R15E UM dated November 18, 1996.

This survey shows (1) the eastern portion of Prudhoe Bay and, to the north thereof, the Beaufort Sea, and (2) the division and redesignation of Tract A of T12N R15E UM (as established on the BLM Rectangular Survey dated October 14, 1968 [<u>Exhibit E</u> attached hereto]) into the following:

(i) Tract B (comprising, as resurveyed, all 22.21 acres of the portion of Heald Point that is situated in Sec. 36 of T12N R15E UM)—which Tract B is the tract of lands (not including the oil and gas estate therein) that was conveyed to Plaintiffs pursuant to Native Allotment Certificate

No. 50-2005-0580, dated September 27, 2005 [see Docket 62-4 (Appendix, pp. 53-55 (Exhibit F))]; said Tract B does not include any of the adjoining tidelands and submerged lands owned by State of Alaska; and

(ii) Tract C (being the remainder of former Tract A and comprising the uplands known as Gull Island and the Niakuk Islands).

This survey also shows, in the vicinity of the northeastern tip of Tract B, the present location of the line of mean high tide *after* placement of fill on Tract B and on the state-owned tidelands and submerged lands adjoining Tract B during the construction of drill site DSNK.

It should be noted here that the word "Niakuk" was not created or used for the first time by the parties to the Oenga Lease. According to the Geographic Names Information System maintained by the U. S. Geological Survey within the Department of the Interior, the islands north and northwest of Heald Point have been known as the "Niakuk Islands" since at least 1949 and may have been known as the Niakuk Islands since before 1853. [See Exhibit G attached hereto; see also Donald J. Orth, Dictionary of Alaska Place Names (U.S. Geological Survey Professional Paper 567) at 686 (G.P.O. 1967) (reprinted 1971).]

Exhibits H, I, and J attached hereto already have been referred to above in connection with certain of the attached maps. Exhibits K, L, M, N, O, P, Q, R, and S are attached hereto for reasons unrelated to the maps. Exhibits K, L, M, N, O, P, Q, R, and S are submitted for the purpose of shedding light on facts and circumstances leading to the

execution of the Oenga Lease—facts and circumstances that Leroy Oenga, according to his Declaration [Docket 78-2, at pages 3-4], did not know or does not remember.

On August 26, 1988 (more than three months before the Original 1989 Lease Agreement was executed [see Docket 62-3 (Appendix, pp. 4-22 (Exhibit A))]), lawyer Glenn M. Feldman advised BP [Exhibit K attached hereto] that he had been retained by Andrew Oenga to represent him in connection with the negotiation of the Oenga Lease. According to Mr. Feldman (who had represented Andrew Oenga in prior trespass litigation relating to Andrew Oenga's *other* Native allotment parcel which had been settled [see Exhibit L attached hereto]), Mr. Feldman was contacted by both Andrew Oenga and Leroy Oenga via telephone and, after participating in a telephone conversation with them, believed that he had been so retained [see Exhibit O attached hereto]. Thereafter, upon the advice of in-house counsel John A. Reeder, BP ceased direct communication with Andrew Oenga and prepared for negotiations respecting the lease [see Exhibit L attached hereto]. Before those negotiations were held, however, Andrew Oenga advised BP in writing [Exhibit M attached hereto] on September 22, 1988, that Mr. Feldman did not represent him, that no lawyer had been engaged to represent him, and that he was comfortable continuing to work with his friend George Ahmaogak (Mayor of the North Slope Borough and the owner of a Native allotment parcel previously leased to ARCO Alaska, Inc.) in connection with negotiating the lease. BP immediately provided a copy of this letter to Mr. Feldman [see Exhibit N attached hereto], receipt of which was acknowledged by Mr. Feldman [see Exhibit O attached hereto].

Thereafter, Andrew Oenga (with the assistance of Leroy Oenga, George Ahmaogak, a representative from the BIA, and an interpreter) proceeded over the next couple months to negotiate the final terms of the Oenga Lease [see Exhibits P, Q, R, and S attached hereto]. Consistent with the BIA's directive to take the appraised rental value as a minimum, Andrew Oenga negotiated a significant ($25,000) signing bonus, which more than doubled the amount of money he received upon execution of the Original 1989 Lease Agreement.

The actions of taken by Andrew Oenga as described above are not the actions of someone who was unable to look out for his own interests. They are actions taken during arms'-length negotiations by a person who understood what he was doing and was ably advised by several individuals, including a representative of the BIA and one of the Plaintiffs.

## ARGUMENT—OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

### 1. Intervenors join in the Opposition of the United States to Plaintiffs' Motion for Partial Summary Judgment respecting Claims 1, 2, and 3 of their Second Amended Complaint.

The United States is primarily concerned with the particular matters and points on which Plaintiffs have sought partial summary judgment respecting Claims 1, 2, and 3 of their Second Amended Complaint. Except as set out below, Intervenors have not separately briefed these matters but instead join in the filings of the United States in opposition to said motion.

**2. None of 30 U.S.C. § 226(m), 42 U.S.C. § 6506a(j)(5), or any similar provisions of state law pursuant to which apportionment of production or royalty can be made applies to any of the rights of the Oenga heirs.**

The cited provisions, along with similar provisions enacted by the various oil and gas producing states, all have been enacted to protect the correlative rights of *mineralowners* or their *lessees* who, due to federal or state conservation rules or orders (e.g., requirements relating to well spacing, the formation of drilling units, etc.), are legally unable to undertake development of their own oil and gas and thus risk having their oil and gas drained by the actions of their neighboring mineralowners or lessees under the Rule of Capture. *See generally* Law of Federal Oil and Gas Leases ch. 16 (Rocky Mt. Min. L. Fndn.) (updated 2007); Bruce M. Kramer & Patrick H. Martin, Law of Pooling and Unitization (3d ed. updated 2007); Howard R. Williams & Charles J. Meyers, Oil and Gas Law (updated 2007) (with revisions by Patrick H. Martin & Bruce M. Kramer).

Andrew Oenga never owned any interest in oil or gas, and the Oenga heirs do not own any interest in oil or gas now, as mineralowner, as lessee, or in any other capacity. These laws thus provide no basis whatsoever for arguing that the United States owes any duty to Andrew Oenga or to the Oenga heirs that has gone unsatisfied. If the Oenga heirs independently owned or had acquired a royalty interest or overriding royalty interest, then laws such as these would provide them with some tools with which they could try to protect themselves from unreasonable drainage by their neighbors. But that is not the case here and therefore these laws simply do not apply.

**3. The legal bases for (a) the amounts paid under the Facility Sharing Agreement for access to the facilities constructed by BP on the Oenga Lease and (b) the overriding royalties paid and to be paid to Kuukpik Corporation on production from or allocated to Arctic Slope Regional Corporation under the Colville River Unit Agreement are so dissimilar from the circumstances respecting the Oenga Lease as to disqualify both from use as "comparables" for any purpose related to the Oenga Lease.**

(a) Facility Sharing Agreement. The consideration set forth behind the redaction in Section 1.0 of the Facility Sharing Agreement [Docket 62-5 (Appendix, pp. 83-88 (Exhibit J))] was paid for "access to the BPX Heald Point initial and permanent facilities". This means that said consideration was paid for access to the following:

(1) to drill site DSNK *as constructed by BP* on both the leased premises and state-owned tidelands and submerged lands,

(2) to the production facilities *constructed by BP* thereon, and

(3) to the pipelines *constructed by BP* to transport crude oil from drill site DSNK to the Lisburne processing center (then operated by ARCO, to which *BP* similarly was required to pay for access) [see Docket 62-7 (Appendix, pp. 125-143 (Exhibit M), at p. 133 (last paragraph))].

The consideration paid pursuant to Section 1.0 of the Facility Sharing Agreement was not paid for access to any unimproved land subject to the Oenga Lease. Meanwhile, the Oenga heirs are entitled to rental on the leased premises *only* as raw, unimproved, vacant land [Docket 62-3 (Appendix, pp. 4-22 (Exhibit A), at p. 9 (Section 9))]. The cost paid by ARCO and Exxon *for access to BP's facilities* on these lands thus is legally irrelevant to

the Oenga heirs, not a proper comparable, and certainly not an example from which one could infer a duty to seek a form of production-based consideration for the Oenga heirs.

(b) Kuukpik. The laws, administrative materials, conveyances, and agreements pertaining to lands in the Colville Delta in the vicinity of the village of Nuiqsut fill several boxes and easily could be the subject of a long fascinating law review article. Such an article need not be written to establish the legal irrelevance of the Kuukpik situation to this case, however. Here is the story, in a nutshell and without resort to any confidential materials (though counsel for Plaintiffs or Intervenors can provide such confidential materials to the court under seal if that is desired).

Kuukpik Corporation ("Kuukpik") is the Native village corporation for the Native village of Nuiqsut. See Alaska Native Claims Settlement Act ("ANCSA") §§ 8, 11(b)(1), 43 U.S.C. §§ 1607, 1610(b)(1) (Nuiqsut is spelled "Nooiksut" in § 11(b)(1)). Nuiqsut is situated just west of the Colville River in T10N R4E UM and T10N R5E UM, within the National Petroleum Reserve-Alaska ("NPRA"). See 42 U.S.C. § 6502. Kuukpik has selected (see ANCSA § 12, 43 U.S.C. § 1611) and received conveyance of (see ANCSA § 14, 43 U.S.C. § 1613) the *surface estate* in and to *tens of thousands of contiguous acres* of land in the vicinity of Nuiqsut. Some of this land is situated outside of NPRA; some of this land is situated inside NPRA. In all cases, however, the subsurface estate in, to, and under said lands originally was excepted and reserved to the United States. ANCSA § 14, 43 U.S.C. § 1613.

As to those Kuukpik lands situated outside of NPRA, Arctic Slope Regional Corporation ("ASRC") (the Native regional corporation for the North Slope of Alaska; see ANCSA § 7, 43 U.S.C. § 1606) automatically received conveyance of the reserved subsurface estate in, to, and under said lands pursuant to ANCSA § 14(f), 43 U.S.C. § 1613(f). As a general rule, severed mineral estates such as subsurface estates under ANCSA are dominant. But section 14(f), 43 U.S.C. § 1613(f), provides in relevant part that

> the right to explore, develop, or remove minerals from the subsurface estate in the lands within the boundaries of any Native village shall be subject to the consent of the Village Corporation.

For many years it was unclear what Congress intended by the phrase "within the boundaries of any Native village": Did it mean only the actually occupied village site, all lands in the township in which the village is situated, or all lands acquired by the village corporation within the 25-township withdrawal made by ANCSA § 11(a), 43 U.S.C. § 1610(a)? This ambiguity finally was resolved in Leisnoi, Inc. v. Stratman, 154 F.3d 1062 (9th Cir. 1998) (observing that ANCSA distinguishes between lands "patent[ed] to a Village Corporation" and lands "within the boundaries of any Native village" and holding that test should be whether there is physical evidence of occupancy). Before the Ninth Circuit resolved this issue, village corporations and regional corporations sometimes had to negotiate a resolution, especially if the regional corporation wanted to enter into mining or oil and gas leases respecting its subsurface estate in the vicinity of the village. This legal uncertainty was one of the factors that led to the acquisition by Kuukpik prior to 1998 of overriding royalty interests on *thousands of acres* of lands outside of NPRA.

No such uncertainty exists in the case of the 40 acres of land subject to the Oenga Lease, however, and of course the Oenga Lease involves only 40 acres.

As for those Kuukpik lands situated inside NPRA, nothing was automatic for ASRC. First, under ANCSA § 14(f), 43 U.S.C. § 1613(f), no subsurface estate was conveyed to ASRC underlying surface estate conveyed to Kuukpik inside NPRA. Instead, ASRC received "in lieu rights" to select the subsurface estate in other lands outside of NPRA. But this was not satisfactory to ASRC and so it negotiated an agreement with the Secretary of the Interior in 1979 that was approved by Congress when it enacted the Alaska National Interest Lands Conservation Act (Act of December 2, 1980, Pub. L. No. 96-487, 94 Stat. 2371) ("ANILCA"). See ANILCA § 1431, 94 Stat. 2533-2543. This section directed or authorized many land exchanges between the United States and ASRC. One of those exchanges, authorized under ANILCA § 1431(o), 94 Stat. 2542-2543, called for the relinquishment by ASRC of "in lieu" subsurface estate in exchange for the subsurface estate that it would have received under section 14(f) of ANCSA in the vicinity of Nuiqsut but for the fact that the affected lands were inside NPRA. There was one catch, however: In order to complete this exchange, ASRC was required by section 1431(o) to "obtain the concurrence of [Kuukpik]".

The requirement to obtain Kuukpik's concurrence effectively reversed the normal dominant/servient relationship between ANCSA subsurface estate and ANCSA surface estate, and this reversal allowed Kuukpik ultimately to obtain overriding royalties on thousands of acres of subsurface estate inside NPRA, too.

Almost all of Kuukpik's resulting overriding royalties are described in the most current Exhibit A to the Colville River Unit Agreement, a copy of which was filed herein as the Appendix to Intervenors' Opposition to Plaintiffs' Motion To Compel [Docket 52-2 (Appendix)]. None of these overriding royalty interests arose under legal circumstances even remotely similar to those relating to the lands subject to the Oenga Lease. In the Kuukpik case it owns *tens of thousands of contiguous acres of surface estate*, with respect to some of which the surface estate is effectively the dominant estate and with respect to the rest of which it was uncertain until 1998 the extent to which it might be the dominant estate. None of this was or is similar to the factual and legal circumstances pertaining to the lands subject to the Oenga Lease, and thus none of the Kuukpik overriding royalties provides a proper comparable, especially not one sufficient to create a duty on the part of the Secretary to seek a form of production-based consideration for the Oenga heirs.

**4. The possessory rights granted to BP under the Oenga Lease were exclusive. The option granted to BP to expand from time to time the amount of land included in the Oenga Lease was exclusive, was irrevocable, and was exercisable when it was exercised by BP. The United States thus was not obligated (a) to breach the Oenga Lease to prevent the exercise of such option, (b) to seek to renegotiate a partial relinquishment by BP of the Oenga Lease when contacted by another potential lessee, (c) to advise the Oenga heirs of such contact, or (d) to counsel the Oenga heirs to do (a) or (b) above.**

In these matters there is no uncertainty. The possessory rights granted to BP under the Oenga Lease were exclusive [Docket 62-3 (Appendix, pp. 4-22 (Exhibit A), at p. 10 (Section 11))]. See RESTATEMENT (SECOND) OF PROPERTY: LANDLORD AND TENANT § 1.2 (1977) (a lease transfers "possession" from lessor to lessee, so that lessee becomes

seized of the estate in land held by lessor, for the term of the lease). Andrew Oenga excepted and reserved nothing out of the rights granted by the Oenga Lease except (1) a limited right of inspection (Section 25 of Oenga Lease) and (2) a limited right of access across the leased premises (Section 26 of Oenga Lease). Subject to those two limited rights, possession of the entire estate held by Andrew Oenga in the leased premises was granted and remains granted to BP by the Oenga Lease. To grant anything less would effect a reduction in the fair rental value.

Likewise, the option granted to BP to expand from time to time the amount of land included in the Oenga Lease was exclusive and was exercisable any time during the term of the Lease [Docket 62-3 (Appendix, pp. 4-22 (Exhibit A), at p. 10 (Section 11))]. Nothing could prevent BP from exercising said option either in July 1993 (when said exercise doubled the amount of land being leased) or in January 1994 (when said exercise again doubled the amount of land being leased so as to include all of the subject parcel, and when the Oenga heirs expressly consented to the provision of the 1994 Lease Amendment authorizing facility sharing agreements without notice to or the consent of the Secretary or anyone else). Thus, during the very period when the Oenga heirs allege that they could have sought relinquishment by BP of a portion of the Oenga Lease so as to lease it to another, BP properly exercised its right to lease *the entire premises*, effectively *quadrupled*—in less than six months—the amount being paid to the Oenga heirs, and seriously constrained its own ability to terminate the Oenga Lease in the future. In 1993-94, the Oenga Lease worked exactly as it was supposed to work. Yet the Oenga

heirs now argue that, somewhere in this increasingly lucrative period for the Oenga heirs, the United States failed to satisfy its obligations to the Oenga heirs. Such an argument cannot stand.

## ARGUMENT—REPLY TO PLAINTIFFS' OPPOSITION TO INTERVENORS' MOTION FOR PARTIAL SUMMARY JUDGMENT

### 1. Intervenors hereby include in their Reply the arguments set forth above in their Opposition To Plaintiffs' Motion for Partial Summary Judgment.

For purposes of the Reply portion of this memorandum, Intervenors hereby incorporate by reference the arguments set out above in the Opposition portion of this memorandum, insofar as said arguments (a) counter arguments made by the Oenga heirs in opposition to Intervenors' Motion for Partial Summary Judgment respecting Claim 3 of Plaintiffs' Second Amended Complaint or (b) rebut any suggestion by the Oenga heirs that a genuine issue of material fact exists so as to prevent the court from granting Intervenors' Motion for Partial Summary Judgment respecting Claim 3.

### 2. Notwithstanding the best efforts of the Oenga heirs to suggest ambiguity, the Oenga Lease that cannot be read, under the existing facts and applicable rules of law, in the manner they wish.

The Oenga heirs try to build a façade of certainty respecting the use in the Oenga Lease of the word "Niakuk" in a variety of places and ways (e.g., in "Niakuk Project"), all while ignoring the key facts in existence (or *not* in existence) at various times that shed real light on what the parties meant or did not mean when they used that word.

First, it is important to know that the word "Niakuk" has been used on the North Slope of Alaska since at least 1949 and perhaps as early as the early 19th Century to describe the

area and islands in the vicinity of Heald Point [see Exhibit G attached hereto]. Use of the word "Niakuk" by the parties to the Oenga Lease to describe generally the offshore project envisioned from time to time by BP for the area north of Heald Point thus would be logical, in the same way that other projects on the North Slope have been given names tied to nearby places early in the life of those projects (e.g., from east to west, Duck Island, Prudhoe Bay, Point McIntyre, Kuparuk River, Milne Point, and Colville River). Use of such place names to distinguish one project from another is commonplace in the natural resources industries, but such use *by itself* in no case confines—or could reasonably be construed by anyone, *absent more detailed information*, to confine—either (1) the areal extent of any such named project to only the land or geographic feature that is so named or (2) in the case of underground oil, gas, or other mineral deposits, the vertical or underground extent of any such project. This is especially true in circumstances where the very nature and scope of the project is constantly changing as time passes, as new information develops, and as technology changes.

When parties to a real estate lease reduce the terms of their agreement to writing, if they wish to impose limits on the grant of particular real estate or to reserve or except particular rights with respect to particular real estate, they must do so expressly and with clarity. RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 1.2 comment d (2000) (last three sentences); *accord*, Milton R. Friedman & Patrick A. Randolph, Friedman on Leases §§ 26:2 (text accompanying nn. 11-12) and 27:3.1 (text accompanying nn. 25 and 28) (5th ed. 2003). No attempt was made in the Oenga Lease to do that.

Indeed, it is not surprising either (1) that neither Andrew Oenga nor his heirs attempted to restrict or confine the exercise of rights granted under the Oenga Lease to particular accumulations or (2) that BP did not agree to any such restriction, as knowledge respecting the various accumulations known to exist in the vicinity of Heald Point and the Niakuk Islands and how those accumulations might be developed was in a constant state of flux in 1988. The Lisburne accumulation, the Niakuk accumulation, and the Raven accumulation all were known to exist prior to the execution of the Oenga Lease effective January 1, 1989, [see Docket 62-6 (Appendix, pp. 104-124 (Exhibit L) (Niakuk); Docket 62-7 (Appendix, pp. 125-143 (Exhibit M) (Niakuk and West Niakuk)); Docket 62-8 (Appendix, pp. 153-157 (Exhibit O) (Lisburne)); Exhibits H, I, and J attached hereto (Niakuk, Combined Niakuk, and Raven)] but the full nature and extent of none of them was known to anyone at that time due to the limited exploration that had occurred. As a result, none of these accumulations could or would have been narrowly defined in or made the subject of an express limitation in the Oenga Lease because it simply could not then be done. In addition, both parties knew that the manner in which any or these accumulations would be further explored or developed remained subject to change, depending on permitting constraints, technological advancements, and market conditions, and so they structured the initial years of the Oenga Lease in such a manner as would accommodate these variables [Docket 62-3 (Appendix, pp. 4-22 (Exhibit A), at pp. 5-6)]. Finally, it would have made no sense to Andrew Oenga or the Oenga heirs to limit the grant to any particular accumulation, for that necessarily would decrease the

value of the leased premises to BP and accordingly would have decreased the rent payable to Andrew Oenga and to the Oenga heirs.

The constantly changing knowledge respecting the various accumulations of oil and gas in the vicinity of Heald Point and the Niakuk Islands is perhaps best demonstrated in this case in connection with the Niakuk accumulation. Just recently the State of Alaska, acting through its Commissioner of the Department of Natural Resources ("DNR"), established a single participating area—the Combined Niakuk Participating Area—for the purpose of developing the oil and gas accumulation previously embraced within the former Niakuk PA and the former West Niakuk PA [Exhibit I attached hereto]. This constitutes the *second expansion* of the initial Niakuk PA (the first expansion having occurred in 1997 when the West Niakuk PA also was established on an interim basis). Given that the Initial Niakuk Participating Area was not even formally established until

(1) more than five years after the effective date (January 1, 1989) of the Oenga Lease [see Docket 62-3 (Appendix, pp. 4-22 (Exhibit A))],

(2) more than seven months after BP notified the BIA that it was exercising its exclusive option to lease more of the subject parcel and was converting the Oenga Lease from a year-to-year tenancy to a long-term lease [see Docket 62-3 (Appendix, pp. 23-25 (Exhibit B))], as it was required to do under the terms of the Original 1989 Lease Agreement [see Docket 62-3 (Appendix, pp. 4-22 (Exhibit A))], and

(3) two months after execution *by the Oenga heirs* of the 1994 Lease Amendment pursuant to which, inter alia, BP exercised its option to lease all 40 acres of the subject parcel [see Docket 62-3 (Appendix, pp. 26-33 (Exhibit C))],

the Oenga Lease simply cannot be read as allowing use of the leased premises in connection with the yet-to-be-established initial Niakuk PA but not in connection with any an expansions thereof or any additional participating areas. There was and is nothing in the Oenga Lease to support such a reading, especially when (1) the real purpose for including a reference to the "Niakuk Project" in the Original 1989 Lease Agreement was not to refer to any particular accumulation but instead to describe when BP must convert the Oenga Lease from a year-to-year tenancy to a long-term lease [see Docket 62-3 (Appendix, pp. 4-22 (Exhibit A) at pp. 5-6)] and (2) the only purposes of BP's unrecorded letter of July 29, 1993, to the Bureau of Indian Affairs [see Docket 62-3 (Appendix, pp. 23-25 (Exhibit B))] were to notify the BIA that BP was doing just that and, in addition, was exercising its exclusive option to lease more of the subject parcel. Reading the Oenga Lease in this way gives meaning to all of its parts and amendments without reading more into it than the facts suggest or the applicable rules of law allow, and thus this is the manner in which it should be read. NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159-60 (Fed. Cir. 2004) ("[w]hen interpreting the contract, the document must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts").

In addition, insofar as the Lisburne accumulation or any other oil or gas underlies the lands subject to the Oenga Lease, it must be remembered that this was expressly excepted and excluded from the conveyance made by Native Allotment Certificate No. 50-2005-0580 dated September 27, 2005 [see Docket 62-4 (Appendix, pp. 53-55 (Exhibit F))]. The Oenga heirs own no oil or gas under their allotment—said oil and gas is owned by the State of Alaska subject to oil and gas leases ADL-028320 and ADL-034630—and all of the oil and gas situated to the north under the Niakuk Islands or under the beds of Prudhoe Bay and the nearby Beaufort Sea likewise is owned by the State of Alaska subject to various oil and gas leases. *The Oenga heirs have no interest in or rights to any oil or gas situated anywhere*. Under these circumstances, and given the broad language of Sections 10 and 11 of the Oenga Lease, it makes absolutely no sense to infer that the parties granted rights to develop accumulations north of Heald Point but not the accumulation known to exist directly underneath and in the immediate vicinity of the allotment.

Finally—yet again demonstrating the ever-changing amount of knowledge respecting the various accumulations of oil and gas in the vicinity of Heald Point and the Niakuk Islands—the State of Alaska, acting through its Commissioner of DNR, also recently established the Raven Participating Area for the Raven accumulation situated wholly within the area of the Combined Niakuk Participating Area but within separate deeper geologic formations [Exhibit J attached hereto]. This accumulation, *known to exist since 1978*, now is being produced for the first time through existing wells previously drilled

through the Niakuk accumulation. The Oenga Lease—containing no express reservations, exceptions, or limitations except those set forth in Sections 25 and 26—simply cannot be construed as limiting use of the leased premises to production from only the first horizon to be produced and not from any other horizons encountered in otherwise authorized wells. Pursuant to the Oenga Lease, Lessor granted to BP the right to occupy and use the leased premises for any and all purposes related to the development and production of oil and gas, *without limiting such right to certain particular tracts, areas, reservoirs*. BPX's use and occupancy of the leased premises thus has been at all times authorized by and within the scope of the grant made by the Oenga Lease.

**3. Neither the Facility Sharing Agreement nor the manner in which it was executed violates the Oenga Lease or 25 C.F.R. Part 162.**

Prior 25 C.F.R § 162.12 (1987), prior 25 C.F.R § 162.12 (1993), and current 25 C.F.R § 162.610 (2007) all state in relevant part as follows [emphasis added]:

> Subleases and assignments.
>
> (a) *Except as provided in paragraphs (b), (c), and (d) of this sectio*n, a sublease, assignment, amendment or encumbrance of any lease or permit issued under this part may be made *only with the approval of the Secretary and the written consent of all parties* to such lease or permit, including the surety or sureties.
>
> (b) *With the consent of the Secretary*, the lease may contain a provision authorizing the lessee to *sublease the premises, in whole or in part, without further approval*. Subleases so made shall not serve to relieve the sublessor from any liability nor diminish any supervisory authority of the Secretary provided for under the approved lease.

The 1994 Lease Amendment [see Docket 62-3 (Appendix, pp. 26-33 (Exhibit C))] to the Oenga Lease was made in complete conformance and compliance with 25 C.F.R § 162.12(a) (1993) (requiring approval of the Secretary and the written consent of all parties to such lease). The amendment to Section 13 made by the 1994 Lease Amendment thus was made in accordance with 25 C.F.R § 162.12(b) (1993) (requiring consent of the Secretary to include such a provision).

More importantly, the amendment to Section 13 excluding facility sharing agreements from the notice requirement otherwise applicable thereunder to subleases does not transform facility sharing agreements into new "assignments" for which notice and consent is required once again under 25 C.F.R § 162.12(a) (1993) because both assignments and subleases involve one thing that facility sharing agreements do not: a transfer of possessory rights. RESTATEMENT (SECOND) OF PROPERTY: LANDLORD AND TENANT § 15.1 comment i (1977) (transfer by tenant of *entire interest* in leased premises with no reversionary interest is an "assignment"; transfer of all or portion of leased premises for *less than the remaining term* is a "sublease"). The amendment to Section 13 excluding facility sharing agreements from the notice requirement applicable to subleases thus does not violate or effect an end-run around 25 C.F.R § 162.12 (1993) or the spirit thereof. Not requiring notice of the execution of the Facility Sharing Agreement—a type of agreement that does not "convey an interest in real property" and is thus "less" than either an assignment or a sublease—does not violate 25 C.F.R § 162.12 (1993) or Section 13 (as amended) of the Oenga Lease. By the 1994 Lease Amendment, Plaintiffs

expressly consented in advance to the execution of agreements such as the Facility Sharing Agreement and were not affected in any way afterwards by having done so because BP remained in full legal "possession" of the leased premises at all times and thus fully obligated and liable in all respects under the Oenga Lease.

**4. Heald Point is not a monopoly location.**

Finally, Plaintiffs claim that the Oenga allotment is so "unique" as to be a "monopoly location". This simply is not true. BP's oil and gas leases entitled it, and still entitle it, to use the seabed under Prudhoe Bay and the Beaufort Sea. There can be no doubt that the oil industry knows how to build offshore islands, to install offshore platforms, to build subsea pipelines, etc. It simply is a question of whether the particular project at hand can be permitted and can cover the costs involved.

Here, if in 1988 Andrew Oenga had demanded an overriding royalty, or if the Secretary had demanded an overriding royalty for him, the parties simply may not have reached agreement. If so, then Andrew Oenga and the Plaintiffs might have received nothing from BP over the next 20 years and BP would have had to consider other alternatives. Indeed, perhaps no project would have been built and BP's oil and gas leases outside of the Lisburne PA might have expired. Or market circumstances might have changed so as to allow the offshore accumulations to be developed profitably using offshore facilities. Or technological advances in horizontal drilling might have occurred that would allow development to have occurred from *other* onshore locations.

But none of that occurred. Instead, the parties reached a proper, legal, arms'-length agreement that provided significant immediate monies to Andrew Oenga and flexibility and certainty for both parties over the long term. Oenga's heirs now wish that agreement said something other than what it says. This court cannot grant them the relief they seek.

## CONCLUSION

For the reasons set forth in the original motion filed by the United States [Docket 42], the reasons set forth in the motion for partial summary judgment filed by Intervenors [Docket 62], the reasons set forth in the opposition and reply of the United States that is being filed concurrently with the this opposition and reply of Intervenors, and the reasons set forth in this opposition and reply of Intervenors, the motions of the United States and Intervenors should be granted and the motion of Plaintiffs should be denied.

RESPECTFULLY SUBMITTED this 15th day of February, 2008.

*s/ Joseph J. Perkins, Jr.*
JOSEPH J. PERKINS, JR.
Guess & Rudd P.C.
510 L Street, Suite 700
Anchorage, Alaska 99501
Telephone: 907-793-2200
Fax: 907-793-2299
jperkins@guessrudd.com
Attorney for Intervenor-Defendants

CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of February, 2008, a true and correct copy of the foregoing Memorandum and accompanying Appendix were sent electronically to the following counsel of record:

| | |
|---|---|
| James M. Upton<br>Attorney for Defendant United States<br>U.S. Department of Justice<br>Env't & Natural Resources Div.<br>Natural Resources Section<br>P.O. Box 663<br>Washington, D.C. 20044-0663<br>Tel: 202-305-0482<br>Fax: 202-305-0506<br>E-mail: james.upton@usdoj.gov | Raymond C. Givens<br>Attorney for Plaintiffs<br>Givens Law Firm<br>1309 114th Ave. S.E., Suite 211<br>Bellevue, WA 98004<br>Tel: 425-641-5949<br>Fax: 425-614-0158<br>E-mail: raygivens@givenslaw.com |

*s/ Joseph J. Perkins, Jr.*
JOSEPH J. PERKINS, JR.