**EXHIBIT G**

Entry for "Niakuk Islands" found in Geographic Names Information System maintained by U.S. Geological Survey

<http://geonames.usgs.gov/pls/gnispublic/f?p=115:3:1690510353132399285::NO::P3_FID:1416433>

USGS
Geographic Names Information System (GNIS)

Stop! Do not bookmark or copy/paste this URL before reading FAQs.

Query Result FAQs

## Feature Detail Report

| | |
|---|---|
| Feature ID: | 1416433 |
| Name: | Niakuk Islands |
| Class: | Island |
| Size: | 1.2 mi. long |
| History: | Eskimo name meaning "head" (neaqoq); reported by USC&GS in 1949. This name may be the same as that reported by Surgeon John Simpson on his 1853 native map as Niako. See Niako I. |
| Description: | off-shore group, extends W of Heald Point, at mouth of Prudhoe Bay, on Beaufort Sea coast, 23 mi. SE of Beechey Point, Arctic Plain. |
| Citation: | Collected during Phase I data compilation (1976-1981), primarily from U.S. Geological Survey 1:24,000-scale topographic maps (or 1:25K, Puerto Rico 1:20K), various edition dates, and from U.S. Board on Geographic Names files. |
| Entry Date: | 31-Mar-1981 |
| Elevation(ft/m)*: | 0/0 |

Mapping Services

Click the link to display the feature in U.S. mapping services.

- USGS The National Map
- HomeTownLocator
- TopoZone.com
- GNIS in Google Map
- Microsoft Virtual Earth
- TerraFly.com
- TerraServer DOQ
- TerraServer DRG
- Find the Watershed
- MapQuest
- Yahoo! Local Maps
- Expedia

## Counties

| Sequence | County | Code | State | Code | Country |
|---|---|---|---|---|---|
| 1 | North Slope | 185 | Alaska | 02 | US |

## Coordinates (One point per USGS topographic map containing the feature, NAD83)

| Sequence | Latitude(DEC) | Longitude(DEC) | Latitude(DMS) | Longitude(DMS) | Map Name |
|---|---|---|---|---|---|
| 1 | 70.3566667 | -148.2386111 | 702124N | 1481419W | Beechey Point B-3 |

U.S. Department of the Interior || U.S. Geological Survey
12201 Sunrise Valley Drive, Reston, VA 20192, USA
gnis_manager@usgs.gov
Form updated: January 31, 2008
USGS Privacy Policy and Disclaimers

# EXHIBIT H

DNR Decision dated September 2, 1988, certifying Niakuk No. 5 well as the well in which "commercial quantites" of oil in the Niakuk accumulation had first been discovered

STATE OF ALASKA

STEVE COWPER, GOVERNOR

DEPARTMENT OF NATURAL RESOURCES

DIVISION OF OIL AND GAS

PO BOX 7034
ANCHORAGE, ALASKA 99510-7034

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

September 2, 1988

DECISION

Standard Alaska Production Company :
P.O. Box 196612 : Oil and Gas Lease ADL 34635
Anchorage, Alaska 99510-6612 : Niakuk 34635 No. 5

NIAKUK 34635 NO. 5 CERTIFIED AS DISCOVERY WELL

ADL 34635 CONDITIONALLY GRANTED FIVE PERCENT DISCOVERY ROYALTY

The Division of Oil and Gas ("division") hereby conditionally grants the reduction of the royalty rate from twelve and one half percent (12 1/2%) to the discovery rate of five percent (5%) for all production allocated to ADL 34535 for the period April 1, 1985 through March 31, 1995. This grant of royalty reduction is based on the certification of Standard Alaska Production Company's ("SAPC")[1] Niakuk 34635 No. 5 ("Niakuk No. 5") well as the discovery well for the Niakuk hydrocarbon structure.

The lease has been allocated a portion of the production from the Lisburne Participating Area within the Prudhoe Bay Unit since December 1986. This fact somewhat complicated the adjudication of SAPC's discovery royalty claim. The implementation of the discovery royalty will begin upon commencement of construction of the oil transportation pipeline(s) between the Niakuk No. 4 and No. 5 offshore drill site and the proposed landfall at Heald Point. The retroactive adjustment applicable to the allocated Lisburne production will be made by amending Lisburne royalty returns for the affected months. The credit, calculated on a value basis, shall be taken against any future production allocated to ADL 34635. The State of Alaska ("state") reserves its right to audit or otherwise contest the amended filings and the per barrel value of the credit.

[1]References to SAPC should include predecessors of SAPC and operators and affiliated parties of those predecessors, including without limitation, Sohio Petroleum Company, Sohio Alaska Petroleum Company, and BP Alaska, Inc.

000035

~~000821~~



AGO 3013554-1e1rr

## HISTORICAL BACKGROUND

The statute which authorized the discovery rate was the former AS 38.05.180(a), which stated:

> ... the holder of a lease who drills and makes the first discovery of oil or gas in commercial quantities in a geologic structure shall pay a royalty on all production under the lease of five percent for ten years following the date of discovery and thereafter the royalty rate of twelve and one half percent.

Although this provision was subsequently repealed, it was in effect when ADL 34635 was issued. Paragraph 12 of the lease for ADL 34635 describes the discovery royalty provision as follows:

> If Lessee shall drill on said land and make the first discovery of oil or gas in commercial quantities in any geological structure, the royalty rate under this lease shall, instead of the rates prescribed in Paragraph 11, be five percent for a period of ten years following the date of such discovery, and thereafter the royalty rates shall be those prescribed in Paragraph 11. If this lease is committed to a unit agreement approved or prescribed by Lessor as provided in the regulations, the five percent royalty rate shall not apply to all, but only, the production allocated to this lease under such agreement.

Regulations implemented the discovery royalty statute and the lease term. These now-repealed regulations formerly appeared in 11 AAC 83.200 - 11 AAC 83.230. The question of the effect of the repeal of these regulations also complicated the adjudication of this discovery royalty application.[2]

SAPC purchased oil and gas lease ADL 34635 at Competitive Oil and Gas Lease Sale 18 on January 24, 1967. The lease provisions include a ten-year primary term and a fixed royalty rate of twelve and one half percent. The division issued the lease on April 1, 1967 as conditional lease pending the state's receipt of patent to the onshore portions of the lease. The lease term began on March 27, 1974 when the federal government patented the upland acreage to the state. The primary term was to end on March 27, 1984.

---

[2]SAPC has variously stated that the regulations directly control the consideration of this case (Hearing Transcript, pp. 10-11) and agreed that the regulations should serve as a "non-binding guide" (August 27, 1987 letter from SAPC Counsel John Reeder to Assistant Attorney General Mark P. Worcester). It is not necessary to determine whether the regulations are binding or merely a non-binding guide to resolve the issues presented by the application.

000036 ~~000923~~



4GO 3013---

On April 1, 1977 the lease was committed to the Prudhoe Bay Unit, thus extending the lease term. The state issued a drilling permit to SAPC for Niakuk No. 5 on February 19, 1985, and SAPC spudded the well the next day. Niakuk No. 5 was suspended as an oil producer on April 17, 1985. The company filed a "Statement of First Discovery of Oil and Gas in Commercial Quantities in a Geologic Structure" on May 3, 1985.

SAPC submitted the Statement of First Discovery to the state in the form of an affidavit signed by Roger C. Herrera and dated May 3, 1985. The affidavit indicates that on March 7, 1985 at 0400 hours SAPC retrieved a 59 foot core sample from the well and found "... Kuparuk River Formation sandstones and shales with a strong oil staining and odor." The document went on to indicate that "... subsequently further cores were cut ... which included 60 feet of net porous sandstones and conglomerates most of which contained good oil indications." The affidavit continued:

> A full suite of electric logs was run in the well on 3-14-85 and 3-15-85. Analysis of these logs confirmed the presence of the porous sandstone intervals in the Kuparuk River Formation, and suggested the presence of hydrocarbons.

SAPC conducted drill stem tests April 3 through April 7, 1985 and confirmed the discovery.

On July 8, 1985, SAPC submitted confidential data regarding the geologic structure of the Niakuk No. 5 well. Director Kay Brown acknowledged receipt of the data in an August 27, 1985 letter to Mr. Herrera. The discovery royalty matter thereafter lay dormant for two years.

Meanwhile, other matters relating to the lease transpired. On February 21, 1986 SAPC requested that Niakuk No. 5 be certified as capable of producing oil or gas in "paying quantities." The division complied with this request on February 28, 1986. On July 3, 1986 SAPC asked for a delay in the contraction of the lease from the Prudhoe Bay Unit. On August 22, 1986 the division approved the request for delay in contraction, with the stipulation that the lease be committed to a participating area by April 1, 1992 or be contracted out of the unit. Subsequently, on May 15, 1987, the division issued a decision approving the Lisburne Participating Area, effective December 1, 1986. Two sections of ADL 34635 (sections 31 and 32) were committed to the Lisburne Participating Area.

At the same time, SAPC continued its analysis and consideration of production from the Niakuk structure, and on June 16, 1987 SAPC presented its findings to the division. SAPC discussed the structural geology, reservoir analysis, and development options.

Because this presentation brought up the need for resolution of the discovery royalty issue for this lease and because SAPC was concurrently raising the issue of its asserted discovery royalty entitlement with regard to ADL 34633 (based on the Sag Delta No. 4 well) in a nearby unit, the division wrote a letter on June 2, 1987 encouraging SAPC to move ahead on the matter, unless the company decided not to assert a discovery royalty certification request. After some intervening discussions and correspondence, SAPC filed its discovery royalty certification application for Niakuk No. 5 on August 25,

000037 ~~000923~~



AGO 3013556

1987. The division issued public notice of the application on September 9, 1987.

In correspondence dated November 10, 1987 from James E. Eason, Division Director, to John A. Reeder, Senior Counsel for SAPC, the division solicited additional evidence concerning whether SAPC had satisfied the "commercial quantities" test. SAPC responded in two ways. First, in a November 17, 1987 letter, Mr. Reeder indicated that the concern with the commerciality of the discovery would not have arisen had Standard not been urged to file its application by the June 2, 1987 letter to SAPC. Mr. Reeder stated:

> Action on the application was not required until just prior to production, and issues such as those raised in your letter with respect to the establishment of commercial quantities could be more easily addressed if not eliminated, in the context of a committed plan of development.

He further stated:

> ... as was explained in the presentation to your division, a number of options exist as to the ultimate development of Niakuk, most strongly influenced by environmental concerns. Until an option is selected, it will be difficult to develop specific economics for the actual project, as was done with Endicott. You may wish to reconsider whether a decision needs to be made at this time, although Standard believes it can easily demonstrate that Niakuk No. 5 meets the test described in the referenced definition.

On December 22, 1987, the division conducted a hearing to gather more information on both the Sag Delta No. 4 and Niakuk No. 5 discovery royalty applications. SAPC made an oral presentation concerning the commerciality of Niakuk No. 5. The presentation covered drill stem test production results, transient pressure analysis, special core analysis, reservoir modeling, and economic analysis. Subsequent to the hearing, SAPC has started applying for permits for the development of the Niakuk field.

Also, in informal discussions, Mr. Reeder has indicated, much as he did in his November 17, 1987 letter, that SAPC would be agreeable to having the discovery royalty certification be effective upon some objective evidence of actual commercial production, such as the letting of the contract for the construction of the causeway.

## ISSUES

### Separate Geologic Structure

Division technical staff have reviewed the data submitted by SAPC. The technical staff agree that a separate trapping mechanism has reasonably been demonstrated and that Niakuk No. 5 was the first well to discover the so-called Niakuk structure contained within that separate entrapping

mechanism. A confidential drawing showing the limits and areal extent of the Niakuk structure is being transmitted to SAPC under separate cover.

Date of Discovery

SAPC's application for discovery royalty certification states that it:

> ... believes that the date of initial discovery is April 7, 1985 (the date of the completion of the production tests of Niakuk No. 5) ... and, consequently ... the date of commencement of discovery status would be the first day of May, 1985. Therefore, discovery status, if granted, would terminate on the last day of April, 1995.

The state disagrees with the assertion that the first discovery was made on April 7, 1985. Mr. Herrara's May 3, 1985 affidavit clearly demonstrates that hydrocarbons were discovered through analysis of the core samples and the electric log analysis in March, 1985. The drill stem tests, conducted April 2 through April 7, 1985, merely confirmed the discovery which had occurred in March. The May 3, 1985 cover letter to the "Statement of First Discovery" appropriately noted that the drill stem tests "verified" the fact of discovery - implicitly acknowledging that the first discovery had already occurred.

Moreover, the division's review of other discovery royalty certification decisions made over the last twenty years reveals that the industry and the division have consistently accepted the fact that the "discovery occurs upon the first encounterment of oil and gas," not upon the date of a drill stem test confirming the extent of the discovery of oil and gas. The former discovery royalty regulations provide that the priority "as to time and date of discovery" is established by presenting evidence that "oil or gas has been encountered ..." (11 AAC 83.120 (a)). By contrast, the purpose of a "potential test" (which pursuant to the regulations must be conducted within a year of the completion of the discovery well) is to establish "commercial quantities," not the date of discovery (11 AAC 83.120 (b)).

Finally, if the date of the drill stem test were to control the date of the commencement of the discovery royalty period, this would allow the lessee to manipulate the discovery royalty period. Since the ten-year discovery royalty rate period commences the first of the month following the date of "discovery," and because the commencement of production always requires at least several years of additional analysis, planning, and development for production, a lessee would always prefer to have the discovery royalty period delayed if possible. It would be unreasonable to allow a company which has encountered a good showing of oil and gas to delay the commencement of the discovery royalty period simply by delaying the testing of the well until closer to the time when production might start.

For these reasons, the state concludes that the discovery occurred in March not April, 1985. As a result of this determination, the discovery royalty rate will commence on April 1, 1985, "the first of the next month after the established date of initial discovery period" (11 AAC 83.215(1)). The five percent discovery royalty will be applicable for production allocated to the lease for ten years from April 1, 1985, that is, through March 31, 1995.

The Scope of Production to Which the Discovery Royalty Rate Applies

As noted above, a portion of ADL 34635 is included within the Lisburne Participating Area. The division thus must address whether the discovery royalty rate of five percent applies only to actual or allocated production from the Niakuk structure, or whether it also applies to production attributed to this lease from the Lisburne Participating Area. For the reasons discussed below, the state concludes that the five percent discovery royalty rate applies to production allocated to ADL 34635 from both the Niakuk reservoir and the Lisburne Participating Area.

As shown above, the statute and the lease are explicit as to the production to which the discovery royalty rate applies. Both the statute and the regulation unambiguously provide that all production allocated to the lease (not just production allocated to the lease from the discovered separate geologic structure) is eligible for the five percent royalty rate.

Despite the lack of ambiguity in the statute and lease, an attorney general's opinion has previously addressed whether the discovery royalty rate applies only to the discovered geologic structure. In an unpublished memorandum dated August 26, 1966 from former Assistant Attorney General Ralph G. Crews to Department of Natural Resources Commissioner Phil R. Holdsworth, a copy of which is attached as Exhibit A, the Assistant Attorney General conceded that the statutory provision that the royalty be paid on "all production under the lease for ten years" was properly implemented in the former regulation, 11 AAC 505.748. That regulation, later slightly revised and redesignated as 11 AAC 83.230, explicitly provided that the five percent royalty rate applied to "all production from all zones, strata, formations and structures under and within the exterior boundaries of the lease." Mr. Crews conceded that "the way the statute is written, regulation 505.748 correctly construes [the] statute." However, he did not believe that the "drafters of this statute intended such a largess in favor of the lessee." He thought a "more correct interpretation ... would be that all production from the newly discovered structure on a lease" would be entitled to the reduced royalty rate.

Subsequently, as part of the dispute concerning the Union - Marathon discovery royalty application for ADL 17594 in Cook Inlet, the Attorney General's office prepared an extensive narrative summary of the administration of the discovery royalty statute and regulations, as well as a compilation of the many documents reflecting that history. Copies of those pages of the narrative which deals with Mr. Crews' memorandum are attached as Exhibit B. The division agrees with the criticism of the Crews memorandum stated in Exhibit B. Moreover, even if the division were to agree with Mr. Crews' policy concerns with the statute, the division can not ignore the clear meaning of the statute. Nor does the division have the power to unilaterally amend a lease term. Thus, even if the regulations had been amended as suggested by Mr. Crews, we doubt that they could have validly reduced the scope of the discovery royalty entitlement.

Finally, it must be noted that the regulations were never amended as Mr. Crews suggested they should be. At the time ADL 34635 was issued in 1967, the lease form remained the same as it had when Mr. Crews issued his opinion in 1966. For whatever reason, the legislature did not amend the discovery

royalty statute in the wake of Mr. Crews' opinion, nor did the Department of Natural Resources promulgate new regulations or amend the lease form.

For the foregoing reasons, the state concludes that any discovery royalty rate entitlement for ADL 34635 shall be applied to all production allocated to that lease during the discovery royalty period.

## Commerciality

The division's concern with commerciality of the Niakuk reservoir was heightened when is became apparent that certification of the discovery could entitle SAPC to an immediate reduced royalty for production allocated to ADL 34635 from the Lisburne Participating Area, a field previously discovered by a well on another lease. To insure that the discovery royalty statute not be used in an unintended way to the detriment of the citizens of the state, the division found it especially important to carefully scrutinize the evidence of the commerciality of the Niakuk discovery. Without scrupulous attention to the "commercial quantities" standard, it would be possible for SAPC to enjoy the reduced "discovery royalty rate" for a portion of the production from the Lisburne field without ever producing from the Niakuk structure.

The state's concerns have been satisfied in this case in two ways. First, SAPC has made a strong showing of their geologic findings and analysis, engineering analysis and planning, and economic analysis and planning. This process itself demonstrates a strong commitment to produce hydrocarbons, if feasible, from the Niakuk structure. SAPC has demonstrated through its actions that its motivation has been to pursue production possibilities from the Niakuk structure rather than to use the Niakuk discovery just as a mechanism for achieving a reduction of royalties on Lisburne production. Indeed, at the hearing on December 22, 1987, it seemed as though the SAPC officials present were unaware of the collateral consequences that a discovery royalty award would have on production allocated ADL 34635 from the Lisburne field.

Second, SAPC further satisfied the state's concerns by agreeing that the discovery royalty certification be conditioned upon concrete evidence that the Niakuk structure will actually be produced. The division finds that commencement of construction of the oil transportation pipeline(s) between the Niakuk No. 4 and No. 5 offshore drillsite and the proposed landfall at Heald Point will demonstrate the commerciality of the Niakuk structure. When SAPC submits written evidence of that requirement being satisfied, the five percent discovery royalty award will be effective for all production allocated to ADL [illegible] for the period April 1, 1985 through March 31, 1995.

James E. Eason
Director

Attachments

1139

JE/KMO/07960

# EXHIBIT I

DNR Decision dated December 21, 2007, approving formation of Combined Niakuk Participating Area

PRUDHOE BAY UNIT

APPLICATION TO COMBINE THE NIAKUK AND WEST NIAKUK PARTICIPATING AREAS INTO THE COMBINED NIAKUK PARTICIPATING AREA

**AMENDED**
FINDINGS AND DECISION OF THE DIRECTOR
OF THE DIVISION OF OIL AND GAS UNDER DELEGATION OF AUTHORITY FROM THE COMMISSIONER, DEPARTMENT OF NATURAL RESOURCES, STATE OF ALASKA

This Amended Decision replaces the Combined Niakuk Participating Area Decision dated and signed December 5, 2007

December 21, 2007

**TABLE OF CONTENTS**

**I. APPLICATION AND RESULTS** .......... 3

**II. DISCUSSION OF THE DECISION CRITERIA** .......... 4

**A. 11 AAC 83.303(B) CRITERIA DISCUSSION** .......... 4

1. PRIOR EXPLORATION AND DEVELOPMENT ACTIVITIES AND THE GEOLOGICAL AND ENGINEERING CHARACTERISTICS OF THE RESERVOIR .......... 4
2. BPXA'S PLANS OF DEVELOPMENT .......... 7
3. THE ECONOMIC COSTS AND BENEFITS TO THE STATE .......... 7
4. THE ENVIRONMENTAL COSTS AND BENEFITS .......... 15

**B. 11 AAC 83.303(A) CRITERIA DISCUSSION** .......... 16

1. PROMOTE THE CONSERVATION OF ALL NATURAL RESOURCES AND PREVENTION OF ECONOMIC AND PHYSICAL WASTE .......... 16
2. PROVIDE FOR THE PROTECTION OF ALL PARTIES OF INTEREST, INCLUDING THE STATE .......... 16

**III. FINDINGS AND DECISION** .......... 18

Attachment #1 - CNPA and PBU Expansions and Contractions
Attachment #2 - Map of the CNPA
Attachment #3 - Proposed CNPA Tract Description, Allocation, and Ownership Schedule
Attachment #4 – Objection to formation of CNPA

## I. APPLICATION AND RESULTS

BP Exploration (Alaska) Inc. (BPXA), operator of the Niakuk Participating Area (NPA) and the West Niakuk Participating Area (WNPA), on behalf of itself and the other Working Interest Owners (WIO), including Chevron U.S.A. Inc., ConocoPhillips Alaska Inc. (CPAI), and ExxonMobil Alaska Production Inc. (Exxon), applied (Application) on May 5, 2005, to the State of Alaska, Department of Natural Resources (DNR), Division of Oil and Gas (Division) to combine the NPA and WNPA and contract the Prudhoe Bay Unit (PBU). The NPA was formed in 1994 and the WNPA was formed in 1997. The Application proposes a single Combined Niakuk Participating Area (CNPA). Forest Oil Corporation was a WIO at the time the Application was submitted, but has subsequently sold its interest.

The Application responds to the Division's November 17, 1997, interim decision approving the "Fourth Expansion of the Unit Area, First Expansion of the Participating Area and Formation of the WNPA." That interim decision approved the formation of the WNPA as a "temporary solution," and set March 31, 1998, for the Greater Niakuk Area owners to submit a "final combined (WNPA and NPA) application." The Application is the "final combined (WNPA and NPA) application," as contemplated in the interim decision. The Application and this Findings and Decision (Decision) have been delayed since 1998 for various reasons, including the need to complete additional appraisal drilling and equity negotiations among WIOs, to exchange additional information, and to conduct and complete negotiations between the Division and WIOs.

The key results of this Decision are as follows:

- Field cost allowance refunds and amended royalty reports
  The WIOs shall pay the State for certain field costs previously deducted from the State's royalty share of NPA and WNPA production, plus interest, under the retroactive, revised production allocations established under this Decision. This Decision also establishes the percentage of CNPA production ineligible for future field cost deductions. The WIOs shall file amended royalty reports to account for the prior production that is subject to field cost refunds.

- CNPA and PBU boundaries established
  The NPA, WNPA, and the PBU are conformed to an approved CNPA and PBU boundary and Section 21 NE ¼, N ½ SE ¼ of ADL 34626, will automatically contract out of the CNPA and PBU if a well is not drilled, tested, and certified as capable of production in paying quantities in that area by January 1, 2011.

- Final tract allocations established
  NPA and WNPA tract allocations approved under the interim decision are revised retroactively for production previously allocated to the

northern halves of ADLs 34625 and 34626. CNPA tract allocations are established.

- September 1980 Prudhoe Bay Unit Royalty Settlement Agreement (1980 RSA)
  The 1980 RSA will not apply to production from the northern halves of ADLs 34625 and 34626, effective upon approval of this Decision and retroactive to November 1, 1996.

## II. DISCUSSION OF THE DECISION CRITERIA

The DNR commissioner (Commissioner) reviews unit-related applications under AS 38.05.180(p) and 11 AAC 83.303—11 AAC 83.395. By memorandum dated September 30, 1999, the Commissioner approved a revision of Department Order 003 and delegated this authority to the Division Director. This Decision evaluates the Application based on the criteria set out in 11 AAC 83.303(a) and (b). A discussion of the subsection (b) criteria is set out directly below, followed by a discussion of the subsection (a) criteria.

### A. 11 AAC 83.303(b) criteria discussion

#### 1. Prior Exploration and Development Activities and the Geological and Engineering Characteristics of the Reservoir

The proposed CNPA boundary is based on the known extent of the Kuparuk River Formation (Kuparuk) Reservoir boundaries using geologic, geophysical, and reservoir engineering (G&G) data. G&G and other technical data submitted in support of the Application included the following: type logs, paper and digital copies of the top structure, net pay and oil pore foot maps for the Kuparuk, interpreted seismic lines, structural cross sections through the Niakuk segments, digital log data, a spreadsheet of log tops and sub-zones, 3-D seismic dataset, detailed discussion of the Niakuk geologic and reservoir models, discussion of the 2005 original oil in place (OOIP) map, detailed discussion of the petrophysical log model used for Niakuk segments 1, 3, 5 and 2, and a discussion of the development of the NPA and WNPA. The Division will hold these data confidential under AS 38.05.035(a)(9)(C) and 11 AAC 96.220.

In the 1970s and early 1980s, exploration north of the Prudhoe Bay oil field focused on the Permo-Triassic Ivishak sandstone, the same target found at Prudhoe Bay. It wasn't until the late 1980s that exploration ventures considered reservoir targets other than the Ivishak sandstone as potential developments. One of the primary targets became the Kuparuk.

During lower Cretaceous time, deposition on the present day North Slope changed from a relatively passive margin with sediments sourced from the north to an extensional rift basin margin in which sediments were sourced from faulted, rift margin shoulders to the south. A regionally extensive unconformity called the Lower Cretaceous Unconformity (LCU) marks the uplift and subsequent erosion of Lower Cretaceous to pre-Devonian basement rocks across the North Slope. Secondary

faults within the rift margin contributed sediment as well as impacted local sediment dispersal. Sediment was preserved in local depo-centers off the bounding highs.

The ancestral Prudhoe High, location of the super giant Prudhoe Bay oil field, is one of the primary sources for Lower Cretaceous Kuparuk deposition at Niakuk.

The Kuparuk sediments at Niakuk are approximately the age of the Lower Cretaceous Kuparuk River Formation C sandstones at Kuparuk River Field, located 28 miles to the west. Niakuk stratigraphy is complex. The stratigraphy in combination with minor faults contributes to the formation of two separate accumulations in four segments that have been developed over the past 13 years. The Kuparuk is overlain by minor Kalubik shales and a thick succession of highly radioactive shale (HRZ). The Kuparuk occurs above the LCU that erodes into progressively older formations on local horst blocks and to the east. In general, the Kuparuk at Niakuk lies unconformably above the LCU, which eroded into shales of the Jurassic Miluveach or Kingak Formations.

The Niakuk Oil Pool is defined as the accumulation of hydrocarbons that is found in and is correlative with the interval from 12,318 feet MD (-9,351 feet TVDss) to 12,942 feet MD (-9,842 feet TVDss) in the Niakuk #6 well. The CNPA is a combination structural/stratigraphic trap. It is bound to the south by a major normal fault zone, the Niakuk bounding fault which juxtaposes Kuparuk on the northern, down-thrown side against Lisburne carbonates on the south side of the fault. To the north, east, and west, reservoir quality degrades to siltstone. Structural dip to the east in Segment 2 also contributes to trapping. There are three segments in the western accumulation and one segment in the eastern accumulation. These segments are bounded by minor faulting on the north and south sides and each segment has a unique stratigraphy. The two accumulations have different oil-water contacts.

Early exploration wells north of Prudhoe Bay Field include the Niakuk #1,1A, 2, 2A, 3, 4, 5 and 6 wells, the Gull Island #1 well and the Pt. McIntyre #1 and #2 wells. These early wells, while targeting deeper formations, penetrated a section of the Kuparuk that was very different depositionally from the Kuparuk located in the Kuparuk River Field. The Kuparuk interval north of Prudhoe Bay Field is depositionally complex, exhibits structurally controlled thickening and thinning and is segmented by minor faults as evidenced by various oil-water contacts. The various oil water contacts define segments. Segments 1, 3, and 5 occur in the western area and Segment 2 occurs in the eastern area of the CNPA.

The Sohio Niakuk #1 and #1A wells, completed in 1975 and 1976, respectively, encountered hydrocarbons in the Kuparuk interval, but the wells were not tested. Core in the Kuparuk at Niakuk #1A confirmed oil shows that were indicated on electric logs and a mudlog. Additional drilling of the Sohio Niakuk #2 and #2A wells in 1976 and 1977 confirmed fair hydrocarbon shows in the Kuparuk based on mudlogs, but also illustrated limits on reservoir quality and pay. In 1977 Gulf Oil Co. drilled the Point McIntyre #1 and #2 wells approximately 8.5 miles west of the Niakuk wells. They drilled straight through mudlog shows that indicated fair oil shows in the Kuparuk in order to evaluate the Ivishak sandstone, which was wet. The wells were plugged and abandoned that same year. Geographically between the early Point McIntyre and Niakuk wells, ARCO drilled the Gull Island #1 well in 1976. The Kuparuk interval found in Gull Island #1 contained a low net/gross interval that precluded any testing. The Niakuk #3 well was drilled and completed in 1979. The top Kuparuk was located down structure at -9301TVDss. SWC's indicated poor shows in the Kuparuk. The well was plugged and abandoned in April 1980. Niakuk #4 completed drilling in 1985. Niakuk #4 is

completely missing the Kuparuk as it is located at the crest of a horst block. The LCU scours down into the Jurassic Kingak shales at this location. This suggested a more complex depositional history for the Kuparuk in this area than had previously been thought. BPXA's Niakuk #5, the discovery well for the Niakuk pool, was completed on April 18, 1985. It was cored and tested oil at 1,800 BOPD in the Kuparuk. The Niakuk pool was further delineated with Niakuk #6, which was drilled and cored in the Kuparuk in 1986.

Production from the NPA commenced in April 1994 from five production wells (NK-18, NK-20, NK-22, NK-23 and NK-26) in the eastern area and two production wells (NK-10 and NK-12A) in the western area. Production from the WNPA started as a tract operation with production from NK-27 (West Niakuk 1) in April 1995. West Niakuk is an extension of the western segment(s) that were defined in the NPA. To date there are a total of 19 producers and eight injectors (not counting ST's and PB's) drilled from the Heald Point NK DS. There is one producer L5-34 drilled from the Lisburne L5 drillsite. All production has been from the Kuparuk until recently.

Initial estimates of rock properties based on the early exploration wells (Niakuk 1, 1A, 2, 2A, 5 and 6) are as follows:

| Segment 1 | Porosity | Permeability | Net/Gross | Oil Saturation |
|---|---|---|---|---|
| Zone 3 | 24.4% | 6-1250md | 1.0 | 66% |
| Zone 4 | 15.2% | 6-1250md | .95 | 75% |
| Segment 2 | | | | |
| Zone D | 19.5% | 1-1169md | .87 | 67% |
| Zone F | 23.0% | 1-3008md | .98 | 79% |

Fluid properties based on reservoir fluid samples from Niakuk 5 located in the eastern segment include the following:

- Initial reservoir pressure of 4,461 psia at 8,900' TVD subsea.
- Bubble-point pressure is estimated at 4,200psi (up from an initial estimate of 3,835 psia in 1993).
- Initial Reservoir temperature ranged from 179 to 182 degrees F.
- Oil gravity measures 24.9o API, range between 20-30 API.
- Viscosity of 1.4 centipoise
- Oil formation volume factor (Boi) is 1.31 RB/STB at bubble point pressure.

The oil-water contact in the West Niakuk (Segment 1) is -9,240TVDss, in the West Niakuk Platform (Segments 3 and 5) it is -9,285 TVDss and in the East Niakuk area (Segment 2) it is –9,535TVDss. Estimated OOIP in the Niakuk Oil Pool is approximately 310MMSTB.

BPXA has submitted data that supports the mapped CNPA as being underlain by hydrocarbons. It has been producing hydrocarbons in paying quantities since 1994. The Division's evaluation of the subsurface geology supports the configuration of the proposed CNPA.

## 2. BPXA's Plans of Development

BPXA has submitted plans of development for the CNPA as a part of the Greater Point McIntyre area annual Plan of Development (POD) Review process. On October 1, 2007, the Division approved the POD for the pending CNPA. That approval remains in effect.

## 3. The Economic Costs and Benefits to the State

### 3.1-Tract Allocation Schedule

Attachment #3 is the proposed CNPA Tract Description, Allocation, and Ownership Schedule included in the Application. The "tract participation percentage," column 12 of attachment #3, is the proposed CNPA production allocation by tract. The tract participation percentages are calculated from known G&G data and are based on OOIP. To account for lands outside the original PBU, and not subject to a field cost deduction from the state's share of royalty oil production, BPXA proposed that 6.79 percent and 5.58 percent of production from the NPA and WNPA be allocated to the northern halves of ADLs 34625 and 34626, respectively. In a January 31, 2007, letter, BPXA revised those percentages and proposed that 7.474 percent and 5.584 percent of production from the NPA and WNPA be allocated to the northern halves of ADLs 34625 and 34626, respectively.

Allocation of 7.474 percent of NPA production to the northern half of ADL 34625 and 5.584 percent of WNPA production to the northern half of ADL 34626 is approved. These allocations shall apply retroactively from January 1, 2008; 1) to January 1, 2000 for CPAI and BPXA; 2) to November 1, 1996 for Exxon, and; 3) for other NPA and WNPA minority interest owners to the date they joined the NPA and WNPA. These retroactive allocations replace the tract allocations approved in the 1997 interim decision for the northern halves of ADLs 34625 and 34626. BPXA is not required to retroactively re-file monthly operator reports for the NPA and WNPA.

Effective January 1, 2008, the sum of these retroactive NPA and WNPA allocations, or 13.058 percent of CNPA production, must be allocated to the northern halves of ADLs 34625 and 34626.

When the Application was submitted, BPXA owned 26.355356 percent, Chevron owned 1.16 percent, Exxon owned 36.395491 percent, CPAI owned 36.069385 percent, and Forest owned 0.019768 percent of the production from the RPA. Effective September 1, 2006, Forest's ownership was assigned to BPXA, CPAI, and Exxon. The following revised Ownership currently applies to the CNPA: BPXA-26.360567%, CPAI – 36.076746%, Exxon – 36.402687%, and Chevron – 1.16%. Within 30 days of this Decision, BPXA shall submit a revised CNPA Tract Description, Allocation, and Ownership Schedule that reflects the recent CNPA ownership change.

**3.2-Field Costs**

Refunds due to the state for field costs previously deducted from the state's royalty share of NPA and WNPA total production are retroactive to January 1, 2000, for CPAI and BPXA and to November 1, 1996, for Exxon. Refunds from other PBU minority WIOs are retroactive to the date they joined the NPA and WNPA. CPAI's and BPXA's retroactive payment obligations have been adjusted based on the 2001 Royalty Settlement Agreements between the State and BPXA and CPAI's predecessor settling all royalty value claims for the period 1993 through 1999. Table 1, below, lists the NPA and WNPA lessees and their ownership percentages since November 1, 1996.

The 1980 RSA will not apply to production from the northern halves of ADLs 34625 and 34626 effective upon approval of this Decision and retroactive to November 1, 1996.

Table 1

| Period | NPA Lessees | Lessee's % | WNPA Lessees | Lessee's % | Comment |
|---|---|---|---|---|---|
| 11/1/1996 - 3/31/2000 | BPXA | 100 | ARCO AK | 50 | INITIAL |
| | | | EXXON | 50 | |
| | | | | | |
| 4/1/2000 - 4/30/2000 | BPXA | 100 | ARCO AK | 50 | Name Change: Exxon to ExxMob |
| | | | EXXMOB | 50 | |
| | | | | | |
| 5/1/2000 - 6/30/2000 | BPXA | 100 | EXXMOB | 50 | Name Change: ARCO AK to PHILLAK |
| | | | PHILLAK | 50 | |
| | | | | | |
| 7/1/2000 - 1/31/2001 | BPXA | 26.66467 | BPXA | 26.66467 | REALIGNMENT |
| | EXXMOB | 35.82283 | EXXMOB | 35.82283 | |
| | FORCE | 0.02 | FORCE | 0.02 | |
| | MOBIL AKEP | 0.9998 | MOBIL AKEP | 0.9998 | |
| | PHILLAK | 36.4927 | PHILLAK | 36.4927 | |
| | | | | | |
| 2/1/2001 - 6/30/2001 | BPXA | 26.66467 | BPXA | 26.66467 | Name Change: FORCE to FOREST |
| | EXXMOB | 35.82283 | EXXMOB | 35.82283 | |
| | FOREST | 0.02 | FOREST | 0.02 | |
| | MOBIL AKEP | 0.9998 | MOBIL AKEP | 0.9998 | |
| | PHILLAK | 36.4927 | PHILLAK | 36.4927 | |
| | | | | | |
| 7/1/2001 - 9/30/2002 | BPXA | 26.66467 | BPXA | 26.66467 | Exxon/Mobil Name Changes/Assignments |
| | EXXMOBAK | 36.82263 | EXXMOBAK | 36.82263 | |
| | FOREST | 0.02 | FOREST | 0.02 | |
| | PHILLAK | 36.4927 | PHILLAK | 36.4927 | |
| | | | | | |
| 10/1/2002 - 10/31/2002 | BPXA | 26.66467 | BPXA | 26.66467 | Name Change: PhillAk to ConPhillAk |
| | CONPHILLAK | 36.4927 | CONPHILLAK | 36.4927 | |
| | EXXMOBAK | 36.82263 | EXXMOBAK | 36.82263 | |
| | FOREST | 0.02 | FOREST | 0.02 | |

**Table 1 -continued**

| Period | NPA Lessees | Lessee's % | WNPA Lessees | Lessee's % | Comment |
|---|---|---|---|---|---|
| 11/1/2002 - 8/31/2006 | BPXA | 26.355356 | BPXA | 26.355356 | PBU Super Alignment |
| | CHEVRON | 1.16 | CHEVRON | 1.16 | |
| | CONPHILLAK | 36.069385 | CONPHILLAK | 36.069385 | |
| | EXXMOBAK | 36.395491 | EXXMOBAK | 36.395491 | |
| | FOREST | 0.019768 | FOREST | 0.019768 | |
| | | | | | |
| 9/1/2006 - present | BPXA | 26.360567 | BPXA | 26.360567 | ASSIGNMENT: FOREST to BPXA / CONPHILLAK / EXXMOBAK |
| | CHEVRON | 1.16 | CHEVRON | 1.16 | |
| | CONPHILLAK | 36.076746 | CONPHILLAK | 36.076746 | |
| | EXXMOBAK | 36.402687 | EXXMOBAK | 36.402687 | |

No later than March 31, 2008, each WIO shall file amended royalty returns electronically with the state in the same manner as it filed its original royalty returns. The WIOs shall file amended returns for the first production month and for each succeeding production month for which royalties were not originally filed in accordance with the terms of this Decision. The WIOs shall use selling arrangement code 207002A001 to account for reimbursement to the state the portion of gross monthly production volume not entitled to a field cost deduction. Contemporaneously, each WIO shall pay the field cost refund amount due by wire transfer, made in the same manner that it made the initial royalty payments. The amount due for each production month must include interest on the principal amount due to the state for the month. The interest must be calculated from the date that the original royalty report was due until the date of refund payment under each WIO's royalty settlement agreement with the state. Effective with the production month of January 1, 2008, BPXA, as operator, shall file operator reports (O1) and each WIO shall file royalty reports (A1) using the new accounting unit code PBCN for the CNPA.

### 3.3 Participating Area Boundary

The CNPA previously consisted of two separate PAs, the NPA and WNPA, which were established partially based on lease lines that reflected prior working interest ownership. Ownership interests have subsequently been aligned and the extent of the reservoir has been further defined through additional field development. The alignment of interests and expanded knowledge of the reservoir boundaries justifies combining the two separate PAs into a single combined PA. 11 AAC 83.351(b) provides that "[a] separate participating area must be established … for each reservoir delineated, except that with the consent of the commissioner and all working interest owners, any two or more reservoirs or participating areas within the unit may be combined into one participating area . . . ."

The NPA, WNPA, and the PBU will be conformed to the approved CNPA and revised PBU boundaries as shown and described in Attachments 1, 2, and 3. The approved CNPA encompasses the reasonably known reservoir limits of the Kuparak sufficient to justify development and production. The boundaries were established based on the known extent of the reservoir boundary using G&G data. 11 AAC 83.351(a) provides that a PA may "include only the land reasonably known to be underlain by hydrocarbons and reasonably known or reasonably estimated . . . to be capable of producing or contributing to production of hydrocarbons in paying quantities." Similarly, 11 AAC 83.351(c) provides that a PA must "exclude acreage reasonably proven through the use of geological, geophysical, or engineering data to be incapable of producing hydrocarbons in paying quantities, subject to approval by the commissioner." Paying quantities is defined by 11 AAC 83.395(4) to mean:

> Quantities sufficient to yield a return in excess of operating costs, even if drilling and equipment costs may never be repaid and the undertaking as a whole may ultimately result in a loss; quantities are insufficient to yield a return in excess of operating costs unless those quantities, not considering costs of transportation and marketing, will produce sufficient revenue to induce a prudent operator to produce those quantities.

BPXA provided the Division with confidential G&G data indicating that paying quantities may exist in Section 21 NE ¼, N ½ SE ¼ of ADL 34626 (designated area). The designated area has no well and is included in the CNPA based on the existing G&G data and contingent on the following:

- Three years from the effective date of this Decision, BPXA shall drill a well into the designated area that penetrates the Kuparak River sandstone.

- If the well is tested, BPXA shall timely provide the Division with a status report of operations, well test, core, logging, and other drilling results and data sufficient for the Division to make a paying quantities determination under 11 ACC 83.361.

Notwithstanding the provisions of 11 AAC 83.356 regarding notice and hearing and an opportunity to be heard, if BPXA does not complete the above obligations, or if the well does not have paying quantities as determined by the Division under 11 ACC 83.361, the designated area will automatically contract out of the CNPA and PBU. The WIOs have agreed to contract this area out of the CNPA if a well is not drilled three years from the effective date of this Decision. If the designated area contracts out of the CNPA and PBU, BPXA shall timely file the following with the Division:

- revised CNPA and PBU maps contracting Section 21 NE ¼, N ½ SE ¼ of ADL No. 34626 out of the CNPA and PBU; and

- revised allocation of OOIP attributable to each tract in the CNPA, including the OOIP attributable to the northern halves of ADLs 34625 and 34626. These revised allocations are subject to Division review and approval under 11 AAC 83.371.

**3.4-Facility Sharing, Production Allocation, and Metering**

The CNPA will be developed from the Heald Point drill pad where there are six mini-modules including two production manifold skids accommodating 19 producers and eight injectors (including two Lisburne-Alapah wells). This leaves available space for several additional wells. Well L5-34 was drilled from the Lisburne L5 drill site into the CNPA and shares drillsite facilities with other Lisburne wells at that location. CNPA production will flow onto shared facilities at the Lisburne Production Center (LPC), resulting in surface commingling of CNPA production with Lisburne, Point McIntyre, Stump Island, Kuparak, and West Beach production. The CNPA will receive water injection from the LPC and lift gas from the Lisburne high-pressure gas injection system at the Lisburne L5 drillsite. CNPA was converted back to seawater injection as part of a larger Greater Point McIntyre water optimization project so that only seawater water is injected. Infrastructure support facilities--camp, water, shop, roads, bridges, airstrip, etc.--will be shared with the Lisburne Participating Area and Initial Participating Area. CNPA production will be constrained by the gas and water handling capacity at the LPC. This facility and infrastructure sharing is expected to lower development and operating costs, increase ultimate recovery, and reduce waste.

In a September 26, 2005, letter BPXA amended the Application by submitting draft Niakuk Special Supplemental Provisions (draft NSSP) to the Prudhoe Bay Unit Operating Agreement as Attachment #12. The draft NSSP establishes certain provisions for CNPA wells using LPC facilities. BPXA further indicated in the September 26, 2005, letter, that revisions to the draft NSSP were under way. BPXA shall submit a final, complete, and signed NSSP to the Division within 90 days of this Decision. The final NSSP must be substantively consistent with the draft, include all attachments, and highlight any changes from the draft version provided with the Application.

In a September 29, 2005, letter BPXA indicated that the third and fourth amendments to the Lisburne Special Supplemental Provisions (LSSP) provide for CNPA use of the LPC and sharing of other Lisburne equipment and provided a copy of those amendments. Further, in a February 24, 2006, letter BPXA indicated that Lisburne PA owners had approved the sharing of Lisburne equipment with the greater Niakuk area owners and had approved treatment of the greater Niakuk area as a sharing participating area under Section 53.02 of the LSSP. BPXA also provided a copy of the LSSP as an attachment to the September 29, 2005, letter. This approval is based, in part, on the third and fourth amendments to the LSSP providing for CNPA use of the LPC and sharing of other Lisburne equipment, and the PBU and Lisburne owners approving the sharing of Lisburne equipment with the CNPA owners and treating the CNPA as a sharing participating area under terms in the third and fourth amendments to the LSSP. If the CNPA or Lisburne owners have made any changes to the third and fourth amendments to the LSSP or Section 53.02 of the LSSP since September 29, 2005, a full description and documentation of the changes must be provided to the Division within 90 days of this Decision.

CNPA production will be allocated and metered in two ways. First, production commingled at the surface with other PBU oil pools will be allocated and metered under the terms and conditions set out in Alaska Oil and Gas Conservation Commission (AOGCC) Conservation Order No. 329A, dated June 4, 1996, including as follows:

- conduct well tests to determine production rates for each well;
- calculate each well's theoretical monthly production ("TMP") based on well test rates and actual time on production;
- sum the TMP volume for all wells in all pools;
- determine an allocation factor as the ratio of the metered volume to the TMP for all wells in all pools (i.e., metered/TMP); and
- calculate each well's actual monthly production ("AMP") volume as: AMP = TMP x Allocation Factor.

NGLs will be allocated based on actual gas production volumes and NGL process simulations. Process simulations will be updated at least once per year based on NGL samples.

Each producing well will be tested at least twice each month. Wells that have been shut in and cannot meet the twice monthly test frequency must be tested within five days of startup. All available test separator capacity within the constraints imposed by operating conditions must be used for well testing.

Use of new multi-phase meters remains in the research phase and are not approved for full-scale field implementation.

Second, BPXA is currently commingling production from the Kuparak and Raven Reservoirs (separate PAs and reservoirs) down-hole in NK-43 well. The down-hole commingling should result in greater oil recoveries from both reservoirs and is approved for the NK-43.

The commingled production must be allocated to the correct PA and reservoir because the state's royalty oil is valued differently in the CNPA and proposed Raven PA. It will be allocated between the Raven and Kuparak reservoirs under the terms and conditions set out in AOGCC Administrative Approval CO329B.003, dated October 9, 2007, including as follows:

At least twice per year and not less frequently than once every seven months:

a. samples must be collected from NK-43; and
b. NK-43 well production must be allocated down-hole between the planned Raven Participating Area and the CNPA based on a geochemical analysis.

The Division reserves the right to review down-hole sampling, down-hole allocation, well test, and surface allocation data to ensure compliance with the methodologies prescribed in this Decision. The review may include requesting any information the Division deems pertinent to the review, which may include, but is not limited to, inspection of facilities, equipment, and well test data.

### 3.5-Gas Disposition

The interim CNPA Initial POD indicated that Niakuk-produced gas (except gas extracted as NGLs and shipped through TAPS) would be, prior to gas sales, used or consumed for unit operations, or injected into another formation underlying the PBU Area. The Division recognizes that there may be more gas produced beyond that used for unit operations and approves injecting this excess gas into another formation underlying the unit area or to extract NGLs and blend with crude oil for shipment through TAPS. However, any residue gas from the CNPA injected into another formation underlying the unit area must only be injected into a reservoir that is part of an approved PA in the PBU. Any residue gas from the CNPA injected into another formation underlying the unit area will be treated as indigenous natural gas for royalty reporting purposes and WIOs will be responsible for royalty payments when the gas is ultimately sold. Any residue gas injected from the CNPA into another formation underlying the unit area must be reported and accounted for separately on the LPC Gas Reserves and Debit Report submitted monthly to the Division. The Division will allow CNPA gas injection into another formation because it would be burdensome for the Division and the WIOs to track and report the relatively small amount of gas produced from the CNPA reservoirs.

BPXA has also indicated that CNPA gas extracted as NGLs and blended with crude oil for shipment through TAPS will be processed through the Lisburne NGL plant. Therefore, extracting NGLs at the Lisburne NGL plant from CNPA-produced gas is approved and all NGLs manufactured at the Lisburne NGL plant from CNPA-produced gas must be accounted for and reported as CNPA NGLs.

### 3.6 Summary of Economic Costs and Benefits to the State

The CNPA will result in both short-term and long-term economic benefits to the state. Continued development and production from the CNPA will provide royalty and tax revenues to the state over the life of the field and the lessees may reinvest revenues in new exploration and development in the state. Royalty, tax, and employment benefits derived from production and economic development will far exceed any additional administrative burdens associated with the CNPA.

This Decision provides for refund to the state of field costs previously deducted from the state's share of royalty oil production attributable to northern halves of ADLs 34625 and 34626. In addition, this decision provides for elimination of future field cost deductions from the state's share of royalty oil production attributable to these areas. This increases net royalty revenue to the state attributable to oil production from the CNPA, and attributable to past production from the NPA and WNPA.

While much of the reservoir development has already been completed, the WIOs have proposed adequate plans to develop the remaining CNPA reserves.

The economic benefits of forming the CNPA outweigh the costs. Therefore, the Division's evaluation of the section .303(b)(5) criteria supports approval of the Application.

**4. The Environmental Costs and Benefits**

The approval of the CNPA itself has no environmental impact. Approval of the CNPA is an administrative action that does not convey any authority to conduct any operations on the surface within the unit area. The approval does not entail any environmental costs in addition to those that may occur when permits are issued to conduct lease-by-lease exploration or development.

Unitization does not waive or reduce the effectiveness of the mitigation measures that condition the lessee's right to conduct operations on these leases. The unit operator must obtain permits from various agencies before drilling a well or wells or initiating development activities to further develop known reservoirs within the CNPA. PBU leases contain stipulations designed to protect the environment and address concerns regarding impacts to the area's fish and wildlife species, habitat and subsistence activities, and cultural resources.

The operator must also obtain the Division's approval of a plan of operations before performing any field operations 11 AAC 83.346. The plan of operations permit undergoes a multi-agency review that includes a public notice and 30-day comment period. A plan of operations must describe the operating procedures designed to prevent or minimize adverse effects on natural resources. When reviewing a plan of operations, the Division will consider the operator's ability to compensate the surface land owner for potential damage sustained to the surface estate and any needed plans for rehabilitation of the unit area. A PBU Plan of Operations is currently in place for the NPA and WNPA and is independent of subsurface boundaries. Consolidation of the NPA and WNPA into the CNPA has no effect on the continued compliance under the existing PBU Plan of Operations.

There has been production from the NPA and WNPA since approximately 1994 and the CNPA reservoirs are now in the later stages of development and production. No significant surface facility expansions are anticipated at this time. The CNPA will continue to provide access to existing LPC facilities for consolidated development of the Kuparak reservoirs. Unnecessary duplication of development efforts on and under the surface has been and will continue to be avoided. Activity will continue to affect habitat and subsistence activity less than if development occurred on individual leases. Continued development activity is not expected to significantly impact bird, fish, and mammal populations.

Based on the foregoing, the environmental costs and benefits of forming the CNPA justify approval of the Application under the section .303(b)(1) criteria.

**B. 11 AAC 83.303(a) Criteria Discussion**

### 1. Promote the Conservation of all Natural Resources and Prevention of Economic and Physical Waste

The CNPA owners have developed the Kuparak reservoirs in a way that prevents economic and physical waste and promotes the conservation of resources through unitized rather than lease-by-lease development. Mitigation measures are in place to promote conservation and prevent waste and future development should continue in the same fashion.

The CNPA will share production facilities and support infrastructure with the Lisburne, Point McIntyre, and initial PBU PAs. As discussed above, a unit plan of operations is currently in place for the NPA and WNPA. Consolidation of the NPA and WNPA into the CNPA has no effect on the existing plan of operations. Compliance with the plan of operations should conserve and prevent economic and physical waste of surface resources.

The CNPA provides for efficient, integrated development of the Kuparak reservoirs. The CNPA promotes efficient development of the reservoir, efficient well spacing, and reasonable operating and reservoir management strategies. The CNPA allows for the development of economically marginal hydrocarbon accumulations due to the lower capital and operating costs resulting from commingled production and common facilities. Marginally economic reserves, which otherwise would not be produced on a lease-by-lease basis, can be produced from the CNPA in combination with more productive leases. The CNPA will allow more optimal pressure maintenance and secondary recovery through a joint, unitized effort of the WIOs. Maximizing oil and gas recovery results in a more optimal use of the resource and minimizes economic and physical waste.

Formation of the CNPA should reduce costs and environmental impacts associated with development of the Kuparak reservoir within this area of the PBU, thereby conserving resources, preventing economic and physical waste, expediting development of reserves, and promoting more optimal ultimate recovery of oil and gas from the CNPA. Therefore, the Division's evaluation of the section .303(a)(1) and (2) criteria supports approval of the Application.

### 2. Provide for the Protection of all Parties of Interest, Including the State

The CNPA protects the economic interests of the state and will be more likely to maximize hydrocarbon recovery and revenue to the state. Formation of the CNPA continues and advances the efficient evaluation and development of the hydrocarbon resources while minimizing impacts to the area's cultural, biological, and environmental resources.

Formation of the CNPA protects the economic interests of the WIOs. The approved production allocation schedule agreed to by the WIOs ensures an equitable allocation of cost and revenue.

On April 18, 2006, the Division received a letter from Mr. Ray Givens, attorney for the Oenga heirs who own surface rights to Heald Point. The Oenga heirs assert that their Heald Point surface lease

with BPXA authorizes production from Niakuk, but not from West Niakuk. The letter, which is included as Attachment #4 to this Decision, asked that the Division:

1. take any and all action within its jurisdiction to halt the production of oil and gas from West Niakuk PA through Heald Point until this trespass matter is resolved;
2. delay the consolidation of the Niakuk PA and West Niakuk PA until this matter is resolved;
3. take any and all action within its jurisdiction to halt the production of oil and gas from West Niakuk PA through Heald Point until BPXA, as lessee of BIA Lease #F-89-01, and the other West Niakuk interest holders can provide the Department with concurrence from all parties with an ownership interest in the Heald Point property that there exists the requisite legal authority to produce oil and gas from West Niakuk through the Heald Point facility; and
4. Delay the consolidation of the Niakuk PA and West Niakuk PA until this concurrence is provided.

On May 26, 2006, the Division received a letter from Guess & Rudd, attorneys for BPXA, providing its response to Mr. Given's letter and asking that the Division act on the CNPA Application without delay.

On June 21, 2006, the Division received a second letter from Mr. Givens responding to the Guess & Rudd letter and again asking the Division to defer its CNPA decision until the surface lease between the Oenga heirs and BPXA is modified.

The Division will not further delay its CNPA formation decision because of these requests. This decision deals with subsurface issue surrounding the establishment of the consolidated PA. The issue raised in the letters focuses on resolution of a private dispute regarding individual surface rights--an issue separate and apart from this Decision. It is a dispute that must be resolved between BPXA and the Oenga heirs.

## III. Findings and Decision

1. Under 11 AAC 83.303, I approve the Application to form the CNPA effective January 1, 2008, subject to the terms and conditions set out in this Decision.

2. The NPA, WNPA, and the PBU are conformed to the approved CNPA and revised PBU boundaries as shown and described in Attachments 1, 2, and 3. The approved CNPA encompasses the reasonably known reservoir limits of the Kuparak River formation sufficient to justify development and production.

3. Section 21 NE ¼, N ½ SE ¼ of ADL 34626, as shown and described in Attachments 1, 2, and 3, is included in the CNPA contingent on the drilling, testing, and certification of a well that penetrates the Kuparak River Sandstone on or before three years from the effective date of this decision, and as provided in section II A 3.3 of this Decision.

4. BPXA shall file operator (O1) reports and each WIO shall file royalty reports (A1) using the new accounting unit code of PBCN for the CNPA. BPXA and the other WIOs shall reference this account code on the monthly operator and royalty reports submitted to the Division for CNPA production. The accounting code becomes effective on the first day of the month following this approval. In the case where production from CNPA Kuparak Reservoir is commingled downhole with production from the proposed Raven Reservoir, such as is the case with NK-43, only the portion of production allocated to the CNPA Kuparak Reservoir must be referenced to the new accounting unit code of PBCN on the monthly operator and royalty reports submitted to the Division for CNPA production. The Raven Reservoir portion must be appropriately allocated to its approved accounting code on the Raven monthly operator and royalty reports submitted to the Division.

5. BPXA shall conduct diligent exploration, delineation, and production of the reservoirs underlying the approved CNPA under the plans of development and operations approved by the Division. BPXA may not commence drilling, development, or production operations until it acquires all required permits.

6. The formation of the CNPA divides costs and allocates produced hydrocarbons in a manner currently acceptable to all affected WIOs and in accordance with the terms of the November 17, 1997, interim decision and applicable state regulations, including 11 AAC 83.351(a) and 11 AAC 83.371(a). Under 11 AAC 83.351(a) and 11 AAC 83.371(a), and in accordance with the terms set out in this Findings and Decision, the Division approves the allocation of production and costs for the tracts within the CNPA as set out in Attachment #3, but subject to a revision of the ownership schedule as described in section II A 3.1 of this Decision. Within 30 days of this Decision, BPXA shall submit on behalf of the WIOs, a revised CNPA Tract Description, Allocation, and Ownership Schedule that reflects the transfer of Forest's interest as described in section II A 3.1 of this decision.

7. Allocation of 7.474 percent and 5.584 percent of production from the NPA and WNPA to the northern halves of ADLs 34625 and 34626, respectively is approved, retroactive from the effective date of this Decision to the retroactive dates set out in paragraph 9.

8. Field costs must not be deducted from the state's share of royalty oil production attributable to the northern halves of ADLs 34625 and 34626, areas outside the original PBU, and field costs previously deducted from this production must be refunded to the state, plus interest, retroactive from the effective date of this Decision to the retroactive dates set out in paragraph 9.

9. Refunds of field costs previously deducted from the state's royalty share of NPA and WNPA production are retroactive to January 1, 2000, for CPAI and BPXA and to November 1, 1996, for Exxon. Refunds from other minority WIOs are retroactive to the dates they joined the CNPA and WNPA.

10. Effective January 1, 2008, allocation of 13.058 percent of CNPA production to the northern halves of ADLs 34625 and 34626 is approved.

11. Field cost deductions provided for under the 1980 RSA will not apply to production from the northern halves of ADLs 34625 and 34626, effective upon approval of this Decision and retroactive to November 1, 1996.

12. No later than March 31, 2008, each WIO shall file amended royalty returns electronically with the state in the same manner as it filed its original royalty returns. The WIOs shall file amended returns for the first production month and for each succeeding production month for which royalties were not originally filed in accordance with the terms of this Decision. The WIOs shall use selling arrangement code 207002A001 to account for reimbursement to the state the portion of gross monthly production volume not entitled to a field cost deduction. Contemporaneously, each WIO shall pay the field cost refund amount due by wire transfer, made in the same manner that it made the initial royalty payments. The amount due for each production month must include interest on the principal amount due to the state for the month. The interest must be calculated from the date that the original royalty report was due until the date of refund payment under each WIO's royalty settlement agreement with the state. Effective with the production month of January 1, 2008, BPXA, as operator, shall file operator reports (O1) and each WIO shall file royalty reports (A1) using the new accounting unit code PBCN for the CNPA.

13. CNPA production may be commingled with other PBU production in PBU surface facilities before custody transfer. The terms for use of those facilities are amendments to the PBU operating agreement and are set out in the NSSP and the third and fourth amendments to the LSSP. This Decision describes BPXA's submittals and representations regarding these amendments. BPXA shall submit a final NSSP subject to the terms and conditions set out in this Decision.

14. CNPA production shall be allocated and metered according to terms and conditions set out in this Decision.

15. The Division recognizes that there may be more gas produced from the CNPA beyond that used for unit operations and approves injecting this excess gas into another formation underlying the unit area and extracting and blending NGLs with crude oil for shipment through TAPS subject to terms and conditions set out in this Decision.

16. BPXA has also represented that CNPA gas extracted as NGLs and blended with crude oil for shipment through TAPS will be processed through the Lisburne NGL plant. Therefore, extracting NGLs at the Lisburne NGL plant from CNPA-produced gas is approved and all NGLs manufactured at the Lisburne NGL plant from CNPA-produced gas must be accounted for and reported as CNPA NGLs subject to the terms and conditions set out in this Decision.

A person affected by this decision may appeal it, in accordance with 11 AAC 02. Any appeal must be received within 20 calendar days after the date of "issuance" of this decision, as defined in 11 AAC 02.040 (c) and (d), and may be mailed or delivered to Tom Irwin, Commissioner, Department of Natural Resources, 550 W. 7th Avenue, Suite 1400, Anchorage, Alaska 99501; faxed to 1-907-269-8918; or sent by electronic mail to: dnr.appeals@alaska.gov. If no appeal is filed by the appeal deadline, this decision becomes a final administrative order and decision of the Department on the 31st day after issuance. An eligible person must first appeal this decision in accordance with 11 AAC 02 before appealing this decision to Superior Court. A copy of 11 AAC 02 may be obtained from any regional information office of the Department of Natural Resources.

Kevin Banks, Acting Director

December 21, 2007
Date

Attachments:

**Attachment #1 - CNPA and PBU Expansions and Contractions**
**Attachment #2 - Map of the CNPA**
**Attachment #3 - Proposed CNPA Tract Description, Allocation, and Ownership Schedule**
**Attachment #4 – Objection to formation of CNPA**

**Attachment #1 - CNPA and PBU Expansions and Contractions**

bp **ATTACHMENT 1 - PROPOSED NIAKUK PA CONTRACTIONS AND EXPANSIONS**



**Attachment #2 - Map of the CNPA**



## Attachment #3 - Proposed CNPA Tract Description, Allocation, and Ownership Schedule

ATTACHMENT 3
TRACTS WITHIN THE NIAKUK PA AND NIAKUK PA TRACT PARTICIPATIONS

| Tract | Lease | Township /Range | Section | Acres | Royalty % | Working Interest Ownership % BPXA | ConocoPhillips | ExxonMobil | Chevron | Forest | Tract Participation |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 4 | 34625 | 12N-15E | Sec. 13: SW1/4SW1/4 | 40 | 12.5 | 26.355356 | 36.069385 | 36.395491 | 1.160000 | 0.019768 | 21.14% |
| | | | Sec. 14: S1/2, S1/2N1/2, S1/2N1/2N1/2 | 560 | | | | | | | |
| | | | Sec. 23: All | 640 | | | | | | | |
| | | | Sec. 24: W1/2, W1/2SE1/4 | 400 | | | | | | | |
| 5 | 34626 | 12N-15E | Sec. 15: SE1/4 | 160 | 12.5 | 26.355356 | 36.069385 | 36.395491 | 1.160000 | 0.019768 | 16.81% |
| | | | Sec. 21: NE1/4, N1/2SE1/4 | 240 | | | | | | | |
| | | | Sec. 22: All | 640 | | | | | | | |
| 30 | 34629 | 12N-15E | Sec. 27: N1/2, N1/2S1/2 | 480 | 12.5 | 26.355356 | 36.069385 | 36.395491 | 1.160000 | 0.019768 | 8.31% |
| 31 | 34630 | 12N-15E | Sec. 25: All | 640 | 12.5 | 26.355356 | 36.069385 | 36.395491 | 1.160000 | 0.019768 | 18.95% |
| | | | Sec. 26: All | 640 | | | | | | | |
| | | | Sec. 36: NE1/4, N1/2NW1/4 | 240 | | | | | | | |
| 32 | 34635 | 12N-16E | Sec. 29: All | 640 | 12.5 | 26.355356 | 36.069385 | 36.395491 | 1.160000 | 0.019768 | 31.53% |
| | | | Sec. 30: All | 588 | | | | | | | |
| | | | Sec. 31: N1/2 | 295.5 | | | | | | | |
| | | | Sec. 32: N1/2 | 320 | | | | | | | |
| 33 | 34634 | 12N-16E | Sec. 28: N1/2, SW1/4 S1/2SE1/4, NW1/4SE1/4 | 600 | 12.5 | 26.355356 | 36.069385 | 36.395491 | 1.160000 | 0.019768 | 3.26% |
| | | | Sec. 33: N1/2N1/2 | 160 | | | | | | | |
| Total | | | | 7283.5 | | | | | | | 100.00% |

BPXA - BP Exploration Alaska Inc.
Chevron - Chevron U.S.A. Inc.
ConocoPhillips - ConocoPhillips Alaska, Inc.
ExxonMobil - ExxonMobil Alaska Production Inc.
Forest - Forest Oil Corporation

**Attachment #4 – Objection to formation of CNPA**

GIVENS LAW FIRM
P.O. Box 400, 912 E. Sherman Ave.
Coeur d'Alene, ID 83816-0400
phone (208) 676-1310
fax (208) 676-1296
raygivens@givenslaw.com
www.givenslaw.com

RECEIVED
APR 2 1 2006
DIVISION OF
OIL AND GAS

April 18, 2006

Bill Van Dyke, Acting Director
Director/Administration
Alaska Department of Natural Resources
550 West 7th Avenue, Suite 800
Anchorage, Alaska 99501-3560

Re: Prudhoe Bay Unit - Objection to Application for Consolidation of Niakuk P.A. and West Niakuk P.A. and Request for Other Action

Dear Mr. Van Dyke:

I write to you as the attorney of the Heirs of Andrew Oenga (Oenga Heirs) regarding BIA Allotment # F-14632. The purpose of this letter is to memorialize the Oenga Heirs' objection to the contemplated consolidation of the Niakuk P.A. and West Niakuk P.A., currently before the Alaska Department of Natural Resources (Department), and to suggest additional relief.

The Oenga Heirs are the owners of BIA Allotment # F-14632, Parcel B - Heald Point, on the northeast edge of Prudhoe Bay. That allotment is subject to Lease # F-89-01. The lessor interests are now held by the Oenga Heirs, as owner, and the United States, as their trustee. The lessee interests are currently held by BP Exploration (Alaska) Inc. (BPX) as successor to the original lessee.

The allotment was originally leased for use as a pipeline corridor. BPX has since constructed an oil production facility on the Heald Pont property. Oil and natural gas has been produced thru this Heald Point facility from the Niakuk P.A. for some time. Recently the Oenga Heirs learned that oil and gas from the West Niakuk P.A. was also being produced thru Heald Point. The Oenga Heirs have now learned that BPX is requesting the Department to consolidate the Niakuk P.A. and the West Niakuk P.A. into a single Participation Area. The difficulty is that the Lease does not authorize the use of the Heald Point property for the production of oil from any P.A. other than Niakuk.

A copy of the original Lease and the first letter amendment/notice regarding the Lease are attached and incorporated herein. They have recently been provided to the Alaska Oil and Gas Commission (Commission) regarding an objection to currently establish Raven Pool Rules. While the Lease grants broad uses of the Heald Point property, it only allows

those uses to be made regarding the "Niakuk Project". Original Lease p. 1 (last sentence), p. 2 (first sentence of third paragraph) (emphasis added), and "Niakuk Development Project" letter amendment title.

This "Niakuk Project" or "Niakuk Development Project" was more specifically referred to by BPX as:

> This Lease provides authorization for BP to construct production facilities to support development of and production from our Niakuk oil accumulation.

July 29, 1993 Lease letter amendment/notice (emphasis added).

This explanation of the limited scope of the Lease, in BPX's own words, makes clear that this Lease is not applicable to any other participation area, such as West Niakuk. The Oenga Heirs raised this concern with BPX before Christmas (4 months ago). A Tolling Agreement, which expires the end of June, 2006, was entered into between BPX, the United States and the Oenga Heirs. The United States invited, thru BPX, the West Niakuk interest holders to participate in the Tolling Agreement. Unfortunately, a creditable and meaningful response has not been provided.

Consequently, the Oenga Heirs have been forced to send the attached Notice To Immediately Halt Trespass to BPX and each of the other West Niakuk participating companies. See attached Notice which is incorporated herein.

Because Lease # F-89-01 does not authorize production from the West Niakuk thru the Heald Point facility, the Oenga Heirs generally ask that the Department:

> 1) take any and all action within its jurisdiction to halt the production of oil and gas from West Niakuk P.A. thru Heald Point until this trespass matter is resolved, and
>
> 2) delay the consolidation of the Niakuk P.A. and West Niakuk P.A. until this matter is resolved.

Resolution of this matter could be established when all parties with an interest in Heald Point, its Lease, production facility and use of that facility, present the Department with their joint concurrence that oil and gas from West Niakuk can be produced thru Heald Point and the facility constructed thereon. The above action by the Department could provide a meaningful first step in preventing this matter from becoming embroiled in litigation and controversy for the foreseeable future.

An additional historical fact supports the above requests. In 1993, before West Niakuk oil began being produced thru the Heald Point facility, ARCO, predecessor in interest of ConocoPhillips as one of the State lease holders of the West Niakuk leases, approached the BIA requesting to lease a portion of the Oenga's Heald Point Allotment. See attached BIA telephone log. Unfortunately, this inquiry did not result in ARCO leasing a portion

of the Oengas' Heald Point property for a West Niakuk production facility. The Oenga Heirs' understanding is that BPX thereafter conveyed to ARCO two or three of its Heald Point directional wells for use in West Niakuk. This occurred at approximately the same time Exxon (the other West Niakuk leaseholder) removed its objection to the Commission establishing the Niakuk Pool Rules.

According to the Oenga Heirs' estimates, over $1.5 billion worth of oil from the Niakuk P.A. and the West Niakuk P.A. has been produced thru the Heald Point production pad since its construction twelve years ago. During this period, the Oenga Heirs have been paid on average less than $90,000/year for the use of their property in the production of oil and gas from the Niakuk P.A. and nothing for the use of their property in the production of oil and gas from the West Niakuk P.A. This gross inequity should not be allowed to continue. Oil and gas from the West Niakuk P.A. should not be allowed to be produced thru the Heald Point facility contrary to the existing Lease.

The Oenga Heirs wish to make clear that they do not object to the eventual production of oil and gas from West Niakuk P.A. thru the Heald Point facility. Similarly they do not object to the eventual consolidation of the Niakuk P.A. and the West Niakuk P.A. These should occur, however, only after the Heald Point Lease is amended to appropriately reflect the additional use that is being made of the Oenga property and appropriate rental values for that use. Until then, it would be inappropriate to allow continued production of oil and gas from the West Niakuk P.A. thru Heald Point.

It could also be inappropriate to further complicate matters by consolidating Niakuk P.A. and West Niakuk P.A. when one is subject to a trespass claim and there is the potential for judicial action. All decisions made regarding this property will come under the scrutiny of the courts and the public in general unless the matter is now resolved.

Specifically, the Oenga Heirs request that the Department take the following action:

1) take any and all actions within its jurisdiction to halt the production of oil and gas from West Niakuk P.A. thru Heald Point until BPX, as lessee of BIA Lease #F-89-01, and the other West Niakuk interest holders can provide the Department with concurrence from all parties with an ownership interest in the Heald Point property that there exists the requisite legal authority to produce oil and gas from West Niakuk thru the Heald Point facility.

2) delay consolidation of the Niakuk P.A. and the West Niakuk P.A. until the above concurrence is provided.

The Department certainly has a legitimate interest in assuring itself that State leaseholders have a legally valid means of producing oil and gas from State leases. The relief requested would be in furtherance of that legitimate function in this contentious matter. It would also encourage all parties to reach a fair and reasonable agreement with respect to the production from the West Niakuk thru the Heald Point facility.

Thank you for your consideration.

Sincerely,

Raymond C. Givens
Idaho State Bar # 1695
Washington State Bar # 36029
raygivens@givenslaw.com

On Behalf of the Oenga Heirs

RCG:jr
Enclosure

cc: Oenga Heirs
Roger Hudson, Deputy Solicitor, DOI
Dorothy Edwardsen, ICAS
Joseph J. Perkins, Guess & Rudd
John Cyr, BPX