# ATTACHMENT No. 46

# DECLARATION OF KATHLEEN DICKINSON

Kathleen Dickinson hereby declares as follows:

1. My name is Kathleen Dickinson, and I currently reside in Palm Coast, Florida. Between 1983 and 1995 I was employed as a Realty Specialist with the Bureau of Indian Affairs in Fairbanks, Alaska. In 1993, many of the day-to-day activities of the realty program were transferred pursuant to the Indian Self-Determination Act (ISDA) from the BIA to the Arctic Slope Native Association (ASNA), and I assisted with that transfer. While the direct client contact with restricted Native land owners shifted to ASNA, the BIA remained responsible for ultimate formal approval of any transactions affecting title, including leases. A few years later, in 1995, I was offered a job with ASNA, and I left the BIA and went to work for them, where I continued until that job ended in 2000, when the ISDA realty services contract was shifted to a different tribal organization contractor, the Inupiat Community of the Arctic Slope (ICAS).

2. Before 1993, files on individual Alaska Native allotments were maintained by the BIA. Then those files were transferred to ASNA, which maintained and supplemented them with newly generated notes, correspondence, contract documents, and other materials. When ICAS, a new ISDA contractor took over from ASNA, the files on individual allotments were transferred to ICAS, which took custody of them, and was supposed to continue maintaining and supplementing them.

3. While I was working with the BIA Fairbanks Agency in the late 1980s, I was involved with matters relating to Parcel B of the Native Allotment of Andrew Oenga, an elderly Inupiat Eskimo resident of Barrow, Alaska. Because of the location of his Parcel B on land near

offshore oil deposits, oil companies were interested in siting on-shore facilities there for use in accessing and developing offshore oil fields. In particular, Standard Alaska Production Company, Inc., which later became BP Exploration (Alaska), Inc., was interested in obtaining rights to use Andrew Oenga's land, because they had leased a nearby offshore oil field from the State of Alaska, which had acquired rights in it from the federal government. Both during my period of work with the BIA, and subsequently, when I worked for ASNA, I was involved in matters relating to the leasing of Parcel B of the Andrew Oenga allotment.

4. I have recently been contacted by the Alaska Regional Solicitor's Office of the Department of the Interior, and asked to review a number of documents that I was familiar with during my time of working with the BIA and the ASNA, in order to refresh my memory as to details of the events I was then involved in. I understand that these documents were filed with the Court of Federal Claims in May 2007, and I will be using the numbering system of that filing in referring to them. I have also been asked to review a January 2, 2008 document entitled "Declaration of Leroy Oenga," portions of which relate to events during the time period that I was involved with the property, and as to which I had personal knowledge. I was also asked to review a document entitled "Oenga's Proposed Findings of Uncontroverted Fact," dated January 7, 2008. What follows are my best recollections from personnel knowledge and review of documents that I worked with or reviewed during the time I worked for the BIA or ASNA, between 1983 and 2000. After my job with ASNA ended, I went to work for the State of Alaska Department of Transportation and Public Facilities, where I worked until September 7th, 2007, when I retired and relocated to Florida with my husband.

5. As documented, Attachment 4, the BIA was approached in May1988 by Standard

Alaska Production Company, subsequently renamed BP Exploration (Alaska), Inc., announcing the oil company's intention to negotiate with land owner Andrew Oenga about obtaining a right-of-way across or lease of a portion of Parcel B of his allotment. Using as a template a previous lease agreement covering another allotment, Attachment 5, the oil company solicited and received in July 1988 preliminary comment from the BIA on their proposed draft lease. See Attachment 6. When contacted, Andrew Oenga initially sought advice from various quarters other than the BIA. He engaged experienced legal counsel in August 1988, although he apparently later decided to forego that representation. Attachments 8, 9, and 10. I know that Andrew was also relying on his family, including in particular Leroy Oenga, to advise him, as well as others. For instance, North Slope Borough Mayor George Ahmaogak was consulted. See Attachment 8. The BIA did not discourage, but rather *encouraged* Mr. Oenga to get advice from anyone he trusted.

6. When the negotiations entered into a more serious phase, I was the person who participated on behalf of the BIA, which had to approve any deal that Andrew wanted to enter into. Attachment 11 is a copy of my memo describing a September 26, 1988 meeting between the land owner and his translator and family on the one hand, and oil company reps on the other. Leroy Oenga and others who eventually inherited interests in the parcel were at that meeting. At the time, the expected use of the parcel for pipeline and road purposes was discussed, but it was also identified that the prospective lessee might want to put other improvements on the parcel in connection with the project. An appraisal was reviewed, and payment terms were discussed.

7. Just a few weeks later, in October 1988, the oil company reported to me that the environmental permit to build a causeway to an offshore drilling pad was denied, and that the

company was reconsidering its plans. I promptly informed Andrew Oenga and Rex Okakok, his translator, of this development. These developments were recited in a Report of Investigation I prepared in January 1989, recommending approval of the lease. In November the oil company decided it would go ahead with the lease. As my September memo and January report indicate, I made a number of suggestions favorable to Mr. Oenga, which were eventually incorporated into the lease. Key ones included: (a) successful lessor insistence on a substantial signing bonus; (b) modification of the lease payment escalation clause to give the lessor the higher of a CPI- or appraisal-based adjustment.

8. I understand that Leroy Oenga has declared that he and Andrew thought the lease was only for a road and right-of-way, and didn't understand the "fine print," presumably including Paragraph 10, which allowed the oil company to use the land under lease for any oil development-related purpose. The lease itself clearly authorized use for a much broader array of purposes and such was explained to Mr. Oenga and his interpreter, Rex Okakok. The lease was executed by Andrew Oenga and approved by the BIA on January 20, 1989 Attachment 19.

9. In July of 1993, I was contacted by a representative of ARCO, another oil company, which was interested in seeing if they could rent part of Parcel B. Because the 1989 lease to Standard Alaska (by then known as BP) gave the lessee the unilateral right to increase the acreage under lease, I reasoned that the allotment owners could not enter into a new lease or sale without getting a release of part of the Parcel B acreage from BP's rental option. When I contacted BP representatives about the ARCO inquiry, they said they were planning to exercise the option to increase the acreage under lease, which I reported back to ARCO's representative. As my log notes indicate, I judged that a second lease to a different tenant would be in the

allotment owners' interest ("if there was any way to lease the balance to ARCO we certainly would"). A copy of my telephone log recording these contacts was attached to Leroy Oenga's recent Declaration, along with an assertion that the owners had been unaware of ARCO's interest in 1993, and a suggestion that this information was withheld from them. That is not the case. The BIA had no reason to withhold the information from the Oenga heirs, and I am pretty confident that both Diane Sam of ASNA and the Oenga heirs were made aware of the ARCO feeler shortly after it was received.

10. Although I can't point to definitive documentation on this point, my recollection is supported pretty directly by three of the attachments filed by the Government's in May 2007. At the top of the second page of Attachment 32, ASNA Realty Officer Diane Sam's contact log, she specifically references the ARCO inquiry in the context of the heirs' agreement to increase the acreage subject to back rent to the full Parcel B, based on the rationale that BP's "veto" of a second lease in favor of ARCO in effect meant that BP was precluding owner use of the whole parcel. The only way this position would make sense to the owners is if they were aware of the ARCO offer. Likewise, Attachment 34, ASNA's January 1994 report and recommendation for approval of a lease amendment, indicates quite directly that the heirs were aware of ARCO's offer, because item 12 of a list of the heirs concerns refers directly to the ARCO contact. Thirdly, the January 14, 1993 Counseling Record signed by Leroy Oenga and each of the other heirs specifically references ARCO, and acknowledges the lessee BP's right to enter into an agreement with ARCO concerning Parcel B.

11. Paragraphs 7, 9, and 11 of Leroy Oenga's January 2008 Declaration also seek to portray the situation between 1993 and 2005 as one where the heirs were deprived of information

about the lease and its administration, were prevented from reviewing documents in their files, and were generally "kept in the dark." This characterization does not square at all with my recollection, either when I was working for the BIA or later when I was working for ASNA. I can recall no instance when any owner asked for a copy of any document pertaining to the lease, and was denied access to it, see for example, Attachment 17, BIA's letter with copy of the lease and other pertinent information to Wallace Oenga. And Leroy Oenga himself cites none. In fact, both BIA and ASNA policy would have called for giving any restricted land owner full access to information relating to his property.

12. Leroy Oenga also states that neither he nor any of his fellow owners received a copy of the 1993 or 1997 BIA appraisals prepared for purposes of complying with the periodic rent adjustment clause in the 1989 lease. If they did not receive copies of these appraisals, it is only because they did not ask. If they had asked, the copies would have been provided. Attachment 44 is an example of the letter I sent to each owner on October 8, 1997 while I was working for ASNA. It informs the owners that a BIA appraisal has been completed, and explains how a periodic rental increase was determined. Leroy Oenga could easily have asked to see or be furnished with a copy of the appraisal, but he evidently did not. If he had, ASNA would have readily fulfilled his request.

13. I realize that the Oenga heirs would have liked to receive a larger amount of rent for BP's use of Parcel B, which they inherited in 1990 subject to the 1989 lease. With the benefit of hindsight, it might have been possible that more generous payment terms could have negotiated with Standard Alaska back in 1989, but they weren't. Leroy Oenga and some his fellow owners were at the table with Andrew Oenga when he entered into the contract in 1989. They sought or

had access to independent legal advice, and counsel from other sophisticated individuals such as North Slope Borough Mayor Ahmaogak, and they took another hard look at the lease in the period of 1993 through 1995, when two intensive renegotiations and sets of amendments were agreed to, both times initiated by the heirs. Again they had access to outside advice, as well as the very able and conscientious help of ASNA Realty Officer Diane Sam. I don't know of anything that would have prevented them from taking their complaints about the BIA's actions to court long before they did.

14. I understand that the Oengas are claiming that they were unable to formulate any of the claims they are asserting until the received the benefit of an "accounting" in 2005. If they are saying that they were unaware of how much money they were receiving under the lease before that time, I disagree. In my experience, the owners were consistently very attentive to financial matters, and well-informed as to how much rental income they were receiving. In order to accelerate receipt of payments, they came up with the concept of borrowing money from a bank, and then repaying it with the stream of annual rental payments to be received from BP. That scheme was then incorporated into the lease as part of Lease Amendment No. 3 in May 1995. Attachment 41. Once those loans were negotiated, the owners kept track and were informed in detail about how much of each rental payment was being applied to loan repayment, and how much was available for their direct expenditure. My October 8, 1997 letter to Leroy Oenga, Attachment 44, is an example of the type of report that was typically provided to the individual lessors. I am at a loss to know what money related information they didn't know, or lacked access to.

Pursuant to the provisions of 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed at Palm Coast, Florida this 29th day of January, 2008.

Kathleen Dickinson