**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **WALLACE OENGA, et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**UNITED STATES,**<br><br>**Defendant, and**<br><br>**BP EXPLORATION (ALASKA), INC., CONOCOPHILLIPS ALASKA, INC., EXXON MOBIL ALASKA PRODUCTION, INC., CHEVRON U.S.A., INC., AND FOREST OIL CORPORATION,**<br><br>**Defendant-Intervenors, and**<br><br>**KUUKPIK CORPORATION,**<br><br>**Defendant-Intervenor.** | ) | **No. 06-491 L**<br><br>**Chief Judge Edward Damich** |

**DEFENDANT UNITED STATES' REPLY TO OENGAS' RESPONSE TO DEFENDANT' MOTION TO DISMISS AND MEMORANDUM IN SUPPORT**

RONALD J. TENPAS
Assistant Attorney General
Environment & Natural Resources Division

JAMES M. UPTON
SAMANTHA KLEIN
Natural Resources Section
Environment & Natural Resources Division
Department of Justice
P. O. Box 663
Washington, D.C. 20044-0663
Tel: (202) 305-0482
Fax: (202) 305-0506
Email: james.upton@usdoj.gov

Attorneys for Defendant

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **WALLACE OENGA, et al.,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | |
| **UNITED STATES,** | ) | **No. 06-491 L** |
| **Defendant, and** | ) | **Chief Judge Edward Damich** |
| **BP EXPLORATION (ALASKA), INC., CONOCOPHILLIPS ALASKA, INC., EXXON MOBIL ALASKA PRODUCTION, INC., CHEVRON U.S.A., INC., AND FOREST OIL CORPORATION,** | ) | |
| **Defendant-Intervenors, and** | ) | |
| **KUUKPIK CORPORATION,** | ) | |
| **Defendant-Intervenor.** | ) | |

**DEFENDANT UNITED STATES' REPLY TO OENGAS' RESPONSE TO DEFENDANT' MOTION TO DISMISS AND MEMORANDUM IN SUPPORT**

Defendant United States (hereinafter "Defendant") submits that the Oengas' Response to the Defendant's Motion to Dismiss fails to refute the legal and factual arguments in support of Defendant's Motion. A memorandum in support of Defendant's Reply is appended hereto.

## MEMORANDUM IN SUPPORT OF DEFENDANT'S REPLY

**Introduction**

Citations herein to Attachment **Nos. 1** through **45** refer to the Attachments to the Defendant's Motion to Dismiss.

## ARGUMENT

**I. <u>CLAIM No. 1</u>**

**Claim No. 1** concerns the government's alleged failure to collect royalties on all the oil produced through use of the Oenga allotment Parcel B. Plaintiffs contend that the Indian Mineral Leasing Act (28 U.S.C. §§ 396, 396(c),(d) and (e)) and the implementing regulations (25 C.F.R. Part 212) (1987 and 1996) created this money mandating duty.

**A. <u>The Governing Six-Year Statute of Limitations Bars Claim No. 1</u>.**

The government reiterates that this claim accrued in 1989 when the Lease went into effect. Clearly, the original lessor must be charged with the knowledge that the Lease, on its face, did not provide for royalties. When Andrew Oenga died in 1990, the statute continued to stand against his successors-in-interest. In this case, the equities for arguing for a different starting date are particularly weak, since several of the present plaintiffs were at the table when the Lease was first negotiated. See Dickinson Declaration, Attachment **No. 46**, paragraph 5 (attached to Defendant's Opposition as are Attachment **Nos. 47, 48 and 49).** Even if Plaintiffs did not know the terms of the Lease when signed by Andrew Oenga, in January, 1989, they knew of the terms after they became owners in April 1990, or after their ownership was confirmed in September, 1990.

In the alternative, **Claim No. 1** occurred no later than 1993, when (pursuant to Paragraph

Nos. 5 and 9 of the Lease) the government did the first required periodic adjustment of the "fair market rental rate" of the portion of Oenga allotment Parcel B leased by British Petroleum's predecessor-in-interest, Standard Alaska Production Co. Plaintiffs were clearly chargeable with knowledge of the 1989 Lease's contents in 1993. One asked for a copy in February of that year (see Attachment **No. 16)**, and another discussed the then current provisions of the Lease in August, 1993 (see Attachment **No. 32,** Entry for August, 1993).

In other words, assuming, arguendo, that Andrew Oenga was an "Indian mineral owner" within the meaning of 25 U.S.C. § 396 and 25 C.F.R. Part 212 and that his heirs, the plaintiffs, are also "Indian mineral owners" as plaintiffs assume,[1/] then a provision for the payment of royalties should have been included in the 1989 Lease, instead of a provision for the payment of "fair market rental value." Plaintiffs are changeable with all the knowledge they needed to assert **Claim No. 1** from the day the lease was executed in 1989, or giving them the benefit of every doubt, from a date no later than 1993, when they became immersed in the details of the existing Lease and the ASNA assisted effort to amend it in their favor. The limitations period as to **Claim No. 1** expired years before the present action was instituted.

Defendant stresses that **Paragraph No. 9 of the Lease** specifically provides that the BIA (in its re-appraisal procedures) to determine the "fair market rental rate" of the leased premises may not base its review upon "any income the Lessee derives from the leased premises." This provision refutes the plaintiffs' argument that "fair rental value" must be based upon a royalty. Any royalty payment would, by definition, be based on the value of all oil produced by BP

[1/] For reasons discussed at pages later herein, we believe this assumption has no legal or factual support.

through use of the oil production facility on Parcel B. Thus, a royalty payment would clearly be based upon “income the Lessee [BPX] derives from" allotment Parcel B. In sum, Paragraph No. 9 barred BIA from treating a royalty as a “form of rent” in doing its appraisals. A “thruput” would also be based upon the “. . . income the Lessee [BPX] derives from the leased premises” and could not be considered by BIA as a “form of rent,” either, for appraisal purposes.[2] See Sealed Declaration of Edward Morse at 3. Paragraph 9 put the plaintiffs on notice they would not be receiving a "royalty" or a "thruput."

In sum, for purposes of determining "first accrual" of a claim under 28 U.S.C. § 2501 (the statute of limitations), the plaintiff is not required to possess knowledge of all the relevant facts in order for the cause of action to accrue. Fallini v. United States, 56 F.3d 1378, 1380 (Fed. Cir. 1995), cert. denied, 517 U.S. 1243 (1996). Certainly, Mr. Oenga was aware that the draft Lease provided for a rental payment - - not a royalty. See Attachment **Nos. 11** and **12** to the government's Motion to Dismiss. In the alternative, "first accrual" occurred in 1993, when the first required rental adjustment was scheduled. Defendant asserts that the Arctic Slope Native Association (ASNA) kept the plaintiffs informed about the rental adjustment process prior to their negotiations with BPX over the prospective rental adjustment which took effect in January, 1994.

**1. Plaintiffs' Argument that Claim No. 1 did not Accrue Until 2003 or 2005 is Devoid of Substance.**

Plaintiffs argue that **Claim No. 1** did not accrue until 2003 or 2005 when plaintiffs

[2] Alternatively, in 1993, when the first re-appraisal was to be done, the plaintiffs could have requested that Paragraph No. 9 of the Lease be amended to provide for the payment of a royalty on any oil produced through the use of allotment Parcel B.

received the government's "accounting responses" to the plaintiffs' demands that the government account for the proceeds generated under the Lease. Pls. Br. at 18. Defendant denies that its responses to the Plaintiffs' demands for preparation of an accounting of Lease proceeds amounted to "accounting responses." See Answer to Second Amended Complaint at Paragraph. No. 4. In short, no responses amounting to an accounting exist. Also, this argument rests on the statute of limitations tolling provision cited at 15-16 of Plaintiffs' brief which is not applicable to the claims at issue. See Argument A.3. below.

**2. The Provision in the 2005 Interior Appropriations Act Tolling the Running of the Statute of Limitations on Indian Claims Until the Indian Owner has Received an Accounting From the Government Does not Apply to the Plaintiffs' Claim No. 1.**

Plaintiffs' principal argument (as to all three claims) against the statute of limitations bar is the alleged applicability of the following provision in the Interior Department appropriations act for Fiscal Year 2005 (Pub. L. No. 109-54, 119 Stat. 499, 519 (2005)):

> [N]otwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim, including any claim in litigation pending on the date of the enactment of this Act, concerning losses to or mismanagement of trust funds, until the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss. [3/]

Pls. Br. at 15. Plaintiffs argue that the foregoing "Indian Trust Accounting Statute" (ITAS) applies to **Claim No. 1** because the government's failure to collect a royalty on the oil produced through use of the subject allotment amounts to a failure to "'timely collect amounts due and owing . . .'", and fits within the "'losses to . . . trust funds'" phrase of the 2005 appropriations act. They cite Shoshone Indian Tribe of the Wind River Reservation v. United States, 364 F.3d 1339,

---

[3/] An identical (or essentially identical) provision is to be found in all appropriations acts for Interior beginning with Fiscal Year 1990 and continuing up to the present.

1350-51 (Fed. Cir. 2004), cert. denied , 544 U.S. 973 (2005). In support of this interpretation of the 2005 tolling provision, they rely upon Judge Hewitt's decision in Osage Tribe of Indians of Oklahoma v. United States, 68 Fed. Cl. 322 (2005) (which concerned a claim of BIA's alleged failure to collect proper oil royalties and in which J. Hewitt ruled that such a claim fell within the "losses to . . . trust funds" language of an identical tolling provision). The Osage decision deals with a situation which is distinctly different than the Oenga situation, because Osage involved oil and gas leases which specifically provided for the payment of oil royalties, unlike the Oenga Lease which is a lease of Andrew Oenga's (and now plaintiffs') allotment Parcel B which consists solely of the surface estate thereof, and specifies only the payment of the "fair market undeveloped rental value" of this surface estate. Any argument that **Claim No. 1** could not have been knowable until the plaintiffs were informed of how much rent was actually collected is devoid of merit.

The tolling provision in the Fiscal Year 2005 appropriations act relied upon by the Oengas does not save **Claim No. 1** from the statute of limitations bar. In Shoshone, the Federal Circuit held that the quoted language upon which the Oengas rely does not apply to claims of mismanagement of trust assets other than funds - - that is, lands and natural resources held in trust for Indian tribes or individual Indians. In other words, the cited language does not toll the running of the statute of limitations as to claims for mismanagement of Indian lands or natural resources held in trust. The Pawnee decision (cited by the plaintiffs) expressly characterized a claim about the government's alleged failure to collect the proper oil royalty as a **claim for "mismanagement of Indian lands and natural resources."** Pawnee v. United States, 830 F.2d 187, 190 (Fed. Cir. 1987), cert. denied, 486 U.S. 1032 (1988). The Pawnee characterization of a

claim of "failure to collect a proper royalty" as a claim for "mismanagement of Indian lands and natural resources"is **binding** on this court. Again, the foregoing arguments apply equally as much to **Claim Nos. 2 and 3**.

At best, **Claim No. 1** is a claim for failure to properly manage Oenga allotment Parcel B -- the trust asset. It is not a claim for the mismanagement of trust monies. Thus, **Claim No. 1** concerns the government's alleged mismanagement of "Indian lands." Accordingly, the tolling provision cited by plaintiffs does not apply to **Claim No. 1.** See also Simmons v. United States, 71 Fed. Cl. 188, 193 (2006) (tolling provision in Interior appropriations act for 2004 held inapplicable to an Indian allottee's claim for mismanagement of timber on allotment).[4/] This conclusion applies fully as much to **Claim Nos. 2 and 3**.

**B. Plaintiff's Alleged "Fiduciary Duty to Collect a Royalty on the Oil Produced thru the Production Facility on the Leased Oenga Allotment"is not Money Mandating.**

Plaintiffs contend that: (1) the Indian Mineral Leasing Act (25 U.S.C. §§ 396, 396(c)(d) and (e)); (2) the 1987 and 1996 versions of 25 C.F.R. Part 212 (the regulations implementing the Indian Mineral Leasing Act); (3) the Federal Oil and Gas Royalties Management Act (30 U.S.C. § 1701, et seq., especially Section 1702(6)) (FOGRMA); (4) 30 C.F.R. Part 296 (1993), the regulations implementing (FOGRMA); and (5) 43 C.F.R. Part 3160 constitute a network of statutes and regulations which taken together create a "money mandating 'fiduciary duty to collect a royalty on the oil produced thru the oil production facility on the Oenga allotment.' " (Pls. Br. at 23-24 and 26). This legal proposition relies heavily upon Navajo Nation v. United

[4/]Plaintiffs set up a "straw man" when they assert that the government's statute of limitations argument is really an argument that the beneficiary has a duty to "independently manage his trust property." Defendant has never remotely intimated such a position.

States , 501 F.3d 1327 (Fed. Cir. 2007) (hereinafter "Navajo V").

**1. Paragraph 9 of the Lease Bars the Use of a Royalty or "Thruput" in Determining the Fair Market Rental Rate of Parcel B.**

As noted, **Paragraph No. 9 of the Lease** specifically provides that the BIA (in its re-appraisal procedures) to determine the "fair market rental rate" of the leased premises may not base its review upon "any income the Lessee derives from the leased premises." This provision refutes the plaintiffs' argument that "fair rental value" must be based upon a royalty or a "thruput." Thus, Paragraph 9 refutes the assertion of any money mandating duty to collect a royalty on oil produced through use of Parcel B as an oil production facility.

**2. The Indian Mineral Leasing Act and the Regulations Implementing It Apply Only to Indian Mineral Owners.**

The 1909 Act governing mineral leases on Indian allotted lands (25 U.S.C. § 396) [5/]and 25 C.F.R. Part 212 simply do not apply to the plaintiffs because they are not "**Indian mineral owners."** In our motion to dismiss, we argued that the definition of "Indian mineral owner" contained in the 1996 version of Part 212 did not encompass the Oengas. Plaintiffs respond that the 1987 version of Part 212 contains no definition of "**Indian mineral owner**" and, asserts that therefore, the government's argument must fail.

The 1996 Federal Register Notice of proposed changes in Part 212 clearly establishes that

the 1987 version of Part 212 applied only to "Indian mineral owners," as well. This term appears in boldface seven times in the first four pages of the Notice. (Copy appended as Attachment **No. 48**). Moreover, nothing in the Notice suggests that the Oengas would have been deemed to

---

[5/] Section 396 is not part of the Indian Mineral Leasing Act which begins with Section 396 (a).

be "Indian mineral owners" under the 1987 version of Part 212, nor do the Oengas cite to any provision of the 1987 version which suggests they could reasonably have been viewed as "Indian mineral owners" prior to 1996.

**3. Plaintiffs' Efforts to Prove that they are "Indian Mineral Owners" Should be Rejected.**

Plaintiffs' tortured argument designed to convince the Court that they are "Indian mineral owners" within the meaning of 25 U.S.C. § 396[6/] and 25 C.F.R. Part 212 amounts to an acknowledgment that **Claim No. 1** cannot be money mandating unless the Court accepts this threshold argument. Any objective analysis of this argument requires its rejection.

The starting point for Plaintiffs' reasoning is the definition of "lease site" in 30 U.S.C. § 1702(6) (FOGRMA) which refers to the "surface of a severed mineral estate on which exploration for, or extraction or removal of, oil and gas is authorized pursuant to lease." (Pls. Br. at 26). But this provision has no bearing on the scope of the term "Indian mineral owners." Rather, the definition of "lease site" relates solely to the government's inspection and enforcement functions under FOGRMA which are designed, in part, to ensure that the operations of an oil and gas lessee do not damage the surface estate. [7/] Plaintiffs then stress the absence of any definition of "mineral interests" in Part 212; their ensuing reasoning attempts to blur the distinction between the Indian owner of a surface estate and the Indian owner of a mineral estate.

---

[6/] Plaintiffs cite to 25 U.S.C. §§ 396(c),(d) and (e), as well as 25 U.S.C. §396, but (d) is only applicable to minerals owned by Indian tribes.

[7/] Plaintiffs argue that the "broader statutory" definition of "lease site" should prevail over the "narrow regulatory"definition of "Indian mineral owner." Pls. Br. at 29-30. But this is nonsensical because the definition of "lease site" is in FOGRMA, while the regulatory definition is found in 25 C.F.R. Part 212 which implements the Indian Mineral Leasing Act.

Pls. Br. at 28.

Plaintiffs next assert the following:

* * *

> An underground pool of oil is of great potential, but of little value without a surface location that can be used as a point of production. One of the "bundle of sticks in a complete 'mineral interest' s**urely includes the stick or interest in the right of use of a surface location needed to realize the potential of the oil**. If the surface overlying the oil pool cannot be used to develop the oil, as is the case with Niakuk, West Niakuk and Lisburne, then the 'mineral interest' in those pools is not complete. If the owner of such a
> subsurface oil pool has to lease a surface point of production at another location, then that leased surface property **has properly becomes [sic.] part of the fully realized 'mineral interest' and is entitled to a share of the royalty.**

(Emphasis added) Pls. Br. at 30. In turn, this means, according to the Oengas, that the **"owner of the point of production can properly be said to 'own mineral interests in oil and gas'** as used in 25 C.F.R. Part 212.3." (Emphasis added) Id. at 31. Section 212.3 contains the definition of "Indian mineral owner."

The Court must reject the foregoing arguments. This analysis seeks to obliterate the well established line of demarcation between a surface estate and a mineral estate. In Del-Rio Drilling Programs, Inc. v. United States, 35 Fed. Cl. 186, 194-95 (1996), opinion withdrawn, 37 Fed. Cl. 157 (1997), rev'd, 146 F.3d 1358 (Fed. Cir. 1998), reinstatement of 1996 opinion, 46 Fed. Cl. 683 (1998), the Court of Federal Claims held that surface and mineral estates are separate and distinct and the mineral estate is dominant. In other words, the Del-Rio case is diametrically at odds with plaintiffs' line of reasoning.

An oil company lessee's acquisition of a use right of an unrelated surface estate - - as was done under the Oengas'/BPX lease - - does not somehow magically transform the Oengas' non-mineral surface estate into a mineral estate. At the outset, it was determined that any lease of

Andrew Oengas' allotment Parcel B was not a mineral lease. Indeed, the allotment certificate for Parcel B reserved "[a]ll of [the] oil and gas in the land so allotted" to the United States - - a restriction specifically mandated by 43 U.S.C. §§ 270-11 and 270-12.

Finally, the Oengas' use of the terms "surely includes","has properly become[]" and "can properly be said" - - all suppositions - - does not substitute for the lack of any supporting authority for plaintiffs' position. This complete dearth of legal support is another compelling reason for the Court to reject plaintiffs' convoluted argument.

**4. Plaintiffs' Reliance Upon 30 U.S.C. § 226(m) is Misplaced.**

Plaintiffs support for **Claim No. 1** is heavily dependent upon the proposition that the "common law trust duties of care, candor, and loyalty" require that since the government is authorized to pay royalties to a surface owner of land used as a point of production so as enable the government to gain access to oil at another location under 30 U.S.C. § 226(m), it had a fiduciary duty to "collect a similar royalty for the Oengas." Pls. Br. at 28. This argument should be rejected. Again, we stress that **Paragraph No. 9 of the Lease** bars the BIA from collecting a royalty for the Oengas.

It is beyond dispute that 30 U.S.C. § 226(m) does not authorize the leasing of Indian lands and, therefore, has nothing to do with Indian lands. See Haley v. Seaton, 281 F.2d 620 (D.C. Cir. 1960). Since 30 U.S.C. § 226(m) has nothing to do with leasing of Indian lands, plaintiffs' argument really amounts to a "moral"argument. But, 28 U.S.C. § 1505 does not confer jurisdiction on this court to adjudicate "moral" claims,"unlike the "fair and honorable dealings" clause (Clause (5) of Section 2 of the Indian Claims Commission Act) (hereinafter "ICCA"). See Menominee Tribe of Indians of Wisconsin v. United States, 221 Ct. Cl. 506, 514-520, 607

F.2d 1335, 1340-44 (1979) (held that Section 1505 is much more narrow in scope than the ICCA and does not incorporate the "fair and honorable dealings" clause which encompassed "moral" claims). But even in the context of "fair and honorable dealings" claims concerning alleged mismanagement of tribal lands/natural resources held in trust, there is no support for the plaintiffs' argument.

In White Mountain Apache Tribe of Arizona v. United States, 10 Cl. Ct. 115, 118 (1986), the Tribe raised a "fair and honorable dealings" claim that the government had allowed the part of the tribal rangelands leased to non-Indian livestock owners to become severely overgrazed which, in turn, caused severe erosion of these rangelands. The Tribe argued that it should be able to recover damages on this claim measured by the cost of restoration because when the government sues third parties for harming public lands, it traditionally has sought damages measured by the cost of restoration of the lands at issue[8/]. The court gave short shrift to the Tribe's argument; when the court later found the government liable on the overgrazing/erosion claim, it ruled that damages must be measured by diminution in value. White Mountain Apache Tribe of Arizona v. United States, 11 Cl. Ct. 614, 664 (1987), aff'd, 5 F.3d 1506 (Fed. Cir. 1993), cert. denied, 511 U.S. 1032 (1994). The Tribe's argument was equitable/moral in nature.

The Oengas assume that if the government pays royalties to the surface owner of land in order for the government to use this land as a point of production to access oil from another location, then (under common law trust duties) the government has a fiduciary duty to "collect a

---

[8/] ICCA jurisprudence had allowed tribes to recover only damages measured by the diminution in the value of the affected land (unless the diminution in value exceeded the cost of restoration). See Gila River Pima-Maricopa Indian Community v. United States, 199 Ct. Cl. 586, 596, 467 F.2d 1351, 1357 (1972)

similar royalty" for Oengas. This is because allotment Parcel B is used as an oil production facility to access oil from the Niakiak, West Niakuk and Lisburne Participating Areas. The Oengas' argument is also equitable/moral in nature. Given the rejection of the White Mountain Apache Tribe's equitable/moral argument as to the proper measure of damages in the context of a "'fair and honorable dealings"claim, the Oengas' moral argument here should not be accepted by he Court in the context of a Section 1505 case about the alleged mismanagement of Indian lands.

Plaintiffs' use of the Federal Circuit's 2007 Navajo Nation opinion is an improper extension of that opinion. The Federal Circuit did not contend that statutory and regulatory mandates need not exist, but instead relied on a "network" of statutory and regulatory provisions. Plaintiffs' claims do not fit within the alleged "network" of the statutory and regulatory provisions they cite. Second, although the Federal Circuit viewed the "common law trust duties of care, candor and loyalty" as being present in United States v. White Mountain Apache Tribe, 537 U.S. 465, 475 (2003), Defendant submits that the White Mountain Apache opinion should not be read so broadly. Indeed, in the Supreme Court's 2003 Navajo Nation opinion, Justice Ginsburg cabined White Mountain Apache by stressing that the latter decision was premised upon the government's use of the trust property in question for its own purposes - - that is, by statute, the United States was given total control of the trust property to use it for its own purposes until it was returned to the tribal beneficiary. The government has made no use of the Oenga allotment for its own purposes; no statute or regulation directs the United States to collect the royalties in question.

In its 2003 Navajo opinion, the United States Supreme Court **refused to hold** that the

common law trust duties of care, candor and loyalty (found to apply to the government by the Federal Circuit in its 2007 Navajo opinion because of the ex parte communications between a representative of Peabody Coal and the Assistant Secretary- Indian Affairs on the royalty rate specified in the proposed coal lease amendment in question) applied to the government on the basis of these very same ex parte communications. This refusal was despite the fact that the Nation's brief before the Supreme Court made these communications its central focus.

In short, plaintiffs' contentions that the statute of limitations is not applicable to **Claim No. 1** and that **Claim No. 1** embodies a money mandating duty are clearly devoid of merit and should be rejected.

## II. CLAIM NO. 2

### INTRODUCTION

Plaintiffs rely upon Leroy Oenga's January 2, 2008 Declaration that neither he nor the other plaintiffs received copies of either the 1993 or 1997 BIA appraisals used to make the rental adjustments scheduled under the Lease. However, the contemporaneous documentary record belies this claim. Even if Leroy Oenga did not physically acquire his own paper copy of the 1993 appraisal, he certainly had it explained to him in August,1993 - - a few weeks after its issuance. See Entry 2 to the Diane Stevens' Oenga Lease Log in Attachment **No. 32**; this Entry describes multiple visits to the ASNA Realty Office and contains the following notation: "Also receive and discuss appraisal."[9] Moreover, as discussed elsewhere, it is a fair inference that the Oengas were aware of the $1,600 per acre/per year appraisal valuation, since the negotiations

[9] Indeed, it appears that if Leroy Oenga did not physically obtain a copy of the 1993 appraisal it was because he never requested a copy. See Attachment **No. 46**, ¶ 12.

concerning what became the January, 1994 lease amendment (Attachment **No. 35**) featured the Oengas' attempt to secure back rent for 40 acres for a five-year period using that $1,600 figure. See Attachment **Nos. 28** and **30.**

With respect to the 1997 appraisal, each owner was informed about the amount of the adjusted rental based upon the 1997 BIA appraisal, but was also informed he/she would be receiving a larger amount under the CPI adjustment required under the Lease. Attachment **Nos. 44** and **46.** Again, there is no evidence that Leroy Oenga requested a copy of the 1997 appraisal, either

**A. The Governing Six-Year Statute of Limitations Bars Claim No. 2.**

The Second Amended Complaint alleges that the lease rental adjustments of 1993 and 1997 were unlawful (¶¶ 23- 24). However, the Second Amended Complaint (¶¶ 25-26) specifically excludes the lease rental adjustments of 2001 and 2005 from this case because they are the subject of an ongoing administrative proceeding before the Interior Board of Indian Appeals. Accordingly, the statute of limitations bars all of **Claim No. 2** because the lease rental adjustments of 1993 and 1997 are both beyond the six-year statute of limitations period.

It is clear that the plaintiffs have waited far too long to raise any claims about the methodology used in the 1993 and 1997 appraisals, not only because they had contemporaneous knowledge of their conclusions and access to their contents, but because they were demonstrably very attentive to the cash flow being generated by the Lease. One BIA official with firsthand knowledge of how the Lease was administered states: "[T]he owners were consistently very attentive to financial matters and well-informed about how much rent they were receiving." See Attachment **No. 46**,¶ 14. An ASNA official with firsthand knowledge of the day-to-day

administration of the Lease states: "The owners . . . were very interested in and very well-informed about the details of the cash flows." See Attachment **No. 47**, paragraph 3. Notably, the January 2, 2008 Declaration of Leroy Oenga does not contradict the quoted assertions, but merely states that family members did not get hard copies of the 1993 and 1997 appraisals. The statements discussed above demonstrate that plaintiffs' argument the government's failure to provide them with an "accounting" kept them from knowing about the facts underlying **Claim No. 2** is devoid of merit. **Claim No. 2** is time-barred. [10]

### B. Neither the Indian Long-term Leasing Act Nor the Implementing Regulations Gives Rise to a Money Mandating Duty as to Claim No. 2.

The purported sources of the alleged money mandating duty embodied in **Claim No. 2** are

25 U.S. C. § 415 (the Indian Long-term Leasing Act) and 25 C.F.R. Part 162 (the regulations implementing the Act). The Oengas characterize **Claim No. 2** as the government's alleged failure to determine and collect the "fair annual rental" for the Oenga allotment Parcel B based

---

[10] Plaintiffs argue that **Claim No. 2** (and also **Claim Nos. 1 and 3**) did not accrue until 2003 or 2005 because it was only then that the plaintiffs received the government's "accounting responses" to the plaintiffs' demands that the government account for all the proceeds generated under the Oenga Lease. The information provided to plaintiffs' counsel in 2003 and 2003 was not in the nature of an accounting. This information did not enhance their ability to discover the facts comprising the government's alleged wrongs. In reality, the only real change in the 2003-2005 period was that the plaintiffs had retained a different lawyer. As noted at the outset of this brief, their predecessors-in-interest had access to legal advice in 1989. See Attachment **No. 46**, paragraph 5 and Attachment **Nos. 8, 9 and 10.** The plaintiffs had access to independent legal advice in 1993 (see Attachment **Nos. 25, 26 and 28);** in 1994 (Attachment **No. 37);** and in 1995 (Attachment **No. 40**). At all these points in time, the plaintiffs knew the relevant facts, obtained legal advice, and, yet failed to bring suit against the government on **Claim Nos. 1, 2** or the **second part of Claim No. 3**. **Claim Nos. 1, 2** and the **second part of Claim No. 3** are fatally late and are not salvaged from the limitations bar by the ITAS tolling provision relied upon by the Oengas.

upon "proper appraisals" of the allotment when the lease rental adjustments scheduled for 1993 and 1997 were made. Pls. Br. at 32-33. The Oengas also contend that under the Lease the government assumed "actual control" of the leasing process within the meaning of the Federal Circuit's Navajo opinion (referred to as "Navajo V"). Thus, plaintiffs are arguing, in effect, the Lease created the money mandating duty. Id. at 33.

**1. The Government's Characterization of Claim No. 2 is Correct.**

The government reiterates the characterization of **Claim No. 2** which is set forth in its Motion to Dismiss - - that is, the essence of **Claim No. 2** is the government's failure to make the 1993 and 1997 lease rental adjustments by using royalty rates paid to owners of comparable properties. Plaintiffs retort that this argument "misses the mark", because they are not contending the money mandating duty embodied in Claim No. 2 required the United States to collect a royalty. Pls. Br. at 34. Instead, they assert that "[r]oyalties thruputs, and other considerations paid for the use of land are just different types of rent." Id.. Nonetheless, plaintiffs undercut their assertion by going on to argue that the government did not consider the "'**royalties**, thruputs or other consideration from **comparable properties used as sites for oil production."** (Emphasis added) Pls. Br. at 36. As an example, plaintiffs point to the **"royalties paid to a similar surface owner (Kuukpik Corporation) . . . "** (Emphasis added). [11/]

**2. The "Actual Control" Argument is Flawed.**

The Oengas' assertion that the Lease gave rise to the alleged money mandating duty because it gave the Defendant "actual control" over the leasing process is devoid of merit. The

[11/] Once again, we stress that the language of Paragraph **No. 9 of the Lease** barred BIA from considering the use of a royalty or a "thruput" as a basis for determining the "fair market rental rate" of the leased promises, when doing appraisals to determine lease rental adjustments.

'"actual control" argument is taken from Navajo V - - a ruling which the Federal Circuit premised upon the ruling in the Supreme Court's White Mountain Apache case in which the government was held to have been given by statute exclusive control over trust property with the authorization to use it for its own purposes - - a very rare situation. The government did not use the Oenga allotment Parcel B for its own purposes. More importantly, in Navajo V, the Federal Circuit expressly held that the coal lease at issue there was **not** the source of the money mandating duty it found to exist because the Secretary of the Interior was not a party to that tribal coal Lease. 501 F.3d at 1338-39. See Poafpybitty v. Skelly Oil Co., 390 U.S. 365, 372 (1968) (held that the Secretary of the Interior is not a party to any lease of Indian lands/resources by a third party).

In short, plaintiffs' arguments for the inapplicability of the statute of limitations to **Claim No. 2** and for their characterization of **Claim No. 2** as a money mandating duty totally lack merit and should be rejected.

**III. CLAIM NO. 3**

The **first part of Claim No. 3** concerns the alleged government obligation to give notice of BPX's supposed breach of the Lease and notice of trespass on the allotment by ARCO and Exxon Mobil Alaska Production and to take "related action when requested." The Oengas contend this is a money mandating duty by virtue of the provisions in 25 U.S.C. § 415 and 25 C.F.R. Part 162. Pls. Br. at 37. [12/]

**First Part of Claim No. 3**

---

12/

The **second part of Claim No. 3** is that the defendant's alleged breach of the "common law trust duties of care, candor, and loyalty", in turn, imposed a fiduciary duty upon the Defendant to disclose to the Oengas in 1993 ARCO's expression of interest to the BIA at that time in leasing part of the Oenga allotment Parcel B (in order to be able to access its state oil leases in the West Niakuk and Lisburne Participating Areas) before BIA approved BPX's request

**A. The Government's Alleged Obligation to Give Notice of Breaches of the Lease and Trespass and Take other Related Action, Particularly when Requested Is not Money Mandating.**

In the last analysis, plaintiffs actually rely only upon 25 C.F.R. §§ 162.617 through 623. As to the government's alleged obligation to give notice of the supposed breach of the Lease by BPX when it entered into the 1994 Facilities Access Agreement with ARCO/Exxon, plaintiffs conveniently ignore the fact that Section 162.618 only requires the BIA to send a notice of breach of a lease **only after the BIA has determined that a breach has occurred.** E.g., Pawnee v. United States, 830 F.2d 187, 190-92 (Fed. Cir. 1987), cert. denied, 486 U.S. 1032 (1988) (held that the government's alleged failure to use plaintiffs' methodology for calculating oil royalties does not state a claim where no violation of statute, regulation or lease term can be shown). The Interior Department never made such a determination because it believed that Paragraph No. 10 of the Lease authorized the 1994 Agreement. See February 7, 2008 Declaration of Roger L. Hudson, Attachment **No 49**, ¶ 8. As for the supposed trespass by ARCO/Mobil on the Oenga allotment, Section 162.623 restricts the use of the term "trespass" to a situation where the "tenant remains in possession [of the leased property] after expiration or cancellation of a lease . . . " ,The regulations did not impose a money mandating duty on the government to give notice of the supposed trespass by ARCO/Exxon, because this supposed trespass did not qualify as a "trespass" within the meaning of Section 162.623.[13] In conclusion,

---

to expand its leased area of the 40-acre Oenga allotment Parcel B from 10 to 20 acres. Since the Government's Motion to Dismiss was filed before the Second Amended Complaint was filed, the Motion to Dismiss does not address the **second part of Claim No. 3.** However, the Government's Opposition addresses the **second part of Claim No. 3.**

[13] Even assuming, arguendo, that the asserted "trespass" was within the scope of § 162.623, the BIA had broad discretion as to whether to request the appropriate U.S. Attorney's office to bring

there is nothing in 25 U.S.C. § 415 nor in 25 C.F.R. Part 162 which makes the duty alleged in the **first part of Claim No. 3** money mandating.

**B. The Government's Failure to Bring Suit Against BPX and ARCO/Exxon Does not Constitute a Breach of Trust.**

By referring to "other related action, particularly when requested,"the Oengas strongly suggest that the government's failure to file suits on behalf of the Oengas against: (1) BPX for breach of the Lease; and (2) ARCO/Mobil for trespass upon the Oenga allotment Parcel B amounts to a breach of trust. The governing case law establishes that the failure to bring these suits is not a breach of trust. United States v. Creek Nation, 318 U.S. 629, 639 (1943) The decision of the Attorney General to authorize the filing of suits against third parties on behalf of an Indian tribe or individual Indian is wholly discretionary and cannot be the subject of a breach of trust claim. Shoshone-Bannock Tribes v. Reno, 56 F.3d 1476, 1480-82 (D.C. Cir. 1995).[14/]

**C. The Oengas' Interpretation of the Subject Lease as it Relates to their Breach of Lease/Trespass Claim is Wrong.**

As noted, the plaintiffs argue as to the **first part of Claim No. 3** that the 1994 Facilities Access Agreement entered into between BPX and ARCO/Exxon amounted to both a breach of the subject Lease by BPX and a trespass on allotment Parcel B. The Oengas argue that the intent of the parties at the time the Lease was signed in 1989 controls and the clear intent was to restrict the use of allotment Parcel B to the production of oil from the Niakuk Participating

---

suit on any particular trespass.

[14/] Significantly, the Oengas had the legal capacity to bring suit on their own behalf against BPX and ARCO/Exxon and this strongly militates against the existence of a fiduciary duty upon the government to file suit. See Cherokee Nation of Oklahoma v. United States, 21 Cl. Ct. 565, 574-75 (1990) Here, **prior to 1989**, Andrew Oenga had successfully sued several oil companies for trespass upon a 120-acre parcel which had been allotted to him. This proves that plaintiffs had the same legal capacity.

Area. Pls. Br. at 41-46. The Oengas' "intent" argument is refuted by the fact BIA Realty Specialist Kathleen Dickinson explained to Andrew Oenga (through his interpreter) that Paragraph No. 10 meant that the lessee oil company could use Parcel B for “any oil development

related purpose.” See Declaration of Kathleen Dickinson, Attachment **No. 46** , Paragraph No. 8. Thus, the parties' alleged "intent" to restrict use of Parcel B did not actually exist. Certainly, this contemporaneous administrative construction of Paragraph No. 10 is entitled to great deference. Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana, 472 U.S. 237, 252-55 (1985). [15/]

Paragraph No.10 imposes no geographic restriction on the use of Parcel B for the production of oil; indeed, Paragraph No. 10 makes no mention of oil from tracts within the Niakuk Participating Area. In sum, Paragraph No. 10 is not ambiguous, since it is susceptible to only one reasonable meaning - - the one asserted by Defendant.[16/] Plaintiffs also invoke the canon of contract interpretation that any ambiguity is to be construed against the drafter of a contract or lease - - that is, Standard Alaska Production Co. ( BPX's predecessor-in-interest) as to the Oenga Lease. However, this rule of construction has no applicability, since the language of Paragraph No. 10 is not ambiguous, as we have demonstrated. However, even if the Court were

---

15/

16/ Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375-76 (Fed. Cir. 2004). The plain language of Paragraph No. 10 clearly authorized the 1994 Facilities Access Agreement. Hunt Construction Group, Inc. v. United States, 281 F.3d 1369, 1373 (Fed. Cir. 2002). In contrast to the Defendant's arguments, plaintiffs make much of the term "oil field" in Paragraph No. 10; the use of the singular voice supposedly operates to limit access to Parcel B to oil coming from the Niakuk Participating Area. However, the term "oil field" is used as an adjective, not a noun, and does not support plaintiffs' reading.

to find that Paragraph No.10 is ambiguous and that the parties were not "equal" in bargaining power[17/], this canon should not apply here because, as we have documented, Andrew Oenga had ample opportunity to bargain for/negotiate the terms of the subject Lease. Cf. Saxon Mortgage, Inc. v. Mortgage Plus, Inc., 130 F. Supp. 2d 1236, 1244 n. 2 (D. Kan. 2001).[18/]

**Second Part of Claim No. 3**

**A. The Statute of Limitations Bars the Second Part of Claim No. 3.**

Plaintiffs assert that they first knew about ARCO's 1993 interest in leasing part of Parcel B only in 2003 or 2005, relying upon the Declaration of Leroy Oenga. However, that assertion cannot be reconciled with the written record, which strongly supports the opposite conclusion. Not only does BIA employee Kathleen Dickinson, the person who interacted with ARCO at the time, express confidence that ASNA and the Oengas were informed of the ARCO inquiry, (Dickinson Declaration, Attachment **No. 46** , Paragraph 9), but her recollection is strongly supported by documentary reference to the ARCO inquiry prepared at the time by ASNA, and undoubtedly seen by the lessors . Dickinson Declaration, Paragraph 10, referencing Attachments **Nos. 32** and **34**. Most telling of all, of course, is the January 14, 1994 Counseling Record, signed by each lessee, including Leroy Oenga, which specifically references ARCO, and acknowledged that the lessee, rather than the lessors, have a right to enter into an arrangement with ARCO.

---

[17/] Defendant does not contend that the parties were "equal" in bargaining power, but does contend that all of the bargaining power did not reside with the lessee oil company.

[18/] Furthermore, the Oengas' mistaken views about Paragraph No. 10 of the Lease should be read do not somehow create ambiguity for the purpose of interpreting this provision. Cf. Chickaloon-Moose Creek Native Ass'n, Inc. v. Norton, 360 F.3d 972, 982-983 (9th Cir. 2004).

Attachment **No. 33**. See Harvest Institute Freedman Federation, et al. v. United States, slip op. at 3-5 (January 15, 2008).

**B. The Facts Relating to the "Failure to Disclose" in Navajo Do not Support the Alleged "Failure to Disclose" Claim Here.**

Aside from the fact that the factual premise for the **second part of Claim No. 3** is blatantly erroneous, the fact pattern giving rise to the "failure to disclose" duty found to exist in Navajo V bears little or no resemblance to the fact pattern cited by the Oengas in support of their "failure to disclose" argument. In Navajo, the Assistant Secretary of the Interior - Indian Affairs had an ex parte meeting with a representative of Peabody Coal to discuss Peabody Coal's proposed amendment to a particular Navajo tribal coal lease; the proposed amendment contained a specified royalty rate of 12 and ½ percent. By contrast, the Tribe sought a 20 percent royalty. At the meeting, the Assistant Secretary had indicated the 12 and ½ royalty rate was satisfactory to him. The meeting occurred before the coal company and the Tribe had finished their negotiations over this proposed amendment.

In the Oenga case, the plaintiffs have not established that ARCO ever transmitted a proposed ARCO/Oengas lease to the BIA, unlike Navajo. Also, unlike Navajo, the Oengas did not enter into any lease negotiations with ARCO (now ConocoPhillips), after ARCO had communicated with the BIA. Unlike Peabody Coal's insistence on a coal royalty rate less than two-thirds of what the Navajo Tribe wanted, BPX's agreement to pay rent on all 40 acres contained in Parcel B (effective July 1, 1993), benefitted the Oengas by increasing their proceeds from the Lease. Finally, the factual invalidity of the Oengas' "failure to disclose" argument, coupled with the strong presumption that government officials act properly and in good faith in

carrying out their official duties (e.g., Andrade v. United States, 202 Ct. Cl. 988, 997-998, 485 F.2d 660, 664-65 (1973)), also weighs heavily against the Oengas' argument that the **second part of Claim No.** 3 is money mandating.

Dated this 15th day of February, 2008.

RONALD J. TENPAS
Assistant Attorney General
Environment & Natural Resources Division

s/James M. Upton
JAMES M. UPTON
SAMANTHA KLEIN
Natural Resources Section
Environment & Natural Resources Division
Department of Justice
P. O. Box 663
Washington, D.C. 20044-0663
Tel: (202) 305-0482
Fax: (202) 305-0506
Email: james.upton@usdoj.gov

Attorneys for Defendant

OF COUNSEL:

Roger Hudson, Esq.
Office of the Solicitor
Alaska Regional Solicitor's Office
Department of the Interior
Anchorage, Alaska

Attachments