# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WALLACE OENGA, GEORGENE SHUGLUK, LEROY OENGA, SR., MICHAEL DELIA, TONY DELIA, JOSEPH DELIA, JENNIE MILLER, and TRINITY DELIA, | ) | No. 06-491 L<br>Judge Margaret Sweeney |
| Plaintiffs, | ) | |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant, and | ) | |
| BP EXPLORATION (ALASKA) INC., CONOCOPHILLIPS ALASKA, INC., EXXON MOBIL ALASKA PRODUCTION, INC., CHEVRON U.S.A., INC. and FOREST OIL CORPORATION, | ) | OENGA REPLY BRIEF<br>RE: MOTION FOR PARTIAL SUMMARY JUDGMENT |
| Defendant Intervenors | ) | |

**TABLE OF CONTENTS**

TABLE OF AUTHORITY ii

I. INTRODUCTION 1

II. FACTS 1

III. ARGUMENT 3

A. Statute Of Limitations - Claims One, Two & Three Were Timely Filed 3

B. Money-Mandating Duty – Analytical Approach & Legal Standards 12

C. Claim *One* – Money-Mandating Duty 12

1. Existence of Claim *One* Money-Mandating Duty 12

2. Case Within Scope of Claim *One* Money-Mandating Duty 14

D. Claim *Two* – Money-Mandating Duty 18

1. Existence of Claim *Two* Money-Mandating Duty 18

2. Case Within Scope of Claim *Two* Money-Mandating Duty 20

E. Claim *Three* Money-Mandating Duty 21

1. Existence of Claim *Three* Money Mandating Duty 21

2. Case Within Scope of Claim *Three* Money-Mandating Duty 23

F. Oil Companies Separate Response Arguments 24

IV. CONCLUSION 27

# TABLE OF AUTHORITY

## Cases

*Alaska Pacific Fisheries v. United States*, 248 U.S. 78 (1918) ..................... 17

*Brown v United States*, 86 F.3d 1554, (C.A.Fed 1996) ..................... 18, 19, 20

*Bryan v. Itasca County*, 426 U.S. 373 (1976) ..................... 17

*Del-Rio Drilling v. United States*, 35 Fed. Cl. 186 (1996) ..................... 17

*Fisher v. United States*, 402 F.3d 1167, 1173 (C.A.Fed 2005) ..................... 12

*Menominee Tribe v. United States*, 221 Ct. Cl. 506 (1979) ..................... 16

*Navajo Nation v. United States,* 501 F. 3d 1327 (C.A.Fed 2007) ..................... 12, 20, 22

*Osage Tribe v United States*, 68 Fed. Cl. 322 (2005) ..................... 6, 13

*Shoshone Indian Tribe of the Wind River Reservation v. United States,* 365 F.3d 1339 (C.A. Fed 2004) ..................... passim

*Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engineering,),* 467 U.S. 138, 149 (1984) ..................... 17

*Total Medical Management, Inc. v. U.S.*, 104 F.3d 1314 (C.A.Fed. 1997) ..................... 5, 13

*White Mountain Apache Tribe v. United States*, 10 Cl. Ct 115 (1986) ..................... 16

## Statutes

28 U.S.C. § 2501 ..................... 3, 4, 11, 27

28 U.S.C.§ 2501 ..................... 3

30 U.S.C.§ 1702(6) ..................... 15, 16

30 U.S.C.§ 226(m) ..................... 16, 18, 25

42 U.S.C. § 9506a(j)(5) ..................... 16, 18

*Department of the Interior and Related Agencies Appropriates Bill,* Pub.L. No. 101-512, 104 Stat.1915 (enacted November 5, 1990) ..................... 6

## Other Authorities

H.R.Rep. No. 103-158 (1993) ..................... 10

## Regulations

25 C.F.R. 162 ..................... passim

25 C.F.R. Part 212 ..................... passim

## I. INTRODUCTION

This Motion seeks partial summary judgment 1) that all three Claims in this action were timely filed within six years of accrual, 2) that a money-mandating duty exists as to all three Claims, and 3) that the Plaintiffs' situation is within the scope of the money-mandating duties as to all three Claims.

This Reply Brief addresses the United States' response arguments, in which the Oil Companies join. Docket 88 (United States Response), Docket 87 p. 19 (Oil Companies joining in United States Response). Plaintiffs will be referred to as "Oengas," Intervenors as "Oil Companies," and Intervenor BP Exploration (Alaska) Inc. as "BPX." This Brief's format will be generally the same as the Oengas' initial Partial Summary Judgment Brief. The Oil Companies' separate Response arguments, Docket 87, pp.20-27, will be addressed separately at the end.

## II. FACTS

The facts relevant and material to this Motion were thoroughly addressed in Oengas' initial Brief. Many of the facts addressed in the United States and Oil Companies responses relate solely to the negotiation of the initial Lease Agreement. These have little to do with the facts material to this Motion, because Oengas' Motion takes the initial Lease as it is, and focuses on the United States' failure to comply with the controlling regulations and duties assumed by the United States in that Lease. 25 C.F.R. Part 212 (Claim One), 25 C.F.R. 162 (Claims Two and Three). The focus of this Motion is <u>not</u> whether the United States negotiated a good initial Lease for Andrew Oenga. It did not, but that is not the issue. Consequently, it is not necessary to address the United States' and Oil Companies' Facts regarding initial Lease negotiation which

are not now before the Court. But there is one exception.

That exception is the repeated reference by the United States and the Oil Companies to an attorney, Mr. Feldman. Docket 88 pp. 9-10 (United States), Docket 87 pp. 18-19 (Oil Companies). Mr. Feldman represented Andrew Oenga in a prior trespass matter, but not during the initial Lease negotiation. As shown by the Second Declaration of Leroy Oenga, Attachment 3, Mr. Feldman was at the time an attorney for the U. I. C., a Native village corporation at Barrow, which had made Mr. Feldman's services available to Andrew Oenga for the trespass action, but not for the initial Lease negotiations.

Mr. Feldman is apparently reference for two reasons. The first would seem to be an attempt to divert attention away from the United States' failure to adequately live up to its fiduciary responsibility during the initial Lease negotiations The second would seem to be an attempt to imply that any problems Oengas have with this situation today are of their own making because they did not use an attorney at the time of the initial Lease negotiation.

There are two reasons why references to Mr. Feldman have nothing to do with this Motion and should be disregarded. First, the negotiation of the initial Lease has little or nothing to do with this Motion, except for the obligation or duties assumed by the United States in that Lease. (Duty to set amounts for future rents, duty to collect rents). Second, it is most inappropriate for the United States to attempt to justify its questionable actions at the time of the initial Lease negotiations by chiding an Inupiat elder in his 70s, who spoke little or no English and had lived a largely subsistence lifestyle, and to whom it owed a fiduciary responsibility, for failing to use an attorney who was not available to him. All reference to Mr. Feldman by the United States and the Oil Companies should be disregarded.

## III. ARGUMENT

### A. Statute Of Limitations - Claims One, Two & Three Were Timely Filed

**Oengas' Initial Brief –** Docket 78, pp. 20-28 – Oengas seek partial summary judgment that Claims One, Two and Three were timely filed within six years of accrual. 28 U.S.C. § 2501, the Indian Trust Accounting Statute, PL 109-54 (2005), 119 Stat. 499, 519 (2005), (ITAS), *Shoshone Indian Tribe of the Wind River Reservation v. United States,* 365 F.3d 1339, 1345-51 (C.A. Fed 2004) ("*Wind River*"). All three Claims are subject to the ITAS because they are claims for failure to *collect* proper rents. Id. at 1350 (the ITAS phrase "'losses to ... trust funds' may be understood to cover losses resulting from the Government's failure to timely collect amounts due and owing…") (emphasis added). The action was timely filed in 2006, within six years of receipt of the 2003 and 2006 responses to accountings requested by Oengas under the ITAS. Claim Three was timely filed even without reference to the ITAS.

**United States And Oil Companies Response** – Docket 88, pp. 11-18 (Claim One), 27-28 (Claim Two), 41-42 (Claim Three). The United States' uses a shotgun approach in arguing that all Claims are barred because they are claims for mismanagement of a trust asset, the accounting requests do not implicate the ITAS because Oengas previously knew or should have known of their claims, the documents produced did not constitute an accounting, the proper accrual dates were in 1987 or 1993, rents due for 2000 and 2001 accrued in 1997, and a factual question precluded one of the non-ITAS Claim Three statute of limitation arguments.

**Oengas' Reply –** Oengas are entitled to partial summary judgment that all Claims were timely filed within six years of accrual under 28 U.S.C.§ 2501 due to the operation of ITAS. Claims regarding rents due in 2000 and 2001 were timely filed regardless of the applicability of

the ITAS. The United States does not contest the timeliness of filing of Claim Three under one of the Claim Three theories. A material issue of disputed fact has now been raised as to the other Claim Three theory, both as to the statute of limitations and merits. Consequently, the request for partial summary judgment is withdrawn as to the Claim Three theory for which there is a material issue of disputed fact. Partial summary judgment is still requested on the other Claim Three theory (failure to take action regarding breach and trespass) for which the United States has not contested the timeliness of the filing. Oengas' reply to each United States arguments follows.

**1. The ITAS Displaces All Other Statute of Limitations Laws**

The ITAS states:

> [N]otwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim, including any claim in litigation pending on the date of the enactment of this Act, concerning losses to or mismanagement of trust funds, until the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss.

Id. (emphasis added)

The ITAS displaces all other statute of limitations laws. *Wind River* at 1346 ("The introductory phrase "[n]otwithstanding any other provision of law" connotes a legislative intent to displace any other provision of law that is contrary to the Act, including 28 U.S.C. § 2501."). ITAS was invoked by Oengas' requests for accountings. This action was filed within six years of accrual under ITAS. It was timely filed.

**2. Oengas' Claims are for Breach Trust for Failure to *Collect* Proper Rents, *Not* for Failure to *Manage* a Trust Asset as Argued by the United States**

In *Wind River* the Federal Circuit held that ITAS was applicable to claims for failure to collect proper rents, but not applicable to claims for failure to properly manage trust assets.

*Wind River* at 1350 ("The Act [ITAS] covers claims concerning "losses to ... trust *funds* rather than losses to mineral trust *assets*" and "'losses to ... trust funds' may be understood to cover losses resulting from the Government's failure to timely collect amounts due and owing") (emphasis in original). In suggesting that ITAS is not applicable here despite *Wind River*, the United States characterizes the action as one challenging the propriety of the initial Lease, negotiated with the aid of and approved by the United States, and asserts that this action is a challenge to the management of a trust asset. That is simply not correct. This action takes the initial Lease as it is, and challenges the United States' later failure to perform duties imposed by the regulation and duties assumed by the United States in that initial Lease.

Claim One asserts that once Oengas' Allotment began being used as a point of oil production, the United States had a duty to collect the royalty required by the regulation, not some other amount described in the Lease. 25 CFR Part 212. Claim Two asserts that once Oengas' Allotment began being used as a point of oil production, the United States had a duty to collect "fair annual rental" that took into account the unique location and value of the Allotment for oil production, including rents in similar situations paid as thruputs, royalties or some other form of consideration. 25 CFR Part 162. Both Claims One and Two seek damages for the United States' failure to collect proper rents required under the regulations. Under *Wind River,* the ITAS is applicable to such actions regarding the United States' failure to collect proper rents.

To the extent there is a conflict between a greater amount of rent due under the regulations, versus a lesser amount due under the Lease, the regulation controls. *Total Medical Management, Inc. v. U.S.*, 104 F.3d 1314, 1319 (C.A.Fed. 1997) (contracts involving the

government which do not comply with federal regulations are *void ab initio*).[1]

The United States attempts to circumvent the "failure to collect" language of *Wind River* by citing to stray dicta in *Pawnee v. United States*, 830 F.2d 187, 190 (Fed. Cir.1987), referring to the failure to collect proper royalty payments as "mismanagement of Indian lands and natural resources." Docket 88 pp. 16-17. Such stray language is not applicable for three reasons. First, the language was not used in conjunction with a statute of limitation issue under ITAS. Second, it was written 17 years before the Federal Circuit's 2004 *Wind River* decision where the careful ITAS distinction was made between failure to collect rents due and failure to manage trust assets. Third, *Pawnee* was decided in 1987, three years before ITAS was even enacted. *Department of the Interior and Related Agencies Appropriates Bill,* Pub.L. No. 101-512, 104 Stat.1915. (enacted November 5, 1990). The stray *Pawnee* language has no applicability in this setting.

The United States also attempts to distinguish the recent decision of *Osage Tribe v United States*, 68 Fed. Cl. 322 (2005), but it effort is similarly misplaced. Docket 88 pp. 15-18. It is undisputed that *Osage* dealt with a slightly different statute and factual situation, but its discussion of underlying statute of limitation principles and application of *Wind River* are instructive.

The United States' argument that this is a case regarding management of a trust asset is misplaced. This case is not about the United States negotiating a poor initial Lease, it is about

---

[1] The supremacy of the regulations over Lease is especially strong in this action because of 1) the requirements of 25 CFR 212.41(b) (1996) (Claim One) and 25 CFR 162.5(b)(3) (1987), *162.604(b)(3) (2001)* (Claim Two) that a rent less than provided for in the regulation can be collected only if there is a finding that the lesser rent is in the best interest of the Allottee, coupled with 2) the United States' admission that no such finding has been made. United States' Answer to Second Amended Complaint ¶37 (no such finding made as to Claim One), ¶47 (no such finding made as to Claim Two).

the United States' failure to collect rents required by the regulations. ITAS applies. The United States' argument to the contrary should be rejected.

**3. Oengas' Accounting Request Invoked ITAS Because the Plain Language of the Statute Precludes the Burden-Shifting *Subjective* Standard Urged by the United States**

The United States would have the Court read into ITAS a burden-shifting, subjective standard that is not supported by the plain wording of the statute. The United States argues that the burden was on the Oengas' to acquire on their own the information necessary to learn if they had a claim, and that their failure to do so, coupled with what they may have known, makes the ITAS inapplicable. Docket 88 pp. 11-14.[2] With ITAS thus removed from consideration, the United States argues that the cause of action accrued in 1989 or 1993, much more than six years before filing. Docket 88 pp. 11-14.

This ITAS approach urged by the United States would require ITAS be read 1) as requiring a shifting of the accounting burden (providing information necessary to determine if a claim exists) from the United States to the individual, and 2) as requiring a case-by-case, subjective approach to ascertain what each plaintiff knew of their claim and when they knew it. The plain wording of ITAS precludes such a reading. ITAS provides that the statute of limitations "shall not commence to run on any claim…until the affected tribe or individual Indian has been furnished with an accounting…" Id. (emphasis added). This without question places the burden on the United States of providing the information "from which the beneficiary can determine whether there has been a loss." Id. Similarly, the plain wording of the "notwithstanding" clause and the mandatory nature of the statute precludes the case-by-case subjective approach. As the Circuit said in *Wind River*, "This is simple logic-how can a

[2] Ironically, the United States takes this position even though it concedes that it is not asserting that Oengas have a duty to "independently manage [their] trust property." Docket 88, p. 18, fn. 5.

beneficiary be aware of any claims unless and until an accounting has been rendered?" Id. at 1347.

The construction urged by the United States would have dramatic consequences in the *Cobell* and related Tribal litigation, which is primarily the place the ITAS has been applied. Under the United States' approach, a case-by-case, factual determination would have to be made for each of the tens of thousands of *Cobell* litigants and for each of the hundreds of similar Tribal litigants to determine what they knew about their claim, and when they knew it prior to filing. Tens of thousands of such factual determinations are exactly the imprudent expenditure of scarce judicial resources that Congress was surely attempting to avoid when it adopted ITAS and placed the burden of conducting a requested accounting of such claims on the United States. Congress was painting with a broad brush when it adopted ITAS. The burden-shifting, subjective standard urged by the United States should be rejected.

Secondly, even if the ITAS were read to impose such a burden-shifting, subjective standard, the United States position still fails. The Declaration of Leroy Oenga states that "There is simply no way we understood the United States had failed to collect proper rents or that we had suffered a loss until we received all of the materials received in response to these accounting requests." Docket 78-2 p. 4.

The type of information which the Oengas did not previously have, included:

- The fact that oil production thru the Allotment or royalties, or thruputs were not considered in any way in the collection of rents.
- The actual appraisals and cost of living adjustments performed by or considered by the United States in calculating the amount of rents to be collected.
- The standards under which those appraisals were conducted.

- The items considered and comparables used in the appraisals.
- The itemization of rents actually collected from BPX, and distributed.

This is certainly sufficient to satisfy a subjective standard, especially in light of the fact of the limitation imposed on Oengas' communication with BPX by ¶ 34 of the Third Lease Amendment. Docket 42-5, p.56.

**4. Documents Provided By United States Pursuant to ITAS Request Were Sufficient Accounting Response to Inform Oengas A Loss Had Been Suffered**

The United States acknowledges that Oengas requested an accounting, but "denies that its responses to the Plaintiffs' demands for preparation of an accounting of Lease proceeds amounted to 'accounting responses.'… In short, no responses amounting to an accounting exist." Docket 88 p. 14 (United States Response); Docket 78-2 pp. 9-10 (Oengas' Demand for Accounting). This implausible assertion is unsupportable. The United States cannot render ITAS inapplicable simply by declaring that its response to a request for an accounting "does not amount to accounting responses", or does not "exist[]" Id. Such is precluded by the plain wording of the ITAS that the statute of limitations "shall not commence to run on any claim" until the claimant "has been furnished with an accounting." Once an accounting is requested under the ITAS, the cause of action simply does not accrue until a "meaningful accounting" is received. *Wind River* 364 F.3d at 1347. If the United States' does not respond to an accounting request under the ITAS, or responds in a way which is not an accounting, the result simply is that the statute of limitations does not begin to run.

This does not mean, however, that a plaintiff cannot file earlier if the response, even though not a full accounting, is still adequate inform him that the claim exists. As the Circuit stated in *Wind River*, "The beneficiary, of course, may bring his action as soon as he learns that

the trustee has failed to fulfill his responsibilities." Id. at 1348.

Even though the bankers box full of documents produced in response to Oengas' accounting request might not meet the standards addressed so meticulously in the long-running *Cobell* litigation, the United States' response did provide the Oengas with a great deal of information they did not previously have. It was sufficient to make Oengas aware of their claims that the amount due and owing had not been collected.

The accounting response received by the Oengas from the United States in 2003 and 2006 were sufficient "accounting[s]" within the meaning of ITAS to inform Oengas of their claims. Oengas' claims accrued in 2003 or 2006 under ITAS. This action was timely filed in 2006.

**5. ITAS Is Applicable, So the Accrual Date Is 2003 Or 2006 When Accounting Responses Received, Not Date of Original Lease or Early Appraisal**

For the reasons above stated, the ITAS is applicable to this case. As such, the date of accrual is the date the accounting responses were received in 2003 and 2006. ITAS (providing that the statute of limitation does not begin to run until an "individual Indian has been furnished with an accounting…"), *Wind River*. The United States' argument that this claim accrued at the time of the signing of the Lease or at the time of an appraisal regarding the first rent adjustment is akin to saying that a *Cobell* breach of trust claim or *Cobell*-type Tribal breach of trust claim accrued at the time of signing of a farm lease or timber lease or oil lease 100 years ago. The ITAS simply cannot be read so narrowly, and such a reading would be contrary to the purpose for which the Act was passed. H.R.Rep. No. 103-158, at 57 (1993) (ITAS "extends the Statute of Limitations with relation to Indian trust fund management, to protect the rights of tribes and individuals until the reconciliation and audit of their accounts has been completed."), *Wind River*

at 1345-1351. This cause of action accrued in 2003 and 2006 when the responses to the accounting requests were received.

**6. Claims Regarding 2000 and 2001 were timely filed regardless of ITAS**

Although the United States' argument is not particularly clear, it seems to be arguing that Oengas' claims regarding rents collected for 2000 and 2001 were not timely filed because the rents collected for those years was determined by a 1997 appraisal, more than six years prior to filing. Docket 88, p. 16-17 (as to Claim One and Tolling Agreement), p. 27 (as to Claim Two and 1997 determination). Such an argument is without merit. Even without the ITAS, this action was timely filed as to claims for rents to be collected in 2000 and 2001, due in part to a Tolling Agreement entered into in December 2005.

In December, 2005, the Oengas and the United States entered into a Tolling Agreement that ran thru June, 2006. Docket 67 p. 3 ¶ 6 (Second Amended Complaint), Docket 74 p. 2 ¶ 6 (United States Answer to Second Amended Complaint). Oengas filed this action in June, 2006, prior to the expiration of the Tolling Agreement. As such, any claim for the six years preceding the Tolling Agreement -2005, 2004, 2003, 2002, 2001 or 2000 – would be timely. Oengas' similar claims for 2002-2005 are still in the administrative process, but claims for rents that should have been collected in 2000 and 2001 are part of this action.

The United States' duty under the regulations is to collect "present fair annual rental" 25 USC Part 162 (1987), (2001). The rent must be "fair" for the year collected. Claims regarding such rents accrue in the year for which the rent is to be collected, not to some prior appraisal date. The claims regarding 2000 and 2001 were filed within six year of accrual. 28 U.S.C. § 2501, the Tolling Agreement. The United States apparent argument to the contrary is without merit. Oengas' claims regarding breach of trust for failure to collect proper rents in 2000 and

2001 are timely filed, regardless of the applicability of the ITAS.

**7. Claim Three Was Timely Filed Regardless of ITAS (First Claim Three Theory)**

The United States does not contest the timeliness of the filing of Oengas' first Claim Three argument that the United States breached its duty to take action regarding breach and trespass when requested to do so in 2005 and thereafter. Docket 88, pp.33-44 (Claim Three). Oengas' are therefore entitled to summary judgment that this aspect of Claim Three was timely file.

## B. Money-Mandating Duty – Analytical Approach & Legal Standards

**Oengas' Initial Brief -** Docket 78, pp. 25-27 – In order for a plaintiff to maintain a claim under the Tucker Act, there must be a money-mandating source of substantive law that establishes a duty owed the plaintiff by the United States, the breach of which renders the United States liable to the plaintiff for money damages. *Navajo Nation v. United States,* 501 F. 3d 1327 (C.A.Fed 2007) (*Navajo V*). A single determination of this money-mandating duty is sufficient for jurisdictional and merits purposes. *Fisher v. United States*, 402 F.3d 1167, 1173 (C.A.Fed 2005). Analysis of this money-mandating duty question requires consideration of 1) whether the duty exists, and 2) whether Plaintiff's situation is within the scope of the duty. *Navajo V.*

**United States Response & Oil Company Response** – The United States does not contest or even address this section of Oengas' Brief.

**Oengas' Reply** – No reply is necessary.

## C. Claim *One* – Money-Mandating Duty

**1. Existence of Claim *One* Money-Mandating Duty**

**Oengas' Initial Brief -** Docket 78, pp. 28-30 – A network of statutes and regulations

creates a money-mandating duty, which requires the United States to collect royalties on oil and gas produced thru leased allotments. 25 U.S.C. §§ 396, 396a-g; 30 U.S.C. § 1701 et seq.; 25 CFR Part 212 (1987)*(1996);* 30 CFR Part 296 (1993); 43 CFR Part 3160 (1993); *Pawnee v. United States,* 830 F.2d 187 (C.A.Fed. 1987) (finding money-mandating duty under same network as to oil); *Osage Tribe v. United States*, 68 Fed.Cl. 322 (2005) (finding money-mandating duty under similar network as to oil); *Navajo V,* 501 F. 3d at 1349 (finding money-mandating duty under same network as to coal).

**United States & Oil Company Response –** Docket 88, p.19 – The United States does not attempt to argue that the network of statutes and regulations creates no money-mandating duty, nor could they in light of *Pawnee, Osage Tribe and Navajo V.* Instead the United States argues that ¶ 9 of the initial Lease "refutes the assertion of any money mandating duty to collect a royalty on oil produced through use of Parcel B as an oil production facility." Docket 88 p. 19.

**Oengas' Reply –** Oengas' position is that the network of statutes and regulations requires that a royalty be collected and that this controls over a contrary Lease provision. The United States' argues that the Lease controls, but this is not the law. Mandatory statutes or regulations control over contrary Lease provisions. *Total Medical Management, Inc. v. U.S.*, 104 F.3d 1314, 1319 (C.A.Fed.,1997) (contracts involving the government which do not comply with federal regulations are *void ab initio*).

25 CFR Part 212, and the other statutes and regulation in the network, requires that a royalty be collected on the production of oil from allotted lands. *Pawnee, Osage Tribe.* This network establishes a money-mandating duty. *Pawnee, Osage Tribe and Navajo V.* Oengas are entitled to partial summary judgment that a Claim One money-mandating duty exists.

**2. Case Within Scope of Claim *One* Money-Mandating Duty**

**Oengas' Initial Brief -** Docket 78, pp. 30-36 – Oengas are entitled to a partial summary judgment that their situation is within the scope of the Claim One money-mandating duty because they are appropriately considered persons for whom royalty payments on oil production are to be collected by the United States under the above network of statutes and regulation creating the duty. 25 CFR Part 212.

**United States and Oil Company Response –** Docket 88 pp. 12-20 – The United States' primary argument is that Oengas are not "Indian mineral owners" under 25 CFR Part 212, so no collection of a royalty on oil produced thru their property is required.

**Oengas' Reply –** The crux of this issue is whether Oengas, as allottees of allotted lands involved in the production of oil, are persons for whom a royalty is to be collected by the United States under 25 CFR Part 212. Under the regulation in effect from the time of the Lease until 1996, a royalty was required to be collected on oil "produced and saved from the land leased." 25 CFR 212.16 (1987). Since 1996 a royalty on oil was required to be collected for an "Indian mineral owner." 25 CFR 212.3 (1996) (defining "Indian mineral owner").

Oengas specifically satisfy the standard of the older regulations – applicable to this case for production from 1993-1996 - because they own the "land" or allotment from which the oil was "produced." 25 CFR 212.16 (1987). The oil is "produced" from the production facility constructed on "the land leased." Id. There is no ambiguity, and no further construction is necessary. Oengas were entitled to have a royalty collected for them by the United States from 1993-1996.

The question is more complicated under the newer regulations because the royalty is to be collected for the "Indian mineral owner," and that term is defined using the undefined term

"mineral interest." 25 CFR 212.3 (1996). The question thus becomes whether the term "mineral interest" includes the point of oil production such as Oengas' Allotment. If so, then Oengas are "Indian mineral owner[s]" and they are within the scope of the network of statutes and regulation requiring the Untied States to collect a royalty on the oil produced thru the oil production facility on their Native Allotment.

Oengas' position is that the newer regulations did not take away the right to a royalty that existed under the older regulations. In resolving this question, it is appropriate for the Court to look first to the network of statutes and regulation creating the duty as a whole for guidance in determining whether the term "mineral interest" includes surface points of oil production such as Oengas'.

The United States argues that none the following examples specifically require the construction urged by Oengas, but in doing so it misses the point. The point is that the network of statutes and regulations creating the money-mandating duty takes specific note of surface interests, and in analogous situations provides for payment of oil royalties to surface points of production. They are appropriate to consider not as requiring a royalty, but as guidance when deciding the meaning of the undefined, and thus ambiguous term "mineral interest."

A prime example is 30 U.S.C.§ 1702(6). This statute defines "lease site" as "including the surface of a severed mineral estate, on which exploration for, or extraction or removal of, oil or gas is authorized pursuant to lease." This definition is an indication that the network as a whole recognizes such surface interests. This suggests that it is appropriate to consider "mineral interest" in the 25 CFR 212.3 (1996) definition of "Indian mineral owner" to include Native Allotments such as Oengas' used as the point of oil production. The fact pointed out by the United States that this definition is from a different part of the network dealing with Native

interests in oil production does not matter. The point is that the network takes into account such surface interests.

The same is true of 30 U.S.C.§ 226(m) and 42 U.S.C. § 9506a(j)(5), which allow the United States to pay royalties to other property owners whose property is used as a production site for production of United States oil. The United States again argues that these statutes cannot form the basis of a duty to collect a royalty. It goes on to argue that looking to these statutes as the basis for a royalty is in effect 1) a "moral" claim rejected in *Menominee Tribe v. United States*, 221 Ct. Cl. 506 (1979), 2) a "fair and honorable dealings" claim rejected in *White Mountain Apache Tribe v. United States*, 10 Cl. Ct 115 (1986), or 3) a "common law trust duties of care, candor and loyalty" claim which is beyond what was or should have been held in *Navajo V*.

Again the United States misses the point. These statutes are part of or related to the network establishing the Claim One duty. 30 U.S.C.§ 1702(6) (defining lease site to include the severed surface estate), 30 U.S.C.§ 226(m) and 42 U.S.C. § 9506a(j)(5) (authorizing the United States to pay a portion of its royalty to the owner of another property used as the point of oil production). They are not offered as the basis for a "moral" claim, or a "fair and honorable dealings" claim or a "common law trust duty" claim. These statutes are not offered as the basis of the United States' fiduciary duty. That has already been established. See prior section on existence of Duty. These portions of the network are offered only as guidance in determining whether the undefined, ambiguous term "mineral interest" includes the surface used as the point of oil production.

The rules of construction are an aid in this analysis. One of the rules of construction is that statutes and regulations adopted for the benefit of Tribe, Indians or Native people are to be

construed in their favor. *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engineering,),* 467 U.S. 138, 149 (1984) ("it is a settled principle of statutory construction that statutes passed for the benefit of dependent Indian tribes are to be liberally construed, with doubtful expressions being resolved in favor of the Indians"). See, e.g., *Bryan v. Itasca County*, 426 U.S. 373, 392 (1976); *Alaska Pacific Fisheries v. United States*, 248 U.S. 78, 89 (1918); *Shoshone Indian Tribe of Wind River Reservation v. U.S.* 364 F.3d 1339 (C.A.Fed. 2004). This supports a determination in Oengas' favor that the undefined, ambiguous term "mineral interest" used in the definition of "Indian mineral owner" includes surface interests used in the production of oil such as Oengas.[3]

Finally, the United States argues that the result urged by Oengas would be contrary to the surface/subsurface distinction of *Del-Rio Drilling v. United States*, 35 Fed. Cl. 186 (1996), withdrawn, but later reinstated, 46 Fed. Cl. 683 (1998). Again the United States misses the mark. *Del-Rio* addressed the relationship between the surface estate and the subsurface underlying that surface estate. Oengas agree that if the oil being produced underlay their surface interest, they would have no claim because of the reservation in the original Native Allotment by the United States. See Docket 78, pp. 12, 32 fn. 8 for a thorough discussion of the reservation in the Native Allotment. But this case is not the *Del-Rio* situation of access to an underlying subsurface mineral interest. This situation involves 1) use of a surface interest which is totally separate and in a location different from the location of the oil being developed, 2) by a party who has no right or interest in surface property on which the production facility is located, other that the Lease to use it as a site for an oil production facility. It is the 30 U.S.C.§ 226(m) and 42

[3] The "fair interpretation" rule of *Navajo V* discussed below as to Claim Three also supports this reading of the regulation. Id. 501 F.3d at 1333-34.

U.S.C. § 9506a(j)(5) situation, not the Del-Rio situation. *Del-Rio* is simply not applicable.

The United States is required to collect a royalty on the oil produced thru the production facility on Oengas' Allotment under both the older regulations and the newer regulations. 25 CFR 212.16 (1987) ("produced and saved from the land leased"), 25 CFR 212.3 (1996) (defining "Indian mineral owner" using the undefined term "mineral interest"). Oengas are entitled to a partial summary judgment that their situation is within the scope of the network of statutes and regulations creating the Claim One money-mandating duty.

## <u>D. Claim *Two* – Money-Mandating Duty</u>

### 1. <u>Existence</u> of Claim <u>*Two*</u> Money-Mandating Duty

**Oengas' Initial Brief -** Docket 78, pp. 36-40 - A network of statutes and regulations, coupled with obligations assumed by the United States in the Lease to determine the amount or rent to be collected, create a Claim Two money-mandating duty, requiring the United States to collect "resent fair annual rental," subject to appraisal-based adjustment, on leased Native allotments. 25 U.S.C. § 415(a); 25 CFR Part 162 (1987), *(2001)*; Lease Agreement ¶¶5, 9; and *Brown v United States*, 86 F.3d 1554, (C.A.Fed 1996) (Brown I) (finding money-mandating duty under same network). In order for the rent collected to be "fair," it must be set with consideration of <u>all</u> types of rent collected at comparable sites, including rents based on royalties, thruputs or other types of consideration.

**United States & Oil Company Response —** Docket 88 pp. 29-32 - The United States does not even acknowledge or mention the holding of the Federal Circuit in *Brown I* that 25 U.S.C. § 415(a) and 25 CFR Part 162 create a money-mandating duty. Similarly, the United States does not acknowledge or even mention the actual control the United States assumed in the

Lease ¶5 and ¶9 over the setting of the amount to be collected as rent by conducting periodic appraisals. Instead, the United States reiterates its prior argument that the Lease precludes royalties or thruputs, and argues that other aspects of the leasing process do not amount to actual control.

**Oengas' Reply** – The United States responds the way litigatants often do when there is no valid argument to make. They ignore the crux of the other side's argument, and talk about something else.

There can be no dispute that 25 U.S.C. § 415(a) and 25 CFR Part 162 (1987), *(2001)* create a money-mandating duty regarding commercial leasing of allotted lands. *Brown I*, 86 F.3d at 1563 ("section 415(a) and the implementing regulations of part 162 impose upon the government a fiduciary duty in the commercial leasing context. 'Given the existence of a trust relationship, it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties.'" [quoting *Mitchell II,* 463 U.S. at 226]).

The assumption of control by the United States in ¶ 5 and ¶9 of the Lease over setting the amount of rent to be collected is an additional aspect of the already established Claim Two money-mandating duty. There can be no dispute that in ¶ 5 and ¶9 of the Lease, the United States assumed actual control over setting the amount of rent it would collect for the Oengas by doing periodic appraisals. Lease Agreement Docket 42-2 pp. 64-65 (rent adjustments base on the higher of "rental value for the property established by a <u>Bureau of Indian Affairs appraisal</u>" or a cost of living adjustment.) ( emphasis added). The undisputed expert opinion contained in the Sealed Declaration of Edward Morse, Docket 83, pp.1-20, conclusively establishes what

should have been considered in a proper appraisal of the Oengas' allotment.[4]

Oengas are entitled to a partial summary judgment that 25 U.S.C. § 415(a), and 25 CFR Part 162 (1987), *(2001)*, and Lease Agreement ¶¶5, 9, create a money-mandating duty in this case. *Brown I.*

**2. Case Within <u>Scope</u> of Claim <u>*Two*</u> Money-Mandating Duty**

**Oengas' Initial Brief -** Docket 78, pp. 40-41 - Oengas' situation is within the scope of the Claim Two money-mandating duty because this case questions the amount of the rent collected for the Oengas by the United States on the commercial lease of commercial land. *Brown I.* Specifically, Oengas have alleged a breach of the Claim Two money-mandating duty created by the network and the Lease to collect "fair annual rental" pursuant to United States appraisals. 25 CFR Part 162 (1987), *(2001)* (requiring collection of "fair annual rental" and periodic review); Lease ¶¶ 5,9; *Navajo V*, 501 F.3d at 1346. (rejecting United States argument that a specific breach of a statutory or regulatory standard is required to be within the scope of the duty in favor of a standard that once a duty is found to exist, "common law trust duties of care, candor and loyalty help define the fiduciary responsibilities …")

The Oengas' situation is particularly within this scope because of their allegation that the "fair annual rental" collected should have been in an amount 1) similar to that collected by BPX from Exxon and ARCO, now ConocoPhillips, on oil produced thru the production facility on the

---

[4] The specifics of Mr. Morse's opinion are not quoted here because his Declaration is sealed. Oengas refer the Court to Docket 83 for his Declaration, and specifically to ¶ 4 and ¶ 5 for Mr. Morse's opinion of what types of rent should be considered in such an appraisal, to ¶ 7 for his opinion regarding consideration in an appraisal of the LETTER AGREEMENT between Intervenors allowing use of the production facilities on Oengas' Allotment to develop oil from West Niakuk PA, to ¶ 8 regarding such consideration of Kuukpik royalties, to ¶ 9 regarding such consideration of other compensation paid at Kuukpik, and to ¶ 11 regarding his opinion of the appraisals conducted by the United States in 1993 and 1997 for the Oenga Allotment.

Oenga Allotment, or 2) similar to the 2% royalty paid the Kuukpik Corporation [rent collected for Oengas would have been 34 X greater if Kuukpik rate applied]. See Sealed Declaration of Morse for amount collected, Docket 79.

**United States & Oil Company Response –** The United States does not question the action being within the scope of the Claim Two money-mandating duty.

**Oengas' Reply** – Since the United States did not address the issue, there is no need to reply. Oengas are entitled to a partial summary judgment that their situation is within the scope of the Claim Two money-mandating duty.

**E. Claim *Three* Money-Mandating Duty**

**1. Existence of Claim *Three* Money Mandating Duty**

**Oengas' Initial Brief -** Docket 78, pp. 42-43 – Two separate and distinct Claim Three money-mandating duties were asserted. The first was the duty of the United States to take action when there has been the breach of a lease of trespass to allotted lands. *25 CFR 162.14 (1987),* 25 CFR 162.617-162.623 (2001). The second duty was the duty to disclose.

**United States & Oil Company Response –** Docket 78 pp.42-43 – The United States did not address its duty take action regarding the breach of a lease or trespass of allotted lands. It is appropriate to note, however, that in its own Motion for partial Summary Judgment, the United States took the position that the regulations did not create a money-mandating duty because the United States had to take action "only after the BIA had determined a breach has occurred." United States Reply Brief, Docket 89 p. 20

The United States created a material issue of disputed fact as to the second Claim Three duty – duty to disclose – by the Declaration of Dickinson asserting that disclosure had been

made. United States Opposition Attachment 46.

**Oengas' Reply –** As the second Claim Three duty, the duty to disclose, Oengas presently withdraw their request for summary judgment as to this second Claim Three duty because of the disputed issue of material fact raised by the United States thru the Declaration of Dickerson. This duty to disclose is not essential to Claim Three, it was only an additional theory. Oengas ask that partial summary judgment be issued as to the first Claim Three theory - that the United States has a money-mandating duty to take action when the lease of allotted land has been breached and/or allotted land has been trespassed upon.

In essence, the United States' position is that it can escape liability for non-action regarding a breach of a lease or trespass on allotted land by simply failing to acknowledge that a breach or trespass has occurred. Even if the Court were to later determine that the lease in fact had been breached or that the land had been trespassed upon, the United States' position seems to be that it would not be liable under this theory. This is akin to the old adage of the ostrich sticking its head in the sand. The United States argues this position even though it has assumed responsibility under the Lease for communicating with the Oil Companies, and even though action was specifically requested by Oengas. Third Amended Lease Docket 42-5, p. 56. (United States, thru its agent, assumed communication responsibility), Docket 78-2 pp. 27-27. (demands to give notice of breach and trespass).

Such an argument simply cannot stand under the "fair interpretation" rule of *Navajo V* derived from the "fair inference" standard of *White Mountain Apache.* Navajo V 501 F. 3d at 1333-34. A "fair interpretation" of *25 CFR 162.14 (1987),* 25 CFR 162.617-162.623 (2001) requires a determination that the United States has a money-mandating to take action regarding the breach of a lease or trespass on allotted lands. This is especially true when coupled with the

duty or obligation that the United States assumed in the Third Lease Amendment that all communications with BPX on Oengas' behalf would be handled exclusively by the United States or its contractor. Third Amended Lease Docket 42-5, p. 56.

The United States' argument about whether or not there is a duty to file suit on Oengas' behalf for breach or trespass is premature. The problem here is that the United States would not even give notice of breach or trespass to BPX, even though it had assumed the responsibility for communication with BPX. *25 CFR 162.14 (1987),* 25 CFR 162.618 (2001), Third Amended Lease ¶ 34, Docket 42-5 p. 56. (communication duty)

A "fair interpretation" of *25 CFR 162.14 (1987),* 25 CFR 162.617-162.623 (2001) (subleasing and assigning limitations), the Second Lease Amendment ¶ 13 (subleasing requirements) and the Third Lease Amendment ¶ 34 (duty to communicate with BPX on Oengas' behalf) is that they create a money-mandating duty for the United States to at least send a notice of breach or notice of trespass in a situation such as this. Oengas are entitled to a partial summary judgment that this Claim Three money-mandating duty exists.

**2. Case Within Scope of Claim *Three* Money-Mandating Duty**

**Oengas' Initial Brief -** Docket 78, pp. 43-54 - Oengas' situation is within the scope of the Claim Three money-mandating duty to take action regarding a breach of the lease or trespass on allotted land because of Oengas' allegation of breach and trespass arose from 1) the Lease Agreement limiting BPX's use of the Oenga Allotment to development of oil and gas from Niakuk only, and 2) the LETTER AGREEMENT, or Facility Sharing Agreement, between BPX, Exxon and ConocoPhillips which violates the Oenga Allotment Lease Agreement, as amended, and regulations regarding subleases and assignments of allotted lands. 25 CFR 162.12(a) (1987); 25 CFR 162.610(a) (2001), Second Lease Amendment ¶ 13, Docket 42-4 p. 57.

**United States & Oil Company Response** – Docket 88 pp.42-43 – The United States did not refute or even address Oengas request for summary judgment that their situation was within the scope of this money-mandating duty. It is appropriate to note, however, that in its own Motion for partial Summary Judgment the United States has taken the position that Claim Three should be dismissed because there was no breach or trespass. Docket 42 pp. 41-42 (initial brief), Docket 89 pp.20-23 (Reply Brief). There is no dispute regarding the lack of action taken by the United States. Rather, the United States and the Oil Companies argue that the Lease does not limit use of the Oenga Allotment to oil production from Niakuk. The United States does not address the regulations cited by Oenga that place strict limits on subletting or assigning interest in allotted lands. 25 CFR 162.12(a) (1987); *25 CFR 162.610(a) (2001).* The Oil Companies argue that the LETTER AGREEMENT or Facility Sharing Agreement between BPX, ARCO and Exxon was not a sublease or assignment and that matters were handled in compliance with the regulations. Oil Company Reply Brief, Docket 87 pp. 33-35.

**Oengas' Reply -** Since neither the United States nor the Oil Companies responded to Oengas arguments on this issue, there is technically no need to reply. Even when their arguments from their own Motion on this issue are considered, no new points are raised that were not fully addressed in Oengas' Initial Brief. Docket 78 pp. 42-54. There is no need for additional briefing on the issue. Oengas' situation is within the scope of the Claim Three money-mandating duty. Oengas are entitled to a partial summary judgment that their situation is within the scope of the Claim Three money-mandating duty.

## F. Oil Companies Separate Response Arguments

**Oil Companies' Separate Response** – Docket 87, pp. 19-36. The Oil Companies'

separate Response addresses three points. Those are 1) whether 30 U.S.C.§ 226(m) and 42 U.S.C. § 6506a(j)(5) are applicable, 2) whether the Kuukpik royalties and other payments and the Facility Sharing Agreement (LETTER AGREEMENT) between BPX, ARCO now ConocoPhillips, and Exxon can be used as comparables in determining proper rents due, and 3) whether BPX had the right to use Oengas' Allotment as they did because the Lease gave them a possessory interest.

**Oengas' Reply** – Whether 30 U.S.C.§ 226(m) and 42 U.S.C. § 6506a(j)(5) are applicable – These statutes provide that when the United States finds itself in the same position as did BPX as to the Niakuk PA, or as ARCO and Exxon did as to the West Niakuk PA, having known oil reserves but no point of production, the United States can contract away some of its statutorily-required royalty in exchange for production from a separately held neighboring property. These statutes are not cited as requiring royalties be collected for Oengas under the statutes. Rather, they are proper to consider in the Claim One determination of whether the phrase "mineral interest" in the defined term "Indian mineral owner" should include surface interests used as the point of oil production. They will also be applicable the later breach aspects of this case regarding the determination 1) in Claim One as to the proper allocation of royalty to attribute to the point of production, and 2) in Claim Two regarding the "fair rental value" that should have been collected by the United States under 25 CFR Part 162. See Sealed Declaration of Edward Morse ¶10, Docket 83 p. 7. (Appraiser's undisputed expert opinion on considerations of comparables in appraising value of lease of Oengas' Allotment for oil production purposes.)

Whether the Kuukpik payments and the Facility Sharing Agreement (LETTER AGREEMENT) between BPX, ARCO now ConocoPhillips and Exxon are appropriate comparables – These are both appropriate comparables to use in the later Claim Two breach of

trust determination of what is the "fair annual rental" that should have been collected. They are offered as comparables now regarding the United States' duty to consider them. The Kuukpik payments are similar in some respects, but different in others. The Facility Sharing Agreement or LETTER AGREEMENT between BPX, ARCO, now ConocoPhillips, and Exxon could not be a more direct and appropriate comparable, an agreement between titans in the industry regarding the same property used by the same purpose. As the Court said in its Order granting the Motion to Compel production of these very documents in this case, "Both the Supreme Court and the Federal Circuit have also acknowledged the usefulness of comparability studies in determining whether a given rental adjustment is fair according to criteria aggrieved parties have presented to them for interpretation." *Opinion and Order*, Docket 70, p.8 (discussing value of these documents in determining what is fair rent). See also Sealed Declaration of Edward Morse ¶¶ 7, 8, 9, Docket 83 p. 4-7. (Appraiser's undisputed expert opinion on propriety of considering such arrangements as comparables in appraising value of lease of Oengas' Allotment for oil production purposes).

<u>Whether BPX had the right to use Oengas' Allotment as they did because the Lease gave them a possessory interest</u> – The Lease did not give BPX the unlimited right to use the leased Oenga Allotment however it saw fit. As discussed above as to Claim Three, BPX's rights under the Lease were limited to developing oil from their Niakuk oil lease, not from other locations or other oil leases. Furthermore, also as discussed above as to Claim Three, both subleasing and assigning regulatory limitations and the wording of the Second Lease Amendment ¶ 13 barred the Facility Sharing Agreement of LETTER AGREEMENT between BPX, ARCO and Exxon.[5]

---

[5] The Oil Companies Brief at Docket 87 pp. 25-35 appears to have confused Oengas' discussion of the document titled "LETTER AGREEMENT," which the Oil Companies refer by the generic

## IV. CONCLUSION

For the above stated reasons, it is requested that the Court grant Oengas' Motion for Partial Summary Judgment that 1) all Claims were timely filed within six years of accrual under 28 U.S.C. § 2501 and the ITAS, 2) a money-mandating duty exists under Claims One, Two, and Three, and 3) Oengas' situation is within the scope of that money-mandating duty as to Claims One, Two and Three.

DATED this 10th day of March, 2008.

Respectfully Submitted,

s/Raymond C. Givens
Raymond C. Givens
Givens Law Firm
Attorney for Plaintiffs
1309 114th Ave. SE Suite 211
Bellevue, WA 98006
Tele: 425-641-5949
Fax: 425-614-0158
raygivens@givenslaw.com

---

term "Facility Sharing Agreement" with the First Lease Amendment which was by letter. Oengas do not contest that BPX had the right to take possession of all of Oengas' Allotment under the Lease. Oengas' claim does not have to do with the area leased, but rather with 1) the type and amount of rent to be collected by the United States once the use changed from a road and pipeline right-of-way to oil production, and 2) damages due as a result of the United States' failure to take action regarding the sublease or assignment of the property that allowed it to be used for production of oil from areas other than BPX's Niakuk field, or by companies other than BPX.

**Certificate of Service**

I hereby certify that on the 10th day of March 2008, I electronically filed the foregoing Motion for Partial Summary Judgment with the Clerk of the Court using the CM/ECF System which will send notification of such filing to all parties of record.

James M. Upton
U. S. Department of Justice
Environment & Natural Resource Div
P.O. Box 663
Washington, D.C. 20044-0063
Tele: 202-305-0482
Fax: 202-305-0506
james.upton@usdoj.gov
Attorney for Defendant

.

Joseph J. Perkins, Jr.
Guess & Rudd, P.C.
510 L Street, Suite 700
Anchorage, AK 99501
Tele: 907-793-2200
Fax: 907-793-2299
jperkins@guessrudd.com
jhunter@guessrudd.com
kmason@guessrudd.com
kwaggoner@guessrudd.com
Attorney for Intervenors

DATED this 10th day of March, 2008.

Respectfully submitted,

s/Raymond C. Givens
Raymond C. Givens
Givens Law Firm
Attorney for Plaintiffs
1309 114th Ave. SE Suite 211
Bellevue, WA 98006
Tele: 425-641-5949
Fax: 425-614-0158
raygivens@givenslaw.com

# ATTACHMENT 3

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WALLACE OENGA, GEORGENE SHUGLUK, LEROY OENGA, SR., MICHAEL DELIA, TONY DELIA, JOSEPH DELIA, JENNIE MILLER, and TRINITY DELIA, | ) | No. 06-491 L<br>Judge Margaret Sweeney |
| Plaintiffs, | ) | |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant, and | ) | DECLARATION OF LEROY OENGA |
| BP EXPLORATION (ALASKA) INC., CONOCOPHILLIPS ALASKA, INC., EXXON MOBIL ALASKA PRODUCTION, INC., CHEVRON U.S.A., INC. and FOREST OIL CORPORATION, | ) | |
| Defendant Intervenors | ) | |

**DECLARATION OF LEROY OENGA**

Leroy Oenga hereby declares as follows:

1. I am a Plaintiff in this action, over the age of 18, of sound mind and competent to make this Declaration.
2. During the period of the late 1980s, including the period 1988 and 1989, I was in my early

20s and spent considerable time with my grandfather, Andrew Oenga. I was intimately familiar with his efforts regarding the trespass on his Native Allotment at Heald Point and Point Brower by oil prospectors and with his leasing of the Heald Point portion of his allotment to Standard Alaska Production Company (SAPCo), which later became BP Exploration (Alaska) Inc. (BPX). I was also familiar with the legal representation he had and did not have during this period regarding these matters.

3. During this period, Mr. Glen Feldman was an attorney who worked for UIC, a Native village corporation at the Village of Barrow. UIC made Mr. Feldman available to my grandfather for the trespass matter. When the lease matter later arose, my grandfather again sought Mr. Feldman's assistance, but UIC would not make Mr. Feldman available for the Lease negotiation. As a result, my grandfather relied on the BIA and its lawyer to protect his interests in the lease negotiations with SAPCo in 1988 and 1989.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED this 10th day of March, 2008.

Leroy Oenga

Leroy Oenga

**Certificate of Service**

I hereby certify that on the 10th day of March, 2008, I electronically filed the foregoing Second Declaration of Leroy Oenga with the Clerk of the Court using the CM/ECF System which will send notification of such filing to all parties of record.

James M. Upton
U. S. Department of Justice
Environment & Natural Resource Div
P.O. Box 663
Washington, D.C. 20044-0063
Tele: 202-305-0482
Fax: 202-305-0506
james.upton@usdoj.gov
Attorney for Defendant

James J. Perkins, Jr.
Guess & Rudd, P.C.
510 L Street, Suite 700
Anchorage, AK 99501
Tele: 907-793-2200
Fax: 907-793-2299
jperkins@guessrudd.com
jhunter@guessrudd.com
kmason@guessrudd.com
kwaggoner@guessrudd.com
Attorney for Intervenors

DATED this 10th day of March, 2008.

Respectfully submitted,

s/Raymond C. Givens
Raymond C. Givens
Givens Law Firm
Attorney for Plaintiffs
4935 116th Place SE
Bellevue, WA 98006
Tele: 425-641-5949
Fax: 425-614-0158
raygivens@givenslaw.com