UNITED STATES
COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| WALLACE OENGA, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Docket No.: 06-491L |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

Pages: 1 through 130

Place: Washington, D.C.

Date: August 13, 2008

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WALLACE OENGA, et al., )
)
Plaintiffs, )
)
v. ) Docket No.: 06-491L
)
UNITED STATES, )
)
Defendant. )

Courtroom 4, Room 501
National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Wednesday,
August 13, 2008

The parties met, pursuant to the notice of the Court, at 1:08 p.m.

BEFORE: HONORABLE NANCY B. FIRESTONE
Judge

APPEARANCES:

<u>For the Plaintiffs</u>:

RAYMOND GIVENS, Esquire
Givens Law Firm
1309 - 114th Avenue, S.E., Suite 211
Bellevue, Washington 98004
(425) 641-5949

<u>For the Defendant</u>:

JAMES UPTON, Esquire
U.S. Department of Justice
Environment and Natural Resources Division
General Litigation Section
601 D Street, N.W.
Washington, D.C. 20004
(202) 305-0482

APPEARANCES: (Cont'd)

For the Defendant-Intervenor, BP Exploration and Others:

JOSEPH J. PERKINS, JR., Esquire
Law Offices of Guess & Rudd, P.C.
510 L Street, Suite 700
Anchorage, Alaska 99501
(907) 793-2200

P R O C E E D I N G S

(1:08 p.m.)

THE CLERK: All rise. The United States Court of Federal Claims is now in session, the Honorable Nancy B. Firestone presiding.

THE COURT: Welcome, everybody. Please be seated.

We are here today to hear the oral argument in Oenga, et al. v. United States, 06-491L, and we have two basic issues on the table that we were going to discuss, and those were Claims 1 and 2 and whether they are barred by a statute of limitations and then Claim 3 and whether or not the Defendant-Intervenor's motion for summary judgment should be granted.

So why don't we have everybody introduce themselves? And you might give me a sense, then, when you do that, as to how you are intending to proceed, and we'll see if that all matches up. Mr. Givens?

MR. GIVENS: Thank you, Your Honor. Ray Givens, on behalf of the Plaintiffs.

My understanding of the stipulation that the Court allowed us to go forward with was that, yes, we would address the statute of limitations as to all three claims.

THE COURT: You're right.

MR. GIVENS: And then we would address the money-mandating issues as to Claim 2 and Claim 3.
THE COURT: Okay. We can do it, yes. Okay.
MR. GIVENS: The money-mandating issue and the summary judgment on Claim 3 is about the same thing.
THE COURT: It's kind of the same issue, I guess. I just blend it in my own mind. I apologize.
MR. GIVENS: Maybe I've separated them because I've kind of separated -- in preparing it, no question about that.
THE COURT: Okay.
MR. GIVENS: I went to the seminar that the Court put on last fall and listened particularly to the presentation regarding presentations in the courtroom, and so I hope we can use the Elmo with documents and, to some degree, PowerPoint, too.
THE COURT: That's great.
MR. GIVENS: I have prepared copies of those documents. I've given them to counsel and have a copy for the Court.
THE COURT: That would be great.
All right. So tell me one more time. The way you've broken this out is --
MR. GIVENS: Okay. What they are, Your

Honor, is -- I'm taking off the big paperclip -- the first thing is some preliminary matters, and it's the primary documents that we're going to be looking at.

THE COURT: Okay.

MR. GIVENS: I'll run through them briefly. I've got them spread out here on the table.

Then, as to the arguments themselves, there are three. They kind of separate the statute of limitations arguments, the Claim 2 merits arguments, the money-mandating-duty arguments, and then the Claim 3.

I don't know if the Court would like to hear them all at once or --

THE COURT: Well, this is what I was going to propose. I thought what we should do is the statute of limitations first and then go into what I'll call more of the merits argument.

MR. GIVENS: I'm happy to do that.

THE COURT: Then let me have the Defendants introduce themselves for the record.

MR. UPTON: Good afternoon, Your Honor. My name is James Upton. I'm the attorney of record for the Defendant, the United States, in this case.

THE COURT: Good to see you, Mr. Upton.

MR. UPTON: Thank you.

MR. PERKINS: And, Your Honor, my name is Joe Perkins. I'm the attorney of record for BP Exploration and the other oil company intervenors.

THE COURT: Okay. And, Mr. Perkins and Mr. Upton, how have you decided to divvy up your time with each other?

MR. PERKINS: Your Honor, we haven't really made that determination. We'll have to discuss that.

THE COURT: All right. Well, let me do this, then. Let's go through the statute of limitations argument first, you'll make your presentation, and the two of you will each be given an opportunity to respond. Ideally, we won't take more than a half hour or 45 minutes on that issue, and then leave 45 minutes for the other issue. I'm hoping we can do this in three-hour timeframe, then allowing time for my questions, so that why don't you just being with the statute of limitations, and let's proceed?

MR. GIVENS: Thank you, Your Honor. The preliminary matters first, Your Honor. There are various documents involved, and I'll put some of them up on the Elmo here as we go. The first one is the timeline. We thought that might be helpful to the Court.

As you can see from the board, it starts in '89, when the initial lease negotiations happened. The original lease was signed in '89. It was amended in '93, the second amendment was right at the beginning of '94, and, a couple of weeks later, the West Niakuk Agreement, the facility-sharing agreement, was entered into. The lease was then again amended in '95.

The regulations changed in this case a couple of times, so I'll put those dates up there. Sometimes they matter; sometimes they don't. They use the same wording in the new regulations, but the ones that will be applicable today are the second ones, the 25 C.F.R. Part 162. Those are the regulations that deal with Claim 2.

Then the accounting requests and the responses to that; responses were received in '03, and then the formal request for an accounting, the written request, was made in '05, and it was received in '06, and the claim was filed.

Then, on the left side of the timeline, it shows those two accrual dates on the ITAS timelines, and then, of course, the case was filed within six years of those.

It also shows the traditional 2501, six-year

timeframe and the tolling agreement that ran through the end of June, and the suit was filed just a bit before that.

THE COURT: You've gone through the history, and I appreciate that. In Attachment No. 42 to the government's motion was the stipulation of lease history that everybody signed onto.

MR. GIVENS: Yes.

THE COURT: Presumably, you that history isn't inconsistent with what you're discussing, but I'm just trying to make sure that there isn't something different that you're trying to sort of identify here.

MR. GIVENS: I don't think so, Your Honor. A lot of those issues, I didn't even deal with; I just dealt with the big fact issues.

THE COURT: Okey-doke.

MR. GIVENS: The second document is a map of -- well, it's a couple of maps, actually. Maybe it's easier to look at the second one first. To give the Court an idea of where we're talking about, it's in the very north of Alaska in Prudhoe Bay, and then this second map is a map of Prudhoe Bay, and this spit, Heald Point, is on the northeast edge of Prudhoe Bay, jutting out into the Arctic Ocean, and, of course, the

top one there is more detailed.

The color coding here, Your Honor, the areas are identified from discovery responses from the oil companies. The blue are is Niakuk. That's the Niakuk oil field. It's a lease that British Petroleum had from the State of Alaska and have developed through the facilities on Heald Point.

The red area is West Niakuk. That was a lease, a 50/50 lease, of Arco and Exxon, and, for these purposes, Arco became Conoco-Phillips, so it's now Conoco Phillips.

The yellow area over here is Lisburne. Now, Lisburne is a very large participation area. This is just a small piece of it. It's the only part of it that was developed through here, so that's why it's kind of dotted around there. There is a lot more to Lisburne.

THE COURT: But Lisburne is also identified on the left in the red.

MR. GIVENS: It is, and, as I understand it, Your Honor, these participation areas, they don't go vertically; they kind of go strata-wise.

THE COURT: I see.

MR. GIVENS: So that's why. I looked for a map that didn't have that, and there were some, but

this was just the better map to use.

THE COURT: Okay. That's fine.

MR. GIVENS: I figured, I'm going to have to explain that to the judge. I had better be ready to do it.

This is a data sheet. It's actually in the briefing, and it is developed from discovery responses from the oil companies, and it shows the volume of oil produced through Niakuk, West Niakuk, and Lisburne through the Heald Point facilities.

The price per barrel from the Department of Energy per year -- it's just an estimate, just to give the Court a feel. So the Court can see there is roughly 67 million barrels produced through this facility with somewhere over a billion dollars.

Oengas were paid $80,000 to $89,000 a year, for two-thirds of a million in total over the eight years. If it were a two-percent royalty, it would be a $22 million payout. If it had been a one-percent throughput on the total oil, it would be $67 million. For the one-percent throughput just on West Niakuk oil, it would be $16 million. So it gives the Court some feel.

The next separate document, Your Honor, is the leases. This face sheet is just a few of the

points that we felt were particularly important, and then it just has the actual leases attached to it. We've underlined items that we felt were important, and the lease amendments are numbered on the right. We'll talk about them as we go through.

On the statute of limitations issue, of course, much of it is centered around the Indian Trust Accounting Statute.

THE COURT: Well, the whole thing is sort of centered on that, isn't it?

MR. GIVENS: It is.

THE COURT: Okay.

MR. GIVENS: There is an argument that two of the years were timely filed, even without that, but --

THE COURT: Let's deal with the first, the ITAS first. Okay.

MR. GIVENS: What I did here -- it was hard for me just to grasp everything in this big blob of words, so I broke it out by bullet points. Every word is there. I didn't take out any words. I didn't add any words. It's just itemized.

Of course, the main case that deals with that is what I call the "Wind River Shoshone Band." It's the Shoshone and the Arapaho. I know the Arapaho

Council. I guess, maybe out of fairness to them, I call it "Wind River."

THE COURT: Do you?

MR. GIVENS: There's a lot of Shoshone cases. There is Shoshone Payute, there is Shoshone Sabanac, there is Shoshone of Wind River --

THE COURT: And I call it Shoshone I usually, but that's okay. We're talking about the same one.

MR. GIVENS: The circuit said a lot in that case, and they didn't say it all in the same place. They kind of bounced around but said the same thing in different places. So what I did is I made my own head notes, Judge.

THE COURT: Okay.

MR. GIVENS: Then you can see, looking through the case, my head note numbers are not quite as pretty as West's, but it gets us to the place where they are dealing with that issue.

The final document won't be dealing with it, and this first argument is the letter agreement. It was produced initially, and there was a redaction. You can see it right here on the front page.

There was a motion to compel, and it was produced with this stamp over it that was hard to

read, and it's produced pursuant to a protective order.

THE COURT: We have some people here, so --

MR. GIVENS: I'll be cognizant of that, Your Honor.

THE COURT: Okay.

MR. GIVENS: What I've done here is, on this last attachment, I have typed out exactly what the words are and the amount of throughput that was paid.

THE COURT: Okay.

MR. GIVENS: So it's --

THE COURT: Thank you.

MR. GIVENS: The second preliminary matter, Your Honor, is dealing with the rules of construction, and there are a couple of them that we feel are important here.

First, as to statutes and regulations, of course, all of the general rules of reading the statute as a whole and giving meaning to all of its parts, and the same with regulations, but there is a particular one that's appropriate here, and that is, if there is ambiguity in a statute or regulation adopted for the benefit of Indian people or of Native people, it is to be construed in their favor.

The second rule of construction regarding

leases, and, of course, they are the same general rules that you work with every day, but there is one that, again, is particularly important primarily -- well, that is as to the leases, and that is, if there is any ambiguity, it is to be construed against the maker.

Now, in this case, that's both the United States and the oil companies. The initial lease was presented by the United States, and the oil companies reworked it. Mr. Oenga didn't read English, he didn't speak English, and he didn't write English. He spoke a few words of greeting, but that's like my speaking Spanish, Your Honor. So it was negotiated even in a foreign language for him, so construe against the maker.

Then the conflict: What happens when there is a conflict between the statute or regulations and the lease? Of course, the law is clear. The statute and regulations prevail. The lease provision that's in conflict is void ab initio.

The final matter that permeates this case, of course, is the trust responsibility, and Wind River, not that it's such a big, important point, but just to see how the system works, Judge, Head Note 6 in Wind River is the most exacting fiduciary duty,

and, on page 11 of the text: "The United States must be held to the most exacting fiduciary standards in its relationship with Indian beneficiaries." So that's how that can be used.

So, with those preliminaries, Your Honor, if I could, let me turn to the statute of limitations itself.

There are really, as Plaintiffs view the case, Your Honor, are three statute of limitations issues.

The first issue is whether Claims 1 and 2 were timely filed under the ITAS.

The second issue is, regardless of the ITAS, whether Claims 1 and 2 were timely filed for 2000 and 2001.

The third issue is uncontested. It's Claim 3, and, as we dealt with on the status conference the other day, there is not an issue there.

So what are the parties' positions? Well, the Oengas's position is that the ITAS is applicable; the United States' is that it's not. Using the words of Wind River or Shoshone I, in Oenga's view, it's a trust fund claim for failure to collect. The United States characterizes it as a "trust asset claim."

To be a little more specific, there is, I

think, agreement on some issues.

THE COURT: Okay.

MR. GIVENS: That's always nice. There is agreement on both sides that if we're talking about collecting -- Wind River makes that clear -- that is a trust fund issue. If we're talking about the lease itself -- the U.S. negotiated a bad lease or breached its fiduciary duty and didn't get the highest rate of return -- that's a trust asset issue.

But the real crux of the issue is the parts that are underlined there: Determining the amount duel; which side does that fall on? In our view, that is part of collection, Your Honor.

THE COURT: You're going to tell me why you think that that's what the case stands for. Isn't that the position that was rejected by the circuit? Maybe I'm missing something on your reading of Wind River Shoshone, but I thought the Federal Circuit was trying to make it pretty clear that if it's not provided for in the lease, or the monies are not provided for, and what you're complaining about is that they should have been provided for, then that is going to be a trust asset issue.

Now, are you trying to say that because it should have been provided for in the lease that

converts it into a trust fund issue as opposed to a trust asset issue? Clearly, under the lease, there was no provision for royalties. The rentals were set by an appraisal that had been established.

The government's position is, so long as we collected the monies that were due and owing under that, the obligation has been fulfilled, and you're talking about the breach is then a trust asset issue because you didn't get as much as you should have.

Draw the link for me as to why this isn't a fairly clearcut issue.

MR. GIVENS: I think it is a clean-cut issue, Your Honor, but I think it's the other way.

THE COURT: You're going the other way. Explain to me why.

MR. GIVENS: Okay. I will.

THE COURT: Excuse me for just one second.

MR. GIVENS: Yes.

(Pause.)

THE COURT: Yes. Go ahead.

MR. GIVENS: With the Court's permission, let me kind of go around it and come back to the nut of your question -- okay? -- because there are two cases from this Court that dealt really with a Claim 1-type issue, dealt with the royalty, where that exact

issue came up, and, in the Osage case and in a follow-up to the Wind River case, in both of those decisions, the decision of the Court of Federal Claims has been that the determination of the amount that should be collected falls on the failure-to-collect side rather than the failure-to-negotiate-a-good-lease side.

THE COURT: Right.

MR. GIVENS: In the Osage case, the issue was whether the United States had followed the right process in the collection of these royalties, and that's really the same as our Claim 1 issue, whether the royalty process required by the regulations had been followed.

THE COURT: So you think, in terms of any agreements you've entered into, I can just ignore them and say, It doesn't matter what was agreed to or stipulated to; you have to follow these regs --

MR. GIVENS: Yes, Your Honor.

THE COURT: -- that that becomes an accounting issue.

MR. GIVENS: Yes.

THE COURT: Okay. You don't see a problem with that, in that, throughout this process, it was understood, at various points, that there wasn't going to be a royalty and that the rents were going to be

set based upon a fair market value of raw land that had nothing to do with oil production at all.

I understand you have an argument that that's contrary to the regs, but doesn't that go to the issue of the government's management of the asset as opposed to what it needed to collect from BP?

MR. GIVENS: We don't feel it does, Your Honor, for this reason, that if there is a conflict between the regulation and the agreement, then the regulation controls.

What happened here is there was a lease that was entered into, and it had an intended use in that lease.

THE COURT: I understand, to build the pipeline.

MR. GIVENS: That use changed. When the use changed, that implicated the regulations. So they have to trump, and they do for a couple of reasons because both regulations, both as to the Claim 1 oil regulations and as to the Claim 2 present, fair annual rental regulations.

The regulations say that if the amount to be collected is less than set out in the regulations, that's okay, so long as there is a finding that it is in the best interest of the allottee that that lesser

amount be collected, and the United States has conceded that there was no such finding.

So, one, the regs control, and this lack of a finding is even a little more muscle as to why the regs control as to both of them.

I guess we would direct the Court on --

THE COURT: But I'm worried about your contention that you ignore what your clients have agreed to and how you propose I deal with that.

For example, in Attachment 35, the agreement to amend the lease that was signed by your clients in 1994, they specifically agreed that the lessor shall make no additional claims, requests, or demands of the lessee or lease rental payments except as set forth in paragraph 5, and then paragraph 5 says, rental payments may be increased at successive four-year intervals.

What should I do with that language?

MR. GIVENS: Well --

THE COURT: If they have said that they agree they are not going to seek anything except with regard to these rental adjustments, and they don't file a lawsuit within six years of these adjustments, that they won't make any other claim except through this proceeding --

MR. GIVENS: Your Honor, the arguments are different as to Claim 1 and Claim 2, and --

THE COURT: I understand Claim 2 deals with the rentals, and Claim 1 deals with the royalty, but haven't they conceded there will be no royalty payment?

I mean, think of the precedent. The government isn't suggesting that if you thought that the lease was inconsistent with the regs, that that couldn't have been brought within a timely period. I don't think they are suggesting you couldn't have brought the case.

What they are saying is that's a case that has to be brought within a six-year period of time, and to convert it into an accounting issue by simply saying, "We would like the money that we think the lease should have originally provided for," is essentially conflating the issue of management of the asset with management of the trust funds, and they are saying you can't conflate those arguments, not that you can't bring a lawsuit.

MR. GIVENS: I understand.

THE COURT: Right. Okay.

MR. GIVENS: Let me answer that this way. First, let me direct the Court to the Osage and what I

call "the Wind River III case." It's a portion of Wind River that's backed down in this Court, and, reading that carefully, it's our view, Your Honor, that it answers your question.

THE COURT: What I'm worried about is really what the Federal Circuit has said. Right? I appreciate what my colleagues have done, but hasn't the Federal Circuit suggested that you have to draw a meaningful distinction between that which is to be collected and that which should have been, you know, provided for in the first instance.

I agree with you, it's not perhaps totally answered, but isn't the implication that the breach-of-trust claims that are aimed at sort of maximizing returns, which sounds like what you're looking for, are, in fact, -- and you're saying no. What you're saying is that because they should have, under the reg., required the royalty --

MR. GIVENS: It's a matter of determining the amount to be collected, Your Honor, and that's the number two, if you will.

THE COURT: All right.

MR. GIVENS: I was going to deal with this a little bit later, but it really gets to the heart of what you're talking about, I believe, Your Honor, as

this document that was signed earlier, and that is, what Congress intended when they passed the ITAS.

Did they intend a subjective standard -- what did you know, and when did you know it? -- or did they intend an objective standard, that if an accounting is requested, and the accounting is received, and a response is received, that's the thing that triggers the accrual of the cause of action?

It's important, I think, to think about what Congress was dealing with. They were dealing with all of these Cobell claims, Your Honor, which, of course, this Court has a bunch of --

THE COURT: Right.

MR. GIVENS: -- the District Court in D.C. has even more. Those claims went back 100 to 150 years, five, six, seven -- 10 generations of people. What did they know, and when did they know it?

The Congress, in looking at that, said, No. That would be a horrible use of scarce judicial resources to force the federal judiciary to look at every one of these breach-of-trust claims and to say, "Okay. What did this family know about how their lease was run and when they could sue and what was being collected, and when did they know it?"

So the Congress painted with a broad brush,

and they did it in two ways. They did it with the notwithstanding clause, the notwithstanding clause of the ITAS, notwithstanding any other provisions of law. In Wind River, the Court said, That clause means that all of the subjective case law dealing with 2501 is not applicable.

The second place where the language here is important is the cause of action does not accrue -- the next-to-the-last bullet -- until the affected individual Indian has been furnished with an accounting, so has been furnished by the United States with the accounting.

Those two provisions, the court, in Wind River, said create this objective standard, which is very different than the standard that is the case law with 2501, but definitely a different way to approach it.

If I could turn for a second to the Claim 2, the determination of Claim 2, and the Oengas' claim there, that's one that's substantively before the Court today as well, Your Honor.

Now, in the lease, it was agreed that there would be an adjustment every four or five years -- it started out five and then went to four -- and, of course, what we're dealing with really is these two

adjustment periods here, from '94 to '97, from '89 to 2001, and what needed to be considered when the rental rate was adjusted.

The regulation requires consideration really of three things:

First, the rent collected has to be presently fair, present, fair, annual rental; and then it also has to take into consideration the equities and the current economic conditions. Those two are in the little-bit-later provision that says you've got to adjust them every so often and take these two considerations in.

The United States took on its own shoulders the duty to perform those appraisals, and the process was that they would do an appraisal, they would conduct a COLA, a cost-of-living adjustment, and there was a very intricate process of figuring out how that would be done, and it's spelled out in the lease, and they would collect the greater of that.

Now, the Court brought up the provisions -- I'm getting my system screwed up, Judge -- the provisions of the lease that dealt with the appraisal adjustment. It's addressed two places. It's addressed in five, and the standard there is fair market undeveloped rental value.

So you look at the value of the land. You don't look at the value of the stuff that's put on it. It's the value of the land. Whether or not these appraisals were done properly, were done pursuant to industry standards, considered the things that should have been considered, that's a factual determination.

THE COURT: This is the issue: The question really is you want me to conclude that the lease, in essence, was both either inconsistent with the regs and has not been implemented in accordance with the regulatory or lease requirements, and the question really is, is that an issue that goes to trust funds, or is that an issue that goes to trust assets?

So I understand what you're saying. I was reading Shoshone somewhat consistently, I think, with what the government was arguing, which is that if what you're worried about -- what the circuit was saying is the ITAS is, in fact, an accounting statute. It isn't to decide how much should have been collected but, rather, with regard to amounts that were collected, the government has to account for those and that the government also needs to account for things that it should have collected but failed to collect. In other words, it was money fairly due and owing.

What you're saying is there is another step

in that and that it can also include --

MR. GIVENS: Exactly, Your Honor.

THE COURT: Tell me exactly where you take that from. Let's get to just the nub of that.

MR. GIVENS: Number three.

THE COURT: That's your number three.

MR. GIVENS: It's on page 11. The government said, Well, we should just look at what's brought in, and then did we manage that well after it's brought in?

THE COURT: Right.

MR. GIVENS: Under the government's proposed interpretations, losses to trust funds would apply to purely passive behavior resulting in decreases in the trust funds. We reject the government's narrow reading. That is just the passive bank teller approach that was rejected by the circuit.

Then, when they get over here later --

THE COURT: Go, then, and say, at the same time, the Court of Federal Claims interpretation is overly expansive.

MR. GIVENS: Right.

THE COURT: And they are trying to find the line in between.

MR. GIVENS: And that's why I went through

what I think there is agreement on, Your Honor. The line is drawn at the lease, and if the claim is that the lease didn't maximize -- if all we're dealing with is the lease, we don't have a conflict of regs involved.

THE COURT: And this one doesn't right now. Right.

MR. GIVENS: And the lease didn't maximize the profits.

THE COURT: Because you could have, under the lease, charged five dollars a ton, and you only charged a dollar a ton. That's a breach-of-trust case that you that you have to bring within six years. That's not an accounting, and that's what the government is arguing what you're really doing here, and why is that wrong?

MR. GIVENS: Because the issue of determining how much to collect is not -- we take the lease as it is, good, bad, or indifferent.

THE COURT: Okay.

MR. GIVENS: We're not challenging the lease. We don't think it's a good one, but we take it.

It's easier just to talk about Claim 2 here. Let's talk just Claim 2.

THE COURT: Okay.

MR. GIVENS: The Claim 2 issue, then, is, under the provisions of the lease, how is the rent collected? In our view, the job of the --

THE COURT: And an appraisal was done, and a number was derived at, and they collected the amount of money under the appraisal that came up with that number.

You're saying to me, wrong appraisal. The government is saying, wrong appraisal had to be brought within six years. And the next time they do it, you will be able to go, if you don't like that appraisal within six years, sue us and say, "Breach of trust. You should come up with it." On the merits, they may disagree with you, but, at least, right now, on the statute of limitations.

MR. GIVENS: They might have an argument if they had ever given us an appraisal. Our position is they never did. We never knew what that appraisal was until it was received through the accounting.

But I think the better way of looking at it is not that approach but thinking of it as the process of calculating the rent to be collected is part of collection. That's what the circuit meant when it said, The United States is not passive in its

collection duties.

Then, later, there's all of these items marked "two" on pages 12 and 13, Your Honor. Going through those carefully, it is those provisions, particularly the Osage and Wind River III case, that the circuit looked at when it came to the conclusion that the determination process is part of the collection process.

THE COURT: Right.

MR. GIVENS: So --

THE COURT: Before we go, let's just look at your page 14, your last number two.

MR. GIVENS: Uh-huh.

THE COURT: So here we have the circuit's conclusion: "Based on the language of the Act and statutory rules, we conclude that the Act covers any claims that allege that the government mismanaged funds after they were collected, which we don't have here, as well as any claims that allege that the government failed to timely collect amounts due and owing under the contracts."

And you're arguing that "under the contracts" includes things that the government did not, by its terms, are not due and owing under the contracts, but you're saying are due and owing, either

under the regs or under an appraisal, if it had been better.

MR. GIVENS: Right. Of course, the reason is, is the appraisal was what was required by the contract.

THE COURT: Okay. All right. Let's move to the issue. Let's assume, for the moment, that I feel that the circuit's language is a little bit more constrained than you're asking me to look at, and you then say to me, Well, it doesn't matter. At least we have two years covered. And the government response is, No, because this is a situation in which the appraisals were done every four years or whatever. It's not an annual. So walk me through that argument.

MR. GIVENS: That argument is very straightforward, Your Honor. There is no question that 2000 and 2001 are within the six years, when you apply the tolling statute.

For Claim 1, of course, to determine the amount, if we're dealing with a royalty requirement under the reg. --

THE COURT: Right.

MR. GIVENS: -- you've got to look at the volume produced through the years. So the United States' argument that anything that was decided

earlier simply cannot stand, the amount due in 2000 -- to the amount of production in 2000, the same with 2001.

As to Claim 2, the present, fair annual rental, this is a claim for collection.

THE COURT: When we once spoke, you said to me, These are alternative claims. When I hear you speak, I don't see them being argued to me as alternatives. I get the feeling you're saying, The regs require both a royalty and a rental. So just help me understand how I deal with that contention. The lease, by its terms, said there will be no royalty.

MR. GIVENS: Yes.

THE COURT: Okay. And I understand what you're saying is, things changed when it became a production site, although there were amendments made to the lease thereafter.

But leaving that aside for the moment, help me understand just how you divide up these two claims and how I should look at that in the context of this annual issue.

MR. GIVENS: Well, I guess, Your Honor, if the regs require the collection of a royalty, that has to take precedence.

THE COURT: Okay.

MR. GIVENS: Maybe they do, maybe they don't, maybe it's not timely, but if the regs require it, then that has to take precedence. If not, then we're looking at the present, fair annual rental posture, and, of course, that's the one we're considering --

THE COURT: -- that you're doing right now. I understand.

MR. GIVENS: The claim is for collection, collection for rent due in 2000, and that, even though the decision of the amount to collect might have been made earlier, the statute or the regulation requiring collection of present, fair annual rental -- those three words, "present, fair, annual" -- require it be for the 2004 and 2001.

THE COURT: Right. But the government says, That may be true, but he way this lease is written, that annual lease rental is decided every four years. There isn't an annual appraisal, and, therefore, there is no discretion that's exercised each year, and, therefore, you have to go back to when that appraisal -- each appraisal will give rise to a new statute of limitations but not each year.

MR. GIVENS: And, Your Honor, we simply say

that simply is not correct. The regulation does not allow that interpretation. It just doesn't. The duty is to collect rent that is presently fair, and for statute of limitations purposes, if the Court were to hold, as we were discussing earlier about the impact of Wind River on this and the appraisals, that would not preclude the action in 2000 and 2001 because it is for those years, those present years, that the rent has to be presently fair.

THE COURT: Let me just ask you, just in terms of the law, in terms of agreements that are entered that your clients sign onto, if they, indeed, agree, and I intentionally drew your attention to that Attachment 35, that they won't make any claim or demand, okay, except that they recognize that rental payments may be increased at successive four-year intervals, what do I do with that? Do I just simply say, "Oh, it doesn't matter that they entered into these agreements"?

I mean, the Defendant-Intervenor thinks that all of these things are absolutely fatal to your client, you know, the concessions that have sort of been made, and I've been struggling with that. Are they not bound by -- forget the lease. I'm talking about after they even know that certain things are

going on, they continue to make and sign things that clearly limit their rights, and I don't know what you think I should do with that, as a matter of law.

MR. GIVENS: Your Honor, that's the reason, at the very outset, I talked about the importance of fiduciary obligation here.

Think what we're dealing with. We're dealing with a family of new kids who are one generation away from a subsistence lifestyle that had existed for tens of thousands of years. On the other side, we have the government of the strongest country in the world, and we have the third-largest oil company.

THE COURT: You're not answering my question. Are you saying there is precedent that says that when the individuals who are to be protected have been given information and signed agreements, that there can still be a breach of that trust responsibility? You're not asking me to set this aside, per se. So I'm struggling with how do I deal with that legal constraint.

MR. GIVENS: What we have is a claim for breach of that fiduciary obligation, and for the --

THE COURT: But is it a breach of a fiduciary obligation for somebody to say, "I

understand that the rents will be set every four years and that I can only make an additional claim every four years"? Tell me how that would breach the fiduciary duty.

MR. GIVENS: The circuit was clear, in Wind River, that the fiduciary duty, and the Supreme Court, does not require the individual, the beneficiary, to stay up on the day-to-day operations of things.

So if the trustee says, "Well, look, this is the only way you can do it, and, here, I'm your fiduciary. I'm telling you, this is all you can get, so you've got to sign this," well, that goes to the core of that strict fiduciary standard.

THE COURT: I understand on the merits, but we're still talking about time.

MR. GIVENS: Well, we're not, I don't think, Judge.

THE COURT: Okay.

MR. GIVENS: We're talking about what happened. The document that you're pointing to, to deal with time, really resulted from the discussions with the beneficiary and the fiduciary.

THE COURT: This case is papered with discussions and signatures. I understand your argument about the fairness of this deal.

MR. GIVENS: Okay.

THE COURT: What I'm concerned about, though, are the time constraints that are going on here, and what I'm worried about is there seems to have been an understanding that this is how much we would be getting and that I would have time to bring it, and that it wasn't going to change every year, and I'm worried about what I do with that.

Are you telling me there is a trust principle that says you can ignore all of the beneficiaries' concessions, so to speak?

MR. GIVENS: Two things.

THE COURT: Okay.

MR. GIVENS: Yes to that question.

The second point: In the passage of the ITAS, Congress said, none of that matters, notwithstanding any other provisions of law, notwithstanding the huge body of law that's been built up about subjective knowledge under 2501.

We're cutting a clean slate here to keep judges out of having to decide that.

THE COURT: Okay. So that falls within the sweep of "notwithstanding." Okay.

MR. GIVENS: Yes.

THE COURT: Okay.

MR. GIVENS: The U.S. makes a couple of other small arguments, that the response to the accounting request isn't an accounting. Well, it may not meet the exacting standards that the D.C. Circuit has placed for accountings, but it doesn't matter. The accounting was requested. That's undisputed.

THE COURT: I thought the purpose of that argument was to say they weren't conceding that they had done an accounting. Mr. Upton can explain it, but what I got, though, was the impression not to say that the issue had been conceded in some fashion because there was a response, but I hear what you're saying.

MR. GIVENS: The final argument, we've already covered.

So I guess, then, just in summary, Your Honor, --

THE COURT: Yes.

MR. GIVENS: -- we feel that the ITAS is applicable to all years. That was Congress's intent, to keep the court out of these subjective determinations, that even if it isn't, for some reason -- and it is because the determination of the amount to be collected is a collection item. Even if not, it's timely for 2000 and 2004.

THE COURT: Because it's an annual

obligation.

MR. GIVENS: Yes.

THE COURT: Thank you.

MR. GIVENS: You're welcome. I hope it helps, Your Honor.

THE COURT: It did help.

MR. GIVENS: Thank you.

THE COURT: Mr. Upton, do you want?

(Pause.)

MR. UPTON: May it please the Court, my name is James Upton. I'm the attorney of record for the Defendant, the United States, in this case.

I assume, Your Honor, that you would like me to address statute of limitations first, and then we'll come back to mandating duty later.

THE COURT: That's what we'll do.

MR. UPTON: With respect to Claim No. 1 and the statute of limitations, it's clear in the law, and notwithstanding ITAS, that Section 2501 is a jurisdictional limitation on the waiver of the government's sovereign immunity, which has to be strictly construed.

There are two, what the government calls, "first accrual tests." One is articulated in Hopam Band, and it says, "A claim first accrues when all

events have occurred which fix the liability of the government and entitle the plaintiff to file suit," and the other test, which is essentially the same in substance is in Manomone, and says, "The claim first accrues when all of the operative facts on which a claim is based exist, and none of them are inherently unknowable. The Plaintiff doesn't have to have actual knowledge of all of the relevant facts."

Now, in this case, and, again, I'm talking with respect to Claim 1, the terms of the lease, as the Court has noted, in several places, in paragraphs 4, 5, and 9 refer to rental rates, say nothing about royalties, nor do they say anything about throughputs. Nothing is in there that suggests that.

But, more importantly, paragraph 9 of the lease specifically said that, "in determining the fair market value of the premises," the value may not be based upon "any income the lessee derives from the leased premises." So that means no royalties and no rentals based on royalties would be paid to the Plaintiffs. That was clear from paragraph 9, and, again, as I say, from the outset, when they first had the lease finalized to go into effect in early 1989.

Now, as an alternative date, and this seems to be the date that the Plaintiff agrees with, at

least in part, the claim accrued in 1993. Plaintiff says, at that point, because the use of the parcel be changed from a right-of-way, et cetera, to an oil production facility; that is, a drill pad.

I would emphasize that, again, paragraph 10 of the lease, and that's quoted at page 6 of our motion, says, "The lessee may use the leased premises for any and all oil field exploration, development, construction of facilities, production and support purposes, and for any other uses and purposes reasonably and eventually related thereto."

Paragraph 11 also talks about constructing facilities, including drilling pads, and a drilling pad was constructed.

So, clearly, under the lease, they were entitled to do that, and we say, without an amendment -- I know there is language in the record calling the change that occurred in 1993 when BP decided to expand the lease area from 10 to 20 acres as an amendment, but I think it's important to note that we, meaning the United States, don't view that as an amendment because it was already authorized by the lease.

Now, Mr. Givens has said, We don't know what was in the appraisal. The Plaintiffs knew nothing

about the appraisals.

I think it's very important, and, again -- let me back up.

Mr. Givens now argues primarily that the Claim 1 reaccrued each year, in essence. I would point out that the way his motion was written, he is complaining about the appraisals that were done in '93 and '97, and if that's his complaint, then that's when the cause of action had to have arisen because if we didn't do proper appraisals, and we didn't determine rental value in the way that it should have been done, according to Mr. Givens, then that's when the cause of action accrued.

But he also says, We were kept in the dark, in essence, essentially what Mr. Oenga said in his declaration. We didn't know what was going on. We didn't know anything about these appraisals.

I think there are several particularly germane facts that should be noted.

First of all, and this is in Attachment 23 to our motion, the Arctic Slope Native Association realty specialist, Diane Stevens, and this association was a contractor under 638, handled realty functions for BIA, states, "BP Alaska has decided to exercise their option to expand into another 10 acres of the

allotment so that the total lease area will total 20 acres."

It also says, "The option to expand into another 10 acres means that the east half of the allotment will be used, and the west half is still open. As you know, BP will be constructing a drill pad at that point."

This was a letter written on July 30, '93, to Mr. Oenga.

There was heavy involvement, in July, August, September, and October of '93, with the heirs, also with the BIA realty specialist, Kathleen Dickinson, as well as Ms. Stevens, as to how the expansion of the acreage that was being leased should affect the fair rental value.

I would refer the Court, particularly, to Attachments 27, 28, 29, 30, and 32 of our motion, which documents this.

One example, and also Attachment 34, one example is it's documented that the Plaintiffs and Ms. Stevens met with BP on October 21, '93, in Barrow to discuss what we called the "1994 amendment," what it should be, what should it provide, and what should the changes be.

THE COURT: Right. In my discussion with

Mr. Givens, he is saying it doesn't matter. We can't hold them to that because if the lease should have required the payment of the royalty, or should have required a different appraisal, then that is an issue that goes to the collection of trust funds and is not an issue associated with the proper management of the trust asset.

His fall-back argument is that it's an annual issue, but he would love to go back to the beginning, the beginning of oil development on the property, which is, I guess, '94, when they finally start bringing stuff in.

So tell me, is it a trust fund issue, or is it a trust asset issue?

MR. UPTON: From the government's perspective, this is clearly a trust asset management and nontrust funds issue. I think the language, and the Court pointed this out, the language on page 1351 of the Shoshone opinion, the 2004 opinion by the Federal Circuit, points out that, "We conclude the Act covers any claims that allege that the government mismanaged funds after they were collected --" in other words, these are amounts due and owing "-- or as well as any claims that allege the government failed to timely collect amounts due and owing." That's the

key phraseology here.

It's amounts that were due and owing, under the existing contract, and I would point out that not only does Shoshone support our position; I think Pawnee does, but also Simmons, in which there was an example of a trust asset mismanagement claim which did not fit under ITAS.

I would also add, and this thread runs through all of the resource and trust fund mismanagement claims under the Indian Claims Commission Act -- essentially they are the same kinds of claims -- it's clear, if you read those opinions, that anything that had to do with amounts that were, in fact, collected or even amounts that should have been collected, fall under the accounting category, or, I would say, trust funds category, and I'll give the Court an example.

One example is in the Navajo Timber case, which is the Navajo Tribe of Indians v. United States. It's reported at 9 Claims Court 336. It's a 1986 opinion. There, the plaintiff was complaining because there were missing receipts having to do with the operation of a sawmill, which essentially was run for the benefit of the tribes almost as a tribal enterprise, but it was run by BIA.

They were missing receipts, so they said, Well, obviously, BIA was collecting money. There was money being generated somehow, but these missing receipts indicate that it was generated but not collected, and it's clear that that is an accounting issue. There is no confusion --

THE COURT: You know, it's interesting. I mean, in a way, giving the Plaintiffs their due in this, is the issue that came up in Shoshone, and the issue that has come up in almost all of these, has not been the situation in which the argument is that there is a conflict between the instrument, which, I agree with you, they signed onto over and over and over again. This is not a case where the beneficiaries were in the dark.

They may have been in the dark about expanding some of this stuff, which we deal with later in Claim 3, but, certainly, in terms of what was happening around the time of '94, and yet the argument is that if we peel away the lease, what we would realize is that there is a violation of the regs or the violation of the lease itself because they didn't do the annual, or every four years, appraisal correctly.

Your contention is that that goes to the

management of the asset and is not a collection issue --

MR. UPTON: That's right.

THE COURT: -- because it requires you to figure out how the asset is to be managed. Is that what you're saying?

MR. UPTON: Yes. Let me get back to the issue of amounts due and owing.

THE COURT: Right.

MR. UPTON: The Plaintiffs are arguing that until they got this "accounting," which we do not concede was an accounting, in 2005, that they had no idea what was going on, no idea about what had been collected, and the record in this case shows very clearly, and, again --

THE COURT: No money was going to direct bank accounts.

MR. UPTON: That's right, that type of thing. Not only didn't the individual Plaintiffs keep very close track of what was being generated under the lease, but, on top of that, they had access to independent counsel, as we pointed out, in 1993, 1994, 1995, and you couple that with the record of counseling which is in Attachment 33, there is no earthly reason why they couldn't have brought suit

within six years of, say, 1994, for lack of a better --

THE COURT: And that's what I was asking Mr. Givens, and he was saying, because that doesn't matter. The "notwithstanding" language in ITAS, if it is an accounting question, it nullifies all of those barriers.

MR. UPTON: Right. There again, the crux of this, if it's an accounting issue, it nullifies these barriers.

I think that, again, this all comes back, obviously, to the question of how is this characterized? I guess one of my points here is that Plaintiffs don't want to know. They don't want to know what was due and owing under the lease. They know what was due and owing. They know what they got. They clearly are saying, If you had managed the allotment parcel B properly under the lease, you should have generated a lot more income. In fact, I would call it actually a "maximization-of-income theory.

Now, Mr. Givens also says, Well, you know --

(Discussion held off the record.)

MR. UPTON: Mr. Givens is saying, Well, if there is any conflict between the regulations and the

lease, the regulations trump.

Now, as to Claim 1, it's very important to point out that Mr. Givens assumes that --

MR. GIVENS: Your Honor, could I object? This is strange. This is the Oengas case. This is not Mr. Givens's case. I've sat through -- there have been about 40 references to Mr. Givens.

THE COURT: You know what? That's a point well taken. I don't think, Mr. Upton, you're trying to personalize it.

MR. UPTON: No, I'm not.

THE COURT: So I think, if you want to call it "the Plaintiffs."

MR. UPTON: Yes, Your Honor.

THE COURT: It's a point well taken, Mr. Givens.

MR. UPTON: The Plaintiffs assume that this lease falls under 25 U.S.C. § 396, which is the 1909 Mineral Leasing Act pertaining to allotments, or it falls under the Indian Mineral Leasing Act, 25 U.S.C. § 396(a), et cetera, and under 25 C.F.R. Part 12, which are the implementing regulations under the Indian Mineral Leasing Act.

As we've pointed out, the Plaintiffs do not fit within the definition of "Indian mineral owner,"

which is found in Section 212.3 of Part 212, and --

THE COURT: Mr. Upton, let me just ask you, that's getting to the merits of the argument. Do I have to do that in order to conclude that they, in fact, don't fit within the ITAS?

MR. UPTON: Well, I guess it's relevant to the argument that the regulations trump whatever the lease says. The lease provision may be inconsistent. All I'm saying is --

THE COURT: You don't believe that it is.

MR. UPTON: It simply doesn't apply. So I would just like to mention a couple of arguments that Plaintiffs make.

They cite to the 1987 regulations, 212.16, and they focus on the phrase "oil produced and saved from the land leased." This language refers to land, the subsurface of which contains oil deposits, and, of course, Plaintiff only has a surface stake.

We certainly don't agree that the term "mineral interest" is vague. It's a property law term which refers to the ownership of subsurface minerals.

Two of the statutes that Plaintiffs rely on, 30 U.S.C. § 226(m) and 42 U.S.C. § 6506(a), relate to public lands and have nothing to do with leasing of Indian land.

The other point is that, under Fagrima, there is no equation of the owner of a lease -- they talk about the definition of a "lease site" with the owner of a mineral interest, and I just wanted to point those things out.

THE COURT: I understand.

MR. UPTON: So, again, at least with respect to what was going on, we certainly would contend that the Plaintiffs were well informed, both as to the first lease amendment and as to the second. They were involved, or were kept informed, as we point out in our reply brief, about the appraisals. Mr. Oenga says in his declaration that he never got any copies of the appraisals. There is a letter attached to his declaration which says they made a request to the Office of the Special Trustee, and they didn't get an appraisal from that office.

The offices that the Plaintiffs were dealing with were the offices of the BIA realty specialist and the Arctic Slope Native Association offices, and, in the declarations, Mr. Wild and Ms. Dickinson say they were not aware of any requests that were made and that they had a policy of turning over lease-related documents to the Plaintiffs if the requests were made.

Mr. Oenga's declaration does not specify any

specific instance where he asked for an appraisal report or other documents related to lease from ASNA or BIA, where he was turned down.

(Pause.)

MR. UPTON: With respect to Claim 2, as pointed out, we believe that the two claims -- the two parts of the claim -- involve the lease rental adjustments in 1995 and '97. We think that, as pointed out, that's when those parts of Claim 2 accrued and not later.

The Plaintiffs were informed about the 1993 adjustment. Leroy Oenga had August '93 discussions with ASNA Realty Specialist Diane Stevens about the 1993 lease mineral adjustment -- that's in Attachment 32 -- and we also believe it's fair to infer from the involvement with the readjustment process and the events leading to the '94 amendment to the lease that the allottees knew that the fair rental value of 20 acres of Parcel B was $1,600 per acre. That's based on Attachment 28.

As to the '97 appraisal, each owner was informed about the amount of the adjusted rental based on the '97 appraisal, and they were also informed that the CPI provision, Consumer Price Index provision, in paragraph 5 of the lease meant that they would be paid

an amount higher than the rental amount arrived at in the appraisal.

The other point is that, again, there were no requests, as far as Mr. Wild and Ms. Dickinson, and those are Attachments 46 and 47 to our opposition -- there were no instances where they could remember requests for any documents, in particular, including the appraisals.

As to Claim 3, there has been some confusion here. Originally, Claim 3 was a claim that we had committed a breach of trust by not giving notice of the breach of the lease by BP when the facility sharing agreement was entered into and also notice of trespass.

Then, originally, the Plaintiffs had a claim with respect to not receiving notice that Arco had an interest, in 1993, in renting part of the allotment of Parcel B, but, as I understand it, that's no longer in the case, but the second part of Claim 3 is still in the case, but it concerns the failure to give notice of the facility sharing agreement. That issue of facility sharing was dealt with in the 1994 amendment to the lease, and it said it fully authorized a facility sharing agreement which would not require a notice to the allottees.

THE COURT: I don't think that's relevant right now on this.

The real nub of this, I think, is how far did the circuit go, and did it cover this type of situation, or it didn't, and I have to sit down and, obviously, think that through.

Clearly, I think, Mr. Upton, the government is right. If we're tolling with the six-year statute of limitations, I think it's problematic, and I know what you're getting to, which is to say, the rules should apply, which is, they had knowledge, they should have known, they could have brought it within the six years, and I'm tracking with you on that.

What I'm still grappling with is this question of we haven't been squarely faced before with a situation in which the Plaintiff is making an argument that it's not a mismanagement of the asset if, in fact, as a matter of law, a different amount of funds was due and owing. I have to sort of grapple with that.

MR. UPTON: Your Honor, in that regard --

THE COURT: Yes. Just focus on that for just a moment, and I'm going to give you, Mr. Givens, a few seconds to respond. We'll take, like, a five-minute break and then regroup ourselves for the merits

sort of argument.

MR. UPTON: All right. I would point out again, to the extent that the Plaintiffs are relying on this conflict between the lease provision and the content of the regulation, again --

THE COURT: Or that you didn't do the appraisal properly, which is the language he was identifying, that there was an obligation, and I'm looking at materials that Mr. Givens gave us, that the appraisal itself wasn't done correctly.

MR. UPTON: Right. I guess there are two responses to that. One is that, as Plaintiffs stated, how the appraisals were done is really a factual issue, but, beyond that, I would just add, and this hinges on the merits, to some extent, there certainly is nothing -- and they rely on 25 C.F.R. Part 162 -- which requires the government to consider royalty throughputs as some other form of consideration.

There is simply nothing there, and I would say this is analogous to the Pawnee case, where the plaintiffs argued, Well, you should have calculated royalties a different way. You would have gotten some more money, and you didn't do it. And the court said, Well, there is nothing in the regulations that required us to do that.

And that's also analogous to the Supreme Court Navajo case where the Navajo said, Well, the secretary has to do sort of an independent economic analysis of the reasonableness of the proposed royalty rate, especially where we, the tribe, says it should be higher. And the court said, Well, it simply is in -- or in the regs under --

THE COURT: Thank you.

MR. GIVENS: Thank you, Your Honor. Just a couple of quick points. Starting with one of the last things said, appreciate counsel's consent and really feel it's appropriate that whether or not the appraisals are properly done is a factual matter. With that, the record before this Court consists of the unrefuted sealed declaration of Mr. Morse that they were not done right and they did not meet industry standards and they did not consider the things that should be done. So the issue before the Court then is where you have an appraisal that is done wrong, the lease requires an appraisal, the appraisal is done wrong, is that part of the accounting?

THE COURT: The accounting. No, I understand. I think I get the issue. I don't know if I know the answer quite yet but I know the issue.

MR. GIVENS: The United States spoke several

times about what the Oengas did or did not request. Both in the fiduciary obligation standards set out by the Supreme Court in, particularly in White Mountain Apache and in the until provided with accounting provisions of the ITAS there is no duty to request anything separate.

THE COURT: But, Mr. Givens, you would have to admit that really I give these people credit, I think that while the Oengas may be operating with a lot of educational handicaps and so forth they have been very vigilant in trying to figure out a way to change the situation they found themselves in based upon Angel Oenga's initial agreement. And they meet and they're talking about money and so on.

So while it may be I think the Government's contention is this isn't a situation where you've got quarter interest heirs living miles away from the situation who just have no clue whether they are -- how they are being treated. These folks are in meetings for many meetings with many times signing that they understand what they're agreeing to. And I do find that that does make this a little bit different than other situations where until they, yes, you wouldn't know whether or not you've been cheated or not because until you get an accounting that's

reconciling the books you would have no way of knowing.

I mean they were directing where they wanted money to go here. I mean it is a little bit different. I mean what you really are contending is that under the terms of this it is, it's maybe what makes this case unique is the management of the lease, you know, that's at issue and whether or not something different should have been done. But I don't think it's fair to set this case up as one where people were really completely in the dark. I mean they are vigilant in this case.

MR. GIVENS: Your Honor, the record speaks for itself in that regard.

THE COURT: It does.

MR. GIVENS: But I guess the Oengas are as entitled as any litigant to have the provisions of the law strictly construed in their favor --

THE COURT: Absolutely.

MR. GIVENS: -- as any litigant is. And which suggest, Your Honor, that if the ITAS is viewed as allowing a subjective determination, that is even in a case where the facts may indicate that's, you know, maybe it makes some sense, and particularly when you are used to the 2521 or 2501 cases all the time

where that is part of the determination. But that's a very slippery slope, Your Honor, on all of these Indian trust fund cases. And if the rule that is adopted is that it's the subjective determination of who knew what when that --

THE COURT: I appreciate that.

MR. GIVENS: One of the great things about being able to sit down and gather your thoughts is you can find again the exact place in the cases and the --

THE COURT: Okay.

MR. GIVENS: -- leases that really answer the Court's questions. And the Court's questions as to exactly what did the circuit say, and they said it a bunch of different times in these last two pages. And it basically is the claim for failing to collect the proceeds from the contracts. A claim for failure to collect the revenues derived from the leases.

Let's go to the last one first, failure to collect amounts due under the contract. And then this one: losses to trust funds, which include collecting payments under the contract, and assessing penalties for late payment.

Now, let's -- and I want to talk about that last one. And then let's look at the contract itself. And it's a part that the United States mentioned about

the cost adjustment factor. I call it the COLA, the United States calls it a CPI. It's an adjustment based on inflation. And the contract very -- the lease very expressly says the things that are supposed to be considered.

Now, let's just pause for a second. What if this case were about the United States didn't follow the right provisions in calculating the COLA? In fact, one of the years the '98 through '01 the rent paid was based on the COLA. Well, that would be a claim for failure to timely collect the amounts due under the contract. And the other point though, see down here in 6 it talks about delinquent of rent payments. And that is really very similar to this provision, Your Honor.

I'm sorry, go ahead.

THE CLERK: Mr. Hudson just called. He was disconnected.

THE COURT: Yes, we are going to take a break in a minute and then we will get him back. Thank you.

MR. GIVENS: Thank you, Your Honor.

Assessing a penalty for late payment is one of the things the circuit said is appropriate. That's on the collection side. So if assessing the penalty

is on the collection side, if calculating the COLA is on the collection side, then the details of how the appraisal is done, that it be a proper appraisal, Plaintiffs believe also is on the collection side.

Thank you, Your Honor.

THE COURT: That's helpful.

All right. What I'd like to do is let's take, actually let's take 10 minutes so we can get him back on the phone. And then we will come back and then start discussing the merits issues of claim 2 and claim 3.

Thank you very much.

THE CLERK: All rise.

(Whereupon, a brief recess was taken.)

THE COURT: I see we've lost our audience. Please be seated. I don't know what that says about us but people are reconsidering career choices. Okay.

Mr. Givens, let's now get to the --

MR. GIVENS: Thank you, Your Honor.

THE COURT: -- issues, claim 2 and -- you can do claim 2 and claim 3 together.

MR. GIVENS: If you'd like. We'll do it however you want, Your Honor.

THE COURT: Let's do that together, then they'll respond to it together, so.

MR. GIVENS: All right.

THE COURT: If you don't mind, that would be helpful to me.

MR. GIVENS: Okay. As with all of these type cases, Your Honor, there are really two issues: whether or not a money mandating duty exists; and is the case within the scope of that duty? There's, as I understand it there's no contest about the second of those so the issue for the Court to decide is whether the money mandating duty exists.

Plaintiffs believe it exists for three reasons, Your Honor. First, the circuit has specifically said it exists, that there is a -- maybe it's better to use a little more detail -- that in the Brown case the Federal Circuit said that these regulations, part 162, impose on the United States a money mandating duty in the commercial leasing of allotted lands. That's this case. The rate the duties -- I don't want to make too much of it but it is I think of note that the United States did not even address Brown in its briefing.

And the regulations impose the duty. And they require the U.S. to approve leases, to collect for annual rent, and to periodically review based on the equities and the economic conditions. Those are

the issues as to claim 2. A little different as to claim 3, but if you don't mind I will run through claim 2 first and then go to claim 3, if that's okay.

THE COURT: Uh-huh.

MR. GIVENS: In this case the lease itself also imposes a money mandating duty on the United States. The United States took on its own shoulders in the lease the obligation to conduct the appraisals and to collect the rents and to deposit it in these Oengas' IIM accounts. And then the U.S. took on its own shoulders later in the third amendment the obligation to handle all communication with the oil company.

The parties' positions, Plaintiffs say there's a duty, the United States say there is not a duty. And as Plaintiffs understand the U.S.'s position it is that because the regulations don't expressly require a consideration of royalties or throughputs in determining the fair rent then they don't have to consider them. They also make an argument that the income, the provisions regarding consideration of income in the least prohibits them from considering royalties and throughputs.

Well, address each of those but I think first it's probably appropriate to address the United

States' issue about do the regulations have to specifically require the consideration of throughputs or royalties before they must be considered? And in White Mountain Apache the Court really I think answered this question. And the quoted section here is actually part of a quote in the briefing as well. But what the Court did is it said, you know, there are two totally separate determinations with two different standards involved. The waiver of sovereign immunity in these cases has to be unequivocally expressed. But a very different standard is applied to the substantive creation of the duty.

And in the Mitchell case that was referred to as fair interpretation, it can be fairly interpreted. And the, I guess the wording to the point two is the bottom part of that quote there that when you are looking at the substantive provisions of a Tucker Act claim, not the waiver immunity but the substantive provisions, the conduct that is required is not to be lightly inferred but a fair inference will do.

And in this case the fair inference is the duty to conduct appraisals, means the duties to conduct proper appraisals. And the factual record that is before this Court, the undisputed factual

record is that those appraisals were not properly conducted. And it is fair to infer that a proper appraisal would meet the required standards and would consider things like royalties and throughputs.

Now, so what's required by the regs? Well, first there is the fair inference standard. Second, the wording of the reg is "present fair annual rental." To consider what is fair rental to be collected it's appropriate to consider throughputs. And in this case we have an amazing consideration that we have as part of the record the thruput that was paid by other oil companies for the right to produce their oil through this land.

THE COURT: I don't want to seem overly -- I may be confused a little bit about claim 2. In claim 2 are you focused just exclusively on the additional areas that were added? No. You mean the blue area as well; okay.

And when I read claim 3 are we -- okay.

MR. GIVENS: Just the red area.

THE COURT: Okay, that's what I just want to make -- that's how I construed it, I just wanted to make sure. Okay.

MR. GIVENS: I thought this case was easy, Judge, till I started putting together the argument.

THE COURT: This case isn't, yeah, it's not as easy as you think; you're right.

MR. GIVENS: The point as to claim 2, and the reason that this thruput is important is the Plaintiffs aren't saying, Well, we should have a thruput, or We should have a royalty. What Plaintiffs are saying is that in the determination of the amount to collect in the appraisal what should be looked at is what's collected other places. And it should be looked at royalties, should be looked at throughputs. And this one is amazing because it's the same land, it's just that the interest has been kind of juxtaposed. Now all of a sudden as to this thruput, BP is standing in the shoes the Oengas were a few years earlier. They have the land. And the other Arco and EXXON needed to get at their oil. And so they cut this deal.

Now, in that consideration for the appraisal there needs to be an allocation of value, how much of the amount that was agreed to in the throughputs should be allocated to the land, how much to the production facility? And that's next phase of this case there will be all kinds of folks with opinions about that.

But we do know one thing from the record, we

know that under the deal EXXON and ARCO got one slot, and if they wanted a second one they had to put it in at their own expense. So that that means that the land is, the access to the land increases the value of that. So what's the right amount? You know, we don't know but we can -- it should have been considered.

The Kuukpik consideration, now I don't want to overstate Kuukpik. Kuukpik is different. Kuukpik had a unique situation where they had the surface rights, they had the right to allow or not allow the production of oil from the subsurface rights which were held by ASRC for the regional corporation. But what Kuukpik did have, what makes it similar is they had the surface on which the production facilities were built that could get at that oil. And the royalties at Kuukpik, the consideration there wasn't just the royalty, there was a lot of other consideration that's delineated in Mr. Morse's declaration.

There's also in the briefing a 2.25 percent royalty or 2.50 percent royalty, in one reported case there's a 4 percent royalty. In another case surface owners share to allow production through their property where otherwise there wouldn't be any.

Maybe one of the most interesting

considerations that should have been considered, and Mr. Morse dealt with this, is the -- this one has the actual cites on it -- the statutes give the U.S., well, first the statutes require the U.S. to collect a certain amount of royalties. But we're looking now here at this one. But these two statutes allow the U.S. to collect less royalties or to give up some of its royalties when it finds itself in the same shoes as BP or later ARCO and EXXON where they have properties, oil properties that they can't develop from there that needs to use a production facility on a neighboring facility to get at.

Now, we don't have actual figures to present to the Court, and that's because of there was early discovery on it but limited discovery and so we haven't got that yet. But it's authorized. And as is pointed out, those sorts of things should be considered too, all in doing an appropriate appraisal. And that's just to look at what's fair.

And maybe it's I've practiced law for 34 years and most of my life I've been saying, Judge, this isn't fair, but I've had to find other ways to say it. For the first time in my life I think I've been able to say, Judge, it's not fair and that's the legal standard. And when you look at actual numbers

it's amazing. You don't know what the appropriate allocation between land and plant would be for the thruput for West Niakuk but and don't want to get into the specifics of it but let's just say for the sake of discussion that a dollar per barrel is allocated to the land. Well, what that would mean is that BP collected $16 million for the oil -- looking back at this sheet where all those numbers are -- $16 million, 25 times as much as what was paid to the Oengas.

Or if you look at the whole thing, as the Court asked, is this claim 2 about the whole thing? It is. If you use that same figure, the rents collected should have been 101 times more. That doesn't meet fair standard, it doesn't meet consideration of the equities standard, and it doesn't meet current economic conditions that are standard out of the CFRs. So those provisions of the CFRs, fair, equity, current economic conditions, require the consideration of the throughputs, of the royalties, and of what the U.S. gets from other places.

The duty isn't established just by the CFRs though, it's also established by the lease. U.S. created the duty by assuming on its own shoulders the need to do the lease. The appraisals to do an appraisal it is certainly a fair inference that it

will be a proper appraisal, it will meet industry standards. And the unrefuted, the sole factual, unrefuted factual record before the Court is that these items here, the unique location and use of the property, the throughputs, royalties, U.S. allocations needed to be considered --

THE COURT: In order to come up with a value. Right, I understand.

MR. GIVENS: Yeah.

THE COURT: I mean I think your point is it's not that you're asking that a thruput be paid. What you are saying is is an appraiser would have looked at those items in coming up with a fair value.

MR. GIVENS: The regs require it.

THE COURT: Or the regs.

MR. GIVENS: And the lease requires it. And those requirements create the duty, yes.

THE COURT: Right. But it wasn't a duty to pay a thruput, it's the consideration --

MR. GIVENS: Right.

THE COURT: -- is what you're trying to say.

MR. GIVENS: Right.

THE COURT: So that's why it doesn't violate the lease term. Okay.

MR. GIVENS: Maybe it's a blend.

THE COURT: I know.

MR. GIVENS: I mean, who knows? That kind of discretion is afforded but the discretion to ignore is not afforded.

The U.S. has suggested that the lease actually bars the considerations of that.

THE COURT: There's language in the lease that does say that.

MR. GIVENS: Well --

THE COURT: Not in the way you're trying to phrase it.

MR. GIVENS: -- I'd like to talk about that, Your Honor.

THE COURT: All right.

MR. GIVENS: With the Court's permission.

THE COURT: Sure.

MR. GIVENS: But let's start at the end. Even if it does, that lease has to fall because of if it's required in the regs and prohibited in the lease, the lease falls. That's the <u>Total Medical</u> case.

But let's look at the lease itself. Now, paragraph 5 here is the one that covers it. And it says the adjustments will be based on fair market of undeveloped rental value. Well, the appraising the value of the land, regardless of whether it's viewed

as undeveloped rental value, it still has to appraise the unique location of the land and the uses that are available from that location. And if that use happens to be oil production and if the location gives it unique abilities to do that, then it's appropriate to consider the throughputs and the royalties and of those other cases, even under the wording of this lease.

There is language then in the, I guess it's in 9 which talks more about the reappraisal process, which is really what we're dealing with here, that reappraisal process. Again they talk about fair market rental. That's not really a different term at all. Fair rental value based on the highest and best use of the premise. And then again this phrase, "as raw, undeveloped vacant land." Well, that's fine and that's appropriate. The Oengas aren't claiming that they should get rent based on the plant that's been built, their claim is that that property it's like the square block at 45th and 5th Avenue, now it doesn't matter what's developed on it, it has huge value. That's what this land does, it juts out into those oil fields.

THE COURT: So this is location, location, location? Is that what you're saying?

MR. GIVENS: It is, Your Honor.

And then there's reference also made by the United States that you can't consider income. Well, first, you can't consider the value of improvements. Well, we just talked about that. And you can't consider the income the lessee derives from the lease premise. Well, looking at royalties and throughputs, what land might be worth, that's not looking at the income that they're deriving.

Now, you get a little bit close to it when you talk about the West Niakuk set. But you're talking about it in a different context. And so our position, Your Honor, is the lease does not prohibit any of that. And even if it does, why the lease has -- those provisions have to fall.

So in summary on claim 2, the regulations create a duty. The Circuit has said so in Brown. And the rents have to be set fairly, and that requires consideration of royalties and throughputs and the equities and the current economic conditions. The lease requires, it creates the duty by assuming the appraisal responsibility, setting the rent due, and it doesn't prohibit considering them at all. And if, of course, the lease is contrary to the regs it falls according to the scope.

And as to claim 3, the same basic question, does a money mandating exist and is it within the scope.

THE COURT: When you have this now that you have withdrawn the failure to inform is that -- I think in our last phone conversation you weren't formally doing that, can I now take it that you have?

MR. GIVENS: Yes, Your Honor.

THE COURT: Okay.

MR. GIVENS: But let me make very clear on the record what it is we're withdrawing.

THE COURT: Okay.

MR. GIVENS: In the briefing we suggested that the United States didn't tell the Oengas that ARCO was interested in this, and if the U.S. knew that why they would have found a way to get BP to give up some of the lease and to be able to lease some more of the property to ARCO and then get two income streams from the property.

The U.S. put in documents that clearly created a factual dispute, that's why we have added the lease. But in retrospect that's not the winning claim here. These others are the winning claim, so let's just deal with what works.

THE COURT: Okay. Very good.

MR. GIVENS: Make your job easier, make my job easier, and a cleaner lawsuit.

Now, I want to -- well, it's in the next part whether the case is within the scope. First let's deal with the duty, let's finish that one off.

The duty here is different. The duty is when the lease was breached by allowing, in our view it was breached by allowing this production from West Niakuk and by not giving notice of this agreement, and that meant that the oil that went through there was a trespass. And the United States took no action.

Well, the second issue is the claim within the scope of that duty, and there are two parts to that and we want to make sure that we, we will talk about each of them in detail. But let me just set them out here at the beginning. One is that the least itself contains a geographic limitation that allows production only to be used for the blue area, for Niakuk, it does not allow production for either the red or the yellow, for either West Niakuk or Lisburne.

Second issue is even if the lease allows production everywhere, the facility sharing agreement is invalid because the regulatory requirements of notice and consent were not met.

We'll talk about each of those separately.

What creates the money mandating duty? Well, this is a case involving the leasing of commercial allotted land. Brown controls this as well. The regulations we're talking about are different parts of the same regulatory scheme, the ones dealing with breach of the lease and trespass. And the lease creates the duty, paragraph 8 is called "Default Remedies." And then in third amended lease the United States took on its shoulders the sole responsibility for dealing with the other side that the BIA was designated to -- the lessees hereby designate and appoint BIA to be their sole contact with lessees for any and all matters arising out of this lease or any amendment, and lessees agree that they will under no circumstances contact the lessee. So the U.S. took all of the responsibilities for dealing with BP.

Now, talk about the two scope issues. Let's deal with the first one that the least allows production from Niakuk only. Well, probably best to look at the least itself. The least refers to Niakuk over and over and over again. It's about the Niakuk project on page 1. Niakuk project. Niakuk project. Niakuk project.

On the attachments that show the intended use of the least dealt with Niakuk offshore access

road. Niakuk project location map. This is when they were still going to do the causeway.

Then in the first amendment they deal with it again. And it's been suggested that this is not an amendment to the least. But if you look at the title to it, it is a notification of their rights but it is also a request to amend surface lease.

THE COURT: I agree with you. Those words are repeated many places.

MR. GIVENS: And it refers to Niakuk twice. And the one that rings especially loud, Your Honor, is the first one there because it is, this is BP's document describing its understanding of the lease and it says, "The lease provides authorization to construct production facilities to support development and production from our Niakuk oil accumulation."

So the argument is with that much reference to Niakuk, with no reference to any other location to be used for production, that the intent was that the use was limited to Niakuk. And if there be any question about that, if it's ambiguous, then the rules of construction kick in. And under the rules of construction the lease should be construed against the makers.

THE COURT: You don't see if there is an

ambiguity that there is a need then for a trial to figure out what was the understanding of the parties? In other words you would just absolutely construe it against BP?

MR. GIVENS: Yes.

THE COURT: Okay.

MR. GIVENS: Yes. The United States -- well, I guess actually the oil companies have raised an argument that, well, this is a lease not a right-of-way, and leases give you the right to do everything. And so but the difficulty with that argument is that what we're saying, it is the lease that is actually the limitation, and leases certainly can limit.

So because of that the use of Oengas' property for anything other than the blue, for the red or the yellow, for West Niakuk or Lisburne is not authorized by the least, constitutes a breach of the lease and a trespass. And because the United States assumed the responsibility to carry on all communication with the oil companies, when the Oengas demanded that they follow the lease provisions to start that whole process the U.S. refused, that the lease was breached and that breached their fiduciary duty.

Now, the second claim 3 issue is that the assignment, this document, this letter agreement with ARCO and EXXON to access the Niakuk facilities in integration of Niakuk's interests, that document was an assignment. And the CFRs are very specific about what's needed to be done with leases on assignments with these kind of leases. Now, these regulations that are attached here are part of the 1987 regs, the initial regs that were applicable for almost all of this period. But the exact same wording was adopted in the present regulations, so we're dealing with this same wording for all of them.

And what is it, it specifically deals with subleases and assignments. And it says that they have to be approved, may be made only with the approval of the Secretary and the written consent of the parties. And that the, but then they go on, the consent of the Sec -- with the Secretary's consent, the lease may contain a provision authorizing the lessee to sublease without further approval.

So --

THE COURT: And is the word "assignment" defined anywhere in these regs? I mean they call this a facility sharing agreement, you know that. They don't --

MR. GIVENS: Yes. It's not defined in the regs and it's, we know from the lease, from the second amended lease that it is not a sublease.

THE COURT: We know that.

MR. GIVENS: And we also know that if it were a sublease it would have to, it would have to be noted here. And that's in this paragraph, paragraph 13 here.

THE COURT: Right. But for the regs to be triggered it has to be an assignment?

MR. GIVENS: It has to be a sublease or assignment or, get all the rest of the words that are written.

THE COURT: Amendment or encumbrance, permit.

MR. GIVENS: Encumbrance. And so what happened in this, what happened in this document? Well, the BP assigned to ARCO and EXXON the right to use one of its drilling and manifold slot -- BP will provide a drilling and manifold slot. It did not convey an interest in land, they simply assigned the right to use that slot under the --

THE COURT: You're saying this is an assignment?

MR. GIVENS: This is an assignment. I think

in the briefing, Your Honor, we quoted Black's definition of "assignment" and it falls clearly within that definition.

THE COURT: All right. But the reg itself doesn't define it?

MR. GIVENS: That's right.

THE COURT: Okay.

MR. GIVENS: Now, this is not just a "gotcha" procedural issue, Judge. This is, I don't know that it is possible that there could be a situation that more clearly shows the need for this kind of prior notice and consent. Because if, if this document had been provided in '94 with this redacted word, with these words right in there, not hidden under the --

THE COURT: Right, right.

MR. GIVENS: -- the big stuff, the true value of this property, value negotiated between giants in the industry, a true arm's length transaction, that would have been clear to the world. It would have been clear to the Oengas that, yes, by golly, we have to do something now if the United States has got to. It would be clear to the United States that, well, there is real value here and we've got to do a better job of figuring that out. The uses

changed, therefore we've got to do a better job doing this.

So this is one where, yes, it's a tightly knit procedural argument but it is grounded in the reason for those procedures.

So in summary on claim 3, Your Honor, the -- maybe just let me summarize everything while we're dealing with it. And on claim 2 it's within the, the duty exists and it's within the duty on the same as, and in the scope of the duty, the same as claim 3 both as to because of the provisions of the lease limiting its use to Niakuk and to the provisions on the other. And I guess because some of these issues bleed into the statute of limitations argument. The fact that we are suing after the fact. Some statutes of limitations are like that, most of my practice is doing Superfund work on behalf of tribes, natural resource damage cases primarily, that has a statute of limitations really very similar to what we were talking about here where you don't have to file your suit, you may know exactly what the damages are early after you've done your damage assessment, you don't have to file suit till years later when the EPA finishes its work. So, it's not an unusual thing.

So for all those reasons, Your Honor, we

feel that the case was timely filed and surely exists within the scope for 2 and 3.

THE COURT: Thank you very much.

MR. UPTON: Your Honor, may it please the Court, with respect to claim 2 the Government would maintain that paragraph 5 of the lease, which is quoted at page 5 of our motion, is consistent with the regulations. First of all, the term "present fair annual rental" under the terms of the lease seems to me is met by an appraisal as of '93 and '97. In other words, the appraisal obviously had to determine what the fair rental value was in those two years.

Secondly, the --

THE COURT: You don't disagree this reg applies?

MR. UPTON: Well, if you're talking about Part 162?

THE COURT: Yes.

MR. UPTON: That's the other thing I wanted to address, Your Honor.

THE COURT: Okay.

MR. UPTON: But before that I would, if need be I would be glad to if it's necessary reserve some of my time for Mr. Perkins who is also going to be -- I would like to have the Court hear him in terms of

issues for claims 2 and 3, and 3 in particular because I was talking about lease interpretation industry standards, and he's much more familiar with that than I am.

THE COURT: You will have an opportunity to discuss claim 3.

MR. UPTON: And claim 3 is --

MR. PERKINS: And I did brief and have a few comments on certain aspects of claim 2.

THE COURT: And you will be able to do that.

MR. PERKINS: Okay.

MR. UPTON: Paragraph 5 says that rental payments may be increased at successive 5-year intervals, etc. It says such adjustments to be based upon, based either upon the fair market undeveloped rental value for the property established by a Bureau of Indian Affairs appraisal, or the adjustment will be based on the application of a cost adjustment factor.

And we would maintain that that provision for a cost adjustment factor and using a value, whichever higher value comes from that, at least would take into account economic conditions that would seem to us at that the particular time.

Now, again, and we disagree on this, the parties disagree, I still think the Court needs to

take into account that neither sections 162.107 of Part 162, or 162.604(b) again specifically say anything about royalty thruput. Both in Pawnee and in the Supreme Court Navajo decision it seems to me the basic proposition that's supported is that a party cannot read into a statute or regulation whatever it wishes. And I will get to the Indian construction later.

The second argument they make in support, Plaintiffs make is that this reliance on 30 U.S.C. § 226(m) and 42 U.S.C. § 6506(a)(j)(5), again those statutes apply to public lands. And as I pointed out in our opposition brief, would seem to us that this is analogous to the White Mountain case in 10 Claims Court that I cited where the tribe was saying, well, when the United States sues a party, a third party for damage to public lands the United States traditionally can seek the cost of restoration. And stated the case law, of course, and such that that's not true that an Indian tribe suing the Government for mismanaging its resources or land held in trust. These presumptively you have to look at what the diminution in value was of the property. But they were saying essentially the same thing that it seems to me Plaintiffs are saying here, well, if that rule or if that approach, or

however you want to characterize it, is good enough for the Government then it should be good enough for us. And the Court when it came to make its determination on damages relied on diminution in value.

So again I don't, we don't see the relevance of those particular statutes.

The other thing I need to point out, and I should have mentioned at the outset, is here I believe Plaintiffs said that the parties agree that there is a money mandating duty. The Government is saying, the Government, well, whatever the Brown decision, the Plaintiff is saying that Plaintiffs don't fit within the scope of 162, 25 C.F.R. 162.

THE COURT: That's noted.

MR. UPTON: I just wanted to clarify that because it was confusing.

THE COURT: But you would admit if there was a duty under 162 well then --

MR. UPTON: That's a money mandating duty.

THE COURT: -- it's a money mandating duty?

MR. UPTON: But if you don't fit within it --

THE COURT: Then it's not.

MR. UPTON: -- then it's not.

Mr. Givens, excuse me, Plaintiffs also made the argument which they make in their briefs that the lease imposes a money mandating duty here again with respect to claim 2. But in the Navajo decision of the Federal Circuit in 2007 it reported at 501 F.3d 1327, at pages 38, 39, the Court specifically held that a lease can't be a source of a money mandating duty. So if it's the Plaintiffs' argument that the leases derives the money mandating duty then it seems to me it's contrary to what the Court said.

THE COURT: Maybe I misunderstood the argument. I thought the argument that the Plaintiffs were making is that there is nothing, I thought it was is that paragraphs 5 and 9 aren't inconsistent with 162. I don't, I mean not that the last -- so that in other words I thought, Mr. Givens, you were relying upon 162 as defining the duty, meaning it has to be fair and that your concept of what is fair would include all of these other things. Am I missing your argument?

MR. GIVENS: No, Your Honor. We're certainly saying that. But we are saying more, that under the Supreme Court's jurisprudence the contract itself can create the duty. The United States --

THE COURT: Well, when you said it took it

on itself. I understood that, okay. But if you didn't have a regulatory scheme that would be a little bit more difficult?

MR. GIVENS: Oh, yes, Your Honor.

THE COURT: Okay.

MR. UPTON: In any event, Your Honor, --

THE COURT: Okay.

MR. UPTON: -- that's what I thought I --

THE COURT: Maybe you're right. Okay.

MR. UPTON: The Plaintiffs rely on the White Mountain Apache decision and they talk about statues of the regulations being fairly interpreted. But and they also talk about --

THE COURT: But if you jump to the merits of this just a little bit it does strike one on just a casual glance, which is what the Plaintiffs have been suggesting, than when millions upon millions of dollars have been generated through the use of this property and the lease has only provided for these minimal amounts of money in comparison, and that it wouldn't have been possible to generate these millions upon millions of dollars without access to this property, that a fair rental value that doesn't take into account anything with regard to its location as a valuable piece of real estate vis-a-vis oil

development seems a bit odd. I mean I don't, I mean I don't -- I mean I'm not sure it's such a stretch to suggest that if you get into the regs and you are using words like "fair" that it must mean something. That raw, undeveloped land in the middle of Fairfax County and raw, undeveloped land in the middle of Iowa and raw, undeveloped land in the middle of California that something informs that decision.

MR. UPTON: Well, Plaintiffs say that their decision is informed primarily by the facilities access agreement in terms of what was paid by the other oil companies.

THE COURT: Well, what they're suggesting is that that suggests that you can't ignore the fact that it could be used to develop oil reserves.

MR. UPTON: And we would argue -- and again Mr. Perkins --

THE COURT: He'll be able to address that.

MR. UPTON: -- addressed a lot of that. And we would also say Kuukpik is agreeing with Plaintiffs, it is a unique situation, but it's unique in a way that doesn't make it a comparable.

I would also point out White Mountain Apache that it was a very unique fact situation. I would contend that the decision came out the way it did

because of the fact that the Government was using the trust property for its own purposes. And, of course, the Navajo decision in 2007 relies on White Mountain Apache. So I'm saying that the reliance on White Mountain Apache I think has to be critically looked at. It was a very strange situation, a rate situation where the Government gets to use the beneficiaries' trust property.

THE COURT: Potentially corrupts, yes.

MR. UPTON: Right.

Mr. -- excuse me, the Plaintiffs say that paragraph 9 of the lease upon which we rely does not bar use of a royalty or a thruput. It seems to me that that's sort of hard to understand because a royalty and a thruput are both based on income revenue that's generated by particular use of a particular tract of land. Either one, and the language of 9 seems to me broad enough to preclude, preclude that. I, frankly, don't understand why it's not broad enough.

THE COURT: You think when you have the language "shall not be based" means cannot consider?

MR. UPTON: Right. That's right. I mean it has to be because otherwise if you considered these other forms of rent, as Plaintiffs say, which we don't

necessarily agree is rent, but if you consider these other things then, yes, then you would be basing your appraisal on that.

THE COURT: How would you appraise this land? What does that mean to have raw, undeveloped land in this location? I'm sincerely confused by that.

MR. UPTON: Well, I guess one way to answer that is when we're talking about the facilities access agreement there certainly is a distinction between raw, undeveloped land and one with oil production facilities. Obviously ARCO and EXXON were paying for use to be able to use those facilities. And under the lease Plaintiffs are entitled to rental based on raw, undeveloped land.

THE COURT: It's irrelevant where it's located?

MR. UPTON: I don't know that I could say it's irrelevant. I wouldn't go so far as to say it's irrelevant. And I don't know that the appraisers didn't consider the location, quite honestly.

With respect to claim 3, the Plaintiffs basically say we breached the fiduciary duty by not giving notice of breach of the lease by BP and trespass by ARCO and EXXON because as a result of the

facilities access agreement. And they cite to in particular sections 162.617 through 623 of part 162. Section 162.618 requires that a notice be given only after BIA has determined that a breach has occurred. Then BIA and Interior never made this determination.

And secondly, sections 162.623 limits trespass, the term trespass, the situation where the tenant remains in possession of the lease property after the least expires or is canceled. So therefore certainly what happened we would maintain is not contrary to what these regulatory provisions require, there is no inconsistency there because, again, because DOI made a determination there was a breach and it's not a situation that falls within trespass as the regulations define trespass. The second --

THE COURT: Let me just ask you a question. If the Plaintiff is right and the lease only extended to production from the Niakuk area, would it be a breach of the lease to allow for production outside of that area?

MR. UPTON: I think I would like to defer to Mr. Perkins on that. I don't know how to answer that.

The other part of claim three in terms of, is we would submit, given the terms of the contract there really isn't a claim here on which relief can be

granted. As the Court knows, obviously the first thing is to attempt to harmonize all the parts of the contract which we think are in harmony.

Obviously the expressed language of the lease in the plain meaning of the language are controlling.

There are no limitations on the use of Parcel B contained in paragraph 10. There's no mention in paragraph 10 which is the granting part of the lease of any particular accumulation or tract or area. There's nothing in there.

I would also point out in terms of, we mentioned, the Court mentioned in ten of the parties and the Plaintiff mentioned, Ms. Dickinson's declaration which is Attachment 46, she was involved in negotiation of the lease with Andrew Oenga. She says in paragraph eight of her declaration, "I understand that Leroy Oenga has declared that he and Andrew thought the lease was only for a road and right of way and didn't understand the fine print presumably including paragraph 10 which allowed the oil company to use the land under lease for any oil development related purpose. The lease itself clearly authorized the use for a much broader array of purposes and such was explained to Mr. Oenga and his interpreter."

THE COURT: Let's stick with the issue of geography for a moment which is I think at the core of this. you're contending that paragraph 10, because it doesn't reference any geographic area, would have extended to areas beyond Niakuk.

MR. UPTON: Result and end in that since there's no specific restriction.

THE COURT: And the discussions about Niakuk between the parties, are they irrelevant?

MR. UPTON: I think the basic point is the references to Niakuk are not in the parts of the lease that grant rice to BP.

THE COURT: What about the notification of the Niakuk project commencement? That letter of July 29, 1993 where BP is informing the BIA that what we're doing now is we're requesting to amend the lease so that we can begin production from the Niakuk accumulation.

MR. UPTON: I am assuming that at that point in time they were, BP was concerned with producing oil from what was then called the Niakuk accumulation, and that may well be why they did it. Again, I would like to defer to Mr. Perkins on that issue.

Several other things. One is the reference by Plaintiffs to Indian can or construction. We would

submit, and again this comes up primarily under Claim 3 in the context of paragraph 10. The Indian can or construction doesn't apply or come into use if the language in question is not ambiguous.

I cited in my brief Chickaloon Moose Creek Native Association v. Norton which is reported at 350 Fed 3d 972. At 984 the Court says, "The mistaken views of a Plaintiff about an unambiguous provision in a contract doesn't operate to create ambiguity."

And in the same report it essentially said the same thing in the Catawba case which is reported at 476 US.

I think it's important to make that point.

Certainly as a general rule the failure, well as a rule the failure of the government to bring a suit against a third party when an Indian tribe or an Indian requests us to do so is not a breach of trust. If we don't bring the action it's not a breach of trust, and it's clear under the Supreme Court precedent, especially U.S. v. Creek Nation which I've cited.

The other point that's important, and it was considered so in the Cherokee Nation case in 21 Claims Court 565 is that the Plaintiffs certainly had the capability of bringing their own suit against BP and

any other oil companies.

THE COURT: Wait a second. Isn't there an agreement that was entered into that, I mean I guess you're right. They agreed not to have any contact with them. But --

MR. UPTON: Again, Mr. Perkins can address this, but the reason for that was, as I understand it, the Plaintiffs were constantly contacting BP with questions and whatever and so BP was basically saying we think these inquiries should be channeled through BIA. We don't construe that as a limitation on their ability certainly to bring suit. It has nothing to do with bringing suit. It was simply a matter of --

THE COURT: That was just their sole contact. Okay.

MR. UPTON: Yes, that's my understanding.

I would point out that the original allottee, Andrew Oenga, had brought an action against several other oil companies in the 1980s and he succeeded, so he's certainly a prime example of their capability to bring a suit.

With respect to the whole issue of whether the facilities agreement was an assignment and didn't conform to the regulations, with the Court's permission I'd like to have Mr. Perkins address that.

That's all I have, Your Honor. Thank you.

THE COURT: Thank you, Mr. Upton.

MR. PERKINS: Thank you, Your Honor.

By the way, feel free to interrupt me, ask any particular questions about any issue that you feel needs addressed because I know it's late.

THE COURT: That's okay. We have until 5:00.

MR. PERKINS: Okay.

First with respect to Claim 2, a couple of points in furtherance of simply going to the merits of Claim 2 and not the issue of the money mandating duty.

First, the Plaintiffs have cited to 30 U.S.C. § 226(m) and 42 U.S.C. § 6506(aj) as examples of statutes where the United States would enter into agreements to share some of its production. As Mr. Upton has pointed out, those are public land laws, not Indian law.

More importantly, in my view those apply in situations where the United States owns oil and gas. Mr. Oenga and his heirs own no oil and gas on the North Slope of Alaska.

Second, Mr. Oenga cites to two cases, the <u>Flying Diamond</u> case and the <u>Newstar</u> case, in which the surface owner received some sort of consideration tied

to production. Either production from the surface owner's land or production through the surface owner's land.

In neither of those cases does it say that --

THE COURT: I understand the cases, let's just talk about this for a second.

Part of Claim 2 is suggesting if there's an obligation under the regulation that does apply in 162 to come up with a fair rental value, and you have a lease that says you can't consider the income coming off of, that's coming through that property, what factors can be considered in making something, to consider what would be the fair value?

In other words, if the lease says you can't consider those things but the only way you can be fair in coming up with a fair value is to give some consideration somehow, how do those two things jive? How do you meet the obligation to make a fair rental value for property that's being used for oil production without giving regard to oil production? Just tell me how that would be done in the industry.

MR. PERKINS: Let me make a couple of other observations about the circumstances on the North Slope.

THE COURT: Okay.

MR. PERKINS: Mr. Oenga's allotment is not the only native allotment on the North Slope. It is not the only native allotment in the Prudhoe Bay unit. It is not the only native allotment which has been leased for oil and gas development purposes.

There are comparables and those would be referred to in the appraisals which were undertaken, completed by the Bureau of Indian Affairs. All of that goes to questions of fact. What was an adequate rental?

There are appraisals, there are comparables available where there is surface used for mineral development. We don't have the appraisals before us, we're not discussing the adequacy of those appraisals.

But in the case of the Oenga allotment, yes, it is on the coast. It is surrounded by state land. Fee simple, absolute land owned by the state of Alaska.

Mr. Oenga is asserting essentially that the tidelands and submerged lands are not owned by anyone, and that is not true. They are owned by the state of Alaska.

The tidelands and submerged lands could have been used. It made more economic sense to do a deal

with Mr. Oenga on the terms that were negotiated.

The question becomes whether those terms, whether the language of the lease implements the requirements of 25 CRR 162.

THE COURT: That's the question.

MR. PERKINS: It does. The key language of the rental clause provides for an either/or, whichever is greater. It provides for fair market rental appraisal, and there are comparables. Those appraisals are out there. They're based on comparables. The comparables that were able to be found. Insofar as the fair market rent might be inadequate to address changing economic conditions, the lease goes beyond that and says well, we will make sure that Oenga and his heirs receive cost of living adjustments.

If the fair market rental value does not keep pace with the cost of living, then the cost of living adjustment is what determines the change in the rental under the lease.

The lease itself expressly addresses and satisfies the requirements of 25 C.F.R. § 162 by taking into consideration as a minimum fair market rental value. Whatever that is based on the appraisal. And there are comparables. Other native

allotments in particular.

THE COURT: Do I have that information anywhere?

MR. PERKINS: No. And the reason you don't is because all of that goes to damage issues. Were the appraisals adequate for the purposes of -- essentially we have two appeals pending before the Interior Board of Indian Appeals over the adequacy of the two most recent appraisals, so that's not before the Court.

THE COURT: I see. Okay.

MR. PERKINS: But the issue of taking into consideration changing economic circumstances, and did the Bureau of Indian Affairs look out for the potential impact of that on Mr. Oenga and his heirs? The answer is yes. By providing that the rental would be based either on a cost of living adjustment or the fair market rental value, whichever was greater. Not whichever is less.

THE COURT: I'm being very slow. Tell me, how does that cost of living adjustment work if it's not off of the original appraisal?

MR. PERKINS: Let's say you have the original appraisal, so you have a base rental value.

THE COURT: Right.

MR. PERKINS: The way in which the rental that would be fixed for future periods is determined is number one, you go out and do a new appraisal. Maybe that says the fair market rental value has increased by 20 percent. Meanwhile, cost of living over that four year period has only increased by 10 percent. You'd go on the basis of the fair market rental value. It would be 20 percent more.

If you get an appraisal, and this happened, where you have an appraisal which says that the fair market rental value hasn't changed, it's still the same. Meanwhile the cost of living has gone up 15 percent over those four years. The rent gets increased by 15 percent.

THE COURT: But it's off the baseline.

MR. PERKINS: Off the prior period.

I think one could make an argument that if the BIA had not included that cost of living adjustment clause, that there might have been a failure to satisfy the requirements of Part 162 to deal with the potential changes in economic conditions. But the department did include that.

The regs are not specific about you must do this particular clause or this particular clause or that particular clause. It leaves it to the agency

and the native or the American Indian, to develop what makes sense for the purposes of this transaction.

THE COURT: I guess the issue that, maybe there's a little bit of a disconnect. I think the idea that Part 162 would have ever allowed you to value the land as raw, undeveloped land in the way that you would never be able to account for -- I'm struggling with can Part 162 where the land has a strategic value, has a pretty unique value it sounds like. As you've said, you could have used I guess the state land and that might have been a little --

MR. PERKINS: Taking a look at the agreement on its face and what would have been available for appraisers establishing the initial rent.

THE COURT: I think part of what's happening in this case is we have initial and then we have changing circumstances.

Initially you're going to build the project where this is going to be used for some pipeline. There's going to be two pieces and a pipe going across it and you can move it here, you can put the pipe there. I can understand that.

Then all of a sudden you're using a drilling page --

MR. PERKINS: Ah, but with all due respect,

Your Honor, I believe that the whole concept of the change of use as introduced into this case by the Plaintiff is a ruse.

THE COURT: I understand the lease has a big provision that says you can use it for other things.

MR. PERKINS: I understand. But more importantly, they would be making the same argument here because even if the original plan had been completely implemented, because then you would have had an artificial island constructed in the Beaufort Sea. That would have been the drill pad. The moment the drill had had drill holes going out into West Niakuk or down deeper into Raven, the Plaintiffs would be here complaining wait a minute, the lease only allows that the pipeline carry oil only derived from Niakuk.

I think the whole change of use argument is an attempt to confuse Your Honor about what really was negotiated which was fee simple, absolute lease of the surface. The regulations cited by Mr. Upton with respect to the termination or when a tenant holds over are completely consistent with a grant of exclusive possession, which is exactly what this lease did.

Now the Plaintiffs have asserted that that gives us the right to do everything, and that's not

true.

THE COURT: Okay. What couldn't --

MR. PERKINS: It gives us the right to do everything in connection with oil field exploration and development and production. It does not give us the right to put a tourist facility on Mr. Oenga's property.

We have the right of exclusive possession, however, which means that Mr. Oenga and his heirs, while we have exclusive possession, cannot grant the use of the allotment to someone else to put a tourist facility because we have exclusive possession. And we needed that because this can be dangerous activity.

Now the Plaintiffs have also asserted that under the Facility Sharing Agreement what ARCO now known as ConocoPhillips, was paying for was exactly what we had paid Mr. Oenga for. That is absolutely not true.

What ARCO was paying for under the Facility Sharing Agreement was access to what BP had built. BP trucked in tons of fill, built essentially an artificial island at the end of the spit. They did not just use the spit as it was. They built an artificial fill. They armored it to protect it from the ice. It's much deeper now in terms of fill.

They also built a road to get to it that goes across Mr. Oenga's property.

And most importantly, they built a pipeline. That's what ARCO was paying for access for.

THE COURT: And they want their share of that. That's what they're here for. They're not asking for all of it. They're just saying --

MR. PERKINS: Under the terms of the lease they are entitled to nothing associated with those improvements. And frankly, if, and I pointed this out in my brief. If --

THE COURT: I'm just asking you how can that be a fair annual rent?

MR. PERKINS: I'm not saying that the fair annual rent cannot take into consideration location. In fact what I'm saying is the appraisals should take into consideration location.

This is a 40 acre parcel on the North Slope of Alaska,

THE COURT: That can be used for oil development.

MR. PERKINS: Correct. It doesn't mean there aren't other ways.

THE COURT: I appreciate that.

MR. PERKINS: It turned out, and I forgot to

mention in connection with what ARCO was paying for, ARCO was paying for access to a permitted facility. A facility for which all the Corps of Engineer permits, all the DNR permits, all the EPA permits, if there were any, fish and game permits, all of that was part of the investment made by BP, which they were then essentially charging ARCO for access for.

The fact of location is important and it should have been considered as part of appraisals. But what's on the land, what's constructed. you add up the dollars, and BP would not have spent those dollars unless it had some idea of what its rate of return was going to be from that investment.

What the deal says is that the rental adjustments, in fact the initial fair market rent and the rental adjustments, post-construction. The initial rent was based on fair market, raw land. These were not built before the deal. The deal came into existence, initial fair market rent was established based on location. The construction occurred five years later after permits were obtained. The deal says none of that investment goes onto the bottom line for purposes of calculating what the land is worth.

THE COURT: That's what it says.

MR. PERKINS: But location counts and should have been considered. Right now we're not saying that it wasn't. those issues are really not before the Court.

The Plaintiffs have backed away from their assertions I think, maybe not completely, but their assertions of the strength of the Kuukpik situation. I just wanted to emphasis, I think Kuukpik is not just factually irrelevant, it is legally irrelevant. Likewise I think the Facility Sharing Agreement is legally irrelevant. An appraiser would not be able to consider the Facility Sharing Agreement as a comparable.

THE COURT: I'm not sure I'm hearing that, the argument that it is a comparable. But okay.

MR. PERKINS: But the Kuukpik situation in particular, is so different. Kuukpik owns over 110,000 contiguous acres, not 40. they also on about half of that have under the terms of all the applicable law and conveyances, what amounts to the dominant estate. The Arctic Flow Regional Corporation would not have been able to acquire the subsurface estate under the Kuukpik surface inside the national petroleum reserve which is on the west side of the Coleville River.

They would not have been able to acquire it unless Kuukpik consented. That consent to acquire cost AFRC some overriding royalty. The technical term would be non-participating royalty.

On the east side of the Coleville River it turned out that there was an unresolved legal issue which was what was the scope of the 14(f) consent right. 14(f) of ANCSA, Alaskan Native Claims Settlement Act, basically provides that on regular native land, regular village land, when the village receives the conveyance of the surface the regional corporation will receive the conveyance of the subsurface estate. The general rule is that the subsurface estate will be dominant, except that within the bounds of the native village, whatever that means, the regional corporation must obtain the consent of the village corporation. That uncertainty, that ambiguity of what was the bounds of the native village was not resolved until 1998.

In 1992 the state which owned the submerged lands in the vicinity of the Kuukpik collection and AFRC wanted to hold an oil and gas lease sale together. In fact previous to 1992, in 1991 the state and AFRC actually had done a cross-conveyance so that they had become tenants in common as to the oil and

gas underlying the Kuukpik surface in that area. They wanted to hold an oil and gas lease sale in 1992. This is six years before the issue was resolved about to what extent did you have to get the consent of Kuukpik. So AFRC went and got the consent of Kuukpik so that the oil and gas lease sale could be held. That consent of Kuukpik cost them a one percent override, or technically a one percent no n-participating royalty.

The real difference here is that it's 110,000 acres. You can put a big oil field on 110,000 acres. In fact there is one.

THE COURT: Let's go to the scope of Claim 3.

MR. PERKINS: Your Honor, I believe this is a clear case of the Court being asked to harmonize all the provisions of the agreement. Every single place the term Niakuk project, Niakuk accumulation, even in the letter which shouldn't have been filed as an amendment that says we hereby request to amend, even though they had --

THE COURT: -- calling it that.

MR. PERKINS: I'm aware of that. They had the power to exercise that right to expand the lease. In fact they had the duty. This is where I'm saying

we need to harmonize it.

With respect to the use of the term Niakuk, why is that relevant under the lease? Because the way the lease worked is that from the beginning it was an annual lease. What I'm saying by that is that BP had the right to quit every year. They were under a duty to apprise the BIA and Mr. Oenga when they believed they needed to undertake development of the allotment for whatever purpose. Something other than just holding it and using it for non-disturbing purposes. And they did that.

Now going in to the lease in 1989 all parties knew a whole bunch of things, the first one of which is this land is going to be used to develop oil and gas off-shore. There is no doubt. Everyone knew this lease is going to be used to develop oil out there.

The second thing that's clear from the face of the agreement is that the parties made no effort to describe the oil out there.

THE COURT: They called it the Niakuk project and there happens to be a Niakuk lease area. So why --

MR. PERKINS: You say a Niakuk lease area. There's no piece of paper which says this is the

Niakuk lease.

THE COURT: Let's just talk about the map that Mr. Givens gave us. Do you disagree with that map?

MR. PERKINS: I don't disagree with what's been colored as embracing west Niakuk, what's been colored as embracing Niakuk as of a given moment, and what's colored as embracing a portion of Lisburne. I disagree with his statement that there was a Niakuk lease.

THE COURT: The blue was the Niakuk project, is what he's saying.

MR. PERKINS: Where in the lease does it say that? It doesn't. It does not say that. In fact you could not have drawn that map with those colors in 1989 because it had not been established where the boundaries of the Niakuk accumulation were as of that moment in time. It was not known.

THE COURT: But you sent the letter to these people in 1993 and you called it the Niakuk project. By then are we not bound, don't we have boundaries by then?

MR. PERKINS: Technically we did not have boundaries until after that letter was sent. The Niakuk participating area which is what is that color,

was not formally established by the Department of Natural Resources until later in 1994.

THE COURT: Was that not proposed in 1993?

MR. PERKINS: I'd have to go back and check the record to see when it was proposed. But there's also no question, we're going back to the terms of the lease. The terms of the lease refer never to Niakuk accumulation. They call it the Niakuk project.

THE COURT: So do you.

MR. PERKINS: Of course. Because there are islands off-shore that talk about the Niakuk project, the Niakuk area.

THE COURT: I do think, it is somewhat significant that you're writing a letter saying that the lease provided "authorization for BP to construct facilities to support development and production of our Niakuk oil accumulation."

MR. PERKINS: And that is 100 percent correct.

THE COURT: Then you later describe this under the lease to say "hereby provides notice to the BPA that the first phase of the Niakuk development project has been approved."

MR. PERKINS: First phase, not the only phase.

THE COURT: But you want to then lock in the lease. This is the lock-in provision.

MR. PERKINS: We already had the ability to hold the lease for ten years. What we were doing in that letter of July 1993 is satisfying our obligation to apprise Mr. Oenga that we had the permits we felt we needed. That we were going to be occupying the land to construct facilities. And at that point the lease required us to apprise the Secretary and Mr. Oenga of that fact.

THE COURT: And you wanted to lock in for 25 years.

MR. PERKINS: We already had the ability. As long as we sent that letter at some point during the first ten, then we would have the right for 25 years. But you say lock in. We're not obligated for 25 years. We are obligated, and this is the material change. We became obligated on five year intervals, now changed to four. Until we sent that notice, we could have quit at any time.

Once we sent that notice, we became obligated essentially in five, now four year chunks, for rental. We could not have quit at any point during a four year period and then have been relieved of the obligation to pay rent for the remaining years

of that period. We would have had to quit the premises. We still would have had to pay rent for say years three and four of that particular period.

What that did is it converted this lease from effectively a year-to-year re-upping into an every four years re-upping. It's a material change from BP's point of view.

THE COURT: But you didn't do it to be nice to the Oengas.

MR. PERKINS: We did it to satisfy our obligation under the lease to apprise --

THE COURT: It is a value to you because you wanted to make sure --

MR. PERKINS: We needed to have the land for longer than ten years.

THE COURT: And you knew other people were interested.

MR. PERKINS: We knew other people were interested but --

THE COURT: And you were now making sure that this was --

MR. PERKINS: But we had the right from day one in 1989 to exercise that option.

THE COURT: I agree.

MR. PERKINS: What I'm saying, Your Honor is

that BP did nothing wrong. It did exactly what the lease authorized it to do and required it to do --

THE COURT: Mr. Perkins, I know that. But what we're talking about today is Mr. Givens on behalf of the Plaintiffs is suggesting the understanding of the parties was that the, and maybe it was the only thing that was known at the time, is that they were going to be dealing with oil development out of the Niakuk area.

MR. PERKINS: Your Honor, the lease makes no effort whatsoever to describe the Niakuk area --

THE COURT: Which makes it ambiguous.

MR. PERKINS: No. It doesn't make it ambiguous. The reason the lease refers to Niakuk is for purposes of describing that time period when we must have given that notice. Not --

THE COURT: It's not a geographic bound --

MR. PERKINS: It is not a geographic boundary. The parties made no effort to describe that geographic boundary. In 1989 it would have been impossible to describe that geographic boundary.

THE COURT: Our concern here really isn't 1989. The concern really now is 1993 and 1994. There are subsequent agreements that are now entered to which lead to the development of this oil. That's

where we are now.

MR. PERKINS: I understand, but there has been no legal change in use.

THE COURT: I see.

MR. PERKINS: The use which was granted in 1989 is exactly the use which the parties anticipated. Use of this land for oil field development.

THE COURT: And their argument is oil field development from Niakuk. It may sound very simple but they're saying there was no west Niakuk, it didn't say --

MR. PERKINS: The parties did not make any effort to define what Niakuk project meant.

THE COURT: We have an undefined term. Usually in the law --

MR. PERKINS: It --

THE COURT: Mr. Perkins. An undefined law term usually in the law means what? That it's clear? Or that it's ambiguous?

MR. PERKINS: Under the context of this agreement it did not need to be defined.

THE COURT: I see.

MR. PERKINS: If the time had passed ten years and BP had not delivered the notice, the lease would have expired.

What BP did is deliver the notice based on its conception of the Niakuk project, and it was in its reasonable discretion to describe, for its purposes, what constitutes the Niakuk project.

The lease did not need a definition of the Niakuk project because nothing in the lease hangs on a need to define it.

If BP had not sent the letter in 1993, if time had passed until January 1999, the lease would have gone away. BP sent the letter in 1993. It triggered the every four year, every five now, four year period. And BP has not exercised the right to terminate at any one of those intervals.

THE COURT: Let me just do a hypothetical with you.

If in fact there was no oil in the Niakuk production area, the only oil really is west Niakuk. You have no leases, BP, in west Niakuk. ARCO comes to you because they have leases in the west Niakuk and they say, you realize there's some value in the fact that you own that lease. They have to come through you. Right? Would that be true?

MR. PERKINS: It would have been true until 2000. yes, Your Honor.

THE COURT: Until 2000. Okay.

So if the west Niakuk thing is there, would you be able, you're telling me you would have notified the Oengas and said we're going forward with the Niakuk project? Would you have been able to say that?

Would you have been able to trigger this lease and say I'm going forward with the Niakuk project knowing full well that nothing is coming out of Niakuk. All you're going to do is give this facility over to ARCO. In fact you're even going to let them build it.

MR. PERKINS: Under those circumstances, I think the hypothetical requires this fact to be stated. Under those circumstances where none of the oil would have been coming from leases owned by BP, BP certainly would not have been in the position of hanging onto the lease when ARCO would have wanted it. There would have been a true assignment which would have required notice and consent.

THE COURT: In a way that's what the Plaintiffs are arguing in effect is what is happening here. There were new areas, there are new players. That in effect there's been an assignment. That they weren't given notice of that, and had they bee given notice of that they would have demanded different terms.

MR. PERKINS: I can give you an equal hypothetical the other direction which is suppose the leases in west Niakuk had been acquired by BP directly, then what is to say in the lease that that's not part of BP's Niakuk project? Nothing.

THE COURT: And their argument -- the argument of the Plaintiffs is that's the ambiguity. Did it extend to that area --

MR. PERKINS: What I'm saying Your Honor is that to go down that road of saying the lease is ambiguous, the parties were required to define what constitutes Niakuk. It really goes completely against the lease as a lease and turns it into an easement appurtenant to particular lands which are undefined. That completely rewrites the terms of the agreement. It was a lease, a grant of exclusive possession for purposes of developing off-shore oil. The Niakuk project was not defined because it did not need to be defined to make the agreement work.

I would just say that all of the parties knew that this was a moving target in 1989. What constituted the project, how the project would come into being was all a moving target. Everyone knew it.

THE COURT: It is sort of interesting that the maps that were included in the lease were maps

that dealt with a pipeline project that wasn't going to go forward.

MR. PERKINS: And the Corps of Engineers had absolutely everything to do with it not going forward. It was not BP's choice.

You will also note that the maps do not define the scope of the lands from which oil and gas would be produced. The map shows an island. It does not show the map that Mr. Givens --

THE COURT: I agree with that.

MR. PERKINS: I think the one thing we haven't talked about, in my notes at least, is the last issue raised by the Plaintiffs with respect to the facility sharing agreement is that it was an assignment in violation of the rules. Regardless of what the lease as amended says, that the facility sharing agreement was an assignment.

My reading of the regs which you correctly pointed out do not define assignment. What is an assignment? how does it differ from a sub-lease. The best law that I've found is the restatement that was really quite clear on this subject. An assignment is a complete transfer of all the rights for the entire term. that's certainly not what the Facility Sharing Agreement did. It is not a complete transfer of all

the rights for all or any portion of the term. It's an agreement to allow somebody to use a portion of the facility. And most importantly, no transfer of possession as that legal concept is developed in the context of a real estate lease, no transfer of possession occurred. BP was, is and remains the lessee, completely responsible for all the actions which occur on that property. I think everyone agrees that it's not a sub-lease.

So what it is, what the Facility Sharing Agreement is is something less than both the assignment and the sub-lease.

In terms of the amendment, I think everyone agrees that the amendment was properly adopted with the consent of both the Secretary and all of the lessors.

THE COURT: I agree, they all signed on.

MR. PERKINS: I guess in closing, Your Honor, I really think this, everything seems to hang on this change of use and this expansion of use argument. If you go read what the lease authorized on day one, and what the lease continues to authorize today, there has been no change of use in terms of what has been legally authorized. We are doing exactly what the lease authorized us to do on day one.

THE COURT: Thank you, Mr. Perkins.
Mr. Givens, you have the last word.
MR. GIVENS: Thank you, Your Honor. Hopefully it will be a brief one. It's late.
THE COURT: You all came a far piece, except for Mr. Upton, and we're getting it all down.
MR. GIVENS: Two general thoughts, Your Honor.
First, as I was sitting there listening to the presentation on behalf of the oil companies, it struck me as to why, well I guess the wisdom starting with Justice Marshall which I think you really have to look to him to the creation of the trust responsibility. The jurisprudence system, how important it is, listening to such a forceful presentation on behalf of a huge corporate interest, how important it is for native people, for Indian people, to have the United States at its side to stand up to those pressures. Then when the United States is not at the side of the native, how devastating that is. In our view, that's this case.
A second general point is there was a lot of discussion about factual matters that occurred in the last two presentations that is not in the record. The Plaintiffs have been very careful to make sure that

everything we've presented to the Court, and we've talked about is, and even all of the documents except the advocacy pieces, the top places, was careful to use the ones that had the docket numbers in them.

That's important because the Court is hearing this case on summary judgment and a party cannot stand on the pleadings, and the Court's bound by the record of the case. Where that really becomes important is the issue of the adequacies of appraisals, and that is an issue before this Court. The evidence, the record that this Court has to consider is --

THE COURT: Mr. Morse.

MR. GIVENS: Yes.

THE COURT: I understand.

MR. GIVENS: As to the specific points, the cost adjustment factor, CPI, the COLA, whatever it's called, that that covers current economic conditions.

Current economic conditions I think requires something greater than that. Probably that is most clearly shown if you look at the price of oil during the course of this case. Now we talked a little bit of the area outside of this Court's jurisdiction right now, but in '98 the price of oil was $10 a barrel. Now it's more than ten times that. Just in the last

few years it's risen four or five times.

Those current economic conditions affect the value of this land in this location for this use, so a cost of living adjustment that food has gone up maybe 10, 15, 25 percent, I guess now I'm talking outside the record, but --

THE COURT: I think I have the issues. What you need to really focus in on is what do you think is the ambiguity given what Mr. Perkins is saying. They were authorized to use this property for oil development. That's all they've done. And since there was nothing to constrain the location of the Niakuk project, the Niakuk project could take up all of Prudhoe Bay.

MR. GIVENS: Your Honor, if you take it that broad, the Niakuk project could take up all of the oil produced in the Arctic, if technology could allow going over into Siberia to get oil. That was not --

THE COURT: Well --

MR. GIVENS: That sounds ridiculous but 20 years ago the idea of being able to go out -- each of these squares is a square mile. This thing is going out four miles. To be able to bend a pipeline to go four miles, you can't do that.

There's nothing I can add to what I said

earlier, Your Honor. The ambiguities created by the repeated reference to only Niakuk and particularly by that provision that the Court referred to in the first amendment that's in the company's own words. The rules of construction as to how those have to be dealt with.

As to being able to, as suggested by the United States, that we just can't read into statutes or regulations whatever standards you want under the fair inference standard, this Court prior to Your Honor's assignment to it, in the discovery order that allowed the discovery of the Kuukpik material, so the law of the case, docket 70, page 8, specifically talked about the use of comparables and cited cases there.

The United States suggested there is no duty to bring a lawsuit on behalf of an allottee. We're not asking that.

The breach occurred not by failing to sue, but because the United States assumed the obligation, the sole obligation to communicate with the oil company, declaring the lease to be breached and giving that notice so that a trespass could occur, the hold-over could occur under the regs, failing to do that is what constitutes the breach.

THE COURT: It's Mr. Perkins' contention that assignment usually does mean not simply the right to use my facility, but an assignment in this case of a land interest in totality. Meaning they turned over the lease to somebody else. What do you make of that?

MR. GIVENS: Your Honor, if this is a bundle of sticks of property ownership for a sub-lease, an assignment is something less than that. It keeps dropping down.

THE COURT: And Mr. Perkins' view of the law, which I think is somewhat supported, is that it's actually more than that is what he's contending. The assignment is a substitution in essence. I thought you said, a sub-lease is a lesser interest --

MR. PERKINS: Yes, that was my assertion, Your Honor.

THE COURT: That's what I thought.

MR. GIVENS: Do you want me to brief it, Your Honor? My understanding is that it's --

THE COURT: No, no, it's okay.

MR. GIVENS: -- different. But in either case the intent of the regulations is that notice should be given and --

THE COURT: I understand.

MR. GIVENS: I cannot think of a case where

that should be more appropriate than this one.

It was suggested the Oengas are taking the position that the submerged lands are owned by no one. I can't let that pass, Your Honor. The Oengas are represented by a lawyer who has dealt with that issue a bit. I've talked to them about it. I've litigated it twice in the United States Supreme Court. They understand that these submerged lands are owned by the state. But that becomes very important here, and it becomes important to the value of the land because the state denied the permits, denied the use of that submerged land which increased the value of Oenga's land because it then had to be used differently.

We talked about the fact that appraisals are before the Court. The change of use is very important and it's important because the value changed because of the denial of the permits. So all of that ties together.

I think anything else would just be repeating, Your Honor, so thank you very much.

THE COURT: Mr. Upton has one thing he wants to add, and I'll let him do it.

MR. UPTON: Just one thing. Plaintiffs just stated that they're not contending that we should have brought a suit on their behalf against the oil

companies and that what they wanted was an issuance of notice. I just wanted to reiterate that the fact situation here does not fit the regulatory provisions that I cited before. So therefore this claim of a breach, or a failure to give notice of a breach of contract, and a failure to give notice of trespass, is not money mandating as far as the government is concerned.

THE COURT: All right.

We've got some good issues in this case. I can't say that you haven't thoroughly briefed them, you have. I think I understand them, and now I have to go come up with a final answer.

But thank you very much, particularly those of you who came from out of town to do this. It's very helpful when you have it in person.

You will hopefully hear from me in the next month or six weeks or so.

ALL: Thank you, Your Honor.

THE COURT: Thank you.

(Whereupon, at 4:50 p.m., the hearing in the above-entitled matter was concluded.)

//

//

//

REPORTER'S CERTIFICATE

DOCKET NO.: 06-491L

CASE TITLE: Wallace Oenga et al. v. U.S.

HEARING DATE: August 13, 2008

LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: August 13, 2008

_______________________________

Tammy Brodsky

Official Reporter

Heritage Reporting Corporation

Suite 600

1220 L Street, N.W.

Washington, D.C. 20005-4018