# In the United States Court of Federal Claims

No. 06-491L

(Filed: September 18, 2008)

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * | * |
| WALLACE OENGA, | * |
| GEORGENE SHUGLUK, | * |
| LEROY OENGA, SR., | * |
| MICHAEL DELIA, TONY | * |
| DELIA, JOSEPH DELIA, | * |
| JENNIE MILLER, and | * |
| TRINITY DELIA, | * |
| | * |
| Plaintiffs, | * |
| | * **Breach of Trust Responsibility; Alaska** |
| v. | * **Native Allotment; Oil and Gas** |
| | * **Production; Statute of Limitations –** |
| THE UNITED STATES, | * **28 U.S.C. § 2501; Indian Trust** |
| | * **Accounting Statute (Pub. L. No. 109-** |
| Defendant, | * **54); Continuing Claim Doctrine;** |
| | * **Money-Mandating Claim Under 25** |
| and | * **C.F.R. § 162.** |
| | * |
| BP EXPLORATION (ALASKA) | * |
| INC., CONOCOPHILLIPS | * |
| ALASKA, INC., | * |
| EXXONMOBIL ALASKA | * |
| PRODUCTION INC., | * |
| CHEVRON U.S.A. INC., and | * |
| FOREST OIL CORPORATION, | * |
| | * |
| Defendant-Intervenors. | * |
| | * |
| * * * * * * * * * * * * * * * * * * | |

*Raymond C. Givens,* Bellevue, WA, for plaintiffs.

*James M. Upton,* U.S. Department of Justice, Washington, DC, with whom was *Ronald J. Tenpas*, Assistant Attorney General, for defendant. *Samantha Klein*, U.S. Department of Justice, Washington, DC, of counsel.

*Joseph J. Perkins, Jr.*, Anchorage, AK, for defendant-intervenors.

**O P I N I O N**

**FIRESTONE**, *Judge*.

Pending before the court are the motion for partial summary judgment by the plaintiffs, Wallace Oenga, et al. ("plaintiffs" or "the Oenga heirs"),[1] the motion to dismiss or, in the alternative, for summary judgment by the defendant, the United States ("defendant" or "government"), and the motion by the defendant-intervenors, BP Exploration (Alaska) Inc. ("BPX"), et al. (collectively, "intervenors"),[2] for partial summary judgment. At issue is a 1989 lease between the plaintiffs, owners of a Native allotment adjacent to Prudhoe Bay in Alaska, and BPX, granting BPX the right to operate oil production facilities on the plaintiffs' allotment.[3] The lease was approved by the United States Department of Interior ("DOI") Bureau of Indian Affairs ("BIA"), and

---

[1]The plaintiffs are the heirs of the original lessor, Andrew Oenga, and include his son Wallace Oenga, his daughter Georgene Shugluk, his grandsons Leroy Oenga, Sr., Michael Delia, Tony Delia, and Joseph Delia, his granddaughter Jennie Miller, and his great-granddaughter Trinity Delia. Second Am. Compl. ¶ 7.

[2]The other defendant-intervenors, ConocoPhillips Alaska, Inc. ("ConocoPhillips") (formerly ARCO Alaska, Inc. ("ARCO") and PHILLIPS Alaska, Inc.), Exxon Mobil Alaska, Inc. ("Exxon"), Chevron U.S.A., Inc. ("Chevron"), and Forest Oil Corporation ("Forest Oil"), are "Working Interest Owner" oil companies which "reimburse BPX for costs incurred by BPX as Unit Operator" for certain oil and gas leases, including the ones at issue in this case, in exchange for which "BPX delivers to each Working Interest Owner its proportionate share of all oil and gas produced from [the] leases." Mot. to Intervene at 4; Intervenors' Proposed Findings of Uncontroverted Fact ("IPFUF") ¶ 12.

[3]At the time the lease was entered into, BPX was called Standard Alaska Production Company. Standard Alaska changed its name to BPX effective January 31, 1989. Intervenors' Mot. at 7. To avoid confusion, this opinion will refer to the company as BPX throughout.

formal amendments were made in 1994 and 1995.[4]  The plaintiffs claim that the

government breached its trust obligations to them in connection with the lease.

The plaintiffs' complaint sets forth three claims, each in the alternative.  In their

first claim ("claim one"), the plaintiffs allege that they were entitled under various statutes

and regulations to receive a royalty on the value of oil and gas produced on the allotment

and that the government breached its fiduciary responsibilities and trust obligations when

it failed to require or collect royalty payments from the lessee.[5]  In their second claim

("claim two"), the plaintiffs allege, in the alternative, that under 25 U.S.C. § 415(a) (2006)

and 25 C.F.R. § 162 (1987, 2001), they were entitled to a "present fair annual rental,"

taking into account the use of the location for oil production facilities, and that the

government's failure to require or collect such rent constituted a breach of its fiduciary

responsibilities and trust obligations.

In their third claim ("claim three"), the plaintiffs allege that the lease and its

amendments were intended to extend only to oil and gas development and production from

the Niakuk oil field, and therefore the oil companies' use of the plaintiffs' allotment to

develop and produce oil and gas from the West Niakuk and Lisburne areas constituted

---

[4]In addition, as discussed <u>infra</u>, in January 1994, ARCO and Exxon entered into a facility sharing agreement with BPX, under which BPX provided ARCO and Exxon with a drilling slot and access to the BPX facilities on the plaintiffs' allotment in exchange for a thruput (an amount paid per barrel produced).  Sealed Decl. of Edward Morse ¶ 7, Attach.; <u>see also</u> Intervenors' Ex. ("IE") J.

[5]The plaintiffs list 25 U.S.C. §§ 396, 396c-396e, 396g (1955), 30 U.S.C. §§ 1701-57 (1996), 25 C.F.R. § 212 (1987, 1996), 30 C.F.R. § 206 (1993), and 43 C.F.R. § 3160 (1993) as giving rise to a money-mandating duty for the government to collect such royalties.  Pls.' Mot. at 23-24.

breaches of the lease and trespasses.  The plaintiffs argue that the government, in turn,

breached its duties as set forth in 25 U.S.C. §§ 162.617-162.623 (2001) to send notices and

take other actions against these alleged breaches of lease and trespasses, when the

plaintiffs made demands to that effect after learning of the use of the allotment for oil and

gas development and production from beyond the Niakuk area.  The plaintiffs also argue

that the facility sharing agreement between BPX, ARCO, and Exxon violated both the

lease, as amended, and regulations regarding subleases and assignments of allotted lands.[6]

The government asserts that claims one and two are barred by the six-year statute of

limitations set forth in 28 U.S.C. § 2501 (2004).[7]  The plaintiffs counter that claims one

and two are timely because they did not accrue until the plaintiffs received responses to

their requests for accountings of lease proceeds, pursuant to the Indian Trust Accounting

Statute ("ITAS"), Pub. L. No. 109-54, 119 Stat. 499, 519 (2005).[8]  The government

---

[6]As part of their third claim, the plaintiffs originally argued that the government also breached its duty to disclose to the plaintiffs its knowledge of ARCO's interest in leasing the allotment to develop its offshore state oil leases.  However, this "second part" of claim three has since been withdrawn by the plaintiffs in light of contradictory evidence submitted by the government.  Tr. of Oral Arg. at 74:4-24.  Accordingly, the court will not address the "duty to disclose" portion of claim three in this opinion.

[7]28 U.S.C. § 2501 provides, in relevant part: "Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."

[8]The ITAS provides:

[N]otwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim . . . concerning losses to or mismanagement of trust funds, until the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss[.]

119 Stat. at 519.

counters that claims one and two relate to mismanagement of trust assets, rather than trust funds, so the ITAS does not apply.

With regard to claim three, the government and the intervenors do not raise a statute of limitations defense, arguing instead that both the use of the allotment by ARCO and Exxon and the oil and gas development and production from the West Niakuk and Lisburne areas were authorized under the broad language of the lease and its amendments, and that because such actions were within the scope of the lease, no breaches of the lease or trespasses occurred.  Without such lease violations or trespasses, the government argues, the provisions of 25 C.F.R. §§ 162.617-162.623 do not apply, and  therefore the plaintiffs have failed to establish a money-mandating duty on the part of the government with regard to claim three.[9]

For the reasons set forth below, the court finds that the plaintiffs' first and second claims are time-barred under the six-year statute of limitations set forth in 28 U.S.C. § 2501, because those claims challenge the mismanagement of trust assets, rather than trust funds, and as such they are not covered by the ITAS.  With regard to the plaintiffs' third claim, the court finds that the development and production of oil and gas from the Lisburne Participating Area ("PA") through the plaintiffs' allotment exceeded the scope of the lease and that the plaintiffs have stated a claim that the government breached its money-mandating duty to investigate and take action against such a violation.  However,

---

[9]Likewise, the intervenors argue that "since the undisputed facts establish that the actions of Intervenors on the leased premises have been at all times within scope of the grant made by the lease, claim three fails as a matter of law."  Intervenors' Mot. at 7.

the court finds that disputed issues of fact remain as to whether the scope of the lease, and particularly the "Niakuk Project," included development and production of oil and gas from the West Niakuk area.  Thus, the question of whether the activities in the West Niakuk area constituted a lease violation giving rise to a money-mandating duty on the part of the government to take action cannot be resolved on summary judgment.

## I.  BACKGROUND FACTS

The following facts are taken from the parties' cross-motions for summary judgment, proposed findings of uncontroverted facts,[10] and accompanying exhibits.  The facts below are undisputed unless otherwise noted.[11]

### A.  Negotiation of the Original Lease

In 1971, Andrew Oenga ("Mr. Oenga"), an Inupiat Alaska Native, applied for and received an Alaska Native Allotment at Heald Point[12] from the DOI Bureau of Land Management ("BLM").[13]  PPFUF ¶¶ A.2-A.3; DA 1, 2.  The forty-acre allotment,

---

[10]The government filed a "Statement of Genuine Issues of Material Fact in Dispute" ("DIMFD") in response to the plaintiffs' Proposed Findings of Uncontroverted Facts ("PPFUF").

[11]In addition, the facts set forth infra are consistent with the "Stipulation of Lease History" entered into by the Oenga heirs, BPX, and the BIA in May 1995.  Def.'s Attach. ("DA") 42.

[12]Heald Point is located on Alaska's North Slope, on the northeast edge of Prudhoe Bay. See DA 19.  Mr. Oenga's allotment covers the entire end of the Point, which is a long, narrow finger of land bounded by water on three sides.  See DA 13 Ex. A at 1.

[13]Pursuant to 43 U.S.C. §§ 270-1 to 270-3 (1970), repealed with a savings provision by 43 U.S.C. § 1617(a) (2000), Mr. Oenga was eligible, due to his status as an Alaska Native, to receive title to a plot of land from the United States government for use as a homestead by him and his heirs in perpetuity.  DA 2, 3.

designated Native Allotment F-14632 Parcel B,[14] included a provision reserving to the United States "[a]ll of the oil and gas in the land so allotted, and to it, or persons authorized by it, the right to prospect for, mine, and remove such deposits from the same."[15,16]  DA 2.

In May 1988, BPX approached the BIA and Mr. Oenga about "a right-of-way application for an access road and pipeline" across a portion of Parcel B to access its offshore oil leases with the State of Alaska.  Pls.' Mot. at 7 (quoting DA 4); DA 46 ¶ 5. The area offshore from the plaintiffs' allotment is known as the Prudhoe Bay Unit

---

[14]Mr. Oenga also secured a 120-acre "Parcel A," not at issue here, as part of Allotment F-14632.  See DA 1.

[15]The defendant contends that, because of this clause, the Oenga heirs are Indian surface owners only under the definitions set forth in 25 C.F.R. § 212.3 (2008) and are therefore not entitled to a royalty payment.  Because the court finds, as discussed infra, that the plaintiffs' claim for a royalty is time-barred, the court does not reach the merits of the defendant's argument regarding the applicability of this regulation to the plaintiffs' lease.

[16]The document quoted by both the plaintiffs and the government for the terms of the allotment is, in fact, Native Allotment Certificate (Patent) No. 50-2005-0580, dated September 27, 2005, which formally transferred "Lot 1" of Parcel B – an area "[c]ontaining 22.21 acres" – to Mr. Oenga's heirs.  DA 2.  As to the remaining 17.79 acres of Parcel B, "the allotment has not yet been conveyed because all of the lands in [the township in which the acres are situated] were conveyed by U.S. Patent No. 50-74-0093 dated March 27, 1974" by the DOI/BLM to the State of Alaska, which was then asked to reconvey it when Mr. Oenga's "superior interest" was discovered.  IPFUF ¶¶ 4-9 (emphasis in original) (citing IE I); DA 11, 12.  Apparently this portion has not yet been reconveyed back to Mr. Oenga.  However, "BPX has leased, pursuant to the Oenga Lease, and thus is paying rent on, the entire 40-acre parcel as if the entire 40-acre parcel had been certificated."  IPFUF ¶ 10.

("PBU").[17]   See IE BB-1.[18]   At that time, the PBU included the Lisburne PA,[19] the

formation of which had been approved by Alaska DNR on December 4, 1986.  IE O.  The

PBU also encompassed the area which would later become the Niakuk PA, though that PA

was not formed until March 2, 1994.  IE L.  In addition, the PBU would later be expanded

to encompass the area designated as the West Niakuk PA, formed on November 17, 1997.

IE M.

    Lease negotiations involving BPX, the BIA, and Mr. Oenga and his relatives

ensued later in 1988.  BPX developed a draft lease, with input from the BIA, using a lease

from another allotment as an example.  DA 46; see DA 5.  BIA Superintendent Michael

Stancampiano noted in a July 14, 1988 letter to BPX's Steven Taylor that, by law, "[n]o

lease can be approved for less than fair annual rental . . . unless it can be shown to be in

the best interest of the landowner."  DA 6.

---

[17]According to the Alaska Department of Natural Resources ("DNR"), "[a]n oil and gas 'unit' is comprised of a group of leases which cover all or part of one or more potential or known reservoirs and which are subject to a 'unit agreement' . . . which is typically executed by those with an interest in the leases."  IE L at 1.

[18]The intervenors submitted two sets of exhibits, both referenced alphabetically.  The court denotes those attached to their corrected motion for partial summary judgment (Doc. 62) with a single letter (i.e., "B") and those attached to their reply (Doc. 87) with a double letter (i.e., "BB").

[19]According to Alaska DNR, a "participating area," in turn,

    is usually limited to that part of the unit area which has been shown to be productive of oil or gas in 'paying quantities.' . . . [A] separate PA must generally be established for each delineated reservoir. . . . The boundaries of PAs can be continually revised as more wells are drilled and more data are obtained.

IE L at 1.

On September 26, 1988, BIA Realty Specialist Kathleen Dickinson met with Mr. Oenga, his interpreter Rex Okakok,[20] Mr. Oenga's daughter and grandson (Georgene Shugluk and Leroy Oenga, respectively, both of whom are parties to this suit), and three BPX representatives (Terry Obeney, Stu Hirsh, and Cindy Bailey), to discuss and clarify the terms of the lease. DA 11, 12. Neither Mr. Oenga nor Mr. Okakok "had seen the proposed lease nor the [initial] appraisal prior to this meeting." DA 11. Mr. Obeney indicated that at that point, BPX was "only proposing to construct the road and pipeline on the parcel," with the possible addition of "a staging area for the actual construction on the parcel," and Mr. Hirsh stated that BPX would need to lease at least ten and up to twenty acres of the allotment. Id.; see also IE PP (When asked why BPX did not want to lease the entire forty acres, Mr. Obeney explained that "the pipeline corridor was a relatively narrow corridor approximately 100 feet wide."). According to Ms. Dickinson, "a considerable amount of time" in the September 26, 1988 meeting was spent discussing appraisal values and techniques for purposes of determining the yearly rental rate, and "Mr. Oenga appeared to understand the basis for the figures arrived at in the appraisal."[21] DA 11; see also IE PP.

According to Ms. Dickinson, the "initial purpose" behind the Niakuk Project was "to construct a causeway out to Niakuk island where [BPX's] drilling facility was to be placed." DA 21; see also DA 42 (Stipulation of Lease History, May 11, 1995) ("Niakuk

---

[20]Mr. Oenga "spoke and read little or no English." PPFUF ¶ A.2.a.

[21]The memos describing the September 26, 1988 meeting do not mention any discussion of royalties. DA 11; IE PP.

development plans in 1988 involved the use of the allotment for a road and pipeline corridor leading to an offshore production island.  The island would be connected to shore via a one mile long causeway.").  However, on October 19, 1988, Mr. Hirsh of BPX reported to Ms. Dickinson that "the environmental permit to build a causeway to an offshore drilling pad was denied [by the Army Corps of Engineers], and that [BPX] was reconsidering its plans" – as a result, the "lease with Mr. Oenga would be placed on hold." DA 46 ¶ 7; DA 12.  According to Ms. Dickinson, she "promptly informed Andrew Oenga and Rex Okakok, his translator, of this development."  Id.  On November 15, 1988, however, "the oil company decided it would go ahead with the lease."  Id.

### B.     Terms of the 1989 Lease

Mr. Oenga signed the final lease on January 19, 1989.[22]  DA 13.  The next day, the lease, designated BIA Lease No. F-89-01, was approved by BIA Realty Officer David O. Scott, Jr., as being "in conformity with existing laws and regulations."[23]  DA 12.  At the time the lease was executed, "[t]he leased premises consisted of 10 acres being a road and pipeline corridor."[24]  DA 42.  However, it is undisputed that the lease also permitted BPX to "use the leased premises for any and all oil field exploration, development, construction, facilities, production and support purposes and for any other uses and purposes reasonably

---

[22]The effective date stated in the lease is January 1, 1989.  DA 13.

[23]In addition, the lease itself stated that it was "made and entered into . . . in accordance with the provisions of existing law and regulations at [25 CFR 162 (1987)], which by reference are made a part hereof."  DA 13 (brackets in original).

[24]Some of the permits for the causeway to an offshore drilling pad had already been denied by October 1988, before the lease was entered into in January 1989.  DA 12, 42, 46 ¶ 7.

or conveniently related thereto."  DA 13 ¶ 10.  The lease permitted construction of "any facilities (pipelines, access roads, causeway approaches, drilling pads, a construction pads [sic] or any other required facilities) on the leased premises."  Id. at ¶ 11.  Moreover, under the lease, BPX was entitled to use the unleased portions "for geotechnical, survey and design work at any time prior to commencement of construction activities."[25]  Id. at ¶ 10.  BPX could also "sublease all or portions of the leased premises to others, as it may see fit, for uses permitted under this Lease Agreement" without any explicit notice requirement.  Id. at ¶ 13.

The lease provided for two phases.  During the first phase, the land would be let on a year-to-year basis for a maximum of ten years, during which time the lessee would "attempt to obtain required permits for the Niakuk Project."[26]  DA 13 ¶ 1.  In addition, BPX had the option of moving to a second lease phase – consisting of a series of five-year terms with the option to extend up to a maximum of twenty-five years – either by giving written notice to the BIA Superintendent of its intent to proceed with the Niakuk Project, id. at ¶ 1, or by exercising its option "at its sole discretion" at the end of the original lease term, if ninety days' written notice was given.[27]  Id. at ¶ 2.

---

[25]Such uses of the unleased areas were to be allowed "without cost to lessee [BPX]," and Mr. Oenga could not "require separate or additional permits" for such activities.  DA 13 ¶ 10.

[26]The phrase "Niakuk Project" is not defined in the lease.

[27]In the first phase of the project, BPX "ha[d] the option to cancel this Lease Agreement at any time," provided notice was given to both the BIA and Mr. Oenga.  DA 13 ¶ 1.  In the second phase of the lease, BPX also had the option to cancel the lease "for any reason," but only at the end of each five year period.  DA 13 ¶ 15.

The lease provided for an annual payment of $1,600 per acre ($16,000 per year for the initial ten-acre area) for each of the first five years, plus a $25,000 signing bonus.  DA 13 ¶¶ 3, 4.  BPX would pay the rental amount to the BIA, which would then credit the funds to Mr. Oenga's Indian Individual Money Account.  Id. at ¶ 4.  The rental rate could be "increased at successive five-year intervals beginning in the sixth year after rental payments have begun[,] . . . based upon either the fair market <u>undeveloped</u> rental value for the property established by a [BIA] appraisal . . . or . . . based on the application of a 'Cost Adjustment Factor'; which ever [sic] is greater."[28]  Id. at ¶ 5 (emphasis added).  The Cost Adjustment Factor was calculated using the change in the Consumer Price Index ("CPI") from the CPI at the time of the prior rental adjustment (or, for the first reappraisal, the CPI at the time the lease was executed).  Id.  The increase in rental payments was not to exceed fifty percent in any five-year period.  Id.

The lease's reappraisal term stated:

> [BIA] review for the purposes of establishing the fair rental value of the premises shall be based on the highest and best use of the premises as <u>raw, unimproved vacant lot at the time of the appraisal and shall not be based on the cost or value of improvements or developments made by the Lessee or any income the Lessee derives from the leased premises</u>.

DA 13 ¶ 9 (emphasis added).  Thus, the rental payments would not be based on the value of the use of the land for an oil pipeline, a facility to produce oil, or any of the other activities permitted under the lease.

---

[28]This method of "using whichever method gave the highest adjustment" was included by Ms. Dickinson as a way to obtain greater compensation for Mr. Oenga.  DA 12.

In addition, though the lease initially provided for use of a minimum of ten acres, the lease permitted BPX to amend the lease to "increase or decrease the size of the leased premises at any time at Lessee's sole discretion," provided a proportionate increase or decrease in the rental payments was also made. DA 13 ¶ 11. Because BPX had the option to rent the full tract, and because it was permitted to use the unleased premises for activities supporting its operations on the leased premises, Mr. Oenga was effectively unable to enter into other leasing arrangements on the unleased premises. See, e.g., DA 46 ¶ 9 (the BIA refused to allow ARCO to lease part of Parcel B, as discussed below); see also DA 30 (Realty Officer Diane Stevens of Arctic Slope Native Association ("ASNA") noted that, because of BPX's option to expand and the impact of the development on the entire parcel, "the entire 40 acres were effectively at the disposal of BP[X].").

Attached to the lease as Exhibit A were two maps, both dated September 21, 1988, entitled "Niakuk Project Location Map" and "Niakuk Onshore Access Road and Pipelines."[29] DA 13 at Ex. A. The Niakuk Project Location Map depicted "Proposed Causeway/Pipelines" physically extending from the "Oenga Allotment" to a "Proposed Niakuk Production Island Addition" offshore.[30] Id. The Niakuk Onshore Access Road and Pipelines map showed a series of "Proposed Pipelines" (including one for "Water

---

[29]These maps were incorporated into the lease by a reference in the granting paragraph stating that "[t]he allotment and leased premises are shown on the attached Exhibit A." DA 13.

[30]As noted supra, some of the permits for the causeway to an offshore drilling pad had been denied by October 1988, before the execution of the lease in January 1989. DA 12, 46 ¶ 7. The maps in Exhibit A of the lease, dated September 21, 1988, apparently predate that development.

Injection," one for "Production," and two labeled "Future") running alongside an "Access Road" along the length of the allotment.  Id.

Mr. Oenga died on April 16, 1990, and interest in the allotment was divided among his several heirs in accordance with his last will and testament.  DA 14, 15.

### C.    Adjustments and Amendments to the Lease

### 1.    The July 29, 1993 Letter

When BPX was "unable to secure the necessary permits for the causeway,"[31] DA 21, "[t]he scope of the Niakuk development change[d]."  DA 42.  BPX "revised their plans," DA 21: "development of Niakuk [would] now be done from a production pad at the tip of Heald Point."  DA 42.  Mr. Hirsh informed Ms. Dickinson on July 7, 1993 that BPX intended to increase the leased area and build a production pad on the plaintiffs' property.  DA 21.  The Oenga heirs were informed of the revised plans by the end of July 1993.[32]  DA 23.

On July 29, 1993, BPX formally exercised its option to proceed with the second phase of the lease in a letter from Mr. Hirsh to BIA Superintendent Samuel Demientieff, giving written notice to the BIA "that the first phase of the Niakuk Development Project has been approved and that development will procede [sic] . . . ."  DA 20.  The letter

---

[31]The Stipulation of Lease History indicates that eventually, "only the North Slope Borough approve[d] the causeway permits.  The State of Alaska and the Corps of Engineers reject[ed] the permits."  DA 42.

[32]In a letter to Leroy Oenga, dated July 30, 1993, Ms. Stevens of ASNA indicated, "As you know, BP will be constructing a pad at the point."  DA 23.

During this time, the BIA transferred "day-to-day lease administration duties from the Fairbanks Agency of the [BIA] to [ASNA], which contracted to perform such administrative responsibilities . . . ."  Def.'s Mot. at 7-8; DA 24.

described the 1989 lease as "provid[ing] authorization for BP[X] to construct production facilities to support development of, and production from, <u>our Niakuk oil accumulation</u>." <u>Id.</u> (emphasis added).  Mr. Hirsh indicated that "an armored production pad will be constructed at the tip of Heald Point" and that "[w]e have also redesigned and relocated our pipelines to the east side of the access road."  <u>Id.</u>  The letter further stated that, pursuant to the 1989 lease, "the Lease is converted from a year-to-year basis to a fixed twenty-five year term," and "BP[X] hereby requests that the Lease be amended so as to increase the size of the Leased Premises from 10 acres to 20 acres effective August 1, 1993," with a corresponding increase in rent for the "enlarged Leased Premises."  <u>Id.</u>

In the July 29, 1993 letter, BPX requested that BIA Superintendent Demientieff "indicate [his] approval of this amendment by signing in the space provided below . . . ." <u>Id.</u>  The letter included a signature line for Mr. Demientieff, beneath the statement "The within Lease Amendment is hereby approved . . . ."  <u>Id.</u>  Mr. Demientieff signed the statement provided by BPX on August 3, 1993.  DA 20.

Construction of the "Niakuk production pad" on the plaintiffs' allotment began in August 1993, with portions of the pad "being constructed on submerged lands owned by the State of Alaska" adjacent to the plaintiffs' allotment.  DA 42.

### 2.       The 1993 Appraisal

On June 15, 1993, the BIA requested a real estate appraisal of the plaintiffs' Heald Point allotment.  DA 18, 21, 23.  BIA Staff Appraiser, John R. Cress, inspected the property on June 17, 1993 and prepared an Appraisal Report on August 6, 1993.  DA 19.

After comparing the property to other leases in the area, Mr. Cress estimated the market rent for the original ten acres to be $16,000 per year, unchanged from the rate set in 1989. DA 19. Mr. Cress' report noted that the land "remain[ed] undeveloped," but that "[t]he highest and best use" of the land would be "Industrial – oil or natural gas related development or production site." DA 19. Ms. Stevens at ASNA informed Leroy Oenga that the 1993 appraisal was taking place via letter dated July 30, 1993. DA 23.

### 3.    The 1994 Amendments

On July 2, 1993, ARCO contacted the BIA about the possibility of leasing part of Parcel B. DA 46 ¶ 9; Pls.' Attach. ("PLA") 1 at 11. However, "[b]ecause the 1989 lease to [BPX] gave the lessee the unilateral right to increase the acreage under lease," Ms. Dickinson of the BIA "reasoned that the allotment owners could not enter into a new lease or sale without getting a release of part of the Parcel B acreage from BP[X]'s rental option." DA 46 ¶ 9. In her January 20, 2008 declaration, Ms. Dickinson stated, "I am pretty confident that . . . the Oenga heirs were made aware of the ARCO feeler shortly after it was received." Id.

On August 30, 1993, Leroy Oenga sent a letter to Ms. Stevens at ASNA requesting a meeting with BPX in order to "work at a better lease agreement" with the goal of "a lump sum to be paid to the heirs of Andrew Oenga." DA 27. On October 21, 1993, the Oenga heirs and Ms. Stevens met with representatives of BPX. DA 28. On November 10, 1993, Ms. Stevens sent a letter to BPX proposing various amendments to the lease and identifying areas of conflict. DA 28, 30. Among the primary concerns of ASNA and the

-16-

heirs in these negotiations was BPX's option to increase or decrease the acreage of the lease without the plaintiffs' approval.  Ms. Stevens described the lease as "creat[ing] a cloud of title over the entire parcel," citing the BIA's denial of ARCO's request to lease part of the plaintiffs' allotment as an example of "the entire parcel [being] at the disposal of BP[X] without proper compensation to the Lessor."  DA 30.  ASNA and the Oenga heirs requested compensation for the entire forty acres, both retroactively in a lump sum for the first five years of the lease and for the remaining lease term.  DA 30.  In addition, ASNA and the heirs proposed amendments requiring "mutual agreement of the Lessor and Lessee" for future increases and decreases in leased acreage, and requiring that BPX provide written notice to the lessors and ASNA "setting forth the terms and provisions of any assignment, sublease, transfers, or other arrangements which provide a benefit to a party outside this agreement."  Id.

On November 30, 1993, Mr. Hirsh of BPX responded to Ms. Stevens' letter, agreeing to amend the lease to increase the leased premises to include the entire forty acres of Parcel B, but not agreeing to pay rent for the entire forty acres any earlier than the date that ARCO was denied an opportunity to lease part of the allotment, nor to include a provision requiring mutual consent before decreasing the acreage.[33]  DA 31.  Mr. Hirsh rejected the proposed amendment to give notice of arrangements with third parties, with

---

[33]This letter also mentions the "Niakuk Project" in relation to the 1989 lease, as follows: "A more precise description of the leased premises was not available at the time the lease was executed because the Niakuk Project was in the permitting process and a final location of the right-of-way had not been surveyed."  DA 31.

the exception of "sublease" of the property, and indicated that, though BPX did not foresee

any assignment, sublease, or transfer of the leased premises,

> [t]he most likely scenario for third party involvement on Heald Point would be
> for one or more of the following to occur: 1.) BP[X] assigns an interest in its
> Niakuk oil and gas leases to a third party; 2.) the Niakuk Participating Area[34]
> is expanded to include oil and gas leases owned by parties other than BP[X]
> and their leases are developed from Heald Point or 3.) BP[X] enters into a
> production facility sharing arrangement with one or more third parties.

Id.

Finally, on January 20, 1994, the lease was amended to increase the annual rent to

$80,640 (reflecting both the increase to forty acres[35] and application of the CPI adjustment

in January 1994), modify the payment schedule from annual to biennial, provide for rental

readjustments every four years instead of every five years, and require notice of any

sublease of the premises by BPX.  Def.'s Mot. at 9-10; IE C.  However, "sublease" was

defined to exclude "facility sharing agreements or other transactions which do not convey

an interest in real property."  DA 35.  In addition, the amendments stated that "Lessors

shall make no additional claims, requests or demands of Lessee for Lease rental payments,

rental payment adjustments or rental payment advances except as set forth in [the Lease

Rental Adjustments provision]."  Id.

---

[34]As noted supra, the Niakuk PA was located within the PBU, which also encompassed
the Lisburne PA.  The creation and expansion of the various PAs relevant to this case are
described in more detail, infra.

[35]This increase in the size of the leased premises was "deemed effective on July 1, 1993
for purposes of calculating rental payments."  DA 35.

At the time they signed the amendments in January 1994, each of the Oenga heirs signed a counseling record prepared by ASNA.  DA 33, 34.  The counseling records stated as follows:

> I understand that the lease signed by Andrew Oenga legally allows BP Exploration to develop and manage this Native allotment. . . . I understand that the original lease is still in effect except for those parts changed by the amendment signed in August by BIA and those parts changed by these amendments. . . . I understand that this lease amendment increases the acres being leased to BP[X] from 20 acres to 40 acres. . . . I understand that by agreeing to end the negotiation now, it may not be possible for ASNA Limited to reopen negotiations on the lease. . . .
>
> I understand that BP[X] may enter into any arrangement with ARCO to develop this property.  <u>I understand that I will not receive any changes in payment because BP[X] has full legal right to develop the property and enter into any agreements with ARCO. . . . I understand that I will not receive any changes in payments except for a possible change every four years because raw land values may go up or because the [CPI] may go up.</u> . . . I understand and agree with the lease amendments and so I am signing the amendment of my own free will.

DA 33 (emphasis added).

### 4.     The ARCO/Exxon Facility Sharing Agreement

Shortly after the 1994 amendments were executed, on January 27, 1994, BPX entered into a facility sharing agreement providing ARCO and Exxon with a drilling and manifold slot at the Heald Point drillsite "to test the prospectivity of their lease(s) at the western limit of the BPX Niakuk Field."  IE J (redacted "LETTER AGREEMENT – ARCO/Exxon Access to Niakuk Facilities and Integration of Niakuk Interests").  In return, if the tests resulted in commercial production, ARCO and Exxon agreed to pay BPX a thruput for access to the BPX facilities on the Oenga allotment.  Id.  Pursuant to this

facility sharing agreement, "shared use of the leased premises by BPX, ARCO . . . and

Exxon . . . continued until BPX became the sole operator of the Prudhoe Bay Unit Area

[("PBUA")] in 2000."  IPFUF ¶ 13 (<u>citing</u> IE K (Alaska DNR decision approving BPX as

sole operator of PBUA, June 27, 2000)).

It is undisputed that BPX did not give the plaintiffs notice of the facility sharing

agreement at the time.  Leroy Oenga asserts that "[t]he first I or any member of the family

learned of this LETTER AGREEMENT was in 2005 after our attorney met with BP[X]."

PLA 1 ¶ 8.  The government and intervernors assert that no such notice was required under

the terms of the 1994 lease amendments which expressly excluded facility sharing

agreements from the notice requirement for subleases.  DIMFD ¶ 5.e; IPFUF ¶ 30.

### 5.    The 1995 Amendments

After signing the 1994 amendments, the Oenga heirs continued to explore their

options for increasing the payments under the lease.  On December 20, 1994, BPX offered

to purchase the allotment for $600,000 cash.  DA 38 (Doc. 42-5 at 44).  The family

verbally accepted the offer, but the sale was not completed.  DA 40, 42.  In January 1995,

the Oenga heirs entered negotiations with BP to obtain a lump sum payment of $240,000

and annual (as opposed to biennial) payments for the remaining value of the lease, in

exchange for no direct communication by the lessees with BPX and no requests for further

amendments of the lease by ASNA and the BIA, except as a result of a change in

circumstances affecting the leasehold.  DA 40.  BPX rejected this proposal on February 2,

1995, though negotiations continued.  <u>Id.</u>

On May 11, 1995, the lease was amended again.  DA 41.  The 1995 amendments changed the payments from biennial back to annual, required that payments be made to a bank where some of the heirs had taken out loans, modified the first possible cancellation date to coincide with the term of those loans (January 1, 2001), and "appoint[ed] the BIA, acting by and through ASNA, to be [the] sole contact with [BPX] for any and all matters arising out of this Lease Agreement or any amendment thereto."[36]  Id.

### 6.     The 1997 Appraisal

Consistent with the terms of the 1994 amendments, reappraisals were done in 1997 (for purposes of the 1998 rental adjustment) and every four years thereafter.[37]  The BIA's 1997 appraisal (conducted May 14, 1997) was limited to a review of a December 1994 appraisal by an appraiser retained by BPX, conducted in preparation for the potential purchase of the entire allotment from the Oenga heirs.  Second Am. Compl. ¶ 24; Ans. ¶ 24; DA 38, 43.  The 1997 appraisal valued the forty-acre lease at $85,680 annually.  DA 43.  The annual rent for the period beginning in 1998 was set at $88,997.34 instead, because the CPI adjustment was greater than the appraised market value.  DA 44.  Letters were sent to the Oenga heirs in October 1997, informing them of the 1997 appraisal and rental adjustment.[38]  Def.'s Mot. 14 (citing sample letter to Leroy Oenga, DA 44).

---

[36]At the same time as the 1995 amendments were executed, the Oenga heirs, BPX, and the BIA executed the "Stipulation of Lease History" setting forth some of the facts and circumstances surrounding the lease and its amendments up to that point.  DA 42.

[37]Claims stemming from the 2001 and 2005 reappraisals and rental adjustments are not before this court.  Those claims are pending before the DOI Board of Indian Appeals.

[38]It is apparently disputed whether the rent payment for 1998 remained at $80,640 or increased to $88,997.34, the amount collected each year from 1999-2001 (a difference of

### D.   Production Via the Plaintiffs' Allotment

#### 1.   Oil and Gas Lease Areas Involved

Beginning in February 1993, BPX applied to Alaska DNR to approve the formation of the Niakuk PA within the PBU, and DNR granted the application, thereby forming the Niakuk PA, on March 2, 1994.[39]  IE L at 106, 107.  Alaska DNR indicated that "[p]rimary production [wa]s scheduled from April 1994 to April 1995 from approximately five to seven wells," and that "[a]fter April 1995 . . . , plans [we]re to have permanent drillsite facilities available and waterflood operations [we]re scheduled to begin."  Id. at 114.  Alaska DNR also indicated that "development drilling [wa]s ongoing within the Niakuk area," and that "[i]nitial plans call[ed] for the reinjection of the gas produced from the Niakuk Reservoir, less gas sold or used for lease purposes, into the Lisburne Reservoir."[40]  Id.  "Of course," Alaska DNR noted, "if additional data are obtained or submitted in the future, the boundaries of the [Niakuk PA] may be revised."  Id. at 106.

---

$8,357.34).  Compare PLA 2; Second Am. Compl. ¶ 29 with DIMFD ¶ 8.a (citing DA 44; Ans. ¶ 29).  The total rent collected is therefore disputed and is either $670,191 by the plaintiffs' calculation or $678,549.40 by the defendant's calculation (a difference of $8,358.40).  Id.

To the extent that the plaintiffs claim that they did not receive in 1998 the $8,357.34 increase computed in 1997, their claim is for mismanagement of trust funds and may therefore be timely under the ITAS.  See Shoshone Indian Tribe of the Wind River Reservation v. United States ("Shoshone I"), 364 F.3d 1339, 1350 (Fed. Cir. 2004).  However, as noted supra, the record contains a letter to Leroy Oenga informing him of the increased payment amount in October 1997.  DA 44.  It is not clear when the plaintiffs allege they received a "proper accounting" of this disputed amount.  Accordingly, the court defers ruling on the timeliness of this portion of the plaintiffs' claim.

[39]According to Alaska DNR, ARCO had objected to BPX's proposed plan, hoping to include in the original Niakuk PA the two ARCO/Exxon leases (34626 and 34629) of which portions were later included in the West Niakuk PA, but they were denied.  IE L; cf. IE M.

[40]Alaska DNR had approved the formation of the Lisburne PA for the Lisburne Reservoir within the PBU on December 4, 1986.  IE O.

On November 17, 1997, Alaska DNR approved the "interim application" by the Greater Niakuk Area ("GNA") Owners – BPX, ARCO, and Exxon – to (1) expand the PBU and the Niakuk PA and (2) form a new PA, the West Niakuk PA, within the PBU.  IE M.  Alaska DNR indicated that the areas would encompass lands overlying the Kuparuk River Formation reservoirs[41] and that its decision would govern operations in the GNA while the GNA Owners "obtain[ed] additional drilling data" in order to "resolve the equity issues among themselves."[42]  Id.  The expansion of the Niakuk PA involved adding portions of two state oil and gas leases already encompassed by the Niakuk PA.  Id.  The newly formed West Niakuk PA encompassed portions of two different state oil and gas leases not included in the Niakuk PA.  Id.

---

[41]Alaska DNR indicated that "the Kuparuk River Formation reservoir is stratigraphically and structurally complex and contains multiple compartments," and that

> [t]he proposed PA boundaries do not conform with the known compartmentalization of the reservoir.  For example, . . . data indicate that the Kuparuk reservoir is in communication between the proposed W[est] N[iakuk] PA and the current N[iakuk] PA.  The boundaries for the W[est] N[iakuk] PA and the expanded N[iakuk] PA . . . are based on geography and lessee interests rather than the known geology of the reservoir.

IE M (emphasis added).

[42]Alaska DNR also noted that "[t]he GNA Owners have negotiated agreements among themselves to share the existing production capacity of the Lisburne facilities, the Heald Point facilities, and the PBU infrastructure."  Id.

As noted above, Alaska DNR approved BPX's application to become the sole unit operator for the entire PBUA on June 27, 2000.[43,44]   IE K.

## 2.   Production by the Oil Companies

With regard to the original Niakuk PA, to date, BPX has used the premises leased from the plaintiffs to "facilitate the production of oil and gas from" nine sections of land pursuant to four Alaska DNR leases of which BPX is the lessee.  IPFUF ¶ 14(a); IE L at 122.  With regard to the <u>expanded</u> Niakuk PA, to date, BPX has used the premises leased from the plaintiffs to "facilitate the production of oil and gas from" twelve sections of land pursuant to the same four Alaska DNR leases.[45]  IPFUF ¶ 14(b).  From 1994 through 2001, oil production through the plaintiffs' allotment from the Niakuk PA was 47,897,086 barrels ("bbls").  PLA 2 (Linda Langer's summary of defendant's and intervenors' discovery responses).

From the execution of the facility sharing agreement in 1994 until BPX became the sole operator of the PBUA in June 2000, ARCO and Exxon used the premises leased from

---

[43]Prior to that, BPX had been the unit operator for the Western Operating Area of the PBU and ARCO (under its new name, Phillips Alaska, Inc.) had been the unit operator for the Eastern Operating Area of the PBU.  IE K.

[44]On December 21, 2007, the formation of the Combined Niakuk PA, encompassing much of both the former expanded Niakuk PA and the former West Niakuk PA, was approved by Alaska DNR.  IE II; Intervenors' Reply at 24.

[45]The production from the expanded Niakuk PA has "[a]lmost all . . . come from the Niakuk accumulation in and under" the PA, though two of the wells there have produced "some oil from the deeper Raven accumulation."  IPFUF ¶ 15.  The "Raven Participating Area" was established in December 2007 encompassing this Raven accumulation – the Raven PA is "situated wholly within the area of the Combined Niakuk Participating Area" – the Combined Niakuk PA, also established in December 2007, now encompasses both the former Niakuk PA and the former West Niakuk PA.  IE II, JJ.  Claims relating to the Raven and Combined Niakuk PAs are outside the scope of this litigation.

the plaintiffs to "facilitate the production of oil and gas from the lands included in the

West Niakuk [PA]" via five sections of land pursuant to two Alaska DNR leases, and

"from certain lands included in the Lisburne [PA]" via three sections of land pursuant to

two Alaska DNR leases.  IPFUF ¶¶ 16-17.  In June 2000, when BPX became the sole

operator within the PBUA, BPX took over the ARCO/Exxon leases in the West Niakuk

and Lisburne PAs and began using the leased premises to facilitate the production of oil

and gas from those lands in addition to those in the Niakuk PA, and this use continues to

date.  IPFUF ¶ 18.  From 1995 through 2001, oil production through the plaintiffs'

allotment from the West Niakuk PA was 16,722,387 bbls, amounting to approximately

24% of the total oil production from the Heald Point facility during those years.  PLA 2.

In addition, from 1994 through 2001, oil production through the plaintiffs' allotment from

the Lisburne PA was 3,180,979 bbls, or approximately 5% of the total oil production from

the Heald Point facility during those years.  Id.

Thus, the total volume of oil produced through Heald Point between 1994 and 2001

was 67,800,452 bbls.  Id.  The plaintiffs' undisputed estimate, based on the United States

Department of Energy's annualized price per barrel of oil, is that the oil produced through

Heald Point during those years was worth roughly $1,139,363,899.  Id.

E.     The Plaintiffs' Requests for Accountings and Demands

In 2003, the plaintiffs made an informal, oral request of the BIA's realty contractor,

the Inupiat Community of the Arctic Slope ("ICAS") (a successor contractor to ASNA

which now possesses the ASNA files, Def.'s Mot. at 9), for an accounting of the payments

received under the lease.  Pls.' Mot. at 14; PLA 1 ¶ 4.  "Some documents were received in response."  PLA 1 ¶ 4.  The plaintiffs maintain that it was in the government's response to its 2003 request for information that they learned of the production of West Niakuk PA oil and gas through the BPX facility on the plaintiffs' allotment.  Second Am. Compl. ¶ 64. In addition, on November 22, 2005, the plaintiffs filed a formal request with the DOI for an accounting under the ITAS.  PLA 2 at 9.  On February 8, May 12, and May 26, 2006, the plaintiffs received documents in response.  PLA 1 ¶ 4; Second Am. Compl. ¶ 3.  The government denies that any of the government's responses in 2003 or 2006 constituted an accounting under the ITAS.  Def.'s Resp. at 8 ("[N]o responses amounting to an accounting exist.").

On December 1, 2005, the plaintiffs demanded in a letter to the DOI, the BIA, and ICAS that the government give notice and take action regarding alleged breaches of the lease by BPX, including "[u]nauthorized and unreasonable use of the property by utilizing [it] to produce oil from the West Niakuk Lease."  PLA 1 at 21.  On December 23, 2005, the plaintiffs demanded that the government give notice and take action to halt the alleged trespasses by the lessees of the West Niakuk Oil Lease – listed as BPX, ConocoPhillips, Chevron, Exxon, Forest Oil, and Forcenergy Inc.  Id. at 23.

Also in December 2005, the plaintiffs, the government, and BPX entered into a tolling agreement for the period between December 20, 2005 and June 30, 2006, inclusive. Second Am. Compl. ¶ 6.  Under the terms of the tolling agreement, the plaintiffs' claims dating back to December 20, 1999 were to be considered timely.  On the final day of that

period, June 30, 2006, the present suit was filed.  On September 25, 2006, BPX, Chevron,

ConocoPhillips, Exxon, and Forest Oil filed a motion to intervene as defendants, which

was granted on December 22, 2006.

The plaintiffs maintain that it was not until 2007 during discovery in the present

case that they learned of the production of Lisburne PA oil and gas through the facility on

the plaintiffs' allotment.  Second Am. Compl. ¶ 64; PLA 1 at 26.  Accordingly, on June 4,

2007, the plaintiffs demanded in a letter to the BIA that the government give notice and

take action regarding the alleged breaches of lease and trespasses arising from the

production of Lisburne PA oil and gas.  PLA 1 at 26; PPFUF ¶ B.4.b.

### F.      Proceedings to Date

As noted above, the plaintiffs allege that the government has breached its fiduciary

responsibility and trust obligation by failing to collect royalties (claim one) or, in the

alternative, a fair annual rental (claim two) from BPX, or in the alternative, by failing to

take action to halt the alleged breaches of lease by BPX and alleged trespasses by ARCO

and Exxon as requested by the plaintiffs in 2005 with regard to the West Niakuk PA and

2007 with regard to the Lisburne PA (claim three).

On May 14, 2007, the government filed a motion to dismiss, or, in the alternative,

for summary judgment, alleging that claims one and two should be dismissed for lack of

jurisdiction under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims

("RCFC"), because they are barred by the six-year statute of limitations set forth in 28

U.S.C. § 2501.  The government further argued that claims one, two, and three should be

dismissed under RCFC 12(b)(6) because they are not claims upon which relief may be granted, on the grounds that none of the claims are money-mandating.  On June 25, 2007, the intervenors filed a motion for partial summary judgment with regard to claim three, arguing that all of the activities complained of were within the scope of the activities permitted by the lease, and therefore no breach of lease or trespass occurred.

On January 3, 2008, the plaintiffs filed their own motion for partial summary judgment, seeking a determination that claims one, two, and three were timely filed within six years of accrual, and that money-mandating duties exist and were breached by the government for all three claims.  Briefing on the motions was completed on March 10, 2008, and oral argument was heard on August 13, 2008.

## II.   DISCUSSION

### A.   Standard of Review

In passing on a motion to dismiss, whether for lack of subject matter jurisdiction under RCFC 12(b)(1) or for failure to state a claim upon which relief may be granted under RCFC 12(b)(6), "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1965 (2007) (internal citations omitted); Holley v. United States, 124 F.3d 1462, 1465 (Fed. Cir. 1997). In considering a motion under RCFC 12(b)(6), "[t]he court must determine whether the claimant is entitled to offer evidence to support the claims, not whether the claimant will

ultimately prevail." Chapman Law Firm Co. v. Greenleaf Const. Co., 490 F.3d 934, 938 (Fed. Cir. 2007) (internal quotation omitted).

Under RCFC 56(c), by contrast, summary judgment is appropriate "if the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986). Summary judgment will not be granted if the "dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. Contract interpretation is a question of law that is generally resolvable by summary judgment. Varilease Tech. Group, Inc. v. United States, 289 F.3d 795, 798 (Fed. Cir. 2002). Where, however, the contract language is ambiguous, disputed issues of fact may arise as to the intent of the parties. Perry-McCall Constr., Inc. v. United States, 46 Fed. Cl. 664, 672 (2000).

The United States Court of Federal Claims is a court of limited jurisdiction, Jentoft v. United States, 450 F.3d 1342, 1349 (Fed. Cir. 2006), and under the Tucker Act, 28 U.S.C. § 1491 (2000), it may "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). However, under 28 U.S.C. § 2501, "[e]very claim of which the United States

Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."  "The six-year statute of limitations set forth in [28 U.S.C. §] 2501 is a jurisdictional requirement for a suit in the Court of Federal Claims."  John R. Sand & Gravel Co. v. United States, 457 F.3d 1345, 1354 (Fed. Cir. 2006), aff'd 128 S.Ct. 750 (2008).

Moreover, the Tucker Act simply confers jurisdiction on this court; a plaintiff must also identify a separate money-mandating statute upon which to base a claim for damages. In re United States, 463 F.3d 1328, 1333 (Fed. Cir. 2006) ("[A] Tucker Act plaintiff must assert a claim under a separate money-mandating constitutional provision, statute, or regulation, the violation of which supports a claim for damages against the United States." (citing Todd v. United States, 386 F.3d 1091, 1094 (Fed. Cir. 2004))).  "[A] statute creates a right capable of grounding a claim within the waiver of sovereign immunity if, but only if, it can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained."  United States v. White Mountain Apache Tribe, 537 U.S. 465, 472 (2003) (internal quotation omitted).

### B.      The ITAS Does Not Apply to Plaintiffs' Claims One and Two.

The plaintiffs have moved this court to find that their first claim, seeking compensation for the government's failure to collect proper royalties on the oil and gas produced through the facility on Heald Point, and their second claim, in the alternative, seeking compensation for the government's failure to collect "present fair annual rental" taking into account the use of the land for oil production facilities, are timely under the

-30-

six-year statute of limitations set forth in 28 U.S.C. § 2501 because, under the ITAS, those

claims did not accrue until the plaintiffs received responses to their requests for

accountings in 2003 and 2006.  Meanwhile, the government has moved to dismiss those

claims for lack of subject matter jurisdiction, arguing that because claims one and two

relate to mismanagement of trust <u>assets</u> – seeking damages for the government's alleged

failure to maximize the trust asset by providing royalties or higher rents – rather than trust

<u>funds</u>, as distinguished by the Federal Circuit in <u>Shoshone I</u>, 364 F.3d at 1350, the ITAS

does not apply.[46,47]  Instead, the government argues, claim one accrued in 1989, when the

lease was executed without any provision for royalties, and claim two accrued in 1993 or

1997 at the latest, when the rental adjustments complained of were made.  As discussed

below, the court agrees with the government that the plaintiffs' claims for failure to collect

royalties or proper rent do not fit within the ambit of the ITAS.

Claims by individual Indians or tribes for breach of trust are subject to the same

six-year statute of limitations under 28 U.S.C. § 2501 that applies to other litigation

against the United States under the Tucker Act.  <u>Hopland Band of Pomo Indians v. United</u>

<u>States</u>, 855 F.2d 1573, 1576 (Fed. Cir. 1988) ("[S]tatutes of limitations are to be applied

---

[46]<u>Shoshone I</u> discussed a 2003 version of the ITAS provision, called the "[DOI] and Related Agencies Appropriations Act," Pub. L. No. 108-7 (2003), which contained the same language as the ITAS provision at issue in this case.  <u>Shoshone I</u>, 364 F.3d at 1343.

[47]As noted <u>supra</u>, the government also contends that its responses in 2003 and 2006 to the plaintiffs' requests for accountings were not "accountings" under the meaning of the ITAS, and that therefore they have no effect on the running of the statute of limitations under 28 U.S.C. § 2501.  Because the court finds, as discussed <u>infra</u>, that the ITAS does not apply to the plaintiffs' claims, the court does not reach the question of whether the government's responses constituted "accountings."

against the claims of Indian tribes in the same manner as against any other litigant seeking

legal redress or relief from the government." (citing Capoeman v. United States, 440 F.2d

1002, 1007-08 (Ct. Cl. 1971) (applying the same rule to an individual Indian))).  28 U.S.C.

§ 2501 requires that claims be "filed within six years after such claim first accrues."

(emphasis added).  According to the Federal Circuit, "[a] cause of action for breach of

trust traditionally accrues when the trustee 'repudiates' the trust and the beneficiary has

knowledge of that repudiation."  Shoshone I, 364 F.3d at 1348 (citing Hopland Band, 855

F.2d at 1573).  However, as noted above, the ITAS provides:

> [N]otwithstanding any other provision of law, the statute of limitations shall not
> commence to run on any claim . . . concerning losses to or mismanagement of
> trust funds, until the affected tribe or individual Indian has been furnished with
> an accounting of such funds from which the beneficiary can determine whether
> there has been a loss[.]

119 Stat. at 519.  For "claims falling within [the] ambit" of the ITAS, therefore, the statute

of limitations does not begin to run – meaning the claims do not accrue – until the

plaintiffs receive a meaningful accounting.[48]  Shoshone I, 364 F.3d at 1347.

---

[48] As the Shoshone I court explained, "This is simple logic-how can a beneficiary be
aware of any claims unless and until an accounting has been rendered?"  346 F.3d at 1347.
Along those lines, the "meaningful accounting" standard has been found to require more than
simple notice, in that the information in the accounting must be sufficient to raise suspicion of
possible losses.  Chippewa Cree Tribe of the Rocky Boys Reservation v. United States, 69 Fed.
Cl. 639, 664 (2006).  Accordingly, the ITAS comports with the "lesser duty to discover
malfeasance" on the part of trust beneficiaries.  Shoshone I, 364 F.3d at 1347 ("Beneficiaries of
a trust are permitted to rely on the good faith and expertise of their trustees.").

As to what claims are within the ambit of the ITAS,[49] the Federal Circuit in

Shoshone I "limit[ed] the claims that may be brought to those relating to (1) the

Government's mismanagement of tribal trust funds after their collection and (2) losses to

the trust resulting from the Government's failure to timely collect amounts due and owing

to the Tribes under its . . . contracts."[50]   The Federal Circuit held that the ITAS "covers

claims concerning 'losses to . . . trust funds' rather than losses to mineral trust assets."

Shoshone I, 364 F.3d at 1350 (emphasis in original).  Based on the reference to "trust

funds" in the ITAS, therefore, the Federal Circuit determined that the ITAS covered some

but not all breach of trust claims relating to the loss or mismanagement of money on

behalf of tribes and individual Indians.  Specifically, the Federal Circuit declined to

include claims involving a failure to "obtain a maximum benefit from a mineral asset" but

found that the ITAS does cover "losses resulting from the Government's failure to timely

collect amounts due and owing to the Tribes under its . . . contracts."  Id. at 1350.

The Shoshone I court rejected the trial court's "overly expansive" view that

"'mismanagement of trust funds' plainly covers a breach of fiduciary duty in the

management of money already received in the trust" whereas "'losses to . . . trust funds' . .

. correspond[ed] to the Government's mismanagement of trust assets and the breach of its

---

[49]The plaintiffs argue that the "notwithstanding any other provision of law" phrase in the ITAS means that an objective accrual standard – "when was the accounting received?" – has replaced the previous, subjective standard of "what did the Indians know and when did they know it?"  It is not disputed that, if the ITAS applies, the accrual date is fixed as the date an accounting is received.  However, the "notwithstanding any other provision of law" phrase adds nothing to the key inquiry for claims one and two in this case: do the claims constitute "claim[s] . . . concerning losses to or mismanagement of trust funds" under the ITAS in the first place?

[50]The plaintiffs' claims in Shoshone I pertained to sand and gravel contracts.  Id. at 1341.

trust duty to 'make the trust property productive.'" Id. at 1348-49.  Accordingly, the

Federal Circuit rejected the trial court's view that the ITAS could be extended to "claims

that the Government did not receive the best possible price for the leases negotiated,"

reasoning that, "[w]hile it is true that a failure to obtain a maximum benefit from a mineral

asset is an example of an action that will result in a loss to the trust, the [ITAS'] language

does not on its face apply to claims involving trust assets." Id. at 1349-50 (emphasis in

original).

However, the Federal Circuit also rejected the government's "narrow reading" of

the ITAS, at the opposite extreme.  Id. at 1349.  The government had argued that "the

[ITAS] applies only to claims for the mismanagement or loss of tribal funds that were

actually collected and deposited into the tribal trusts by the Government," reasoning that

the phrase "mismanagement of trust funds" connoted "active misconduct relating to the

tribal funds," while the phrase "losses to . . . trust funds" connoted "'purely passive

behavior' resulting in a decrease in the trust funds." Id. at 1349.  In other words, "[u]nder

the Government's theory of liability, the [ITAS] would not apply to losses that the Tribes

alleged occurred because of the Government's failure to collect rents or to collect rents in

a timely manner or to timely deposit such rents into the tribal trust accounts." Id.  The

Federal Circuit found that such a "narrow reading" would render the term "losses to"

redundant, because "mismanagement of trust funds after their collection necessarily results

in a loss to such funds." Id. (emphasis added).

Instead, the <u>Shoshone I</u> court found that, "[i]n the context of the [ITAS], 'losses to . . . trust funds' may be understood to cover losses resulting from the Government's failure to timely collect amounts due and owing to the Tribes under its . . . contracts." <u>Id.</u> at 1350. Importantly, the <u>Shoshone I</u> court went on to explain what was meant by "failure to collect amounts due and owing . . . under its . . . contracts," concluding: "We therefore interpret the phrase 'losses to . . . trust funds' to mean losses resulting from the Government's failure or delay in (1) collecting payments under the . . . contracts, (2) depositing the collected monies into the Tribes' interest-bearing trust accounts, or (3) assessing penalties for late payment."[51] <u>Id.</u> at 1350-51.

Here, the plaintiffs argue that the determination of the amount required as a matter of law to be collected under the lease is part of the "collect[ion of] amounts due and owing" under the lease and is therefore a loss of trust funds covered by the ITAS.  In particular, with regard to claim one, the plaintiffs argue that, once the Oengas' allotment began being used for oil and gas production in 1993, the plaintiffs were entitled by law to collect a royalty, notwithstanding the lack of provision for royalties in the lease.  As a result, the plaintiffs argue, it is not the failure to include royalties in the original lease that they are challenging – the plaintiffs concede that would have been a trust asset management issue – but rather the later failure to collect the royalties required by regulation once the use changed from a pipeline to a production facility.  The plaintiffs

---

[51]The court noted that "[f]iduciary breaches such as" those listed result in the type of "losses to trust funds that are separate and distinct from the mismanagement of trust funds once collected." <u>Id.</u>

argue that, regardless of the lease terms, if the regulations require that a royalty be collected, that is an "amount due and owing" to the plaintiffs that is subject to the ITAS. Similarly, with regard to claim two, the plaintiffs argue that, once the use of the property changed, they were entitled by regulation to a "fair annual rental" that took into account the unique location and value of the allotment for oil production, and that as a result, the appraisals conducted under the lease were not appropriate.  The rental amounts required by regulation are "due and owing" to the plaintiffs, they argue, and therefore the government's failure to timely collect those amounts is covered by the ITAS.

The court is not persuaded by the plaintiffs' arguments.  In light of the guidance from the Federal Circuit in Shoshone I, laid out above, the plaintiffs' reliance on Shoshone I for the assertion that the ITAS applies to their royalty and rent claims as "failure[s] to collect amounts due and owing" is misplaced.  Id.  As an initial matter, the repeated references in Shoshone I to amounts due and owing "under [the] contracts," see, e.g., id. at 1342, 1350, 1351, 1355, suggest that, according to the Federal Circuit, the ITAS extends only to cases where money was lost to the trust fund by virtue of the government's failure to collect the amount stipulated in a given contract or lease, as opposed to its failure to include the legally-required terms in the contract or lease to begin with.  This reading is particularly prohibitive of the plaintiffs' claim one for royalties, which were not provided for in any version of the lease or its amendments, before or after the change in use to oil and gas production.

However, the plaintiffs have argued that the "under [the] contracts" language in Shoshone I nonetheless allows for claims alleging violations of the statutes and regulations governing collection under leases such as the one in this case, insisting that the ITAS contemplates such claims.  Accordingly, a deeper investigation must be made into the meaning of the phrase "collect[ing] amounts due and owing . . . under [the] contracts" to address this subtler argument by the plaintiffs.  Where, as here, the plaintiffs are not alleging that trust funds were mismanaged after collection, the Federal Circuit has indicated, as set forth above, that the ITAS is limited to claims of failure or delay in activities such as "(1) collecting payments under the . . . contracts, (2) depositing the collected monies into the Tribes' interest-bearing trust accounts, or (3) assessing penalties for late payment."  Shoshone I, 364 F.3d at 1350-51.  The plaintiffs here have not alleged failure or delay in depositing collected monies into their accounts or in assessing penalties for late payments.  However, those two examples are instructive in deciphering what is meant by the first, "collecting payments under the . . . contracts" example.  Failure and delay in "depositing" and "assessing penalties" on payments do not suggest claims relating to breach of a substantive trust obligation; rather, those examples suggest claims relating to errors in the transmission and calculation of funds.  Likewise, as a series, (1) collecting payments, (2) depositing the monies, and (3) assessing late penalties connote errors in acquiring, moving, and measuring amounts of money, prior to those amounts becoming part of the pool of money in the trust fund, not errors in determining what is required as a

matter of substantive Indian leasing law – errors of the latter type pertain instead to the management of the asset, the leased allotment.[52]

This reading of "collect[ion] of amounts due and owing . . . under [the] contracts" comports with the Federal Circuit's comments in Shoshone I regarding the policy benefits of the distinction between trust funds and trust assets.  To wit:

> As part of its duties, a trustee must keep clear and accurate accounts, showing what he has received, what he has expended, what gains have accrued, and what losses have resulted.  An accounting alone will not reveal the mismanagement of tribal assets . . . .  In contrast, the comparison of pertinent . . . contracts with the results of an accounting will reveal what income was required to be received by the Government but was either not received or was received late.

Shoshone I, 364 F.3d at 1351 (emphasis added) (internal citations omitted).  Thus, as emphasized previously, the Federal Circuit has signaled that, for trust fund issues, the contract itself is the relevant source of information regarding what was required of the government.  Moreover, losses to trust funds, as opposed to trust assets, are losses that are detectable by comparing the contract to the accounting.  In this case, a comparison of the lease with the results of an accounting would not reveal what income was (allegedly) required to be received, and therefore claims one and two raise trust asset issues, not trust fund issues covered by the ITAS.

A closer look at the plaintiffs' specific claims further illustrates this contrast.  For example, in the case of claim one for royalties, what is required of the government would be revealed not by comparing the lease to the accounting, which would yield equivalent

---

[52]To hold otherwise would open the ITAS to delaying the accrual of any and all money-mandating claims that an Indian leasing requirement was violated.

results, but by comparing the lease or its amendments, which contained no provisions for such royalties, with the underlined applicable statutes and regulations, to determine whether such royalties were required under the law. The plaintiffs have not set forth any reason why they could not have undertaken such a comparison of the lease documents with the applicable laws during the six years after those documents were executed with provisions for oil production but not for royalties, or, at the latest, after the property began to be used for such production.

Likewise, in the case of claim two for a "fair annual rental" accounting for the value of the lease for oil production, a comparison of the lease with the results of an accounting would not reveal whether a larger annual rental was required by law. The lease itself stated that rental adjustments would be "based upon . . . the fair market undeveloped rental value," "based on the . . . use of the premises as raw, unimproved vacant land," and "not . . . based on the cost or value of improvements or developments made by the Lessee or any income the Lessee derive[d] from the leased premises." DA 13 ¶¶ 5, 9. The appraised market values reflected in the "accountings" did just that. Thus, only a comparison of the lease with the applicable laws would reveal whether a "fair annual rental" taking into account the value of the land for oil production was required. Again, the plaintiffs have not set forth any reason why such a comparison of the lease and the applicable laws could not have been made within the six years after the use of the land changed with no corresponding change in the lease terms.[53]

---

[53]Indeed, this reading is also consistent with the legislative history of the ITAS. In the House Report accompanying the 1993 renewal of the appropriations bill in which the provision

Thus, the plaintiffs' attempt to characterize their first and second claims as challenging something other than statutory and regulatory violations arising from the terms of the lease and its amendments fails, and the accrual of the plaintiffs' claims one and two may not be delayed until the receipt of accountings under the ITAS.[54,55]

---

is located, the committee noted that it intended to "extend[] the Statute of Limitations with relation to Indian trust fund management, to protect the rights of tribes and individuals until the reconciliation and audit of their accounts has been completed." H.R. Rep. No. 103-158, at 57 (1993) (emphasis added). In other words, the ITAS was intended to provide an opportunity to reconcile the Indians' accounts, balancing the books by comparing what was owed under the arrangement entered into with what was received, as evidenced by the accounting.

By the same token, the numerous and fact-intensive Cobell cases which prompted the passage of the ITAS involved "mismanagement of Individual Indian Money (IIM) trust accounts." See, e.g., Cobell v. Babbitt, 30 F.Supp.2d 24, 27-28 (D.D.C. 1998) (Under the IIM trust account system, "the United States acts as trustee of accounts that hold money on behalf of individual Indian beneficiaries."). The Cobell claims, like the ITAS, were concerned with the management of the trust funds, rather than with whether the government complied with the applicable laws in setting up the fund-generating arrangements in the first instance.

[54]As noted supra, the dispute over the correct payment of rent in 1998 does fit within the ambit of the ITAS, as the amount was owed to the plaintiffs under the lease. In fact, the alleged failure to collect the $8,357.34 calculated under the lease to be owed to the plaintiffs in 1998 is a perfect illustration of the kind of claim of "failure to timely collect amounts due and owing . . . under [the] contracts" considered to be a claim involving trust funds under Shoshone I. 364 F.3d at 1350. For example, a comparison of the lease documents with an accounting would reveal the discrepancy over that amount. As such, as noted supra, the claim may be timely, depending on when the proper accounting (causing the statute of limitations to begin running on that claim under the ITAS) was received.

[55]The plaintiffs support their reading of Shoshone I by relying on the decisions of several members of this court who have interpreted the ITAS to include: plaintiffs who were owed royalties under other leases, Osage Tribe of Indians of Oklahoma, 68 Fed. Cl. 322 (2005), plaintiffs who had been awarded judgment funds by the Indian Claims Commission but were not paid, Chippewa Cree Tribe, 69 Fed. Cl. at 639, and plaintiffs who were owed royalties under existing leases, Shoshone Indian Tribe of the Wind River Reservation v. United States ("Shoshone II"), 71 Fed. Cl. 172 (2006). Those cases involved challenges to what was owed under the terms of a lease or judgment, rather than what should have been included in the lease or judgment in the first instance, and as such they are distinguishable from the plaintiffs' claims one and two.

The plaintiffs also list Simmons v. United States, 71 Fed. Cl. 188, 193 (2006), a case in which the ITAS was found to be inapplicable to a damage claim for mismanagement of timber assets on a reservation allotment, without explaining why that case should be distinguished from

### C.      The Plaintiffs' Claims One and Two Are Barred by 28 U.S.C. § 2501.

Having determined, as discussed above, that the ITAS does not apply to delay the accrual of the plaintiffs' claim one for failure to collect royalties and claim two for failure to collect "present fair annual rental," the court now turns to the timeliness of these claims under 28 U.S.C. § 2501 based on traditional rules of accrual.[56]  The plaintiffs argue that, even without the ITAS, their claims for improper payments in 2000 and 2001,[57] at least, were timely filed because as claims for improper collection of funds, they accrued at the time of collection, and therefore a new claim accrued each year payment was due. Moreover, the plaintiffs assert that the royalties required under claim one involve consideration of the year's volume, rate, and formula, so a new claim accrues each year the royalties are not properly collected.  Likewise, the plaintiffs argue that the "present fair annual rental" required in claim two contemplates by its terms a present and annual duty to collect a fair rental, so the claim accrues each year.  While they acknowledge that the

their own.  In fact, Simmons, in which the plaintiff demanded compensation for timber allegedly improperly harvested from his land, is strongly analogous to the present case, and the court in that case dismissed the claim on Shoshone I grounds.  Simmons, 71 Fed. Cl. at 193.

[56]As noted supra, a tolling agreement between the plaintiffs, the defendant, and BPX provided that the statute of limitations would not run between December 20, 2005 and June 30, 2006.  The complaint in this court was filed on June 30, 2006.  Thus, the parties do not dispute that any claims accruing after December 20, 1999 (six years prior to December 20, 2005) may be considered timely under 28 U.S.C. § 2501.  The court notes, however, that the Supreme Court's recent holding in John R. Sand & Gravel Co. v. United States that "a court a court must raise on its own the timeliness of a lawsuit filed in the Court of Federal Claims, despite the Government's waiver of the issue," 128 S.Ct. 750, 752 (2008) (emphasis added), calls the validity of such tolling agreements into question.  Because the analyses of the timeliness of the plaintiffs' claims are not affected by the six-month window of time subject to the tolling agreement, the court does not reach the question of the validity of the tolling agreement at this time.

[57]As noted supra, the plaintiffs' claims stemming from the rental adjustment done in 2001 (and applied to the years 2002-2005) are pending before the DOI Board of Indian Appeals.

rental amount for 2000 and 2001 was set most recently by the 1997 appraisal and rental adjustment, the plaintiffs argue that the government had an obligation to comply with the regulations each year when it collected payment, regardless of the lease terms.

The government responds that even the 2000 and 2001 claims are time-barred because they accrued when the plaintiffs were chargeable with knowledge of what payments they would receive and how they would be calculated.  Specifically, the government contends that claim one accrued in 1989, when the lease was executed without any royalty provision.  In the alternative, the government contends that, at the latest, claim one accrued in 1993, when the first rental adjustment occurred, since the method of determining the compensation should have been clear to the Oenga heirs at that point, or in 1994, when the lessee began to use the property for oil and gas production but still no royalties were received.  By that time, the government argues, the plaintiffs had enough information to bring their claim against the government for the failure to collect royalties. Similarly, the government argues that the alleged failures to collect payments based on a "fair annual rental" in claim two accrued in 1993 and 1997, when the appraisals and rental adjustments occurred, setting the rent for the subsequent periods, with no changes in payment allowed under the lease until the next adjustment.  The government claims that, while the plaintiffs may not all have had copies of the appraisals, the plaintiffs had contemporaneous knowledge of the conclusions therein, and they participated in extensive lease negotiations during that time, giving them sufficient knowledge of the return they

were receiving to bring claim two within six years of the allegedly improper rental adjustments.

As noted above, "[a] cause of action for breach of trust traditionally accrues when the trustee 'repudiates' the trust and the beneficiary has knowledge of that repudiation." Shoshone I, 364 F.3d at 1348.  Thus, the accrual standard for breach of trust has two components: (1) when was the trust repudiated, and (2) when did the beneficiary "learn[] that the trustee . . . failed to fulfill his responsibilities." Id.  As to the first component, "[a] trustee may repudiate the trust by express words or by taking actions inconsistent with his responsibilities as trustee." Id.  In this case, the plaintiffs allege that the government's repudiation occurred each year, including 2000 and 2001, at the time of the annual collection of the rent by the government, while the government contends the alleged repudiation occurred, at the latest, at the time the government calculated the rental adjustments to be collected – no later than 1997.

The court agrees with the government that even the portions of the plaintiffs' claims one and two pertaining to 2000 and 2001 are time-barred under 28 U.S.C. § 2501.  The actions of the government that the plaintiffs allege in claims one and two were inconsistent with its responsibilities as trustee were set in motion by the execution of the lease, approved by the BIA, with no provision for royalties (despite listing oil production as an allowable use of the site) and provisions for annual rental rates that were not to be "based on the cost or value of the improvements or developments made by [BPX] or any income [BPX] derive[d] from the leased premises." See DA 13 ¶ 9.  The alleged failures

to fulfill the responsibilities to collect royalties and "fair annual rental" were then cemented by the perpetuation of those lease terms in each subsequent amendment of the lease, and by each of the government's rental adjustments according to those terms, all of which failed to add a royalty provision or change the way the annual rent was calculated even after the site began to be used for oil production in 1994.[58]   Accordingly, the government's alleged failure to fulfill its responsibilities – its "repudiation" of the trust – occurred no later than 1997, the last time that, despite oil being produced from the allotment, the government's calculation of the rent owed to the plaintiffs still did not reflect that use.[59]   See Shoshone I, 364 F.3d at 1348.   Moreover, since the plaintiffs knew of this alleged repudiation no later than October 1997, when they were informed by letter

---

[58]In fact, the 1994 amendments specifically provided that "Lessors shall make no additional claims, requests or demands of Lessee for Lease rental payments, rental payment adjustments or rental payment advances except as set forth in [the Lease Rental Adjustment provision]." DA 35.

[59]The plaintiffs' emphasis on the government's duties regarding "collection" of such rental is misplaced.  With regard to claim two, the court notes that the regulations pertaining to "fair annual rental" which the plaintiffs complain were violated refer to the government's duties in "negotiating," "approving," or "granting" leases.  See, e.g., 25 C.F.R. § 162.604 ("Except as otherwise provided in this part no lease shall be approved or granted at less than the present fair annual rental." (emphasis added)); 25 C.F.R. § 167.605 (discussing lease negotiation); see also 25 C.F.R. § 167.107.  Similarly, with regard to claim one, the regulations setting forth the government's duties with regard to royalties refer to lease approval as well.  See, e.g., 25 C.F.R. § 212.41 ("The Secretary shall not approve leases with a royalty rate less than 16 2/3 percent[.]" (emphasis added)).

   Accordingly, the court focuses on the government's actions related to approval and granting of the lease and its amendments as the relevant duties for "repudiation" purposes.  The court need not decide whether the rental adjustments should be included in these "lease approval and granting" duties, however, as the last such adjustment occurred in 1997 and any claim arising from it is therefore time-barred in any event.

of the 1997 appraisal and rental adjustment,[60] DA 44, claims one and two accrued no later than that date.

Nor can the plaintiffs' argument that the government had a duty to correct its course every year that it collected payments be characterized as a "continuing duty" claim.  In continuing duty cases, "any ongoing breach of the continuing duty [creates] a series of individual actionable wrongs."  Mitchell v. United States, 10 Cl. Ct. 787, 788-89 (Cl. Ct. 1986).  Where such a duty exists, those individual wrongdoings "which arose within the six-year limitations period may be sued upon."  Id.  This approach has been applied in certain pay cases, on the grounds that each failure to pay the proper amount gave rise to a new claim.  See, e.g., Friedman v. United States, 310 F.2d 381, 384-85 (Ct. Cl. 1962).

The Federal Circuit has held that, "[i]n order for the continuing claim doctrine to apply, the plaintiff's claim must be inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated

---

[60]The plaintiffs assert that they were not given copies of the actual 1993 and 1997 appraisals in this case until they received the "accounting responses" in 2003 and 2007.  See, e.g., PLA 1 ¶ 7.  However, the plaintiffs have not set forth any evidence that documents pertaining to the lease, including the appraisals, were withheld or otherwise not available to them upon request.  Cf., e.g., DA 46 (Ms. Dickinson's declaration stating "If [the heirs] had asked, the copies [of the appraisals] would have been provided.").  Accordingly, the court finds that it is sufficient for purposes of knowledge of repudiation that they were made aware of the existence and contents of such documents at the time.  See, e.g., DA 23 (July 30, 1993 letter to Leroy Oenga from ASNA informing him that the 1993 appraisal had occurred and that "[a]s you know, BP[X] will be constructing a pad at the point."); DA 33 (counseling records signed by each heir in January 1994, indicating that they understood that they would "not receive any changes in payment because BP[X] has the full right to develop the property and enter into any agreements with ARCO."); DA 42 ("Stipulation of Lease History" signed by the parties to the May 1995 amendments, indicating the change to building a production pad on the allotment in 1993); DA 44 (October 8, 1997 letter to Leroy Oenga from Ms. Dickinson indicating that the 1997 appraisal had occurred and that the CPI adjustment would be used instead, as it was greater).

damages." <u>Brown Park Estates-Fairfield Dev. Co. v. United States</u>, 127 F.3d 1449, 1458 (Fed. Cir. 1997).  In <u>Brown Park</u>, the plaintiffs alleged that the Department of Housing and Urban Development ("HUD") had failed to properly set the maximum rent for low-income housing based on the fair market value of the rental property for the local area, because required rental adjustments were not made during a period outside the six year statute of limitations, and "on account of HUD's breaches outside the period of the statute of limitations, HUD started from the wrong base when making rent adjustments during the six years prior to the filing of suit."  <u>Id.</u> at 1457-58.  "Thus, the alleged improper base for these latter years relates directly to, and is completely dependent on, whether HUD failed to make rent adjustments in earlier years . . . ."  <u>Id.</u> at 1458.

In response to the government's statute of limitations defense, the plaintiffs in <u>Brown Park</u> argued that theirs was a continuing claim.  <u>Id.</u> at 1454.  However, the Federal Circuit held that the claims accrued at the time of the earlier failure to make proper rent adjustments, at which time the statute of limitations began to run.  <u>Id.</u> at 1455.  The <u>Brown Park</u> court held that "a claim based upon a single distinct event, which may have continued ill effects later on, is not a continuing claim."  <u>Id.</u> at 1456; <u>see also</u> <u>Boling v. United States</u>, 220 F.3d 1365, 1373 (Fed. Cir. 2000) ("The continuing claims doctrine . . . does not apply in cases where a single governmental action causes a series of deleterious effects, even though those effects may extend long after the initial governmental breach.").

Here, the plaintiffs' claims one and two are barred because the lease amendments in 1994 and 1995 and the rental adjustments in 1993 and 1997 were each distinct events that

allegedly caused continuing ill effects to the plaintiffs in the intervening years.  The lease amendments in 1994 and 1995 set off a "series of deleterious effects" allegedly suffered by the plaintiffs, but once each amendment was in place, the payments in later years did not give rise to independent damages – the damages were directly tied to the terms of the earlier lease amendment.  See Boling, 220 F.3d at 1373.  Likewise, the harm incurred in the years between rental adjustments (in 1998, 1999, 2000, and 2001, for example), was directly tied to the preceding adjustment in which the allegedly incorrect rates were set; the rent collections in each of those intervening years did not have "its own associated damages."  See Brown Park, 127 F.3d at 1458.  Thus, when the BIA allegedly failed to collect the proper royalties or rent in 2000 and 2001, it was adhering to the terms to which it had bound itself in the formation of the lease, the subsequent amendments, and the rental adjustments under the lease, and it was not committing any new, independent wrongs.[61] Accordingly, the 2000 and 2001 claims are barred because they arose, at the latest, from the 1997 rental adjustment, which occurred outside the limitations period.[62]

---

[61]This is consistent with the characterization of the claims for failure to collect proper rents and royalties as mismanagement of the trust assets, since such mismanagement could occur only as a single event at the setting of the rent, after which the BIA lacked the power under the terms of the lease to unilaterally alter the contract, in contrast to mismanagement of trust funds, which could occur as a series of individual accounting-type errors, each giving rise to new harm.

[62]Because claim two is entirely time-barred, the court does not reach the question of whether the plaintiffs have alleged a money-mandating duty in claim two.

**D.    Production from the Lisburne PA Was Outside the Scope of the Lease, and the Plaintiffs Have Established a Money-Mandating Claim of Breach of Trust for the Activities There; However, Disputed Issues of Material Fact Preclude Summary Judgment as to Whether Production from the West Niakuk PA Was Within the Scope of the Lease.**

In their third claim, the plaintiffs allege that the government breached its fiduciary obligation and trust responsibility by failing to take appropriate actions against the alleged breaches of the lease and trespasses caused by the production of oil and gas from locations other than the Niakuk area through the plaintiffs' allotment – specifically the Lisburne and West Niakuk PAs.[63]  In particular, the plaintiffs argue that the scope of the lease did not encompass oil and gas development and production from areas outside Niakuk, pointing to

---

[63]As noted <u>supra</u>, the government and the intervenors have not raised a statute of limitations defense to claim three.  However, the plaintiffs have moved for summary judgment with regard to the timeliness of claim three, arguing that it accrued when the government failed to take action as requested via demand letters by the plaintiffs – in 2005 with regard to West Niakuk and the use of the allotment by ARCO and Exxon, and in 2007 with regard to Lisburne. Pls.' Mot. at 17-18.  Alternatively, the plaintiffs point to the dates when they <u>learned</u> of the production of oil from West Niakuk and Lisburne through the facility on their allotment – in 2003 for West Niakuk (via a requested accounting), and in 2007 with regard to Lisburne (via discovery in the present litigation) – as accrual dates.  <u>Id.</u>

Though neither the government nor the intervenors has challenged the timeliness of claim three, the court has an independent duty to determine whether the claim falls within the six-year statute of limitations set forth in 28 U.S.C. § 2501.  <u>John R. Sand & Gravel</u>, 128 S.Ct. at 752 ("[A] court must raise on its own the timeliness of a lawsuit filed [under 28 U.S.C. § 2501] in the Court of Federal Claims, despite the Government's waiver of the issue.").

As discussed <u>supra</u>, a breach of trust claim traditionally accrues "when the trustee 'repudiates' the trust and the beneficiary has knowledge of that repudiation."  <u>Shoshone I</u>, 364 F.3d at 1348.  In this case, it is undisputed that the plaintiffs did not have knowledge of the development and production from West Niakuk and Lisburne until 2003 and 2007, respectively. Moreover, it is undisputed that the government failed to take action in response to the plaintiffs' demands with regard to West Niakuk and Lisburne in 2005 and 2007, respectively.  Thus, under either set of possible accrual dates, claim three was brought within six years of accrual and is therefore timely under 28 U.S.C. § 2501.  The plaintiffs' motion for partial summary judgment with regard to the timeliness of claim three is **GRANTED**.

the repeated references to the "Niakuk Project" in the original lease,[64] and the absence of

references to other areas, as evidence that the intention of the parties at the time the lease

was executed was that oil would be produced from Niakuk only.

Under this reading of the lease, the plaintiffs argue that BPX breached the lease

when it allowed the production of oil and gas from the Lisburne and West Niakuk PAs

through its facilities on the plaintiffs' allotment, first by way of the facility sharing

agreement with ARCO and Exxon, and later by producing the oil and gas from those areas

itself.  In addition, the plaintiffs argue that ARCO and Exxon trespassed on the plaintiffs'

allotment when they used BPX's facilities to produce oil and gas from Lisburne and West

Niakuk.[65]  In this action, the plaintiffs claim that the United States had a money-mandating

---

[64] For example, the plaintiffs quote the language of ¶ 1 of the lease, to the effect that:

> [t]he first ten years of the lease shall constitute a period within which
> the Lessee shall attempt to obtain required permits for the <u>Niakuk
> Project</u>. . . . [D]uring the initial ten (10) year period, Lessee must
> notify the Lessor and the Superintendent [of the BIA] of the status of
> the permitting process and/or of the <u>Niakuk Project</u>. . . . Such notice
> is required within ninety (90) days of the date that the <u>Niakuk Project</u>
> is either fully permitted or the project is cancelled or delayed. . . . If
> Lessee serves written notice that it intends to procede [sic] with the
> <u>Niakuk Project</u>, then this lease will be deemed to have been taken for
> consecutive five (5) year periods . . . .

DA 13 ¶ 1 (emphasis added).  As a further example, the plaintiffs point to the two maps attached
to the lease as Exhibit A, entitled "<u>Niakuk Project</u> Location Map" and "<u>Niakuk</u> Onshore Access
Road and Pipelines."  <u>Id.</u> at Ex. A (emphasis added).  As described in detail <u>supra</u>, these maps
depict a causeway extending offshore to a "Proposed <u>Niakuk</u> Production Island Addition."  <u>Id.</u>
(emphasis added).

[65]The plaintiffs also argue that the facility sharing agreement between BPX and ARCO
and Exxon was an "assignment," and that notice of and consent to the arrangement were
therefore required, under both the 1994 amendments to the lease, which required notice to the
Oenga heirs and ASNA "if the leased premises are subleased" but excluded "facility sharing
agreements or other transactions which do not convey an interest in real property," DA 35 ¶ 13,

duty to take action against these breaches of the lease and trespasses at the request of the

Oenga heirs in 2005 (with regard to West Niakuk) and 2007 (with regard to Lisburne) –

especially given the provision in the 1995 lease amendments designating the BIA as the

sole contact with BPX – and that the government breached that duty.

_____

and the regulations governing leases of allotted lands, particularly 25 C.F.R. § 162.610, which states that "a sublease, assignment, amendment or encumbrance of any lease or permit issued under this part may be made only with the approval of the Secretary and the written consent of all parties to such lease or permit," except that, "[w]ith the consent of the Secretary, the lease may contain a provision authorizing the lessee to sublease the premises, in whole or in part, without further approval."  25 C.F.R. § 162.610(a)-(b) (2001).  The plaintiffs define "assignment" as "the transfer of rights or property."  Black's Law Dictionary (8th ed. 2004); see also id. (defining "partial assignment" as "[t]he immediate transfer of part but not all of the assignor's right.").

The intervenors respond that, though an assignment would have required notice and consent under the lease and the regulations cited by the plaintiffs, the facility sharing agreement in this case is not an assignment.  The intervenors define "assignment" as a transfer of possessory rights, under which the "entire interest" in leased premises is transferred with no reversionary interest, as opposed to a "sublease," which involves transfer of all or a portion of the leased premises for "less than the balance of the term."  Intervenors' Reply at 28 (citing Restatement (Second) of Property § 15.1 cmt. i (1977); see also Rest. (2d) of Prop. § 15.1 cmt. i (defining a "partial assignment" as transfer of an undivided share or specific portion of the leased property "for the balance of the term of the lease" (emphasis added))).

The court agrees with the government that the facility sharing agreement in this case was not an assignment.  The agreement allowed ARCO and Exxon to use a drilling and manifold slot at the Heald Point drillsite to test the prospectivity of their leases.  IE J.  It did not convey all or part of BPX's interest in the leased premises for the balance of the lease term.  In fact, the interest conveyed by the agreement was recouped by BPX before the end of the lease when, in 2000, BPX took over ARCO and Exxon's leases and BPX itself began producing the oil therefrom through Heald Point.  The court notes that the definition of assignment in Black's Law Dictionary, cited by plaintiffs, goes on to state that "assignment of lease" means "[a]n assignment in which a lessee transfers the entire unexpired remainder of the lease term, as distinguished from a sublease transferring only a portion of the remaining term." (emphasis added).  This comports with the Restatement (Second) of Property definitions, cited by the intervenors, as noted supra.

The 1994 amendments specifically excluded facility sharing agreements from the notice requirement for subleases, in accordance with the allowance in 25 C.F.R. § 162.610(b) for Secretary-approved lease provisions authorizing subleases without consent.  Thus, the court finds that the entry into the facility sharing arrangement without notice and consent was permissible as a matter of law.  However, to the extent that the facility sharing agreement allowed for activities outside the scope of the lease, the plaintiffs' claims are still viable, as discussed infra.

In response, the defendant and intervenors argue that the terms of the lease were sufficiently broad to include the development and production of oil and gas without regard to where such oil and gas was located, as the lease did not place geographical or geological restrictions on the use of the leased premises.  They point to the language of ¶ 10 of the lease, which states, as noted above, that "[t]he Lessee may use the leased premises for any and all oil field exploration, development, construction, facilities, production and support purposes and for any other uses and purposes reasonably or conveniently related thereto."  DA 13 ¶ 10.  The intervenors claim that, notwithstanding the references to the "Niakuk Project" in the lease, no effort was made to define the geographic boundaries of the oil exploration and production because at the time the lease was entered into, the location of the oil and gas was not yet completely understood, and that in fact, the "Niakuk PA" as such was not formed until March 2, 1994, more than five years after the lease was executed.[66]  The intervenors contend that the references to the "Niakuk Project" in the lease pertain only to the initial, ten-year phase of the lease, limiting only "the extent to which BPX could continue to hold the [Oenga lease] as a year-to-year tenancy instead of a long term tenancy."  Intervenors' Mot. at 21 (emphasis in original).

Thus, the central question in claim three is one of lease interpretation, particularly interpreting the meaning of the "Niakuk Project."  It is well-established that "[c]ontract interpretation begins with the language of the written agreement."  NVT Techs., Inc. v.

---

[66]Likewise, the West Niakuk PA was not formed until November 17, 1997.

United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (citing Foley Co. v. United States, 11 F.3d 1032, 1034 (Fed. Cir. 1993)).  "When interpreting the contract, the document must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts." Id. (citing McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1434-35 (Fed. Cir. 1996)).  Meaning should be given to all parts of the contract to avoid "leav[ing] a portion of the contract useless, inexplicable, void, or superfluous." Id. (citing Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991).  The court must determine the correct interpretation of the lease provisions "consistent with the parties' intent at the time of [lease] execution." Cities of Burbank, Glendale, and Pasadena v. Bodman, 464 F.3d 1280, 1284 (Fed. Cir. 2006) (citing Winstar Corp. v. United States, 64 F.3d 1531, 1540 (Fed. Cir. 1995)).  In addition, when interpreting a contract, "the language of [the] contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances." Teg-Paradigm Environmental, Inc. v. United States, 465 F.3d 1329, 1338 (Fed. Cir. 2006) (internal quotation omitted).

### 1.    The Lease Did Not Encompass the Lisburne PA.

The court agrees with the plaintiffs that, tested by the above standards of contract interpretation, the scope of the lease, while broad, did not encompass oil and gas development and production from the Lisburne PA, which had been formed in December 1986, more than two years before the signing of the January 1989 lease.  Though the term "Niakuk Project" is not defined in either the lease or the later amendments, the repeated

references to it may not be read out of the lease.  See NVT Techs., 370 F.3d at 1159 (A

contract interpretation should not "leave[] a portion of the contract useless, inexplicable,

void, or superfluous.").  In this case, given that the exact boundaries of the Niakuk area

were not known at the time the lease was executed, the term "Niakuk Project" is more

readily defined in terms of what it did not include.  As evidenced by the Alaska DNR

decisions discussing and delineating the various areas within the PBU, see, e.g., IE O

(approving formation of the Lisburne PA on December 4, 1986); IE HH (certifying a

Niakuk discovery well on September 2, 1988), a "reasonably intelligent person acquainted

with the contemporaneous circumstances," Teg-Paradigm, 465 F.3d at 1338, would not

consider those areas to be entirely amorphous or interchangeable, as the intervenors have

implied.  Specifically, though the boundaries of the Niakuk area were not set at the time

the lease was executed, it was clearly separate from the Lisburne PA.  See, e.g., IE HH

(September 2, 1988 Alaska DNR decision distinguishing those portions of lease number

34635 within the Lisburne PA from those portions within the "discovered separate

geologic structure" called the "Niakuk hydrocarbon structure" or "Niakuk structure").

Given the fact that the Lisburne PA was a defined area prior to the execution of the

lease, the lack of any reference to that area in the lease (despite the repeated references to

Niakuk) indicates that the lease was not intended to encompass activities in the Lisburne

PA.[67]  Stretching the term "Niakuk Project" to include development and production from a

---

[67]Though the phrase "Niakuk Project" appears only in the lease term describing the first
phase of the lease, BPX's "written notice that it intends to procede [sic] with the Niakuk Project"
is the mechanism which automatically triggered the onset of the second phase of the lease, and
as such the references to the Niakuk Project must be considered to have bearing on the scope of

distinct, pre-existing participating area with a pre-existing leasing structure is not a reasonable reading of the lease language in light of the contemporaneous circumstances. The defendant and intervenors have not put forth any reason why, if activities within the previously defined Lisburne PA were intended to be included within the scope of the Oenga lease, that area was nonetheless never mentioned in the lease, the subsequent amendments, or indeed in any communications with the plaintiffs until after the filing of this lawsuit, though Niakuk was mentioned repeatedly.  Accordingly, the court finds that the scope of the lease did not include the activities in the Lisburne PA.[68,69]

_____

both the first and the second phases.  See DA 13 ¶ 1; see also Tr. of Oral Arg. 117:23-25 (Counsel for the intervenors indicated that "[i]f the time had passed ten years and BP[X] had not delivered the notice, the lease would have expired."); NVT Techs., 370 F.3d at 1159 ("When interpreting the contract, the document must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts.").

[68]This reading of the lease is consistent with BPX's July 29, 1993 letter giving notice to the BIA of its intent to proceed with the "Niakuk Development Project," which stated that "[t]he [1989] Lease provided authorization for BP[X] to construct production facilities to support development of, and production from, our Niakuk oil accumulation."  DA 20 (emphasis added). This confirms that the Niakuk Project was understood to be tied to a particular oil accumulation, the boundaries of which may not have been completely known, but which certainly did not refer to the unmentioned Lisburne accumulation, already encompassed at that time by the Lisburne PA.  Cf. Intervenors' Mot. at 23 ("The Lisburne accumulation, the Niakuk accumulation, and the Raven accumulation all were known to exist prior to the execution of the Oenga Lease effective January 1, 1989 . . . ."); see also Teg-Paradigm, 465 F.3d at 1338 ("Although extrinsic evidence may not be used to interpret an unambiguous contract provision, we have looked to it to confirm that the parties intended for the term to have its plain and ordinary meaning." (citing Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed. Cir. 2003))).

The plaintiffs maintain that the July 29, 1993 letter should be considered the first lease amendment, and that no notice of the amendment was given to the plaintiffs prior to the signing of the July 29, 1993 letter by the BIA on August 3, 1993.  See, e.g., PPFUF ¶¶ A.5.b-c; PLA 1. The intervenors counter that the letter was not an amendment and merely provided notice to the BIA of (1) the shift to the second phase of the lease and (2) the exercise of BPX's option to increase the size of the leased premises.  See, e.g., Intervenors' Mot. at 20.

As described supra, BPX's July 29, 1993 letter was characterized by its own terms as a "Lease Amendment" and was formally approved as such by the BIA.  DA 20.  However, the letter had two titles, "Notification of Niakuk Project Commencement" and "Request to Amend

**2.      Disputed Issues of Fact Preclude Summary Judgment as to the
Activities in the West Niakuk PA.**

In contrast to the Lisburne PA, the court finds that disputed issues of fact remain as

to whether the scope of the lease and the "Niakuk Project" were intended to extend to the

oil and gas development and production from the West Niakuk PA through the plaintiffs'

allotment.  As noted above, the West Niakuk PA was not formed until November 17,

1997, and has since been melded together with the former expanded Niakuk PA to form

---

Surface Lease F89-01," and the request to amend pertained to the increase of the leased premises
(for which BIA approval was not actually required under the lease, DA 13 ¶ 11).  DA 20; see
also Tr. of Oral Arg. 110:19-20 (counsel for intervenors noted that "the letter . . . shouldn't have
been filed as an amendment").

     For purposes of claims one and two, the court need not decide whether the July 29, 1993
letter was a formal amendment, as those claims are time-barred in any event, as discussed supra.
For purposes of the Lisburne area portion of claim three, the court need not decide whether the
letter was an amendment, as the court finds that the lease did not contemplate development and
production from the Lisburne area, and the reference in the July 29, 1993 letter to the "Niakuk
oil accumulation" only serves to confirm that understanding, as discussed above.  To the extent
that the nature of the July 29, 1993 letter is relevant to the West Niakuk area portion of claim
three, the court defers ruling on the question until the factual issues surrounding that claim have
been further developed.

     With regard to the plaintiffs' charge that they did not receive proper notice of the changes
mentioned in the July 29, 1993 letter, the court finds that such a claim is not timely.  The record
contains a letter from Ms. Stevens of ASNA to Leroy Oenga, dated July 30, 1993, describing
BPX's planned expansion to twenty acres and the corresponding increase in rental payment, and
stating that "[a]s you know, BP[X] will be constructing a pad at the point."  DA 23.  In addition,
the Oenga heirs each signed a counseling record in January 1994, stating, "I understand that the
original lease is still in effect except for those parts changed by the amendment signed in August
by BIA and [the 1994] amendments."  DA 33 (emphasis added).  Accordingly, any claim that
notice of these changes was not properly given to the plaintiffs prior to the BIA's August 3, 1993
approval accrued when they became aware of that approval, no later than the signing of the
counseling records in January 1994, and well over six years before the plaintiffs brought their
claims in this court.  See 28 U.S.C. § 2501.

[69]The court notes that inclusion of activities in the Lisburne PA within the scope of the
original lease would have increased the value of the leased premises to BPX and consequently
the rent bargained for by the heirs.  Similarly, if the plaintiffs had been apprised of the later
addition of oil and gas development and production from the Lisburne PA, they would have been
in a position to renegotiate the lease to increase the rent accordingly.

the "Combined Niakuk PA."  It is not clear from the record what was known about the West Niakuk area at the time the lease was executed nor when the amendments were signed.  In order to interpret the lease term "Niakuk Project" in relation to the West Niakuk area – even to determine whether or not it is ambiguous as to the activities there[70] – the court will require more information regarding industry standards, including how oil and gas leasing was structured in the PBU, what role geography and geology played in the delineation of the various areas and PAs, and the history and nature of the oil and gas exploration and development therefrom.  See Teg-Paradigm, 465 F.3d at 1338 (When interpreting a contract, "the language of [the] contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances."); see also id. ("Even when a contract is unambiguous, it may be appropriate to turn to one common form of extrinsic evidence – evidence of trade practice and custom.").  Unlike the Lisburne PA, which the record clearly indicates was a separate and distinct area long before the lease was entered into in 1989, the court cannot determine on the present record just how separate and distinct the West Niakuk and Niakuk areas were – or were thought to be – at the time the agreements at issue in this case were made.  Accordingly, the court denies all parties' motions with regard to whether the West Niakuk activities were outside the scope of the lease.

---

[70]See, e.g., Teg-Paradigm, 465 F.3d at 1338 ("When a provision in a contract is susceptible to more than one reasonable interpretation, it is ambiguous, and we may then resort to extrinsic evidence to resolve the ambiguity." (internal citations omitted)).

### 3.    A Money-Mandating Duty to Take Action Against the Lease Violations Exists, and the Government Breached That Duty with Regard to the Lisburne PA.

Having determined that the oil and gas development and production from the Lisburne PA through the plaintiffs' allotment were outside the scope of the lease and the amendments, the court must consider whether a money-mandating duty on the part of the government existed to take action to halt those activities, as the plaintiffs allege.  In addition, in the event the plaintiffs can show at trial that the West Niakuk activities were also outside the scope of the lease, the same analysis will apply.

The plaintiffs argue that, under 25 U.S.C. § 415(a) and 25 C.F.R. § 162, the government has specific duties to send notice and remedy breaches of lease and trespasses arising in relation to commercial leases on Indian allotments such as the one at issue in this case.  The plaintiffs point to Brown v. United States, 86 F.3d 1554, 1563 (Fed. Cir. 1996), in which the Federal Circuit agreed with an Indian landowner that "by virtue of the control they place in the hands of the Secretary [of Interior], [25 U.S.C. §] 415(a) and the implementing regulations of [25 C.F.R. §] 162 impose upon the government a fiduciary duty in the commercial leasing context." (quoting Mitchell v. United States, 463 U.S. 206, 226 (1983) ("Given the existence of a trust relationship, it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties.")).  In Brown, the Federal Circuit agreed with the Indian landowner that "it is the assumption of 'control or supervision' over tribal money or property by the government that gives rise to the imposition of trust standards, and 'control or supervision' perfectly describes the

Secretary's role with respect to commercial leasing of allotted lands." Id. (quoting

Mitchell, 463 U.S. at 225) (additional internal quotation omitted).  The Federal Circuit

cautioned, however, that "where no specific statutory requirement or regulation is alleged

to have been breached by the Secretary, the money claim against the government must

fail."  Id.  In this case, the specific regulatory requirements alleged to have been breached

by the BIA include 25 C.F.R. §§ 162.617-162.623.[71]

The government concedes that, if the circumstances complained of by the plaintiffs

are found to fit within the scope of 25 C.F.R. § 162, a money-mandating duty exists.  Tr.

---

[71]25 C.F.R. § 162.617(b) (entitled "How will BIA determine whether the activities of a tenant under a lease are in compliance with the terms of the lease?") states that "[i]f an Indian landowner notifies [BIA] that a specific lease violation has occurred, [BIA] will initiate an appropriate investigation within five business days of that notification."  25 C.F.R. § 162.618 (entitled "What will BIA do in the event of a violation under a lease?") states that "[i]f [BIA] determine[s] that a lease has been violated, [BIA] will send the tenant and its sureties a notice of violation within five business days of that determination," upon receipt of which the tenant must either cure, dispute, or request additional time to cure the violation.

Under 25 C.F.R. § 162.619 (entitled "What will BIA do if a violation of a lease is not cured within the requisite time period?"), in turn, "[i]f the tenant does not cure a violation of a lease within the requisite time period, [BIA] will consult with the Indian landowners, as appropriate, and determine whether" the lease should be canceled, other remedies should be invoked, or the tenant should be granted additional time to cure the violation.  If the BIA decides to cancel the lease, 25 C.F.R. § 162.619 also requires that notice be sent to the tenant, including "the amount of any unpaid rent, interest charges, or late payment penalties due under the lease," and that the tenant be ordered to vacate the property within thirty days, barring an appeal of the cancellation decision.

25 C.F.R. § 162.620 specifies appeal bond procedures in the event of lease cancellation, while 25 C.F.R. § 162.621 specifies the effective date of cancellations.  25 C.F.R. § 162.622 provides that the BIA will take "appropriate emergency action," including "judicial action," if "a tenant or any other party causes or threatens to cause immediate and significant harm to the leased premises during the term of a lease."  Finally, 25 C.F.R. § 162.623 (entitled "What will BIA do if a tenant holds over after the expiration or cancellation of a lease?") provides that "[i]f a tenant remains in possession after the expiration or cancellation of a lease, [BIA] will treat the unauthorized use as a trespass," and "[u]nless [BIA] ha[s] reason to believe that the tenant is engaged in negotiations with the Indian landowners to obtain a new lease, [BIA] will take action to recover possession on behalf of the Indian landowners, and pursue any additional remedies available under applicable law."

of Oral Arg. 86:11-25.  However, the government counters that the plaintiffs'

circumstances do not fit within that scope.  Id.  Specifically, the government argues that

"plaintiffs conveniently ignore the fact that [25 C.F.R. §] 162.618 only requires the BIA to

send notice of breach of a lease only after the BIA has determined that a breach occurred."

Def.'s Mot. at 28 (emphasis in original).  The government argues that "[t]he [DOI] never

made such a determination because it believed that [¶] 10 of the Lease authorized the 1994

[Facility Sharing] Agreement."  Id.  Moreover, the government argues, no trespass

occurred because the Oenga lease neither expired nor was canceled, and therefore the

tenant cannot be considered to have "remain[ed] in possession after expiration or

cancellation," as defined under 25 C.F.R.§ 162.623.  As a result, the government claims,

the plaintiffs have failed to establish any violation of a statute or regulation, as required for

the claim to be money-mandating.

The court finds that the clear guidance of Brown dictates that where, as here, the

plaintiffs have alleged specific breaches of the regulations under 25 C.F.R. § 162, a trust

responsibility exists and the claim of breach of that trust is money-mandating.  Brown, 86

F.3d at 1563.  As an initial matter, the plaintiffs have correctly noted that the government's

strained reading of the duties contained in 25 C.F.R. §§ 162.617-162.623 would mean that

"simply by failing to acknowledge that a breach or trespass occurred," the government

could avoid triggering its responsibilities under the regulatory scheme.  Pls.' Reply at 22.

The government's reading of the regulatory requirements does not comport with the plain

language of the regulations.  Specifically, under 25 C.F.R. § 162.617, the regulations state

that "[i]f an Indian landowner notifies [BIA] that a specific lease violation has occurred, [BIA] will initiate the appropriate investigation within five business days of that notification."  Then, under 25 C.F.R. § 162.618, "[i]f [BIA] determine[s] that a lease has been violated, [BIA] will send the tenant . . . a notice of violation within five business days."[72]  This regulatory scheme cannot be read to allow the BIA to look the other way rather than make a determination that the lease has been violated, nor does it allow the BIA to avoid taking the actions triggered by such a determination by making a determination that is incorrect as a matter of law.  To decide otherwise would put such non-actions or incorrect actions beyond redress as not money-mandating, which would be directly counter to the purpose of the government regulations in providing a remedy for

---

[72]As set forth in n.71, supra, this notice, in turn, triggers a duty to respond on the part of the tenant, either by curing the violation or by disputing it.  25 C.F.R. § 162.618.  Moreover, if the tenant does not cure the violation, the BIA must, under 25 C.F.R. § 162.619, "consult with the Indian landowners, as appropriate," to determine whether the lease should be canceled or other remedies should be invoked.  Lease cancellation, in turn, carries additional responsibilities, including treating a tenant who holds over as a trespasser.  25 C.F.R. § 162.623; see also 25 C.F.R. § 162.108 (entitled "What are BIA's responsibilities in administering and enforcing leases?") ("[BIA] will ensure that the tenants comply with the operating requirements in their leases, through appropriate inspections and enforcement actions as needed to protect the interests of the Indian landowners and respond to concerns expressed by them. [BIA] will take immediate action to recover possession from trespassers operating without a lease, and take other emergency action as needed to preserve the value of the land.").

The government mischaracterizes the plaintiffs' claim as challenging the government's failure to bring a lawsuit against a third party upon request, for which the government argues there is no trust duty and therefore no breach of trust, citing Creek Nation v. United States, 318 U.S. 629, 639 (1943).  As described above, however, there are numerous requirements in 25 C.F.R. § 162 that may be triggered by a lease violation, long before a lawsuit, if any, would be required to be filed.  The plaintiffs assert that "[t]he breach occurred not by failing to sue, but because the United States assumed the . . . sole obligation to communicate with the oil company" and failed to take the corrective actions mandated by the regulations.  Tr. of Oral Arg. 126:16-25.  Accordingly, Creek Nation is inapposite.

lease violations – in this case, to ensure that the plaintiffs' property and financial interests were protected.

Here, the plaintiffs sent letters in 2005 and 2007 notifying the BIA that the lease was being violated as a result of the unauthorized use of the property to produce oil from the West Niakuk and Lisburne PAs.  PLA 1 at 21, 26.  The government does not assert that the  "appropriate investigation" required under 25 C.F.R. § 162.617 was undertaken by the BIA upon receiving this notice of specific lease violations by the Indian landowners.  Instead, the government argues that it is immune from liability because it incorrectly determined that the lease allowed oil and gas production from the Lisburne PA even though no reference was made to such activities in the lease, as discussed above. That the government's determination with regard to Lisburne, and potentially also West Niakuk, was incorrect as a matter of law cannot serve to bar the plaintiffs' current suit on the grounds that it is not money-mandating.  Instead, it does the opposite: it gives rise to a specific, money-mandating claim that the regulations were violated by the government, the very basis of this suit.[73]

## III.   CONCLUSION

In light of the foregoing, the court **GRANTS** the government's motion to dismiss plaintiffs' claims one and two for lack of subject matter jurisdiction because they were not filed within six years of accrual as set forth in 28 U.S.C. § 2501.  Accordingly, the

---

[73]The responsibilities set forth in 25 C.F.R. § 162 are bolstered where, as here, the government assumed sole responsibility for contacting BPX regarding "any and all matters arising out of this Lease Agreement," as set forth in the 1995 lease amendments.  DA 41.

plaintiffs' motion for partial summary judgment with regard to the timeliness of claims

one and two is **DENIED**.  In addition, the court **GRANTS-IN-PART** the plaintiffs'

motion for partial summary judgment with regard to the Lisburne PA portion of claim

three, and the case shall proceed to trial regarding the damages arising from the Lisburne

area development and production.  However, the court **DENIES-IN-PART** the plaintiffs'

motion for partial summary judgment with regard to the West Niakuk PA portion of claim

three, because disputed issues of material fact preclude a finding with regard to the scope

of the lease; the case shall proceed to a trial regarding liability and, if appropriate,

damages with regard to the West Niakuk area claim.  Accordingly, the defendant's and

intervenors' motions to dismiss and for partial summary judgment on claim three are

**DENIED**.

The parties shall submit a joint status report on or before **Friday, October 17,**

**2008**, proposing a schedule for the next steps in the litigation.

**IT IS SO ORDERED.**


s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge