# In the United States Court of Federal Claims

### No. 06-491L
### (Filed: February 12, 2010)

```
* * * * * * * * * * * * * * * * * * * *    *
                                          *
WALLACE OENGA,                            *
GEORGENE SHUGLUK,                         *
LEROY OENGA, SR.,                         *
MICHAEL DELIA, TONY                       *
DELIA, JOSEPH DELIA,                      *
JENNIE MILLER, and                        *
TRINITY DELIA,                            *
                                          *
            Plaintiffs,                    *   Damages for Breach of Trust
                                          *   Responsibility; 25 C.F.R. Part 162
v.                                        *   Alaska Native Allotment; Oil and Gas
                                          *   Production; Restitution; Oil Trespass;
THE UNITED STATES,                        *   Continuing Claim Doctrine; Interest.
                                          *
            Defendant,                     *
                                          *
and                                       *
                                          *
BP EXPLORATION (ALASKA)                   *
INC., CONOCOPHILLIPS                       *
ALASKA, INC., EXXONMOBIL                   *
ALASKA PRODUCTION INC.,                    *
CHEVRON  U.S.A. INC., and                 *
FOREST OIL CORPORATION,                   *
                                          *
            Defendant-Intervenors.        *
                                          *
* * * * * * * * * * * * * * * * * * * *    *
```

*Raymond C. Givens,* Bellevue, WA, for plaintiffs.

*James M. Upton,* U.S. Department of Justice, Washington, DC, with whom was *Ignacia S. Moreno,* Assistant Attorney General, for defendant.  *Roger Hudson,* U.S.

Department of Interior, Anchorage, AK, of counsel.

*James E. Torgerson*, Anchorage, AK, for defendant-intervenors.

## O P I N I O N

**FIRESTONE**, *Judge*.

This is the second decision issued in this case, in which the plaintiffs, Wallace

Oenga, et al. ("plaintiffs" or "the Oenga heirs"),[1] seek damages for breach of trust by the

defendant, the United States ("defendant," "government").  In the first decision, issued

September 18, 2008, the court rejected many of the plaintiffs' claims on jurisdictional

bases but found that the plaintiffs had established a breach of trust with respect to claims

related to certain activities conducted by the defendant-intervenors, BP Exploration

(Alaska) Inc. ("BPX"), et al. (collectively, "intervenors"),[2] on the Oenga heirs' land.

Oenga v. United States, 83 Fed. Cl. 594 (2008).

The dispute at issue is based on violations by BPX of a 1989 lease between

plaintiff landowners of a Native allotment and BPX.[3]  This lease gave BPX, subject to

---

[1]The plaintiffs are the heirs of the original lessor, Andrew Oenga, and include his son
Wallace Oenga, his daughter Georgene Shugluk, his grandsons Leroy Oenga, Sr., Michael Delia,
Tony Delia, and Joseph Delia, his granddaughter Jennie Miller, and his great-granddaughter
Trinity Delia.

[2]The other intervenors, ConocoPhillips Alaska, Inc. (formerly ARCO Alaska, Inc.
("ARCO")), Exxon Mobil Alaska, Inc. ("Exxon"), Chevron U.S.A., Inc., and Forest Oil
Corporation, are "Working Interest Owner" companies that cover BPX's costs in exchange for a
proportionate share of oil produced under certain leases. Mot. Intervene 4; Intervenors' Proposed
Findings of Uncontroverted Fact ¶ 12.

[3]BPX was called Standard Alaska Production Company at the time of the original lease,
but changed its name to BPX effective January 31, 1989.

certain restrictions, the right to operate oil production facilities on the allotment.  In the

September 18, 2008 decision, this court granted the defendant's motion to dismiss two of

the plaintiffs' three claims for lack of subject matter jurisdiction.  In particular, the court

ruled that the plaintiffs' claims regarding breach of trust in connection with the

government's alleged failure to collect royalty payments or a fair annual rental for BPX's

use of the allotment under the lease were barred by the statute of limitations.  Id.  The

court, however, granted in part the plaintiffs' motion for partial summary judgment with

regard to the portion of the third claim concerning the Lisburne Participating Area

("PA"), which the court deemed to be outside the scope of the lease between the plaintiffs

and BPX.  Id.  The court denied the plaintiffs' motion with regard to the West Niakuk PA

portion of the same claim, as disputed issues of material fact remained regarding whether

production from this area was within the scope of the lease.  Id.  The government is thus

liable for breach of its fiduciary responsibilities and trust obligations with regard to the

Lisburne PA, and possibly the West Niakuk PA as well, because the government failed to

take action after it knew or possibly should have known of BPX's activities that were

outside the scope of the lease.

The court asked the parties to prepare the case for proceedings to set the period

and measure of damages appropriate for the government's breach of trust related to

BPX's use of the allotment for production from the Lisburne PA.[4]  The parties have

_____

[4]If, at trial, the plaintiffs can prove that production from the West Niakuk PA was also
outside the scope of the lease, this opinion will apply to that portion of the claim as well.

3

returned to the court with briefs aimed at drawing out their different theories of the bases

for the government's breach of trust, theories for measuring the damages for which the

government is liable, and the time period for which damages are due.

## I.    BACKGROUND FACTS

While the current question before the court is a legal one, the facts relevant to the

court's decision are set forth below.  A more detailed description of the facts involved in

this action is set forth in the court's September 18, 2008 decision in this case.  See id.

The issue pending before the court arises out of BPX's alleged violations of a lease

allowing possession and use of the plaintiffs' forty-acre Alaska Native Allotment at Heald

Point, located on Alaska's North Slope, for various oil-production-related activities.[5]

Signed in 1989 by the late Andrew Oenga,[6] the lease was approved by the United States

Department of Interior ("DOI") Bureau of Indian Affairs ("BIA") and provided for an

annual payment of $1,600 per acre that could be increased at successive five-year

---

[5]From 1994 on BPX has used the leased premises to facilitate the production of oil and
gas pursuant to a number of Alaska Department of Natural Resources leases within the Prudhoe
Bay Unit ("PBU").  The PBU encompasses the Lisburne PA, formed in 1986, the Niakuk PA,
formed in 1994, and the West Niakuk PA, formed in 1997.  Leases within these PAs were held
during part of the relevant period by a number of the intervening oil companies.  Pursuant to a
Facility Sharing Agreement entered into by BPX, Exxon, and ARCO in 1994, BPX allowed these
other companies access to its facilities on the plaintiffs' allotment.  BPX became the sole
operator of the PBU Area in 2000.  The plaintiffs assert that production from the BPX facilities
on Heald Point totaled over 90 million barrels in the period from 1994 through 2008.  Decl. of
Power at 20.

[6]Andrew Oenga died in 1990.  The plaintiffs are his heirs now holding interest in the
allotment.

4

intervals based on a periodic BIA appraisal.[7]  A 1994 amendment to the lease changed the

interval for appraisals from five to four years.  Accordingly, appraisals have been

conducted in 1993, 1997, 2001, 2005, and 2009.  Under the 1994 amendments, BPX also

secured access to the plaintiffs' entire forty-acre allotment.  The lease was amended again

in 1995, making BIA the sole source of contact with BPX regarding matters arising out of

the lease agreement, thereby prohibiting the plaintiffs from directly contacting BPX.

In 1994, BPX entered into a facility sharing agreement with Exxon and ARCO,

which provided Exxon and ARCO with a drilling and manifold slot to be used for oil

production at the Heald Point drillsite.[8]  From that time on, Exxon and ARCO, and later

BPX, used the plaintiffs' allotment to facilitate oil and gas production from the Lisburne

PA.

While the plaintiffs filed the present suit on June 30, 2006, they maintain that it

was not until 2007, during the discovery phase of this case, that they learned of the

intervenors' production from the Lisburne PA that is now at issue.  After learning of this

production, the plaintiffs wrote to BIA on June 4, 2007 demanding that the government

give notice to the tenant by June 18, 2007 that it was in violation of the lease and was to

stop use of the property.  The letter also demanded that the government collect damages

---

[7]Initially, BPX leased only ten of the allotment's forty acres.  As the number of acres leased by BPX increased, total lease payments rose accordingly.

[8]It is not disputed that the drill slots were placed in an area BPX had filled to raise previously-submerged, state-owned lands.  Oil pumped through drill slots on this filled area was then piped across portions of the plaintiffs' allotment.

for BPX's past lease violations.  It is undisputed that the government did not take this

action.  The plaintiffs filed their Second Amended Complaint on June 17, 2007,

containing the claim arising from the intervenors' Lisburne PA activities now at issue.

Production from the Lisburne PA stopped on October 1, 2008, shortly after this court's

issuance of its September 18, 2008 opinion declaring such production to be outside the

scope of the lease between the plaintiffs and BPX.

## II.    DISCUSSION

### A.    Standard of Review

Summary judgment is appropriate when "the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue as to

any material fact and that the movant is entitled to judgment as a matter of law."[9]  R. Ct.

Fed. Cl. 56(c)(1); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986);

---

[9]As the court discussed with the parties during the oral argument on the issues now before the court, the court will not rule on the plaintiffs' specific damage claims based on the expert affidavits submitted by the plaintiffs until the legal questions regarding the source and scope of the trust responsibility and theories of damages are set.  Therefore, consideration of the plaintiffs' inclusion of various affidavits of economic and engineering experts opining on the precise methodology proper for determining damages in this case is premature at this point in the proceedings.  Summary judgment is inappropriate for issues that may "ultimately turn on the credibility of witnesses."  Leggett & Platt, Inc. v. Hickory Springs Mfg. Co., 285 F.3d 1353, 1362 (Fed. Cir. 2002) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Fed. R. Civ. P. 56 advisory committee's note (1963 Amend.) ("Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate.")); see also Ferring B.V. v. Barr Labs., Inc., 437 F.3d 1181, 1192 n.13 (Fed. Cir. 2006) ("Credibility . . . become[s] an issue once a party offers a declarant's testimony in support or in opposition to summary judgment.") While, such expert opinion may be appropriate and relevant at trial, it is neither appropriate nor relevant at this stage.

Casitas Mun. Water Dist. v. United States, 543 F.3d 1276, 1283 (Fed. Cir. 2008);

Telemac Cellular Corp. v. Topp Telecom, Inc., 247 F.3d 1316, 1323 (Fed. Cir. 2001)

(citation omitted).  Questions of law are particularly appropriate for summary judgment.

Dana Corp. v. United States, 174 F.3d 1344, 1347 (Fed. Cir. 1999).

**B.    The Source and Scope of the Government's Trust Responsibility**

In order to determine whether damages may be appropriate as compensation for

the government's breach of its trust responsibilities and, if so, what measure should be

used to calculate damages, the court must first examine the source and scope of the

government's trust responsibility in this case.  This involves consideration of the

regulatory and lease provisions creating the trust relationship between the plaintiffs and

the government and what acts or failures of the government constituted a breach of the

duties within that trust relationship.

1.    Introduction

It is well-settled that to determine the source and scope of the government's trust

responsibility, the court must look to the substantive source of law that establishes

specific fiduciary or other duties.  United States v. Navajo Nation, 537 U.S. 488, 506

(2003) ("Navajo I") ("[A] Tribe must identify a substantive source of law that establishes

specific fiduciary or other duties, and allege that the Government has failed faithfully to

perform those duties. . . . [The court's] analysis must train on specific rights-creating or

duty-imposing statutory or regulatory prescriptions"); see also United States v. Navajo

Nation, 129 S. Ct. 1547, 1558 (2009) ("Navajo II"); United States v. White Mountain

Apache Tribe, 537 U.S. 465, 473-74 (2003).  Here, the plaintiffs argue that the BPX lease

language imposed a duty upon the government to monitor and enforce the Oengas' lease.

Alternatively, the plaintiffs assert that the DOI regulations contained in 25 C.F.R. Part

162 include a duty to monitor and ensure compliance with the lease.

The government counters that neither the BPX lease nor the relevant regulations

created a duty on the part of the government to monitor or ensure compliance with the

BPX lease.  Rather, the government contends that the only breach of its trust duties

stemmed from its failure to respond when BPX's breach of the lease was brought to the

government's attention in June 2007.  Because BPX stopped producing oil from the

Lisburne PA in 2008, the government argues that the plaintiffs are entitled only to de

minimus damages.[10]

Each of these contentions will be examined in turn.

2.   The lease between the plaintiffs and BPX does not impose any
specific trust obligation to monitor or ensure compliance with the
lease.

The plaintiffs argue that lease ¶¶ 8, 30, and 34 imposed fiduciary duties upon the

United States to monitor BPX's use of the leased property and to ensure compliance with

the terms of the lease.  Lease ¶ 8 provides the remedies available for violations of the

lease after notice and opportunity to cure, providing that the lessor may "re-enter, re-let,

---

[10]The intervenors have also filed briefs in support of the government's position.

evict, terminate the Lease Agreement or recover rents or any other remedy he has under law." Lease ¶ 8.  Paragraph 30 provides that BPX's lease obligations run to the United States as well as to the lessor.  Lease ¶ 30.  Paragraph 34, which was added by lease amendment in 1995, designates BIA as the "sole contact with Lessees for any and all matters arising out of this Lease Agreement . . . . Lessors agree that they will under no circumstances contact the Lessee . . . ."  Lease ¶ 34.  The government argues that none of these lease provisions can be fairly read to impose an independent duty on the part of the government to monitor and ensure compliance with the lease.

The court agrees with the government and finds that there is no support for the plaintiffs' claim that these lease provisions in and of themselves created an affirmative duty on the part of the government to monitor and then ensure compliance with the lease. Paragraph 8 provides the lessor with options once a breach of the lease has been discovered, but imposes no duty upon the government to discover breaches that might give rise to the exercise of one of these options.  Paragraph 30 provides that the lease obligations run to the United States, yet it does not suggest any obligations running from the United States to the lessor.  Paragraph 34, while helpful in establishing the context of the Oenga heirs' dealings with the intervenor, does not on its own create any affirmative duty on the part of the government to monitor the lease and then enforce its terms.  The court agrees that ¶ 34 does elevate the BIA's duties in the sense that it requires BIA to act as an intermediary between the parties to the lease; however, it imposes no duty on BIA

to actively monitor or manage the use of the allotment. Thus, the plaintiffs have not identified any lease provisions imposing specific duties upon the United States to independently monitor and ensure compliance with the lease.

3. The pre-2001 regulations did not impose any specific trust obligation to monitor or ensure compliance with the lease.

The plaintiffs point to a number of regulations they claim establish a source of the government's trust obligations. Some of these regulations were in place in 1994 when the plaintiffs claim that BPX began to violate the lease and the government first failed to fulfil its trust duties. Other regulations, however, were not promulgated until 2001 and did not impose any duty upon the government until that time. The plaintiffs claim that the earlier regulations, when read in concert with the provisions of the lease identified above, imposed a trust duty to monitor and manage the lease. In particular, the plaintiffs have identified two regulations in effect prior to 2001: 25 C.F.R. § 162.5(b) required that all leases of Indian allotments be set at not less than "fair annual rental"; § 162.8 required the lease to "provide for periodic review" of the lease, considering "the equities involved," including "economic conditions at the time . . . ." 25 C.F.R. §§ 162.5(b), 162.8 (1982). Citing the court's previous statement that the "responsibilities set forth in 25 C.F.R. . . . are bolstered where, as here, the government assumed sole responsibility for contacting BPX regarding 'any and all matters arising out of this Lease Agreement,'" Oenga, 83 Fed. Cl. at 623 n.73, the plaintiffs argue that in combination with the obligations they assert are created by the lease, these provisions imposed a duty on the United States to monitor

10

and manage the plaintiffs' lease beginning in 1994.  In response, the United States argues

that the only obligation created by these pre-2001 regulations was to respond once a

lessor provided notice to the government that the lease was being violated.  In particular,

the government points to 25 C.F.R. § 162.14, which provided:

> Upon a showing satisfactory to the Secretary that there has been a violation of
> the lease or the regulations in this part, the lessee shall be served with written
> notice setting forth in detail the nature of the alleged violation and allowing
> him ten days from the receipt of the notice in which to show cause why the
> lease should not be cancelled.

25 C.F.R. § 162.14 (1982).  The government argues that under this regulation, the

government was only obligated to act after notice.

The court agrees with the defendant that federal regulations did not impose upon

BIA a duty to monitor or manage leases such as the plaintiffs' prior to the 2001

amendments.  The two sections identified by the plaintiffs, 25 C.F.R. §§ 162.5, 162.8, are

not on point.  Section 162.5 merely established a duty that the BIA may set rent for a

leased property at no less than fair annual rental.  It does not address monitoring for lease

violations.  See 25 C.F.R. § 162.5 (1982).  Similarly, § 162.8 established that the lease

must provide for periodic inspections and evaluations of the equities to ensure fair annual

rental.  It also does not address monitoring for lease violations.  See  25 C.F.R. § 162.8

(1982).

Moreover, this view was confirmed by the Federal Circuit in Brown v. United

States, 86 F.3d 1554 (Fed. Cir. 1996), wherein the Circuit found that while BIA had a

duty to act once Indian landowners called lease violations to the Secretary's attention, "there is no suggestion in the regulations that [the Secretary] monitor a lessee's compliance with the lease or take any other active management role."  Brown, 86 F.3d at 1565.  The plaintiffs' contention that their case is distinguishable from Brown, on the grounds that the provisions in their lease impose different obligations, is without merit.  As discussed above, the lease provisions noted by the plaintiffs were not sufficient to establish a duty to monitor or manage the leased property.

The court therefore finds that the government did not have a trust responsibility to monitor and ensure compliance with the plaintiffs' lease under the regulations in effect before new regulations were promulgated on January 22, 2001, either alone or in combination with the lease.[11]

4.      The regulations promulgated in January 2001 created, for the first time, a duty to monitor and ensure compliance with leases and to take corrective action once aware of a lease violation.

i.      The government had a duty to monitor.

The plaintiffs argue that the regulations promulgated on January 22, 2001[12] imposed a duty on the government to monitor and ensure compliance with the plaintiffs' lease.  They point specifically to 25 C.F.R. § 162.108(b), which requires that BIA "ensure

_____

[11]The government did, of course, have a trust obligation to take appropriate action once it received actual notice of the lease violation from the plaintiffs, which the parties agree did not occur until June 2007.

[12]These regulatory changes were effective March 23, 2001.  66 Fed. Reg. 7068 (Jan. 22, 2001).

that tenants comply with the operating requirements in their lease through appropriate inspections and enforcement actions as needed to protect the interests of the Indian landowners"; § 162.617(a), which allows BIA to enter the leased property to "ensure that the tenant is in compliance with the operating requirements of the lease"; § 162.617(b), which states that BIA will "initiate an appropriate investigation" if notified of a lease violation; § 162.618, which requires BIA to send notice of the violation of the tenants; and § 162.619, which lists BIA's responsibilities in the situation when, after notice, the tenant has not cured its violation. 25 C.F.R. §§ 162.108(b), 162.617(a), 162.617(b), 162.618, 162.619 (2001). The plaintiffs argue that these regulations impose a duty on the government to act without notice from the landowner to conduct inspections and ensure compliance with the Oenga heirs' lease.

The government asserts that these regulations should not be read to impose an affirmative duty on the part of the government to monitor or ensure compliance with BIA-approved leases. In support, the defendant argues that nowhere in the regulatory history is there evidence of any intent to create new fiduciary duties with the promulgation of 2001 amendments to the 25 C.F.R. Part 162 regulations. The government argues that in such circumstances no new trust duties should be implied.

The court agrees with the plaintiffs that some of the 2001 regulatory provisions identified did change the trust relationship and did impose a new duty on the government to monitor and ensure compliance with the BIA-approved lease. First, the plain language

of 25 C.F.R. § 162.108(b) imposes this duty:

> [BIA] will ensure that tenants comply with the operating requirements of the lease through appropriate inspections and enforcement actions as needed to protect the interests of the Indian landowners and respond to concerns expressed by them. We will take immediate action to recover possession from trespassers operating without a lease, and take other emergency action as needed to preserve the value of the land.

25 C.F.R. § 162.108(b) (2001) (emphasis added). The government suggests that this provision merely provides for a government duty to initiate inspections and enforcement actions after it has been notified of a lease violation. The government's reading does not comport with the plain language of the regulation, as it disregards the promise to "protect the interests of the Indian landowners" independent of the promise to "respond to concerns expressed by them."[13]

---

[13]The government's citation of a proposed rulemaking notice does not support its contention that these regulations impose no such duty to monitor. The section of the notice quoted in the government's brief does indeed lay out proposed procedures for responding to a tenant's breach of lease. See 65 Fed. Reg. 43874-01 (July 14, 2000). That this quoted language does not mention a duty to monitor and manage Indian landowner leases is inapposite to finding such a duty. First, as the plaintiffs point out, the language quoted is from a proposed rulemaking that was never adopted, and is thus entitled to no deference. Tedori v. United States, 211 F.3d 488, 492 (9th Cir. 2000) (citing In re AppleTree Mkts., Inc., 19 F.3d 969, 973 (5th Cir. 1994) ("proposed regulations are entitled to no deference until final"); LeCroy Research Sys. Corp. v. Comm'r, 751 F.2d 123, 127 (2d Cir. 1984) ("Proposed regulations are suggestions made for comment; they modify nothing")). While similarities between the proposed and adopted versions exist, differences are present. Explanation in the final rule promulgated on January 22, 2001 states that the BIA, in response to comments following the proposed rulemaking notice, "strengthened the provisions for the BIA's enforcement of leases and permits on trust and restricted lands." 66 Fed. Reg. 7068 (Jan. 22, 2001) (emphasis added); see also 66 Fed. Reg. 7079 (Jan. 22, 2001). Second, the language the government quotes from the proposed rulemaking simply sets forth procedures for BIA to follow once a breach is noted. While certain sections in the final rule set forth these post-discovery procedures, § 162.108(a) established an independent duty for BIA to take steps to discover such violations.

25 C.F.R. § 162.617(a) reinforces this conclusion.  Under § 162.617(a), BIA is given the authority to "enter the leased premises . . . to protect the interests of the Indian landowners and ensure that the tenant is in compliance with the operating requirements of the lease."  25 C.F.R. § 162.617(a) (2001).

Finally, contrary to the government's contentions that the regulations only require an obligation to act after notice, there are separate regulations that govern in circumstances in which the government is given notice by the landowner.  See 25 C.F.R. § 162.618 (2001).  These regulations would be redundant if the above-cited provisions also only triggered a duty to act after notice.  The court must read the regulations to give meaning to all provisions.  Kyocera Wireless Corp. v. Int'l Trade Comm'n, 545 F.3d 1340, 1356 (Fed. Cir. 2008) (citing TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought . . . to be so construed that . . . no clause, sentence, or word shall be superfluous . . . ." (internal quotations removed)).  Based on the foregoing, the court concludes that the government, after March 2001, had an independent trust duty to monitor the plaintiffs' lease to discover and stop lease violations.

      ii.    Once the government learns of a violation, either on its own or after notice, it must take action.

25 C.F.R. § 162.618 governs the government's trust obligation once the government has determined that a lease has been violated:

15

(a)  If we[14] determine that a lease has been violated, we will send the tenant and its sureties a notice of violation within five business days of that determination. . . .

(b)  Within ten business days of the receipt of a notice of violation, the tenant must:

>      (1)  Cure the violation and notify us in writing that the violation has been cured;

>      (2)  Dispute our determination that a violation has occurred and/or explain why we should not cancel the lease; or

>      (3)  Request additional time to cure the violation.

25 C.F.R. § 162.618 (2001).  Section 162.619 sets forth the BIA's responsibilities after giving notice to the tenant in breach:

(a)  <u>If the tenant does not cure a violation of a lease within the requisite time period, we will consult with the Indian landowners, as appropriate, and determine whether</u>:

>      (1)  The lease should be canceled by us under paragraph (c) of this section and §§ 162.620 through 162.621 of this subpart;

>      (2)  <u>We should invoke any other remedies available to us under the lease,</u> including collecting on any available bond;

>      (3)  <u>The Indian landowners wish to invoke any remedies available to them under the lease</u>; or

>      (4)  The tenant should be granted additional time in which to cure the violation.

(b)  If we decide to grant a tenant additional time in which to cure a violation, the tenant must proceed diligently to complete the necessary corrective actions within a reasonable or specified time period from the date on which the extension is granted.

(c)  If we decide to cancel the lease, we will send the tenant and its sureties a cancellation letter within five business days of that decision. The cancellation letter must be sent to the tenant by certified mail, return receipt requested. We will also provide actual or constructive notice of a cancellation decision to the Indian landowners, as appropriate. The cancellation letter will:

>      (1)  Explain the grounds for cancellation;

>      (2)  Notify the tenant of the amount of any unpaid rent, interest charges, or late payment penalties due under the lease;

>      (3)  Notify the tenant of its right to appeal under part 2 of this chapter,

---

[14]"We" refers to BIA throughout.

16

> as modified by §162.620 of this subpart, including the amount of any appeal bond that must be posted with an appeal of the cancellation decision; and
>
> (4)  Order the tenant to vacate the property within 30 days of the date of receipt of the cancellation letter, if an appeal is not filed by that time.

25 C.F.R. § 162.619 (2001) (emphasis added).

With regard to "remedies available . . . under the lease," § 162.619(a)(2), (3), the plaintiffs' lease provides the following:

> If the Lessee should fail to perform or to comply with any term or condition of this Lease Agreement, the Lessor, after written notice giving the [Lessee] a ten (10) day period within which to respond, may pursue his rights to re-enter, re-let, evict, terminate the Lease Agreement, or <u>recover rents or any other remedy he has under law</u>.  Lessee shall be given a reasonable time to cure such default or breach.

Lease ¶ 8 (emphasis added).  The lease further provides:

> Lessors hereby designate and appoint the BIA, acting by and through [the Arctic Slope Native Association ("ASNA")], to be their <u>sole contact with Lessees for any and all matters arising out of this Lease Agreement or any amendment thereto</u>.  Lessors agree that they will under no circumstances contact the Lessee in person or by telephone, facsimile, electronic mail, United States mail, courier service, or any other means.  If Lessors contact Lessees, Lessees shall be []under no obligation to respond to Lessors['] contacts and shall refer all such contacts to ASNA or the BIA.

Lease ¶ 34.  Together, these regulations imposed a duty on the government to enforce the plaintiffs' lease and to pursue other appropriate remedies against BPX on behalf of the plaintiffs based its agreement to serve as the sole contact for all matters arising out of the lease.  However, even if the plaintiffs were solely responsible for initiating an action to recover damages from BPX, in light of ¶ 34 of the lease, the government, by failing to

17

notify the plaintiffs of the breach and provide them with the option of pursuing BPX, breached its trust responsibility.

> iii.   The government is liable for breaching its trust responsibilities by failing to monitor the lease, discover the violation, and take appropriate remedial actions.

By not conducting the "appropriate inspections" required by 25 C.F.R. § 162.108(b) that should have revealed BPX's breach of the lease in connection with production from the Lisburne PA, the government breached its duty to "ensure that the tenant is in compliance" with the lease.[15]  See 25 C.F.R. §§ 162.108(b), 162.617(a) (2001).  Had the government fulfilled its trust obligations and discovered that BPX was exceeding the scope of the lease, the government would have the been required under § 162.618 to give BPX notice and the opportunity to cure its breach.  Thereafter, if BPX refused to cure its breach, BIA would have needed to consult with the plaintiffs to determine which option provided by 25 C.F.R. § 162.619 to pursue.  Further, the plaintiffs would then have had the right to have the government on their behalf pursue under ¶ 8 of the lease "any other remedy [the plaintiffs have] under law," including the right to recover damages for BPX's past lease violations during the previous years of production from the Lisburne PA.[16]  Lease ¶ 8.  As discussed above, in this case, the BIA

---

[15]Certainly, when the government conducted its periodic reappraisals of the lease in 2001 and again in 2005, it had occasion to familiarize itself with activities taking place on the plaintiffs' allotment.

[16]The plaintiffs additionally argue that BPX's use of the allotment for purposes exceeding the scope of the lease could be viewed as a trespass, triggering 25 C.F.R. § 162.106.  The full text

assumed responsibility in ¶ 34 of the BPX lease to serve as the sole contact for all matters arising under the lease. In such circumstances, the government would have been required to act as the plaintiffs' representative in any action against BPX to recover damages. In addition, as noted above, even if the plaintiffs were obligated to initiate an action to recover damages from BPX, the government breached its trust responsibility by failing to notify the plaintiffs of the breach and provide them with an opportunity to pursue BPX.

---

of the regulation is as follows:

> If a lease is required, and <u>possession is taken without a lease</u> by a party other than an Indian landowner of the tract, we will <u>treat the unauthorized use as a trespass</u>. Unless we have reason to believe that the party in possession is engaged in negotiations with the Indian landowners to obtain a lease, we will take action to recover possession on behalf of the Indian landowners, and pursue any additional remedies available under applicable law.

25 C.F.R. § 162.106(a) (2001) (emphasis added). The plaintiffs agree that they are not entitled to double damages for breach of trust based on both a breach of lease and trespass theory, but assert that the government also had a trust duty to stop trespassors on its allotment, including BPX once it used the allotment for production of Lisburne oil. The plaintiffs' argument that the government breached a trust duty to stop trespassers fails because BPX's use of the allotment for production from the Lisburne PA was a breach of its lease with the Oenga heirs, rather than a trespass. Under the 1994 lease amendment, BPX secured possession of the entire allotment. As such, BPX controlled one hundred percent of the allotment and the plaintiffs had no possessory interest. In such circumstances, activities related to Lisburne on the allotment could not have constituted a trespass, as the plaintiffs suffered no loss of possession. Black's Law Dictionary defines "trespass" as a "wrongful entry on another's real property," suggesting possession or entry without right. <u>Black's Law Dictionary</u> 1642 (9th ed. 2009). Regulatory provisions pertaining to trespass thus are inappropriate where possession is not at issue, particularly where adequate regulations exist addressing the context of a lease violation. The final rule notice for Part 162 supports the proposition that a breach of a lease is distinct from a trespass, as it states that "[BIA has] rejected the comments requesting that we treat non payment [of rent] as trespass, based on the availability of contract remedies prior to the cancellation of the lease." 66 Fed. Reg. 7081 (Jan. 22, 2001). Similarly, other breaches of lease should be treated as such and not as trespasses.

Citing Creek Nation v. United States, 318 U.S. 629 (1943), the government contends that it cannot be liable for failure to bring suit on behalf of the plaintiffs to recover damages because the government is never required to bring suit on behalf of trustees.  Based on Creek Nation, the government argues that the Secretary of the Interior has broad discretion in determining whether to bring suit against third parties on behalf of Tribes and therefore cannot be liable for breach of trust for failing to do so.  The present case, however, is easily distinguishable from Creek Nation.  In Creek Nation the Supreme Court found that there was no statutory or regulatory duty on the part of the government to affirmatively seek compensation for the Tribe against a trespassing railroad.  See Creek Nation, 318 U.S. at 639-40.  However, the plaintiff here has identified a lease and substantive regulations under 25 C.F.R. Part 162 imposing a non-discretionary duty on the government to obtain compliance with the plaintiffs' lease and seek damages.  See United States v. Mitchell, 463 U.S. 206, 224 (1983) ("Mitchell II") (contrasting the limited trust relationship created by the General Allotment Act with fuller fiduciary responsibilities imposed by substantive statutes mandating government management of Indian-owned assets); Cherokee Nation of Oklahoma v. United States, 21 Cl. Ct. 565, 575-76 (1990) (distinguishing Mitchell II-type control creating non-discretionary duties from a general fiduciary relationship imposing fewer substantive duties).  The court agrees with the plaintiffs that the trust duty established by the regulations and the BIA-approved lease between the plaintiffs and BPX distinguishes this case from Creek Nation.

In summary, the sources and scope of the government's trust responsibilities have now been identified.  The government breached two distinct trust duties with respect to BPX's Lisburne PA activities on the plaintiffs' allotment.  First, the government breached its duty to monitor compliance with the lease and thus failed to take appropriate action to remedy the lease violations, as was required by the 25 C.F.R. Part 162 regulations that became effective on March 23, 2001.  See 25 C.F.R. §§ 162.108(b), 162.617(a) (2001).  Second, the government breached its duty to enforce the plaintiffs' lease as was required by 25 C.F.R. Part 162 once it was given notice by the plaintiffs in 2007 that BPX was in breach.  See 25 C.F.R. §§ 162.618, 162.619 (2001).  Damages to be awarded in this case will account for the harm suffered by the plaintiffs due to both breaches of trust.[17]

### C.      The Availability and Measure of Damages

  1.      Damages are available for the government's breach of trust responsibilities.

Having identified the specific duty-imposing regulatory provisions breached by the government, the court next looks to whether damages are appropriate as a general matter for the government's breach of trust.  General trust principles are applicable to analyzing whether damages should be available in cases involving property held in trust by the government for American Indians.[18]  See White Mountain Apache Tribe, 537 U.S. at 474-

---

[17]The precise period for which damages are appropriate for each of these breaches is discussed separately in part II.E of this opinion.

[18]The same principles are applicable in the case of Alaska Natives.

76.  "[P]rinciples of trust law might be relevant 'in drawing the inference that Congress

intended damages to remedy a breach.'"  Navajo II, 129 S. Ct. at 1552 (quoting White

Mountain Apache Tribe, 537 U.S. at 477).  "Given the existence of a trust relationship, it

naturally follows that the Government should be liable in damages for the breach of its

fiduciary duties.  It is well established that a trustee is accountable in damages for

breaches of trust."  Mitchell II, 463 U.S. at 226 (indicating that courts should look to the

Restatement of Trusts in such circumstances).  The substantive duty-imposing statutory or

regulatory prescriptions need not "expressly provide for money damages; the availability

of such damages may be inferred."  Navajo I, 537 U.S. at 506; see also Navajo II, 129 S.

Ct. at 1552.

> Looking to traditional trust law, the Restatement of Trusts provides:
>
> If the trustee commits a breach of trust, he is chargeable with
> > (a) any loss or depreciation in value of the trust estate resulting from
> > the breach of trust; or
> > (b) any profit made by him through the breach of trust; or
> > (c) any profit which would have accrued to the trust estate if there
> > had been no breach of trust.

Restatement (Second) of Trusts § 205 (1959); see also LaRue v. DeWolff, Boberg &

Assoc., Inc., 128 S. Ct. 1020, 1024 n.4 (2008) (citing Restatement (Second) of Trusts §

205 and stating, "Under the common law of trusts, which informs our interpretation of

ERISA's fiduciary duties . . . trustees are 'chargeable with . . . any profit which would

have accrued to the trust estate if there had been no breach of trust,' . . .").  The

Restatement does not address the exact context at hand, namely where the trustee has

breached the trust by failing to monitor and then ensure compliance with lease terms related to the trust property.  However, the Restatement does address the analogous situation where the trustee disposes of property he was to retain, and confirms the appropriateness of damages in the amount of profits that would have been obtained had the trustee not committed this breach.  Restatement (Second) of Trusts § 208; see also § 205, cmt. i.  Based on these authorities, the court thus finds that the plaintiffs may recover for the government's breach of its trust obligations.

2.    Restitution is not an appropriate measure of damages.

Having determined the regulatory bases for the trust obligations and the appropriateness of damages for the government's breach of trust, the court must now determine what is the most appropriate measure of such damages.  The plaintiffs have proposed a variety of measures, including restitution based on a theory of total breach of the lease.  For reasons discussed below, the court finds that restitution is not an appropriate measure of damages in this case.

The plaintiffs argue, based on a specific provision in their lease with BPX, that they would have been entitled to terminate the lease due to BPX's unauthorized use of the allotment and that the government should be liable to them for damages based on total breach of lease because the government failed to stop this unauthorized use and terminate the lease.

The plaintiffs concede that BPX's actions with regard to the lease and the Lisburne

23

PA would not give rise to a total breach under established contract law principles.

Nonetheless, the plaintiffs argue that under ¶ 8 of their lease with BPX, they were entitled

to obtain termination in the event of "any" lease violation and that they lost this

opportunity when the government breached its trust responsibility.  Had the plaintiffs had

the opportunity to terminate the lease, they would have sought damages equal to all of

BPX's profits related to activities within the scope of the lease.  The plaintiffs conclude

that because the government failed to seek damages for total breach from BPX, the

government is now liable for this amount.  The plaintiffs are seeking an estimated $68

million under this damage theory.

The government and intervenors argue that there is nothing in ¶ 8 of the lease that

makes termination an automatic right upon any breach of the lease.  Rather, the

government and intervenors contend that the lease simply authorizes termination of the

lease in the event of a "total breach."  They argue that in this case, as the plaintiffs

concede, the breach of lease based on the introduction of oil from the Lisburne PA does

not rise to the level of a total breach.

The court agrees with the government and intervenors.  The plaintiffs have read

too much into ¶ 8 of the lease.  Paragraph 8 provides that termination of the lease is a

possibility if the lessee does not cure a violation, but termination is not automatic.  The

lease provides:

> If the Lessee should fail to perform or comply with any term of this Lease
> Agreement, the Lessor, after written notice giving Lessor a ten (10) day period

24

within which to respond, may pursue his rights to re-enter, re-let, evict, terminate the Lease Agreement or recover rents or any other remedy he has under law.

Lease ¶ 8.  The lease language in question does not automatically give the plaintiffs the right to terminate the lease because of "any" breach, nor does it automatically make any breach a total breach.  Rather, the lessor can pursue the right to terminate the lease if termination is otherwise appropriate under law.  Termination of the lease and certainly restitution damages would only have been proper if BPX's actions amounted to a total breach.[19]  The plaintiffs have conceded, and the court agrees, that the breach was not, on its own, total or material, and so could not give rise to damages based on restitution.[20]

---

[19]Though, as the plaintiffs point out, a material breach "gives rise to a right to exercise a termination provision in a contract," Dow Chem. Co. v. United States, 226 F.3d 1334, 1346 (Fed. Cir. 2000), the case cited is unhelpful because it concerns a scenario where there was no termination clause.  Rather than holding that a termination clause made any breach a material one, as plaintiffs suggest, the court in Dow Chemical simply held that where the government failed to pay royalties for a license agreement for the use of the plaintiff's patent, this constituted a repudiation of the agreement, which was a material breach that gave rise to the plaintiff's right to terminate the license.  Id. at 1345-46.

[20]A total breach "so substantially impairs the value of the contract to the injured party at the time of the breach that it is just in the circumstances to allow him to recover damages based on all his remaining rights to performance."  Mobil Oil Exploration & Producing Se., Inc. v. United States, 530 U.S. 604, 608 (2000) (quoting Restatement (Second) of Contracts § 243); Amber Res. Co. v. United States, 538 F.3d 1358, 1368 (Fed. Cir. 2008).  A total breach "destroys the essential object of the contract."  Mobil Oil, 530 U.S. at 608, 630 (holding that the government committed a total breach when it denied companies certain promised opportunities, thereby repudiating companies' oil and gas leases); N. Helex Co. v. United States, 197 Ct. Cl. 118 (1972) (government's long-term failure to pay on a contract to purchase helium was both material and total).

Here, while using the Oenga heirs' allotment for production of oil from the Lisburne PA exceeded the breadth of the lease, this breach was not of the scope that it so "substantially impair[ed] the value of the contract" that a proper remedy involves damages for the value of the complete contract as though it were voided by BPX's breach.  This is evidenced by the fact that

"[R]elief in restitution is 'available only if the breach gives rise to a claim for damages for total breach and not merely to a claim for damages for partial breach.'" Hansen Bancorp, Inc. v. United States, 367 F.3d 1297, 1309 (Fed. Cir. 2004) (quoting Restatement (Second) of Contracts § 373 cmt. a (1981)); see also Mobil Oil Exploration & Producing Se., Inc v. United States, 530 U.S. 604, 608 (2000).  Here, because the lease did not mandate termination without evidence of a material or total violation and BPX's breach with regards to Lisburne PA production was less than material or total, only damages for a partial breach are available.[21]

>        3.       Statutory damages based on trespass of oil interests are not
>                 appropriate.

The plaintiffs next argue that if they are not entitled to restitution-type damages, the court should use the federal and Alaska law of damages for oil trespass as the proper measure of damages for breach of trust.  In particular, the plaintiffs argue that 43 C.F.R. § 9239.0-8 directs the court to apply any state law on oil trespass where a trespass involves oil.[22]  Where no such state statute exists, other federal regulations provide a default

---

the 1994 lease amendment clearly contemplated production facilities on the allotment; production from the Lisburne PA simply exceeded this level of production allowed in the lease. The breach did not destroy the plaintiffs' property interests or result in an abrogation of the entire lease, nor did it destroy an essential object of the lease agreement.

[21]Because there has not been a total breach of the lease between BPX and the Oenga heirs, the court has no occasion to address the parties' dispute as to the proper measure of restitution.

[22]The regulation provides:

The rule of damages to be applied in cases of timber or other vegetative resources, coal, oil, and other trespass in accordance with the decision of the Supreme Court of

measure for calculating oil trespass damages.  As the plaintiffs point out, Alaska indeed

has a statute relevant to the measure of oil trespass damages.  See Alaska Stat. §

31.30.010.  Under the Alaska statute, "Damages for Wrongful Extraction of Oil or Gas":

> (a) If oil or gas has been or is extracted from any existing or subsequently
> drilled well by any person without right but who asserts a claim of right in
> good faith or who is acting under an honest belief as to the law or the facts, the
> measure of damages, if there is any right of recovery under existing law, shall
> be the value of the oil or gas at the time of extraction, without interest, after
> deducting all costs of development, operation, and production. The costs shall
> include taxes and interest on all expenditures from the date of the
> expenditures.

Id.  Based on the application of this statute, the plaintiffs seek $45 million in damages.

The defendant and intervenors argue that the federal regulations and Alaska statute

regarding oil trespass damages are not appropriate because the breach of trust

responsibility in this case did not involve the improper taking of oil.

The government correctly argues that 43 C.F.R. § 9239.0-8 is inapplicable because

it applies to trespasses of various kinds on public lands, rather than on private property

such as the Native allotment at issue here.  Looking at the context of this regulation, it is

clear that Subpart 9239 concerns trespasses on only public lands.  43 C.F.R. § 9239.0-8 is

within Subtitle B, "Regulations Relating to Public Lands," of Title 43.  Further, §

---

> the United States in the case of Mason v. United States (260 U.S. 545, 67 L. ed. 396),
> will be the measure of damages prescribed by the laws of the State in which the
> trespass is committed, unless by Federal law a different rule is prescribed or
> authorized.
>
> 43 C.F.R. § 9239.0-8.

9239.0-3 provides, "(a) Sections 9239.0-3 to 9239.7 are issued under the authority of R.S. 2478; 43 U.S.C. § 1201.  (b) <u>In addition to liability for trespass on the public lands, as indicated in this part</u>, persons responsible for such trespass may be prosecuted criminally under any applicable Federal law. . . ."  24 C.F.R. § 9239.0-3 (emphasis added).  Thus the status of the allotment at issue precludes application of 43 C.F.R. § 9239.0-8. Accordingly, the court has no occasion to apply the Alaska oil trespass statute by way of 43 C.F.R. § 9239.0-8.

Additionally, an examination of the Alaska statute confirms that it does not apply in any case, because BPX's actions did not involve an unlawful taking of oil owned by the plaintiffs, but instead the use of the plaintiffs' land for production and transportation of the oil.  The Alaska statute provides:

> If oil or gas has been or is extracted from any existing or subsequently drilled well by any person without right but who asserts a claim of right in good faith . . . the measure of damages . . . shall be the value of the oil or gas at the time of extraction, without interest, after deducting all costs of development, operation, and production.  The costs shall include taxes and interest on all expenditures from the date of the expenditures.

Alaska Stat. § 31.30.010.  This statute's plain language indicates that it applies where the taking of oil, rather than the use of land, is a trespass.  Such a reading makes the provided measure of damages sensible, as the value of the oil taken, minus costs, is an appropriate measure in a situation where a defendant, without right, extracted plaintiff-owned oil from the plaintiff's land.  Further, as the intervenors point out, the statute seemingly codifies the so-called "mild" rule for good faith trespass to minerals, requiring the

trespasser to pay damages based on a royalty rate or the market value of the minerals minus costs.  See Alyeska Pipeline Serv. Co. v. Anderson, 629 P.2d 512, 526 (Alaska 1981); Alaska Placer Co. v. Lee, 553 P.2d 54, 57 (Alaska 1976); Dan S. Dobbs, Law of Remedies § 5.3(2) (2d ed. 1993) (distinguishing claims for diminished value of a severed article from diminished value of the land).  The plaintiffs' suggestion that this language applies to a situation where the plaintiffs own only the land used in production of the oil, but not the oil itself, deprives the statute of this meaning by arbitrarily broadening the range of contexts where this measure of damages would apply.  In such circumstances, damages based on the Alaska oil trespass statute are wholly inappropriate.

4.    Present fair annual rental is the appropriate measure of breach of trust damages.

Having eliminated restitution and statutory oil trespass as proper measures for damages in this case, the court next addresses the plaintiffs' remaining argument, that damages for the government's breach of trust should be measured by considering the present fair annual rental ("PFAR") for BPX's use of their property beyond the scope of the lease.  While the parties' arguments differ as to the proper methodology for determining PFAR, they all agree that PFAR is a proper way to conceive of damages in this case.

The court concurs.  In order to restore the plaintiffs to the position they would have been in but for the government's failure to discover BPX's breach and take appropriate action against BPX, appropriate damages are those that compensate the plaintiffs for

29

BPX's breach of the lease.  A number of cases indicate that PFAR is indeed the correct measure of breach of trust damages in the context of improper use of Indian-owned property.  See, e.g., Oneida Indian Nation of N.Y. State v. Oneida County, 719 F.2d 541 (2d Cir. 1983); Hammond v. County of Madera, 859 F.2d 797, 803 (9th Cir. 1988); Watson v. United States, 263 F. 700, 702 (9th Cir. 1920); Cayuga Indian Nation of N.Y. v. Pataki, 165 F. Supp. 2d 266, 282-83 (N.D.N.Y. 2001), rev'd on other grounds, 413 F.3d 266, 274-78 (2d Cir. 2005); Alaska v. 13.90 Acres of Land, 625 F. Supp. 1315 (D. Alaska 1985), aff'd Etalook v. Exxon Pipeline Co., 831 F.2d 1440 (9th Cir. 1987); Thrift Shop, Inc. v. Alaska Mut. Sav. Bank, 398 P.2d 657, 661 (Alaska 1965).

The court will now focus on whether there are any legal constraints on the application of PFAR in this case.

### D.     Limitations on the Use of PFAR

The court agrees with the parties that it will need expert opinion to reach a determination as to what constitutes PFAR in this case.  However, because the breach of trust at issue arose in the context of an existing lease, the court will examine which, if any, of those lease provisions apply and whether there are any other legal constraints on determining PFAR in this case.

Contrary to the intervenors' argument, the court is not bound to measuring the damages due in this case strictly by reference to the existing lease between BPX and the Oenga heirs.  The intervenors argue that using a PFAR approach to setting damages for

the government's breach should be based squarely on the lease restrictions and limited by the periodic appraisals conducted by the BIA that set the rent for the allotment under the lease between the Oenga heirs and BPX.  First, the intervenors argue that these appraisals included a valuation of the right to bring oil from the Lisburne PA onto the allotment because the appraisals encompassed the plaintiffs' fee simple estate.  Under this theory, the intervenors argue, the plaintiffs have already received compensation for BPX's use of the allotment for purposes outside the scope of the lease, and there were no additional rights with additional value that BPX violated.  Accordingly, the intervenors conclude, the plaintiffs are not entitled to any additional payments.

Alternatively, the intervenors argue that if the plaintiffs are entitled to damages based on Lisburne PA production, the amount should be based on a percentage of the rent set by the appaisals conducted under the lease reflecting the additional oil produced from the Lisburne PA.  In other words, the intervenors argue that the appraisals are an appropriate and objective measure for determining PFAR by comparing the level of use for the Lisburne PA to the level of use elsewhere.

The plaintiffs counter that the appraisals are not binding because they are invalid under 25 C.F.R. Part 162 in that they have not accurately reflected the fair rental value of the allotment.  The plaintiffs contend that the lease constraints on appraising the allotment are not consistent with 25 C.F.R. Part 162's requirement that "no lease shall be approved or granted at less than the present fair annual rental."  25 C.F.R. § 162.604(b) (2001).  In

particular, ¶ 5 of the lease requires:

> [Rental] adjustments will be based upon either the fair market undeveloped rental value for the property established by a [BIA] appraisal . . . or the adjustment will be based on the application of a 'Cost adjustment Factor'; whichever is greater. . . . It is understood by all parties that the rental payments will not escalate by more than 50% in any single five (5) year period.

Lease ¶ 5.

The plaintiffs go further to assert that PFAR should be based on the volume of oil produced from the Lisburne PA through the facilities on the plaintiffs' allotment, using as a benchmark the facility charge in dollars per barrel ("$/bbl") that BPX charges other companies for use of those facilities.  The plaintiffs argue that the $/bbl access fee is useful for determining the value of the allotment to the oil companies using it.  The plaintiffs' theory is that the $/bbl charge represents the value of both the land and the production facility on it, and subtracting the cost of the facility should isolate the value of the land.  Put simply, the plaintiffs suggest that the court multiply this access fee by the volume of oil produced from the Lisburne PA though the allotment and then subtract the amount of BPX's investment related to that production facility.

In this same vein, the plaintiffs argue that the court should look to royalties and other consideration used in comparable arrangements between Native landowners and oil companies, or employ an approach that looks to the cost savings achieved by BPX's use of the allotment for Lisburne production versus the alternative cost of constructing an off-allotment facility achieving the same results.

The defendant and intervenors counter that use of the plaintiffs' proposed methodologies would result in an inappropriate award for the plaintiffs and that these methodologies are not based on appropriate appraisal practices.  They continue to assert that the BIA appraisals set the appropriate measure of PFAR.

First, the court agrees with the plaintiffs that because production from the Lisburne PA is not within the scope of the lease, restrictions in the lease pertaining to the setting of rent are not binding, and the court is not bound by the earlier BIA appraisals in determining damages for the government's breach in this case.  Uses outside the scope of the lease were, by definition, not covered by the lease.  Damages based on those uses are thus not bound by the lease.  For the same reason, the court is not bound by the other restrictions on rent increases included in the lease, such as the limitation that rental payments under the lease may not increase by more than fifty percent in any five-year period.  See Lease ¶ 5.  The court is also not bound by the lease requirement that appraisals are to be based on the value of the allotment as undeveloped land.  The plaintiffs' allotment now and at the time that the breach began is valuable as an oil production site.

While PFAR in this case is not to be limited by the terms of the existing lease or the appraisals, the appraisals of the plaintiffs' property could be relevant to determining PFAR in this case.  Further, whether royalties, profits, or revenues otherwise derived from oil are relevant to setting PFAR is also a matter the court will not decide until it

hears expert opinion.  Finally, whether the cost of leasing land for an alternative facility built elsewhere to achieve the same results as the Heald Point facility is relevant to determining PFAR based on the uniqueness of the allotment in terms of its proximity to the Lisburne PA is also a matter that the court will not decide before trial.[23]  In sum, the court is not prepared, at this time, to rule on the relevance of any approach to determining PFAR as the measure of the government's breach of trust damages in this case.[24]

### E.       Period of Damages

Having concluded that PFAR will serve as the proper measure of damages, the court now turns to the question of the period of damages for which PFAR is now due. The defendant asserts that should the court find that the regulations in effect following the 2001 amendments imposed a duty to monitor the plaintiffs' allotment, the plaintiffs may only collect damages stemming from BPX's breach during the six-year statute of limitations as calculated from the date of the filing of the Second Amended Complaint, June 17, 2007.  The intervenors likewise argue that the government can only be liable for

---

[23]See in Raven Red Ash Coal Co., where the court used this formulary in an analogous scenario.  There, a defendant had a right-of-way across plaintiffs' land for limited purposes, which he exceeded by bringing 50,000 tons of coal across this easement.  The court awarded the rental value of a completely new easement rather than the incremental rental value of the addition to the existing easement.  Raven Red Ash Coal Co. v. Ball, 39 S.E.2d 231 (Va. 1946); see also Corley v. Orangefield Indep. Sch. Dist., 152 F. App'x 350 (5th Cir. 2006) (in calculating damages for a telecommunications company that exceeded the terms of an easement by transmitting information in addition to electricity on lines crossing plaintiffs' properties, the unique location of some properties made those owners more able to extract a higher payment per square foot than others); Dobbs, supra, § 5.9.

[24]Because the court has concluded that this case involves a breach of lease rather than a trespass, damage theories based on trespass are irrelevant and not addressed.

damages ensuing after the plaintiffs' claim accrued, in 2007.  The intervenors argue that the government would not have been able to collect damages from BPX at that time, because recovery would have been barred by the statute of limitations.

As stated above, the plaintiffs argue that the 2001 amendments to 25 C.F.R. Part 162 imposed a duty upon the United States to monitor and ensure compliance with the lease plus a duty based on the lease arrangement to pursue on the Oenga heirs' behalf an action against BPX to recover for the past breach of the lease.  It is under this theory that the plaintiffs claim they are entitled to damages stemming back to the beginning of production from the Lisburne PA, in 1994.

As the court explained above, the plaintiffs are correct in their assertion that the government had a duty beginning March 23, 2001 to both monitor and enforce the plaintiffs' lease.  The Second Amended Complaint containing the claims now at issue was filed June 17, 2007, thus the jurisdictional requirements of 28 U.S.C. § 2501 (2006) limit the time over which the court may award damages to the period beginning June 17, 2001.  While the duty imposed by these regulations to monitor the lease agreement began more than six years prior to the filing of the plaintiffs' claim, this duty was a continuing one and is subject to the continuing claim doctrine.  This constituted an ongoing breach rather than a single event.  Under the continuing claim doctrine, when a defendant owes a continuing duty, a new cause of action arises each time the defendant breaches that duty.  Cherokee Nation of Oklahoma  v. United States, 26 Cl. Ct. 798, 803 (1992).  ("[T]he

continuing claim doctrine prevents the statute of limitations from protecting an offender in an ongoing wrong, and thereby avoids claims that would be unactionable simply because they commenced prior to the statutory period.").  In <u>Mitchell</u>, the court held that the government's duty to manage a tribe's commercial timber was an ongoing trust obligation, and "[t]hus, the non-performance of the duty is properly viewed as giving rise to a series of actionable breaches."  <u>Mitchell v. United States</u>, 10 Cl. Ct. 787, 789 (1986). "The continuing claim doctrine . . . revives in part those claims that may have first accrued prior to the six year statute of limitations."  <u>Cherokee Nation</u>, 26 Cl. Ct. at 803. Because of the nature of the government's breach, the government's ongoing failure to monitor and ensure compliance with the plaintiffs' lease allows the plaintiffs to recover for those breaches of the government's duty to monitor and enforce the Oengas' lease occurring within the limitations period, which began running June 17, 2001.

The plaintiffs are entitled to a damage award that accounts for the damages the government should have recovered on their behalf had the government fulfilled its trust responsibilities under the regulations and lease in 2001 to stop the lease violation and recover damages.[25]  The government's ability to recover damages from BPX in 2001 would have been subject to the applicable statute of limitations, just as is the plaintiffs' present claim.  Under 28 U.S.C. § 2515 or Alaska Stat. § 09.10.050, recovery would have

---

[25]As noted above, the government is liable for the damages it should have sought from BPX, either as the plaintiffs' representative or because the BIA failed to inform the plaintiffs of their right to pursue damages.

36

been limited to the six years prior to the date of the government's claim against BPX.[26]

Because the government's breach began in 2001, a claim filed at that time would have

resulted in recovery for BPX's breach dating back six years–to 1995.

    In sum, the court finds that the government is liable for breach of trust for the

damages it should have collected from BPX for acting outside the scope of the lease and

for failing to stop the lease violation when it should have monitored the lease and secured

compliance. Because PFAR is the proper measure of damages, PFAR applies to both this

1995-2001 period and to the post-2001 breach of trust violations continuing until BPX

---

[26]The intervenors argue that neither the plaintiffs nor government could, in 2001 or
thereafter, have recovered damages from BPX stemming from BPX's breach of the lease because
such recovery would have been barred by the applicable statute of limitations. This argument
appears to be premised on the idea that BPX committed only one breach of its lease with the
Oengas, occurring in 1994 when BPX began allowing production from the Lisburne PA. This is
incorrect. BPX's use of the allotment for purposes exceeding the scope of the lease occurred
throughout the period from 1994 to 2008. This constituted an ongoing breach rather than a single
event. As stated above, under the continuing claim doctrine, when a defendant owes a
continuing duty, a new cause of action arises each time the defendant breaches that duty.
Cherokee Nation, 26 Cl. Ct. at 803. The cases relied upon by the intervenors are simply not on
point, as both involve scenarios in which none of the ongoing activities potentially giving rise to
a claim occurred within the limitations period. See Simmons v. United States, 71 Fed. Cl. 188,
192-93 (2006) (holding that the continuing claim doctrine could not salvage plaintiffs' claims
where "[n]either the failure to protect against the trespass, nor the failure to prosecute the
trespass, occurred within the limitation period"); Hayes v. United States, 73 Fed. Cl. 724 (2006)
(government's breach arose from a single event rather than a continuing series of wrongs and was
outside the statute of limitations); see also Wells v. United States, 420 F.3d 1343, 1346 (2005)
(distinguishing cases in which a single wrong causes lingering effects occurring during the
limitations period from cases in which wrongs occur during the limitations period, triggering
applicability of the continuing claim doctrine). While BPX's breach of its lease began in 1994,
that breach constituted a series of actionable wrongs continuing through 2001 and beyond. Thus,
the fact that the first moment of the breach occurred in 1994, more than six years prior to the
imposition of the government's duty to monitor the plaintiffs' lease, would not have barred
recovery for the period of six years prior to the filing of a suit for breach of the plaintiffs' lease
had the government fulfilled its trust responsibilities in 2001.

stopped its breach of the lease in 2008.

### F.    Availability of Interest

Whatever the amount of damages the court determines is proper, the plaintiffs argue that interest is due on that amount.  It is established that absent statutory authority, an award of pre-judgment interest against the government is prohibited.  "Interest on a claim against the United States shall be allowed in a judgment of the United States Court of Federal Claims only under a contract or Act of Congress expressly providing for payment thereof."  28 U.S.C. § 2516(a) (2006); see also Mitchell v. United States, 664 F.2d 265, 275 (Ct. Cl. 1981) (en banc).  Recognizing this constraint, the plaintiffs present two alternative theories under which they argue they are due pre-judgment interest.  The first is that the plaintiffs are due the interest that the defendant should have collected from BPX during the period that BPX was breaching the lease.  The plaintiffs point to 25 C.F.R. § 162.615(b), which requires the government to collect interest on past due rents. The plaintiffs argue that when the government breached its fiduciary duties by failing to recover money for BPX's breach, the interest on that past-due amount owed by BPX became part of the principal now due to the plaintiffs.

The plaintiffs' alternative argument is that the government owes interest on the total amount that it failed to collect from BPX, because under 25 U.S.C. § 161a(b), this money would have been deposited in an interest-bearing trust account.  But for the government's breach, the argument goes, the Oenga heirs would have been earning

38

interest on funds collected to remedy BPX's breach.

The government responds that the lease controls on whether interest is due, and ¶ 7 of the lease provides only for interest on payments not made within thirty days of becoming due.  The intervenors similarly argue that the lease does not provide for any collection or payment of interest, and that the applicable regulations only allow collection of interest if it is provided for in the lease.  Also, both argue that the court may not award interest damages unless specifically authorized by statute, and that the plaintiffs have identified no relevant federal statute directing that damages be deposited into an interest-bearing trust account.  Further, the government points out that some of Oenga heirs had their part of the rental payments sent directly to banks where they had taken out loans, and that this portion of the payments did not constitute a "deposit into a trust account."

While case law draws fine distinctions on the subject, the court finds that the plaintiffs are not entitled to interest on the damages they seek.  This is because this is not a case where the government failed to collect rents that were due.  Rather, this is a case where the government failed to seek damages.  It is a subtle distinction, but rather than allowing recovery of rent otherwise due, the court is now using rental value as a proxy for setting the damages for which the government is now liable.  The court can find no statute or regulation that requires payment of interest in this particular circumstance.

The plaintiffs' first argument–that the government owes what interest BPX owed the government–relies on both 25 C.F.R. § 162.615(b) and lease language requiring

payment of interest on overdue rent.  This is not a case of overdue rent.  The government

breached its trust responsibility by failing to stop BPX from using the allotment for

production from the Lisburne PA and by not seeking damages from BPX for such use.  25

C.F.R. 162.615(b) is simply inapplicable.

The plaintiffs' second argument–that the government owes the interest that would

have accrued had BPX paid for its overuse of the allotment, is based on a statute that

directs the government to deposit funds held in trust in interest-bearing accounts.  Much

of the parties' briefing on this issue is devoted to resolving which of two cases, Shoshone

Indian Tribe of the Wind River Reservation v. United States, 364 F.3d 1339, 1352 n.7

(Fed. Cir. 2004), cert. denied, 544 U.S. 973 (2005), or Mitchell, 664 F.2d 265, is

controlling.

In Shoshone, the court held that the Indian plaintiffs were due interest on the

revenues that the government would have collected and held in trust had it not breached

its fiduciary duties, because the government was specifically required by federal statute to

deposit funds into an interest-bearing account.  Shoshone, 364 F.3d at 1352 n.7.  This

breach deprived the Tribes of principal in their trust accounts plus the interest that would

have been generated on that principal.  Id.  The court held, "This decision therefore does

not award pre-judgment interest, but rather awards interest as a part of the damages

sustained by the Government's breach."  Id., citing Short v. United States, 50 F.3d 994,

999-1000 (Fed. Cir. 1995) (Indian plaintiffs who did not receive their rightful shares of

timber proceeds from government had right to interest on their share of proceeds from date of each wrongful distribution; rather than interest on damage award, interest is part of the damage award); see also Peoria Tribe of Indians of Okla. v. United States, 380 U.S. 468 (1968) (awarding interest on potential proceeds from the sale of tribal lands had the government not violated a treaty requiring they be sold at public auctions, rather than private).

The government argues that Shoshone is inapplicable and that the default rule against pre-judgment interest should apply because, in the present case, no federal statute specifically directs the lease rental payments to be deposited into an interest-bearing trust account in this instance.  Indeed, in Mitchell, the court found that where there is no such statute, the plaintiffs were not entitled to interest on funds the government failed to collect under its trust obligations.  Mitchell, 664 F.2d at 275 ("Those sums or their equivalent were never held by the Government for plaintiffs, were not subject to the specific interest provisions we have just discussed, and there is no statute awarding back-interest on such unpaid compensation now awarded by the court in this suit."), aff'd on other grounds, 463 U.S. 206 (1983) 664 F.2d at 275.  The Shoshone court distinguished Mitchell on this ground.  Shoshone, 364 F.3d at 1354.

The plaintiffs, in search of this necessary statutory "hook," point to 25 U.S.C. § 161a(b), which states:

> All funds held in trust by the United States and carried in principal accounts on the books of the United States Treasury to the credit of individual Indians

shall be invested by the Secretary of the Treasury, at the request of the
Secretary of the Interior, in public debt securities with maturities suitable to the
needs of the fund involved, as determined by the Secretary of the Interior, and
bearing interest at rates determined by the Secretary of the Treasury, taking
into consideration current market yields on outstanding marketable obligations
of the United States of comparable securities.

to 25 U.S.C. § 161a(b).  The court in <u>Shoshone</u> specifically recognized 25 U.S.C. § 161a,

along with §§ 155, 161b, and 162a, as being part of the necessary statutory "hook" that

was lacking in <u>Mitchell</u>.  <u>Shoshone</u>, 364 F.3d at 1353 ("We also find merit in the Tribes'

argument that the general provisions for tribal trust management and interest accrual

found in 25 U.S.C. §§ 161a, 161b, and 162a mandate the payment of interest.  When

considered in conjunction with the Government's fiduciary duty to collect revenue from

mineral leases . . . these trust fund statutes create an obligation for the Government to pay

interest on amounts that the Government failed to collect."); <u>see also</u> <u>Short</u>, 50 F.3d at

998 ([25 U.S.C. §§ 161a, 161b, and 162a], in conjunction with the government's fiduciary

duty to Indian tribes, <u>see</u> <u>United States v. Mitchell</u>, . . . give the plaintiffs a substantive

right to damages, including interest . . . ." (internal citations removed)).  However, the

<u>Shoshone</u> court also found this duty to pay interest emanating from 25 U.S.C. § 612,

which governed the specific reservation at issue.  <u>Shoshone</u>, 364 F.3d at 1351-52.

The decisions in Shoshone and Mitchell are difficult to reconcile, but the court

finds that the present case is not distinguishable from Mitchell on the same grounds as

was Shoshone.  <u>Shoshone</u> dealt with funds the government was obligated by statute to

<u>collect and hold in trust</u>, whereas this is a case in which the government failed to secure

damages for the plaintiffs.  Again, the distinction is subtle, but here the measure of breach of trust damages happens to be the fair rental value of BPX's use of the allotment, but the nature of the government's violation is a failure to undertake its responsibilities under applicable regulations and lease provisions to ensure compliance with the lease, <u>not</u> to seek <u>rents</u> that were due to the plaintiffs.  In other words, the damages here are not <u>rent</u> that should have been collected and held in trust, but <u>damages</u> that would have been measured as rent because of the particular type of violation.  Moreover, the damages that the government should have collected in 2001 or should have given the plaintiffs the option to collect would not have been held in trust for the plaintiffs.  Rather, in either context, these damages would have been paid directly to the plaintiffs themselves.  There is nothing in the lease to suggest that damages for breach of the lease were to be held in trust.  Accordingly, the general statutory requirements that the government must earn interest on funds held in trust are irrelevant, and the plaintiffs have identified no statute saying the government may be liable for interest on damages it should have collected that would have not have been held in trust.  Absent the necessary statutory mandate allowing inclusion of interest as part of an award of damages against the government, the court can authorize no such award.

Because the plaintiffs have not identified a statute that would allow for interest, interest on the damages the government should have collected from BPX for breach of its lease will not be part of the damages award to which the plaintiffs are now entitled.

43

## III.    CONCLUSION

For the reasons stated above, the court holds that the government breached its trust responsibilities to monitor the plaintiffs' lease and ensure compliance with its terms in 2001.  Damages that the government should have collected from BPX at that time, plus damages stemming from BPX's continued use of the allotment for purposes outside the scope of the lease are now due to the plaintiffs.  These damages will be measured as the present fair annual rental of the improper use of the allotment.  The precise methodology for determining present fair annual rental will require a fact hearing and expert opinion should this case proceed to trial.  The plaintiffs are not entitled to interest on the damages the government should have collected or allowed the plaintiffs to collect from BPX.

Each of the plaintiffs', defendant's, and intervenors' motions for partial summary judgment with respect to the measure and period of damages is thus **GRANTED-IN-PART** and **DENIED-IN-PART**.  The parties are directed to file a joint status report by March 1, 2010 proposing the next steps in litigation and detailing the remaining issues in this case to be adjudicated, including other production areas in dispute.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge